UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

---

NATIONAL ASSOCIATION OF PRIVATE FUND
MANAGERS; ALTERNATIVE INVESTMENT
MANAGEMENT ASSOCIATION, LIMITED; and
MANAGED FUNDS ASSOCIATION,

    *Plaintiffs*,

v.

SECURITIES AND EXCHANGE COMMISSION,

    *Defendant*.

Case No. 4:24-cv-00250

---

## **COMPLAINT**

1. This case concerns the Securities and Exchange Commission's attempt to vastly expand its authority by adopting a sweeping, unprecedented new interpretation of a 90-year-old statute.  By a 3-2 vote, over two strong dissents, the Commission adopted a final rule (the "Dealer Rule") founded on the novel position that many of the world's largest, most prominent market participants have been operating unlawfully, as unregistered securities "dealers," for 90 years without anyone—including the Commission—having previously noticed.

2. According to the Rule, a "dealer" includes—and, because the statutory text has not changed since 1934, has *always* included—any person whose trading activity "regular[ly]" has the "effect of providing liquidity" to the marketplace.  89 Fed. Reg. 14,938, 14,945/2 (Feb. 29, 2024) (Adopting Release), attached as Ex. 1.  The Rule identifies two "ways in which a person" will be considered to be regularly providing liquidity, but those are "non-exclusive" factors.  *Id.* at

1

14,944/1.  Even if a firm does not qualify as a "dealer" under those factors, the firm can "*still* be a

dealer."  *Id.* at 14,945/2 (emphasis added).

3.      By the Commission's own reckoning, the definition underlying the Rule—based

on factors that appear nowhere in the statutory text, and overlooked by everyone in the nine dec-

ades since the Exchange Act's adoption—could "arguably" capture "all" regular market partici-

pants because *anybody* who trades securities provides liquidity.  87 Fed. Reg. 23,054, 23,062/1

(Apr. 18, 2022) (Proposing Release) ("all market participants who buy or sell securities … argua-

bly contribute to a market's liquidity").  The Rule is so overbroad, so lacking any limiting princi-

ple, and so "clearly a misreading of the statute," that, by the Commission's own admission, it

would mean that everyone from a mutual fund to the Federal Reserve Bank of New York has been

operating as an unregistered "dealer"—a felony, 15 U.S.C. §§ 78o(a)(1), 78ff—since the 1930s.

Comm'r Peirce Dissent (Feb. 6, 2024), tinyurl.com/yb4cvx4w; *see* Adopting Release at 14,959/1-

2 (Federal Reserve Bank of New York), 14,998/2-3 (investment companies, *e.g.*, mutual funds).

4.      The unworkability of this definition is reflected in the exceptions and carve-outs

the Commission created to try and mitigate the definition's absurd results.  The Commission rec-

ognized that the definition is so broad, for example, that the "open market operations" of the Fed-

eral Reserve—a "key" component of the "monetary policy of the United States"—would be illegal

unregistered "dealing."  *Id.* at 14,959/1-2.  So the Commission adopted a smattering of "exclu-

sions" for specific types of entities that never before were considered dealers, carve-outs that have

no basis in the statutory text.  *Id*. at 14,955-61.  That the Commission was forced to arbitrarily

exempt large swaths of the market from its definition proves that the definition goes beyond what

Congress intended.  *See Chamber of Com. v. Dep't of Labor*, 885 F.3d 360, 383 (5th Cir. 2018).

5. To make matters worse, the Commission's sweeping definition does not even represent the outer limit of who counts as a "dealer." The Rule is expressly non-exclusive, with no presumption of compliance if an entity falls outside the definition. *See* Adopting Release at 14,964/2 ("a person may be a dealer … *even if it does not meet the conditions set forth in the … rules*" (emphasis added)).

6. Plaintiffs' members are managers of private funds swept into the Rule. Private funds, such as hedge funds, are pooled investment vehicles—pools of investor assets collectively managed and invested by professional investment managers. Private funds, which are governed by an entirely different regulatory regime devoted specifically to such funds, are *customers* of broker-dealers, who execute trades on behalf of private funds and other investors. The Commission admits that the benefit of regulating private funds as "dealers" would "be very small," Proposing Release at 23,088/1, but expressly acknowledges that the Rule will cover private funds as dealers anyway, Adopting Release at 14,957/3-14,958/2. The Commission estimates that only a dozen or so funds will be swept up in its new definition, but this estimate arbitrarily considers the effect of only a single prong of the Rule, in a single market, and is untethered to any meaningful data or other record evidence. The reach of the *entire* Rule—completely ignored by the Commission—will go much further.

7. The costs of the Rule are enormous. Dealer regulations are not designed for private funds. They are (in the Commission's own words) "inappropriate or untenable," as applied to private funds. Adopting Release at 14,999/2. As the Commission concedes, dealer regulations would (among other things): (1) prohibit private funds from participating in the market for initial public offerings—thereby degrading "the ability of issuers to raise new capital," *id.* at 14,993/1, and undermining a central part of the SEC's mission: facilitating capital formation; (2) subject

private funds to an insurance program that has no conceivable application to their business, *id.* at 14,980/1; (3) sap private funds of existing regulatory protections, Comm'r Peirce Dissent, *supra*; (4) compel private funds to rewrite their governing documents to give their own investors *worse* terms, Adopting Release at 14,988/1 n.570; and (5) subject private funds to a net-capital require-ment that not only was designed for different purposes, but will impose enormous costs on private funds and force them to curtail trading or withdraw from certain markets entirely.  Indeed, the Commission's own staff cannot defend the application of dealer regulations to private funds.  *See, e.g.*, Open Meeting 43:36-43:43 (Feb. 6, 2024), tinyurl.com/4fr9dav6 (Mr. Roy:  "… I'm not an expert on hedge funds ….").

8.      The Commission must live within the bounds of the authority that Congress has given.  The agency's ambition to exercise "more comprehensive regulatory oversight," Adopting Release at 14,939/2, is not a valid basis for the Rule.  The Rule exceeds the Commission's authority under the Exchange Act and is arbitrary and capricious.  Accordingly, the Rule cannot be sustained under the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* ("APA"), and the Court should set it aside in its entirety.

## PARTIES

9.      Plaintiffs are nonprofit membership organizations whose members include hedge fund managers adversely affected by the Rule.  Plaintiffs' members are affected in two ways.  As the Commission acknowledges, they must immediately develop programs and processes to track and compare their investment, trading, and hedging activity relative to the new "dealer" factors adopted in the Rule.  And for members that satisfy those factors, they must register the applicable funds as dealers, subjecting them to an array of regulations such as a prohibition on participating in IPOs, Adopting Release at 14,993/1, requirements to maintain certain levels of "net capital," *id.*

at 14,988, and compulsory membership in an insurance fund designed to protect retail customers, which private funds don't have, *id.* at 14,980/1.

10.     Plaintiff the National Association of Private Fund Managers ("NAPFM") is a Texas non-profit corporation headquartered in Fort Worth, Texas, which was founded to, among other things, provide education to its members and represent their legal and economic interests before the government and in the courts.  As part of this mission, NAPFM has submitted comments on behalf of its members in rulemakings—including in the administrative proceedings below. NAPFM's members manage over $600 billion in assets as of July 2023.

11.     Plaintiff Alternative Investment Management Association, Ltd. ("AIMA") is the global representative of the alternative investment industry, and its members collectively manage more than $3 trillion in hedge fund assets.

12.     Plaintiff Managed Fund Association ("MFA") represents the global alternative asset management industry and its mission is to advance the ability of its members to raise capital, invest, and generate returns for their beneficiaries.  MFA's members manage over $3.2 trillion in assets across a diverse range of investment strategies.

13.     NAPFM's, AIMA's, and MFA's members will need (at minimum) to develop a compliance program to "analyze and monitor [their] trading activit[ies]" relative to the standards adopted in the Rule.  Adopting Release at 14,965/1.

14.     Defendant Securities and Exchange Commission is an agency of the Government of the United States subject to the APA.  *See* 5 U.S.C. § 551(1); *Chamber of Com. v. SEC*, 88 F.4th 1115 (5th Cir. 2023).

## JURISDICTION AND VENUE

15.     The Court has subject-matter jurisdiction under 28 U.S.C. § 1331.  The action arises under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, and the APA, 5 U.S.C. § 500

*et seq.*, which instructs the Court to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations," or is "arbitrary, capricious," or "otherwise not in accordance with law," *id.* § 706(2).

16.    Venue is proper in this District, and in the Fort Worth Division, because Plaintiff NAPFM maintains its principal place of business in Fort Worth, Texas, and no real property is involved in this action.  *See* 28 U.S.C. § 1391(e)(1)(C) (in actions against a federal officer or agency, venue is proper "in any judicial district in which … the plaintiff resides if no real property is involved in the action").

## BACKGROUND

### I.    Congress Purposefully Exempts Private Funds From Federal Registration.

17.    This case concerns the Commission's latest attempt to force private funds, among others, to register with the Commission.

18.    "Private funds," such as hedge funds, are a type of pooled investment vehicle—a pool of investor assets collectively managed and invested by professional investment managers. Unlike more familiar pooled investment vehicles, such as mutual funds, private funds are *private*; they generally are not accessible to non-professional investors (*i.e.*, retail customers).  Instead, private funds generally serve the world's most sophisticated investors, including large institutions such as pension funds and endowments.

19.    Dating back to the enactment of the federal securities laws, Congress (and the Commission) recognized that pooled investment vehicles (also called "investment companies") were not subject to direct regulation under the Exchange Act (as "brokers," "dealers," or otherwise). *See, e.g.*, 2 H.R. Doc. No. 76-279, at 1523 n.434 (1939); H.R. Rep. No. 76-2639, at 10 (1940). Accordingly, in the Investment Company Act of 1940, Congress provided for the registration (as

"investment companies") of some pooled investment vehicles.  But, critically, Congress exempted private funds.  Because private-fund investors, due to their size and sophistication, are assumed to be capable of protecting their own interests, Congress deliberately exempted private funds from the prescriptive regulatory regime—including Commission registration—applicable under the Investment Company Act to mutual funds and other publicly offered investment vehicles.  *See generally Goldstein v. SEC*, 451 F.3d 873, 875 (D.C. Cir. 2006).

20.     Instead, Congress created a separate regulatory regime for private funds.  That regime, which generally leaves private funds and their investors to structure their own business relationships, provides for the registration—as investment advisers, not dealers—of many advisers to private funds and requires certain reports, among other things.  *See, e.g.*, Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, §§ 401-19, 124 Stat. 1376, 1570 (2010) ("Private Fund Investment Advisers Registration Act of 2010").

## II.     The Commission Tries, and Fails, to Impose Registration and Other Requirements on Private Funds.

21.     Congress's light-touch approach with respect to private funds has proven remarkably successful.  Over the years, private funds have returned trillions of dollars in gain to investors, far exceeding the returns available from other investment options.  Today, investments in private funds are valued at some $26.6 trillion.

22.     Nevertheless, and despite private funds' unparalleled track record of success, the Commission has, from time to time, sought "a hook on which to hang more comprehensive regulation" of private funds.  *Goldstein*, 451 F.3d at 882.

23.     As noted, private funds are not unregulated.  Most private-fund managers must register as investment advisers.  And private funds are also subject to numerous requirements regarding risk pursuant to Federal Reserve Regulations T, U, and X, 12 C.F.R. §§ 220.1 *et seq.*, 221.1 *et*

7

*seq.*, 224.1 *et seq.*, and the Commission's Market Access Rule, 17 C.F.R. § 240.15c3-5 *et seq.*, short selling pursuant to Regulation SHO, *id.* § 240.200 *et seq.*, restrictions on participating in certain offerings under Rule 105 of Regulation M, *id.* § 242.105, as well as anti-fraud prohibitions under Commission Rule 10b-5, *id.* § 240.10b-5, to name a few of the many regulations governing private funds and their activities.

24.     But over time, the Commission has sought to expand its authority over private funds.  In 2004, for example, the Commission complained that although private funds had "become significant participants in the securities markets," and "provide[d] liquidity to the markets," private funds were not required to register with the Commission.  69 Fed. Reg. 72,054, 72,056, 72,060 (Dec. 10, 2004).  The Commission, by a 3-2 vote, tried a workaround.  It acknowledged that the investment advisers (the fund managers) to private funds were, under the plain text of the Investment Advisers Act, exempt from registration with the Commission (as "investment advisers") because they typically advised only one client (the fund itself).  *Id.* at 72,054-55.  So the Commission tried to redefine "client."  The Commission declared that fund managers really had thousands of clients (all of the individual investors in the funds they managed), rather than just one client (the fund itself).  *Id.* at 72,058.  So, the Commission said, the fund managers for private funds were required to register with the Commission, after all.  *Id.*

25.     The D.C. Circuit struck down the Commission's redefinition.  *See Goldstein*, 451 F.3d at 882.  The court recognized that the Commission could "not accomplish its objective"— "more comprehensive regulation" of private funds—"by a manipulation of meaning" of longstanding statutory words.  *Id.*

26.    Last year, the Commission tried again, by another 3-2 vote.  Once again, the Commission complained that although "private fund assets under management have steadily increased," private funds were generally exempt from prescriptive Commission regulation.  88 Fed. Reg. 63,206, 63,207 (Sept. 14, 2023).  Turning to an ancillary provision in the Dodd-Frank Act enacted about a decade earlier, and which does not mention private funds, the Commission claimed to have found authority to comprehensively regulate the internal affairs of private funds.  *See id.* at 63,214.  Plaintiffs and others are currently challenging that effort to unlawfully expand the SEC's reach over private funds.  *See Nat'l Ass'n of Priv. Fund Managers v. SEC*, No. 23-60471 (5th Cir.).

## III.    The Commission Adopts Its Overbroad "Dealer" Rule to (Again) Try to Force Registration by Private Funds, Among Others.

27.    In the Rule on review, the Commission has returned again to "manipulat[e] the meaning" of language to force registration and other requirements on private funds.  *Goldstein*, 451 F.3d at 882.  As part of the Commission's "aggressive agenda" that its own Inspector General has criticized in an extraordinary report, *The Inspector General's Statement on the SEC's Management and Performance Challenges, October 2022*, at 3 (2022), the agency, by 3-2 vote, adopted the Dealer Rule.

28.    The Rule purports to interpret the statutory term, "dealer," which was expressly defined by Congress in Section 3(a)(5) of the Securities Exchange Act of 1934.  *See* 15 U.S.C. § 78c(a)(5)  (defining dealer as "any person engaged in the business of buying and selling securities … for such person's own account through a broker or otherwise" except when "not as part of a regular business"); *see also id.* § 78c(a)(44) (defining "government securities dealer").  According to the majority of the Commission, the word "dealer" actually includes any person whose trading activity "regular[ly]" has the "effect of providing liquidity" to the marketplace, which

seemingly describes every private fund.  Adopting Release at 14,945/2; *see* Comm'r Uyeda Dissent (Feb. 6, 2024), tinyurl.com/325mhpay.

29.     The Rule adopts two "qualitative" tests for determining whether a person "regular[ly]" has the "effect of providing liquidity" to the marketplace.  But those tests are non-exclusive:  "No presumption shall arise that a person is not a dealer … solely because that person does not satisfy [the standards set forth in the Rule]."  Adopting Release at 15,009/2.

30.     Commissioners Uyeda and Peirce dissented.  Commissioner Uyeda described the Commission's overbroad conception of what constitutes "dealing" as "arbitrary and even tyrannical."  Comm'r Uyeda Dissent, *supra*.  He explained that the Commission lacked authority to expand a statutory term, "dealer," that Congress *itself* defined in 1934.  *Id.*  As Commissioner Uyeda detailed, the Exchange Act's definitions of "dealer" and the related term "broker" "generally reference *how* customer securities transactions are effectuated."  *Id.* (emphasis added).  The definitions have no relation to private funds, who trade only for themselves, and not to effectuate "customer orders."  *Id.*  Commissioner Uyeda further explained that the existing "dealer" regulatory regime has no rational application to private funds, and that forcing private funds to register as "dealers" would cause private funds to *curtail* their trading, the exact opposite of what the Commission in the Rule purported to want.  *Id.*

31.     Commissioner Peirce agreed with Commissioner Uyeda that the Commission lacked statutory authority to redefine the word "dealer."  Comm'r Peirce Dissent, *supra*.  She explained that the Rule was "absurd[ly]" overbroad and had nonsensical consequences.  *Id.*  "Not only" would the Rule "subject [private funds] to a dealer regulatory regime that does not make sense for them," it would cause private funds to "lose the [regulatory] protections now afforded to

them." *Id.*  Worst of all, Commissioner Peirce explained, the Rule would drive private funds out of the markets, and thus "dampen liquidity provision"—not increase it—across the board.  *Id.*

## IV.   The Dealer Rule Exceeds the Commission's Statutory Authority, Is Arbitrary and Capricious in Violation of the APA, and Is Otherwise Unlawful.

32.    The Dealer Rule exceeds the Commission's statutory authority and is arbitrary and capricious, and, under the APA, the Court should set it aside in its entirety.

### A.    The Exchange Act Does Not Authorize the Dealer Rule.

33.    The new theory underlying the Rule—that a "dealer" includes any person whose trading activity "regular[ly]" has the "effect of providing liquidity" to the marketplace, Adopting Release at 14,945/2—cannot be right.  The Rule is "so broad that the Commission itself has determined that it needed to expressly exclude [registered] investment funds," and even the Federal Reserve Bank of New York, among numerous other entities, to attempt to deal with the overbreadth.  Comm'r Peirce Dissent, *supra*; Adopting Release at 15,009.  That "a cure was needed" at all "'should have alerted [the Commission] that it had taken a wrong interpretive turn.'"  *Chamber of Com. of U.S. v. Dep't of Labor*, 885 F.3d 360, 383 (5th Cir. 2018).  Investment companies, for example, have *never* been thought to be regulated by the Exchange Act, and Congress in fact created a specialized regulatory framework for them under a *different* statute—the Investment Company Act of 1940, 15 U.S.C. § 80a-1 *et seq*.  The Commission is "not free to 'adopt [so] unreasonable [an] interpretation[]'" of the Exchange Act that it sweeps in entities never before considered to be dealers and "then edit other statutory provisions to mitigate the unreasonableness."  *UARG v. EPA*, 573 U.S. 302, 328 (2014).

34.    The error of the Commission's new interpretation is also evident in the mismatch between the rules the agency developed over decades to regulate dealers for the protection of customers, and the entities—such as hedge funds—that now would be subject to those ill-fitting rules.

Those rules are not designed for private funds and cannot rationally be applied to the funds' business model. *See infra* ¶¶ 45-47; *see also* Comm'r Peirce Dissent, *supra*. This is because private funds are not dealers.

35. The Rule, in fact, has no basis in the "original meaning of the statute," *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019), and its definition already has been rejected by this Court. In *Chapel Investments, Inc. v. Cherubim Interests, Inc.*, the Court explained that a firm, like a private fund, that trades *only* for "its own best interests," and "not [to] provide advice or services to other investors," "cannot be considered a dealer." 177 F. Supp. 3d 981, 990-91 (N.D. Tex. 2016); *see* Comm'r Uyeda Dissent, s*upra* ("Historically, dealers had customers. The Exchange Act's definitions of 'broker' and 'dealer' generally reference how customer securities transactions are effectuated. 'Brokers,' acting as agents, trade 'for the account of' the customer. 'Dealers' take the opposite side of a customer's trades in their 'own account.'" (footnotes omitted) (quoting 15 U.S.C. § 78c(a)(4), (5)). And nothing in the text of the statutory definition mentions liquidity.

36. The Commission's unexplained departure from past precedent making clear that providing liquidity, by itself, is not sufficient to make somebody a "dealer" further buttresses the point that the Rule is overbroad. *See infra* ¶ 59. *Compare, e.g.*, Adopting Release at 14,938/3 (claiming that firms with a "significant share of market volume" should be "registered with the Commission as … dealers"), *with Adoption of Rule 15Ba2-1*, 1975 WL 163406, at *4 (Oct. 15, 1975) ("[T]he nature of a bank's activities, rather than the volume of transactions or similar criteria, are of greater relevance in determining when a bank is a municipal securities dealer.").

   **B.   The Rule Is Arbitrary and Capricious.**

37. In addition to exceeding its statutory authority, the Commission, in adopting the Dealer Rule, failed to engage in reasoned decisionmaking, contrary to the requirements of the

APA.  The Commission imposed on private funds a regulatory regime that is unwarranted, unworkable, and will ultimately be harmful to markets and investors alike.  The Commission then set a compliance deadline that is impossible to meet.

### 1.      The Rule Is Unnecessary.

38.      The Commission has not demonstrated a need for placing unprecedented regulatory burdens on private funds.  Indeed, the Commission concedes that the benefit of regulating private funds as "dealers" would be "very small."  Proposing Release at 23,088/1.

39.      The Commission suggests that imposing "dealer" regulations on private funds would make them less likely to discontinue trading in turbulent markets.  But dealer regulations "are designed to protect customers, not to address whether … [firms] might stop trading during market turmoil."  Comm'r Uyeda Dissent, *supra*.  As the Commission acknowledges, broker-dealer net capital rules are "designed to ensure that broker-dealers … have sufficient liquid capital to protect the assets of customers and to meet their responsibilities to other broker-dealers."  Adopting Release at 15,002/2.  Trading during turbulent markets has nothing to do with it.  Moreover, the Commission concedes that the Dealer Rule will have a "negative effect" on overall market liquidity, *id.* at 14,996/1, as firms affected by the Rule will "curtail or cease the trading activities described in the final rule rather than submit to dealer registration," *id.* at 14,994/1.  The Commission does not, and cannot, rationally explain how "reducing liquidity provision ex ante" will "solve the problem of inadequate liquidity provision in times of crisis."  Comm'r Peirce Dissent, *supra*.

40.      The Commission also claims that the Rule will give the Commission "more comprehensive regulatory oversight."  Adopting Release at 14,939/2.  But Congress has *already* determined the appropriate level and manner of oversight of private funds.  *See supra* ¶¶ 19-20, 23.  And "being an effective regulator does not require comprehensive surveillance and a prescriptive regulatory regime governing the activities of every market participant" anyway.  Comm'r Peirce

Dissent, *supra*.  The Commission, in any event, *already* has access to substantial data, and market participants, whether registered as "dealers" or not, are already subject to anti-fraud and anti-manipulation rules, *see, e.g.*, 15 U.S.C. § 78j(b), and otherwise constrained by regulatory risk limits, *see, e.g.*, 17 C.F.R. § 240.15c3-5.  Comm'r Uyeda Dissent, *supra*.

41.    Lastly, the Commission asserts that the Rule is "expected to benefit currently registered dealers by ensuring that all of their competitors, including currently unregistered market participants, are subject to common regulatory requirements."  Adopting Release at 14,978/1-2.  But that "entails a fundamental economic fallacy," Comm'r Uyeda Dissent, *supra*, and has matters backwards:  private funds are *customers* of broker-dealers, not their *competitors*.  Broker-dealers compete *for* private funds' execution and other trading business.  Report of the President's Working Group on Financial Markets 9 (1999).

### 2.    The Rule Will Irrationally Create Harmful, Counterproductive Consequences.

42.    Besides being unnecessary, by subjecting private funds to "a costly and ill-fitting regulatory regime," the Dealer Rule will create harmful, counterproductive consequences. Comm'r Peirce Dissent, *supra*.

### a)    The Rule Promotes the Very Outcome—*Less* Liquidity—That it Seeks to Avoid.

43.    As discussed, the Commission suggests that imposing "dealer" regulations on private funds and others will make them less likely to discontinue trading in turbulent markets.  But the Rule will promote "the very outcome that it seeks to avoid," Comm'r Uyeda Dissent, *supra*, because it is undisputed that the Rule will have a "negative effect" on overall market liquidity, Adopting Release at 14,996/1.  The Commission offers no reason to believe that *reducing* liquidity overall will *increase* liquidity in times of crisis.  Comm'r Peirce Dissent, *supra*.

44.     Trading in U.S. government bonds issued by the Treasury Department will be especially adversely affected.  The Rule will "reduce liquidity in the Treasury markets, make them more volatile, reduce the number of liquidity providers, and increase debt costs to taxpayers." Comm'r Uyeda Dissent, *supra*; *see also* Committee on Capital Markets Regulation Comment 1 (Oct. 19, 2022), tinyurl.com/bdhruptu ("[T]he Proposal would reduce liquidity in the U.S. Treasury markets potentially increasing the severity and frequency of significant volatility in such markets with negative implications for financial stability.").

> **b)     The Rule Imposes on Private Funds a Regulatory Regime that Is Unworkable.**

45.     The Rule will also subject private funds to a regulatory regime that the Commission admits "may be inappropriate or untenable."  Adopting Release at 14,999/2.  Dealer regulations are designed "to protect the assets of customers," *e.g.*, *id.* at 15,002/2; *accord* Comm'r Uyeda Dissent, *supra*, but private funds do not trade with customers.  The result is nonsensical, and even the Commission's staff cannot explain how private funds could fit within a regulatory regime that is built for an entirely different business model.  *See, e.g.*, Open Meeting 43:09-43:43, *supra* (Comm'r Peirce: "[H]ow does the relationship of the … private fund with its broker dealer change if it becomes a dealer under this new rule?"  Mr. Roy:  "… I'm not an expert on hedge funds, so I really don't want to get into that too much ….").

46.     The Dealer Rule will, among other things, force private funds to join an insurance fund (the Securities Investor Protection Corporation), and pay a tax on their revenue to support that fund, to protect customer accounts that do not exist.  Adopting Release at 14,980/1.  At the same time, by labeling private funds "dealers," the Dealer Rule will cause affected firms, which are themselves *customers* of broker-dealers, to "lose the [regulatory] protections now afforded to them as customers."  Comm'r Peirce Dissent, *supra*.  The "dealer" label will also force private

funds to keep investors' capital "off-limits to withdrawal for at least one year." Adopting Release at 14,988/1 n.570. According to the Commission, funds will "need to renegotiate contracts with investors to provide for a one-year lockup period." *Id.* The result of all of this is a net *loss* of regulatory protections for everyone.

47.    Moreover, by virtue of other "dealer" regulations (which are not designed for private funds), the Commission acknowledges that private funds will need to "stay out of the IPO market," which "could impact the ability of issuers to raise new capital, as well as reduce efficient pricing in new issues." Adopting Release at 14,993/1. In other words, the Commission is directly undermining a key part of its mission: to facilitate capital formation. This could cause an investor exodus from certain funds that must register as dealers, potentially forcing those funds to liquidate.

c)    **The Rule Is Overly Broad, and the Commission Failed to Address Substantial Comments Pointing that Out.**

48.    The Rule is overly broad in a number of ways, unaddressed by the Commission, and will for that reason create significant uncertainty as to the scope of the Rule. As a result, many firms will curtail their trading to avoid being swept into the Commission's overbroad conception of a "dealer."

49.    The "dealer" factors the Commission adopted are themselves arbitrarily broad. For example, the Commission states that a firm is a "dealer" if it "[r]egularly" expresses trading "interest" at or near the best available price on both sides of the market. Adopting Release at 15,009/1. As the Commission defines these terms, this factor seemingly captures *anyone* "who make[s] money by buying low and selling high." Comm'r Uyeda Dissent, *supra*. "Regularly," in the Commission's view, means "more than a few isolated" times, Adopting Release at 14,948/2 n.104, and expressing trading interest, the Commission says, includes any "order," *id.* at 14,949/3, and

does not require "simultaneous" action on both sides of the market, *id.* at 14,951/2.[1]  Thus, if a firm buys stock now, and sells it for a profit a few minutes, hours, or even days later—and repeats this a few times—that, in the Commission's view, might make the firm a "dealer."

50.     Similarly, according to the Commission, if a firm "[e]arn[s] revenue primarily from capturing bid-ask spreads, by buying at the bid and selling at the offer, or from capturing any incentives offered by trading venues to liquidity-supplying trading interest," it, too, is a "dealer." Adopting Release at 15,009/1.  But even the Commission admits that it is unable to empirically "distinguish between trades that capture the bid-ask spread and trades that profit from intraday price movements." *Id.* at 14,972/1; *see* Comm'r Uyeda Dissent, *supra*.

51.     The Commission also failed to consider that many funds employ multiple, independent strategies for investing, thereby reducing risk to funds and their investors through diversification.  *See The Hedge Funds That Changed the Game*, Wall St. J. (Feb. 23, 2024), tinyurl.com/2s47ub4k ("Known as multimanager firms, they divvy up money across as many as hundreds of specialized investment teams with the aim of producing steadier returns that are uncorrelated to broader markets.").  Commenters explained to the Commission that these independent trading strategies, by coincidence, may often result in the fund buying and selling the same security (*i.e.*, expressing a trading interest at or near the best available price on both sides of the market).  But in no world would any reasonable person consider that dealing.  *See, e.g.*, MFA Comment 31-32 (May 27, 2022), tinyurl.com/42w2e4sy; NAPFM Comment 3 (May 27, 2022), tinyurl.com/y7c5fm3a.  The Commission "failed to respond to [these] comments" entirely, in clear

---

[1]   Commenters specifically warned that "unless this test was limited to *simultaneous* quotations on both sides of the market," it "would be extraordinarily overbroad."  MFA Comment 26 (May 27, 2022), tinyurl.com/42w2e4sy.  As with other significant comments, however, the Commission rejected these comments without a rational explanation.

violation of the APA. *Chamber of Com.*, 85 F.4th at 780. The Commission claimed to have addressed commenters' concerns by amending the Rule so that "dealer" status was not assessed *across* legal entities. Adopting Release at 14,963/1. But that missed the point: different portfolio managers often operate within the *same* legal entity, and assessing "dealer" status across independent strategies is irrational and risks sweeping in any fund that pursues a multi-strategy approach.

52.     The Commission's sweeping definition does not even represent the outer limit of who counts as a "dealer." Although the Commission claims to have narrowed the rule from the proposal, the Commission adopted "a 'no presumption' clause to clarify that a person may be a dealer if it engages in a regular business of buying and selling securities for its own account, *even if it does not meet the conditions set forth in the ... rules*." Adopting Release at 14,964/2 (emphasis added). The Commission stated that "[n]o commenters suggested changes to the proposed no presumption clause," so the Commission adopted the "provision as proposed." *Id.* But commenters *did* object, repeatedly. MFA, for example, explained that it would "be arbitrary and capricious for the Commission to finalize a Proposal intended to define a term, but then not define it," by leaving the definition entirely open-ended. MFA Comment, *supra*, at 5. That is particularly true, MFA explained, when the Commission is simultaneously pursuing enforcement actions in federal court under an even broader theory that would make *every* professional trader in the United States a "dealer." *Id.* at 5-6. Other commenters pressed the same point. *See, e.g.*, AIMA Third Comment 2-3 (Aug. 21, 2023), tinyurl.com/9edbyt2f; Overdahl Comment ¶ 36 (May 27, 2022), tinyurl.com/y5jafm8u; Small Public Company Coalition Comment 6 (May 27, 2022), tinyurl.com/mnu8npx4. The Commission ignored these problems with the "no presumption" clause, which renders the dealer definition no definition at all, since it sets no limits.

53.     Indeed, the Commission's new "dealer" definition is so indeterminate the Commission can only say that staff will "withdraw" prior interpretations of "dealer" that are inconsistent with the Rule.  Adopting Release at 14,940/1 n.14.  Even the Commission cannot tell anyone *which* interpretations no longer stand, or why.

### 3. The Commission Failed to Adequately Consider the Rule's Impact on Efficiency, Competition, and Capital Formation.

54.     In adopting this unnecessary, costly, and counterproductive Rule, the Commission also violated its heightened statutory duty to consider its rules' impacts on "efficiency, competition, and capital formation," 15 U.S.C. § 78c(f), an independent statutory violation and yet another respect in which the Rule is arbitrary, capricious, and not in accordance with law.  Such failures by the Commission to adequately "'apprise itself'" of the "'economic consequences'" of its rules have repeatedly resulted in invalidation of Commission rules.  *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011); *see also Am. Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166 (D.C. Cir. 2010); *Chamber of Com. v. SEC*, 412 F.3d 133, 140-44 (D.C. Cir. 2005).  Here, the Commission "failed once again" to fulfill this statutory duty.  *Bus. Roundtable*, 647 F.3d at 1148.  Its economic analysis is illogical, incomplete, and conspicuously lacks any finding that the Rule "will" promote efficiency, competition, or capital formation.  15 U.S.C. § 78c(f).

55.     The Commission concedes that the Rule will have "negative effects on market liquidity and efficiency," will disproportionately burden smaller firms, and, at best, will have "mixed" effects on capital formation.  Adopting Release at 14,996-97.  That is a reason to *abandon* the Rule, not to adopt it.

56.     In downplaying these negative effects, the Commission argues that the Rule will impact "fewer" firms than under the proposal, *id.* at 14,994/2, but that assertion has no basis in the record, and it is wrong.  The Commission entirely failed to consider the sweep of the Rule in the

equity markets, made no estimate on the coverage of one of the two prongs of the Rule, and, as discussed above, failed to consider the Rule's overbreadth in multiple respects. This is an "important aspect of the problem" the Commission failed to deal with. *Chamber of Com.*, 85 F.4th at 777.

57.     The Commission's economic analysis is also inadequate because it failed to consider the aggregate impact of recent rulemakings. The "cumulative effect" of related rulemakings is "unquestionably an important aspect of the problem" that the Commission must consider. *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 246 (5th Cir. 2023). Here, however, the Commission expressly ignored all pending rulemakings. Adopting Release at 14,965/1-2. And although the Commission purported to consider recently adopted rules, *id.*, the Commission did not meaningfully address them. The Treasury Clearing Rule, for example, addresses many of the same risks purportedly addressed by the Dealer Rule, *id.*; *see also* AIMA Second Comment 1-2 (Nov. 17, 2022), tinyurl.com/55ds8re2, and the Commission does not explain *why* the additional Dealer Rule is needed. It says that the two rules address the same risks "through different mechanisms," Adopting Release at 14977/2, but that says nothing about whether one rule obviates the need for the other.

58.     Finally, in failing to adequately account for the Rule's impact on efficiency, competition, and capital formation, the Commission independently violated Section 23(a)(2) of the Exchange Act, which prohibits the Commission from adopting a "rule or regulation which would impose a burden on competition not necessary or appropriate in furtherance of the purposes of" the Act. 15 U.S.C. § 78w(a)(2).

### 4. The Rule Departed Without Reason or Explanation from Prior Commission Positions.

59.     Finally, the Rule is arbitrary and capricious because it departs without explanation from prior Commission policy and practice.  Under bedrock principles of administrative law, an agency "'changing its course must supply a reasoned analysis.'"  *Lone Mountain Processing, Inc. v. Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013).  Here, although the Commission has stated that private funds are "active market participants" that provide "liquidity," *see, e.g.*, Report of the President's Working Group on Financial Markets, *supra*, at 2, the Commission has never before taken the position "that liquidity provision alone by a person trading for its own account constitutes dealing activity or that trading activity becomes dealing activity merely because it has the effect of providing liquidity."  Comm'r Peirce Dissent, *supra*.  In fact, the Commission has repeatedly observed that private funds are "*not*" broker-dealers.  Report of the President's Working Group on Financial Markets, *supra*, at B-1 (emphasis added).

### C. The Compliance Date Is Impossible to Meet.

60.     Finally, the Court should set aside the compliance date and immediately toll all applicable deadlines to prevent significant disruption to U.S. securities markets.  As the effective date looms, private funds will have to develop systems to track the Rule's factors and even then they could not be sure whether they qualify as dealers under the Rule given its sprawling, indeterminate nature.

61.     Moreover, the Commission does not explain how private funds would *ever* be able to register as "dealers," let alone within the one-year compliance period the Commission adopted.  The Commission's assertion—that the entity that reviews applications (the Financial Industry Regulatory Authority, or FINRA) has "'ways to help expedite the processing of applications,'" Adopting Release at 14,964/3—is not credible or responsive to important aspects of the problem, or

consistent with prior Commission actions.  The Commission offers no explanation how FINRA, which is *already* backlogged, *see* Chamber of Digital Commerce Comment 6 (June 13, 2022), tinyurl.com/bd849rpd, could "expedite" the review of applications.  And regardless of *FINRA's* processing speed, the Commission failed to "consider[] the ability" of *applicants* to complete the steps they need to take "to comply with the Final Rule" within one year.  *Louisiana v. Dep't of Com.*, 559 F. Supp. 3d 543, 548 (E.D. La. 2021).  The Commission thus "'failed to consider an important aspect of the problem,'" *id.*, and the compliance date is unlawful for this reason alone.

## COUNT I
## (WITHOUT STATUTORY AUTHORITY)

62.  Plaintiffs incorporate the previous paragraphs as if fully restated here.

63.  The Dealer Rule exceeds the Commission's statutory authority because it captures firms that are not, and have never been considered to be, "dealers" and lacks any limiting principle.

64.  Accordingly, the Dealer Rule is in excess of statutory jurisdiction, authority, or limitations, in violation of 5 U.S.C. § 706(2)(C).

## COUNT II
## (ARBITRARY AND CAPRICIOUS)

65.  Plaintiffs incorporate the previous paragraphs as if fully restated here.

66.  The Dealer Rule is arbitrary and capricious.  Among other things, the Commission failed to engage in reasoned decisionmaking by failing: to provide a reasoned basis for the Rule; to consider important aspects of the problem it believed it faced; to define the term "dealer" in a comprehensible manner; to consider and address relevant comments; to acknowledge and provide good reasons for changing policy positions; and to adequately address the economic consequences of its final action.

67.  Accordingly, the Rule is arbitrary, capricious, and is otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT III
## (CONTRARY TO LAW)

68.     Plaintiffs incorporate the previous paragraphs as if fully restated here.

69.     The Dealer Rule violates Section 23(a)(2) of the Exchange Act because it "impose[s] a burden on competition not necessary or appropriate in furtherance of the purposes of" the Act.  15 U.S.C. § 78w(a)(2).

70.     Accordingly, the Dealer Rule is not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

71.     Plaintiffs pray that this Court:

        a.      Declare that the Rule was promulgated by the Commission in excess of statutory authority or limitations within the meaning of 5 U.S.C. § 706(2)(C) and is arbitrary and capricious and otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

        b.      Vacate and set aside the Rule in its entirety;

        c.      Enjoin the Defendant and all of its officers, employees, and agents from implementing, applying, or taking any action whatsoever under the Rule;

        d.      Issue all process necessary and appropriate to postpone the effective date of the Rule to maintain the status quo pending the conclusion of this case;

        e.      Award Plaintiffs their costs and reasonable attorney's fees; and

        f.      Grant such further and other relief as the Court deems just and proper.

Dated:  March 18, 2024                    Respectfully submitted,


                                          */s/ Dee J. Kelly*
                                          _____
                                          DEE J. KELLY (TX Bar No. 11217250)
                                          KELLY HART & HALLMAN, LLP
                                          201 Main Street, Suite 2500
                                          Fort Worth, TX 76102
                                          (817) 332-2500
                                          dee.kelly@kellyhart.com

                                          EUGENE SCALIA*
                                          HELGI C. WALKER*
                                          MAX E. SCHULMAN*
                                          LAEL D. WEINBERGER*#
                                          MICAH S. QUIGLEY*∞
                                          GIBSON, DUNN & CRUTCHER LLP
                                          1050 Connecticut Avenue, N.W.
                                          Washington, DC 20036-5306
                                          (202) 955-8500
                                          escalia@gibsondunn.com

                                          BRIAN A. RICHMAN (TX Bar No. 24139696)
                                          GIBSON, DUNN & CRUTCHER LLP
                                          2001 Ross Avenue, Suite 2100
                                          Dallas, TX 75201
                                          (214) 698-3100
                                          brichman@gibsondunn.com

_____
* *pro hac vice* application forthcoming
# Admitted only in California; practicing under the supervision of principals of the firm.
∞ Admitted only in Texas; practicing under the supervision of principals of the firm.