# Exhibit 1

## SECURITIES AND EXCHANGE COMMISSION

**17 CFR Part 240**

[Release No. 34–99477; File No. S7–12–22]

RIN 3235–AN10

**Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer in Connection With Certain Liquidity Providers**

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Final rule.

**SUMMARY:** The Securities and Exchange Commission ("SEC" or "Commission") is adopting new rules to further define the phrase "as a part of a regular business" as used in the statutory definitions of "dealer" and "government securities dealer" under sections 3(a)(5) and 3(a)(44), respectively, of the Securities Exchange Act of 1934 ("Exchange Act").

**DATES:**
*Effective date:* April 29, 2024.
*Compliance date:* The compliance date is discussed in section II.B of this release.

**FOR FURTHER INFORMATION CONTACT:**
Emily Westerberg Russell, Chief Counsel; John Fahey, Deputy Chief Counsel; Joanne Rutkowski, Assistant Chief Counsel; Bonnie Gauch, Senior Special Counsel; Shauna Sappington Vlosich, Senior Special Counsel; Geeta Dhingra, Branch Chief; Katherine Lesker, Special Counsel; and Carl Emigholz, Special Counsel at 202–551–5550 in the Office of Chief Counsel, Division of Trading and Markets, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549–7010.

**SUPPLEMENTARY INFORMATION:** The Commission is adopting the following new rules under the Exchange Act: (1) 17 CFR 240.3a5–4 ("Rule 3a5–4"), and (2) 17 CFR 240.3a44–2 ("Rule 3a44–2") (collectively, "final rules").

## Table of Contents

I. Introduction
    A. Background
    B. Overview of the Final Rules and Modifications to the Proposal
II. Discussion of Final Rules
    A. Component Parts
    1. Qualitative Standard
    a. Elimination of the Proposed First Qualitative Factor
    b. Expressing Trading Interest Factor
    c. Primary Revenue Factor
    2. Quantitative Standard
    3. Exclusions
    a. Person That Has or Controls Assets of Less Than $50 Million
    b. Registered Investment Companies, Private Funds, and Registered Investment Advisers
    c. Official Sector Exclusions
    d. Other Requests for Exclusions
    4. Definitions and Anti-Evasion
    5. No Presumption
    B. Compliance Date
III. Economic Analysis
    A. Introduction
    B. Baseline
    1. Rules and Regulations That Apply to Registered Dealers
    2. Affected Parties
    a. Principal Traders
    b. Private Funds and Advisers
    c. Number of Affected Parties
    3. Competition Among Significant Liquidity Providers
    4. Externalities
    C. Economic Effects, Including Impact on Efficiency, Competition, and Capital Formation
    1. Benefits
    a. Regulatory Consistency and Competition
    b. Regulations on Financial and Operational Risk-Taking
    c. Regulations on Reporting
    d. Regulations on Deceptive Practices
    e. Regulations Related to Examinations
    2. Costs
    a. Compliance Costs
    b. Costs Associated With the Net Capital Rule
    c. Potential Implications for Private Funds and Advisers
    d. Effects on Market Liquidity
    3. Effects on Efficiency, Competition, and Capital Formation
    a. Effects on Efficiency
    b. Effects on Competition
    c. Effects on Capital Formation
    D. Reasonable Alternatives
    1. Retain the Quantitative Standard
    2. Retain the First Qualitative Standard (e.g., "Routinely Making Roughly Comparable Purchases and Sales of the Same or Substantially Similar Securities [or Government Securities] in a Day")
    3. Remove the Exclusion for Registered Investment Companies
    4. Exclude Registered Investment Advisers and Private Funds
    5. Require Registered Investment Advisers and Private Funds To Report to TRACE
    6. Carve Out or Narrow Application to Crypto Asset Securities
IV. Paperwork Reduction Act
V. Regulatory Flexibility Act
VI. Other Matters
Statutory Authority

## I. Introduction

The dealer regulatory regime is a cornerstone of the U.S. Federal securities laws and helps to promote the Commission's longstanding mission to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation.[1] Advancements in electronic trading across securities markets have led to the emergence of certain market participants that play an increasingly significant liquidity-providing role in overall trading and market activity—a role that has traditionally been performed by entities regulated as dealers.[2] However, some of these market participants—despite engaging in liquidity-providing activities similar to those traditionally performed by either "dealers" or "government securities dealers" as defined under sections 3(a)(5) and 3(a)(44) of the Exchange Act, respectively, and despite their significant share of market volume—are not registered with the Commission as either dealers or government securities dealers under sections 15 and 15C of the Exchange Act, respectively. The identification, registration, and regulation of these market participants as dealers will provide regulators with a more comprehensive view of the markets through regulatory oversight and will support market stability and resiliency and protect investors by promoting the financial responsibility and operational integrity of market participants that are acting as dealers.[3] Further, the final rules will promote competition among entities that regularly provide significant liquidity by applying consistent regulation to these entities, thus leveling the competitive playing field between liquidity provision conducted by entities that are currently registered as dealers and government securities dealers and by entities that are not.

The Federal securities laws provide a comprehensive system of regulation of securities activity, and the definition of "dealer" is one of the Exchange Act's most important definitions, as it sets forth certain activities that cause persons to fall within the Commission's regulatory ambit.[4] Section 3(a)(5) of the Exchange Act defines the term "dealer" to mean "any person engaged in the

---

[1] *See, e.g., Eastside Church of Christ* v. *National Plan, Inc.,* 391 F.2d 357 (5th Cir. 1968) ("The requirement that brokers and dealers register is of the utmost importance in effecting the purposes of the Act. It is through the registration requirement that some discipline may be exercised over those who may engage in the securities business and by which necessary standards may be established with respect to training, experience, and records."); *see also* section 2 of the Exchange Act, 15 U.S.C. 78b (stating that "transactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are effected with a national public interest which makes it necessary to provide for regulation and control of such transactions and of practices and matters related thereto").

[2] *See* Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer, Exchange Act Release No. 94524 (Mar. 28, 2022), 87 FR 23054 (Apr. 18, 2022) ("Proposing Release").

[3] *See* section III.

[4] *See supra* note 1; *see also Roth* v. *SEC,* 22 F.3d 1108, 1109 (D.C. Cir. 1994).

business of buying and selling securities . . . for such person's own account through a broker or otherwise,'' but excludes ''a person that buys or sells securities . . . for such person's own account, either individually or in a fiduciary capacity, but not as a part of a regular business.'' Similarly, section 3(a)(44) of the Exchange Act provides, in relevant part, that the term ''government securities dealer'' means ''any person engaged in the business of buying and selling government securities for his own account, through a broker or otherwise,'' but ''does not include any person insofar as he buys or sells such securities for his own account, either individually or in some fiduciary capacity, but not as part of a regular business.'' These statutory definitions of ''dealer'' and ''government securities dealer,'' and the accompanying registration requirements of the Exchange Act, were drawn broadly by Congress to encompass a wide range of activities involving the securities markets and their participants.[5] Market participants that meet these statutory definitions are required to register with the Commission and are subject to a panoply of regulatory obligations and supervisory oversight, unless an exemption or exception applies.[6]

Under the Exchange Act, the SEC has the authority to define the terms used in the statutory definitions of ''dealer'' and ''government securities dealer,'' and to oversee and regulate registered dealers.[7] The Commission is adopting new Rules 3a5–4 and 3a44–2 under the Exchange Act to further define what it means to be engaged in the business of buying and selling securities ''as a part of a regular business'' within the definitions of ''dealer'' and ''government securities dealer,'' respectively.[8] The final rules,

which have been modified to narrow the scope of the proposed rules and carefully tailored in response to commenter concerns, will help to ensure that market participants that take on significant liquidity-providing roles are appropriately registered and regulated as dealers and government securities dealers. As discussed further below, the final rules are one way to establish that a person is a dealer or government securities dealer; otherwise applicable court precedent and Commission interpretations will continue to apply.[9]

Registration will enable more comprehensive regulatory oversight of securities markets and those participants that take on significant liquidity-providing roles. The final rules will support market stability and resiliency and protect investors by promoting the financial responsibility and operational integrity of significant liquidity providers that are acting as dealers in the securities markets.[10]

## A. Background

The statutory definition of ''dealer'' in section 3(a)(5) and the accompanying registration requirements of the Exchange Act were drawn broadly by Congress in 1934 to encompass a wide range of activities involving the securities markets and their participants. Section 3(a)(5) of the

Exchange Act defines the term ''dealer'' to mean ''any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise,'' but excludes ''a person that buys or sells securities . . . for such person's own account, either individually or in a fiduciary capacity, but not as a part of a regular business.'' [11] This statutory exclusion from the definition of ''dealer'' is often referred to as the ''trader'' exception.[12] Absent an exception or an exemption, section 15(a)(1) of the Exchange Act makes it unlawful for a ''dealer'' to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security unless registered with the Commission in accordance with section 15(b) of the Exchange Act.[13] Similarly, section 3(a)(44) of the Exchange Act provides, in relevant part, that the term ''government securities dealer'' means ''any person engaged in the business of buying and selling government securities for his own account, through a broker or otherwise,'' but ''does not include any person insofar as he buys or sells such securities for his own account, either individually or in some fiduciary capacity, but not as part of a

---

[5] Unless otherwise indicated, references to ''dealer'' activity apply both with respect to ''dealers'' and ''government securities dealers'' under sections 3(a)(5) and 3(a)(44) of the Exchange Act, respectively; and references to ''security'' apply both with respect to ''security'' and ''government security'' under sections 3(a)(10) and 3(a)(42) of the Exchange Act, respectively. *See* Proposing Release at 23057 (Congress defined ''dealer'' broadly ''to encompass a wide range of activities involving investors and securities markets.''); *Registration Requirements for Foreign Broker Dealers,* Exchange Act Release No. 27017 (July 11, 1989), 54 FR 30013, 30015 (July 18, 1989) (''Foreign Broker Dealer Adopting Release'').

[6] *See* Proposing Release at 23057; Foreign Broker Dealer Adopting Release at 30015.

[7] *See, e.g.,* Exchange Act section 3(b) (authorizes the SEC to define terms used in the Exchange Act, consistent with the provisions and purposes of the Exchange Act, 15 U.S.C. 78c(b)).

[8] On Mar. 28, 2022, the Commission voted to issue the proposed 17 CFR 240.3a5–4 (''proposed Rule 3a5–4'') and 240.3a44–2 (''proposed Rule 3a44–2'') (collectively, ''proposed rules'') to further

define ''as a part of a regular business'' as that phrase is used in the statutory definitions of ''dealer'' and ''government securities dealer.'' *See* Proposing Release. The release was posted on the Commission website that day, and comment letters were received beginning that same date. The comment period closed on May 27, 2022. Comments are available here: *https://www.sec.gov/comments/s7-12-22/s71222.htm.* We have considered all comments received since Mar. 28, 2022.

[9] *See* 17 CFR 240.3a5–4(c) (''Rule 3a5–4(c)'') and 240.3a44–2(c) (''Rule 3a44–2(c)'') (providing that no presumption shall arise that a person is not a dealer or government securities dealer solely because that person does not satisfy the standards of the final rules). As discussed in the Proposing Release and below, the courts and the Commission look to an array of factors in determining whether someone is a ''dealer'' within the meaning of the statute. *See, e.g.,* Definition of Terms in and Specific Exemption for Banks, Savings Associations, and Savings Banks Under Sections 3(a)(4) and 3(a)(5) of the Securities Exchange Act of 1934, Exchange Act Release No. 46745 (Oct. 30, 2002), 67 FR 67496, 67498–67500 (Nov. 5, 2002) (''2002 Release''); *see also* section II.A.5 (explaining that otherwise applicable interpretations and precedent continue to apply to determine whether a person is acting as a dealer, even when that person does not fall within the requirements of the new rules); section II.A.3 (explaining that the $50 million threshold is not an exclusion from the ''dealer'' definition for all purposes, but only for purposes of the new rules).

[10] Section III below describes the estimated benefits and costs associated with registering as a dealer or government securities dealer for those persons who meet the qualitative standard of the final rules.

[11] *See* sections 3(a)(5)(A) and (B) of the Exchange Act, 15 U.S.C. 78c(a)(5)(A) and (B). The definition of ''dealer'' in the Exchange Act is largely unchanged from its enactment in 1934. Until the Gramm-Leach-Bliley Act (''GLBA'') was enacted in 1999, banks were excluded from the definition of ''dealer.'' The GLBA added section 3(a)(5)(C) of the Exchange Act to create a series of functional exemptions from the statutory definition of dealer. The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (''Dodd-Frank Act'') further amended section 3(a)(5)(A) of the Exchange Act to exclude from the dealer definition persons engaged in the business of buying and selling security-based swaps, other than security-based swaps with or for persons that are not eligible contract participants. The Dodd-Frank Act established a statutory framework for regulating security-based swaps that includes the registration and regulation of security-based swap dealers.

[12] *See* 2002 Release (explaining that ''a person that is buying securities for its own account may still not be a 'dealer' because it is not 'engaged in the business' of buying and selling securities for its own account as part of a regular business,'' and that ''[t]his exclusion is often referred to as the dealer/trader distinction'').

[13] A bank engaged in these activities with respect to government securities would not register with the Commission as a dealer. *See* Exchange Act section 3(a)(5)[C](i)[II] (providing an exception from dealer status when a bank buys or sells exempted securities, which are defined in Exchange Act section 3(a)(12)(A) to include government securities); *see also* Exchange Act section 3(a)(6) (definition of ''bank''). A bank may nonetheless be a government securities dealer under section 3(a)(44). As such, it would not register with the Commission but instead would provide written notice of its government securities dealer status with the appropriate Federal banking regulator.

Case 4:24-cv-00250-O  Document 1-1  Filed 03/18/24  Page 4 of 74  PageID 28

regular business.'' [14] Read together, these provisions identify a ''government securities dealer'' as a person engaged in the business of buying and selling government securities for its own account as part of a regular business. Section 15C of the Exchange Act makes it unlawful for a ''government securities dealer'' (other than a registered broker-dealer or financial institution) to induce or attempt to induce the purchase or sale of any government security unless such government securities dealer is registered in accordance with section 15C(a)(2).[15]

The Commission has long identified factors that would be informative for determining whether a person is a dealer. For example, the Commission's 2002 Release states that ''[a] person generally may satisfy the definition, and therefore, be acting as a dealer in the securities markets by conducting various activities: (1) underwriting; (2) acting as a market maker or specialist on an organized exchange or trading system; (3) acting as a *de facto* market maker whereby market professionals or the public look to the firm for liquidity; or (4) buying and selling directly to securities customers together with conducting any of an assortment of professional market activities such as providing investment advice, extending credit and lending securities in connection with transactions in securities, and carrying a securities account.[16] These principles demonstrate that the analysis of whether a person meets the definition of a dealer depends upon all of the relevant facts and circumstances.'' [17]

In recent years, market participants regularly engaging in significant liquidity provision have not registered, either as ''dealers'' under section 15 of the Exchange Act or ''government securities dealers'' under section 15C of the Exchange Act.[18] This is particularly true in the U.S. Treasury market where certain market participants, particularly those commonly known as proprietary or principal trading firms (''PTFs''), account for about half of the daily volume in the interdealer market and yet are not registered as dealers—despite performing critical market functions, in particular liquidity provision, that historically have been performed by dealers.[19] The

Commission recognizes that, depending on their business models, PTFs may not engage in certain types of dealer activities. Some may not, for example, underwrite securities, solicit clients, provide investment advice, carry accounts for others, or extend credit, and so may not implicate principle (1), (2), or (4) as discussed in the 2002 Release. The Commission is concerned, however, that some PTFs act as *de facto* market makers but do so without registration.[20] Such a regulatory gap results in inconsistent oversight of market participants performing similar functions (whether in the same market or across asset classes). This limited regulatory oversight of significant liquidity providers increases the difficulty and complexity for regulators to investigate, understand, and address significant market events.[21] As a result,

[14] 15 U.S.C. 78c(a)(44). Congress added the definition of ''government securities dealer'' to the Exchange Act in the Government Securities Act of 1986 (''GSA''). Public Law 99–571, 100 Stat. 3208 (Oct. 28, 1986). In addition to otherwise applicable regulations, government securities dealers must comply with rules adopted by the Treasury. *See* regulations under section 15C of the Exchange Act of 1934, 17 CFR 400.1(b), *available at https://www.govinfo.gov/content/pkg/CFR-2018-title17-vol4/pdf/CFR-2018-title17-vol4.pdf.* These regulations address financial responsibility, protection of customer securities and funds, recordkeeping, and financial reporting and audits. Also included are rules concerning custodial holdings of government securities by depository institutions. The Commission retains broad antifraud authority over banks that are government securities dealers. Soon after enactment of the GSA, the staff issued a series of no-action letters to persons seeking assurances that the staff would not recommend enforcement action if they did not register as government securities dealers. *See, e.g.,* Bankers Guarantee Title & Trust Co., SEC No-Action Letter (Jan. 22, 1991); Bank of America, Canada, SEC No-Action Letter (May 1, 1988); Citicorp Homeowners, Inc., SEC No-Action Letter (Oct. 7, 1987); Fairfield Trading Corp., SEC No-Action Letter (Dec. 10, 1987); Louis Dreyfus Corp., SEC No-Action Letter (July 23, 1987); United Savings Association of Texas, SEC No-Action Letter (Apr. 2, 1987); Continental Grain Co., SEC No-Action Letter (Nov. 28, 1987). Staff reports, Investor Bulletins, and other staff documents (including those cited herein) represent the views of Commission staff and are not a rule, regulation, or statement of the Commission. The Commission has neither approved nor disapproved the content of these staff documents and, like all staff statements, they have no legal force or effect, do not alter or amend applicable law, and create no new or additional obligations for any person. Staff in the Division of Trading and Markets is reviewing its no-action letters and other staff statements that address the Exchange Act's definition of ''dealer'' or ''government securities dealer'' to determine which letters and other staff statements, or portions thereof, should be withdrawn in connection with the adoption of the final rules. Some of these letters and staff statements, or portions thereof, may be moot, superseded, or otherwise inconsistent with the final rules, and, therefore, may be withdrawn by the staff. A list of the letters to be withdrawn will be available on the Commission's website.

[15] A government securities dealer that is a registered dealer or a financial institution must file notice with the appropriate regulatory agency that it is a government securities dealer. *See* 15 U.S.C. 78o–5(a). Exchange Act section 3(a)(46) defines the term ''financial institution'' to include: (i) a bank (as that term is defined in Exchange Act section 3(a)(6) (15 U.S.C. 78c(a)(6)); (ii) a foreign bank (as that term is used in the International Banking Act of 1978); and (iii) a savings association (as defined in section 3(b) of the Federal Deposit Insurance Act, the

deposits of which are insured by the Federal Deposit Insurance Corporation). *See* 15 U.S.C. 78c(a)(46)(A) through (C).

[16] 2002 Release at 67498–67500.

[17] *See id.; see also* Proposing Release at 23058–59.

[18] *See* Proposing Release at 23081.

[19] Nellie Liang and Pat Parkinson, Hutchins Center Working Paper #72, Enhancing Liquidity of the U.S. Treasury Market Under Stress (Dec. 16, 2020), at 6. The term ''PTF'' is not defined in the securities laws. PTFs trade as principals, buying and selling for their own accounts, and often employ automated, algorithmic trading strategies (including passive market making, arbitrage, and structural and directional trading) that rely on speed, which allows them to quickly execute trades, or cancel or modify quotes in response to perceived market events. *See* Proposing Release at 23055. *See also* Joint Staff Report: The U.S. Treasury Market on Oct. 15, 2014 (July 13, 2015) (''2015 Joint Staff Report''), prepared by staff of the U.S. Department of the Treasury, Board of Governors of the Federal Reserve System, Federal Reserve Bank of New York, U.S. Securities and Exchange Commission, and U.S. Commodity Futures Trading Commission, *available at https://www.sec.gov/reportspubs/specialstudies/treasury-market-volatility-10-14-2014-joint-*

*report.pdf.* The 2015 Joint Staff Report is a report of the Inter-Agency Working Group for Treasury Market Surveillance (''IAWG''). In contrast, many equity market participants may already be registered in order to take advantage of certain incentives offered only to exchange members. *See* Exchange Act section 6(c)(1) (requiring a national securities exchange to deny membership to any person that is not a registered broker or dealer or, if a natural person, associated with a registered broker or dealer).

[20] The significant role played by market participants not registered as dealers distinguishes the Treasury market from other markets where these types of participants are more typically registered as dealers. One commenter stated that it understood ''from its member firms that one of the effects of the Market Access Rule is that many previously unregistered PTFs operating in the equity and options markets became registered as broker-dealers due to their business need to submit their orders directly into the market without having to first run them through the risk controls of other broker-dealers,'' and that the Proposing Release did not address this market development. *See* Comment Letter of Securities Industry and Financial Markets Association (May 27, 2022) (''SIFMA Comment Letter I''); *see also* 17 CFR 240.15c3–5 (''Rule 15c3–5'' or ''Market Access Rule'') (requiring broker-dealers with market access to establish, document, and maintain a system of risk management controls and supervisory procedures reasonably designed to manage financial, regulatory, and other risks of this business activity). As explained in the Proposing Release, it is the Commission's understanding that in the equity markets, because PTF trading strategies typically depend on latency and cost advantages made possible by trading directly (via membership) on a national securities exchange, and the Exchange Act limits exchange membership to registered broker-dealers, there is incentive for many PTFs to register as broker-dealers to gain these advantages. In the U.S. Treasury market, however, where trading occurs on alternative trading systems (''ATSs'') and other non-exchange venues, PTFs lack this incentive to register. *See* Proposing Release at 23072–73. *See also* Exchange Act section 6(c)(1) (''A national securities exchange shall deny membership to (A) any person, other than a natural person, which is not a registered broker or dealer or (B) any natural person who is not, or is not associated with, a registered broker or dealer.'').

[21] *See, e.g.,* Inter-Agency Working Group for Treasury Market Surveillance Joint Staff Report, Recent Disruptions and Potential Reforms in the U.S. Treasury Market: A Staff Progress Report

investors and the markets currently lack important protections.

Courts have repeatedly recognized the requirement that dealers register as being "of the utmost importance in effecting the purposes of the Exchange Act." [22] Dealers generally must register with the Commission and become members of a self-regulatory organization ("SRO"); [23] comply with

Commission and SRO rules, including certain financial responsibility rules,[24] transaction and other reporting requirements,[25] operational integrity rules,[26] and books and records requirements,[27] all of which

help to enhance market stability by giving regulators increased insight into firm-level and aggregate trading activity and so help regulators to evaluate, assess, and address market risks. In addition, registered dealers and government securities dealers are required to comply with all applicable securities laws, including not only section 17(a) of the Securities Act of 1933 ("Securities Act") and section 10(b) of the Exchange Act but also specialized anti-manipulative and other antifraud rules promulgated pursuant to section 15(c) of the Exchange Act.[28] These regulatory requirements provide fundamental protections that contribute to fair and orderly markets. Firms that are government securities dealers (including registered broker-dealers trading government securities) must also comply with rules adopted by the U.S. Treasury, including rules relating to financial responsibility, recordkeeping, financial condition reporting, and risk oversight.[29] Importantly, dealers are

prepared by U.S. Department of the Treasury, Board of Governors of the Federal Reserve System, Federal Reserve Bank of New York, U.S. Securities and Exchange Commission, U.S. Commodity Futures Trading Commission (Nov. 8, 2021) ("2021 IAWG Joint Staff Report") (describing Mar. 2020 COVID–19 and Oct. 15, 2014, flash rally disruptions to the Treasury market). *See also supra* note 18 and accompanying text.

[22] Proposing Release at 23060–61; *see also SEC* v. *Benger,* 697 F. Supp. 2d 932, 944 (N.D. Ill. 2010) (quoting *Celsion Corp.* v. *Stearns Mgmt. Corp.,* 157 F. Supp. 2d 942, 947 (N.D. Ill. 2001) (section 15(a)'s registration requirement is "of the utmost importance in effecting the purposes of the Act" because it enables the SEC "to exercise discipline over those who may engage in the securities business and it establishes necessary standards with respect to training, experience, and records."); *Roth* v. *SEC,* 22 F.3d 1108, 1109 (D.C. Cir. 1994) ("The broker-dealer registration requirement serves as the keystone of the entire system of broker-dealer regulation."); *Regional Properties, Inc.* v. *Financial and Real Estate Consulting Co.,* 678 F.2d 552, 561 (5th Cir. June 3, 1982); *Eastside Church of Christ* v. *National Plan, Inc.,* 391 F.2d 357, 361 (5th Cir. Mar. 12, 1968).

[23] *See* sections 15(b)(8), 15C(e)(1), and 17(b) of the Exchange Act, 15 U.S.C. 78o(b)(8), 15 U.S.C. 78o–5(e)(1), and 15 U.S.C. 78q(b), respectively. Section 15(b)(8) of the Exchange Act makes it unlawful for any registered broker or dealer to effect any transaction in securities (with certain exceptions) unless the broker or dealer is a member of a registered securities association or effects transactions in securities solely on a national securities exchange of which it is a member. Section 15C(e)(1) of the Exchange Act requires that a registered government securities broker-dealer become a member of a registered national securities exchange or registered national securities association. Because government securities are not traded on registered national securities exchanges, a person that registers as a government securities dealer under section 15C to trade only government securities would generally need to become a member of a registered national securities association (FINRA is the only registered national securities association). The Commission recently adopted amendments to 17 CFR 240.15b9–1 ("Rule 15b9–1") to replace rule provisions that provide an exemption for proprietary trading with narrower exemptions from national securities association membership for any registered broker or dealer that is a member of a national securities exchange, carries no customer accounts, and effects transactions in securities otherwise than on a national securities exchange of which it is a member. *See* 17 CFR 240.15b9–1; Exemption for Certain Exchange Members, Exchange Act Release No. 98202, Aug. 23, 2023), 88 FR 61850 (Sept. 7, 2023) ("Amended Rule 15b9–1 Adopting Release"). Section 17(b) of the Exchange Act provides, among other things, that all records of a broker-dealer are subject at any time, or from time to time, to such reasonable, periodic, special, or other examinations by representatives of the Commission and the appropriate regulatory agency of the broker-dealer as the Commission or the appropriate regulatory agency deems necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of the Exchange Act.

[24] *See, e.g.,* 17 CFR 240.15c3–1 ("Rule 15c3–1" or "Net Capital Rule"); Financial Responsibility Rules for Broker-Dealers, Exchange Act Release No. 70072 (July 30, 2013), 78 FR 51823 at 51849 (Aug. 21, 2013) ("The capital standard in Rule 15c3–1 is a net liquid assets test. This standard is designed to allow a broker-dealer the flexibility to engage in activities that are part of conducting a securities business (*e.g.,* taking securities into inventory) but in a manner that places the firm in the position of holding at all times more than one dollar of highly liquid assets for each dollar of unsubordinated liabilities (*e.g.,* money owed to customers, counterparties, and creditors)"). The rule imposes a "moment to moment" net capital requirement in that broker-dealers must maintain an amount of net capital that meets or exceeds their minimal net capital requirement at all times.

[25] *See, e.g.,* FINRA Rule 6730(a)(1) (requiring FINRA members to report transactions in TRACE-Eligible Securities, including Treasury securities, which promotes transparency to the securities markets, including the Treasury market, by providing market participants with comprehensive access to transaction data); FINRA Rule 7220 (Trade Reporting Facilities); FINRA Rule 4530 (Reporting Requirements) which requires FINRA members to report among other things when the member or an associated person of the member has violated certain specified regulatory requirements, is subject to written customer complaints, and is denied registration or is expelled, enjoined, directed to cease and desist, suspended or disciplined by a specified regulatory body. The provision at 17 CFR 240.17a–5(d)(1)(i)(A) ("Rule 17a–5(d)(1)(i)(A)") requires broker-dealers, subject to limited exceptions, to file annual reports, including financial statements and supporting schedules that generally must be audited by a Public Company Accounting Oversight Board ("PCAOB") registered independent public accountant in accordance with PCAOB standards. *See also* Consolidated Audit Trail, Exchange Act Release No. 62174 (May 26, 2010), 75 FR 32556 (June 8, 2010); Joint Industry Plan; Order Approving the National Market System Plan Governing the Consolidated Audit Trail, Exchange Act Release No. 79318 (Nov. 15, 2016), 81 FR 84696 (Nov. 23, 2016) ("CAT Approval Order"); Joint Industry Plan; Notice of Filing of a National Market System Plan Regarding Consolidated Equity Market Data, Exchange Act Release No. 77724 (Apr. 27, 2016), 81 FR 30614 (May 17, 2016) ("CAT Notice").

[26] *See, e.g.,* Market Access Rule (promotes market integrity by reducing risks associated with market access by requiring financial and regulatory risk management controls reasonably designed to limit financial exposures and ensure compliance with applicable regulatory requirements).

[27] *See, e.g.,* section 17(a) of the Exchange Act and 17 CFR 240.17a–3 ("Rule 17a–3") and 240.17a–4 ("Rule 17a–4"); *see also, e.g.,* FINRA Rules 2268, 4510, 4511, 4512, 4513, 4514, 4515, 5340, and 7440(a)(4) (requiring member firms to make and preserve certain books and records to show compliance with applicable securities laws, rules, and regulations and enable Commission and FINRA staffs to conduct effective examinations); NYSE Rule 440 (Books and Records); CBOE Exchange Rule 7.1 (Maintenance, Retention and Furnishing of Books, Records and Other Information). Among other things, Commission and SRO books and records rules help to ensure that regulators can access information to evaluate the financial and operational condition of the firm, including examining compliance with financial responsibility

rules, among other rules, as well as assess whether and how a firm's participation in the securities markets impacted a major market event. *See* Staff Study on Investment Advisers and Broker-Dealers As Required by section 913 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Jan. 2011) at 72. *See also* Recordkeeping and Reporting Requirements for Security-Based Swap Dealers, Major Security-Based Swap Participants, and Broker-Dealers; Capital Rule for Certain Security-Based Swaps Dealers, Exchange Act Release No. 71958 (Apr. 17, 2014), 79 FR 25194, 25199 (May 2, 2014) ("The requirements are an integral part of the investor protection function of the Commission, and other securities regulators, in that the preserved records are the primary means of monitoring compliance with applicable securities laws, including antifraud provisions and financial responsibility standards.").

[28] *See, e.g.,* sections 15(c)(1) and (2) of the Exchange Act, 15 U.S.C. 78o(c)(1) and (2), and rules promulgated thereunder. Section 15(c) of the Exchange Act prohibits broker-dealers from effecting any transaction in securities by means of any manipulative, deceptive, or other fraudulent device or contrivance.

[29] Under Title I of the GSA, all government securities brokers and government securities dealers are required to comply with the requirements in Treasury's GSA regulations that are set out in 17 CFR parts 400 through 449, as well as all other applicable requirements. For the most part, Treasury's GSA regulations incorporate with some modifications: (1) Commission rules for non-financial institution government securities brokers and government securities dealers; and (2) the appropriate regulatory agency rules for financial institutions that are required to file notice as government securities brokers and government securities dealers. *See, e.g.,* 17 CFR part 400, Rules of general application; 17 CFR part 401, Exemptions; 17 CFR part 402, Financial responsibility; 17 CFR part 403, Protection of customer securities and balances; 17 CFR part 404, Recordkeeping and preservation of records; 17 CFR part 405, Reports and audit; and 17 CFR part 449, Forms, section 15C of the Exchange Act. The GSA regulations also include requirements for custodial holdings by depository institutions at 17 CFR part 450, which were issued under Title II of the GSA. The Treasury GSA regulations provide in many

Continued

subject to Commission and SRO examination and enforcement of compliance with applicable Federal securities laws and SRO rules.[30]

On March 28, 2022, the Commission proposed Rules 3a5–4 and 3a44–2 to identify certain activities that would constitute a "regular business" requiring a person engaged in certain liquidity-providing activities to register as a "dealer" or a "government securities dealer," absent an exception or exemption.[31] Proposed Rules 3a5–4 and 3a44–2 were designed to define the types of activities that would cause a person to be regarded as a *de facto* market maker and therefore subject to registration as a dealer under sections 15 and 15C of the Exchange Act. Specifically, the proposed rules would have established three qualitative factors, as well as a quantitative standard applicable only with respect to government securities. The proposed rules also further defined the types of entities that would be included in and excluded from the ambit of the rules. The proposed rules focused only on the *de facto* market maker test, as emphasized through the inclusion of the "no presumption" language, which provided that the further definition of "regular business," if adopted, would not seek to address all persons that may be acting as dealers under otherwise applicable interpretations and precedent.

The Commission received comment letters from a variety of commenters including investment advisers, PTFs, private fund advisers, crypto asset related entities and industry groups, insurance industry groups, industry associations, advisory groups, retail investors, and other market participants.[32] The comments addressed all aspects of the proposal.

Commenters in support of the proposal shared the Commission's concerns regarding the significant role of unregistered entities that act as liquidity providers and emphasized the benefits of registration and regulation.[33] These commenters discussed specific benefits, in particular transparency, market integrity and investor protection, as well as appropriate Commission and SRO oversight of entities registered as dealers and government securities dealers.[34]

Some commenters stated that they supported the Commission's policy goals but expressed concerns regarding whether the proposed rules would achieve those goals.[35] As discussed more fully below, these and other commenters raised certain common themes, which generally reflected concerns regarding the breadth of the proposed rules and that the proposed rules would inappropriately apply to persons not engaging in dealer activity. Specifically, many commenters stated that some of the terms used in the proposed qualitative factors were vague and overly broad.[36] As discussed below,

some commenters thought that the proposed first qualitative factor was overinclusive and would capture activity that was not dealing.[37] Commenters also raised concerns about certain terms used in the proposed first qualitative factor, the manner in which they would be interpreted, and the compliance challenges that they might present.[38] While the Commission is generally retaining the overall structure of the proposed rules, the Commission is making certain modifications to the text of the rules and also is providing guidance to address concerns raised during the public comment process.

Many commenters also questioned whether the quantitative standard exceeds the Commission's authority under the Exchange Act and is consistent with historical Commission interpretations and guidance and Federal case law.[39] As discussed above, the SEC has the authority to define the terms used in the statutory definition of "dealer" and oversee and regulate registered dealers. Further, the statutory definitions of "dealer" in section 3(a)(5) and "government securities dealer" in section 3(a)(44), and the accompanying registration requirements of the Exchange Act, were drawn broadly by Congress to encompass a wide range of activities involving the securities markets and their participants. PTFs and other market participants that engage in dealer activity in the U.S. Treasury market should be subject to the same regulatory requirements as other dealers.

In addition, commenters, many of which were in the asset management industry, stated that the proposed definition of "own account" would

---

instances that a registered dealer can comply with a Commission rule to establish compliance with the comparable Treasury requirement. *See, e.g.,* 17 CFR 402.1(b) ("This part does not apply to a registered broker or dealer . . . that is subject to [Rule 15c3–1]."); 17 CFR 403.1 (regarding application to registered brokers or dealers); 17 CFR 404.1 and 17 CFR 405.1(a) (same).

[30] *See* Exchange Act section 15(b) (regarding Commission authority to sanction brokers and dealers); section 15C(c) (regarding Commission authority to sanction government securities dealers that are registered with it); section 15C(d) (authorizing the Commission to examine books and records of government securities dealers registered with it); and section 17(b) (broker-dealer recordkeeping and examination). *See also* section 15C(g) (restricting the authority of the Commission with respect to government securities dealers that are not registered with the Commission).

[31] *See* Proposing Release; *see also* Exchange Act section 15 (regarding registration of dealers) and section 15C (regarding registration of government securities dealers).

[32] Comments received in response to the Proposing Release are available at: *https://www.sec.gov/comments/s7-12-22/s71222.htm*.

[33] *See, e.g.,* Comment Letter of The Financial Industry Regulatory Authority, Inc. (June 23, 2022) ("FINRA Comment Letter"); Comment Letter of Better Markets (May 27, 2022) ("Better Markets Comment Letter").

[34] *Id.*

[35] *See, e.g.,* SIFMA Comment Letter I ("We support the policy goal of proposed Rule 3a44–2 to require PTFs in the government securities market to register as government securities dealers, but believe that the Commission can adequately capture trading activity by unregistered PTFs by adopting solely the qualitative standards set forth Rule 3a44–2(a)(1)(ii) and (iii), without the need to adopt the standard in Rule 3a44–2(a)(1)(i)."); Comment Letter of Modern Markets Initiative (May 27, 2022) ("MMI Comment Letter") ("MMI appreciates the SEC's intent in the Proposal to support transparency, market integrity, and resiliency across the U.S. Treasury market and other securities markets, as it relates to ensuring that proprietary (or principal) trading firms and other market participants who are acting as dealers be, in fact, registered as 'dealers.' MMI agrees it is important that dealers or those who engage in buying and selling of government securities as registered dealers should become members of a self-regulatory organization, and receive the benefits and obligations under the existing framework of Federal securities laws."); Comment Letter of Asset Management Group of Securities Industry and Financial Markets Association (May 27, 2022) ("SIFMA AMG Comment Letter") ("While SIFMA AMG can appreciate the Commission's efforts to protect investors and further the public interest, we do not believe that the Proposal will achieve those goals with respect to money managers."); Comment Letter of FIA Principal Traders Group (Dec. 12, 2023) ("FIA PTG Comment Letter II").

[36] *See, e.g.,* Comment Letter of Association of Digital Asset Markets (May 27, 2022) ("ADAM Comment Letter"); Comment Letter of Citadel (June

7, 2022) ("Citadel Comment Letter"); Comment Letter of Morgan, Lewis & Bockius LLP (June 8, 2022) ("Morgan Lewis Comment Letter"); Comment Letter of T. Rowe Price (June 8, 2022) ("T. Rowe Price Comment Letter"); Comment Letter of Investment Company Institute (May 27, 2022) ("ICI Comment Letter"); SIFMA Comment Letter I; SIFMA AMG Comment Letter; Comment Letter of Alternative Investment Management Association (May 27, 2022) ("AIMA Comment Letter II"); Comment Letter of Managed Funds Association (May 27, 2022) ("MFA Comment Letter I"); Comment Letter of McIntyre & Lemon, PLLC (May 31, 2022) ("McIntyre Comment Letter II"); Comment Letter of FIA Principal Traders Group (May 27, 2022) ("FIA PTG Comment Letter I"); Comment Letter of Managed Funds Association (Dec. 19, 2023) ("MFA Comment Letter V"). *See also* section II.A.1.

[37] *See, e.g.,* AIMA Comment Letter II; MFA Comment Letter I; Comment Letter of Element Capital Management LLC (May 27, 2022) ("Element Comment Letter"); SIFMA Comment Letter II; MFA Comment Letter V.

[38] *See, e.g.,* MFA Comment Letter I; SIFMA AMG Comment Letter; T. Rowe Price Comment Letter.

[39] *See, e.g.,* SIFMA AMG Comment Letter; Comment Letter of Two Sigma (May 27, 2022) ("Two Sigma Comment Letter I").

inappropriately apply the dealer regime to private funds and registered investment advisers, and that the proposed exclusion for registered investment companies should be expanded to registered investment advisers and to private funds managed by registered investment advisers.[40] Commenters in the crypto asset industry also opposed the proposal, stating that the dealer framework should not apply to entities that transact in crypto assets that are securities.[41]

Further, many commenters believed that the economic analysis did not adequately address economic implications of the proposed rules.[42] Commenters also stated that the proposed rules were largely unnecessary because of existing regulatory obligations, stating that the Commission has other tools to accomplish its stated goals of improving transparency including, for example, the Consolidated Audit Trail ("CAT"), the Trade Reporting and Compliance Engine ("TRACE") and large trader reporting,[43]

and that the proposed rules could have a negative effect on liquidity.[44]

*B. Overview of the Final Rules and Modifications to the Proposal*

After careful review of comments received and upon further consideration, the Commission is adopting Rules 3a5–4 and 3a44–2 as revised. As discussed below, while the Commission is generally retaining the overall structure of the proposed rules, we are making certain modifications to the text of the rules and also are providing guidance to address concerns raised during the comment process. In particular, the modifications we have made to more appropriately tailor the scope of the final rules will address various concerns raised by commenters and appropriately require only entities engaging in *de facto* market making activity to register as dealers.[45] Overall, the final rules will achieve the Commission's important goals of protecting investors and supporting fair, orderly, and efficient markets.

An overview of the changes from the proposal follows:

*Modification and Streamlining of the Qualitative Standard*—The Commission has modified the proposed qualitative factors to: (1) eliminate the proposed qualitative factor that would have captured persons engaging in liquidity provision by routinely making roughly comparable purchases and sales of the same or substantially similar securities in a day ("proposed first qualitative factor"); (2) more closely track the

statutory language of the Exchange Act by referring to "regular" rather than the proposed "routine" patterns of behavior that have the effect of providing liquidity to other market participants; and (3) add the phrase "for the same security" to the factor relating to the expression of trading interests to clarify that it will apply only when a person is on both sides of the market for the same security. While the proposed first qualitative factor was intended to capture persons whose pattern of trading indicates that their liquidity provision forms a part of a regular business and to distinguish them from persons engaging in isolated or sporadic securities transactions (and therefore not engaging in such a regularity of participation), commenters raised a number of concerns with this factor, in particular that it was overinclusive and would capture activity that was not dealing, but rather investing in the ordinary course. After consideration of comments, the Commission has decided to eliminate this factor from the final rules. As discussed below, the qualitative factors as modified, together with the statutory definition and related precedent and interpretations, appropriately describe the circumstances in which a person would be deemed to engage in a "regular" pattern of buying and selling securities that has the effect of providing liquidity to other market participants, including in the U.S. Treasury market.

*Deletion of the Quantitative Standard*—The Commission proposed a bright line test under which persons engaged in certain levels of activity in the U.S. Treasury market would be defined to be buying and selling securities "as part of a regular business," regardless of whether they meet any of the qualitative factors. The quantitative standard was intended as a backstop to the qualitative factors to capture the most significant Treasury market participants.[46] While the proposed trading volume threshold was intended to provide an easily measurable and non-discretionary standard, commenters raised concerns regarding the application of this standard, in particular with respect to investment activities that might trigger the quantitative threshold. After consideration of these comments, the Commission has decided to eliminate

[40] *See, e.g.,* Comment Letter of National Association of Private Fund Managers (May 27, 2022) ("NAPFM Comment Letter"); MFA Comment Letter I; AIMA Comment Letter II. *See also* section II.A.3.

[41] The Proposing Release used the phrase "digital asset that is a security." *See* Proposing Release at 23057 n.36. For purposes of this Adopting Release, the Commission does not distinguish between the terms "digital asset securities" and "crypto asset securities."

[42] *See, e.g.,* Comment Letter of Andreessen Horowitz (May 27, 2022) ("Andreessen Horowitz Comment Letter"); AIMA Comment Letter II; ADAM Comment Letter; MFA Comment Letter I; Comment Letter of Blockchain Association (May 27, 2022) ("Blockchain Association Comment Letter"); Comment letter of U.S. Representatives Patrick McHenry and Bill Huizenga (Apr. 18, 2022) ("U.S. Reps Comment Letter"); Comment Letter of Virtu Financial (May 27, 2022) ("Virtu Comment Letter"); Comment Letter of Alphaworks Capital Management (May 27, 2022) ("Alphaworks Comment Letter"); Two Sigma Comment Letter I; FIA PTG Comment Letter I; Comment Letter of Independent Dealer and Trader Association (May 27, 2022) ("IDTA Comment Letter"); NAPFM Comment Letter; Comment Letter of Schulte Roth & Zabel LLP (May 27, 2022) ("Schulte Roth Comment Letter"); SIFMA Comment Letter I; Comment Letter of James Overdahl (May 27, 2022) ("Overdahl Comment Letter"); Comment Letter of Fried, Frank, Harris, Shriver, & Jacobson LLP (May 27, 2022) ("Fried Frank Comment Letter"); Element Comment Letter; Comment Letter of Chamber of Digital Commerce (June 13, 2022) (Chamber of Digital Commerce Comment Letter"); Morgan Lewis Comment Letter; Comment Letter of DeFi Education Fund (May 27, 2022) ("DeFi Fund Comment Letter"); Comment Letter of Ranking Member, Tim Scott, U.S. Senator (Dec. 14, 2023) ("Scott Comment Letter").

[43] *See, e.g.,* MMI Comment Letter; Virtu Comment Letter; AIMA Comment Letter II; ADAM Comment Letter; SIFMA AMG Comment Letter; SIFMA Comment Letter I; Fried Frank Comment Letter; Element Comment Letter; T. Rowe Price Comment Letter.

[44] *See, e.g.,* AIMA Comment Letter II; FIA PTG Comment Letter I; Virtu Comment Letter; McIntyre Comment Letter II; Alphaworks Comment Letter; MMI Comment Letter; Schulte Roth Comment Letter; IDTA Comment Letter; NAPFM Comment Letter; Comment Letter of Federal Regulation of Securities Committee of the Business Law Section of the American Bar Association (May 27, 2022) ("ABA Comment Letter"); Fried Frank Comment Letter; MFA Comment Letter I; Element Comment Letter; Citadel Comment Letter; Morgan Lewis Comment Letter; DeFi Fund Comment Letter; Scott Comment Letter.

[45] With respect to the Commission's authority to adopt the final rules, some commenters asserted that the major questions doctrine is implicated. *See, e.g.,* Comment Letter of Consensys Comment Letter Inc. (May 26, 2022) ("Consensys Comment Letter"); Comment Letter of American Investment Council (Aug. 8, 2023) ("AIC Comment Letter"). In further defining what it means to be engaged in the business of buying and selling securities "as a part of a regular business" within the definitions of "dealer" and "government securities dealer" under the Exchange Act, the Commission did not claim an "[e]xtraordinary grant[] of regulatory authority" based on "vague," "cryptic," "ancillary," or "modest" statutory language. *West Virginia* v. *EPA,* 142 S. Ct. 2587, 2608–10 (2022) (quotation omitted). Nor did it assert authority that falls outside its "particular domain." *Alabama Ass'n of Realtors* v. *HHS,* 141 S. Ct. 2485, 2489 (2021) (per curiam). Congress granted the SEC authority to oversee and regulate dealers, and the Exchange Act empowers the SEC with authority to define statutory terms.

[46] *See* Proposing Release at 23072 (stating that the quantitative standard was "designed to make clear the Commission's view that a person engaged in this regular volume of buying and selling activity is engaged in the buying and selling of government securities for its own account as part of a regular business, and therefore, should be subject to the same regulatory requirements as other dealers").

the quantitative standard from the final rules. As discussed below, the qualitative factors as modified, and otherwise applicable court precedent and Commission interpretations, appropriately describe the circumstances in which a person would be deemed to engage in a "regular" pattern of buying and selling securities that has the effect of providing liquidity to other market participants, including in the U.S. Treasury market.

As a result of these modifications, the final rules establish two non-exclusive ways in which a person will be determined to be engaged in a regular pattern of providing liquidity to other market participants "as part of a regular business":

• Regularly expressing trading interest that is at or near the best available prices on both sides of the market for the same security, and that is communicated and represented in a way that makes it accessible to other market participants ("expressing trading interest factor"); [47] or

• Earning revenue primarily from capturing bid-ask spreads, by buying at the bid and selling at the offer, or from capturing any incentives offered by trading venues to liquidity-supplying trading interest ("primary revenue factor").[48]

*Revision of "Own Account" Definition and Addition of Anti-Evasion Provision*—The Commission had proposed to define "own account" to include accounts "held in the name of a person over whom that person exercises control or with whom that person is under common control" ("the aggregation provision").[49] Upon consideration of the comments, the Commission has revised the definition so that the final rules define "own account" to mean an account: (i) held in the name of that person; or (ii) held for the benefit of that person. The rules as adopted thus are consistent with the Commission's historical "entity" approach to broker-dealer regulation.[50]

However, with a view to deterring the establishment of multiple legal entities or accounts to evade appropriate regulation, the final rules include an anti-evasion provision that prohibits persons from evading the registration requirements by: (1) engaging in activities indirectly that would satisfy the qualitative factors; or (2) disaggregating accounts. The changes from the proposed rules address concerns about the scope of the proposed rules as raised by commenters while enhancing the Commission's current ability to prevent and address potentially evasive behavior.[51]

*Exclusions*—The Commission is providing an exclusion for "central banks," "sovereign entities," and "international financial institutions," all as defined in the final rules. The exclusion is appropriate in view of the unique roles played by these entities. The Commission also is adopting as proposed the exclusions from the final rules for registered investment companies and persons that have or control less than $50 million in total assets.[52]

The Commission is not adopting certain commenters' suggestions for additional exclusions. Among other things, as discussed more fully below, the Commission is not excluding private funds or registered investment advisers from the final rules because an investment adviser or private fund could be acting as a dealer depending upon the particular activities in which it is engaged. The final rules do, however, include several modifications and clarifications to address many of the compliance and other concerns raised by certain commenters, including those raised by private funds and registered investment advisers.[53]

In addition, as discussed in more detail below, the Commission is not excluding certain types of securities, specifically crypto asset securities, from the application of the final rules.[54] As stated in the Proposing Release, the proposed rules would apply to any "security" as defined in section 3(a)(10) or "government security" as defined in

section 3(a)(44) of the Exchange Act. The dealer framework is a functional analysis based on the securities trading activities undertaken by a person, not the type of security being traded. Accordingly, the final rules will apply with respect to any crypto asset that is a "security" or "government security" within the meaning of the Exchange Act.

Further, the Commission disagrees with the argument that certain market participants, including PTFs, are not dealers because they do not have customers.[55] There is no requirement in the statutory text of either section 3(a)(5) or section 3(a)(44) that dealers have customers. In comparison, the Exchange Act's definition of "broker" is "any person in the business of effecting transactions in securities for the account of others," which includes (but is not limited to) customers.[56] The dealer definition includes no such limiting language and, since its enactment, the dealer definition was understood to cover "the operations of a trader . . . *who has no customers* but merely trades for his own account through a broker" so long as those operations are "sufficiently extensive to be regarded as a regular business . . . ."[57] Likewise, many of the factors that the Commission identified in its 2002 Release do not presume a dealer is acting for a customer.[58] Indeed, a number of Exchange Act rules applicable to dealers presuppose that there are dealers without customers and are tailored for that business model.[59]

Further, a helpful analogy can be drawn to the Commission's rulemaking further defining who is a "security-based swap dealer"—a definition that closely parallels the statutory definition of "dealer," particularly with respect to the exclusion of activities that are not part of a regular business.[60] In that

---

[47] The proposed second qualitative factor has been modified to change the term "trading interests" to "trading interest" and the words "are" to "is" and "they" to "it." This is a non-substantive modification to align the term with common usage.

[48] The proposed third qualitative factor has been modified to change the term "trading interests" to "trading interest." This is a non-substantive modification to align the term with common usage.

[49] *See infra* note 297 and accompanying text. Further, the Commission is removing the definitions of "control" and "parallel account structure."

[50] *See, e.g.,* Foreign Broker-Dealer Adopting Release at 30017 ("the Commission uses an entity approach with respect to registered broker-dealers"). *See infra* note 326 and accompanying text.

[51] *See* section II.A.4.

[52] *See* section II.A.3. As discussed further below, the less than $50 million exclusion is not an exclusion from the "dealer" definition for all purposes, but only for purposes of the final rules that focus on *de facto* market making. Outside of this context, the question of whether any person, including a person that has or controls less than $50 million in total assets, is acting as a dealer, as opposed to a trader, will remain a facts and circumstances determination.

[53] *See* section II.A.3.b.

[54] Comments requesting that the proposed rules not apply specifically to crypto asset securities are discussed further in section II.A.3.

[55] *See Eastside Church of Christ* v. *National Plan, Inc.,* 391 F.2d 357 (5th Cir. 1968).

[56] 15 U.S.C. 78c(a)(4)(A).

[57] Charles H. Meyer, Securities Exchange Act of 1934 Analyzed and Explained 33–34 (1934) (emphasis added).

[58] *See* 2002 Release at 67498–67500.

[59] *See, e.g.,* 17 CFR 240.15c3–1(a)(6) ("Rule 15c3–1(a)(6)") (requiring firms relying on this provision to transact only with other brokers and dealers and prohibiting such firms from carrying customer accounts); Rule 15b9–1 (exempting brokers-dealers from becoming members of a national securities association if they are a member of an exchange, do not carry customer accounts, and any securities transactions that they effect elsewhere than an exchange of which they are a member meet certain exceptions).

[60] *See* Further Definition of "Swap Dealer," "Security-Based Swap Dealer," "Major Swap Participant," "Major Security-Based Swap Participant" and "Eligible Contract Participant," Exchange Act Release No. 66868 (Apr. 27, 2012), 77 FR 30596, (May 23, 2012) ("Entities Release")

matter, in comparing "counterparties" with "customers," the Commission stated that "any interpretation of the 'security-based swap dealer' definition that is predicated on the existence of a customer relationship may lead to an overly narrow construction of the definition." [61] Accordingly, in this regard, these commenters have read a limitation into the statute where none exists.

As stated above, some commenters suggested that the final rules are unnecessary because the SEC has other tools to accomplish the goals of the rulemaking, including large trader reporting, TRACE, and CAT. Certain commenters urged the Commission to take additional or different regulatory actions for entities covered by the Investment Advisers Act of 1940 ("Advisers Act") than the approach we have adopted, including leveraging existing data from Form PF filings or making amendments to the existing regulatory regime under the Advisers Act. However, as discussed below, dealer registration is tailored to provide specific protections to address potential risks associated with dealer activity, and the aforementioned tools do not provide sufficient regulatory oversight and transparency into the trading activity of entities that are not otherwise registered as dealers.

Commenters expressed the view that the proposed rules could have a negative impact on liquidity or may cause many market participants to cease, modify, or curtail their trading activity to avoid being required to register as a dealer.[62] However, as discussed further below, we have made

various modifications to appropriately tailor the scope of the final rules to address concerns raised by commenters about effects on liquidity. The Commission has crafted the final rules to draw upon established concepts and to expand upon prior Commission statements to identify more specifically the activities of certain market participants who act as dealers by "providing liquidity" to other market participants, and to establish a more level regulatory playing field for these types of significant liquidity providers. The test established in the Exchange Act to determine if a person is a dealer is whether the person is engaged in the business of buying and selling securities for its own account "as part of a regular business." [63] The final rules are thus intended to reflect the longstanding distinction between so-called "traders"—whose liquidity provision is only incidental to their trading activities—and persons who are "in the business" of providing liquidity as part of a "regular business," and so are "dealers" and "government securities dealers" under the Exchange Act. Under the final rules, a person is deemed to be engaged in buying and selling securities for its own account as part of a regular business—and therefore within the definition of "dealer" or "government securities dealer"—if that person is engaged in a "regular pattern of buying and selling securities that has the effect of providing liquidity to other market participants."

The final rules are not the exclusive means of establishing that a person is a dealer or government securities dealer; otherwise applicable Commission interpretations and precedent will continue to apply.[64] In other words, these rules address one way in which a person can be engaged in the regular business of buying and selling securities for its own account, but these rules do not displace, modify, or substitute for otherwise applicable Commission interpretations and court precedent. A person engaging in other activities that satisfy the definition of dealer under otherwise applicable interpretations and precedent, such as underwriting, will still be a dealer even though those activities are not addressed by the two qualitative factors.[65]

The final rules, as modified, appropriately balance the concerns of the various commenters in a way that will best achieve the Commission's important goals to protect investors and support fair, orderly, and resilient markets through the complete and consistent application of dealer regulations. Further, the modifications we have made to tailor the scope of the final rules, including the persons scoped into the final rules, will address various concerns raised by commenters and appropriately require only entities engaging in dealing activity to register as dealers.

## II. Discussion of Final Rules

### A. Component Parts

#### 1. Qualitative Standard

The qualitative standard in the proposed rules was intended to build on existing statements by the Commission and the courts regarding "dealer" activity to further define certain factors for determining when a person is engaged in buying and selling securities for its own account "as part of a regular business" as that phrase is used in sections 3(a)(5) and 3(a)(44) of the Exchange Act. Under paragraph (a)(1) of the proposed rules, a person would be engaged in buying and selling securities for its own account "as a part of a regular business" and so would be a dealer or a government securities dealer, if that person engages in a routine pattern of buying and selling securities (or government securities) that has the effect of providing liquidity to other market participants. Under this standard, as supplemented by the qualitative factors, when the frequency and nature of a person's securities trading is such that the person assumes a role—whether described as market-making, *de facto* market-making, or liquidity-providing—similar to the role that historically has been performed by a registered dealer, that person would be deemed to be a dealer or government securities dealer.[66] The proposed rules would have further defined three types of activities that would be considered to have the effect of providing liquidity to other market participants: (i) routinely making roughly comparable purchases and sales of the same or substantially similar securities (or government securities) in a day; or (ii) routinely expressing trading interests that are at or near the best available prices on both sides of the market and that are communicated and represented in a way that makes them accessible to other market participants; or (iii) earning

("Although commenters have expressed the view that a person that engaged in security-based swap activities on an organized market should not be deemed to be a dealer unless it engaged in those activities with customers, we do not agree.").

[61] *Id.* at n.282.

[62] *See* ABA Comment Letter at 9–12; ADAM Comment Letter at 16; AIMA Comment Letter II at 11–13; Comment Letter of Alternative Investment Management Association (Nov. 17, 2022) ("AIMA Comment Letter III") at 3 and 8; Alphaworks Comment Letter at 6; Andreessen Horowitz Comment Letter at 10 and 13; Blockchain Association Comment Letter at 7; Citadel Comment Letter at 7–8; Comment Letter of Committee on Capital Markets (Oct. 19, 2022) ("Committee on Capital Markets Comment Letter") at 3; DeFi Fund Comment Letter at 14; Element Comment Letter at 5; FIA PTG Comment Letter I at 2–10; Fried Frank Comment Letter at 8–11; Comment Letter of Gretz Consilium LLC (May 26, 2022) ("Gretz Comment Letter") at 18; ICI Comment Letter at 7–8; McIntyre Comment Letter II at 2; MFA Comment Letter I at 12; Comment Letter of Managed Funds Association (Dec. 5, 2022) ("Lewis Study") at 2; Morgan Lewis Comment Letter at 2 and 14; NAPFM Comment Letter at 5; Overdahl Comment Letter at 16–23; Schulte Roth Comment Letter at 2; SIFMA Comment Letter I at 8; SIFMA AMG Comment Letter at 16–17; Two Sigma Comment Letter at 2 and 9; Virtu Comment Letter at 3–4.

[63] *See* sections 3(a)(5)(A) and (B) of the Exchange Act, 15 U.S.C. 78c(a)(5)(A) and (B); section 3(a)(44) of the Exchange Act, 15 U.S.C. 78c(a)(44).

[64] *See* Rules 3a5–4(c) and 3a44–2(c) (providing that no presumption shall arise that a person is not a dealer or government securities dealer solely because that person does not satisfy the standards of the final rules). *See also* section II.A.5.

[65] *See supra* note 16.

[66] *See, e.g.,* 2002 Release at 67499.

revenue primarily from capturing bid-ask spreads, by buying at the bid and selling at the offer, or from capturing any incentives offered by trading venues to liquidity-supplying trading interests.

Commenters stated that the terms "routine" and "routinely" in the proposed rules were unclear and would lead to inconsistent interpretations.[67] In response to the comments and upon further consideration, the Commission has replaced the term "routine" with "regular" in 17 CFR 240.3a5–4(a)(1) and 240.3a44–2(a)(1) so that a person will be engaged in buying and selling securities for its own account "as a part of a regular business"—and so be a dealer or a government securities dealer—if that person engages in a regular pattern of buying and selling securities (or government securities) that has the effect of providing liquidity to other market participants. As discussed more fully below, "regular" participation in the securities markets is part of the statutory definition of "dealer" in the Exchange Act and therefore is a concept that should be familiar to market participants.[68]

In addition, as discussed below, after further consideration, the Commission has revised the qualitative standard by eliminating the proposed first qualitative factor and modifying the remaining two qualitative factors. These changes are designed to more appropriately tailor the rule to the nature of dealing in today's securities markets.[69] As a result of these modifications, the final rules establish two non-exclusive ways in which a person will be deemed to be engaged in providing liquidity as part of a regular business:

• Regularly expressing trading interest that is at or near the best available prices on both sides of the market for the same security, and that is communicated and represented in a way that makes it accessible to other market participants; or

• Earning revenue primarily from capturing bid-ask spreads, by buying at the bid and selling at the offer, or from capturing any incentives offered by

trading venues to liquidity-supplying trading interest.

a. Elimination of the Proposed First Qualitative Factor

As discussed in the Proposing Release, the proposed first qualitative factor was intended to capture a person's pattern of trading, the consistency and regularity of which indicate that its liquidity provision forms a part of a regular business.[70] Specifically, under proposed 17 CFR 240.3a5–1(a)(1)(i) and 240.3a44–2(a)(1)(i), a person that, trading for its own account, "routinely mak[es] roughly comparable purchases and sales of the same or substantially similar securities in a day" would be engaged in a pattern of trading that "has the effect of providing liquidity to other market participants," and therefore engaged in buying and selling securities or government securities "as part of a regular business" as a dealer or government securities dealer.[71] The proposed first qualitative factor was intended to separate persons engaging in isolated or sporadic securities transactions from persons whose regularity of participation in securities transactions demonstrates that they are acting as dealers.

Commenters raised a number of concerns about the proposed first qualitative factor.[72] As a general matter, commenters contended that the proposed first qualitative factor would capture activity that was not dealing, but rather investing in the ordinary course.[73] One commenter recommended that certain specific activities be explicitly excluded from the rule, including asset liability management, liquidity and collateral management, and activities ancillary to exempt dealer activity.[74] As discussed further below, commenters also expressed concerns about certain terms used in the proposed first qualitative factor, the

manner in which they would be interpreted, and the compliance challenges that they might present, focusing in particular on the use of the terms "routinely," "substantially similar," "roughly comparable," and "in a day."[75] As a result of these concerns, some commenters stated that the Commission should remove the first proposed qualitative factor.[76]

After further consideration and in light of commenters' concerns, the Commission has decided to eliminate the proposed first qualitative factor. The Commission agrees with commenters that the proposed first qualitative factor could capture more than dealing activity intended to be captured by the rule. Accordingly, the Commission is not adopting the first factor.

The Commission emphasizes that the elimination of this factor does not mean that the conduct that would have been captured by the proposed factor is not dealing activity. This conduct may be *de facto* market making under the other two qualitative factors or dealer activity under otherwise applicable precedent. In this regard, as discussed in section II.A.5, no presumption shall arise that a person is not a dealer or government securities dealer as defined by the Exchange Act solely because that person does not satisfy the standard set forth in the final rules.

b. Expressing Trading Interest Factor

The Commission proposed a second qualitative factor to identify activity that "has the effect of providing liquidity to other market participants" focused on the expression of trading interests. Specifically, under proposed 17 CFR 240.3a5–4(a)(1)(ii) and 240.3a44–2(a)(1)(ii), a person that, trading for its own account, "routinely express[es] trading interests that are at or near the best available prices on both sides of the market and that are communicated and represented in a way that makes them

---

[67] *See, e.g.,* ADAM Comment Letter; Element Comment Letter; Morgan Lewis Comment Letter; Consensys Comment Letter; MFA Comment Letter I; NAPFM Comment Letter; SIFMA AMG Comment Letter.

[68] *See* 15 U.S.C. 78c(a)(5) and 78c(a)(44).

[69] As discussed below, the Commission is adding the phrase "for the same security" so that the proposed second qualitative factor applies to expressing trading interest on both sides of the market for the same security. The Commission has also modified, as appropriate, the remaining qualitative factors to replace the term "routinely" with "regularly."

[70] *See* Proposing Release at 23066.

[71] *See id.*

[72] *See also supra* notes 37–38 and accompanying text.

[73] *See, e.g.,* AIMA Comment Letter II; MFA Comment Letter I; Element Comment Letter; SIFMA Comment Letter II; FIA PTG Comment Letter II; MFA Comment Letter V. For example, one commenter stated that "[w]ithout revision to, and clarification of, these vague terms, this Qualitative Standard will clearly capture many short-term investment strategies engaged in by traders that are not indicative of dealer functions." Element Comment Letter. Another stated that "Qualitative Standard 1 would capture many common hedge fund strategies that have never been, and should not now be, considered dealing, including fixed-income arbitrage, convertible bond arbitrage and capital structure arbitrage, as well as a number of relative value or quantitative strategies." AIMA Comment Letter II.

[74] SIFMA Comment Letter II.

[75] *See, e.g.,* MFA Comment Letter I; SIFMA AMG Comment Letter; T. Rowe Price Comment Letter; MFA Comment Letter V.

[76] MFA Comment Letter I ("We have considered this proposed test and strongly believe that it will be unworkable for market participants—as described in detail below—and we therefore urge the Commission not to include Qualitative Test 1 in any final rule."). *See also* AIMA Comment Letter II ("We believe the Commission should limit its qualitative standards to only Qualitative Standard 3."). In addition, one commenter suggested that the Commission replace the first and second proposed qualitative factors with a test defining a person acting as a *bona fide* market maker under Regulation SHO as a dealer. *See* MFA Comment Letter I. As discussed below, the Commission is removing the proposed first qualitative standard and declines to replace the proposed second qualitative factor with a test defining a person acting as a *bona fide* market maker under Regulation SHO. *See* section II.A.1.b.

accessible to other market participants'' would be engaging in a routine pattern of trading that has the effect of providing liquidity to other market participants, and as a result, would be a dealer under the proposed rules.[77] As the Commission stated in the Proposing Release, this factor ''would update the longstanding understanding that regular or continuous quotation is a hallmark of market making or *de facto* market making (and, hence, dealer) activity, to reflect technological changes to the ways in which buyers and sellers of securities are brought together.'' [78]

The Commission explained in the Proposing Release the meanings of certain key terms used in the proposed second qualitative factor.[79] Specifically, as discussed in more detail below, the Commission explained the terms ''routinely,'' ''trading interests'' and ''best available prices on both sides of the market.'' [80]

The Commission received a range of comments on the proposed second qualitative factor. One commenter explicitly supported the proposed second qualitative factor, voicing support for the policy goal of requiring PTFs in the government securities market to register as government securities dealers.[81] The commenter stated that it believed that the second qualitative factor would achieve this goal.[82] As discussed below, a number of commenters opposed the proposed second qualitative factor, contending that the factor would capture activity that was not dealing,[83] and expressing concerns about certain terms used in this factor (*i.e.,* ''routinely,'' ''trading interests,'' ''both sides of the market,'' ''accessible to other market participants''), as well as addressing other issues.[84]

Advancements in the securities markets have altered the way in which market participants interact with the markets. Certain market participants

continue to perform important dealer functions as providers of liquidity to other market participants by expressing trading interest on both sides of the market for a security to other market participants. The expressing trading interest factor takes these changes into account, while also allowing for flexibility in its application in the markets for different securities, based on the wide variance in liquidity, depth, or other traits.

In adopting the proposed second qualitative factor as the expressing trading interest factor, the Commission is replacing the term ''routinely'' with ''regularly.'' The Commission is also revising the rule text to explicitly provide that the test applies with respect to the expression of trading interest in the ''same'' security. Other than these changes, and certain non-substantive changes, for the reasons set forth below, the Commission is adopting this factor as proposed. Accordingly, under the expressing trading interest factor, a person ''regularly expressing trading interest that is at or near the best available prices on both sides of the market for the same security and that is communicated and represented in a way that makes it accessible to other market participants'' is engaged in buying and selling securities for its own account ''as a part of a regular business'' as the phrase is used in sections 3(a)(5)(B) and 3(a)(44)(A) of the Exchange Act. The expressing trading interest factor will appropriately capture those market participants who are engaging in liquidity-providing activities similar to those traditionally performed by dealers or government securities dealers as defined under sections 3(a)(5) and 3(a)(44) of the Exchange Act.[85]

*Regularly*

The Proposing Release stated that the term ''routinely'' as used in the proposed second qualitative factor meant that a person must express trading interests more frequently than occasionally, but not necessarily continuously, both intraday and across time.[86] The use of the term ''routinely'' in the proposed second qualitative factor was thus intended to capture significant liquidity providers who express trading interests at a high enough frequency to play a significant role in price discovery and the provision of market liquidity, even if their liquidity provision may not be continuous like that of some traditional dealers.[87] The Proposing Release stated

that the liquidity providers that would be covered by the proposed second qualitative factor are very active in the markets—their participation is very routine—as demonstrated by the ''key role'' they play ''in price discovery and the provision of market liquidity'' in both the interdealer U.S. Treasury market and the equity markets.[88]

A number of commenters expressed concerns related to the use of the term ''routinely.'' [89] Several commenters stated that the term ''routinely'' was unclear, which would make it difficult or impossible for market participants to determine whether their activities would be captured by the proposed second qualitative factor.[90] For example, one commenter stated that the term ''routinely'' is ''unclear, defined with reference to another undefined concept ('occasional') and distinguished from a concept ('continuous') that market participants actually understand and have experience applying.'' [91] As a result, the commenter stated this factor ''would ultimately be unworkable for market participants who will have to make subjective determinations, on at least a daily basis, about whether they are 'routinely' engaging in the activity described in [the proposed rules].'' [92] Another commenter asserted that use of the term ''routinely'' ''will lead to inconsistent application across market participants.'' [93] Commenters also raised questions about the Proposing Release's analogy to the approach in the Commission's joint rulemaking with the Commodity Futures Trading Commission regarding, among other things, the definitions of ''swap dealer'' and ''security-based swap dealer.'' [94] In particular, commenters stated that the reference was inappropriate because of the different nature of the markets for

[77] As discussed below, the Commission is adding the phrase ''for the same security'' to the expressing trading interest factor to specify that this factor applies to expressing trading interest on both sides of the market for the same security.

[78] Proposing Release at 23068.

[79] *Id.*

[80] *Id.*

[81] SIFMA Comment Letter I.

[82] *Id.*

[83] *See, e.g.,* MFA Comment Letter I; SIFMA AMG Comment Letter; AIMA Comment Letter II.

[84] *See, e.g.,* MFA Comment Letter I; McIntyre Comment Letter II; Consensys Comment Letter; Gretz Comment Letter; FIA PTG Comment Letter I; Blockchain Comment Letter; NAPFM Comment Letter; ADAM Comment Letter; SIFMA AMG Comment Letter; Comment Letter of Managed Funds Association (July 21, 2023) (''MFA Comment Letter II''); Element Comment Letter; Morgan Lewis Comment Letter; ABA Comment Letter.

[85] *See* 15 U.S.C. 78c(a)(5) and 78c(a)(44).

[86] Proposing Release at 23068.

[87] *Id.*

[88] *Id.*

[89] *See, e.g.,* MFA Comment Letter I; McIntyre Comment Letter II; Consensys Comment Letter; Gretz Comment Letter; FIA PTG Comment Letter I; Blockchain Comment Letter; NAPFM Comment Letter; ADAM Comment Letter; SIFMA AMG Comment Letter; MFA Comment Letter II; Element Comment Letter; Morgan Lewis Comment Letter; ABA Comment Letter.

[90] *See, e.g.,* MFA Comment Letter I; Element Comment Letter; ADAM Comment Letter; Morgan Lewis Comment Letter; SIFMA AMG Comment Letter.

[91] MFA Comment Letter I.

[92] *Id. See also* Element Comment Letter (''''routine' trading can indicate market making, which implies a dealer function, but can also indicate the day-to-day activity of a private fund's trading desk.'').

[93] ADAM Comment Letter. *See also* SIFMA AMG Comment Letter.

[94] *See, e.g.,* ADAM Comment Letter; Morgan Lewis Comment Letter; SIFMA AMG Comment Letter; *see also* Proposing Release at n.132.

cash securities and security-based swaps.[95]

As an alternative to "routinely," some commenters suggested using a different term, with most such commenters suggesting "continuous."[96] Some commenters asked whether the Commission had considered using "regularly," stating that the statute uses the term "regular."[97]

After further consideration, the Commission has replaced the term "routinely" with "regularly." As with the term "routinely" in the Proposing Release, the term "regularly" in the final rules will apply to a person's expression of trading interest both within a trading day and over time.[98] This requirement distinguishes persons engaging in isolated or sporadic expressions of trading interest from persons whose regularity of expression of trading interest demonstrates that they are acting as dealers. As some commenters expressly stated,[99] the term "regular" is part of the statutory definition of "dealer" in the Exchange Act.[100] The term "regular" captures persons operating as dealers through their expression of trading interest on both sides of the market for the same security in a manner consistent with this statutory text.

A market participant does not need to be continuously expressing trading interest to be engaging in a "regular" business. The Exchange Act's definitions of "dealer" and "government securities dealer" do not include a requirement of continuous participation. The ordinary meaning of "continuous" is "characterized by continuity; extending in space without interruption of substance; having not interstices or breaks; having its parts in immediate connection; connected, unbroken" and "marked by uninterrupted extension in space, time, or sequence," as defined by the Oxford English and the Merriam-Webster dictionaries, respectively.[101] While such

"continuous" expression of trading interest would be indicative of dealer activity, a continuous standard would not be appropriate because it would be too limited in markets for securities that exhibit varying degrees of depth and liquidity.[102]

Whether a person's activity is "regular" will depend on the liquidity and depth of the relevant market for the security. For example, in markets that have significant liquidity and market depth, and have experienced advancements in technology and electronic trading, like the U.S. Treasury market,[103] expressing trading interest on both sides of the market for the same security as part of an investment strategy on a one-off basis would not be sufficiently regular to be caught by the expressing trading interest factor. Rather, "regular" in the most liquid markets would mean more frequent periods of expressing trading interest on both sides of the market both intraday and across days given the efficiency in which securities can be bought and sold and the market's ability to absorb orders without significantly impacting the price of the security.[104] In contrast, if the market for a security is less liquid, and it is difficult to execute orders in that security or large orders can dramatically affect the price of the

security, the term "regular" would account for the possibility of more interruptions or wider spreads for the best available prices.

The expressing trading interest factor captures the hallmark *de facto* market making activity in which dealers make a market in a security, standing ready to trade on both sides of the market on the same security on a regular ongoing basis.[105] Those market participants that have established themselves as significant market intermediaries—and critical sources of liquidity—in a market by employing automated, algorithmic trading strategies that rely on high frequency trading strategies to generate a large volume of orders and transactions would be captured by the expressing trading interest factor.[106] This would include market participants that, for example, employ passive market making strategies involving the submission of non-marketable resting orders (bids and offers) that provide liquidity to the marketplace at specified prices.[107] Accordingly, the term "regularly" will capture those market participants that engage in the activity described in the expressing trading interest factor on a frequent enough basis (both within a trading day and over time) that they do so as part of a regular business.

Trading Interest

The proposed second qualitative factor in the proposed rules would have applied to "trading interests." The Proposing Release stated that the use of the broader term "trading interests" in the proposed second qualitative factor, rather than the term "quotations," would reflect the prevalence of non-firm trading interest offered by marketplaces today, and account for the varied ways in which developing technologies permit market participants to hold themselves out as willing to buy or sell securities, or otherwise communicate their willingness to trade, and to effectively make markets.[108] As explained in the Proposing Release, the broader term was intended to capture the traditional quoting engaged in by dealer liquidity providers, new and developing quoting equivalents, and the orders that actually result in the provision of liquidity.[109] In other words,

[95] *See, e.g.,* ADAM Comment Letter; Morgan Lewis Comment Letter; SIFMA AMG Comment Letter.

[96] SIFMA AMG Comment Letter; Comment Letter of BlackRock (Mar. 16, 2023) ("BlackRock Comment Letter").

[97] MFA Comment Letter I (". . .but query, was 'nearly continuous' considered? Or 'regular'?"); McIntyre Comment Letter II (stating that the Proposed Rule "replaces the statutory text of 'regular' and 'continuous' with an amorphous notion of 'routine' patterns of providing liquidity.").

[98] As proposed, the term "routinely" would have meant both repeatedly within a day and repeatedly over time. *See* Proposing Release at 23068.

[99] *See supra* note 97.

[100] 15 U.S.C. 78c(a)(5).

[101] *See, e.g., Iqbal* v. *United States Citizenship & Immigr. Servs.,* 397 F. Supp. 3d 273, 283 (W.D.N.Y.

2019) (quoting Merriam-Webster, *https://www. merriam-webster.com/dictionary/continuous* (Aug. 22, 2019)); *see also Axia Inc.* v. *Jarke Corp.,* No. 87 C 8024, 1989 WL 39722, at *3 (N.D. Ill. Apr. 20, 1989) (explaining that "continuous" is commonly understood as "uninterrupted" in the context of an interpretation of a patent claim).

[102] *See* Remarks of Lorie K. Logan, Executive Vice President of the Federal Reserve Bank of New York, at the Brookings-Chicago Booth Task Force on Financial Stability, *available at https://www. newyorkfed.org/newsevents/speeches/2020/ log201023;* Remarks of Deputy Secretary Justin Muzinich at the 2020 U.S. Treasury Market Conference | U.S. Department of the Treasury; *see also* Treasury Market Liquidity during the COVID– 19 Crisis—Liberty Street Economics (newyorkfed.org). *See also* 2015 IAWG Report (when conducting an algorithm-level analysis from the event window on Oct. 15, 2014, the IAWG found "the analysis suggests that multiple types of trading strategies were deployed by PTFs during the event window. Some PTF algorithms appear to explain the considerable amount of net passive market making activity that was witnessed across cash and futures over the event window and likely was an important contributing factor to the absence of price gapping despite the unprecedented large price swings. Another, and equally significant, group of PTF strategies appears to have aggressively traded in the direction of price moves during the event window, accounting for the bulk of the overall aggressive trading imbalance observed.").

[103] *See* Proposing Release at 23055.

[104] *See* Proposing Release at 23058 (stating "[t]he 'regularity' of participation in securities transactions necessary to find that a person is a 'dealer'" has not been quantified, but involves engaging in 'more than a few isolated' securities transactions.") (citing *SEC* v. *Am. Inst. Counselors, Inc.,* Fed. Sec. L. Rep. (CCH) ¶ 95388 (D.D.C. 1975)); *see also supra* note 98.

[105] *See* Concept Release on Equity Market Structure, Exchange Act Release No. 61358 (Jan. 14, 2010), 75 FR 3594 (Jan. 21, 2010) ("2010 Equity Market Structure Concept Release") at 3607–08.

[106] *See* Amended Rule 15b9–1 Adopting Release at n.8.

[107] 2010 Equity Market Structure Concept Release at 3607–08.

[108] Proposing Release at 23068.

[109] *Id.*

the proposed use of the term "trading interests" was intended to update the Commission's longstanding understanding that regular or continuous "quotation" is a hallmark of market making or *de facto* market making (and, hence, dealer) activity, to reflect the various and evolving ways in which buyers and sellers of securities are brought together.[110] Using the term "trading interests," rather than "quotations," the Commission stated, would also allow for clear and consistent application of the definition of "dealer" and "government securities dealer." [111]

A number of commenters objected to the use of the term "trading interests" on various grounds including, among others, the difficulty in applying the term and the breadth of the term purportedly causing non-dealing trading activity to be captured.[112] One commenter explained that it would be challenging for firms to assess whether non-firm trading interest actually is at or near the best available price because non-firm trading interest often is not executed given that firms are not required to execute non-firm trading interest, even if matched.[113] The commenter also stated that nearly any active investor or trader might express trading interests on both sides of the market to get best execution, and suggested limiting the factor instead to "firm two-sided quotations" expressed on a "continuous or near continuous basis." [114] Another commenter similarly requested that the term "trading interest" be replaced with a quotation and order-based standard.[115]

Two commenters stated that applying the proposed second qualitative factor to investment advisers would inappropriately subject them to potential dealer status simply for exercising their fiduciary duties.[116] For example, one commenter stated that an investment adviser may have to submit trading interests throughout a trading day in order to obtain best execution and meet other fiduciary obligations acting for their clients, or to use specific trading protocols available in the market, such as the order book.[117]

Similarly, other commenters stated that the proposed second qualitative factor could require firms, including unregistered funds excluded from the Investment Company Act and registered investment advisers, to register as dealers for engaging in activity that has not historically been considered to be dealer activity.[118] One commenter, for example, questioned whether portfolio managers, by taking long/short positions or seeking arbitrage opportunities, would be required to register as dealers under the proposed second qualitative factor.[119] Another commenter stated that some asset managers have funds with active fixed-income trading strategies involving indications of interest to trade bonds, as well as swaps, on similar or even identical underlying issuers in order to take advantage of mispricing or to create a unique non-directional risk profile in a trade.[120] According to this commenter, although this activity entails communicating and indicating interest on such trades to a number of counterparties, it has never been considered dealing.[121] Yet another commenter stated that firms that, as a primary element of their trading strategy, simultaneously and continuously post bids and offers in a specific instrument at or near the national best bid and offer, have not historically been treated as having engaged in dealer activity where the firm posting quotes did not hold itself out to customers.[122] One commenter asked for clarity on how the proposed second qualitative factor would apply in the digital assets space, and in particular whether participants in a digital asset liquidity pool, by leaving their assets in the pool and thereby exposing those assets to sale at the pool's prevailing exchange rate, are expressing a "trading interest." [123]

After consideration of the comments, the Commission has determined to adopt the proposed second qualitative factor with minor, non-substantive modifications to the term "trading interest." The term "trading interest" means: (i) an "order" as the term is defined under 17 CFR 240.3b–16(c) ("Rule 3b–16(c)"); [124] or (ii) any non-firm indication of a willingness to buy or sell a security that identifies the security and at least one of the following: quantity, direction (buy or sell), or price. A standard of "firm two-sided quotations" expressed on a "continuous or near continuous basis," while captured by the existing understanding of "dealer" under Exchange Act section 3(a)(5), does not account for the full range of liquidity-providing dealer activity undertaken in today's security markets.[125] The term "trading interest" accounts for the varied mechanisms that permit market participants to effectively make markets. These include, but are not limited to, the use of streaming quotes, request for quotes ("RFQs"), or order books. To be captured by the expressing trading interest factor depends less on the method used to communicate trading interest, and more on whether the person is expressing trading interest on both sides of the market for the same security that has the effect of providing liquidity in the same security to other market participants.

At the same time, expressing trading interest is not, standing alone, enough to demonstrate engaging in a "regular pattern of buying and selling securities that has the effect of providing liquidity to other market participants" under the final rules. Specifically, under the final rules, a person will be engaged in activity as part of a regular business if that person "[e]ngages in a regular pattern of *buying and selling securities* that has the effect of providing liquidity to other market participants by . . . [r]egularly expressing trading interest that is at or near the best available prices on both sides of the market for

---

[110] *Id.* The Commission has stated previously that a market maker engaged in bona-fide market making is a "broker-dealer that deals on a regular basis with other broker-dealers, actively buying and selling the subject security as well as regularly and continuously placing quotations in a quotation medium on both the bid and ask side of the market." *See, e.g.,* Exchange Act Release No. 32632 (July 14, 1993), 58 FR 39072, 39074 (July 21, 1993).

[111] Proposing Release at 23068.

[112] *See, e.g.,* MFA Comment Letter I; SIFMA AMG Comment Letter; AIMA Comment Letter II. A number of other commenters objected to the Proposing Release's use of the term "trading interests" on the grounds that the term is the subject of another proposed rule. *See, e.g.,* ABA Comment Letter; SIFMA AMG Comment Letter; SIFMA Comment Letter I; MFA Comment Letter I. As discussed below, it is appropriate for the final rules to use the term "trading interest." The Commission is adopting the term "trading interest" as explained herein for purposes of the final rules.

[113] MFA Comment Letter I.

[114] MFA Comment Letter II; *see also* MFA Comment Letter I.

[115] SIFMA AMG Comment Letter.

[116] *Id.;* MFA Comment Letter I.

[117] SIFMA AMG Comment Letter.

[118] *Id.;* AIMA Comment Letter II.

[119] McIntyre Comment Letter II.

[120] *See* AIMA Comment Letter II (explaining, for example, that some asset managers may have funds with active fixed-income strategies that may be captured by the proposed second qualitative factor).

[121] AIMA Comment Letter II.

[122] Fried Frank Comment Letter. As discussed below, whether a person meets the definition of "dealer" is not contingent upon whether that person has customers.

[123] DeFi Fund Comment Letter.

[124] Rule 3b–16(c) states that "the term order means any firm indication of a willingness to buy or sell a security, as either principal or agent, including any bid or offer quotation, market order, limit order, or other priced order." The Proposing Release previously referenced the definition of "order" under 17 CFR 242.300. Proposing Release at 23068. This release refers to Rule 3b–16(c), which defines the term "order" identically and is further discussed in the release adopting 17 CFR 242.300 through 242.304 ("Regulation ATS"). *See* Regulation of Exchanges and Alternative Trading Systems, Exchange Act Release No. 40760 (Dec. 8, 1998), 63 FR 70844 (Dec. 22, 1998).

[125] *See* Proposing Release at 23068.

the same security and that is communicated and represented in a way that makes it accessible to other market participants (emphasis added)."[126] A market participant seeking price information by requesting quotes on a security, without including prices, on both sides of the market would generally not satisfy this qualitative factor because that trading interest, absent more, would not be "at or near the best available price." With respect to the commenter's statement that investment advisers' fiduciary duties may require them to submit "trading interests" throughout a trading day, the final rules have been modified so that the definition of "own account" applies to accounts in which the person holds the account in its name or the account is held for the benefit of that person.[127] As such, the trading interest expressed by investment advisers for purposes of their fiduciary duty to their clients and their clients' accounts, such as when investment advisers place orders or request quotations on behalf of their clients, would not be activity captured by the expressing trading interest factor, unless the investment adviser itself is the account holder or the account is held for the benefit of the investment adviser.[128] Moreover, as discussed above, persons engaging in the activity described in the qualitative standard are acting as dealers regardless of whether the person engaging in such dealer activity has or holds itself out to customers.[129] The statutory definitions of "dealer" and "government securities dealer" distinguish between a dealer and a trader on the basis of whether a person is in the "regular business" of buying and selling securities for one's own account—not whether the person is doing so to effectuate customer orders.[130]

One commenter questioned how to apply the term "trading interest" to certain types of products, structures, or activities in the so-called decentralized finance ("DeFi") market to provide crypto asset securities liquidity.[131] Whether a particular activity in the crypto asset securities market, including in the so-called DeFi market, gives rise to dealer activity requires an analysis of the totality of the particular circumstances against all elements of the expressing trading interest factor.[132] Commenters argued that crypto assets should not be covered by the final rules.[133] However, the Commission is not excluding any particular type of securities, including crypto asset securities, from the application of the final rules. The dealer framework is a functional analysis based on the securities trading activities undertaken by a person, not the type of security being traded. Persons, including persons using so-called "automated market makers," that are engaged in buying and selling securities for their own account must consider whether they are dealers under the final rules, and thus subject to dealer registration requirements.[134]

As discussed below, the final rules build off existing legal standards and, as discussed throughout this release, are designed to address where market participants are engaging in *de facto* market making and required to register as dealers or government securities dealers, regardless of which such technology is used.[135] As explained throughout this release, the application of the dealer regulatory regime to such persons will promote the Commission's longstanding mission.

Both Sides of the Market

Under the proposed rules, in order to come within the proposed second qualitative factor, the expression of trading interests would need to be "at or near the best available prices on both sides of the market."[136] As discussed in the Proposing Release, the phrase "at or near the best available prices on both sides of the market" describes "the activity of liquidity-providing dealers, which help determine the spread between the best available bid price and the best available ask price for *a given security*."[137] The Proposing Release further explained that, by competing to both buy and sell at the best available prices, liquidity providers help to narrow bid-ask spreads.[138] The Commission also stated that the proposed second qualitative factor helped to emphasize that a liquidity

---

[126] See Rules 3a5–4(a)(1)(ii) and 3a44–2(a)(1)(ii).

[127] See SIFMA AMG Comment Letter. *See also* section II.A.4.

[128] Furthermore, as discussed in section II.A.3, the Commission declines to include an exclusion from the final rules for registered investment advisers and private funds and continues to believe that when engaged in dealer activity, including by expressing trading interest as set forth in the factor, registered investment advisers and private funds should be subject to the dealer regulatory regime, which includes not only registration obligations, but also comprehensive regulatory requirements and oversight that broadly focus on market functionality—that is, the impact of dealing activity on the market as a whole.

[129] See *supra* notes 55–59 and accompanying text.

[130] See *id.*; 15 U.S.C. 78c(a)(5); 15 U.S.C. 78c(a)(44)(A). In fact, the definition of "broker" presumes that a person is effectuating securities transactions on behalf of customers. See 15 U.S.C. 78c(a)(4) (stating that a broker means "any person engaged in the business of effecting transactions in securities *for the account of others*") (emphasis added).

[131] DeFi Fund Comment Letter.

[132] A threshold question in determining the applicability of the final rules is whether a person engaging with products, structures, or activities in the so-called DeFi market has or controls total assets of less than $50 million. *See* 17 CFR 240.3a5–4(a)(2)(i) ("Rule 3a5–4(a)(2)(i)"); 17 CFR 240.3a44–2(a)(2)(i) ("Rule 3a44–2(a)(2)(i)"); section II.A.3. If so, that person would not be captured by the final rules. *See also* 17 CFR 240.3a5–4(d); 17 CFR 240.3a44–2(d) (providing that a person not meeting the conditions set forth in the final rules may nonetheless be a dealer if it otherwise engages in a regular business of buying and selling securities for its own account); *infra* note 284 and accompanying text (citing examples where persons engaging in crypto asset securities transactions are operating as dealers as defined under section 3(a)(5)). If this exclusion cannot be relied upon, then the expressing trading interest factor could apply. Furthermore, as discussed in section II.A.3.a, the exclusion for persons having or controlling less than $50 million in total assets applies to the final rules and does not modify existing applicable court precedent and Commission interpretations.

[133] See, e.g., ADAM Comment Letter (stating "the blanket application of the dealer and government securities dealer regulatory framework to digital assets would be premature and imprudent."); *see also* Consensys Comment Letter; DeFi Fund Comment Letter; Chamber of Digital Commerce Comment Letter; Blockchain Association Comment Letter.

[134] The application of the final rules turns on whether a particular crypto asset is a security, as defined under the U.S. Federal securities laws. The term "security" includes an "investment contract," as well as other instruments. To the extent there is a question as to whether a particular crypto asset is an investment contract that is a security, the analysis is governed by the test first articulated by the Supreme Court in *SEC* v. *W.J. Howey Co.*, 328 U.S. 293, 301 (1946). *See, e.g., SEC* v. *Terraform Labs PTE, Ltd.*, No. 23–cv–1346, 2023 WL 8944860 (S.D.N.Y. Dec. 28, 2023) (stating that *Howey* was and remains a binding statement of law and that there

was no genuine dispute that the elements of the *Howey* test had been met)); *SEC* v. *Kik Interactive Inc.*, 492 F. Supp. 3d 169, 177–180 (S.D.N.Y. 2020) (applying *Howey* in granting the Commission's motion for summary judgment finding Kik's sale of Kin tokens to the public was a sale of a security and required a registration statement); *SEC* v. *LBRY*, No. 21–CV–260–PB, 2022 WL 16744741 (D.N.H. Nov. 7, 2022) (applying *Howey* in granting the Commission's motion for summary judgment finding "no reasonable trier of fact could reject the SEC's contention that LBRY offered LBC [a crypto asset] as a security."); Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO, Exchange Act Release No. 81207 (July 25, 2017) ("DAO 21(a) Report") (describing how DAO tokens were securities under *Howey*).

[135] *See* sections II.A.3, III.D.6; *see also* Policy Recommendations for Crypto and Digital Asset Markets Final Report, Board of the International Organization of Securities Commissions (Nov. 2023) (stating that "the regulatory frameworks (existing or new) should seek to achieve regulatory outcomes for investor protection and market integrity that are the same as, or consistent with, those required in traditional financial markets in order to facilitate a level-playing field between crypto-assets and traditional financial markets and help reduce the risk of regulatory arbitrage"), *https://www.iosco.org/library/pubdocs/pdf/IOSCOPD747.pdf*; Final Report with Policy Recommendations for Decentralized Finance (DeFi), Board of the International Organization of Securities Commissions (Dec. 2023), *https://www.iosco.org/library/pubdocs/pdf/IOSCOPD754.pdf*.

[136] Proposing Release at 23068.

[137] *Id.* (emphasis added).

[138] *Id.*

provider, to come within the rules, must both buy and sell securities.[139]

Several commenters requested clarification as to how to apply the phrase "on both sides of the market," particularly, with regard to what period of time to use when evaluating orders placed on both sides of the market, and as to whether the phrase applies to the market for a single security or related instruments.[140] Some commenters asserted that the absence of a time limitation could prevent market participants from using all available trading strategies in a market, including active trading strategies where a person would post resting offers and bids on a central limit order book ("CLOB"), without registering as a dealer.[141] Two of these commenters urged the Commission to modify the proposed second qualitative factor to clarify that the trading interest must be expressed on both sides of the market simultaneously.[142] According to one commenter, if the proposed second qualitative factor does not require that the trading interest be expressed on both sides of the market simultaneously, it "would result in this test capturing trading that is not consistent with dealer activity."[143] Commenters also urged the Commission to clarify that the phrase "both sides of the market" applied to the same security.[144] One commenter suggested that the Commission modify the proposed second qualitative factor to add the phrase "for the same security."[145]

Consistent with the Proposing Release which explained that the proposed second qualitative factor applies to persons expressing trading interests on both sides of the market in a given security, the Commission is modifying the rule text to add the phrase "for the same security" to the second qualitative factor.[146]

The Commission is not adopting a requirement that the trading interest be expressed simultaneously on both sides of the market. Limiting the expressing trading interest factor to the simultaneous expression of trading interests could exclude other regular expressions of trading interest that constitute dealer activity by providing liquidity to other market participants. While simultaneously expressing trading interest on both sides of the market in the same security is indicative of dealer activity, market participants also can be acting as dealers by regularly providing liquidity even where the expressions of trading interest on both sides of the market for the same security are not simultaneous, particularly because the markets for different securities have varying structures, trading volume, and liquidity.[147] Further, adding a simultaneity condition could lead to behavior where a dealer might, for example, express trading interest to buy and sell in alternate moments in time to evade the requirement to register. Accordingly, the Commission is not conditioning the application of the expressing trading interest factor on trading interests being expressed simultaneously. Due to the differences between markets, participants will need to assess the totality of their trading activity to determine if they are expressing trading interests on both sides of the market for the same security sufficiently close in time to have the effect of providing liquidity in the same security to other market participants.

The Commission recognizes that non-firm trading interest (and firm quotations for that matter) need not be executed, even if matched. Nonetheless, it will be possible to assess whether a non-firm trading interest is actually "at or near the best available price," using the similar information that market participants use to make bids and offers, including recently completed purchases and sales and the totality of indications of willingness to buy or sell at specified

prices.[148] For example, market participants can use similar information to that used by registered broker-dealers to assess whether a customer order was executed at the best available price.[149]

Finally, as discussed above in connection with the term "trading interest," to come within this factor, a person expressing trading interest (including through a CLOB) must be buying and selling securities, and it must engage in such activity "regularly."

*Accessible to Other Market Participants*

Under the proposed rules, market participants would have had to routinely express trading interests accessible to other market participants to be considered to have engaged in a routine pattern of trading that has the effect of providing liquidity to other market participants.[150] In the Proposing Release, the Commission explained that the proposed second qualitative factor would apply only when the expressed trading interests that are at or near the best available prices on both sides of the market are "communicated and represented in a way that makes them accessible to other market participants."[151]

One commenter objected to the proposed second qualitative factor's phrase "communicated and represented in a way that makes them accessible to other market participants," stating that the Proposing Release does not make clear whether trading interests made available to a limited group of participants via a RFQ would trigger the factor, versus trading interests published on a broadly accessible order book. The commenter stated further that the vagueness of the standard would prevent market participants from applying it with confidence and might encourage market participants to choose execution venues and order types that are not transparent or accessible.[152] This commenter recommended adopting a test defining a person acting as a *bona fide* market maker under 17 CFR 242.200 through 242.204 ("Regulation SHO") as a dealer, in lieu of the first and second proposed qualitative factors.[153]

The phrase "accessible to other market participants" reflects the plain

---

[139] *Id.*

[140] *See, e.g.,* SIFMA AMG Comment Letter; AIMA Comment Letter II; MFA Comment Letter I; Citadel Comment Letter.

[141] *Id.* For instance, according to one commenter, there are examples of where market participants using a CLOB routinely express trading interests on both sides of the market in various instruments over the course of a trading day, and CLOBs can benefit both market liquidity and competition. *See* Citadel Comment Letter.

[142] *See* MFA Comment Letter I; Citadel Comment Letter.

[143] MFA Comment Letter I.

[144] *See, e.g.,* Citadel Comment Letter; Lewis Study; MFA Comment Letter I; Citadel Comment Letter II.

[145] MFA Comment Letter II.

[146] Proposing Release at 23068 (stating "[t]he phrase 'best available prices on both sides of the market' more specifically and clearly describes the activity of liquidity-providing dealers, which help determine the spread between the best available bid

price and the best available ask price for a *given* security") (emphasis added). The phrase "same security" is to be interpreted as that phrase is used in the Proposing Release. *See* Proposing Release at 23067 (stating " 'the same' securities means that the securities bought and sold are securities of the same class and having the same terms, conditions, and rights [, and] securities bearing the same Committee on Uniform Securities Identification Procedures ('CUSIP') number, for example, would be considered 'the same.' ").

[147] *See* 2010 Equity Market Structure Concept Release at 3608 (stating that "proprietary traders are analogous to OTC [over-the-counter] market makers in that they have considerable flexibility in trading without significant negative or affirmative obligations for overall market quality").

[148] *See, e.g.,* Disclosure of Order Execution and Routing Practices, Exchange Act Release No. 43590 (Nov. 17, 2000), 65 FR 75414, 75418 (Dec. 1, 2000) (stating that quotation information contained in the public quotation system must be considered in seeking best execution of customer orders).

[149] *Id.*

[150] Proposing Release at 23068.

[151] *Id.*

[152] MFA Comment Letter I.

[153] *Id.*

Case 4:24-cv-00250-O   Document 1-1   Filed 03/18/24   Page 16 of 74   PageID 40

meaning that a person expresses trading interests to more than one market participant. For example, where a person makes a trading interest available (such as streaming two-way indicative quotes) to more than one market participant, even if the person made that trading interest available through individual communications, that person would be expressing trading interest accessible to other market participants.[154] Again, the expressing trading interest factor does not hinge on any particular method of communication and representation (*e.g.*, RFQ, indications of interest, or streaming quotes); it depends on the totality of the trading activity to determine if the person is expressing trading interests on both sides of the market for the same security to have the effect of providing liquidity in the same security to other market participants.

The Commission is not adopting the suggestion to replace this factor with a test defining a dealer as a person engaging in *bona fide* market making activities under Regulation SHO. The *bona fide* market making exception under Regulation SHO applies to a specific subset of dealer activity. As the Commission previously stated when proposing Regulation SHO, "a narrow exception for market makers and specialists engaged in bona fide market making activities is necessary because they may need to facilitate customer orders in a fast moving market without possible delays associated with complying with the proposed 'locate' rule." [155] For example, a broker-dealer must claim the *bona fide* market making exception from the locate requirement of Regulation SHO at the time of the short sale in a particular security.[156] Accordingly, limiting the applicability of the final rules to those persons eligible for Regulation SHO's bona-fide market-making exception would

exclude persons engaged in other liquidity-providing dealer activity.

One commenter stated that the proposed second qualitative factor would impact the Commission's Order Competition Rule proposal.[157] On December 14, 2022, the Commission proposed a rule that would require certain orders of individual investors to be exposed to competition in fair and open auctions before such orders could be executed internally by any trading center that restricts order-by-order competition.[158] As discussed below, the Commission has considered the current regulatory landscape in presenting the baseline. To the extent the proposed Order Competition Rule is adopted, the baseline in that rulemaking will reflect the regulatory landscape that is current at that time.[159]

In sum, the Commission has determined to replace the term "routinely" with "regularly," add the phrase "for the same security," and make non-substantive modifications to this factor, but otherwise is adopting this factor as proposed.

### c. Primary Revenue Factor

Finally, the Commission proposed a third qualitative factor encompassing activity that "has the effect of providing liquidity to other market participants." Specifically, under proposed 17 CFR 240.3a5–4(a)(1)(iii) and 240.3a44–2(a)(1)(iii), a person that, trading for its own account, "earn[ed] revenue primarily from capturing bid-ask spreads, by buying at the bid and selling at the offer, or from capturing any incentives offered by trading venues to liquidity-supplying trading interests," would have been engaging in a routine pattern of trading that has the effect of providing liquidity to other market participants, and as a result, would have been a dealer under the proposed rules. The Commission explained in the Proposing Release that one fundamental characteristic typical of market makers and liquidity providers—and one that has historically been viewed as dealer activity—is trading in a manner designed to profit from bid-ask spreads or liquidity incentives rather than with a view toward appreciation in value.[160] We stated that persons engaged in such activity are "in the business" of providing liquidity because (1) they routinely supply it and (2) the revenue they earn through bid-ask spreads or

liquidity incentives is their primary source of revenue.[161]

The proposed third qualitative factor accounted for both forms of revenue. As to the first—capturing bid-ask spreads—the Commission stated that when a liquidity provider routinely buys and sells securities in a manner designed to capture a spread with such frequency and consistency that its revenue is made up primarily of this form of compensation, it would be considered to be engaged in a routine pattern of providing liquidity as a service and would fall within the scope of the rules.[162] As to the second, the Commission stated that when a liquidity provider, as a result of its routine purchases and sales of securities, captures "incentives offered by trading venues to liquidity-supplying trading interests" with such frequency and consistency that its revenue is made up primarily of this form of compensation, it would be considered to be engaged in a routine pattern of providing liquidity as a service and generally standing ready to buy or sell securities, and so would fall within the scope of the proposed rules.[163]

In the Proposing Release, the Commission explained the meaning of certain key terms in the proposed third qualitative factor. The Commission stated that the factor used the phrase "earn revenue"—rather than, for example, "profit from"—to make clear that a person's trading strategies would not need to be profitable to bring them within the rule.[164] Dealer activity is dealer activity regardless of whether it is profitable. With respect to the term "primarily," the Commission further stated that, generally speaking, although the Commission has not established a bright-line test, if a person derives the majority of its revenue from either of the sources described in the proposed third qualitative standard, it would likely be in a regular business of buying and selling securities or government securities for its own account.[165]

Finally, with respect to the term "trading venues" the Commission stated that market evolution has given rise to a variety of venues in which liquidity providers can express trading interests, and the term "trading venues" is designed to capture the breadth of these different venues.[166] In explaining

---

[154] On the other hand, when an investor seeking liquidity sends a single, one-sided RFQ to a number of potential liquidity providers, this action by itself does not generally trigger the expressing trading interest factor because it is on one side of the market in an isolated instance.

[155] Short Sales, Exchange Act Release No. 48709 (Oct. 28, 2003), 68 FR 62972, 62977 (Nov. 6, 2003); *see also* Short Position and Short Activity Reporting by Institutional Investment Managers, Exchange Act Release No. 98738 (Oct. 13, 2023), 88 FR 75100, 75136 (Nov. 1, 2023) (stating "a market maker must also be a market maker in the security being sold, and must be engaged in bona-fide market making in that security at the time of the short sale.").

[156] The determination of eligibility for the bona-fide market-making exceptions in Regulation SHO is distinct from the determination of whether the effect of a person's trading activity indicates that such person is acting as a dealer. Proposing Release at n.131.

[157] Comment Letter of Two Sigma (Mar. 31, 2023) ("Two Sigma Comment Letter II").

[158] Order Competition Rule, Exchange Act Release No. 96495 (Dec. 14, 2022), 88 FR 128 (Jan. 3, 2023).

[159] *See* section III.B.

[160] Proposing Release at 23069.

[161] *Id.*

[162] *Id.*

[163] *Id.*

[164] *Id.*

[165] *Id.*

[166] *Id.* at 23069–70. As discussed in the Proposing Release, the term "trading venue" was designed to capture the variety and breadth of different venues resulting from market evolution. *Id.* To the extent

the term "trading venue" the Proposing Release referenced a definition of "trading venue" that described it to mean "a national securities exchange or national securities association that operates an SRO trading facility, an ATS, an exchange market maker, an OTC market maker, a futures or options market, or any other broker- or dealer-operated platform for executing trading interest internally by trading as principal or crossing orders as agent." [167] The Commission further stated that the third proposed qualitative standard was designed to capture dealer activity wherever that activity occurs, "whether on a national securities exchange, an ATS . . . *or another form of trading venue.*" [168] The Commission also stated that for purposes of the proposed rules, the particular venue mattered less than the fact that a market participant provides liquidity on it.[169]

Of the three proposed qualitative factors, this factor received the fewest comments. Two commenters supported the third qualitative factor as proposed.[170] According to one of the commenters, capturing bid-ask spreads or earning revenue from liquidity incentives have traditionally been indicative of dealing activity and the proposed third qualitative standard would be less likely to capture certain funds, advisers, and trading strategies that the commenter believed would be inappropriately captured by the first and second qualitative factors.[171]

Another commenter stated the proposed third qualitative factor was "workable," assuming two modifications.[172] First, the commenter stated that the proposed third qualitative factor should turn on "profit," rather than "revenue." [173] In the commenter's view, because dealers are in the business of profiting from their market-making activities, they are unlikely to be (or stay) engaged in markets if they are not profiting from their dealer activities.[174] As a result, the commenter believed that a person otherwise meeting the factor but failing to earn profits in doing so is better viewed as a trader than a dealer.[175] Second, the commenter stated that the proposed third qualitative factor should be limited to "national securities exchanges and ATSs," rather than "trading venues." [176] In the commenter's view, to reduce the compliance burdens on market participants while capturing the most significant trading activity, the rule should be limited to the most liquid trading venues, including those where liquidity incentives are most likely to be offered and where trading to profit from the spread occurs most often.[177] The commenter stated that this change

would avoid difficult and unworkable line-drawing questions, such as when pricing offered by an OTC market maker to its customer would constitute an "incentive" captured by the rule.[178]

Some commenters objected to the proposed third qualitative factor,[179] expressing concerns about the lack of clarity as to, and breadth of, its application.[180] One of these commenters stated that the term "primarily" is potentially vague because a person might earn more revenue from appreciation in the value of its inventory of securities than from capturing bid-ask spreads or trading incentives.[181] Another commenter explained that certain portfolio management and trading strategies, like hedging and arbitrage strategies, among other things, seek to derive value, positive fund performance, and portfolio-trading revenues by taking advantage of pricing differentials in bid-ask spreads.[182] The commenter stated that such strategies have not traditionally been viewed as dealer activity and questioned whether they would be captured by the proposed third qualitative factor.[183] Another commenter stated that trading incentives are often organized in a manner that allows traders or their investment advisers to reduce overall commissions and fees paid by directing liquidity-providing trades to specific venues.[184] In the commenter's view, the "optimization of commission costs by an investment adviser on behalf of investors, or by a trader acting on his or her own behalf, should not by itself require registration as a dealer for a person who is otherwise a trader." [185] Finally, some commenters objected that the proposed third qualitative factor's application in the crypto asset securities market may not be clear, including how the factor applies to so-called DeFi market products, structures, and activities such as so-called decentralized exchange ("DEX") and "automated market maker" activities, as well as activities related to blockchain consensus and validation.[186]

---

new systems develop as a result of technological advancements that offer market participants the ability to provide liquidity in a security for other market participants, the term "trading venue" would apply to such systems. *Id.*

[167] *Id.* Whether an entity is or is not registered with the Commission does not affect the determination of whether that entity is a trading venue for purposes of the final rules. For example, a person operating a platform for executing trading interest internally would likely be operating as a broker or dealer, regardless of whether that person is registered as such, and the receipt of incentives from that person could be captured by the factor. *See* 15 U.S.C. 78o(a)(1) (absent an exemption, persons meeting the definition of broker or dealer must register with the Commission).

[168] Proposing Release at 23070 (emphasis added).

[169] *Id.*

[170] SIFMA Comment Letter I (stating that "[s]ubject to our additional comments on the application of the proposed rules to bank holding companies, we believe that the qualitative standard in proposed . . . Rule 3a44–2(iii) [is] generally a good step forward to address this long-standing asymmetric regulatory treatment for similar [dealing] activities."); *see also* AIMA Comment Letter II (requesting the Commission to limit the qualitative standard to the third factor alone).

[171] AIMA Comment Letter II.

[172] *See* MFA Comment Letter I; *see also* MFA Comment Letter II. Another commenter stated it shared many of the comments raised by MFA with respect to the proposed third qualitative test. *See* BlackRock Comment Letter. *See also* ICI Comment Letter (stating "[t]o avoid unintentionally capturing ordinary investment and trading strategies, the Commission should limit the qualitative test to capture persons trading only in the same securities—where this purpose is clear—rather than trading in merely similar securities.").

[173] *See* MFA Comment Letter I.

[174] *See id.*

[175] *See id.*

[176] *Id. See also* ABA Comment Letter ("the proposed tests for the definition of ''dealer'' requires interpreting terms that are not yet settled because they are concurrently being commented on in a proposed form."); DeFi Fund Comment Letter (stating "whether a DeFi protocol constitutes a 'trading venue' is likely to turn on the outcome of the Commission's pending proposal to expand its 'exchange' definition, which we strongly oppose."). As discussed below, the Commission believes it is appropriate for the final rules to use the term "trading venues." The Commission has proposed an amendment to Form ATS–N to change the term "Trading Centers" to "trading venue" and has proposed the term to mean a national securities exchange or national securities association that operates an SRO trading facility, an ATS, an exchange market maker, an OTC market maker, a futures or options market, or any other broker- or dealer-operated platform for executing trading interest internally by trading as principal or crossing orders as agent. *See* Amendments Regarding the Definition of "Exchange" and Alternative Trading Systems (ATSs) that Trade U.S. Treasury and Agency Securities, National Market System (NMS) Stocks, and Other Securities, Exchange Act Release No. 94062 (Jan. 26, 2022), 87 FR 15496, 15539–40 (Mar. 18, 2022). Although the term "trading venue" is used in the final rules and the proposed amendment to Form ATS–N, the adoption of the term as discussed above is appropriate for the final rules.

[177] MFA Comment Letter I.

[178] *Id.*

[179] *See, e.g.,* FIA PTG Comment Letter II.

[180] *See, e.g.,* Gretz Comment Letter; McIntyre Comment Letter II; Element Comment Letter; SIFMA AMG Comment Letter; ICI Comment Letter; MFA Comment Letter I.

[181] Gretz Comment Letter.

[182] McIntyre Comment Letter II.

[183] *Id.*

[184] Element Comment Letter.

[185] *Id.*

[186] *See, e.g.,* ADAM Comment Letter (stating that "the third qualitative factor does not account for 'staking' and the way in which some blockchains use the proof-of-stake consensus mechanism to
Continued

After consideration of the comments, the Commission has determined to adopt, as the primary revenue factor, the third qualitative factor as proposed, with a non-substantive change. The final rules continue to use the phrase "earn revenue" rather than "earn profit." While the Commission acknowledges the possibility that persons whose liquidity provision fails to turn a profit may ultimately seek out more profitable lines of business, dealer status requires only that a person be "in the business," not that that business be profitable.[187]

The term "trading venues" is intended to accommodate the variety of venues in which market participants today engage in liquidity-providing dealer activity. In addition, the use of this term is intended to capture venues as they evolve, wherever that activity occurs, whether on a national securities exchange, an ATS, any other broker- or dealer-operated platform for executing trading interest internally by trading as principal or crossing orders as agent, or any other platform performing a similar function.[188] The particular venue matters less than the fact that a market participant provides liquidity on it.[189] As discussed in the Proposing Release, there have been notable technological enhancements affecting securities trading across markets and asset classes.[190] Accordingly, the term "trading venues" is designed to capture current trading venues that use a variety of technologies, as well as trading venues that use technologies and venues that may develop over time. The term "trading venues" is designed to help ensure that, as innovation and technology used by such venues evolve, the final rules remain effective at supporting market stability and resiliency, protecting investors, and promoting competition across the U.S. Treasury and other securities markets. For these reasons, the Commission declines to limit the scope of this factor to trading venues that are national securities exchanges or ATSs.

Regarding the term "primarily" as used in the primary revenue factor, the Proposing Release stated that if a person derives the majority of its revenue from the sources described in paragraph (a)(3)(iii), it would likely be in a regular business of buying and selling securities or government securities for its own account.[191] Further, in response to one commenter's example,[192] while the analysis of this specific scenario would depend on the totality of circumstances, as a general matter, it is unlikely that a person who regularly earns more revenue from an appreciation in the value of its inventory of securities than from capturing bid-ask spreads or incentive payment for liquidity provision, would be considered to earn revenue "primarily" from capturing bid-ask spreads or trading incentives.

A commenter stated that the Proposing Release did not account for how the primary revenue factor would apply to market participants transacting in the crypto asset securities market; as commenters have pointed out, the crypto asset securities market has structures, products and activities that may implicate dealer registration.[193] Whether a particular activity in the crypto asset securities market, including in the so-called DeFi market, gives rise to dealer activity will require an analysis of the totality of the particular facts and circumstances. As discussed above, any person engaged in buying and selling securities for its own account must consider whether it is a dealer, including under the final rules, and so subject to dealer registration requirements.[194] Accordingly, the primary revenue factor will capture market participants that are primarily earning revenue from capturing spreads or liquidity incentives offered by trading venues, including trading venues that support transacting in crypto asset securities.[195]

With respect to portfolio management and trading strategies that for varying reasons may seek to take advantage of pricing differentials in bid-ask spreads, as stated above, persons who engage in

a pattern of trading for their own account having the effect of providing liquidity to other market participants should be subject to the dealer regulatory regime, even if they are also registered investment advisers or private funds. As discussed below, the important protections provided by the dealer regulatory framework differ from those under the private fund and private fund advisers regulatory scheme established by the Advisers Act.[196] The primary revenue factor, as with the expressing trading interest standard, focuses on activity rather than label or status. Market participants will need to determine, based on their trading activities, whether their portfolio management and trading strategies meet this standard.

To summarize, one fundamental and historically recognized view of dealer activity is trading in a manner designed to profit from spreads or liquidity incentives.[197] Under the final rules, persons providing liquidity because they regularly supply it and the revenue they earn as a result through bid-ask spreads or liquidity incentives as their primary source of revenue are "in the business" of dealing, and such persons regularly undertaking this liquidity-providing role for their own account in overall trading and market activity must register as dealers and be subject to the dealer regulatory regime.

### 2. Quantitative Standard

The Commission proposed a quantitative standard that would establish a bright-line test under which persons engaging in certain specified levels of activity in the U.S. Treasury market would be defined to be buying and selling government securities "as a part of a regular business," regardless of whether they meet any of the qualitative factors.[198] Specifically, proposed 17 CFR 240.3a44–2(a)(2) (proposed "Rule 3a44–2(a)(2)") provided that a person engaged in buying and selling government securities for its own account would be engaged in such activity "as a part of a regular business" if that person in each of four out of the last six calendar months, engaged in buying and selling more than $25 billion of trading volume in government

---

validate transactions, leaving unclear whether certain 'validators' might be captured by the third qualitative factor."); DeFi Fund Comment Letter (questioning if the "liquidity provider tokens" participants in digital asset liquidity pools receive in proportion to the amount of liquidity they contribute to the pool constitute an "incentive . . . for liquidity-supplying trading interests").

[187] See Proposing Release at 23069.

[188] Whether a particular structure or activity in the crypto asset securities market, including the so-called DeFi market, involves a trading venue is a facts and circumstances determination.

[189] See Proposing Release at 23069.

[190] See Proposing Release at 23055.

[191] Proposing Release at 23069.

[192] See Gretz Comment Letter (stating " 'Primarily' might be a bit vague. Technically, an entity could earn more revenues by price increases on the securities being held in stock for trading than by catching bid-ask spreads.").

[193] See DeFi Fund Comment Letter; ADAM Comment Letter. A commenter explained that "a blockchain utilizing proof-of-stake validation lets users participate in verifying the blockchain by staking the native token, providing a reward if they propose and approve valid smart contracts." ADAM Comment Letter.

[194] See section II.A.1.b.

[195] As discussed above, a threshold question is whether the person has or controls total assets of less than $50 million, and if so, the person would not be captured by the final rules. See supra note 132 and accompanying text.

[196] See section II.A.3.

[197] Proposing Release at 23069. The Commission has previously identified a person's seeking, through its presence in the market, compensation through spreads or fees, or other compensation not attributable to changes in the value of the security traded, as a factor indicating dealer activity. See Entities Release at 30609.

[198] See Proposing Release at 23071, n.165.

securities as defined in section 3(a)(42)(A) of the Exchange Act.[199]

Some commenters generally supported inclusion of the quantitative standard.[200] One commenter stated that "quantitative standard[ ] build[s] upon and [is] consistent with past Commission regulations and case law for defining a dealer." [201] The majority of commenters, however, urged that the Commission remove the quantitative standard, raising various issues and concerns with establishing a test based solely on trading volume.[202]

Many commenters maintained that the quantitative standard was arbitrary and overly broad, and opined that a volume standard alone could not distinguish between a dealer and a trader.[203] Several commenters stated that the quantitative standard would capture persons engaging in non-dealing trading activity.[204] Some commenters also stated that the trading volume threshold was too low in light of the size of the U.S. Treasury market and that the Proposing Release failed to provide sufficient detail on how the proposed trading volume would be measured and implemented.[205]

After consideration of the comments, the Commission has decided to eliminate the quantitative standard from the final rules. While a trading volume threshold could provide a bright-line test under which persons engaging in certain specified levels of activity in the U.S. Treasury market would be defined to be buying and selling securities "as a part of a regular business," the Commission has concluded such a bright-line test is unnecessary. The modified qualitative factors and otherwise applicable court precedent and Commission interpretations will appropriately address when market participants are acting as government securities dealers in the U.S. Treasury market by engaging in a "regular" pattern of buying and selling securities that has the effect of providing liquidity to other market participants. Therefore, the Commission has decided to delete the quantitative standard from the final rules.

In addition, as discussed in section II.A.5, no presumption shall arise that a person is not a government securities dealer as defined by the Exchange Act solely because that person does not satisfy Rule 3a44–2(a).[206] Thus, market participants acting similarly to traditional dealers that are buying and selling U.S. Treasuries as part of a regular business may still meet the definition of government securities dealer even absent the activity identified in the qualitative standard.

### 3. Exclusions

The proposed rules provided exclusions for certain market participants that the Commission determined do not provide liquidity to the markets in a manner requiring dealer registration or are subject to a comparable regulatory structure which addresses the types of concerns that the proposed rules were intended to address. The Commission is adopting these exclusions as proposed. In addition, the Commission is adding exclusions for central banks, sovereign entities, and international financial institutions, as defined in the final rules. Each of these exclusions is discussed in more detail below.[207]

### a. Person That Has or Controls Assets of Less Than $50 Million

In the Proposing Release, the Commission proposed to exclude from the proposed rules "[a] person [208] that has or controls total assets of less than $50 million." The Commission stated that providing an exception was appropriate because, even though a person that has or controls less than $50 million in assets may be engaged in the activities identified in the qualitative standard, the frequency and nature of such a person's securities trading are less likely to pose the types of financial and operational risks to the market that may be associated with the significant dealer activity that the rules were designed to address.[209]

Commenters that addressed this exclusion raised a number of concerns.[210] Some commenters stated that it was arbitrary or inconsistent with the plain reading of the "dealer" definition.[211] A few commenters stated that the threshold was too low.[212] However, one of those commenters also said that the threshold could be too high for some securities.[213]

After consideration of comments, the Commission is adopting this exclusion as proposed. While we appreciate commenters' concerns, as indicated in the Proposing Release, the final rules are intended to capture market participants not registered as dealers that serve a critical dealer role in the securities and government securities markets through their liquidity provision or significant and regular trading activity in the market. These smaller market participants are unlikely to engage in the significant liquidity provision that is

---

[199] Proposed Rule 3a44–2(a)(2); Proposing Release at 23071.

[200] See the Better Markets Comment Letter (stating that the "quantitative standards for government securities markets, coupled with the proposed qualitative standards, will help to capture the high-frequency trading firms trading in significant volumes of U.S. Treasury bonds that are not currently registered with the Commission."); *see also* FINRA Comment Letter.

[201] Better Markets Comment Letter.

[202] *See, e.g.,* Element Comment Letter; MMI Comment Letter; Two Sigma Comment Letter I; FIA PTG Comment Letter I; NAPFM Comment Letter; AIMA Comment Letter II; ADAM Comment Letter; SIFMA AMG Comment Letter; McIntyre Comment Letter II; SIFMA Comment Letter I; Overdahl Comment Letter; Fried Frank Comment Letter; MFA Comment Letter I; ICI Comment Letter; Morgan Lewis Comment Letter; T. Rowe Price Comment Letter; Citadel Comment Letter; DeFi Fund Comment Letter; Comment Letter of Investment Advisers Association (June 6, 2022) ("IAA Comment Letter I"); BlackRock Comment Letter; FIA PTG Comment Letter II; Comment Letter of Darrell Duffie (Jan. 10, 2024) ("Duffie Comment Letter").

[203] *See, e.g.,* AIMA Comment Letter II; ICI Comment Letter; T. Rowe Price Comment Letter.

[204] *See, e.g.,* FIA PTG Comment Letter I; SIFMA AMG Comment Letter; Morgan Lewis Comment Letter; MMI Comment Letter; Two Sigma Comment Letter I; NAPFM Comment Letter; AIMA Comment Letter II; MFA Comment Letter I; McIntyre Comment Letter II; Element Comment Letter; ICI Comment Letter; Citadel Comment Letter; T. Rowe Price Comment Letter; Fried Frank Comment Letter; Consensys Comment Letter; ADAM Comment Letter; SIFMA Comment Letter I; Overdahl Comment Letter.

[205] *See, e.g.,* Two Sigma Comment Letter I; FIA PTG Comment Letter I; Element Comment Letter; MFA Comment Letter II. One commenter agreed that repurchase and reverse repurchase transactions should be excluded from counting towards the quantitative standard threshold. *See* ACLI Comment Letter.

[206] *See* section II.A.5.

[207] The Commission has determined to create bright-line exclusions for certain persons from the scope of the final rules for policy reasons specific to these types of persons as further defined below. This is in contrast to various exclusions requested by commenters related to, among other things, specific securities activities that market participants may engage in (such as certain trading strategies or asset classes). Because these specific securities activities and specific types of securities cannot be viewed in isolation, and could constitute in whole or in part liquidity-providing activity that these

rules are designed to address, the Commission is not adding these categorical exclusions. Rather, as with any other securities activities, whether these specific securities activities result in triggering the provisions of the final rules requires a facts and circumstances analysis of the totality of a person's activities. The Commission, however, has significantly refined its proposal (including, notably, the aggregation provision) so that persons whose securities activities may have been captured may no longer be within the scope of the rules as adopted.

[208] As noted below, the term "person" has the same meaning as prescribed in section 3(a)(9) of the Exchange Act: "a natural person, company, government, or political subdivision, agency, or instrumentality of a government."

[209] Proposing Release at 23062.

[210] One commenter also raised practical issues about how the exclusion would operate in connection with the proposed aggregation provision; however, these concerns have been mooted with the removal of the aggregation provision. *See* ICI Comment Letter.

[211] *See, e.g.,* MMI Comment Letter; SIFMA AMG Comment Letter; Consensys Comment Letter.

[212] *See* Defi Fund Comment Letter; Element Comment Letter; Gretz Comment Letter; Consensys Comment Letter. *See also* section III.B.2.

[213] *See* Gretz Comment Letter.

the focus of the final rules.[214] Importantly, we disagree that the $50 million threshold is arbitrary or too low or too high because, as stated in the Proposing Release, this exception parallels an established and well understood standard for distinguishing between "retail" and "institutional" accounts for purposes of broker-dealer regulation.[215] In the context of the final rules, persons that have or control assets of $50 million or more—so-called "institutional" accounts—are more likely to have a significant impact on the market as opposed to "retail" accounts of smaller market participants who are less likely to pose financial and operational risks to the markets. Further, in response to the commenter who raised practical issues about how the exclusion would operate in connection with investment advisers' separately managed accounts, as discussed in more detail below, the Commission has removed the aggregation provision, which should address those concerns.[216] Finally, we reiterate that this is not an exclusion from the "dealer" definition for all purposes, but only for purposes of the final rules, which focus on *de facto* market making. Outside of the context of these rules, the question of whether any person, including a person that has or controls less than $50 million in total assets, is acting as a dealer, as opposed to a trader, will remain a facts and circumstances determination. For example, an underwriter with assets below $50 million could still be required to register as a dealer.

### b. Registered Investment Companies, Private Funds, and Registered Investment Advisers

The Commission also proposed to exclude registered investment companies registered under the Investment Company Act from the application of the rules.[217] In proposing the exclusion, the Commission cited to the comprehensive regulatory framework under the Investment Company Act and its extensive oversight and broad insight into the operations and activities of registered investment companies.[218] In contrast, the proposed rules did not exclude private funds, instead discussing differences between the regulatory regime that applies to registered advisers to private funds, and the one that applies to dealers, including leverage constraints and reporting.[219] As explained in the Proposing Release, private funds are not subject to the extensive regulatory framework of the Investment Company Act.[220] Further, the Commission did not propose to create a blanket exclusion for registered investment advisers because a registered investment adviser trading for its "own account" could nevertheless meet the definition of a "dealer" and therefore should be required to register.[221]

Many commenters agreed with the proposed exclusion for registered investment companies.[222] However, most of these commenters also stated that the exclusion should be expanded to registered investment advisers[223] and private funds managed by registered investment advisers.[224] Commenters

cited to the regulatory regime under the Advisers Act.[225] Some commenters stated that some of the reasons supporting an exclusion for registered investment companies also would support an exclusion for registered advisers,[226] or an exclusion for private funds.[227]

In addition, many commenters stated that imposing dealer requirements—and in particular net capital requirements[228]—on private funds would be inappropriate and untenable,[229] and could in turn significantly and negatively affect liquidity if private funds were to modify or cease their trading activity.[230] As support for an exclusion for private funds, many commenters cited to Form PF, which requires certain registered advisers that have at least $150 million in private fund assets under

---

[214] *See* Proposing Release at 23062.

[215] Under FINRA rules, a "retail" account is distinguished from an "institutional" account that is defined, in part, as belonging to "a person (whether a natural person, corporation, partnership, trust, or otherwise) with total assets of at least $50 million." FINRA Rule 4512(c)(3); *see also* Business Conduct Standards for Security-Based Swap Dealers and Major Security-Based Swap Participants, Exchange Act Release No. 77617 (Apr. 14, 2016), 81 FR 29959, 29995 n.462 (May 13, 2016) (adopting a similar threshold in connection with security-based swap dealers, for purposes of 17 CFR 240.15Fh–3(f)(4). The Commission considered but is not using the definition of "retail customer" adopted as part of Regulation Best Interest, as the policy considerations behind that definition are different than those presented here: the focus of Regulation Best Interest is the regulatory protections provided to customers who receive recommendations from broker-dealers, whereas the focus of this rulemaking is the regulation of persons engaging in certain dealer-like activities. *See* Regulation Best Interest: The Broker-Dealer Standard of Conduct, Exchange Act Release No. 86031 (June 5, 2019), 84 FR 33318 (July 12, 2019).

[216] *See supra* note 254 and accompanying text.

[217] *See* proposed 17 CFR 240.3a5–4(a)(2)(ii) and 240.3a44–2(a)(3)(ii).

[218] Registered investment companies are subject to a regulatory framework under the Investment Company Act and rules thereunder, which imposes requirements regarding capital structure, custody of assets, investment activities, transactions with affiliates and other conflicts of interest, and the duties and independence of boards of directors, among other things. Moreover, registered investment companies are subject to statutory limits on indebtedness and rules that limit leverage risk. In addition, registered investment companies must adopt, implement, and review at least annually written policies and procedures reasonably designed to prevent violations of the Federal securities laws by the fund. Proposing Release at 23063.

[219] Proposing Release at 23083.

[220] *Id.*

[221] Proposing Release at 23073–74.

[222] *See, e.g.,* ICI Comment Letter; MFA Comment Letter II; Element Comment Letter; McIntyre Comment Letter II; IAA Comment Letter I.

[223] *See, e.g.,* SIFMA Comment Letter I; SIFMA AMG Comment Letter; IAA Comment Letter I; Comment Letter of Investment Adviser Association (Oct. 17, 2023) ("IAA Comment Letter II").

[224] *See, e.g.,* MFA Comment Letter I (recommending that the exclusion for registered investment companies be expanded "to cover any person registered as an investment adviser (or

exempt or excluded from registration other than as a family office), as well as any private fund client of such adviser (and any affiliated general partner, managing member, or similar control person of the private fund client), with respect to trading done by the person with or through a registered broker-dealer"); Element Comment Letter; McIntyre Comment Letter II; IAA Comment Letter I; T. Rowe Price Comment Letter; IAA Comment Letter II.

[225] *See, e.g.,* MFA Comment Letter I ("Advisers and the private funds they manage are already subject, directly or indirectly, to comprehensive regulation, which is sufficient to address the objectives of the Proposal without subjecting them to dealer registration.").

[226] *See, e.g.,* T. Rowe Price Comment Letter ("It appears the SEC's rationale for excluding registered investment companies is that they are subject to various requirements, including those related to custody, conflicts of interest, books and records, policies and procedures, and designation of a chief compliance officer. RIAs should also be excluded as they are subject to similar requirements, as well as a robust registration regime, and must act in accordance with their fiduciary duties."); McIntyre Comment Letter II ("[T]he Commission notes that the 'regulatory framework' to which registered investment companies are subject justifies the exclusion of these entities. However, [we believe] that the current regulatory environment and framework for registered investment advisers is also very robust. . ."). *See also* Scott Comment Letter.

[227] *See, e.g.,* Citadel Comment Letter ("The disparate treatment of private funds and mutual funds . . . further highlights the lack of justification for requiring private funds to register as dealers . . . Moreover, the Commission's logic for exempting RICs equally applies to private funds.").

[228] *See, e.g.,* MFA Comment Letter I (stating that the Net Capital Rule functions more like a restriction on the types of investments and trading a firm can engage in than a restriction on leverage and that the requirements would impede investors' highly negotiated liquidity rights); Citadel Comment Letter (stating that the Net Capital Rules would impose substantial costs and finding "the absurdity of applying these rules to private funds, which do not hold customer securities"). *See also* AIMA Comment Letter II; Morgan Lewis Comment Letter; Fried Frank Comment Letter; T. Rowe Price Comment Letter; IAA Comment Letter I; Element Comment Letter.

[229] *See, e.g.,* Two Sigma Comment Letter I; MFA Comment Letter I; NAPFM Comment Letter; AIMA Comment Letter II.

[230] *See, e.g.,* Schulte Roth Comment Letter.

management to report certain confidential information about their private funds.[231]

Some commenters described potential practical difficulties with applying the dealer regulatory framework to private fund advisers and private funds[232] and with having a managed account register as a dealer.[233] One comment letter suggested that if a fund or separately managed account were required to register as a dealer, a conflict could arise between the fund's or separately managed account's adviser's fiduciary duty to achieve best execution and a best execution obligation to a counterparty "when participating in all-to-all trading protocols where they may match with another end-user."[234] We do not believe that such a conflict would arise in this scenario.[235]

As support for such potential practical difficulties, some commenters stated that private funds are merely pools of assets that rely on fund managers for all functions and therefore do not have personnel or infrastructure to meet the dealer regulatory requirements.[236] A few commenters questioned the Commission's concern[237] that exempting private funds and private fund advisers from the proposed rules would produce negative outcomes with respect to PTFs,[238] with one of these commenters citing to "leverage constraints and reporting" as the "only two differences" between the private funds and dealer regulatory framework as noted in the Proposing Release.[239] Another commenter identified possible exceptions from the application of certain SEC and FINRA rules that may be necessary if registered investment advisers and/or the private funds they advise were required to register as dealers.[240] Some commenters identified issues with imposing a dealer regulatory framework on investment advisers,[241] with one commenter stating that the "unsuitability of the dealer regime for advisers is highlighted by the inconsistency of an adviser needing to stand ready as a dealer to provide liquidity to, *i.e.,* trade as principal with, the market, potentially through its clients' accounts, while being prohibited from acting in that capacity with its clients."[242]

After consideration of the comments and for the reasons stated here and in the Proposing Release,[243] the Commission is adopting the exclusion for registered investment companies as proposed. As stated above, many commenters generally supported the exclusion and did not suggest specific changes for registered investment companies but instead requested that the Commission expand the scope of the exclusions to include registered investment advisers and private funds.

The Commission, however, is not including an express exclusion for private funds or registered investment advisers. Depending on the totality of the facts, a private fund may be engaged in the business of buying and selling securities for its own account.[244] Similarly, a registered investment adviser that is trading for its "own account" could implicate dealer registration requirements. Further, as stated in the Proposing Release, market actors that are engaged in dealing activity should be subject to the dealer regulatory regime, which includes not only registration obligations, but also regulatory requirements specific to dealer activity and oversight that broadly focus on the dealer market functionality—that is, the impact of dealing activity on the market as a whole.[245]

Entities engaging in dealing activity that meet the qualitative standard are required to register as dealers and comply with regulatory requirements that are applicable to dealer activity. Dealer regulatory requirements address related but distinct concerns from investment adviser regulation. In addition, dealer registration enhances regulatory oversight[246] of market participants' trading activities and interactions with the market overall. In this regard, dealer regulatory requirements focus broadly on market functionality (along with protecting investors under principles of fair dealing between parties).[247]

However, the Commission is mindful of concerns raised by commenters regarding the application of the dealer regime to registered investment advisers and private funds and as such has made significant changes to the definition of "own account" to remove the

[231] *See, e.g.,* MFA Comment Letter I; T. Rowe Price Comment Letter; AIMA Comment Letter II; *see also* 17 CFR 279.9.

[232] *See, e.g.,* AIMA Comment Letter II; *see also* ABA Comment Letter.

[233] *See, e.g.,* ICI Comment Letter; SIFMA AMG Comment Letter ("In addition, the Proposal fails to consider how the principal trading prohibitions in the Advisers Act would impact an investment adviser that comes within the meaning of the term dealer solely because of its managed accounts.").

[234] *See* BlackRock Comment Letter.

[235] Rather than "counterparty," FINRA Rule 5310 applies to "any transaction for or with a *customer or a customer of another broker-dealer*" (emphases added). The commenter did not specify what would constitute an "all-to-all trading protocol." However, a dealer simply posting an order on a fully anonymous platform or providing a price in response to a bid request or bid list presented to the dealer or other competitive bidding process would likely not be subject to a best execution obligation since the dealer has not accepted a customer order for the purpose of facilitating the handling and execution of such order; this situation is analogous to Supplementary Material .04 to FINRA Rule 5310 which draws a distinction between those situations in which a firm acts solely as the buyer or seller in connection with an order presented against the firm's quote as opposed to accepting an order for handling and execution. *See* FINRA Regulatory Notice 15–46. *See also infra* notes 599–601 and accompanying text.

[236] *See, e.g.,* ABA Comment Letter; MFA Comment Letter I; AIMA Comment Letter II.

[237] Proposing Release at 23096 ("Excluding these funds would guarantee that the dealer regime would fail to capture this type of securities dealing activity. Furthermore, a blanket exclusion for hedge funds may provide an opportunity for regulatory arbitrage. For example, PTFs may seek to restructure themselves as private funds, thus preempting the intended benefits of the proposed rules.").

[238] *See* AIMA Comment Letter II; MFA Comment Letter I; IAA Comment Letter I; *see also* T. Rowe Price Comment Letter.

[239] *See* AIMA Comment Letter II ("Indeed, the Commission's view expressed in the Proposal is that the only differences between the regulatory regime for private fund advisers and securities dealers are leverage constraints and reporting, yet the Commission has chosen to include both private funds and their advisers within the scope of the Proposal.").

[240] *See* Element Comment Letter (identifying, in part, licensing of personnel who structure private placements on behalf of Required Registrants with the Series 79 license; application of Reg NMS Rule 611 to cross-trades effected on behalf of a Required Registrant by its investment adviser; application of the Net Capital Rule to Required Registrants; and application of the possession and control requirements of the customer protection rule, 17 CFR 240.15c3–3 ("Rule 15c3–3"), in situations where hypothecation of securities may be in the best interests of an investment advisory client).

[241] *See, e.g.,* IAA Comment Letter I ("Unlike brokers or dealers, advisers are prohibited from holding client assets or from taking client assets onto their balance sheets. To the extent that advisers trade securities, they do so through a broker or dealer intermediary, generally on behalf of and for the benefit of their clients"); *see also* T. Rowe Price Comment Letter ("We also are concerned that the SEC has not adequately assessed the feasibility and impact of an RIA being regulated as a dealer while also being subject to the [Advisers Act] for the same activities, nor does the Proposal detail how an entity could practically comply with both regimes.").

[242] *See* IAA Comment Letter I.

[243] *See supra* note 218 and accompanying text.

[244] *See, e.g., In the Matter of Murchinson Ltd., Marc Bistricer, and Paul Zogala,* Exchange Act Release No. 92684 (Aug. 17, 2021) (settled matter). In *Murchinson,* the Commission charged the principals of a hedge fund with causing dealer violations under section 15(a).

[245] Proposing Release at 23078–79.

[246] Dealers and government securities dealers are subject to extensive regulation and oversight and generally must: (i) register with the Commission and become members of an SRO; and (ii) comply with Commission and SRO rules, including certain financial responsibility and risk management rules, transaction and other reporting requirements, operational integrity rules, and books and records requirements, all of which help to enhance market stability by giving regulators increased insight into firm-level and aggregate trading activity. *See* section I.A.

[247] Proposing Release at 23056. *See also id.* at 23078–79 (describing the regulatory requirements of registered dealers and government securities dealers).

Case 4:24-cv-00250-O Document 1-1 Filed 03/18/24 Page 22 of 74 PageID 46

aggregation standard in order to appropriately tailor the scope of persons captured by the final rules.

Further, there are material differences between the private fund and dealer regulatory frameworks, and dealer registration offers important benefits and regulatory protections to address the risks related to dealing activities.[248] As explained in the Proposing Release, registered private fund advisers are regulated under the Advisers Act and information on private fund activities is reported by registered private fund advisers on Form PF. The information the Commission obtains on certain private funds through its regulation of registered investment advisers, however, differs from that the Commission collects for the purposes of dealer regulation.[249] Private funds also do not have the same level of reporting of their securities transactions. For example, fixed income transactions between private funds are not directly reported in TRACE. If their fixed-income trade is with a broker-dealer and reported by the broker-dealer, private funds appear anonymously in TRACE.[250]

Although, as commenters noted, the Commission collects some information about certain private funds through Form PF, this reporting alone is not a sufficient substitute for the comprehensive dealer requirements because the dealer requirements are specific to dealer activity. For example, Form PF only requires reporting related to a subset of the private fund industry and does not include individual trade reporting details, which would give regulators greater insight into securities trading patterns, including the ability to more efficiently match trades to market participants.[251]

In response to commenters who stated that private funds are merely pools of assets that rely on fund managers for all functions and therefore do not have personnel or infrastructure to meet the dealer regulatory requirements, to the extent that a private fund engages in activities that trigger dealer registration under the final rules, such private funds would need similarly to establish means, whether by contract or otherwise, of complying with the obligations for registered dealers, just as the fund must do to comply with any other regulatory obligation.

In response to the commenter who suggested there were "only two

differences" between the dealer and private fund regulatory regimes, the examples provided in the Proposing Release (i.e., leverage constraints and reporting requirements) were non-exhaustive examples.[252] As discussed in the Proposing Release, registered dealers' leverage is limited by net capital requirements, which must be maintained at all times, while private funds have no formal leverage constraints.[253] Further, in response to commenters who raised concerns about the application of certain SEC and FINRA rules or stated that certain dealer requirements were untenable or inappropriate, while the Commission acknowledges that complying with a new rule set may require market participants to revise their business models, as discussed further in the economic analysis, appropriate regulation of dealer activities, and the benefits associated with enhancements to investor protection and orderly markets, justifies these associated costs and difficulties associated with registration.[254]

Finally, while not excluding registered investment advisers and private funds, the Commission is, however, modifying the definition of "own account" to mean an account held in the name of, or for the benefit of, that person and removing the proposed first qualitative factor. These changes will respond to concerns related to separately managed accounts and investment advisers trading on behalf of their clients, including those exercising discretion; these investment advisers generally will not be captured by the final rules because they would not be buying and selling for their "own account." Private funds that are buying and selling for their "own account" in a way that meets the qualitative standard could be captured by the final rules. To the extent that private funds or investment advisers trigger application of the final rules, they would need to comply with the dealer registration requirements or cease engaging in dealer activity.

c. Official Sector Exclusions

The Commission is adopting express exclusions for central banks, sovereign entities, and international financial institutions, as defined in the final rules. Together, these exclusions are

referred to as the "Official Sector Exclusions."

The Official Sector Exclusions are designed to permit central banks, sovereign entities, and international financial institutions to continue to pursue important policy goals, and to be consistent with principles of international comity and the privileges and immunities granted to foreign central banks, foreign sovereigns and sovereign entities, and certain international financial institutions under U.S. Federal law.[255]

For purposes of the Official Sector Exclusion, the final rules define a "central bank" as a reserve bank or monetary authority of a central government (including the Board of Governors of the Federal Reserve System or any of the Federal Reserve Banks). This definition also includes the Bank for International Settlements ("BIS"). The BIS is owned by central banks,[256] so it is appropriate to include the BIS in the final rules' definition of central bank. The final rules define a "sovereign entity" as a central government (including the U.S. Government), or an agency, department, or ministry of a central government. Finally, the final rules define an "international financial institution" by identifying specific entities and providing that an "international financial institution" also includes any other entity that provides financing for national or regional development in which the United States government is a shareholder or contributing member.[257] The following entities are specifically identified as an "international financial institution" under the final rule: (1) African Development Bank; (2) African Development Fund; (3) Asian Development Bank; (4) Banco Centroamericano de Integración Económica; (5) Bank for Economic Cooperation and Development in the Middle East and North Africa; (6) Caribbean Development Bank; (7) Corporación Andina de Fomento; (8) Council of Europe Development Bank; (9) European Bank for Reconstruction

---

[248] Proposing Release at 23083.

[249] Id.

[250] Id.

[251] 17 CFR 279.9. See section III.C.1.c for a discussion of the benefits of additional regulatory reporting.

[252] See section I.A (citing to the benefits of dealer registration).

[253] Proposing Release at 23083. See also section III.B.2.b (stating that private funds and investment advisers do not have to comply with the Net Capital Rule or with any other direct, regulatory constraint on leverage).

[254] See section III.C.

[255] See, e.g., Standards for Covered Clearing Agencies for U.S. Treasury Securities and Application of the Broker-Dealer Customer Protection Rule With Respect to U.S. Treasury Securities, Exchange Act Release No. 99149 (Dec. 13, 2023).

[256] See BIS, About BIS—Overview, https://www.bis.org/about/index.htm (noting that "the BIS is owned by 63 central banks, representing countries from around the world that together account for about 95% of world GDP.").

[257] Cf. 17 CFR 50.76(b) (the Commodity Futures Trading Commission ("CFTC") definition of international financial institution for purposes of exemptions from swap clearing requirement).

and Development; (10) European Investment Bank; (11) European Investment Fund; (12) European Stability Mechanism; (13) Inter-American Development Bank; (14) Inter-American Investment Corporation; (15) International Bank for Reconstruction and Development; (16) International Development Association; (17) International Finance Corporation; (18) International Monetary Fund; (19) Islamic Development Bank; (20) Multilateral Investment Guarantee Agency; (21) Nordic Investment Bank; (22) North American Development Bank.

The exclusion is appropriate for the Federal Reserve System—the central bank of the United States—both because excluding the Federal Reserve System will not contravene any of the Commission's goals in adopting the final rules and because of the Federal Reserve System's unique role in the U.S. Treasury market and the U.S. economy. Entities that constitute part of the Federal Reserve System should be excluded from dealer registration because requiring them to register as dealers would not address the primary concerns animating the final rules.[258] Moreover, transactions in U.S. Treasury securities are an important tool in the fiscal and monetary policy of the United States.[259] In particular, cash and repo transactions in U.S. Treasury securities are one of the primary tools used by the Federal Reserve Bank of New York to conduct open market transactions at the direction of the Federal Open Market Committee.[260] The System Open Market Account, which is managed by the Federal Reserve Bank of New York's System Open Market Trading Desk, is "the largest asset on the Federal Reserve's balance sheet." [261] In light of the key role of open market operations

conducted by the Federal Reserve Bank of New York in the monetary policy of the United States, an exemption from the final rules is appropriate for the Federal Reserve System.[262]

With respect to central banks generally, central banks are typically created by statute and are part of, or aligned with, a central government.[263] Further, as with the Federal Reserve System in the United States, the purpose of a central bank is generally to effectuate monetary policy for its respective nation.[264] In light of ongoing expectations that Federal Reserve Banks and agencies of the Federal government would not be subject to foreign regulatory requirements in their transactions in the sovereign debt of other nations, the principles of international comity counsel in favor of exempting foreign central banks—as well as sovereign entities and international financial institutions.[265]

Finally, Congress has granted foreign central banks, other foreign sovereign entities, and certain international financial institutions special privileges and immunities under U.S. Federal

law,[266] and thus in these circumstances the Commission is not including these entities in the final rules.

### d. Other Requests for Exclusions

The Commission received a number of comments about how the proposed rules would apply to crypto assets. In the Proposing Release, the Commission explained that the definition of "dealer" and the accompanying registration requirements of the Exchange Act were drawn broadly by Congress to encompass a wide range of activities involving securities markets and participants in those markets.[267] The Commission further stated that proposed Rules 3a5–4 and 3a44–2 would apply to any crypto asset that is a "security" as defined by section 3(a)(10) of the Exchange Act or a "government security" as defined by section 3(a)(42) of the Exchange Act, respectively.[268]

The Commission received several comments concerning the application of the proposed rules to crypto assets that are securities that trade through centralized trading platforms or trade in the so-called DeFi markets, and to persons who trade crypto asset securities. Many opposed applying the proposed rules to persons transacting in crypto asset securities.[269] Commenters

---

[258] Regulators already have insight into the activities of the Federal Reserve System, and the Federal Reserve Banks already consider market integrity and resiliency issues. *See, e.g.,* Enhancing the Resilience of the U.S. Treasury Market 2022 Staff Progress Report (Nov. 10, 2022) at 1, *available at https://home.treasury.gov/system/files/136/2022-IAWG-Treasury-Report.pdf* (stating that the Inter-Agency Working Group for Treasury Market Surveillance "was formed by the Treasury Department, SEC, and Federal Reserve Board in 1992 to improve monitoring and surveillance and strengthen interagency coordination with respect to the Treasury markets . . .").

[259] 12 U.S.C. 225a (defining goals of monetary policy); *see also* Federal Reserve Bank; Monetary Policy: What Are Its Goals? How Does It Work? *available at https://www.federalreserve.gov/monetarypolicy/monetary-policy-what-are-its-goals-how-does-it-work.htm.*

[260] *See* Federal Reserve Bank; Monetary Policy Implementation, *available at https://www.newyorkfed.org/markets/domestic-market-operations/monetary-policy-implementation.*

[261] *Id.*

[262] *See* Order Exempting the Federal Reserve Bank of New York, Maiden Lane LLC, Exchange Act Release No. 61884 (Apr. 9, 2010) (granting exemptions to the Federal Reserve Bank of New York, Maiden Lane LLC and the Maiden Lane Commercial Mortgage Backed Securities Trust 2008–1 in connection with restructuring of debt instruments acquired by the Federal Reserve Bank of New York when it facilitated the acquisition of the Bear Stearns Companies Inc. by JP Morgan Chase & Co., including permitting receipt of compensation that is calculated by reference to underwriting fees received by other parties to the restructuring). Congress similarly exempted transactions in which one counterparty is a member of the Federal Reserve System from the regulation of swaps and security-based swaps in Title VII of the Dodd-Frank Act. *See* 15 U.S.C. 78c(a)(68)(A) (stating that a security-based swap is a swap, as defined in 7 U.S.C. 1a(47), subject to certain other conditions); 7 U.S.C. 1a(47)(B)(ix) (excluding from the definition of swap any transaction in which one counterparty "is a Federal Reserve bank, the Federal Government, or a Federal agency that is expressly backed by the full faith and credit of the United States").

[263] The authorizing statutes generally provide that the government owns all or part of the capital stock or equity interest of the central bank. *See, e.g.,* Capital of the ECB Protocol on the Statute of the European System of Central Banks and of the European Central Bank ("ECB Protocol"), Article 28.2, *available at https://www.ecb.europa.eu/ecb/legal/pdf/en_statute_2.pdf.*

[264] *See, e.g.,* ECB Protocol, *supra* note 263, Article 3.1; Bank of Japan Act, Articles 1 and 2, *available at https://www.boj.or.jp/en/about/boj_law/index.htm/#p01.*

[265] For similar reasons, the CFTC has similarly determined to exempt swap transactions involving foreign central banks, sovereign entities, and international financial institutions from the statutory requirement that swap transactions be cleared with a Derivatives Clearing Organization. *See* 17 CFR 50.75, 50.76; Swap Clearing Exemptions, 85 FR 76428, 76429–30, 76432 (Nov. 30, 2020).

[266] The United States has taken actions to implement international obligations with respect to such immunities and privileges. *See, e.g.,* International Bank for Reconstruction and Development ("World Bank") and International Monetary Fund (22 U.S.C. 286g and 22 U.S.C. 286h), the European Bank for Reconstruction and Development (22 U.S.C. 290l–6), the Multilateral Investment Guarantee Agency (22 U.S.C. 290k–10), the Africa Development Bank (22 U.S.C. 290–8), the African Development Fund (22 U.S.C. 290g–7), the Asian Development Bank (22 U.S.C. 285g), the Inter-American Development Bank (22 U.S.C. 283g), the Bank for Economic Cooperation and Development in the Middle East and North Africa (22 U.S.C. 290o), and the Inter-American Investment Corporation (22 U.S.C. 283hh). *See also* the International Organization and Immunities Act (22 U.S.C. 288) and the Foreign Sovereign Immunities Act (28 U.S.C. 1602) ("FSIA") (the FSIA is an exception from the general principle of sovereign immunity, which derives from customary international law).

[267] *See* Proposing Release at 23057.

[268] *See id.* at n.36.

[269] *See, e.g.,* Consensys Comment Letter; ADAM Comment Letter; Andreessen Horowitz Comment Letter; Blockchain Comment Letter; Comment Letter of Global Digital Asset and Cryptocurrency Association (May 27, 2022) ("GDCA Comment Letter"); U.S. Reps Comment Letter; Chamber of Digital Commerce Comment Letter; DeFi Fund Comment Letter. In addition to the comments discussed in section II.A.1, many of the commenters that represent participants of the crypto asset industry expressed concerns that mirror those of other commenters. For example, *compare* GDCA Comment Letter (stating that the "the proposed one-year compliance period is wholly impractical") *with* MFA Comment Letter I. In these circumstances, those comments are addressed in

Continued

expressed their concern that they do not understand which crypto assets are securities under the Federal securities laws and believe it would be inappropriate for the dealer regulatory framework to apply to persons transacting in crypto assets that are securities.[270] In addition, certain of these commenters expressed their view that there were aspects of the dealer regulatory framework, including registration, that could substantially raise the costs, and could be unworkable, for crypto asset security participants, and could hinder U.S. innovation in the crypto asset market.[271] For example, some commenters contended that the Commission has provided no viable path forward by which a Commission-registered broker-dealer can custody digital assets.[272] Commenters requested that if the Commission were to move forward with adopting the proposed rules, the Commission revise the final rules to carve out or tailor the application to persons transacting in crypto assets that are securities.[273]

One commenter supported applying the proposed rules to all securities, including crypto asset securities, and asked the Commission to resist suggestions from other commenters to carve out any types of assets that are securities from the "dealer" definition.[274] The commenter urged that the Commission apply securities regulation "equally to all securities regardless of how novel, 'innovative,' popular, or profitable such offerings may be."[275]

The Commission also received comments about the application of the proposed rules to so-called DeFi products, structures, and activities, and users and participants thereof.[276] One

commenter asserted that it is unreasonable for the proposed rules to apply to so-called DeFi products, structures and activities because they assert that these do not have a central controlling body and are just software, and that they do not raise the concerns identified by Congress when the Exchange Act.[277] Other commenters questioned whether the proposed rules would apply to participants in so-called DeFi products, structures and activities, including those involving the use of smart contracts, automated market makers, or other "all-to-all" or peer-to-peer execution protocols.[278] Commenters expressed concerns that the uncertainty of whether the proposed rules applied to such users or participants could lead to less liquidity in the crypto asset markets.[279] Commenters requested that the Commission clarify that the adopted rules would not apply to so-called DeFi products, structures or activities, or users or participants thereof.[280] One commenter also asserted that crypto assets were currency, and not securities, and asked that the Commission clarify that the proposed rules would not apply to "retailers" or "merchants" that accept payment for goods and services in crypto assets and exchange that crypto asset for fiat currency.[281]

As stated in the Proposing Release, as a threshold matter, the definitions of "dealer" and "government securities dealer" under sections 3(a)(5) and 3(a)(44) of the Exchange Act, and the requirement that dealers and government securities dealers register with the Commission pursuant to sections 15 and 15C of the Exchange Act, apply with respect to the buying and selling of all securities or government securities.[282] Therefore, Rules 3a5–4 and 3a44–2 as adopted apply to any person transacting in securities or government securities, regardless of where the security or government security trades.

The dealer framework is a functional analysis based on the securities trading activities undertaken by a person, not the type of security being traded. The final rules apply to the buying and selling of all securities, including crypto assets that are securities or government securities within the meaning of the Exchange Act. While some commenters stated that the proposed rules should not apply to so-called DeFi, whether there is a dealer involved in any particular transaction or structure (whether or not referred to as so-called DeFi) is a facts and circumstances analysis. There is nothing about the technology used, including distributed ledger technology-based protocols using smart contracts, that would preclude crypto asset securities activities from falling within the scope of dealer activity.[283] Accordingly, certain persons engaging in crypto asset securities transactions may be operating as dealers as defined under the Exchange Act.[284]

Rules 3a5–4 and 3a44–2 apply to persons transacting in crypto assets that meet the definition of "securities" or "government securities" under the Exchange Act. If a person's trading activities in crypto asset securities, including products, structures and activities involved in the so-called DeFi market, meet the definition of "as part of a regular business" as set forth in the final rules (i.e., the person engages in a regular pattern of buying and selling crypto asset securities that has the effect of providing liquidity to other market participants as stated in the qualitative standard), and no exception or exclusion applies, that person would be required to register as a dealer or government securities dealer under the Exchange Act and comply with the requirements applicable to dealers and government securities dealers. Contrary

their respective section in this Adopting Release. *See, e.g.,* section II.B.

[270] *See, e.g.,* ADAM Comment Letter; Chamber Digital Commerce Comment Letter; Blockchain Comment Letter; Andreessen Horowitz Comment Letter.

[271] *See, e.g.,* GDCA Comment Letter; ADAM Comment Letter; DeFi Fund Comment Letter; Consensys Comment Letter; Blockchain Comment Letter; U.S. Reps Comment Letter; American Blockchain PAC Comment Letter; Andreessen Horowitz Comment Letter; ABA Comment Letter.

[272] *See, e.g.,* GDCA Comment Letter; ABA Comment Letter.

[273] *See, e.g.,* Andreessen Horowitz Comment Letter; DeFi Foundation Comment Letter; ADAM Comment Letter. Similarly, one commenter recommended that the application to businesses in crypto assets be narrow. *See also* Gretz Comment Letter (stating "based on the principle of 'same business, same risks, same rules' we'd recommend to have the applicability on digital asset related businesses in narrow scope").

[274] *See* Better Markets Comment Letter.

[275] *See id.*

[276] *See, e.g.,* Andreessen Horowitz Comment Letter; DeFi Fund Comment Letter; Consensys Comment Letter.

[277] *See* Consensys Comment Letter.

[278] *See, e.g.,* DeFi Fund Comment Letter; Andreessen Horowitz Comment Letter.

[279] *See, e.g.,* DeFi Fund Comment Letter; Andreessen Horowitz Comment Letter.

[280] *See, e.g.,* Consensys Comment Letter; Andreessen Horowitz Comment Letter.

[281] *See* Consensys Comment Letter (stating that the rules might apply to "retailers" or "merchants" that accept crypto assets as payment for goods and as an ancillary part of their business, exchange the crypto assets for more traditional forms of currency). The final rules apply only to trading activities involving crypto assets that are securities. As the rules apply only to crypto assets that are securities, commenter's view as to the treatment of trading in crypto assets that are not securities are not relevant to the analysis.

[282] Proposing Release at 23057, n.36.

[283] *See supra* note 135.

[284] *See, e.g., SEC v. Beaxy Digital, Ltd., et al.,* No. 23–cv–1962 (N.D. Ill. Mar. 29, 2023) (Docket Entries 1, 4) (final judgment entered on consent enjoining crypto asset trading platform from operating an unregistered exchange, broker, dealer, and clearing agency). The President's Executive Order on Ensuring Responsible Development of Digital Assets recognized that "many activities involving digital assets are within the scope of existing domestic laws and regulations" and "[d]igital asset . . . intermediaries whose activities may increase risks to financial stability, should, as appropriate, be subject to and in compliance with regulatory and supervisory standards that govern traditional market infrastructures and financial firms." *See* President's Executive Order on Ensuring Responsible Development of Digital Assets, dated Mar. 9, 2022, *available at https://www.whitehouse.gov/briefing-room/presidential-actions/2022/03/09/executive-order-on-ensuring-responsible-development-of-digital-assets/.* As discussed below, these intermediaries perform a wide range of functions, many of which may already qualify them as dealers under the Exchange Act. *See* section III.B.2.c.

to what some commenters have stated, unless an exemption or exception applies, the Exchange Act requires the Commission to register and regulate persons acting as dealers in securities.[285] Regardless of the technology used to engage in crypto asset securities trading and transactions, if a person meets the qualitative standard in the final rule, or otherwise meets the definition of dealer under the Exchange Act, that person is subject to registration as a dealer, and the application of the dealer regulatory regime to its activities.[286]

In addition to the commenters requesting additional exclusions for private funds and advisers and for market participants transacting in crypto asset securities, a commenter stated that the Commission should exclude from the scope of the proposed rules inter-affiliate transactions used by banking institutions to centrally manage cash or risk throughout their organizations.[287] In the context of discussing its concerns with the proposed aggregation provision, the commenter stated that, consistent with exclusions for inter-affiliate transactions in the security-based swaps context, as well as with the language of the proposed rules, which focus on transactions that have "the effect of providing liquidity to other market participants," inter-affiliate transactions should be excluded.[288]

The Commission is not adding an exclusion for inter-affiliate transactions because the Commission is removing the aggregation provision, and the final rules have been modified to focus on the trading activity of a person for an account in the name of, or for the benefit of, that person.[289] In the context of whether a person is acting as a dealer, the Commission continues to believe

each person must independently consider its own trading activities to determine whether its activities require dealer registration.[290] Accordingly, the Commission is not excluding inter-affiliate transactions.[291]

Further, some commenters requested clarification that the proposed rules would not apply to a governmental plan, including public pensions, nor to state administrators managing state funds or to city administrators managing the city pension funds through an exclusion from the proposed rules.[292] One of these commenters specifically raised concerns that the proposed quantitative standard could subject state boards and similar investment fiduciaries and/or administrators of state pension funds to the rules.[293] The Commission is not adding an exclusion for such arrangements because the rules have been significantly modified, including by removal of the quantitative standard and the proposed first qualitative standard, such that the final rules should not capture these arrangements.[294]

### 4. Definitions and Anti-Evasion

As noted in the Proposing Release, the Exchange Act defines a "dealer" or "government securities dealer" as a person engaged in the business of buying and selling securities for its "own account."[295] The proposed rules

included definitions for the terms "person,"[296] "own account," "control," and "parallel account structure."

The proposed rules would have broadly defined a person's "own account" to mean any account that is: "held in the name of that person," or "held in the name of a person over whom that person exercises control or with whom that person is under common control,"[297] or "held for the benefit of those persons,"[298] subject to certain exclusions.[298]

The proposed rules would have excluded from the definition of "own account": (A) an account in the name of a registered broker, dealer, or government securities dealer, or an investment company registered under the Investment Company Act of 1940;[299] (B) with respect to an investment adviser registered under the Investment Advisers Act of 1940, an account held in the name of a client of the adviser unless the adviser controlled the client as a result of the adviser's right to vote or direct the vote of voting securities of the client, the adviser's right to sell or direct the sale of voting securities of the client, or the adviser's capital contributions to or rights to amounts upon dissolution of the client;[300] and (C) with respect to any person, an account in the name of another person that was under common control with that person solely because both persons are clients of an investment adviser registered under the Advisers Act unless those accounts constituted a parallel account structure.[301]

---

[285] See 15 U.S.C. 78o(a); *see generally* DAO 21(a) Report, *available at https://www.sec.gov/litigation/investreport/34-81207.pdf* (addressing the obligation to comply with the registration provisions of the Federal securities laws with respect to products and platforms involving emerging technologies and new investor interfaces).

[286] *See* section III.C.1 (discussing benefits of dealer regulatory framework).

[287] *See* SIFMA Comment Letter I.

[288] *Id.* SIFMA suggested that the Commission modify the text of the proposed second qualitative factor to clarify the treatment of inter-affiliate transactions by adding that the relevant expressions of trading interests are those made to other market participants "not controlling, controlled by or under common control with the person." *See* Comment Letter of Securities Industry and Financial Markets Association (Oct. 5, 2022) ("SIFMA Comment Letter III").

[289] *See* section II.A.4 (discussing the deletion from the definition of "own account" any accounts held in the name of a person over whom that person exercises control or with whom that person is under common control and corresponding exclusions).

[290] In addition, the Commission analyzes the activities of each entity in determining broker-dealer registration status. *See, e.g.,* Foreign Broker-Dealer Adopting Release at 30017 (stating "the Commission uses an entity approach with respect to registered broker-dealers. Under this approach, if a foreign broker-dealer physically operates a branch in the United States, and thus becomes subject to U.S. registration requirements, the registration requirements and the regulatory system governing U.S. broker-dealers would apply to the entire foreign broker-dealer entity.")

[291] *Id.*

[292] Comment Letter of Marcie Frost, Chief Executive Officer, California Public Employees Retirement System; Anastasia Titarchuk, Chief Investment Officer and Deputy Comptroller for Pension Investment & Cash Management, New York State Common Retirement Fund; Jase R. Auby, Chief Investment Officer, Teacher Retirement System of Texas; and Steven Meier, Chief Investment Officer and Deputy Comptroller for Asset Management, Office of the Comptroller of the City of New York (Nov. 3, 2023) ("Public Pension Fund Comment Letter"); Comment Letter of Lamar Taylor, Interim Executive Director & CIO, State Board of Administration of Florida (Nov. 1, 2023) ("Florida State Board Comment Letter").

[293] Florida State Board Comment Letter.

[294] See section I.B.

[295] 15 U.S.C. 78c(a)(5) ("The term 'dealer' means any person engaged in the business of buying and selling securities . . . for such person's *own account* through a broker or otherwise.") (emphasis added); 15 U.S.C. 78c(a)(44) ("The term 'government securities dealer' means any person engaged in the business of buying and selling government securities for his *own account,* through a broker or otherwise . . .") (emphasis added).

[296] Paragraph (b)(1) of the proposed rules provided that the term "person" has the same meaning as prescribed in section 3(a)(9) of the Exchange Act. Section 3(a)(9) of the Exchange Act defines a "person" as "a natural person, company, government, or political subdivision, agency, or instrumentality of a government." *See* 15 U.S.C. 78c(a)(9).

[297] When using the terms "aggregation provision" and "aggregation," the Commission is referring to the following language in the definition of "own account" that was included in the proposed rules: "held in the name of a person over whom that person exercises control or with whom that person is under common control." The removal of this provision eliminated the inclusion of entities under control or common control as set forth in the definition of "own account" under the proposed rules.

[298] Proposing Release at 23062. For purposes of paragraph (b)(2)(ii), the proposed rules incorporated the definition of "control" under 17 CFR 240.13h–1 ("Rule 13h–1").

[299] Proposed 17 CFR 240.3a5–4(b)(2)(ii)(A) and 240.3a44–2(b)(2)(ii)(A).

[300] Proposed 17 CFR 240.3a5–4(b)(2)(ii)(B) and 240.3a44–2(b)(2)(ii)(B).

[301] Proposed 17 CFR 240. 3a5–4(b)(2)(ii)(C) and 240.3a44–2(b)(2)(ii)(C). The Commission proposed to define parallel account structure to mean "a structure in which one or more private funds (each

Continued

Case 4:24-cv-00250-O Document 1-1 Filed 03/18/24 Page 26 of 74 PageID 50

The Proposing Release explained that the proposed definitions were intended to avoid incentivizing market participants to change their corporate structures for the purpose of avoiding registration.[302] The Proposing Release sought comment generally on this aspect of the proposed rules, and also asked whether the Commission should include an anti-evasion provision similar to Rule 13h–1(c)(2) under the Exchange Act.[303]

The Commission received extensive comment on the definitions included in the Proposing Release.[304] Most commenters did not support the definitions, and in particular, suggested eliminating the aggregation provision set forth in the definitions of "own account" and "control."[305] Commenters stated that the proposed rules represented a departure from the Commission's historical "entity" approach to broker-dealer regulation.[306]

Many commenters stated that the Commission should maintain an entity approach to registration, focusing on activity on an entity-by-entity basis,[307] and suggested that instead of aggregating the trading activities of entities within a corporate structure, the Commission should adopt an anti-evasion standard.[308] In particular, one commenter stated that the Commission should apply the principles of the entity approach to broker-dealer registration that it articulated in the adopting release to 17 CFR 240. 15a–6 ("Rule 15a–6") where registration activities are assessed on an entity-by-entity basis, rather than across affiliated entities.[309] Another commenter also cited to Rule 15a–6, stating that, in assessing whether a person has to register as a government securities dealer, such commenter believed that Congress intended that the Commission should focus on activity on an entity-by-entity basis rather than on an aggregated basis.[310]

Regarding the proposed aggregation standard, many commenters raised concerns that trading activities of entities, including banks and bank holding companies, that may be excepted or exempted from dealer registration would nonetheless need to be aggregated with, and potentially trigger registration of, commonly controlled persons under the proposed rules, contrary to policy decisions Congress and the Commission has made to not require these entities to register as dealers.[311] One commenter stated that the proposed aggregation provisions would force market participants to constantly monitor their trading activities and their volume (for government securities) across all subsidiaries and clients to determine whether either the qualitative or quantitative standards are triggered.[312] One commenter questioned why the Commission's aggregation approach departs substantially from established Commission precedent under Regulation M and section 13 reporting requirements.[313]

One commenter stated that the Commission has not explained how dealer registration would work if unrelated client accounts needed to be aggregated.[314] One commenter specifically raised concerns with the "common control" provision stating that: "Combining the securities buying of one entity and the securities selling of another entity when they are under common control is plainly not indicative of dealing activity when it is not coordinated or integrated."[315]

As noted above, many commenters did not support the definitions, specifically the definition of "own account," which they stated was overbroad.[316] One of these commenters stated that there is no connection between controlling—but not owning—an account and that account being the party's "own account."[317] Some commenters stated that all managed accounts should be excluded from the definition.[318]

Similarly, many commenters also did not support the definition of "control"

---

[302] Proposing Release at 23074.

[303] 17 CFR 240.13h–1(c)(2) ("Rule 13h–1(c)(2)"). Rule 13h–1(c)(2) provides that under no circumstances shall a person disaggregate accounts to avoid the identification requirements of the section.

[304] While we received letters from a variety of commenters, these letters primarily represented the asset management industry.

[305] See, e.g., SIFMA Comment Letter I; Fried Frank Comment Letter; Two Sigma Comment Letter I; ICI Comment Letter; AIMA Comment Letter II; ADAM Comment Letter; FIA PTG Comment Letter I; MFA Comment Letter I; T. Rowe Price Comment Letter. See also IAA Comment Letter I; SIFMA AMG Comment Letter; AIMA Comment Letter II ("If the Commission is going to subject private funds and private fund advisers to the Proposal, it should provide some clarity regarding its application and remove the aggregation requirements (including the 'under common control' element)"). While many commenters raised concerns with the definitions of "own account" and "control," most commenters did not specifically address the definition of "person." But see MFA Comment Letter I ("The Commission should define the term 'person' to recognize disaggregation by independent portfolio managers. The Proposal appears based on an assumption that all trading activity taking place within a single legal entity or commonly controlled group of legal entities takes place on an integrated and coordinated basis. However, it is quite common that a single entity (including a fund) or group of entities engage in trading through substantially (for all relevant purposes) independent portfolio managers. . . . To avoid this issue, the Commission should adopt a definition of 'person' that treats separately trading activity conducted by separate decision-makers without coordination of trading or cooperation among or between them. This treatment would be consistent with the treatment of truly separate accounts for other securities law purposes.").

[306] See, e.g., ADAM Comment Letter; SIFMA AMG Comment Letter.

[307] See, e.g., Morgan Lewis Comment Letter; ADAM Comment Letter; SIFMA AMG Comment Letter.

[308] See SIFMA Comment Letter I ("Instead of the Aggregation Rule, the Commission should adopt a targeted anti-evasion standard prohibiting a person from willfully evading dealer or government securities dealer status (under the existing definition and guidance) through coordinated trading activity across commonly controlled entities over which the person exercises investment discretion."). See also ICI Comment Letter ("[I]nstead of a blanket exclusion for parallel account structures from the exception for commonly managed accounts, we believe a general anti-evasion provision similar to Rule 13h–1(c)(2) under the Exchange Act is more appropriate."); IAA Comment Letter I ("The Commission should focus on general anti-evasion principles rather than imposing dealer regulation on advisers and their clients out of concern that some persons could theoretically evade regulation."); T. Rowe Price Comment Letter ("A better way to address potential abusive situations is to impose an anti-evasion clause."); MFA Comment Letter I; Two Sigma Comment Letter I; IAA Comment Letter II.

[309] SIFMA AMG Comment Letter.

[310] Morgan Lewis Comment Letter.

[311] See SIFMA Comment Letter I ("In addition, the Aggregation Rule would undermine statutory and regulatory limits on the scope of dealer and government securities dealer registration."); Committee on Capital Markets Regulation Comment Letter. See also ICI Comment Letter; SIFMA AMG Comment Letter; Morgan Lewis Comment Letter; MFA Comment Letter I.

[312] AIMA Comment Letter II.

[313] See Comment Letter of Managed Funds Association (Apr. 6, 2023) ("MFA Comment Letter IV").

[314] See IAA Comment Letter I.

[315] See MFA Comment Letter IV.

[316] See, e.g., ADAM Comment Letter; Schulte Roth Comment Letter; SIFMA AMG Comment Letter; McIntyre Comment Letter II; MFA Comment Letter I; Andreessen Horowitz Comment Letter; Morgan Lewis Comment Letter; BlackRock Comment Letter. See also IAA Comment Letter I ("We are concerned that these overbroad provisions would sweep in separately-managed accounts and pooled investment vehicles managed in the ordinary course by the same adviser but that have no relationship with one another other than having the same adviser"); McIntyre Comment Letter II ("The proposals construct a complex regime of aggregation and attribution principles in order to address a manufactured concern of avoidance structuring, which has the effect of casting a wide net to capture accounts at the 'legal-entity level,' presumably meaning accounts under common control in a fund complex.").

[317] See Schulte Roth Comment Letter.

[318] See SIFMA AMG Comment Letter; BlackRock Comment Letter ("As discussed in SIFMA AMG's and ICI's respective comment letters, we are concerned that the Proposal's definition of 'own account' is overly broad and could require that separately managed accounts ('SMAs') register as dealers based on the activity of their unaffiliated advisers acting as their agents.").

---

a 'parallel fund'), accounts, or other pools of assets (each a 'parallel managed account') managed by the same investment adviser pursue substantially the same investment objective and strategy and invest side-by-side in substantially the same positions as another parallel fund or parallel managed account." See Proposing Release at 23075.

because they believed the definition was too broad by capturing too many types of arrangements.[319] One commenter stated that the Commission should make clear that advisers do not control their clients merely because they manage those clients' accounts on a discretionary or other basis.[320] Many commenters also opposed the "parallel account structure" definition, also finding that it was overbroad and impractical.[321] While commenters generally did not comment on the definition of "person," one commenter suggested adopting a definition that treats separately trading activity conducted by separate decision-makers without coordination of trading or cooperation among or between them, stating that this treatment would be consistent with the treatment of separate accounts for other securities law purposes.[322]

After careful review of these comments and upon further consideration, the Commission acknowledges the concerns raised by commenters and has determined that for the purpose of assessing dealer status under the final rules, an anti-evasion approach is appropriate. The Commission is revising the rule text to delete from the definition of "own account" any accounts held in the name of a person over whom that person exercises control or with whom that person is under common control and corresponding exclusions. Accordingly, under the rules as adopted, "own account" thus means any account: (a) held in the name of that person; or (b) held for the benefit of that person.[323] At

the same time, in order to prevent potentially evasive behavior and in response to comments, the Commission is adding an anti-evasion provision providing that no person shall evade the registration requirements of this section by: (1) engaging in activities indirectly that would satisfy the qualitative standard; or (2) disaggregating accounts.

Each of these changes is discussed in more detail below.

### Definition of "Person"

The Commission is adopting the definition of "person" as proposed. Removal of the aggregation provision adequately addresses the comment mentioned above[324] suggesting adoption of a definition of "person" that treats separately trading activity conducted by separate decision-makers without coordination of trading or cooperation among or between them. Further, the adopted definition of "person" is well-established and has the same meaning as prescribed in section 3(a)(9) of the Exchange Act and under applicable dealer precedent.[325]

### Definition of "Own Account"

As stated above, the Commission is adopting the definition of "own account" under paragraph (b)(2) to mean any account: (i) held in the name of that person; or (ii) held for the benefit of that person. Further, the Commission is removing the definitions of "control" and "parallel account structure" as the corresponding language in the aggregation provisions of the proposed rules has been removed, and the definitions are no longer relevant.

In response to concerns raised by commenters related to, among other things, the breadth of the proposed rule's aggregation approach, the Commission has determined to focus in the first instance on an analysis of activity on an entity-by-entity basis, rather than aggregating accounts across entities that are controlled by or are under common control with an entity.[326]

### Anti-Evasion Provision

Although the Commission has determined to eliminate the proposed rule's aggregation provision, the

Commission nevertheless remains concerned that some persons may seek to structure their business for the purpose of evading dealer registration. Accordingly, the Commission is adopting an anti-evasion provision in the final rules, consistent with suggestions from commenters. This anti-evasion provision prohibits structuring activities or disaggregating accounts for the purpose of evading the dealer registration requirements.[327] Specifically, the anti-evasion provision provides that "no person shall evade the registration requirements of this section by" either "engaging in activities indirectly that would satisfy paragraph (a) of this section" ("first anti-evasion prong"); or "disaggregating accounts" ("second anti-evasion prong" and together, the "anti-evasion provision").

The first anti-evasion prong prohibits a person from evading the registration requirements by engaging indirectly in activity that would meet the qualitative standard. This prong makes clear that persons are prohibited from evading the dealer registration requirements under the final rules by, among other things, using another person or entity to indirectly engage in activity that would meet the qualitative standard.[328]

The final rules also include a second anti-evasion prong. This prong, which is modeled on Rule 13h–1(c)(2),[329] would make it unlawful for a person to evade registration by disaggregating accounts. For purposes of this second anti-evasion prong, "disaggregate" means separating or breaking up accounts for the purpose of evading the dealer registration requirements. This prong is intended to address persons who seek to evade the requirements of this rule—not by reducing or changing their activity to avoid triggering the rules—but by spreading the activity across entities or accounts such that the level of activity is the same, with no real change with respect to liquidity provision. The second anti-evasion prong thus is intended to address market participants who disaggregate their existing business for the purpose of evading the final rules, but not limit the ordinary course business activities of persons who have no such intent or purpose. For instance, the Commission would generally consider management by a registered investment adviser of separately owned

---

[319] *See, e.g.,* ADAM Comment Letter; Schulte Roth Comment Letter; T. Rowe Price Comment Letter; SIFMA Comment Letter I; MFA Comment Letter I; AIMA Comment Letter II; McIntyre Comment Letter II; IAA Comment Letter I. *See also* SIFMA AMG Comment Letter ("The Commission's definition of 'own account,' and the reference to the definition of 'control' in the large trader reporting regime is inappropriate, exceedingly broad, and will capture a number of accounts and arrangements that were otherwise not contemplated as encompassing traditional dealer activity.").

[320] *See* IAA Comment Letter I; IAA Comment Letter II.

[321] *See, e.g.,* ICI Comment Letter ("The Commission's proposed definition of a 'parallel account structure' in this context is overly broad and would inappropriately result in aggregation among separately owned client accounts that follow substantially the same investment objectives and strategies but are managed by the same registered investment adviser in the ordinary course of business, rather than for purposes of evading dealer registration requirements."). *See also* ABA Comment Letter; SIFMA AMG Comment Letter; IAA Comment Letter I; T Rowe Price Comment Letter.

[322] MFA Comment Letter I.

[323] As discussed below, the Commission has not made changes to the definition of "person," but has made conforming edits to delete the definitions of

"control" and "parallel account structure" due to deletion of the aggregation standard.

[324] *See* MFA Comment Letter I.

[325] Section 3(a)(9) of the Exchange Act defines a "person" as "a natural person, company, government, or political subdivision, agency, or instrumentality of a government." *See* 15 U.S.C. 78c(a)(9). Under section 3(a)(19) of the Exchange Act, the term "company" has the same meaning as in the Investment Company Act of 1940. *See* 15 U.S.C. 78c(a)(19).

[326] *See supra* note 290.

[327] The use of an anti-evasion approach was also suggested by commenters. *See supra* note 308 and accompanying text.

[328] Nothing in these final rules or this release affects the Commission's ability to pursue unlawful unregistered dealer activity under any other applicable provision of the Federal securities laws.

[329] *See* Proposing Release at 23078. *See, e.g.,* ICI Comment Letter; T. Rowe Price Comment Letter.

Case 4:24-cv-00250-O   Document 1-1   Filed 03/18/24   Page 28 of 74   PageID 52

client accounts that follow substantially the same investment objectives and strategies to be ordinary course business activities, and so would not impute the trading in the clients' accounts to the adviser's "own account," absent intent to evade the dealer registration requirements.

The anti-evasion provision is intended to capture persons dividing or structuring their activity to evade the application of the final rules. Potentially evasive activity would include but is not limited to, coordinating and integrating trading across commonly controlled groups of legal entities such that it would not meet the qualitative standard, including by switching which legal entity is engaged in trading to evade the "regular" requirement of the qualitative standard. Other specific examples of potentially evasive behavior include: (i) a person that uses two legal entities to separately purchase and sell securities;[330] or (ii) a person that uses several legal entities to purchase and sell securities, but "rotates" the activity across or among entities in a way that none of the legal entities trades frequently enough to satisfy the "regular" test under either factor.

In determining whether or not a person is evading the dealer registration requirements in violation of the anti-evasion provision, the Commission may consider, for example, whether there are: (i) information barriers to prevent sharing of information or sufficiently segregated trading,[331] (ii) overlapping personnel across accounts or entities, or (iii) separate account statements for each account. Other relevant factors could include, for example, the identification of personnel with oversight or managerial responsibility over multiple accounts in a single entity or affiliated entities, and account owners of multiple accounts, that do not have authority to execute trades or pre-approve trading decisions for accounts or entities;[332] or a business purpose that demonstrates that there is no coordinated buying and selling between accounts or entities.

While the Commission has identified a number of non-exhaustive examples of potentially evasive behavior and described factors that weigh against a conclusion that a person's intent is evasive, it is important to recognize that whether a person has violated the anti-evasion provision will depend on an evaluation of the totality of the facts and circumstances.

### 5. No Presumption

In the Proposing Release, the Commission proposed to include a "no presumption" clause to clarify that a person may be a dealer if it engages in a regular business of buying and selling securities for its own account, even if it does not meet the conditions set forth in the proposed rules. The Commission explained that the proposed rules did not seek to address all persons that may be acting as dealers under otherwise applicable interpretations and precedent (for example, by acting as an underwriter, regardless of whether such person has or controls assets of less than $50 million).[333]

No commenters suggested changes to the proposed no presumption clause. For the reasons discussed in the Proposing Release, we are adopting this provision as proposed. We also reiterate, consistent with our adoption of the no presumption clause, that the final rules do not modify existing court precedent and Commission interpretations, which continue to apply to determine whether a person is a dealer, even if such person would not qualify as a dealer under the final rules.

### B. Compliance Date

In the Proposing Release, the Commission proposed and sought comment on a compliance date of one year from the effective date of the adoption of the final rules.[334] The Commission explained that the compliance period was designed to provide adequate time for persons captured by the proposed rules, if adopted, to apply for dealer registration, and for the relevant SROs to review new member applications, without disrupting the markets or the participants' existing market activities. The Proposing Release explained that the proposed compliance period would not cover market participants whose activities following the effective date of the final rules would require registration under those rules.

The Commission received a few comments relating to the compliance

date.[335] Some of the letters expressed concerns that the compliance period would not be long enough to allow for new dealers or government securities dealers to prepare to register as well as complete the SRO registration process.[336] One of the commenters recommended that the Commission provide the same transition period for market participants whose activities would require registration following the effective date.[337] Another commenter, FINRA, commented that although the current FINRA rule set currently provides for a 180-day review period for a new member application, FINRA has "ways to help expedite the processing of applications for persons captured by the [final rules] and is committed to ensuring an application review process that is thorough and efficient while promoting investor protection." [338]

After further consideration, the Commission is adopting a one-year

---

[330] The separation of purchases and sales in distinct legal entities could also indicate evasive behavior with respect to the expressing trading interest qualitative factor, which requires expressing trading interest on *both* sides of the market.

[331] *See* Citadel Comment Letter ("The Commission should not aggregate trading activities across independent entities, portfolio managers, or trading strategies when assessing whether the proposed qualitative criteria are met, particularly if there are information barriers in place.").

[332] *See* Exchange Act Release No. 56206 (Aug. 6, 2007), 72 FR 45094 (Aug. 10, 2007).

[333] *See* Proposing Release at 23077.

[334] *See* Proposing Release at 23062.

[335] GDCA Comment Letter at 3; MFA Comment Letter I at 33–34; FINRA Comment Letter (explaining that "FINRA membership is key to facilitate effective oversight of such entities, and to provide for enhanced regulatory audit trails and market integrity, among other benefits. . ."). In addition, with respect to the compliance period, several commenters requested the Commission to consider interactions between the proposed rule and other recent Commission rules. In determining compliance periods, the Commission considers the benefits of the rules, as well as the costs of delayed compliance dates and potential overlapping compliance periods. For the reasons discussed throughout this release, to the extent that there are costs from overlapping compliance periods, the benefits of the rules justify such costs. See *infra* section III.C.2.a.vi for a discussion of the interactions of the final rule with certain other Commission rules.

[336] *See* GDCA Comment Letter ("If firms were required to register, the proposed one year compliance period is wholly impractical. In our experience, for a firm that is not currently registered to prepare to register as a broker-dealer, including implementing email, invoicing, and other operations related technology, hiring appropriate personnel, and completing relevant examinations takes at least six months. While FINRA is expected to approve registrations within six months, in the best circumstances that is often not the case. For firms with unusual or complex business plans, such as digital asset focused firms, this process could take years."); MFA Comment Letter I ("We strongly urge the Commission to extend the proposed one-year compliance period. The Proposal's requirements are complex and we understand that firms will need to expend significant time, resources, and effort to understand and apply them. Firms that determine that registration is necessary after an analysis of their trading activity will then need additional time to prepare a Form BD and otherwise prepare to comply with the Commission's dealer regulations. We believe that a 36-month transition period following the effectiveness of any final rule would be more appropriate.").

[337] *See* MFA Comment Letter I (noting that "[i]t will be far easier and fairer to provide a common transition period for all market participants").

[338] FINRA Comment Letter (further stating that FINRA "looks forward to the opportunity to work with the Commission and affected market participants to facilitate a review process that can achieve this balance without disrupting the markets.").

compliance date from the effective date of the final rules for all persons who engage in activities that meet the dealer registration requirements under the final rules. In light of the significant benefits afforded by dealer registration to investors and the markets, it is important for persons engaging in activities that meet the dealer registration requirements to register as soon as possible. Considering FINRA's expressed commitment to expedite the application process,[339] a compliance date of one year from the effective date of the final rules will provide a sufficient period of time for affected market participants to comply with the final rules. However, the one-year compliance period will be applicable to all affected market participants, as we agree that a common transition period will be easier to administer and more equitable.[340]

However, we emphasize that the one-year compliance period only applies to market participants who are engaging in activities covered by the final rules prior to the compliance date, and does not apply to persons whose activities otherwise satisfy the definition of dealer under applicable Commission interpretations and court precedent. It is incumbent here, as with questions of ''dealer'' status generally, for market participants to analyze and monitor their trading activities to understand their registration obligations.

## III. Economic Analysis

### A. Introduction

The Commission is sensitive to the economic effects of its rules, including the costs and benefits and effects on efficiency, competition, and capital formation. Section 3(f) of the Exchange Act requires the Commission, whenever it engages in rulemaking pursuant to the Exchange Act and is required to consider or determine whether an action is necessary or appropriate in the public interest, to consider, in addition to the protection of investors, whether the action would promote efficiency, competition, and capital formation.[341] In addition, section 23(a)(2) of the Exchange Act requires the Commission, when making rules under the Exchange Act, to consider the effect such rules would have on competition.[342] Exchange Act section 23(a)(2) prohibits the Commission from adopting any rule that would impose a burden on competition not necessary or

appropriate in furtherance of the purposes of the Exchange Act.[343]

The final rules will promote competition among entities that regularly provide significant liquidity by applying consistent regulation to these entities, thus leveling the playing field between liquidity provision conducted by entities that are currently registered as dealers and government securities dealers and by entities that are not. The final rules will also promote the financial responsibility and operational integrity of significant liquidity providers that are acting as dealers in securities markets by subjecting them to the Net Capital Rule and to other Commission and SRO rules and oversight. The financial responsibility and operational integrity of these significant liquidity providers, in turn, will support the resilience of securities markets. In addition, the final rules will improve the Commission's ability to analyze market events and detect manipulation and fraud. Although the final rules may have small negative effects on market liquidity and efficiency, due to increases in costs for affected parties, the final rules may also promote liquidity and efficiency by limiting the probability that significant liquidity providers fail.

### B. Baseline

The baseline against which the costs, benefits, and the effects on efficiency, competition, and capital formation of the final rules are measured consists of the current state of the securities markets, current practice as it relates to dealers and other significant liquidity providers in securities markets, and the current regulatory framework. The economic analysis considers existing regulatory requirements, including recently adopted rules, as part of its economic baseline against which the costs and benefits of the final rules are measured.[344] Several commenters requested the Commission to consider

interactions between the economic effects of the proposed rules and other recent Commission rules.[345] The Commission recently adopted seven of the rules mentioned as potentially impacting the economic effects of the final rules,[346] namely the May 2023 SEC Form PF Amending Release,[347] the Treasury Clearing Adopting Release,[348]

[339] FINRA Comment Letter.

[340] *See* MFA Comment Letter I.

[341] 15 U.S.C. 78c(f).

[342] 15 U.S.C. 78w(a)(2).

[343] *Id.*

[344] *See, e.g., Nasdaq* v. *SEC,* 34 F.4th 1105, 1111–15 (D.C. Cir. 2022). This approach also follows SEC staff guidance on economic analysis for rulemaking. *See* Staff's ''Current Guidance on Economic Analysis in SEC Rulemaking'' (Mar. 16, 2012), *available at https://www.sec.gov/divisions/riskfin/rsfi_guidance_econ_analy_secrulemaking.pdf* (''The economic consequences of proposed rules (potential costs and benefits including effects on efficiency, competition, and capital formation) should be measured against a baseline, which is the best assessment of how the world would look in the absence of the proposed actions.''); *id.* at 7 (''The baseline includes both the economic attributes of the relevant market and the existing regulatory structure.''). The best assessment of how the world would look in the absence of the proposed or final action typically does not include recently proposed actions, because doing so would improperly assume the adoption of those proposed actions.

[345] *See, e.g.,* ICI Comment Letter (''The Commission has issued a wide range of interconnected rule proposals . . . [that] in the aggregate warrant further analysis by the Commission. The Commission's failure to consider the Interconnected Rules holistically is a widespread concern among other market participants.'').

[346] Short Position and Short Activity Reporting by Institutional Investment Managers, Exchange Act Release No. 94313 (Feb. 25, 2022), 87 FR 14950 (Mar. 16, 2022) (*see, e.g.,* Overdahl Comment Letter at 24 n.113; MFA Comment Letter I at 15–16); Modernization of Beneficial Ownership Reporting, Securities Act Release No. 11030, Exchange Act Release No. 94211 (Feb. 10, 2022), 87 FR 13846 (Mar. 10, 2022) (*see, e.g.,* Element Comment Letter at 10; Overdahl Comment Letter at 24 n.113; MFA Comment Letter I at 14–16); Private Fund Advisers; Documentation of Registered Investment Adviser Compliance Reviews, Investment Advisers Act Release No. 5955 (Feb. 9, 2022), 87 FR 16886 (Mar. 24, 2022) (*see, e.g.,* MFA Comment Letter I at 20; Element Comment Letter at 10; Overdahl Comment Letter at 24 n.113; AIC Comment Letter at 1 n.3, 8); Amendments to Form PF to Require Event Reporting for Large Hedge Fund Advisers and Private Equity Fund Advisers and to Amend Reporting Requirements for Large Private Equity Fund Advisers, Investment Advisers Act Release No. 5950 (Jan. 26, 2022), 87 FR 9106 (Feb. 17, 2022) (*see* Overdahl Comment Letter at 24 n.113; AIC Comment Letter at 1 n.3, 8; MFA Comment Letter I at 20 n.21); Prohibition Against Conflicts of Interest in Certain Securitizations, Securities Act Release No. 11151 (Jan. 25, 2023), 88 FR 9678 (Feb. 14, 2023) (*see* MFA Comment Letter I at 21–22); Reporting of Securities Loans, Exchange Act Release No. 93613 (Nov. 18, 2021), 86 FR 69802 (Dec. 8, 2021) (*see, e.g.,* Overdahl Comment Letter at 24 n.113); Standards for Covered Clearing Agencies for U.S. Treasury Securities and Application of the Broker-Dealer Customer Protection Rule With Respect to U.S. Treasury Securities, Exchange Act Release No. 95763 (Sept. 14, 2022), 87 FR 64610 (Oct. 25, 2022) (*see* AIMA Comment Letter III at 4; MFA Comment Letter II at 6 n.13).

[347] Form PF; Event Reporting for Large Hedge Fund Advisers and Private Equity Fund Advisers; Requirements for Large Private Equity Fund Adviser Reporting, Investment Advisers Act Release No. 6297 (May 3, 2023), 88 FR 38146 (June 12, 2023) (''May 2023 SEC Form PF Amending Release''). The Form PF amendments adopted in May 2023 require large hedge fund advisers and all private equity fund advisers to file reports upon the occurrence of certain reporting events. The May 2023 SEC Form PF Amending Release revised Form PF to (i) add new current reporting requirements for large hedge fund advisers to qualifying hedge funds upon the occurrence of key events (new section 5); (ii) add new quarterly reporting requirements for all private equity fund advisers upon the occurrence of key events (new section 6); and (iii) add and revise new regular reporting questions for large private equity fund advisers. The compliance dates are Dec. 11, 2023, for the event reports in Form PF sections 5 and 6, and June 11, 2024, for the remainder of the Form PF amendments in the May 2023 SEC Form PF Amending Release.

[348] Standards for Covered Clearing Agencies for U.S. Treasury Securities and Application of the
Continued

the Private Fund Advisers Adopting Release,[349] the Beneficial Ownership Amending Release,[350] the 17 CFR 240.10c–1a ("Rule 10c–1") Adopting Release,[351] the Short Position Reporting

Adopting Release,[352] and the Securitizations Conflicts Adopting Release.[353] These adopted rules were not included as part of the baseline in the Proposing Release because they were not adopted at that time.[354] In

response to commenters, this economic analysis considers potential economic effects arising from any overlap between the compliance period for the final amendments and each of these recently adopted rules.[355]

Dealers perform important market functions, such as absorbing order imbalances and providing liquidity to buyers and sellers who may not arrive at the same time, and a regulatory regime exists to govern their activities.[356] However, market participants that do not register as dealers—and so do not comply with the dealer regulatory regime—increasingly perform critical market functions that historically have been performed by dealers. This difference in regulatory treatment creates the potential for negative externalities, as described below. Furthermore, the unevenness of regulation potentially gives less-regulated entities an unfair advantage over registered dealers that engage in similar activities.

### 1. Rules and Regulations That Apply to Registered Dealers

Persons engaged in the business of buying and selling securities for such person's own account are generally dealers pursuant to section 3(a)(5) of the Exchange Act and are required to register as dealers with the Commission in accordance with section 15(b) of the Exchange Act, become members of an SRO, and adhere to a comprehensive regulatory regime, unless their activities fall within an exception,[357] or unless they limit their dealing activity to excluded or exempted securities.

Dealers that are also government securities dealers are further subject to rules issued by the Treasury that concern financial responsibility, capital requirements, recordkeeping, and

---

Broker-Dealer Customer Protection Rule With Respect to U.S. Treasury Securities, Exchange Act Release No. 99149 (Dec. 13, 2023), 89 FR 2714 (Jan. 16, 2024) ("Treasury Clearing Adopting Release"). Among other things, the Treasury Clearing Adopting Release requires covered clearing agencies for U.S. Treasury securities to have written policies and procedures reasonably designed to require that every direct participant of the covered clearing agency submit for clearance and settlement all eligible secondary market transactions in U.S. Treasury securities to which it is a counterparty. The compliance dates are 60 days following Jan. 16, 2024, for each covered clearing agency to file any proposed rule changes pursuant to 17 CFR 240.17ad–22(e)(6)(i) and (e)(18)(iv)(C) ("final Rule 17ad–22(e)(6)(i) and (e)(18)(iv)(C)") and final Rule 15c3–3, and the rule changes must be effective by Mar. 31, 2025. With respect to the changes to Rule 17ad–22(e)(18)(iv)(A) and (B), each covered clearing agency will be required to file any proposed rule changes regarding those amendments no later than 150 days following Jan. 16, 2024, and the proposed rule changes must be effective by Dec. 31, 2025, for cash market transactions encompassed by paragraph (ii) of the definition of an eligible secondary market transaction, and by June 30, 2026, for repo transactions encompassed by paragraph (i) of the definition of an eligible secondary market transactions. Compliance by the direct participants of a U.S. Treasury securities covered clearing agency with the requirement to clear eligible secondary market transactions would not be required until Dec. 31, 2025, and June 30, 2026, respectively, for cash and repo transactions.

[349] Private Fund Advisers; Documentation of Registered Investment Adviser Compliance Reviews, Investment Advisers Act Release No. 6383 (Aug. 23, 2023), 88 FR 63206 (Sept. 14, 2023) ("Private Fund Advisers Adopting Release"). The Commission adopted five new rules and two rule amendments as part of the reforms. The compliance date for the quarterly statement rule and the audit rule is Mar. 14, 2025, for all advisers. For the adviser-led secondaries rule, the preferential treatment rule, and the restricted activities rule, the Commission adopted staggered compliance dates that provide for the following compliance periods: for advisers with $1.5 billion or more in private funds assets under management, a 12-month compliance period (ending on Sept. 14, 2024) and for advisers with less than $1.5 billion in private funds assets, an 18-month compliance period (ending on Mar 14, 2025). The amended Advisers Act compliance provision for registered investment advisers has a Nov. 13, 2023, compliance date. *See* Private Fund Advisers Adopting Release, sections IV, VI.C.1.

[350] Modernization of Beneficial Ownership Reporting, Securities Act Release No. 11253, Exchange Act Release No. 98704 (Oct. 10, 2023), 88 FR 76896 (Nov. 7, 2023) ("Beneficial Ownership Amending Release"). Among other things, the amendments generally shorten the filing deadlines for initial and amended beneficial ownership reports filed on Schedules 13D and 13G, and require that Schedules 13D and 13G filings be made using a structured, machine-readable data language. The new disclosure requirements and filing deadlines for Schedule 13D are effective on Feb. 5, 2024. The new filing deadline for Schedule 13G takes effect on Sept 30, 2024, and the rule's structured data requirements have a one-year implementation period ending Dec. 18, 2024. *See* Beneficial Ownership Amending Release, section II.G.

[351] Reporting of Securities Loans, Exchange Act Release No. 98737 (Oct. 13, 2023), 88 FR 75644

(Nov. 3, 2023) ("Rule 10c–1a Adopting Release"). The securities loan reporting rule requires any person who loans a security on behalf of itself or another person to report information about securities loans to a registered national securities association (namely, FINRA) and requires FINRA to make certain information it receives available to the public. The covered persons will include market intermediaries, securities lenders, broker-dealers, and reporting agents. The final rule's compliance dates require that FINRA propose its rules within four months of the effective date of final Rule 10c–1a, or approximately May 2024, and finalize them no later than 12 months after the effective date of final Rule 10c–1a, or approximately Jan. 2025; that FINRA implement data retention and availability requirements for reporting 24 months after the effective date of final Rule 10c–1a, or approximately Jan. 2026; that covered persons report Rule 10c–1a information to FINRA starting on the first business day thereafter; and that FINRA publicly report Rule 10c–1a information within 90 calendar days thereafter, or approximately May 2026. *See* Rule 10c–1a Adopting Release, section VIII.

[352] Short Position and Short Activity Reporting by Institutional Investment Managers, Exchange Act Release No. 98738 (Oct. 13, 2023), 88 FR 75100 (Nov. 1, 2023) ("Short Position Reporting Adopting Release"). The new rule and related form are designed to provide greater transparency through the publication of short sale-related data to investors and other market participants. Under the new rule, institutional investment managers that meet or exceed certain specified reporting thresholds are required to report, on a monthly basis using the related form, specified short position data and short activity data for equity securities. The compliance date for the rule is Jan. 2, 2025. In addition, the Short Position Reporting Adopting Release amends the national market system plan governing CAT to require the reporting of reliance on the bona-fide market-making exception in the Commission's short sale rules. The compliance date for the CAT amendments is July 2, 2025.

[353] Prohibition Against Conflicts of Interest in Certain Securitizations, Securities Act Release No. 11254 (Nov. 27, 2023), 88 FR 85396 (Dec. 7, 2023) ("Securitizations Conflicts Adopting Release"). The new rule prohibits an underwriter, placement agent, initial purchaser, or sponsor of an asset-backed security (including a synthetic asset-backed security), or certain affiliates or subsidiaries of any such entity, from engaging in any transaction that would involve or result in certain material conflicts of interest. The compliance date for securitization participants to comply with the prohibition is June 9, 2025.

[354] Since proposing these rules, the Commission adopted rules to prohibit fraud and prevent undue influence over chief compliance officers in security-based swaps entities that were proposed in another proposal identified by a commenter, the Security-Based Swaps Proposal. *See* Overdahl Comment Letter; Prohibition Against Fraud, Manipulation, or Deception in Connection with Security-Based Swaps; Prohibition Against Undue Influence over Chief Compliance Officers, Exchange Act Release No. 97656 (June 7, 2023), 88 FR 42546 (June 20, 2023). However, the Commission believes that there are no potential significant effects from overlapping requirements to comply with the final rules. Specifically, the new security-based swaps rules were effective Aug. 29, 2023—before the effective date of the final rules and over a year before compliance with the final rules is required for

persons engaging in activities that meet the dealer registration requirements—and were expected to have minimal compliance costs because they solely identified prohibited actions.

[355] In addition, commenters indicated there could also be overlapping compliance costs between the final amendments and proposals that have not been adopted. *See, e.g.,* ICI Comment Letter; Overdahl Comment Letter; MFA Comment Letter I; MFA Comment Letter II; Element Comment Letter; AIC Comment Letter; Consensys Comment Letter; AIMA Comment Letter II. To the extent those proposals are adopted, the baseline in those subsequent rulemakings will reflect the existing regulatory requirements at that time.

[356] Order imbalances exist when a market receives more buy orders than sell orders, or vice versa, at a point in time. Dealers may absorb these imbalances by buying when there are more sell orders (and temporarily holding inventory) and by selling when there are more buy orders (by liquidating inventory). A dealer that absorbs imbalances in this way can effectively facilitate a transaction between a person who wishes to sell at time X and a person who wishes to buy at time Y.

[357] *See supra* notes 5 and 11.

reports and audits. However, while not required to register as dealers, market participants (other than registered dealers and financial institutions) that limit their dealing activities to government securities generally have to register with the Commission as government securities dealers under section 15C of the Exchange Act, and similarly must comply with Treasury rules.

The regulatory regime for registered dealers includes provisions that limit risk (*e.g.,* the Net Capital Rule[358] and rules promoting operational integrity[359]), provisions that require certain books and records,[360] provisions that require various reporting and disclosure (including audited financial statements[361] and the identities of owners, directors, and managers[362]), and antifraud and anti-manipulation provisions.[363] The Net Capital Rule requires registered dealers to maintain minimum amounts of net liquid assets at all times, even intraday, thus constraining dealer leverage.[364] In addition to the financial and regulatory risk management controls required by the Market Access Rule, dealers with market access must comply with a number of underlying regulatory requirements when conducting their business.[365] Registered dealers are also subject to the Commission's authority to conduct examinations and impose sanctions[366] and to the rules, examination authority, and enforcement authority of the relevant SRO.[367]

Section 6(b)(5) and section 15A(b)(6) of the Exchange Act, respectively, require that the rules of a national securities exchange and the rules of a national securities association be designed to prevent fraudulent and manipulative acts and practices; promote just and equitable principles of trade; foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities; remove impediments to and perfect the mechanisms of a free and open market and a national market system, and in general protect investors and the public interest.[368] SROs can review their members' supervisory procedures, including requiring internal controls on algorithmic trading.[369] For most securities dealers that trade on more than one exchange, the relevant SRO is currently FINRA.[370] Commission-registered brokers or dealers must also become members of the Securities Investor Protection Corporation ("SIPC").[371]

The regulatory regime differs somewhat for entities that transact only in government securities, especially with respect to requirements on SIPC membership and capitalization.[372] Such

persons engaged in the business of buying and selling government securities for such person's own account are generally dealers pursuant to section 3(a)(44) of the Exchange Act and have to register with the Commission as government securities dealers under section 15C of the Exchange Act. These government securities dealers are not required to be members of SIPC,[373] and they are required to comply with the capital requirements set forth in 17 CFR 402.2 rather than with the Net Capital Rule that applies to dealers. They are further subject to rules issued by the Treasury on financial responsibility, capital requirements, recordkeeping, and reports and audits.[374]

The SEC's recently-adopted Treasury Clearing rule requires that any direct participant of a covered clearing agency submit all eligible secondary market transactions in U.S. Treasury securities for clearance and settlement, including transactions where the counterparty is another member of a covered clearing agency.[375]

As explained in section I.A, courts have repeatedly recognized the requirement that dealers and government securities dealers register as being "of the utmost importance in effecting the purposes of the Exchange Act." [376] Among other things, these regulations promote dealers' financial responsibility, including adequate capitalization (liquidity held against risky assets) and internal controls. The dealer regulations also give the Commission and the SROs tools to help them detect manipulation or fraud by analyzing transaction reports and examining other records kept by dealers.

## 2. Affected Parties

The Commission believes that some entities who are not registered as dealers or government securities dealers perform a significant role in providing liquidity in markets, including entities

---

[358] The Net Capital Rule requires dealers to hold liquid assets in excess of their unsubordinated liabilities. *See* section III.C.2.b for a more complete discussion of the Net Capital Rule.

[359] *See supra* note 26.

[360] *See supra* note 27.

[361] *See* 17 CFR 240.17a–5(d)(1)(i)(A) ("Rule 17a–5(d)(1)(i)(A)").

[362] *See* Form BD.

[363] *See supra* note 28 and surrounding text. *See also, e.g.,* FINRA Rule 2010 (Standards of Commercial Honor and Principles of Trade); FINRA Rule 2020 (Use of Manipulative, Deceptive, or Other Fraudulent Devices); FINRA Rule 4510 Series (Books and Records Requirements). Other SROs have comparable and sometimes equivalent rules. *See, e.g.,* NYSE, *NYSE Rules, available at https:// nyseguide.srorules.com/rules;* Nasdaq, *Rulebook— The Nasdaq Stock Market, available at https:// listingcenter.nasdaq.com/rulebook/nasdaq/rules.*

[364] *See* section III.C.2.b for a discussion of the Net Capital Rule.

[365] These regulatory requirements include, for example, pre-trade requirements such as exchange-trading rules relating to special order types, trading halts, odd-lot orders, and SEC rules under Regulation SHO and Regulation NMS, as well as post-trade obligations to monitor for manipulation and other illegal activity. *See also supra* note 26 on the Market Access Rule.

[366] *See supra* note 30.

[367] Exchange Act section 17(b) subjects broker-dealers to inspections and examinations by Commission staff and by the relevant SRO. In

addition, 17 CFR 240.15b2–2 ("Exchange Act Rule 15b2–2" or "Rule 15b2–2") generally requires the SRO that has responsibility for examining a dealer member to inspect a newly registered dealer for compliance with applicable financial responsibility rules within six months of registration, and for compliance with all other regulatory requirements within 12 months of registration. *See also* 17 CFR 240.17d–1 ("Rule 17d–1") (examination for compliance with applicable financial responsibility rules). Thereafter, FINRA or another SRO, as applicable, continues to inspect each firm periodically, based on the firm's risk profile.

[368] 15 U.S.C. 78f(b)(5) and 15 U.S.C. 78o–3(b)(6).

[369] For instance, see FINRA Rules 2010, 3110, 5210, and 6140, which establish conduct rules that may apply to algorithmic trading and which give FINRA supervisory authority. FINRA Notice 15–09 describes how "FINRA staff has conducted a number of examinations and investigations . . . that were prompted by the detection of systems-related issues at firms engaged in algorithmic strategies, and several of these investigations have resulted in settlements of formal actions." The FINRA notice provides guidance on best practices for keeping algorithmic trading compliant with FINRA and Commission rules.

[370] *See supra* note 23.

[371] Exceptions to the SIPC membership requirement exist for (a) persons whose principal business is conducted outside the United States and its territories and possessions; (b) persons whose business as a broker or dealer consists exclusively of (i) the distribution of shares of registered open end investment companies or unit investment trusts, (ii) the sale of variable annuities, (iii) the business of insurance, or (iv) the business of rendering investment advisory services to one or more registered investment companies or insurance company separate accounts; and (c) persons who are registered as a broker or dealer with respect to transactions in security futures products, pursuant to 15 U.S.C. 78o(b)(11)(A).

[372] *See supra* note 29.

[373] *See* 15 U.S.C. 78ccc(a)(2).

[374] *See* 17 CFR 402.2. *See also supra* note 14 and accompanying text.

[375] *See* Treasury Clearing Adopting Release.

[376] Proposing Release at 23060–61; *see also SEC v. Benger,* 697 F. Supp. 2d 932, 944 (N.D. Ill. 2010) (quoting *Celsion Corp.* v. *Stearns Mgmt. Corp.,* 157 F. Supp. 2d 942, 947 (N.D. Ill. 2001) (section 15(a)'s registration requirement is "of the utmost importance in effecting the purposes of the Act" because it enables the SEC "to exercise discipline over those who may engage in the securities business and it establishes necessary standards with respect to training, experience, and records."); *Roth v. SEC,* 22 F.3d 1108, 1109 (D.C. Cir. 1994) ("The broker-dealer registration requirement serves as the keystone of the entire system of broker-dealer regulation."); *Regional Properties, Inc.* v. *Financial and Real Estate Consulting Co.,* 678 F.2d 552, 561 (5th Cir. June 3, 1982); *Eastside Church of Christ v. National Plan, Inc.,* 391 F.2d 357, 361 (5th Cir. Mar. 12, 1968).

Case 4:24-cv-00250-O Document 1-1 Filed 03/18/24 Page 32 of 74 PageID 56

commonly known as PTFs and potentially other market participants such as private funds. The final rules exclude market participants who have or control assets of less than $50 million.[377] This threshold excludes small market participants, some of whom are natural persons, who are unlikely to pose financial and operational risks to the markets.[378] Similarly, for the reasons discussed above in section II.A.3, the final rules exclude investment companies that are registered under the Investment Company Act and central banks, sovereign entities, and international financial institutions, as defined in the final rules. The following two subsections describe PTFs, as well as private funds and advisers, which are the entities most likely to be affected. The third sub-section below analyzes data from TRACE and Form PF to identify up to 43 entities that the final rules may affect.

### a. PTFs

PTFs, who trade only for their own account without customers, have emerged as *de facto* market makers, especially in the U.S. Treasury market.[379] While some such firms have registered with the Commission as dealers, many others have not. This section discusses the baseline for PTFs in the current market, and a later section will estimate the number of PTFs that may be affected by the final rules due to their activities in the market for U.S. Treasury securities.

Table 1 summarizes the number and type of identifiable market participants in TRACE, by average monthly trading volume in 2022.[380] Many of the most active participants are classified in the data as "PTFs" who are not registered with the Commission as broker-dealers.[381] The 231 firms in Table 1 that were not SEC-registered broker-dealers accounted for approximately 13% of the aggregate Treasury trading volume of all identifiable firms in 2022. The PTFs had by far the highest volumes among the non-broker-dealer firms, and the most active PTFs had trading volumes roughly comparable to those of the most active registered dealers. A Federal Reserve staff analysis concluded that PTFs were particularly active in the interdealer segment of the U.S. Treasury market in 2019, accounting for 61% of the volume on automated interdealer broker platforms and 48% of the interdealer broker volume overall.[382] Figure 1 also shows that in the U.S. Treasury market, some participants who are not SEC-registered dealers trade very high volumes comparable to the most active registered dealers. The very high trading volumes and large share of trading in the interdealer Treasury market suggest that at least some PTFs may be regularly acting as significant liquidity providers.

### TABLE 1—COUNT OF ACTIVE FIRMS IN THE TREASURY MARKET BY TYPE: CALENDAR YEAR 2022

| Firm type | # Firms, by average monthly (buy + sell) volume | | | |
|---|---|---|---|---|
| | all firms | >$10 bn | >$50 bn | >$100 bn |
| SEC-registered broker-dealers ............................ | 854 | 83 | 46 | 34 |
| Other firms ............................ | 231 | 54 | 15 | 10 |
| Dealers ............................ | 110 | 23 | * | 0 |
| Hedge Funds ............................ | 62 | 7 | * | 0 |
| PTFs ............................ | 40 | 23 | 13 | 10 |
| Others ............................ | 19 | 1 | * | 0 |

*Suppressed to protect confidentiality.*

[377] As noted in section II.A.3, outside of the context of these rules, whether a person who has or controls less than $50 million in assets must register as a dealer will remain a facts and circumstances determination.

[378] Most U.S. investors are households, and most household investors have far less than $50 million in assets. The 2019 Survey of Consumer Finance, sponsored by the Federal Reserve Board of Governors and the U.S. Treasury, shows that 68 million U.S. families owned stocks and bonds, either directly or indirectly, and that 93% own less than $1 million. The survey also showed that the mean (median) U.S. household had total assets of $858,000 ($227,000). This number of household investors is much larger than the number of institutional investors. For example, there are currently 3,963 registered investment companies and 15,562 registered investment advisers.

[379] See FINRA Comment Letter.

[380] The analysis is limited to a subsection of TRACE data where the identity of trading counterparties is known. Non-FINRA member participants generally appear anonymously when they trade with FINRA members, who report their activity to TRACE but maintain the anonymity of the non-FINRA member counterparties. When non-FINRA member participants trade on an ATS that is covered by FINRA Rule 6730.07, the ATS reports the transaction to TRACE along with a unique, non-anonymous MPID for each counterparty. For FINRA Rule 6730.07, a "covered ATS" is an ATS, as that term is defined in Rule 300 of SEC Regulation ATS (17 CFR 242.300), that executed transactions in U.S. Treasury securities against non-FINRA member subscribers of $10 billion or more in monthly par value, computed by aggregating buy and sell transactions, for any two months in the preceding

calendar quarter. In 2022, approximately 58% of the non-FINRA member volume in TRACE belonged to anonymous market participants.

[381] Our classification of TRACE entities includes an assessment of non-FINRA firms in the data as "PTFs," "hedge funds," etc. A small number of non-FINRA firms are registered with the Commission as broker-dealers, and these are included with the FINRA firms as "SEC-registered broker-dealers" in Table 1.

[382] James Collin Harkrader and Michael Puglia, "Principal Trading Firm Activity in Treasury Cash Markets," FEDS Notes (Aug. 4, 2020) ("[Principal trading firms] dominate activity on the electronic [interdealer broker] platforms (61%)."). *See also* Doug Brain *et al.*, "Unlocking the Treasury Market Through TRACE," FEDS Notes (Sept. 28, 2018).



**Figure 1. Treasury Trading Volume Distributions of SEC-registered Broker-Dealers versus Other Firms: Calendar Year 2022**

The figure on the left shows the number of identifiable firms in TRACE data during year 2022, by average monthly trading volume (buy + sell). The figure on the right shows the percentage of firms in each volume bucket.

PTFs that are engaged in dealing activities without registering with the Commission do not have the same regulatory responsibilities as registered dealers or government securities dealers. These responsibilities include compliance with regulations regarding capitalization, operational controls, book-keeping, and record-keeping.[383] These PTFs also do not submit annual reports or financial statements to the Commission and are not subject to examination, thus limiting regulators' insight into their internal risk-management or record-keeping practices.

PTFs that are not registered as dealers do face constraints on risk-taking, but they face fewer constraints than registered dealers or government securities dealers. When they trade through a bank or broker-dealer, 12 CFR parts 220, 221, and 224 ("Federal Reserve Regulations T, U, and X") require the bank or broker-dealer to limit the PTFs' risk by imposing margin requirements on loans that use securities as collateral.[384] If they trade through a broker-dealer that is a FINRA member, FINRA Rule 4210 may apply, since the rule specifies margins for securities that FINRA members hold in their customers' accounts, including initial margin requirements on securities transactions and commitments and maintenance

margin.[385] If they trade directly in the market using a broker-dealer's market access, the Market Access Rule requires the broker-dealer offering its market access to establish, document, and maintain a system of controls and supervision designed to limit the risk—*e.g.,* financial, regulatory, operational, or legal—of the PTFs' activities related to that market access.[386] However, entities that are not registered as dealers do not have to comply with the Net Capital Rule.[387]

PTFs that are not registered as dealers do not have reporting obligations to CAT or to TRACE, though these data sources contain certain information on PTFs' trading.[388] CAT generally includes all PTFs' orders in NMS securities, OTC equities, and listed options because they are reported by other registered parties. Broker-dealers, including those through whom PTFs currently trade, are required to report orders and order events to CAT for NMS Securities or OTC equities.[389] Consequently, the receipt of such principal orders from PTFs and the execution of such orders (as well as all other order events) are included in CAT data. However, customers of the broker-dealers, including such PTFs, are only

identified in the CAT system with Customer-IDs.[390] Regulators must then go to a separate database to obtain customer identifying information associated with a Customer-ID.[391]

Pursuant to the CAT NMS Plan, the CAT must capture and store Customer and Customer Account Information in a secure database physically separated from the transactional database. "CAIS" refers to the Customer and Account Information System within the CAT System that collects and links Customer-ID(s) to Customer and Account Attributes and other identifiers for queries by regulatory staff.[392] When the CAIS system becomes fully operational, authorized regulators will

---

[383] *See supra* notes 358–363.

[384] *See* Federal Reserve Regulation T (12 CFR part 220); Regulation U (12 CFR part 221); Regulation X (12 CFR part 224).

[385] *See* FINRA Rule 4210.

[386] *See supra* note 26.

[387] *See supra* note 24 and accompanying text.

[388] *See* Fried Frank Comment Letter; IAA Comment Letter I; McIntyre Comment Letter II; MMI Comment Letter; SIFMA Comment Letter I.

[389] Many broker-dealers contract with third-party service providers to fulfill their reporting requirements to CAT.

[390] Pursuant to the CAT NMS Plan, each customer is required to be assigned a unique Customer-ID that can be used to link all orders and reportable events from a specific customer.

[391] Pursuant to the CAT NMS Plan, the customer information data must be stored separately from the order data (*see* Appendix D–14 and D–33 of the CAT NMS Plan) with different access protocols (*see* Appendix D–14 and D–29 of the CAT NMS Plan). The purpose of these requirements is to secure Personally Identifiable Information ("PII"). According to the CAT NMS Plan, "[a] subset of authorized regulators . . . will have permission to access and view PII data." *See* Appendix D–29 of the CAT NMS Plan.

[392] *See* "Consolidated Audit Trail, Customer and Account Information System (CAIS): Specification for Firm Designated ID (FDID) and Large Trader ID (LTID)" (Dec. 18, 2019), *available at https://www.catnmsplan.com/sites/default/files/2020-01/FDID-LTID-Specification-Publication-12-18-v1.pdf,* for background information on the CAIS system. *See also* CAT NMS Plan 6.5(c)(i) (stating that access is for regulatory use only) and CAT NMS Plan Appendix D 9.1 at p. D–33 (stating that customer information will be stored separately from other data).

be able to identify in the CAIS database all the customers associated with orders and related events captured and stored in the transactional database, including any PTFs that are engaging in dealer activities but that are not registered as dealers. Unlike the identification of customers, regulators can identify registered broker-dealers (who have reporting obligations) by their unique identifiers in CAT transactional data without having to access CAIS. Therefore, analysis requiring the identification of customers (such as PTFs) takes more time because accessing CAIS involves enhanced security measures and requires necessary additional steps that are not required for identifying broker-dealers associated with CAT reported trading activities in the CAT transactional database.

Additionally, broker-dealers and ATSs report transactions in U.S. Government securities to TRACE. However, TRACE data include the identities of unregistered entities only when the trades occur on an ATS covered by FINRA Rule 6730.07 (generally, the ATSs with higher volume).[393] When PTFs that are not registered as dealers trade U.S. Government securities and other fixed-income securities through a broker-dealer or on an ATS that is not covered by FINRA Rule 6730.07, the broker-dealer or ATS reports the transaction to TRACE, but the identity of the PTF remains anonymous. PTFs that are not registered as dealers are always anonymous in the TRACE database for corporate bond transactions.

PTFs with high volumes or large portfolios in equities markets may also have to report to the Commission on Form 13F[394] or Form 13H.[395] On Form 13F, institutional investment managers report the details of their holdings of section 13(f) securities—e.g., CUSIP, fair market value. On Form 13H, among other things, large traders provide details of their organization, governance, and relationships.

PTFs are subject to the anti-manipulation and antifraud provisions under Securities Act section 17(a) and Exchange Act section 10(b), but they are not subject to Exchange Act section 15(c). Exchange Act section 15(c) authorizes the Commission to issue, for registered entities, specific rules and regulations that "define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative and such quotations as are fictitious."[396] They are also not subject to examinations, net capital requirements, or any record-keeping or reporting requirements.

b. Private Funds and Advisers

Private funds[397] are also prominent participants in U.S. securities markets. This section discusses the baseline for private funds and advisers in the current market, and in section III.B.2.c we will estimate the number of hedge funds that may be affected by the final rules.

TABLE 2—PRIVATE FUND STATISTICS AS OF 2022Q4

| Fund type | Count | Gross asset value | | Net asset value | |
|---|---|---|---|---|---|
| | | Total ($B) | Avg ($mm) | Total ($B) | Avg ($mm) |
| Hedge Fund | 9,783 | 9,347 | 955 | 4,811 | 492 |
| Private Equity Fund | 20,860 | 6,710 | 322 | 6,030 | 289 |
| Venture Capital Fund | 2,978 | 375 | 126 | 342 | 115 |
| Liquidity Fund | 71 | 321 | 4,521 | 318 | 4,479 |
| Other Private Fund | 6,688 | 1,622 | 243 | 1,397 | 209 |
| Real Estate Fund | 4,226 | 1,137 | 269 | 857 | 203 |
| Securitized Asset Fund | 2,482 | 935 | 377 | 272 | 110 |

**Note:** These statistics rely on Form PF. Only SEC-registered advisers with at least $150 million in private fund assets under management must report to the Commission on Form PF; SEC-registered investment advisers with less than $150 million in private fund assets under management, SEC exempt reporting advisers, and state-registered investment advisers are not required to file Form PF.

Table 2 shows the number of private funds as of the fourth quarter of 2022.[398] Of the 9,783 hedge funds reported on Form PF during this period, there were 2,069 qualifying hedge funds that reported information on their positions, and these held $2.4 trillion in listed equities and $1.8 trillion in U.S. Government securities.[399] Certain hedge fund strategies, such as those that involve automated or high-frequency trading ("HFT"), could meet the final rules' definition of dealing.

The business models of private equity funds[400] and liquidity funds[401] are

[393] See supra note 380.

[394] Every manager which exercises investment discretion with respect to accounts holding section 13(f) securities, as defined in Rule 13f–1(c), having an aggregate fair market value on the last trading day of any month of any calendar year of at least $100,000,000, shall file a report on Form 13F with the Commission within 45 days after the last day of such calendar year and within 45 days after the last day of each of the first three calendar quarters of the subsequent calendar year.

[395] Each large trader—defined as a person whose transactions in NMS securities equal or exceed 2 million shares or $20 million during any calendar day, or 20 million shares or $200 million during any calendar month—is required to identify itself to the Commission by filing a Form 13H and submitting annual updates, as well as updates on as frequently as a quarterly basis when necessary to correct information previously disclosed that has become inaccurate. See 17 CFR 240.13h–1.

[396] 15 U.S.C. 78o(c)(2)(D). For example, the Net Capital Rule and the Market Access Rule are both tied to section 15(c) of the Exchange Act.

[397] A private fund, including a hedge fund, is an issuer that would be an investment company as defined in section 3 of the Investment Company Act if not for section 3(c)(1) or 3(c)(7) of the Investment Company Act. See 15 U.S.C. 80a–3.

[398] See SEC Division of Investment Management Analytics Office, Private Fund Statistics: Fourth Calendar Quarter 2022 (July 18, 2023) ("Private fund Statistics"), available at https://www.sec.gov/files/investment/private-funds-statistics-2022-q4.pdf.

[399] Large hedge fund advisers have at least $1.5 billion in hedge fund assets under management. A large hedge fund adviser is required to file Form PF quarterly and provide data about each hedge fund it managed during the reporting period (irrespective of the size of the fund). Large hedge fund advisers must report more information on Form PF about Qualifying Hedge Funds than other hedge funds they manage during the reporting period. A Qualifying Hedge Fund is any hedge fund advised by a large hedge fund adviser that had a NAV (individually or in combination with any feeder funds, parallel funds, and/or dependent parallel managed accounts) of at least $500 million as of the last day of any month in the fiscal quarter immediately preceding the adviser's most recently completed fiscal quarter.

[400] See Investor.gov, Private Equity Funds, available at https://www.investor.gov/introduction-investing/investing-basics/investment-products/private-investment-funds/private-equity.

[401] See Daniel Hiltgen, "Private liquidity Funds: Characteristics and Risk Indicators," DERA White Paper (Jan. 27, 2017), available at https://www.sec.gov/files/2017-03/Liquidity%20Fund%20Study.pdf.

unlikely to engage in activities that meet the final rules' definition of dealing, because they are generally long-only investors that are not likely to regularly communicate trading interests on both sides of the market or earn revenue primarily from capturing bid-ask spreads.

Investment advisers are subject to the Advisers Act and the Commission oversees private fund advisers, many of which are registered with the SEC or report to the SEC as exempt reporting advisers.[402] Advisers may also trade for their own account subject to certain restrictions.[403] When trading through a bank or broker-dealer, private funds and investment advisers are indirectly constrained by the same limitations on risk-taking as are PTFs, as described in the previous section—*i.e.*, the Market Access Rule, FINRA Rule 4210, and Federal Reserve Regulations T, U, and X. Investment advisers are subject to a Federal fiduciary duty, which comprises a duty of care and a duty of loyalty,[404] and are subject to the antifraud provisions in section 206 of the Advisers Act. Private funds and investment advisers are also subject to section 10(b) of the Exchange Act and section 17(a) of the Securities Act. Registered investment advisers are further subject to specific substantive requirements related to various areas, including principal trading, agency cross transactions, custody of client assets, and marketing.[405] The Commission also recently adopted new rules and rule amendments to enhance the regulation of private fund advisers.[406]

The Advisers Act establishes reporting and recordkeeping requirements for registered advisers to private funds. For example, section 204 requires registered investment advisers to keep certain books and records (records of the advised private funds are considered records of the adviser for these purposes). Registered investment advisers and exempt reporting advisers must also disclose information on Form ADV. Registered private fund advisers report certain information on the private funds they manage to the Commission annually (and, for certain large advisers of certain large hedge funds, quarterly) on Form PF. Specifically, large hedge fund advisers currently file quarterly periodic reports and—within 72 hours of the occurrence of certain events including extraordinary investment losses and large margin increases— current reports to the Commission on Form PF and are subject to books and records rules and examinations.[407] Advisers are also subject to Commission examinations. Advisers and funds with high trading volumes or large portfolios may also have to report to the Commission on Form 13F or Form 13H, on which they would disclose details of their securities holdings, organization, governance, and relationships.[408]

However, private funds and investment advisers do not have to comply with the Net Capital Rule or with any other direct regulatory constraint on leverage. They also are not required to report their transactions (though their broker-dealer may be required to report the transactions), and they are not subject to section 15(c) of the Exchange Act.[409] Regulators may be able to obtain complete data on private funds' and advisers' securities transactions through examinations, but such information is currently more readily available for registered dealers or government securities dealers.

### c. Number of Affected Parties

In this section, we provide estimates of the number of entities that may satisfy the qualitative standard, as adopted. These estimates are subject to significant caveats that we also describe below. We use TRACE data on U.S. Treasury transactions to provide an estimate of the number of identifiable Treasury-market participants that could

be affected. We use data from Form PF[410] to approximate the number of possibly affected private funds, under the assumption that, to the extent private funds employ trading strategies that would qualify under the final rules' qualitative standard, they would most likely report those as HFT strategies. The analysis focuses on U.S. Treasury markets where market participants not registered as dealers are significant liquidity providers.[411] Natural persons are unlikely to be dealing in U.S. Government securities, and we do not observe any natural persons trading U.S. Government securities in the interdealer market.

Using TRACE data for U.S. Treasury securities, we estimate the number of affected parties by identifying firms that appear to meet the primary revenue factor by earning revenue from capturing bid-ask spreads in the market for U.S. Treasury securities. We do not estimate the number of entities that appear to meet the expressing trading interest factor because the Commission does not have sufficient data on quoting activities. TRACE data identify specific parties in the Treasury market that are not registered broker-dealers who trade on certain ATSs.[412] In other markets, post-trade data do not identify entities that are not registered as broker-dealers. In all markets, when entities transact on ATSs or for or on behalf of other market participants that are not registered broker-dealers, data limitations prevent us from identifying the ultimate buyer or seller. It is the Commission's understanding that significant liquidity providers are more likely to be registered broker-dealers in other markets such as those for equities and options than they are in the market for

---

[402] Section 203(l) of the Advisers Act provides that an investment adviser that solely advises venture capital funds is exempt from registration, and section 203(m) exempts from registration any investment adviser that solely advises private funds if the adviser has assets under management in the U.S. of less than $150 million. Advisers that rely on the venture capital and private fund adviser exemptions are generally referred to as "exempt reporting advisers," because sections 203(l) and 203(m) provide that the Commission shall require the advisers to maintain such records and to submit such reports as the Commission determines necessary or appropriate in the public interest or for the protection of investors.

[403] *See* 17 CFR 275.206(3) ("Rule 206(3)").

[404] *See* Commission Interpretation Regarding Standard of Conduct for Investment Advisers, Investment Advisers Act Release No. 5248 (June 5, 2019) 84 FR 33669 (July 12, 2019), at 24–25.

[405] *See* 17 CFR 275.206(4)–1 ("Rule 206(4)–1"); 17 CFR 275.206(4)–2 ("Rule 206(4)–2"); 17 CFR 275.206(4)–7 ("Rule 206(4)–7").

[406] *See* Private Fund Advisers; Documentation of Registered Investment Adviser Compliance, Investment Advisers Act Release No. 6383 (Aug. 28, 2023) 88 FR 63206 (Sept. 14, 2023) (adopting 17 CFR 275.206(4)–10; 275.211(h)(1)–1, 275.211(h)(1)– 2; 275.211(h)(2)–1; 275.211(h)(2)–2; 275.211(h)(2)– 3).

[407] These periodic and current reporting obligations of large hedge fund advisers on Form PF reflect recently adopted amendments. *See supra* note 347.

[408] *See supra* notes 394 and 395. *See also* Fried Frank Comment Letter; IAA Comment Letter I; McIntyre Comment Letter II; SIFMA AMG Comment Letter.

[409] *See supra* note 396.

[410] Commenters said the proposed rules would have had a much larger impact on private funds than suggested by the economic analysis and asked that the Commission analyze Form PF data to estimate the number of affected funds. *See* AIMA Comment Letter II; IAA Comment Letter I; Fried Frank Comment Letter; T. Rowe Price Comment Letter. In consideration of these comments, we have supplemented this economic analysis with estimations based on Form PF.

[411] *See supra* note 20. *See also* SIFMA Comment Letter I. The letter describes how the Commission's Market Access Rule, beginning in 2010, may have encouraged previously unregistered equity or options dealers to register with the Commission.

[412] *See* FINRA Rule 6730—Transaction Reporting, Supplementary Material .07—ATS Identification of Non-FINRA Member Counterparties for Transactions in U.S. Treasury Securities (among other things, defining the term "covered ATS" as an ATS that executed transactions in U.S. Treasury securities against non-FINRA member subscribers of $10 billion or more in monthly par value, computed by aggregating buy and sell transactions, for any two months in the preceding calendar quarter).

U.S. Treasury securities.[413] We acknowledge that this lack of transparency may affect our estimates.

The Commission does not necessarily observe all revenue sources for the most active participants in the U.S. Treasury market. Thus, for the purpose of estimating the number of affected entities, we consider that firms potentially meet the primary revenue factor if they trade at least 4 of the 10 highest-volume U.S. Government securities on at least 15 different trading days in a given month and if they realize, on average across the month, a positive intraday trading spread on each of those securities.[414] We consider such trading characteristics for this analysis because (1) TRACE data cannot determine whether any spread apparently earned is a "primary" source of revenue,[415] and (2) the calculation of intraday spreads does not distinguish between trades that capture the bid-ask spread and trades that profit from intraday price movements.[416] A firm that earns its revenue primarily from

dealing in U.S. Government securities will likely trade at least one of the highest-volume securities on most trading days and will also tend to profit from those trades. This analysis reflects the requirement that dealing be regular by requiring the firm to trade the security on at least 15 trading days in a month (the "day" threshold) and by counting the number of months in which a firm appears to deal. We only consider a 15-day threshold here, rather than a lower threshold of 10 trading days or a higher threshold of 20 trading days (effectively every trading day in a month), because a firm that is not dealing—even a hypothetical firm that trades randomly—might earn a positive spread in a given security on a few trading days each month; likewise, a firm acting as a dealer might suffer a negative spread on a few trading days each month. Although we rely on a proxy definition of dealing for the purpose of this analysis, we stress that the determination of whether an entity is engaged in regular dealing activity

depends on the facts and circumstances. The empirical proxy of dealing used for the purpose of this analysis—trading a security for at least 15 days in a month with a positive average trading spread—may not be necessary or sufficient for determining whether an activity constitutes dealing according to the final rules.

Figure 2 counts the number of identifiable non-broker-dealers that appear to meet the primary revenue factor for 1+, 2+, etc. months during 2022 in the market for U.S. Government securities. Figure 2, using the empirical measures described above, identifies as potential significant liquidity providers a total of 31 non-broker-dealers in TRACE that would have met the primary revenue factor for at least one month in 2022,[417] and 15 that would have done so for at least 6 months. Depending upon the number of months considered in Figure 2, these numbers include from 13 to 22 entities classified as PTFs and up to 4 entities classified as hedge funds.[418]



**Figure 2. Number of non-broker-dealers appearing to meet the primary revenue factor for U.S. Government securities in 2022**

Several commenters[419] cited the relevance of Form PF data for identifying market participants that could be captured by the final rules. We use Form PF to provide an estimate of the number of possibly affected hedge

funds. Form PF filers provide information on hedge funds' trading strategies in two ways: (1) Question 20 asks about the breakdown of funds' reliance on several categories of strategy—e.g., "Equity, Market Neutral"

or "Equity, Long/Short"—and (2) Question 21 asks how much of the funds' assets are dedicated to HFT strategies.[420] Based on our

---

[413] See supra note 20.

[414] For each firm and for each CUSIP, we calculate the daily spread as the volume-weighted average sell price minus the volume-weighted average buy price. We then take the simple average of this number across days within each firm-CUSIP-month.

[415] The final rules' primary revenue factor says, "earning revenue primarily from capturing bid-ask spreads."

[416] See Lewis Study for a description of some trades that may profit from intraday price movements without intending to capture bid-ask spreads.

[417] These 31 non-broker-dealers represent 13% of the 231 non-broker-dealers shown in Table 1.

[418] In Figure 2, the 31 non-broker dealers that appear to meet the primary revenue factor in 2022

for at least 1 month include 22 PTFs, 4 hedge funds, 4 entities classified as "dealers" (though they are not FINRA members and do not appear to be registered with the Commission), and 1 entity classified as "other." A higher alternative threshold of 20 days would show up to 12 firms, including 9 PTFs and 1 hedge fund. A lower alternative threshold of 10 days would show up to 40 firms, including 27 PTFs and 7 hedge funds.

[419] See, e.g., AIMA Comment Letter II; IAA Comment Letter I; Fried Frank Comment Letter; T. Rowe Price Comment Letter.

[420] The question does not provide a definition for the term high frequency trading strategies. The Commission has proposed to remove Question 21 from Form PF because the form's question on portfolio turnover, with proposed revisions, would better inform our and FSOC's understanding of the extent of trading by large hedge fund advisers and

would better show how larger hedge funds interact with the markets and provide trading liquidity. See Form PF; Reporting Requirements for All Filers and Large Hedge Fund Advisers, Investment Advisers Act Release No. 6083 (Aug. 10, 2022), 87 FR 53832 at 53850 (Sept. 1, 2022), as corrected 87 FR 54641 (Sept. 7, 2022). The proposed amendments to the form's question on portfolio turnover would not provide information on the number of funds that would meet the definition of dealer under the final rules because the proposed portfolio turnover question asks about aggregate value of turnover in a month, for specific asset classes. While responses to the question could indicate potentially high trading activity by private funds, they would not indicate the number of trades or the securities traded. In contrast, responses to current Question 21, which asks about HFT strategies at the fund

understanding of the trading objectives that hedge funds report pursuant to Questions 20 and 21, we believe that any hedge funds employing trading strategies that would fit the final rules' qualitative standard, as adopted, would likely report them as HFT.

Table 3 describes the number of hedge funds that used at least some HFT strategies, as reported by their advisers in the advisers' most recent Form PF filing between 2021–Q4 and 2022–Q3. Using Form PF, advisers report their use of HFT strategies as a range of percentages of net asset value (''NAV''), such as ''less than 10%'' of NAV, ''10%–25%,'' etc. We calculate a range of dollar values for each fund by multiplying the high and low values of the reported range by the fund's NAV. For example, if an adviser reports that a fund engages in HFT using ''Less than 10%'' of the fund's NAV, and if the fund's NAV is $100, then we conclude that the fund uses HFT to manage between $0 and $10 (10% of $100). For reported HFT use of ''100% or more'' of NAV, we use 500% of NAV as the high end of the range. The third row of Table 3 shows the total range of HFT use that we obtain by summing the low and the high estimates across funds. The left column provides statistics for funds with reported HFT use that is less than 10% of NAV, and the right column provides statistics for funds with reported HFT use that is 10% or more of NAV.

TABLE 3—PRIVATE FUNDS' USE OF HFT, LATEST FORM PF FILING BETWEEN 2021–Q4 AND 2022–Q3

|  | Funds with HFT <10% of NAV | Funds with HFT ≥10% of NAV |
| --- | --- | --- |
| # Funds | 40 | 12. |
| Average NAV | $3.2 bn | $0.9 bn. |
| Total $s dedicated to HFT* | $0–$12.7 bn | $8.9 bn–$40.4 bn. |
| # Advisers | 21 | 10. |

*Form PF includes a range of reported HFT—*e.g.,* ''less than 10%'' of NAV, ''10%–25%,'' etc. For funds reporting ''100% or more,'' we use 500% of NAV as the high end of the range.

The use of HFT strategies is, however, an imperfect proxy for whether these funds would qualify under the qualitative standard, as adopted. We are unable to determine whether the HFT activities that these funds report would satisfy the expressing trading interest factor or the primary revenue factor because we do not observe individual transactions in Form PF. The use of HFT strategies, to the extent it may be dealing, is more likely to be a primary source of revenue when it accounts for a larger percentage of a fund's NAV. Accordingly, the 12 hedge funds with HFT of at least 10% of NAV in Table 3 are the more likely to meet the final rules' primary revenue factor. However, since reported HFT may apply to a broader set of activities than the final rules' qualitative factors, the actual number of affected funds may be less than 12.

Our empirical analyses of likely affected parties face other limitations. In the current stage of implementation of CAT, we do not have comprehensive statistics on option or equity market activity stemming from entities engaging in dealing activity that are not registered as dealers, such as those known as PTFs in other markets.[421] Similarly, because our TRACE analysis is limited to U.S.

Government securities, it does not cover markets for equities, options, or other fixed-income markets. Our TRACE data also cannot establish whether firms primarily earn revenue from capturing bid-ask spreads. Further, and specifically for Treasury market participants, our counts of identifiable firms in TRACE may be low because TRACE data on U.S. Government securities transactions does not identify all market participants.[422] The TRACE analysis also relies on empirical proxies to estimate the number of firms—*i.e.,* the range of values for ''regular'' and the ''at least 15 days'' distinction—and uses observed intraday trading spreads rather than the (unobserved) revenue earned from bid-ask spreads. As explained above, the analysis also does not estimate the number of entities described by the final rules' expressing trading interest factor because of data limitations. Whether or not a person is a securities dealer or government securities dealer under the final rules would be, in part, a question of facts and circumstances not observed in the data, such as whether and to whom trading interests are expressed, whether they are on both sides of the market, and whether they are at or near the best available prices.

Commenters said that the number of hedge funds affected by the Proposed Rules would be much higher than the Proposing Release suggested, potentially numbering into the hundreds.[423] However, the changes to the final rules described in section I.B largely respond to commenters' concerns by reducing the number of entities that the final rules would potentially require to newly register as dealers.[423]

One commenter stated that the Commission did not estimate the number of affected parties based on trading in other asset classes, such as corporate bonds, municipal securities, and asset- or mortgage-backed securities.[424] Transaction data in these markets do not permit such estimations because non-broker-dealers are generally labeled as ''customer'' without name attribution in trade reports. However, with regard to PTFs, it is the Commission's understanding that these market participants are most active in on-the-run Treasury markets, where they provide a substantial amount of liquidity, but are less active in off-the-run Treasury securities and play only a small role in the market for agency securities.[425] Similarly, the Commission

---

level, are more directly informative for this release. Based on our understanding of private fund activity, self-reported HFT is more relevant for estimating which entities may be affected by these final rules than the proposed portfolio turnover question.

[421] As described in section III.B.2.a, the CAIS system in CAT will allow the Commission to identify individual non-broker-dealers in equity and options markets, including any PTFs not

currently registered as broker-dealers, but CAIS is not yet fully operational. Notably, because CAIS is not fully operational, the transactional data does not contain unique customer identifiers needed to track the same customer across broker-dealers. This prevents us from analyzing CAT to identify entities engaging in dealing activity that are not registered as dealers.

[422] *See supra* note 380.

[423] *See, e.g.,* AIMA Comment Letter II; Consensys Comment Letter; Fried Frank Comment Letter; ICI Comment Letter; McIntyre Comment Letter II; MFA Comment Letter I; NAPFM Comment Letter; SIFMA Comment Letter I; SIFMA AMG Comment Letter; Two Sigma Comment Letter I.

[424] *See* SIFMA Comment Letter I.

[425] *See* the Commission's proposed amendments to Regulation ATS for ATSs that trade government securities (''ATS–G Proposing Release''), 85 FR

Continued

Case 4:24-cv-00250-O Document 1-1 Filed 03/18/24 Page 38 of 74 PageID 62

does not believe that PTFs are active in municipal securities markets, which are characterized by a high level of retail investors. One commenter to the ATS–G Proposing Release noted that approximately 15% of daily dollar volume in municipal bonds is executed electronically, further indicating that PTFs—which rely on electronic platforms—may not play a significant role in this market.[426] Finally, recent research finds that non-dealer liquidity providers are present in corporate bond markets, though they account for a small share of overall volume. Looking at a particular electronic platform, the authors of one study find that all-to-all trading makes up 12% of all trades on the platform; of this, new liquidity providers acting as dealers account for 7%.[427] However, this platform accounts for approximately 10% of trading reported to TRACE, so that the overall share of non-dealer liquidity providers or PTFs in the corporate bond market is relatively small. Other anecdotal evidence suggests that PTFs have begun to enter the corporate bond market using RFQ platforms, possibly driven by the growth of corporate bond ETFs.[428]

Because crypto asset platforms transacting in crypto assets for their own account may already be dealers under current law—*i.e.*, with respect to crypto assets that are securities or government securities within the meaning of the Exchange Act—the final

rules might affect only a few of the entities that provide significant liquidity in crypto asset markets. We understand that the rules may affect some PTFs in crypto asset markets, however. We are unable to estimate the number of crypto asset market participants who would be affected by the rules, because data do not allow us to match crypto asset security transactions to individual traders, especially across platforms.[429]

### 3. Competition Among Significant Liquidity Providers

The previous sections highlight important differences in regulatory treatment among competing significant liquidity providers. Specifically, registered dealers and the unregistered market participants that perform similar functions operate under different regulations—*i.e.*, unregistered market participants have fewer constraints on risk-taking and are subject to fewer reporting requirements—even as they perform a similar role as dealers in markets. The requirement that dealers register is of the utmost importance in effecting the purposes of the Exchange Act (*see* section I.A). In this section, we provide some data on current concentration in the market for U.S. Government securities and also discuss the competitive implications of differences in regulatory treatment.

Our analysis of TRACE data suggests that liquidity provision in the interdealer market for U.S. Government securities is not concentrated.[430] Table 4 displays measures of market concentration among entities that are potentially dealing in U.S. Government securities across months in 2022.[431] This table categorizes firms as potential significant liquidity providers in three

ways, and we display two measures of concentration for each. In column 1, the list of potential significant liquidity providers includes only firms currently classified as dealers in our TRACE data. In column 2, the list also includes identifiable PTFs. In column 3, the list expands again to include identifiable hedge funds. The two measures of concentration are the volume share of the 5 highest-volume firms and the Herfindahl-Hirschman index (''HHI'').[432] The inverse of the HHI provides some intuition by giving the number of equally sized competitors a market would need to produce such an HHI. The first column of Table 4 shows that between 445 and 714 dealers were active in the U.S. Treasury market in 2022, and that the 5 highest-volume of these firms accounted for approximately 40% of the group's total volume each month. Across months, the HHI in column 1 ranged between 0.047 and 0.056, comparable to a market with 18 to 21 equally sized competitors.[433] If we also consider identifiable PTFs to be significant liquidity providers (column 2), then 479 to 748 significant liquidity providers were active each month during 2022, and the five highest-volume firms accounted for approximately one-third of the group's total. The HHI in this case averages approximately 0.0385, comparable to a market with 26 equally sized competitors. If we further consider identifiable hedge funds in TRACE to be significant liquidity providers (column 3), then 517 to 799 significant liquidity providers were active in the U.S. Treasury market in each month during 2022, the concentration metrics are nearly the same as in column 2. The narrow differences between columns 2 and 3 suggest that the hedge funds that we can identify in TRACE are not major competitors in the market for liquidity provision against either registered broker-dealers or PTFs.

---

87106 (Dec. 31, 2020), *available at https://www.federalregister.gov/documents/2020/12/31/2020-21781/regulation-ats-that-trade-us-government-securities-nms-stock-and-other-securities*. In particular, Table X.2 highlights that PTFs accounted for 31.4% of on-the-run volume share from July 1, 2019, to Dec. 31, 2019, while Table X.3 shows that PTFs accounted for only 1.5% of off-the-run volume. Table X.4 shows that PTFs were essentially not active in agency securities during the same period.

[426] *See* Bond Dealers of America comment letter to ATS–G Proposing Release, *available at https://www.sec.gov/comments/s7-12-20/s71220-8426431-229605.pdf*.

[427] *See* Terrence Hendershott, Livdan Dmitry, and Norman Schürhoff, ''All-to-All Liquidity in Corporate Bonds,'' Swiss Finance Institute Research Paper No. 21–43 (Oct. 27, 2021), *available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3895270*.

[428] *See* Kevin McPartland, What's Next for High Frequency Traders? Not Calling Them High Frequency Traders, Coalition Greenwich (Sept. 27, 2019), *available at https://www.greenwich.com/blog/what%E2%80%99s-next-high-frequency-traders* (noting that one PTF has begun to trade using corporate bond RFQs).

[429] We would have to match entities' trades in crypto asset securities across platforms in order to determine whether or not their trading activity meets the final rules' definition of regular liquidity provision.

[430] We consider all dealer-to-dealer trades and all trades on covered ATSs (*see supra* note 380) to be the interdealer market. For the purposes of this table, we consider all registered broker-dealers to be potential liquidity providers, though it may be the case that some broker-dealers do not regularly seek to provide liquidity in the market for U.S. Government securities.

[431] As of Oct. 2023, there were 3,490 active broker-dealers registered with the Commission. *See* SEC, *Data: Company Information About Active Broker-Dealers* (updated Oct. 2, 2023), *available at https://www.sec.gov/help/foiadocsbdfoiahtm.html*.

[432] HHI is equal to the sum of squared market shares. An index of 1 would indicate a completely concentrated market with a single significant liquidity provider.

[433] A Federal Reserve analysis from 2020 finds that activity on electronic interdealer platforms is slightly more concentrated, with an HHI of 0.082. *See* James Collin Harkrader and Michael Puglia, ''Principal Trading Firm Activity in Treasury Cash Markets,'' FEDS Notes (Aug. 4, 2020).

Table 4—Competition Among Significant Liquidity Providers in the Treasury Market, 2022

[The largest 5 firms in this table overall are registered broker-dealers]

| | Significant liquidity providers: registered BDs | Significant liquidity providers: registered BDs + PTFs | Significant liquidity providers: registered BDs + PTFs + hedge funds |
|---|---|---|---|
| No. of firms ............................................... | 445–714 ............................... | 479–748 ............................... | 517–799. |
| Share of interdealer market * ....................... | 72.7%–83.7% ....................... | 93.7%–97.4% ....................... | 95.0%–98.5%. |
| Concentration measures: | | | |
| Share of top 5 firms ............................... | 37.3%–43.1% ....................... | 32.0%–35.4% ....................... | 31.7%–35.0%. |
| HHI ........................................................ | 0.047–0.056 ....................... | 0.036–0.041 ....................... | 0.036–0.047. |
| *HHI comparable to market with ____ equal-size competitors.* | *18–21* ............................... | *24–28* ............................... | *24–28.* |

* Source: TRACE data. Our sample contains all transactions in the interdealer market, including direct dealer-to-dealer trades and trades that occur on ATSs covered by FINRA Rule 6730.07.

The Commission also understands that many firms compete to provide liquidity in the markets for corporate bonds and for equities (not necessarily the same firms). Research has documented that, as of the first quarter of 2020, about 600 dealers intermediated in the market for corporate bonds, but that the top 10 broker-dealers controlled approximately 70% of the volume.[434] Another analysis by the Commission[435] found that of the 3,972 broker-dealers that filed Form X–17a–5 (FOCUS report) in 2016, 430 were also members of U.S. equities exchanges, and the largest 20 broker-dealers controlled approximately 75% of the total assets of all broker-dealers.

The current competitive landscape among significant liquidity providers is shaped by the difference in regulatory treatment between registered dealers and the unregistered market participants that perform a similar role in the markets. Competition among significant liquidity providers in U.S. capital markets, described above, puts pressure on firms' ability to profit from these activities, meaning that even small regulatory differences across significant liquidity providers can be important. The compliance costs of the additional requirements to which registered dealers are subject may currently allow less-regulated firms such as PTFs to increase (or continue to increase) their share of dealing activity at registered dealers' expense. These dynamics may especially apply to the electronic interdealer segment of the Treasury market, where PTFs now account for a majority of trading activity (as of 2019).[436]

4. Externalities

Externalities arise in a market when a market participant engages in activity that impacts participants not otherwise directly related to the activity and the market participant does not take this impact into account. In this analysis, externalities can arise with regard to activities, such as risk taking and abusive trading, that are taken by market participants who act as regular significant liquidity providers (i.e., dealers). The dealer regulatory regime promotes dealers' financial responsibility, including adequate capitalization (liquidity held against risky assets) and internal controls, which can help address externalities— above and beyond any other existing regulatory or industry practices. Subjecting unregistered market participants that perform as dealers to this regime, similarly to all currently registered dealers, will therefore enhance oversight by regulators and help limit externalities by helping prevent spillovers that may broadly harm investors.

Market participants that act as regular significant liquidity providers, whether registered with the Commission as dealers or not, can not only harm their counterparties but also cause wider harm throughout securities markets if they fail financially.

Failed liquidity providers can become unable to meet short-term obligations to trading counterparties, repo lenders and other lenders, and clearing firms. Negative effects can be transmitted further through creditors or counterparties to other market entities who are not directly related. For instance, a lender that suffers a loss due to the bankruptcy of one of its borrowers may reduce its willingness to lend (i.e., it may increase the price of credit) more generally, especially when the lender is uncertain about whether the bankruptcy is due to idiosyncratic events or to

events that have also negatively impacted other potential borrowers. Prior to or during a failure, a significant liquidity provider may have to liquidate an unexpectedly large position— perhaps acquired because offsetting trades were unavailable for a time or because of errors in trading algorithms or other systems (including human errors). Rapid liquidation of the position may cause detrimental price volatility or a temporary drop in market liquidity.

If the failed liquidity provider is a substantial market participant, then its disorderly exit from the market or from a securities position may push market prices away from fundamental value and harm traders across the markets. Because a significant liquidity provider can harm others to whom it is not directly related—and who may not be able to contract to bear those costs—its failure can impose negative externalities. These externalities may ensue whether the failed liquidity provider is registered as a dealer or not. However, the next paragraph explains how the dealer regime's limitations on financial risk, including the Net Capital Rule, reduce the risk for registered dealers.

Dealer regulations are designed to mitigate the magnitude of these externalities and to limit the probability that they occur at all. For example, the Net Capital Rule requires dealers to maintain sufficient liquid assets to meet all unsubordinated liabilities— including obligations to counterparties and other creditors—and to have adequate additional resources to wind down their business in an orderly manner if they fail financially. PTFs that are not registered as dealers currently face fewer regulations restricting their operational or financial risk,[437] and they are also not subject to additional SRO rules that promote financial

---

[434] Maureen O'Hara and Alex Zhou, *Anatomy of a Liquidity Crisis: Corporate Bonds in the Covid–19 Liquidity Crisis,* 142 J. Fin. Econ. 46 (2021), 46–68.

[435] Transaction Fee Pilot for NMS Stocks, Exchange Act Release No. 82873 (Mar. 14, 2018), 83 FR 13008 (Mar. 26, 2018).

[436] See supra note 382.

[437] See discussion of risk limitations in section III.B.2.a.

responsibility and operational capability. Private funds can place limits on investor withdrawals, and the fund adviser's fiduciary obligations may also deter private funds' excessive risk-taking. However, qualifying hedge funds have no regulatory leverage constraints and tend to have more secured debts than assets that could be liquidated within a day or even within a year.[438]

Some commenters disagreed that traders without customers pose risks to investors, since they do not interact directly with the investing public.[439] A dealer's insolvency can also harm other counterparties and creditors even in the absence of customers. Any entity that effectively and regularly provides significant liquidity to markets, regardless of whether that entity has customers or not, has the potential to harm markets if it fails, as discussed above.

Some commenters questioned the proposal's premise that market participants who are not registered dealers can have important externalities, or stated that any such externalities manifest themselves so infrequently that the proposed rules are unnecessary.[440] Market participants engaged in dealing activities but without being registered as dealers create the potential for serious externalities if they fail, regardless of the historical frequency of such failure. Two examples illustrate such externalities: the failure of Drysdale Government Securities and the Treasury market illiquidity in March 2020. In 1982, Drysdale Government Securities—a firm that was not registered as a dealer but was actively dealing in the U.S. Treasury market for its own account—

failed when it became unable to pay interest due on securities it had acquired in reverse repo agreements with 30 brokers.[441] Drysdale had acquired a $4 billion securities portfolio supported by only $20–30 million in capital—far in excess of the leverage that the Net Capital Rule would have allowed for a registered dealer. Even though Chase Bank (Drysdale's agent) supported market confidence by making Drysdale's payments and markets eventually return to normal, Drysdale's failure harmed market functioning for several days. For as long as a week, "according to dealers, the secondary markets in government securities continue[d] to be very thin, with few deals being done. And . . . the repo market was virtually dead."[442]

In addition, the 2021 IAWG Joint Staff Report showed that PTFs in particular (many of whom were not registered as dealers) appeared to pull back from providing liquidity in the Treasury markets relative to dealers during the market volatility in March 2020, possibly because "their lower capitalization relative to dealers may [have left] them with less capacity to absorb adverse shocks."[443] Higher

capitalization may have given PTFs more capacity to absorb the shock, which may have increased their ability to provide liquidity as well as increasing the resiliency of the market itself. While PTFs may not have been the primary cause of the volatility,[444] this episode illustrates that PTFs' market withdrawal can contribute to stress in the overall U.S. Treasury market. One commenter disagreed with the IAWG's characterization of March 2020, and said that "price moves reflected rapidly shifting outlooks for the world economy, and the spreads were narrower than might be expected given the price moves."[445] Research has shown that Treasury market liquidity in March 2020 was considerably lower than might be expected given the price volatility.[446] Consistent with this research, we disagree with the commenter that spreads were narrower than might be expected. However, we do not necessarily conclude that PTFs always exacerbate market instability, since PTFs' share of market trading appeared to increase during the uncertainty in March 2023.[447]

Negative externalities can also derive from market misconduct by unregistered dealers. Several elements of the dealer regulatory regime address misconduct risks and regulators can examine regulated dealers. Under that regime, financial statement reporting, transaction reporting,[448] and examinations help regulators detect manipulation or fraud and determine whether firms comply with applicable regulations. If unregistered dealers engage in market misconduct, it could result in negative externalities by distorting market prices and adversely impacting market participants.[449]

---

[438] See Private Fund Statistics, Tables 4, 49, and 51. As of the fourth quarter of 2022, qualifying hedge funds had $1.2 trillion (32%*$3.8 trillion) in assets that could be liquidated within a day, $2.9 trillion (78%*3.8 trillion) in assets that could be liquidated within a year, and $3.5 trillion in secured debts. In the Proposing Release, we estimated that "qualifying hedge funds are more leveraged than registered dealers." A commenter disagreed with our use of the word "leverage" in that statement, citing statistics showing that the average hedge fund has a lower ratio of assets to equity—a more traditional measure of leverage—than registered dealers (see MFA Comment Letter I). However, we believe the comparison in the proposal and here is apt because the Net Capital Rule constrains a form of leverage—not book leverage, but a more "liquid" notion of leverage equal to liquid assets minus unsubordinated liabilities. To avoid misunderstanding, we refer to "having more secured debts than assets that could be liquidated within a day or even within a year" instead of "leverage." See also supra note 399 for a definition of "qualifying hedge fund."

[439] See AIMA Comment Letter II; Blockchain Association Comment Letter; FIA PTG Comment Letter I; MFA Comment Letter I; SIFMA Comment Letter I.

[440] See AlphaWorks Comment Letter; FIA PTG Comment Letter I; McIntyre Comment Letter I; Overdahl Comment Letter.

[441] Drysdale Government Securities was very active in the U.S. Treasury market, and the firm had acquired a large portfolio of U.S. Government securities through reverse repurchase agreements. Those agreements required Drysdale to pass along any interest received to the banks from whom it had borrowed the securities. The firm collapsed when it was unable to pass along those interest payments. See Ron Scherer, "How Drysdale Affair Almost Stymied US Securities Market," Christian Science Monitor (May 27, 1982), available at https://www.csmonitor.com/1982/0527/052737.html; James L. Rowe Jr. and Merrill Brown, "Through Abrupt Personality Change, Tiny Wall Street Firm Demonstrates the Allure, and Danger, in Speculative Trading," Wash. Post (May 23, 1982), available at https://www.washingtonpost.com/archive/politics/1982/05/23/through-abrupt-personality-change-tiny-wall-street-firm-demonstrates-the-allure-and-danger-in-speculative-trading/532bf4ea-bdf2-4248-924b-d6a682907aba/ https://www.washingtonpost.com/archive/politics/1982/05/23/through-abrupt-personality-change-tiny-wall-street-firm-demonstrates-the-allure-and-danger-in-speculative-trading/532bf4ea-bdf2-4248-924b-d6a682907aba/ (retrieved from Factiva database).

[442] See Ron Scherer, "How Drysdale Affair Almost Stymied US Securities Market," Christian Science Monitor (May 27, 1982), available at https://www.csmonitor.com/1982/0527/052737.html.

[443] See 2021 IAWG Joint Staff Report, supra note 21. Initially, PTFs increased trading activity, but they pulled back from market making several days later when volatility reached very high levels. See id. at 13 ("In the first week of Mar., a large share of the increased trading volume came from PTFs, and on Mar. 9, PTFs' share of trading on electronic IDB platforms was just over 60%, a typical level. But as heavy net investor sales continued, the balance of activity in the interdealer market shifted . . . PTFs' total share of activity fell to a low of 45% on Mar. 16. Dealers' total volumes on electronic IDB platforms also declined, but less

sharply than PTFs' volumes."). See also infra note 460 and surrounding text.

[444] See Overdahl Comment Letter.

[445] See Alphaworks Comment Letter.

[446] See Darrell Duffie, et al., Oct. 2023, "Dealer Capacity and U.S. Treasury Market Function," Federal Reserve Bank of New York Staff Reports, no. 1070, available at https://doi.org/10.59576/sr.1070.

[447] See Nellie Liang, "Remarks by Under Secretary for Domestic Finance Nellie Liang at the 2023 Treasury Market Conference" (Nov. 16, 2023), available at https://home.treasury.gov/news/press-releases/jy1917.

[448] See Section III.B.2.a for a discussion on transactions reporting by registered dealers versus other entities.

[449] In 2020 and 2021, FINRA identified non-member firms in 17% of the alerts generated by its surveillance of manipulative trading patterns in U.S. Treasury market, despite limitations on its surveillance of non-members—FINRA can only identify trades as involving non-FINRA members when the trades take place on certain ATSs (see supra note 380). See Sept. 27, 2022, letter from FINRA responding to SEC Release No. 95388 (15b9–1), pp. 9–10, available at https://www.sec.gov/

Some commenters said that requiring more Treasury security transactions to be centrally cleared would address the same externalities that are described above.[450] The SEC recently adopted the Treasury Clearing Adopting Release, which, among other things, amends 17 CFR 240.17Ad–22(e)(18) to require covered clearing agencies that provide central counterparty ("CCP") services for U.S. Treasury securities to establish, implement, maintain and enforce written policies and procedures reasonably designed, as applicable, to establish objective, risk-based and publicly disclosed criteria for participation, which require that any direct participant of such a covered clearing agency submit for clearance and settlement all the eligible secondary market transactions in U.S. Treasury securities to which such direct participant is a counterparty.[451] The Treasury Clearing Adopting Release lowers overall systemic risk in the U.S. Treasury market by bringing the benefits of central clearing to more transactions involving U.S. Treasury securities.[452] The amendments that the Commission adopted in the Treasury Clearing Adopting Release will likely yield benefits associated with increased levels of central clearing in the secondary market for U.S. Treasury securities.[453] These benefits could be particularly significant in times of market stress, as CCPs will mitigate the potential for a single market participant's failure to destabilize other market participants, destabilize the financial system more broadly, and/or reduce the effects of misinformation and rumors.[454] A CCP also will address concerns about counterparty risk by substituting the creditworthiness and liquidity of the CCP for the creditworthiness and liquidity of counterparties.[455]

Accordingly, the Commission acknowledges that the Treasury Clearing Adopting Release addresses some of the externalities discussed above stemming from the failure of large firms, which the final rules are also intended to address. However, given that the Treasury Clearing Adopting Release and the final

rules address these externalities through different mechanisms, the final rules would serve to further reduce the externalities in the market for U.S. Government securities. This, in turn, further reduces the probability that a significant liquidity provider fails and thus promotes the stability and resiliency of the government securities market. By limiting the risk of failure, the final rules limit the probability that such failure could harm creditors or lead to price volatility as a troubled firm rapidly deleverages. The final rules may also limit the probability of failure for all PTFs and hedge funds who are engaged in dealing activity. The Treasury Clearing Adopting Release, in contrast, would not require central clearing for hedge funds' cash trades or for any transaction between a PTF who is not a member of a clearing agency and another non-member counterparty. In addition, benefits of the final rules such as the consistent application of dealer regulations across significant liquidity providers, operational and financial requirements designed to mitigate risks, deterrence of abusive and deceptive trading practices, extension of SROs' examination authority to significant liquidity providers for U.S. financial markets, and increased transparency into the identities of significant liquidity providers in the Treasury market, are largely unaffected by the adoption of the Treasury Clearing Adopting Release.

## C. Economic Effects, Including Impact on Efficiency, Competition, and Capital Formation

As described in section II, the Commission believes that the final rules will promote the stability and transparency of U.S. Treasury and other securities markets by closing the regulatory gap that currently exists and ensuring consistent regulatory oversight of persons engaging in regular liquidity provision in securities markets. Specifically, the final rules will increase the share of liquidity provision that is undertaken by persons who are subject to the dealer regime's limits on financial risk-taking, reporting requirements, regulation against abusive practices, and examinations. The greatest benefits come from applying these dealer regulations to entities that are currently not registered at all—*i.e.,* unregistered PTFs. While the Commission already has some insight into private funds and investment advisers, to the extent that certain private funds or registered investment advisers perform the functions of dealers, it would be beneficial to extend dealer risk limitations and transaction reporting

responsibilities to them. These benefits, as well as the costs described in this section, may differ for registered government securities dealers, since they have different capital requirements and are not required to join SIPC as discussed in section III.B.1.

Costs of the final rules include registration and membership fees, costs of recordkeeping and reporting, and costs associated with net capital requirements. Additionally, the final rules may influence patterns of market participation, which may in turn affect competition among significant liquidity providers, market liquidity and efficiency, and capital formation.

### 1. Benefits

The final rules would subject all market participants that perform similar dealer functions to a common regulatory regime. This regime includes provisions that limit risk (*e.g.,* the Net Capital Rule and rules promoting operational integrity), provisions that require certain books and records, provisions that require various reporting and disclosure (including audited financial statements and the identities of owners, directors, and managers), and antifraud and anti-manipulation provisions. Subjecting currently unregistered (as dealers) market participants to dealer requirements will thus enable oversight by regulators,[456] limit externalities by helping prevent spillovers that may broadly harm investors, and ensure that the competitive landscape among significant liquidity providers is not shaped by a difference in regulatory treatment.[457]

As previously discussed, PTFs and hedge funds would be the primary affected parties, and registering PTFs that are dealing would provide the

*comments/s7-05-15/s70515-20144330-309240.pdf.* FINRA staff later clarified that some of that 17% may be due to SEC-registered broker-dealers who are not FINRA members (*see* memorandum of telephone conversation between Commission staff and FINRA *available at https://www.sec.gov/comments/s7-05-15/s70515-226580-474322.pdf*).

[450] *See* AIMA Comment Letter III; Lewis Study; MFA Comment Letter II; Overdahl Comment Letter.

[451] *See* Treasury Clearing Adopting Release, 89 FR 2717–22.

[452] *See id.* at 2716.

[453] *See id.* at 2798.

[454] *See id.*

[455] *See id.* at 2798–99.

[456] One commenter stated that "[t]he Regulation ATS proposal may well result in coverage of some of the same market participants as would be covered by the [proposed rules] and may therefore address some of the needs that the Commission claims warrant the [proposed rules]." *See* Consensys Comment Letter (discussing Amendments Regarding the Definition of "Exchange" and Alternative Trading Systems (ATSs) That Trade U.S. Treasury and Agency Securities, National Market System (NMS) Stocks, and Other Securities, Exchange Act Release No. 94062 (87 FR 15496, Mar. 18, 2022) ("Regulation ATS Proposal")). The Regulation ATS Proposal has not been adopted and is therefore not part of the baseline for this economic analysis. *See supra* note 355. In any event, the final rules and the Regulation ATS Proposal differ in scope and impact, as the rules would apply to market participants engaging in different types of market activities if Regulation ATS is adopted as proposed.

[457] In a comment letter, FINRA agreed that "requiring such entities to register with the SEC . . . would close regulatory gaps," and stated that "current regulatory disparities are especially pronounced in the market for U.S. Treasury securities." *See* FINRA Comment Letter.

largest benefits. Some investment advisers may also be affected if they engage in dealing activities on their own account, and these entities' dealer registration would also provide benefits.

In response to a related initiative in 2010,[458] at least one principal trading firm told the Commission that the costs of registering PTFs as dealers were not justified because equity markets worked well during the autumn of 2008 (then the most-recent crisis) and because the commenter believed that principal trading firms in general help market integrity by providing liquidity during difficult situations.[459] However, the 2021 IAWG Joint Staff Report showed that, during the U.S. Treasury market volatility of March 2020, PTFs' share of market intermediation fell considerably more than did dealers' share.[460] The Joint Staff Report's conclusion suggests that PTFs do not always promote stability in securities markets.

a. Regulatory Consistency and Competition

Currently, large market participants that are not registered as dealers (or government securities dealers) perform critical market functions, in particular liquidity provision, akin to those performed by dealers (or government securities dealers). For example, in the U.S. Treasury market, PTFs account for about half of the daily volume in the interdealer market and yet are not registered as dealers. The final rules will help ensure that all market participants that take on significant liquidity-providing roles are appropriately registered as dealers and government securities dealers. The final rules will thereby promote competition among entities that regularly provide significant liquidity by applying consistent regulation to these entities, thus leveling the competitive playing field between liquidity provision conducted by entities that are currently registered as dealers and government securities dealers and by entities that are not.

The regulatory consistency under the final rules is expected to benefit currently registered dealers by ensuring that all of their competitors, including currently unregistered market

participants that perform the same function as dealers, are subject to common regulatory requirements.[461] As stated above in section III.B.3, even small differences across significant liquidity providers in regulatory costs could be enough to give important advantages to the firms bearing the smallest regulatory burdens.

Some commenters stated that the final rules would negatively impact competition by especially harming small PTFs and creating barriers to entry against small liquidity providers.[462] We agree that the final rules could impose proportionally greater costs on small-volume liquidity providers for two reasons. First, FINRA's Gross Income Assessment[463] generally declines as a percentage of revenue for larger firms, so that firms with smaller revenues pay proportionally larger fees. Second, fees associated with reporting to TRACE[464] are proportionally lower for trades with larger dollar par value. To the extent that larger firms also tend to place larger trades, on average, TRACE reporting might be proportionally more costly for small firms. However, the final rules will exclude market participants who have or control assets less than $50 million.[465] Also, currently registered dealers include smaller market participants, and under the final rules smaller unregistered market participants would be subject to the same rules as smaller registered market participants, thereby creating a level competitive landscape amongst smaller market participants.

b. Regulations on Financial and Operational Risk-Taking

The final rules will mitigate externalities to liquidity and stability, discussed in section III.B.3, by applying the Net Capital Rule and SRO requirements to additional significant liquidity providers. These final rules will reduce the risk that a significant liquidity provider fails and harms its counterparties and the broader

functioning of the markets, by promoting the financial stability of individual significant liquidity providers. SRO supervision may also reduce the risks that errors in algorithms lead to trading activities that violate Commission or SRO rules.[466]

The Net Capital Rule will make risk-taking more costly for affected parties because the final rules will require them to maintain a greater supply of liquid assets when they are exposed to more risk. In the event that a significant liquidity provider fails, the Net Capital Rule will ensure that it has sufficient liquid assets to meet all its liabilities to unsubordinated creditors. In addition, qualifying hedge funds,[467] on average, have fewer liquid assets than the Net Capital Rule would allow.[468] Markets in which significant liquidity providers are required to hold some amount of liquid assets and face constraints on leverage may be less sensitive to sudden market disruptions that could otherwise reduce their capacity to provide liquidity. Such liquidity providers are better able to withstand adverse events without compromising their ability to remain engaged in the market.[469]

The benefit of the Net Capital Rule's constraints on risk-taking may be smaller for certain affected parties. Some persons may meet the final rules' definition of dealing but also keep their gross exposure small at any moment. Such persons would operate with very little leverage and would have few short-term obligations at any moment. The benefit of the Net Capital Rule may also be smaller when applied to persons whose creditors and counterparties have rigorous risk management practices and are capable of calculating and managing their exposure to that person. Such creditors and counterparties may not be seriously harmed by a dealer's failure. As noted above, registered government securities dealers are subject to minimum liquid capital requirements as set forth in 17 CFR 402.2. These requirements would generally serve the same risk-limiting purpose as the Net Capital Rule. Also, the Net Capital Rule would not necessarily make affected persons more willing to provide liquidity in times of market stress; solvent firms could still decide not to provide liquidity if it were not profitable to do so.

The final rules require affected persons to become FINRA members and comply with FINRA rules designed to

---

[458] See 2010 Equity Market Structure Concept Release.

[459] See Comment Letter of Berkowitz, Trager & Trager, LLC (Apr. 21, 2010) ("Berkowitz Comment Letter"). See also supra note 20.

[460] See supra notes 21 and 443 and accompanying text for further discussion of changes in trading activity of principal trading firms during the U.S. Treasury market volatility of Mar. 2020. The market share of PTFs declined from approximately 62% at the beginning of Mar. 2020 to a low of 45% on Mar. 16, 2020.

[461] See section III.B.3.

[462] See Alphaworks Comment Letter; MMI Comment Letter; FIA PTG Comment Letter I.

[463] See infra Table 6.

[464] See infra note 543.

[465] This discussion of the potential negative economic impact on smaller liquidity providers for purposes of the economic analysis does not impact the regulatory flexibility analysis discussed later in section V because the final rules include a $50 million exclusion. As a result, any of the "small liquidity providers" discussed in the economic analysis would not meet the Commission's definition of a "small business" or "small organization" in 17 CFR 240.0–10 ("Rule 0–10"), which defines an "issuer" or "person" other than an investment company as having total assets less than $5 million on the last day of its fiscal year for purposes of the Regulatory Flexibility Act.

[466] See supra note 369 and accompanying text.

[467] See supra note 399.

[468] See supra note 438 and accompanying text.

[469] See supra notes 21 and 443 (referring to the Treasury market events of 2020).

facilitate the orderly and robust execution of algorithmic and HFT operations.[470] Applying these rules would address the risk that a significant liquidity provider's failure could cause market disruptions, and these rules are also designed to limit the duration of any such market disruptions that may occur. We understand that algorithmic HFT is a primary feature of the PTFs and private funds who are most likely to meet the final rules' qualitative factors, since such trading can involve regularly expressing trading interests on both sides of the market (the expressing trading interest factor) or earning revenue from bid-ask spreads or incentives offered for liquidity-providing trades (the primary revenue factor). The application of these rules to affected parties engaged in such algorithmic trading activity will accordingly promote the stability and resilience of U.S. securities markets.

A few commenters agreed that the proposed rules would provide benefits of market stability, integrity, and resiliency.[471] Other commenters asked how the final rules would prevent or mitigate harm from future market disruptions and one said that having more market participants registered as dealers would not have improved the market structure in March 2020.[472] We acknowledge that dealer registration does not obligate an entity to provide liquidity in the secondary market, and that even registered dealers may pull back from the market at times for business reasons. We also acknowledge that even registered dealers can fail. However, we emphasize that the dealer regime, including the Net Capital Rule, seeks to limit financial risk that may make entities more likely to fail or to need to pull back from the market. We believe that compliance with the dealer regime would make significant liquidity providers less likely to contribute to market instability.[473]

Many commenters stated that market participants who are not registered as dealers are already subject to regulatory risk limits, because the market participants typically trade through registered entities (*e.g.,* banks and broker-dealers), and therefore it is not

necessary for such participants to comply with the Net Capital Rule.[474] Other commenters questioned the benefits of regulating private fund advisers as dealers, since existing rules and regulations already limit advisers' risk and protect their investors through rules on custody of assets, fiduciary duty, and reporting, and record-keeping.[475] Another commenter added that professional equity trading firms are also subject to the Market Access Rule, which is designed to promote market integrity, and to the Commission's large trader program, which may impose reporting obligations on unregistered as well as registered entities.[476] The Commission acknowledges that market participants currently have direct and indirect constraints on their trading activity and risk-taking.[477] However, as discussed in section III.B.3.a, the Net Capital Rule is another important constraint on risk-taking and helps promote the stability of markets. Unlike the various margin requirements, the Net Capital Rule directly ensures that dealers are sufficiently liquid so that they can quickly satisfy creditors and counterparties. With respect to direct market access, the Market Access Rule does not directly impose obligations on all trading firms. Rather, the Market Access Rule requires a broker or dealer with market access to establish, document, and maintain a system of risk management controls and supervisory procedures reasonably designed to manage financial, regulatory, and other risks of this business activity.

Some commenters questioned the benefits of applying the Net Capital Rule to entities without customers—*e.g.,* PTFs, investment advisers, or private funds.[478] However another commenter

stated that even entities without customers may still engage in a significant amount of trading activity, and so their financial and operational condition can present risks to the markets.[479] Two commenters said that the Net Capital Rule was designed to protect creditors and counterparties, in addition to customers.[480] Such creditors and counterparties may include repo counterparties and clearing firms. If a significant liquidity provider were to fail, these other parties could become unable to complete trades or lose control of assets, either permanently or temporarily during bankruptcy proceedings. Even if the losses were eventually recovered, the significant liquidity provider could be temporarily unable to deliver securities or cash, forcing the counterparties to quickly enter new trades, put on new hedges, replace frozen collateral, or find new sources of liquidity. If market prices were volatile during this period, even a temporary freeze could cause serious stress to these counterparties and creditors. If a liquidity provider with large enough positions were to fail, the cumulative harm to counterparties and creditors, even if temporary, could cause substantial market disorder. Even if it does not fail, a highly leveraged significant liquidity provider may exacerbate market instability during times of market stress or volatility. For example, the entity may receive margin calls at a time of volatility, requiring it to reduce its leverage by closing positions instead of continuing to provide liquidity the market.

The final rules may also increase the benefits associated with increased central clearing. Under the recent Treasury Clearing amendments,[481] registered dealers and government securities dealers that are direct participants of a covered clearing agency will be required to centrally clear all of their eligible secondary market transactions; such transactions of dealers and government securities dealers that are not direct participants of a covered clearing agency will still be subject to central clearing requirements if those transactions are with members of a covered clearing agency. Accordingly, the final rules may increase the number of transactions subject to central clearing requirements to the extent they result in registration of new dealers or government securities dealers whose eligible secondary market

---

[470] *See supra* note 369.

[471] *See* Better Markets Comment Letter; FINRA Comment Letter; Gretz Comment Letter.

[472] *See* Alphaworks Comment Letter; Consensys Comment Letter; FIA PTG Comment Letter I; McIntyre Comment Letter II; Morgan Lewis Comment Letter.

[473] *See supra* section I.A for a discussion on how dealer registration enhances market stability by giving regulators increased insight into firm-level and aggregate trading activity and so helps regulators to evaluate, assess, and address market risks and to contribute to fair and orderly markets.

[474] *See* Alphaworks Comment Letter; ADAM Comment Letter; MFA Comment Letter I; Lewis Study; Element Comment Letter; ICI Comment Letter; Letter from the Hedge Fund Association (May 27, 2022) ("HFA Comment Letter"); IAA Comment Letter I; IDTA Comment Letter; Morgan Lewis Comment Letter; NAPFM Comment Letter; SIFMA Comment Letter; T. Rowe Price Comment Letter; Virtu Comment Letter. *See supra* notes 384–386 and accompanying text for a discussion of existing risk limits.

[475] *See* AIMA Comment Letter II; ABA Comment Letter; Citadel Comment Letter; Committee on Capital Markets Regulation Comment Letter; Element Comment Letter; MFA Comment Letter I; MFA Comment Letter II; Fried Frank Comment Letter; HFA Comment Letter; IAA Comment Letter I; ICI Comment Letter; Lewis Study; McIntyre Comment Letter II; T. Rowe Price Comment Letter; Two Sigma Comment Letter I.

[476] *See* Lewis Study; McIntyre Comment Letter II.

[477] *See* sections III.B.2.a and III.B.2.b.

[478] *See* AIMA Comment Letter; Blockchain Association Comment Letter; Consensys Comment Letter; FIA PTG Comment Letter I; IAA Comment Letter I; MFA Comment Letter I; T. Rowe Price Comment Letter.

[479] *See* FINRA Comment Letter.

[480] *See* FIA PTG Comment Letter I; AIMA Comment Letter II.

[481] *See supra* notes 348 and 375 and accompanying text.

transactions with a direct participant of a covered clearing agency will need to be centrally cleared.[482] This increase in central clearing will confer benefits as discussed in the Treasury Clearing Adopting Release.[483]

Entities that register as dealers, other than registered government securities dealers, will be required to become members of SIPC. Some commenters questioned whether dealers registered under the final rules that do not have customers would benefit from SIPC membership.[484] We acknowledge that not every registered dealer has customers. However, in the Securities Investor Protection Act of 1970 ("SIPA"), Congress mandated that a broad range of dealers, including those without customers, are required to become members of SIPC.[485] In fact, there are many firms that are current broker-dealers and have no customers that are members of SIPC.[486] The requirement for dealers to become SIPC members is intended to place the financial support of the SIPC program on all firms that made their livelihood in the securities business, regardless of whether they had public customers or not.[487] Accordingly, we believe that expanding SIPC membership will enhance the ability of SIPC to carry out its investor protection mission, consistent with SIPA, which will have positive effects on the securities markets overall. In addition, we note that entities that choose to comply with the final rules by registering as government securities dealers under section 78o–5(a) of the Exchange Act are not required to become SIPC members.

## c. Regulations on Reporting

The final rules would enhance regulators' oversight of significant liquidity providers and of individual securities trades. Entities that register as dealers under the final rules will have new reporting obligations to CAT (if they transact in CAT-reportable securities) and to TRACE (if they transact in TRACE-eligible securities). The additional reporting would give regulators greater insight into securities trading patterns, including the ability to more efficiently match trades to market participants.[488] PTFs who register as dealers or as government securities dealers would also begin submitting annual reports, including financial statements, for the first time. This additional information, especially the financial reporting and the transaction reporting, would help address the Commission's concerns described in sections III.B.3. and III.B.4. The information would enable regulators to better analyze markets—including reconstructing markets and detecting abusive trading behaviors—respond to market events and inform investors.[489] Improved regulatory oversight would, in turn, promote the efficiency and stability of the markets as well as investor confidence, which would support capital formation by increasing demand for securities issued in U.S. markets and lowering yields.

Comment letters argued that dealer registration would not provide an information benefit because transactions are already reported to TRACE or CAT,[490] because investment advisers are already subject to Commission oversight, and because PTFs and investment advisers are potentially subject to reporting on Forms 13F or 13H.[491] Section III.B.2 describes the differences in the information available to regulators for registered dealers compared to PTFs and private funds. Specifically, registered dealers who become FINRA members will be required to report fixed income transactions to TRACE, which will expand the ability to identify the new registered dealers and potentially result in more trades being reported. We believe this information would be useful for surveillance and for market reconstruction.[492] Forms 13F and 13H also contain valuable information, but they do not contain the detailed transaction data that registered dealers are responsible for submitting.[493]

## d. Regulations on Deceptive Practices

The final rules would help the Commission and the SROs to detect and deter abusive behaviors such as fraud or manipulation by subjecting significant liquidity providers to section 15(c) of the Exchange Act[494] and to SRO rules and oversight.[495] As described in section III.B.2, registering affected parties as dealers would subject them to Commission examinations and would expand the Commission's ability to issue specific rules and regulations designed to deter misbehavior under Exchange Act section 15(c). The persons whom the final rules would require to register would be those with the ability to significantly impact markets, whether in pursuit of legitimate trading strategies or possibly through market manipulation. Therefore, subjecting them—particularly the highly active but unregistered PTFs shown in Table 1—to the additional anti-fraud regulations that apply to registered dealers, as well as to additional regulatory oversight, would contribute to fair and orderly markets.

## e. Regulations Related to Examinations

Registered dealers and government securities dealers are subject to examinations by the Commission and by the relevant SRO, and they are also required to comply with certain books and records requirements.[496] PTFs that are not registered as dealers are not subject to examinations or to books and records rules, but registered private fund advisers are currently subject to recordkeeping requirements and Commission examinations. Examinations help regulators detect manipulative or fraudulent activities, as well as verify more generally that persons comply with all relevant

---

[482] Such transactions would not have been cleared under the baseline unless the transaction was with direct participant that brought together multiple buyers and sellers using a trading facility (such as a limit order book) and is a counterparty to both the buyer and seller in two separate transactions. *See* Treasury Clearing Adopting Release.

[483] *See* Treasury Clearing Adopting Release; *see also supra* section III.B.4.

[484] *See* Citadel Comment Letter; Overdahl Comment Letter.

[485] *See* 15 U.S.C. 78ccc(a)(2).

[486] *See* SIPC, *List of Members, available at https://www.sipc.org/list-of-members/* (listing SIPC members, including multiple firms that do not have customers).

[487] *See* SIPC, Member FAQs, *available at https://www.sipc.org/for-members/member-faqs#my-firm-has-no-public-customers-why-do-i-have-to-be-a-member* ("When Congress passed the Securities Investor Protection Act, it made all SIPC members subject to its provisions, including the obligation to pay assessments into the SIPC Fund. The objective was to instill confidence in the investing public and to place the financial support of the SIPC program on all firms that made their livelihood in the securities business, regardless of whether they had public customers or not.").

[488] *See* section III.B.2.a for a discussion of limitations that exist when market participants do not have reporting obligations—reduced efficiency in identifying market participants in CAT, and limited ability to identify market participants in TRACE.

[489] For example, regulators' lack of insight into the market for U.S. Treasury securities became especially apparent during the instability of Mar. 2020. The 2021 IAWG Joint Staff Report on Nov. 8, 2021, noted that "In Mar. 2020 . . . there was a [particular] need for timely information on the positions and transactions of institutions other than dealers." *See supra* note 21. Wider TRACE reporting would have provided more of such information.

[490] *See* Fried Frank Comment Letter; McIntyre Comment Letter II; MMI Comment Letter; Morgan Lewis Comment Letter; SIFMA Comment Letter I; Virtu Comment Letter.

[491] *See* Fried Frank Comment Letter; IAA Comment Letter I; McIntyre Comment Letter II; SIFMA AMG Comment Letter.

[492] *See* FINRA Comment Letter; Gretz Comment Letter.

[493] *See supra* notes 394 and 395 and surrounding text.

[494] *See supra* note 396.

[495] *See supra* notes 367–369.

[496] *Id.*

regulations. Books and records requirements facilitate examinations by ensuring that data entries are defined, recorded, and preserved in a consistent manner across all dealers. The final rules would allow regulators to examine firms that currently are not registered, including PTFs, who are not currently subject to examinations but whose activity contributes significantly to market liquidity or to price discovery. Since examinations help ensure compliance with other rules, and since the Commission already has authority to examine registered investment advisers, subjecting PTFs to examination would support the other benefits that would come from registering PTFs as dealers.

Examinations also help regulators analyze market disruptions and inform subsequent regulatory changes. Since the final rules will give regulators the ability to conduct targeted examinations of entities that provide substantial market liquidity and price formation, regulators will be able to better determine the causes of market disruptions and implement regulatory reforms designed to mitigate and prevent future similar disruptions.[497] For instance, following the market disruptions caused by Knight Capital in 2012,[498] FINRA conducted targeted examinations on member firms' HFT operations and then updated its guidance on supervision and control practices for algorithmic trading strategies.[499] While FINRA oversight did not prevent Knight Capital's disruptions—Knight was a registered broker-dealer—FINRA oversight did give the regulator authority to examine other firms engaged in activities similar to Knight and to inform its guidance.[500]

### 2. Costs

#### a. Compliance Costs

The final rules will impose compliance costs on certain market participants, including costs of registering with the Commission and with an SRO, recordkeeping and reporting costs, direct costs that may stem from meeting net capital requirements (*i.e.,* continuously monitoring capitalization), and self-evaluation as to whether one is a dealer or not.[501] These potential compliance costs can be broadly organized into five categories:

1. Costs related to registration as a dealer or government securities dealer.

2. Costs related to FINRA membership or membership with another SRO.

3. Costs related to TRACE reporting for firms that trade fixed income securities.

4. Costs related to CAT reporting for firms that trade NMS securities or OTC equities.

5. Costs related to SIPC membership for firms that register as dealers under section 15(b) of the Exchange Act.

The costs of registration as a dealer or government securities dealer will apply to all firms. Likewise, the cost of FINRA membership or membership with another SRO will apply to all firms. However, the costs of TRACE reporting will only apply to firms that trade fixed income securities. The costs of CAT reporting will only apply to firms that trade NMS securities, OTC equity securities, or options. The costs of SIPC membership will apply only to firms that register as dealers under section 15(b) of the Exchange Act and not firms that register as government securities dealers under section 15C of the Exchange Act.

The Commission has itemized and updated its cost estimates for affected parties in response to commenters.[502] The following subsections present itemized compliance cost estimates for affected parties that register as dealers under section 15(b) of the Exchange Act after the rules' adoption or register as government securities dealers under section 15C of the Exchange Act. The compliance cost estimates reported in

the following subsections are reported on a per firm basis. Some compliance costs in the following subsections are approximately proportional to trading activity or revenue. For these compliance costs, we report both how these costs scale with trading activity or firm revenue, and quantitative estimates of these costs for the large firm sample from the Amended Rule 15b9–1 Adopting Release.

The cost estimates in the following subsections are subject to several assumptions, uncertainties, and other factors. In particular, the cost estimates are for firms the Commission expects to register as dealers or government securities dealers because the firms meet either the expressing trading interest factor or the primary revenue factor in the final rule. Since estimates of the number of affected parties are subject to some uncertainty, the following cost estimates are subject to similar uncertainty and limitations.[503] Other sources of uncertainty are discussed within individual subsections. Additionally, some firms may already own a registered dealer or government securities dealer. If an affected party already owns a registered dealer, then the party may choose to migrate operations satisfying the expressing trading interest factor or primary revenue factor into the registered dealer instead of registering additional entities as dealers. If an affected party chooses to migrate operations into an existing registered dealer after the rules' adoption, then its compliance costs will likely be less than the cost estimates reported in the following subsections. PTFs, since they do not have clients or customers, would bear the costs of registration and compliance themselves. Private funds, however, may either bear the costs themselves (*i.e.,* the funds' investors would bear the cost) or the costs may be borne by their investment adviser.

#### i. Dealer Registration

This section discusses the Commission's estimates of the costs associated with dealer registration under section 15(b) of the Exchange Act and government securities dealer registration under section 15C of the Exchange Act with the Commission for the final rules' affected parties. The Commission expects the costs of registration to be similar for dealer registration under section 15(b) and government securities dealer registration under section 15C because

---

[497] The Commission currently can examine registered investment advisers and private funds, but it has no authority to examine PTFs who are not registered as dealers.

[498] On Aug. 1, 2012, an error in Knight Capital's trading software caused the firm to purchase $7 billion in equities in the first hour of trading, and the firm later tried to reverse some of the unintentional purchases. The buying and selling caused price volatility in approximately 150 different equities, and nearly bankrupting the firm. *See* Henrico Dolfing, ''Case Study 4: The $440 Million Software Error at Knight Capital,'' *available at https://www.henricodolfing.com/2019/06/project-failure-case-study-knight-capital.html.* For FINRA's response, *see Targeted Examination Letter on High Frequency Trading,* FINRA, *available at https://www.finra.org/rules-guidance/guidance/targeted-exam-letter/high-frequency-trading.*

[499] *See* FINRA Regulatory Notice 15–09, *available at https://www.finra.org/sites/default/files/notice_doc_file_ref/Notice_Regulatory_15-09.pdf.*

[500] *Id.* The notice states, in part, ''FINRA staff has conducted a number of examinations and investigations over the past several years that were prompted by the detection of systems-related issues at firms engaged in algorithmic strategies . . . As a result of these reviews and working with member firms engaged in algorithmic strategies, FINRA has

developed the following list of suggested effective practices for such firms.''

[501] Registered dealers would be subject to requirements, such as Exchange Act Rules 15c3–1, 17 CFR 240.17a–1 (''Rule 17a–1''), 17a–3, 17a–4, and 17 CFR 240.17a–5 (''Rule 17a–5'').

[502] The TRACE analysis identifies up to 22 PTFs, 4 hedge fund, 4 entities classified as ''dealers'' (though they are not FINRA members and do not appear to be registered with the Commission), and 1 entity classified as ''other.'' The Form PF analysis identifies 12 hedge funds as the most likely to be affected. *See supra* note 418.

[503] *See, e.g.,* section III.B.2.c for a discussion of the affected entity estimates and uncertainty regarding the affected entity estimates.

of the registrations' similarity, *e.g.,* both registrations require completing and amending Form BD, maintaining dealer-related policies and procedures, record-keeping, and filing annual reports.

The Commission estimates the initial cost of the final rules for affected parties that register as dealers is approximately $700,000.[504] The Commission estimates the cost of the final rules for parties that self-evaluate but do not register as dealers is approximately $60,000.[505] The initial costs to register as a dealer with the Commission would include costs associated with filing Form BD, filing Form ID, any related legal or consulting costs that may be needed to ensure compliance with rules, including drafting policies and procedures as may be required, and an initial self-evaluation of the final rules' applicability to the affected party.[506] If a firm has a large number of employees, has several lines of business, or relatively complicated trading operations, then the firm may incur greater expenses relative to other firms when registering as a dealer.[507]

The Commission estimates the ongoing cost of registering with the Commission as a dealer is approximately $600,000.[508] The

Commission's estimate of the annual cost for an affected party to maintain its status as a registered dealer includes several items: filing Form BD amendments, risk management system maintenance, information collection, information storage, financial reporting, audits by an independent PCAOB-registered accounting firm, and claiming an exemption from treatment as a dealer pursuant to 17 CFR 240.15c3–3 ("Rule 15c3–3").[509]

A dealer registered under section 15(b) of the Exchange Act is subject to the compliance requirements of the customer protection rule, Rule 15c3–3, unless the dealer's operations satisfy certain criteria that exempt the dealer from the rule.[510] The Commission believes that the affected parties would generally claim they are exempt from Rule 15c3–3 because they do not carry brokerage accounts for customers.[511] If an affected party does not claim an exemption, then the affected party may incur additional costs to comply with Rule 15c3–3. Several commenters suggested that dealers registered under the final rules would lose protections under Rule 15c3–3.[512] However, we do

not believe the final rules will significantly impact registered dealers with respect to the customer protection rule. In particular, Rule 15c3–3 requires a carrying broker-dealer to take steps to protect both customer accounts and also proprietary accounts of other brokers or dealers ("PAB Accounts"). Therefore, a registered dealer that holds accounts at another broker-dealer would benefit from the protections for PAB Accounts under Rule 15c3–3.[513]

The initial and ongoing compliance costs include financial reporting, recording keeping, and net capital requirement compliance operations. The costs associated with the reporting, record keeping, and net capital requirements of dealer registration will depend on the scope of the firm's dealer activities, capital structure, existing compliance-related activity, and jurisdiction. If a firm trades securities belonging to several different asset classes, then the firm may incur greater dealer related compliance costs because different types of securities are subject to different reporting, record keeping, and net capital requirements.[514] If a firm is already a registered investment adviser or affiliated with an investment adviser, then the firm may incur fewer dealer related compliance costs because the firm has prior experience implementing and maintaining compliance-related operations.[515] Firms already conducting reporting and recordkeeping related activities for compliance purposes may incur somewhat lower costs because these firms have already established recordkeeping practices, internal controls, and related business processes. For example, if some of a private fund adviser's existing compliance-related records, internal controls, and other processes overlap with dealer compliance requirements, then the private fund might use its adviser's existing compliance infrastructure to satisfy dealer related compliance requirements. However, these potential cost reductions are limited only to situations where a private fund's existing compliance operations can be re-used to comply with dealer requirements.

---

[504] Exchange Act Release No. 76324 (Oct. 30, 2015), 80 FR 71388, 71509 n.1487 (Nov. 16, 2015) ("Regulation Crowdfunding Adopting Release"), estimates the upper bound on the costs of registering as a broker-dealer and complying with associated regulations would be $500,000. Most of these costs involve personnel hours and legal services. Since the cost of legal services and nominal wages paid to administrative and financial operations employees have approximately risen with the consumer price index since 2015, we adjust these estimates for inflation of 27.31% between Oct. 2015 and May 2023, based on the CPI–U as recorded by the Bureau of Labor Statistics (*see* U.S. Bureau of Labor Statistics, *Consumer Price Index, available at https://www.bls.gov/cpi/data.htm*). $500,000 × 1.2731 = $636,550. We add an additional $60,000 self-evaluation cost suggested by commenters discussed in *infra* note 517. We round this figure to $700,000 to reflect uncertainty in our estimate. As in previous releases, this is an estimated upper bound on the range of registration costs incurred by broker-dealers; it is possible that certain affected parties—for example, smaller firms with relatively simple trading operations—could incur lower registration costs.

[505] *See infra* note 517 for the calculation of the $60,000 self-evaluation cost.

[506] *See* section III.B.1 for a detailed description of the filings and regulations associated with dealer registration and maintaining dealer registration.

[507] *See* Regulation Crowdfunding Adopting Release.

[508] The Regulation Crowdfunding Adopting Release estimated the ongoing cost of broker-dealer registration with the Commission is approximately $230,000. Most of these costs involve personnel hours and legal services, so we adjust this cost estimate for inflation by a factor of 1.2731. The inflation adjusted cost estimate is $230,000 × 1.2731 = $292,831. We add a $300,000 estimate for the cost of an annual audit by an independent PCAOB-registered account firm to this figure to construct

the final cost estimate. *See* Private Fund Advisers; Documentation of Registered Investment Adviser Compliance Reviews, Investment Advisers Act Release No. 6383 (Aug. 2023), 88 FR 63206 (Sept. 14, 2023) ("Registered Investment Adviser Compliance Reviews Adopted Rule") $292,831 + $300,000 = $592,831. We round $592,831 to the nearest hundred thousand to reflect uncertainty in the cost estimate. We have added an additional auditing expense to the Commission's revised cost estimates in response to comment letters that stated that the original expense estimates for broker-dealer registration were underestimated because they omitted compliance, clerical, and accounting related costs associated with preparing and verifying financial statements required to comply with broker-dealer related regulations. *See, e.g.,* AlphaWorks Comment Letter; AIMA Comment Letter II; Citadel Comment Letter; Fried Frank Comment Letter.

[509] *See* the Proposed Rule for estimates of labor hour requirements for completing tasks associated with ongoing broker-dealer registration-related expenses and filing related fees. The hourly wage rates are based on: (1) *SIFMA's Management & Professional Earnings in Securities Industry 2013,* modified by SEC staff to account for an 1,800-hour work-year and inflation, and multiplied by 5.35 to account for bonuses, firm size, employee benefits, and overhead; and (2) SIFMA's *Office Salaries in the Securities Industry 2013,* modified by SEC staff to account for an 1,800-hour work-year and inflation, and multiplied by 2.93 to account for bonuses, firm size, employee benefits, and overhead. The final estimates are based on the preceding SIFMA data sets, which SEC staff have updated since the Proposing Release to account for current inflation rates.

[510] *See* Rule 15c3–3(k).

[511] *See* section IV.A.8.

[512] *See, e.g.,* AIMA Comment Letter II; AIMA Comment Letter III; BlackRock Comment Letter; Citadel Comment Letter at 5; Committee on Capital Markets Comment Letter; Lewis Study; Element Comment Letter; Fried Frank Comment Letter; Hagerty-Hill Comment Letter; MFA Comment Letter

I; NAPFM Comment Letter; Two Sigma Comment Letter.

[513] *See* Rule 15c3–3(e) (requiring carrying broker-dealers to maintain a special reserve bank account for brokers and dealers, which must be separate from any other bank account of the carrying broker-dealer).

[514] Regulation ATS Proposal at 15629.

[515] *Id.*

**Federal Register** / Vol. 89, No. 41 / Thursday, February 29, 2024 / Rules and Regulations **14983**

An additional compliance cost of the rules is the cost of self-evaluation.[516] The self-evaluation cost applies to firms whose trading operations may satisfy the final rules' expressing trading interest factor or primary revenue factor. The Commission estimates the initial costs of self-evaluation for one firm will add up to approximately $60,000.[517] This expense includes costs incurred by a firm to determine whether the firm should register as a dealer following the final rules' adoption from an initial review of the firm's trading operations through the potential preparation of an opinion letter by outside counsel stating the firm does not need to register as a dealer. The self-evaluation process may begin with a review of a firm's trading operations by internal personnel or consultants to assess a firm's likelihood of satisfying the expressing trading interest factor or primary revenue factor. If a firm finds its trading operations are very unlikely to meet either criteria, then the firm may conclude its self-evaluation after this initial review at a cost much less than the $60,000 estimate.[518]

If a firm finds its trading operations might satisfy the criteria for the trading interest factor or primary revenue factor, then the firm will likely hire legal counsel to conduct an independent review of a firm's trading operations. The review will produce one of two outcomes. The first possible outcome is the preparation of an opinion letter stating that the legal counsel believes a firm's trading operations do not satisfy the trading interest or primary revenue factors and therefore the firm does not need to register as a dealer. The second

possible outcome is that the external legal counsel finds that the firm should register as a dealer following the final rules' adoption, in which case the firm will not incur the costs associated with the preparation of an opinion letter.

The Commission is unable to provide quantitative estimates of the number of firms that would incur the cost of self-evaluation but determine they are not required to register. The Commission is unable to provide a quantitative estimate because of the same data limitations that constrain the Commission's ability to estimate the number of firms that will ultimately register as dealers.[519] Our analyses observe several entities whose activities may constitute dealing according to the final rules.[520] However, the lack of transparency in TRACE conceals the identities of other non-FINRA entities that may also be dealing or near enough to dealing to require careful self-evaluation.[521] In addition, some firms engaged in HFT activity as reported on Form PF may determine that they do not meet the final rules' qualitative factors. It is also possible, though unlikely, that some hedge fund activity that is not reported as HFT may nevertheless be dealing or near enough to dealing to require self-evaluation. Because of the limitations of TRACE data, we are unable to estimate the number of entities that would need to self-evaluate. As discussed above, section I.B explains modifications made to the rules that tailor the scope of the final rules. These changes largely respond to commenters' concerns regarding the number of affected parties by narrowing the scope of the final rules in a way that reduces that number. These changes would likewise reduce the number of firms that would incur the cost of self-evaluation.

### ii. FINRA or Other SRO Membership

Affected parties that register as dealers after the final rules' adoption must become members of FINRA or another appropriate SRO.[522] The Commission expects affected parties who choose to register as government securities dealers to become members of FINRA.[523]

The initial costs for an affected party to become a member of FINRA are

composed of FINRA membership application fees and any legal or consulting costs necessary for an affected party to complete the FINRA membership application and comply with FINRA rules.[524] Table 5 summarizes the initial costs associated with FINRA membership for an affected firm. The small firm column in Table 5 reports initial costs for FINRA membership for a firm with one to ten registered employees. The large firm column in Table 5 reports initial costs for FINRA membership for a firm with 101–150 employees.

TABLE 5—INITIAL COST OF FINRA MEMBERSHIP IN DOLLARS PER FIRM *

| Cost | Small firm | Large firm |
|---|---|---|
| Application ............................ | $7,500 | $20,000 |
| Consulting ............................ | 40,000 | 125,000 |
| Total ** | 50,000 | 150,000 |

*Cost estimates are from the Amended Rule 15b9–1 Adopting Release. A small firm has 1–10 registered employees. A large firm has 101–150 registered employees.

** Totals are rounded to the nearest ten thousand to reflect uncertainty in the cost estimates.

The fees associated with a FINRA membership application can vary.[525] The application fee itself depends on the number of registered persons associated with the affected party. If an affected party employs ten or fewer registered persons, then the application fee is $7,500. For an affected party with 11 to 100 registered persons the application fee is $12,5000. The application fee is $20,000 for an affected party affiliated with 101 to 150 registered persons.[526]

The other initial cost associated with FINRA membership is a consulting expense, which accounts for the legal and other advisory work necessary for an affected party to successfully complete a FINRA membership application. Some affected parties may decide to perform this work internally, while others may use outside counsel. When making this choice, an affected party will likely consider factors, such as the size and resources of the affected party, the complexity of the affected

[516] See Blockchain Association Comment Letter II; AIMA Comment Letter II; HFA Comment Letter; Morgan Lewis Comment Letter; NAPFM Comment Letter; SIFMA Comment Letter I; SIFMA Comment Letter II; Schulte Roth Comment Letter.

[517] The Regulation Crowdfunding Adopting Release estimated a lower bound on the cost of registration as a broker-dealer with the SEC is $50,000. See Regulation Crowdfunding Adopting Release at 71509 n.1487. We use this lower bound to approximate the cost of the self-evaluation process, including, if necessary, the use of outside consultants and legal counsel to evaluate a firm's trading operations and the possible preparation of an opinion letter stating a firm does not need to register as a dealer to comply with the final rule. Because the cost of consulting and legal services has approximately risen with the consumer price index since 2015, we adjust this estimate for inflation of 27.31% between Oct. 2015 and May 2023, based on the CPI–U as recorded by the Bureau of Labor Statistics. See Consumer Price Index, U.S. Bureau of Labor Statistics, available at https://www.bls.gov/cpi/data.htm. The inflation adjusted cost of the opinion letter is $63,655.46 = $50,000 × 1.2731. We round this figure to $60,000 to the nearest ten thousand to reflect uncertainty in our estimate of the cost of the opinion letter.

[518] See supra note 517 for the calculation of the $60,000 cost.

[519] See section III.B.2.c.

[520] Id.

[521] See supra notes 380 and 422 and surrounding discussion.

[522] The Commission has revised its estimate of affected firms' FINRA-related costs in response to comment letters. See, e.g., Citadel Comment Letter; Fried Frank Comment Letter; Overdahl Comment Letter; MFA Comment Letter II; Morgan Lewis Comment Letter; NAPFM Comment Letter; Virtu Comment Letter.

[523] See supra note 23.

[524] Initial and ongoing cost estimates associated with FINRA membership are from section V.C.2 of Amended Rule 15b9–1 Adopting Release.

[525] The application fee ranges from $7,500 for a small new member applicant (i.e., 1–10 employees, Tier 1) to $55,000 for a large new member applicant (i.e., 5,000+ employees, Tier 3). See FINRA, Schedule of Registration and Exam Fees, available at https://www.finra.org/registration-exams-ce/classic-crd/fee-schedule.

[526] See FINRA, Schedule of Registration and Exam Fees, available at https://www.finra.org/registration-exams-ce/classic-crd/fee-schedule, for application fees when an applicant has more than 150 registered persons.

party's trading operations, and the affected party's previous use of outside counsel. The Commission's estimate of these consulting costs ranges from $40,000 to $125,000 with a midpoint of $82,500.[527] Additionally, if an affected party is affiliated with a firm that is already a registered member of FINRA and the affiliated firm retains legal personnel with FINRA-related experience, then the affected party may incur fewer expenses during the FINRA membership application process because the affiliated firm's legal staff may provide services at a lower cost than a third party.

Affected parties will incur ongoing annual costs to maintain FINRA membership after completing their initial application. The ongoing annual costs include the Gross Income Assessment ("GIA"), the Trading Activity Fee ("TAF"), the FINRA section 3 fee, FINRA-related compliance activities, and the personnel assessment. Table 6 summarizes these ongoing annual expenses for the final rules' affected parties. The Commission estimates that the ongoing annual cost of FINRA membership for an affected entity will range from approximately $61,000 for a relatively small firm to $1,130,000 for a relatively large firm. We will discuss each of these costs and our estimates below.

TABLE 6—ONGOING COST OF FINRA MEMBERSHIP IN DOLLARS PER FIRM *

| Cost | Small firm | Large firm |
|------|-----------|-----------|
| Trading Activity Fee ** | $7,000 | $120,000 |
| Gross Income Assessment | 30,000 | 330,000 |
| Section 3 Fee | 3,000 | 560,000 |
| Compliance Activities | 20,000 | 100,000 |
| Personnel Assessment | 1,000 | 20,000 |
| Total *** | 61,000 | 1,130,000 |

*Cost estimates are from the Amended Rule 15b9–1 Adopting Release. A small firm has 1–10 registered employees. A large firm has 101–150 registered employees.

**FINRA recently implemented an amendment to TAF that exempts PTFs belonging to FINRA from TAF for trades on exchanges of which the firm is a member. This may cause affected parties to incur lower TAF fees than those reported in the table.

***Totals are rounded to the nearest thousand to reflect uncertainty in the cost estimates.

The Commission estimates the TAF cost for an affected party registering as a dealer following the final rules' adoption will range from approximately $7,000 for a small firm conducting few trades in securities subject to TAF to $120,000 for a large firm conducting many trades subject to TAF.[528]

The TAF is a transaction-based fee that is usually assessed on member firm transactions in covered equity securities, options, security futures, TRACE-eligible bonds, and asset-backed securities.[529] Table 7 summarizes the fees associated with specific classes of

securities under TAF.[530] Most security fees assessed via TAF are subject to one or more conditions and one or more possible exemptions. The covered equity security fee, TRACE-eligible bond fee, and asset-backed security fee are subject to maximum fees per trade. The security future fee is subject to a minimum fee per trade. Some transactions are exempt from TAF, which may reduce firms' TAF related expenses.[531] Potentially relevant exemptions from TAF for firms registering under the rules include transactions in U.S. Treasury securities, transactions in options and futures involving narrow and broad indices, transactions made by a firm in their capacity as a market specialist or market maker, and transactions executed outside the United States not requiring reporting to a transaction reporting association. Additionally, a recently implemented TAF Amendment exempts PTFs from TAF for trades occurring on exchanges of which the firm is a member.[532] If the firms joining FINRA because of the final rules execute trades that qualify for exemption from TAF under the recent TAF amendment, then the firms' TAF-related expenses may be less than our TAF cost estimates.

TABLE 7—TRADING ACTIVITY FEE RATES FOR SPECIFIC SECURITIES IN DOLLARS *

| Security | Fee | Rate |
|----------|-----|------|
| Covered Equity Security | 0.000166 | per share sale.** |
| Option | 0.00279 | per option sale. |
| Security Future | 0.00011 | per round turn transaction.*** |
| TRACE-eligible bond | 0.00105 | per bond sale.**** |
| Asset-Backed Security | sale price × 0.00000105 | per security sale.**** |

*FINRA recently implemented an amendment to TAF that exempts PTFs belonging to FINRA from TAF for trades on exchanges of which the firm is a member. Additionally, FINRA is currently implementing annual increases in its TAF rates until 2024. This table reports the fees that will be in effect for 2024 and future years.

**Up to $7.27 per trade.

*** Minimum charge is $0.012 per round turn transaction.

**** Up to $0.92 per trade.

The GIA is an annual expense determined by a firm's annual gross

revenue, which is defined as a firm's total income as reported on FOCUS

form Part II or Part IIA excluding commodities income.[533] We estimate

---

[527] See Amended Rule 15b9–1 Adopting Release section V.C.2 for the consulting cost estimates and methodology.

[528] The small firm TAF estimate corresponds to the $6,746.92 median annual TAF for the 64 non-FINRA member firms in the Amended Rule 15b9–1 Adopting Release. The large firm TAF estimate corresponds to the $119,255.85 median annual TAF for the 12 largest non-FINRA member firms. We round both figures to the nearest thousand to reflect uncertainty in the estimates. We use data from the Amended Rule 15b9–1 Adopting Release to estimate FINRA costs for affected firms because the Commission does not observe the financial or trading data necessary to directly calculate the TAF or GIA costs associated with FINRA membership for firms affected by these rules.

[529] We have revised our TAF cost estimates in response to comment letters. See Blockchain Association Comment Letter; Overdahl Comment Letter. See also FINRA, Trading Activity Fee, available at https://www.finra.org/rules-guidance/trading-activity-fee.

[530] See FINRA, Schedule A to the By-Laws of the Corporation, Section 1—Member Regulatory Fees (footnote on Trading Activity Fee rates), available at https://www.finra.org/rules-guidance/rulebooks/corporate-organization/section-1-member-regulatory-fees.

[531] See id., section 1(b)(2) (transactions exempt from the Trading Activity Fee).

[532] See Self-Regulatory Organizations; Financial Industry Regulatory Authority, Inc.; Notice of Filing

and Immediate Effectiveness of a Proposed Rule Change To Amend FINRA's Trading Activity Fee, Exchange Act Release No. 97798 (June 26, 2023), 88 FR 42404 (June 30, 2023), available at https://www.govinfo.gov/content/pkg/FR-2023-06-30/pdf/2023-13894.pdf.

[533] We are adding GIA to our estimate of the rules' cost for an affected firm in response comment letters. See Blockchain Association Comment Letter; Overdahl Comment Letter. For the definition of gross revenue, see FINRA, Schedule A to the By-Laws of the Corporation, Section 2—Gross Revenue for Assessment Purposes, available at https://www.finra.org/rules-guidance/rulebooks/corporate-organization/section-2-gross-revenue-assessment-purposes.

the annual GIA for an affected party joining FINRA after the final rules' adoption will range from approximately $30,000 for a small firm with relatively little annual gross revenue to $330,000 for a large firm with a relatively large annual gross revenue.[534] Since FOCUS forms are not available for the final rules' affected parties, we use GIA estimates from Amended Rule 15b9–1 to estimate the affected parties' GIA.[535]

A firm's GIA is the greater of the expense calculated per the schedule in Table 8 below or the firm's average GIA over the previous three years. Table 8 reports the schedule used to calculate a firm's GIA given its gross revenue. The table reports the assessment for the portion of a firm's gross revenue within a given range. For instance, suppose a firm's gross revenue is $100M. The firm's Gross Income Assessment is $172,293. This assessment is the sum of the following items: The firm owes $1,200 on its first million dollars of gross revenue. The firm owes an additional $41,568 = ($24M × 0.1732%) on its gross revenue between $1M and $25M. The firm also owes $92,625 = ($25M × 0.3705%) on its gross revenue between $25M and $50M. And the firm owes $36,900 = ($50M × 0.0738%) on its gross revenue between $50M and $100M.

### TABLE 8—GROSS INCOME ASSESSMENT *

| Gross income range | Cost |
|---|---|
| $0 to $1M | $1,200 |
| $1M to $25M | 0.1732% |
| $25M to $50M | 0.3705% |
| $50M to $100M | 0.0738% |
| $100M to $5B | 0.0520% |
| $5B to $25B | 0.0566% |
| $25B or more | 0.1219% |

*FINRA is currently implementing annual increases in the rates for its Gross Income Assessment until 2024. This table reports the rates that will be in effect for 2024 and future years.

FINRA charges an annual personnel assessment of $210 for each of the first five registered representatives at a firm, $200 for each of the sixth through 25th registered representatives at a firm, and $190 for each of the 26th and subsequent representatives at a firm.[536]

Registered individuals include salespersons, branch managers, department supervisors, partners, officers, and directors involved in a firm's securities business.[537] The Commission does not have the information necessary to estimate the personnel fees the affected parties will likely incur to maintain FINRA membership.[538] Table 6 reports personnel fees for the midpoints of a small firm with 1–10 registered employees and a large firm with 101–150 registered employees.[539] The personnel fee estimate for a small firm is $1,000. The personnel fee estimate for a large firm is $20,000.

FINRA also charges an annual branch office fee of $75 for each office, excluding one office, operated by a firm and registered by FINRA.[540]

Finally, registered dealers are subject to an annual renewal fee that applies for each SRO or jurisdiction where the dealer is registered. Renewal fees vary by SRO and jurisdiction, as well as by the number of registered representatives and branch offices at a dealer. Given our estimate that entities that register as a result of the final rules will not have registered representatives or branch offices, we focus on the fee that applies at the level of the dealer. At the jurisdiction level, renewal fees range between $40 and $600, depending on the state, with most between $250 and $300. If the newly registered dealer chooses to also register with another SRO, renewal fees range between $0 and $10,000, depending on the SRO.[541] We assume that the final rules would require membership at only one SRO.

The discussion above may overstate the final rules' costs to affected firms to the extent that already registered broker-dealers pass regulatory costs through to the affected firms. For example, the

Commission understands that FINRA member brokers and dealers can pass at least some of the burden of regulatory costs including the TAF to their customers, so that the parties who will be affected by the final rules may already bear these costs indirectly to the extent that they trade with FINRA members. If the affected party were to register as a dealer and become a FINRA member, some of the regulatory costs incurred by its trading partners may fall. For instance, when a PTF who is not a broker-dealer places a sell order on an ATS and matches with a FINRA member broker-dealer, the TAF is assessed on the FINRA member executing the cross.[542] However, if the PTF were a FINRA member, then it would bear the TAF costs directly and the other member executing the cross would not, because the TAF is assessed on the selling FINRA member broker-dealer.

### iii. TRACE Reporting

Firms joining FINRA will also incur the costs of reporting their fixed-income transactions (other than municipal securities) to TRACE.[543] We estimate that the initial implementation cost associated with TRACE reporting is $2,000 and that the ongoing annual cost associated with TRACE reporting $100,000.[544] Firms that do not trade fixed-income securities will not incur TRACE reporting costs. In addition, FINRA Rule 7730(b) excludes transactions in U.S. Treasury securities from the TRACE transaction reporting fees.

### iv. Consolidated Audit Trail Reporting

In this section, we estimate costs from CAT-related reporting, should an affected party trade CAT-eligible securities. However, the Commission believes few, if any, of the 43 potentially affected parties identified in section III.B.2.c will incur CAT-related reporting costs. If an affected party does

---

[534] The small firm GIA estimate corresponds to the $33,655.65 median GIA estimate for the 64 non-member firms from the Amended Rule 15b9–1 Adopting Release. The large firm GIA estimate corresponds to the $327,870 median GIA estimate for the 12 largest non-member firms from the Amended Rule 15b9–1 Adopting Release. We round both figures to the nearest ten thousand to reflect uncertainty in the estimates.

[535] *See supra* note 533.

[536] For the personnel assessment, *see* FINRA Fee Increase Schedule, *available at https://*

*www.finra.org/rules-guidance/rule-filings/sr-finra-2020-032/fee-increase-schedule.*

[537] *See* FINRA, Individual Registration, *available at https://www.finra.org/registration-exams-ce/individuals.*

[538] *See* section III.B.2 for a discussion of the data limitations associated with the Commission's estimates of the final rules' affected parties.

[539] For a small firm with 1–10 registered employees the midpoint is 5 employees. 5 × $210 = $1,050. We round $1,050 to the nearest thousand to reflect uncertainty in our cost estimate. For a large firm with 101–150 employees the midpoint is 125 employees. 5 × $210 + 25 × $200 + 95 × $190 = $24,100. We round $24,100 to the nearest thousand ($20,000) to reflect uncertainty in our estimate.

[540] *See* FINRA, Schedule A to the By-Laws of the Corporation, Section 4—Fees, *available at https://www.finra.org/rules-guidance/rulebooks/corporate-organization/section-4-fees.*

[541] *See* FINRA, SRO/Jurisdiction Fee and Setting Schedule, *available at https://www.finra.org/sites/default/files/srojurisdiction-fee-and-setting-schedule.pdf.*

[542] *See* FINRA, Trading Activity Fee Frequently Asked Questions, *available at https://www.finra.org/rules-guidance/guidance/faqs/trading-activity-fee.*

[543] TRACE fees include system fees of between $20 and $260 per month plus transaction reporting fees, which are one of: (i) $0.475 per trade for trades with par value up to $200,000, (ii) $2.375 per million dollars par value for trades with par value more than $200,000 but less than $1 million, or (iii) $2.375 per trade for trades with par value of at least $1 million or $1.50 per trade for agency pass-through MBS that are traded TBA or SBA-backed ABS that are traded TBA. *See* FINRA Rule 7730 (Trade Reporting and Compliance Engine), *available at https://www.finra.org/rules-guidance/rulebooks/finra-rules/7730.*

[544] *See* Amended Rule 15b9–1 Adopting Release, Tables 5 and 6. We have rounded the implementation cost estimate and ongoing annual cost estimate to reflect uncertainty in the estimates.

not trade NMS stocks, OTC equities, or listed options, then the affected party will not incur CAT-related reporting costs because the affected party does not trade securities that must be reported to CAT. For instance, if an affected party that only trades government securities only registers as a government securities dealer under section 15C, then that affected party will not incur CAT-reporting related expenses because it will not trade securities associated with CAT-reporting obligations. Affected parties that newly register as dealers under section 15(b) and trade NMS stocks, OTC equities, or listed options will incur the cost of reporting their transactions in these securities to CAT.[545]

The Commission estimates the initial cost of CAT reporting for an affected party that trades CAT-reportable securities will range from a lower value of approximately $1,100,000 for a small firm with relatively few reportable trades to an upper value of approximately $4,900,000 for a large firm with many reportable trades. Our estimates for the initial costs of CAT compliance for an affected party registered as a dealer and trading CAT-reportable securities are based on inflation-adjusted cost estimates from the CAT NMS Plan Approval Order.[546]

The Commission estimates the ongoing cost of CAT reporting for an affected party that trades CAT-reportable securities will range from a lower value of approximately $600,000 annually for a small firm with relatively few CAT-related trades to an upper value of approximately $4,000,000 annually for a relatively large firm reporting many trades to CAT. The Commission's estimates for the annual costs of CAT compliance of an affected party registered as a dealer and trading CAT-reportable securities are based on inflation-adjusted cost estimates from the CAT NMS Plan Approval Order.[547]

CAT reporting costs also vary depending on security type, order size, and trading venue, among other factors.[548] An affected party that trades more types of securities, that trades a greater variety of order sizes, or that trades at more venues will see higher CAT-related expenses. Affected parties that have a smaller number of registered persons, that conduct less brokerage activity, or that trade smaller volumes of securities will see lower CAT-related reporting costs. Affected parties that only trade U.S. Government securities will not incur CAT-related reporting costs because government securities are not CAT-reportable securities.

In addition to the costs for reporting data to CAT, affected parties that register as dealers and trade NMS stocks, OTC equities, or listed options may be assessed CAT fees under the CAT Funding Plan.[549] These CAT fees would depend on the extent to which an affected party is the executing broker-dealer for its transactions reported to CAT and the type of securities involved in its transactions reported to CAT.[550]

The Commission cannot estimate the magnitude of these costs because the amounts of the CAT fees to be charged to broker-dealers pursuant to the funding model must be established through rule filings pursuant to section 19(b) of the Exchange Act.[551] However, the CAT fees allocated in accordance with the funding model borne by the affected parties are not a new cost to industry, but at least partially represent a transfer of costs from current broker-dealers with CAT reporting responsibilities, who would have higher CAT fees in the absence of the final rules, to affected parties. Furthermore, the Commission believes that other broker-dealers with CAT reporting responsibilities or CAT NMS Plan participants that have previously reported data related to the orders of affected parties to CAT would have likely passed on such costs to the affected parties in the absence of the amendments because the affected parties are customers of existing broker-dealers with CAT reporting obligations.

### v. SIPC Membership

Commenters said that the costs of joining SIPC should also be considered in addition to the costs discussed in the Proposing Release.[552] Under SIPA, all dealers registered under section 15(b) of the Exchange Act in the U.S. are automatically members of SIPC except for certain subsets of dealers. The Commission acknowledges that if an affected party registers as a dealer under section 15(b) of the Exchange Act, then the affected party will become a member of SIPC and incur the costs discussed in this section.[553] However, government securities dealers registered under section 15C of the Exchange Act do not

---

[545] *See* Exchange Act Release No. 79318 (Nov. 15, 2016), 81 FR 84696 (Nov. 23, 2016) ("CAT NMS Plan Approval Order"), for additional information about CAT. We note that the Commission recently approved the CAT Funding Plan. *See* Securities Exchange Act Release No. 98290 (Sept. 6, 2023), 88 FR 62628 (Sept. 12, 2023) ("CAT Funding Plan") for additional information about the CAT Funding Plan.

[546] *See* section V.F of the CAT NMS Plan Approval Order for information about the construction of the estimates of CAT reporting for different types of firms. *See supra* note 504 for information about the sources for the inflation adjustments. The inflation factor for CAT-related costs is 1.25 = 303 (May 2023 CPI–U)/238 (Nov. 2016 CPI–U) after rounding to the nearest hundredths place. The lower value estimate is the inflation adjusted initial implementation cost for an options floor broker from Table 4 of the CAT NMS Plan Approval Order. $848,700 (Implementation cost for one options floor broker) × 1.25 = $1,062,487.53. We round this value to the nearest $100,000 to reflect uncertainty in our cost estimate. The upper value estimate is the inflation adjusted initial implementation cost for an electronic liquidity provider in Table 4 of the CAT NMS Plan Approval Order. $3,875,517 (Implementation cost for one electronic liquidity provider) × 1.25 = $4,851,760. We round this figure to the nearest $100,000 to reflect uncertainty in our cost estimate. We use an options floor broker and an electronic liquidity provider to estimate the range of CAT costs for the affected parties because both types of firms' primary business is liquidity provision and both types of firms do not carry customer accounts.

[547] *See supra* note 546 for a discussion of the inflation adjustments used for the initial and ongoing CAT reporting costs. The lower value estimate is the inflation adjusted ongoing cost for an options floor broker from Table 4 of the CAT NMS Plan Approval Order. $442,625 (Ongoing cost for one options floor broker) × 1.25 = $554,122. We round this value to the nearest $100,000 to reflect uncertainty in our ongoing cost estimate. The upper value estimate is the inflation adjusted ongoing cost for an electronic liquidity provider in Table 4 of the CAT NMS Plan Approval Order. $3,22,5714 (Ongoing cost for one electronic liquidity provider) × 1.25 = $4,038,271. We round this figure to the nearest $100,000 to reflect uncertainty in our ongoing cost estimate.

[548] *See* CAT NMS Plan Approval Order section V.F for a discussion of how CAT reporting costs may vary across firms.

[549] The CAT NMS Plan requires both the Participants and broker-dealers to fund CAT. The CAT NMS Plan includes a funding model that sets for the methodology for allocating fees to recover those costs, including certain costs previously paid by the Participants, among the Participants and broker-dealers. *See* CAT Funding Plan. Specifically, the CAT NMS Plan sets forth a one-third allocation of CAT fees to the applicable Participant in a transaction, to the CAT Executing Broker for the buyer in a transaction, and to the CAT Executing Broker for the seller in a transaction. *See* CAT NMS Plan Approval Order Section 11.3.

[550] *See* CAT Funding Plan Section III.3 for the CAT fees associated with NMS stocks, OTC equities, and listed options.

[551] Such filings have been filed and noticed but are not effective because the Commission temporarily suspended them and instituted proceedings to determine whether to approve or disapprove the proposed rule changes. For example, on Jan. 3, 2024, New York Stock Exchange LLC filed a proposed rule change to establish fees for CAT LLC for broker-dealers relating to certain historical costs. On Jan. 17, 2024, pursuant to section 19(b)(3)(C) of the Exchange Act, the Commission temporarily suspended the rule change and instituted proceedings to determine whether to approve or disapprove the proposed rule change. *See* Self-Regulatory Organizations; New York Stock Exchange LLC; Notice of Filing of a Proposed Rule Change to Amend the NYSE Price List to Establish Fees for Industry Members Related to Certain Historical Costs of the National Market System Plan Governing the Consolidated Audit Trail; Suspension of and Order Instituting Proceedings to Determine Whether to Approve or Disapprove the Proposed Rule Change, Exchange Act Release No. 99380 (Jan. 17, 2024), *available at https:// www.sec.gov/files/rules/sro/nyse/2024/34-99380.pdf.*

[552] *See* Overdahl Comment Letter; Citadel Comment Letter; AIMA Comment Letter II.

[553] *See* 15 U.S.C. 78ccc(2)(A)(i) through (iii).

need to join SIPC, and thus if an affected party registers as a government securities dealer under section 15C, the party will not incur the costs discussed in this section. If an affected party trades only government securities, then the Commission expects the party to register as a government securities dealer under section 15C of the Exchange Act.

The Commission estimates the annual cost of SIPC membership for an affected party registered as a dealer is approximately $3,000 plus 0.15% of gross operating revenues generated by the affected party's securities business minus interest expense and dividends. This annual expense is the sum of two separate annual costs associated with SIPC membership. The first annual expense is approximately $3,000 and represents costs associated with preparing and filing annual reports with SIPC.[554] The second annual expense is an assessment equal to 0.15% of gross operating revenues generated by a dealer's securities business minus interest expense and dividends, which SIPC collects for the SIPC Fund from all SIPC members.[555] We estimate that an affected firm's annual SIPC assessment will be approximately $700,000 for larger firms and $30,000 for smaller firms, although costs will vary depending on each firm's actual gross operating revenues.[556] The annual SIPC assessment of an affected party registered as a dealer may differ from

the above two estimates for a larger firm and a smaller firm if the SIPC assessment rate changes from 0.15% to a different value in the future.[557]

## vi. Other Compliance Costs

One commenter stated that the Commission should consider that "the sheer number and complexity of the Proposals, when considered in their totality, if adopted, would impose staggering aggregate costs, as well as unprecedented operational and other practical challenges." [558] But, consistent with its long-standing practice, the Commission's economic analysis in each adopting release considers the incremental benefits and costs for the specific rule—*i.e.,* the benefits and costs stemming from that rule compared to the baseline. In doing so, the Commission acknowledges that in some cases resource limitations can lead to higher compliance costs when the compliance period of the rule being considered overlaps with the compliance period of other rules. In determining compliance periods, the Commission considers the benefits of the rules as well as the costs of delayed compliance periods and potential overlapping compliance periods.

In this regard, some commenters mentioned the proposals which culminated in the recent adoptions of the May 2023 SEC Form PF Amending Release, the Private Fund Advisers Adopting Release, the Treasury Clearing Release, the Beneficial Ownership Amending Release, the Rule 10c–1a Adopting Release, the Short Position Reporting Adopting Release, and the Securitizations Conflicts Adopting Release.[559] The Commission acknowledges that there are compliance dates for certain requirements of these rules that overlap in time with the final rules, which may impose costs on

resource constrained entities affected by multiple rules.[560]

However, we think these increased costs from overlapping compliance periods will be limited for several reasons. First, the number of newly registered dealers that will be subject to each of the recently adopted rules identified by commenters will be limited based on whether those newly registered dealers' activities fall within the scope of the other rules.[561] Second, commenters' concerns about the costs of overlapping compliance periods were raised in response to the proposal and, as discussed above, we have taken steps to reduce costs of the final rules.[562] Third, although the compliance periods for these rules overlap in part, the compliance dates adopted by the Commission are generally spread out over more than a two-year period from 2023 to 2026.[563] As discussed above, the Commission is adopting a compliance date of one year from the effective date of the final rules for persons engaging in activities that meet the dealer registration requirements to register.[564]

As discussed above, the final rules may result in certain transactions of newly registered dealers or government securities dealers being subject to central clearing requirements under the recent Treasury Clearing amendments.[565] Such newly registered

---

[554] $3,234 = $431 Compliance Attorney × 0.5 hours (Annual Report to SIPC Filing) + $431 Compliance Attorney × 5 hours + $1 Postage (Annual SIPC Membership Filing) + $431 Compliance Attorney × 2 + $1 Postage (Filing Annual Statement from Independent Accounting Firm). We round $3,234 to $3,000 to reflect uncertainty in our estimate.

[555] For the current assessment rate, *see* Securities Investor Protection Corporation, *Assessment Rate, available at https://www.sipc.org/for-members/ assessment-rate.* For the assessment rate calculation, *see* Article 6 of the SIPC Bylaws, *available at https://www.sipc.org/about-sipc/ statute-and-rules/bylaws.*

[556] We use firms from the Amended Rule 15b9–1 Adopting Release to approximate the gross revenue of affected parties that register as dealers. We use the 12 largest firms, which have a median gross revenue of approximately $491 million, from the Amended Rule 15b9–1 Adopting Release to estimate the SIPC assessment for large firms. We use the remaining firms from the Amended Rule 15b9–1 Adopting Release, which have a median gross revenue of approximately $20 million, to estimate the SIPC assessment for small firms. *See* Amended Rule 15b9–1 Adopting Release, section V.C.2.b. Based on those median revenues: $491 million × 0.0015 = $736,500; and $20 million × 0.0015 = $30,000. We round $736,000 to the nearest hundred thousand, $700,000, to reflect the estimate's uncertainty. We cannot calculate with precision the total SIPC-related costs for all affected firms because of data limitations regarding estimating the number of firms that will ultimately register. *See* sections III.B.2.c and III.C.2.a.i and gross operating revenues of those firms.

[557] *See supra* note 555.

[558] MFA Comment Letter II; *see also* ICI Comment Letter (stating that the Commission should consider "practical realities such as the implementation timelines as well as operational and compliance requirements"); Overdahl Comment Letter ("direct costs associated with registering as a government securities dealers will aggregate with the direct costs of compliance with other proposed rules which impact that firm").

[559] *See supra* note 346. As stated above, commenters also specifically suggested the Commission consider potential overlapping compliance costs between the final rules and certain proposing releases. *See supra* note 345 (identifying proposals other than those that have been adopted). These proposals have not been adopted and thus have not been considered as part of the baseline here. To the extent those proposals are adopted in the future, the baseline in those subsequent rulemakings will reflect the regulatory landscape that is current at that time.

[560] *See supra* notes 347–353 (summarizing compliance dates).

[561] The Beneficial Ownership Amending Release amends disclosure requirements that apply to only those persons who beneficially own more than five percent of a covered class of equity securities. The Rule 10c–1a Adopting Release will require only persons who agree to a covered securities loan to report that activity. The Short Position Reporting Adopting Release will require only institutional investment managers that meet or exceed certain reporting thresholds to report short position and short activity data for equity securities. And the Securitizations Conflicts Adopting Release will affect only certain entities—and their affiliates and subsidiaries—that participate in securitization transactions. In addition, principal trading firms will not have to comply with the final rules in the May 2023 SEC Form PF Amending Release or the Private Fund Advisers Adopting Release. *See id.*

[562] The final rules mitigate costs relative to the proposal. As discussed above, the Commission is deleting the proposed quantitative and aggregation standards, which would have required persons to establish robust controls to monitor and analyze trading across their corporate structure to determine whether registration was required, and if so, which entities would register. Additionally, we expect FINRA's expressed commitment to expedite the application process will generally ease the compliance burdens raised by commenters. *See supra* section II.B.

[563] For example, the effective date of the amended deadline for filing Schedule 13D will be early 2024. By contrast, compliance deadlines for reporting securities loans under the Rule 10c–1a Adopting Release will be approximately two years later. *See supra* notes 347–353.

[564] *See* section II.B.

[565] *See* discussion on benefits in section III.C.1.

dealers or government securities dealers may incur costs associated with these central clearing requirements, as discussed in the Treasury Clearing Adopting Release.[566]

### b. Costs Associated With the Net Capital Rule

Affected persons who are not currently in compliance with the Net Capital Rule would need to decrease the charges to their net capital or raise additional capital. This may particularly impact private funds, as their investors generally have withdrawal rights and the Net Capital Rule requires a broker-dealer to subtract from net worth when calculating net capital any contribution of capital to the broker-dealer: (1) under an agreement that provides the investor with the option to withdraw the capital; or (2) that is intended to be withdrawn within a period of one year of the contribution.[567] Therefore, commenters said that funds registering as dealers may have to amend their contractual agreements with investors and that those investors may lose substantial liquidity rights.[568] However, we estimate that the final rules will only affect a small percentage of private funds.[569] We acknowledge that affected private funds may have to limit investor withdrawals if they want to continue dealing securities.[570] Alternatively, an affected private fund may choose to separate its dealing activities into a separate entity.[571]

For market participants engaging in dealing activity, other than private funds, the Net Capital Rule may require additional capital. We anticipate the costs associated with the Net Capital Rule to vary according to the type of investment. For example, less liquid investments and derivatives positions are subject to greater haircuts (see below), and will thus require more capital.[572] Crypto assets that are not securities would be subject to a 100% deduction when computing net capital and so affected persons that hold more of such assets would likely need more net capital.[573] The cost of complying with increased capital requirements arises because an entity is required to either shift the composition of its portfolio to hold more liquid assets—which typically earn lower rates of return—than it would otherwise, or to fund its positions with a greater amount of equity or subordinated debt, which is typically costlier than unsubordinated debt. However, entities that take less financial risk tend to have better credit with investors or lenders, other things equal, so more favorable borrowing terms for affected parties may partially offset the costs of increasing their net capital.

One comment letter stated that the proposed rule would greatly increase the cost of certain trading strategies and provided numerical estimates.[574] These estimates appeared to rely on position sizes and existing margin requirements which the commenter did not provide. We can nevertheless ascertain that the commenter's estimates rest on two assumptions. First, the commenter said that, under the proposed rule, the futures margin requirement would increase by 50% and cited to a CFTC rule describing "Minimum financial requirements for futures commission merchants and introducing brokers."[575] Registration with the SEC as a dealer—by itself—does not create a requirement to also register with the CFTC as a futures commission merchant or introducing broker, so the final rules would not necessarily increase affected parties' futures margin. Registered broker-dealers—as is the case with futures commission merchants—are subject to requirements to take capital charges for proprietary futures positions.[576] However, they need not take a charge if the position is a covered futures position.[577] Second, the commenter calculated margin costs based on a 5-day, 99% confidence, portfolio value at risk ("VaR") that recognizes offsets between futures and bonds positions.[578] VaR calculation methods vary, and they may depend on several assumptions—among other things, the relevant historical time period, the precise assets in a portfolio, covariance between those assets, and methods for modelling future returns. We are uncertain of some of the details of the sample strategies identified by the commenter, such as which precise assets may be involved in the butterfly strategies. Under this uncertainty, rather than make the assumptions needed to calculate VaR, we assume a flat 2% margin cost that does not necessarily recognize offsets. For entities with margin costs lower (or, respectively, higher) than 2%, the actual increases in minimum capital would be higher (lower) than the estimates we report in Table 9. Because the final rules will not include the proposed first qualitative factor, we do not expect the strategies in the letter to necessarily constitute dealing under the final rules.

In this context, in response to the commenter's letter, we undertake our own estimations of how much the final rules may increase affected parties' required capital for different position sizes under 17 of the 18 strategies listed in the comment letter.[579]

*Estimates of increases in required equity:* In Table 9, the left column lists the strategies as given in the comment

---

[566] *See* Treasury Clearing Adopting Release, 89 FR 2811–18.

[567] *See* 17 CFR 240.15c3–1(c)(2)(i)(G) ("Rule 15c3–1(c)(2)(i)(G)"). The Net Capital Rule states that "[any] withdrawal of capital made within one year of its contribution is deemed to have been intended to be withdrawn within a period of one year, unless the withdrawal has been approved in writing by the Examining Authority for the broker or dealer." *Id. See* AIMA Comment Letter II; Citadel Comment Letter; FIA—PTG Comment Letter; Fried Frank Comment Letter; Hagerty-Hill Comment Letter; IAA Comment Letter I; MFA Comment Letter I; NAPFM Comment Letter; Two Sigma Comment Letter.

[568] *See* AIMA Comment Letter II; Citadel Comment Letter; Element Comment Letter; Fried Frank Comment Letter; NAPFM Comment Letter; Two Sigma Comment Letter I; MFA Comment Letter I; FIA PTG Comment Letter I; IAA Comment Letter I; Overdahl Comment Letter; McIntyre Comment Letter II. *See also* Hagerty-Hill Comment Letter.

[569] Table 2 shows 47,088 private funds reported on Form PF as of 2022Q4, but section III.B.2.c explains why the final rules may only affect a small percentage of those funds.

[570] At least some investor capital would need to remain off-limits to withdrawal for at least one year. For example, funds who wish to continue dealing activities may need to renegotiate contracts with investors to provide for a one-year lockup period.

[571] For example, a fund that engages in both dealing and non-dealing activities could divide its activities into two new funds: one that engages in dealing and offers different (lower) liquidity rights for investors, and another than continues to operate the non-dealing strategies and offers the same liquidity rights as the original fund.

[572] *See* MFA Comment Letter I.

[573] *See* DeFi Fund Comment Letter at 9; GDCA Comment Letter. The Net Capital Rule's AI standard requires net capital to exceed 1/15 of aggregate indebtedness. Any crypto assets that are not securities would not contribute to net capital, but borrowing to fund those holdings may contribute to AI. Thus, if an entity were to acquire non-security crypto assets using proportionally the same amount of leverage as for the entity's securities holdings, the non-security crypto assets would reduce the entity's ratio of net capital to AI. Crypto assets that are securities and that have a "ready market," as defined in section (c)(11) of the Net Capital Rule, would likely contribute to net capital, subject to haircuts. *See* 17 CFR 240.15c3–1(c)(2)(vi)(K). Because the Net Capital Rule's AI standard requires net capital to exceed a fraction (1/15) of AI, entities would not necessarily need to fund holdings of non-security crypto assets with 100% equity.

[574] *See* FIA PTG Comment Letter I. The letter listed 18 "typical types of trading activity that PTFs, and many others in the market, often employ," along with quantitative estimates of how much the required equity would have increased under the proposed rules.

[575] CFTC Reg. § 1.17(c)((5)(x)(B). *See also* Morgan Lewis Comment Letter.

[576] *See* 17 CFR 240.15c3–1b ("Rule 15c3–1b").

[577] *See* 17 CFR 240.15c3–1b(a)(3)(ix)(A) ("Rule 15c3–1b(a)(3)(ix)(A)") (providing that there is no charge for inventory which is currently registered as deliverable on a contract market and covered by an open futures contract or by a commodity option on a physical). We assume that futures positions involved in the strategies listed in the letter are covered, but *see infra* notes 587 and 588 for how our calculations may change if they are not.

[578] *See* FIA PTG Comment Letter I.

[579] The FIA PTG Comment Letter I did not provide sufficient information to enable us to assume details for strategy 10 "Two offsetting butterfly positions in bonds."

letter, and the right column lists the contracts and transactions that we assume the strategies involve. Dollar amounts such as $P or $0.5P indicate position sizes.

TABLE 9—SAMPLE STRATEGIES FROM THE FIA–PTG COMMENT LETTER

| | Strategy listed in the comment letter | Contracts and transactions involved * |
|---|---|---|
| 1 ................ | Two year futures vs On the Run cash. | short $P futures position with 2yr Treasury deliverable, long $P Treasury note that will be deliverable against the futures contract. |
| 2 ................ | Five year futures vs On the Run cash. | short $P futures position with 5yr Treasury deliverable, long $P Treasury note that will be deliverable against the futures contract. |
| 3 ................ | Ten year futures vs On the Run cash. | short $P futures position with 10yr Treasury deliverable, long $P Treasury bond that will be deliverable against the futures contract. |
| 4 ................ | Ultra Bond futures vs Deliverable bonds. | short $P futures position with 25+yr Treasury deliverable, long $P Treasury bond that will be deliverable against the futures contract. |
| 5 ................ | Two Year futures vs Off the Run 2s. | short $P futures position with 2yr Treasury deliverable, long $P off-the-run Treasury note that will be deliverable against the futures contract. |
| 6 ................ | Ultra Bond futures vs On the Run 30s. | short $P futures position with 25+yr Treasury deliverable, long $P 30yr on-the-run Treasury bond. |
| 7 ................ | Off-the-run Bond Butterfly ........ | long $P 5yr Treasury note, short $0.5P 2yr Treasury note and short $0.5P 10yr Treasury note. |
| 8 ................ | US/20yr/WN Butterfly ............... | long $P 20yr Treasury bond, short $0.5P futures position with 10yr Treasury deliverable, short $0.5P futures position with 30yr Treasury deliverable. |
| 9 ................ | TY futures vs. Off the Run cash | short $P futures position with 10yr Treasury deliverable, long $P off-the-run Treasury bond that will be deliverable against the futures position. |
| 10 .............. | Two offsetting butterfly positions in bonds. | *We did not have sufficient information to analyze this strategy.* |
| 11 .............. | On the Run vs Off the Run 20yrs. | short $P on-the-run 20yr Treasury bond, long $P off-the-run 20yr Treasury bond. |
| 12 .............. | 5s30s Flattener ........................ | short $P 5yr Treasury note, long $P 30yr Treasury bond. |
| 13 .............. | TY Cash futures basis vs TU Cash futures basis. | short $0.5P futures position with 10yr Treasury deliverable and long $0.5P Treasury bond that will be deliverable against the futures contract; long $0.5P futures position with 2yr Treasury deliverable, short $0.5P Treasury note that will be deliverable against the futures contract. |
| 14 .............. | Ultrabond futures vs. CTD Cash bonds. | short $P futures position with 25+yr Treasury deliverable, long $P Treasury bond that will be deliverable against the futures contract. |
| 15 .............. | On the Run 30 Year vs. Aug47s | long $P Treasury bond maturing Aug. 2047 (assume maturity >25yrs), $P short on-the-run ** 30yr Treasury bond. |
| 16 .............. | On the Run 30 Year vs. Feb42s | long $P Treasury bond maturing Feb. 2042 (assume maturity <20yrs), short $P on-the-run ** 30yr Treasury bond. |
| 17 .............. | On the Run 30 Year vs. Feb36s | long $P Treasury bond maturing Feb. 2036 (assume maturity <14yrs), short $P on-the-run ** 30yr Treasury bond. |
| 18 .............. | Low Risk Tight 3 Year Micro RV ***. | (a) long $P 5yr Treasury note, short $P 2yr Treasury note. (b) long $P 10yr Treasury note, short $P 7yr Treasury note. (c) Long $P 25yr Treasury bond, short $P 22yr Treasury bond. |

* Based on the Commission's understanding of what these strategies mean.
** Analyses performed in Aug. 2022 (calculations of net capital requirements are not sensitive to changes in interest rates since Aug. 2022).
*** We consider three possible versions of this strategy.

In each strategy, the entity in question simultaneously (i) takes a long position of $P (in total) in one or more securities or futures and a short position of $P (in total) in one or more securities or futures; (ii) posts margin; and (iii) keeps no additional cash on its balance sheet, so that its equity equals the value of its margin account.

The net capital calculation begins with computing Tentative Net Capital ("TNC"), which is equal to book equity minus assets not readily convertible to cash (*e.g.*, fixed or intangible assets), minus certain operational charges, plus qualified subordinated liabilities. Because the comment letter discussed these trading strategies in isolation, our calculations correspondingly assume that the entity in question has no assets that are not readily convertible to cash, no relevant operational charges, and no

qualified subordinated liabilities, so that TNC always equals book equity. Net Capital ("NC") equals TNC minus a haircut. Haircuts are standardized by security,[580] but dealers can seek regulatory approval to instead compute net capital using the market risk standards of appendix E.[581] Our calculations rely on the standardized haircuts.

NC must equal or exceed the greater of a fixed-dollar minimum requirement and a ratio-based minimum requirement. The aggregate indebtedness (AI) standard requires NC to exceed the greater of (i) one-fifteenth of AI (or one-eighth for 12 months after commencing business as a broker or

dealer) and (ii) a fixed dollar amount that varies by broker-dealer type.[582] We assume that the relevant fixed dollar amount is $100,000 for parties affected by the final rules, as that is the fixed dollar minimum for a dealer. We assume that all loans involved in the sample strategies in Table 9 would be "adequately collateralized by securities which are carried long by the broker or dealer and which have not been sold"

---

[580] *See* SEC Rule 15c3–1(c)(2)(vi).
[581] Dealers approved to calculate net capital in this manner must also maintain at all times TNC of at least $5 billion and NC of at least $1 billion.

[582] For example, the fixed dollar amount equals $5,000 for a broker-dealer that does not receive, directly or indirectly, or hold funds or securities for, or owe funds or securities to, customers; $50,000 for an introducing broker dealer that receives but does not hold securities; $100,000 for a dealer (defined as a broker-dealer that, among other things, "effects more than ten transactions in any one calendar year for its own investment account"); $250,000 for a carrying broker-dealer; $20 million for an OTC derivatives dealer; or $1 billion for a broker-dealer that has been approved to use models to compute net capital.

and that securities borrowed would also be adequately collateralized. AI is thus equal to zero in our analysis, and NC under the AI standard must therefore exceed the fixed dollar amount of $100,000.[583] An alternative standard requires NC to exceed the greater of (i) 2% of customer debit items or (ii) $250,000. Our calculations assume that, similarly to the PTFs to which the comment letter refers,[584] the trader in question has no customers. Therefore, in the absence of customer debit items, this alternative standard requires at least $250,000 of NC, which is higher than the $100,000 fixed-dollar minimum under the AI standard.

Certain dealers [585] engaged in activities as market makers can avoid calculating a haircut (so NC=TNC) if they maintain liquidating equity above a threshold equal to a percentage of their securities or derivatives positions.[586] We consider this provision in our analysis, but we find that the capital requirement for market makers is not the binding constraint for any of the sample strategies.

OTC derivatives dealers must also maintain TNC of $100 million, and dealers that are approved to calculate haircuts using their own internal risk

models must maintain TNC of $5 billion. Our calculations are for affected parties to which these TNC requirements do not apply, however.

Lastly, as described above, our calculations assume that the entity in question, whether registered as a dealer or not, faces a margin requirement of 2%, so that its book equity equals $0.02P.

To summarize, we estimate the increased capital requirement for affected parties under the following conditions: (i) TNC equals book equity; (ii) affected parties would use the standardized haircuts specified in the Net Capital Rule; (iii) the fixed amount under the AI standard is $100,000 and AI equals zero so that the AI standard requires $100,000 of NC; (iv) the alternative standard requires NC of $250,000, therefore it would not be adopted by affected parties in lieu of the $100,000 fixed dollar minimum required under the AI standard; (v) certain entities can claim a market maker exception that allows them to avoid calculating a haircut (so NC=TNC) if they maintain capital above a certain threshold; (vi) all futures positions are covered; and (vii) the entity in question must maintain capital of $0.02P even if

it does not register with the Commission.

Under these conditions, the AI standard requires that book equity minus any haircut exceeds $100,000—*i.e.*, book equity must exceed $100,000 plus any haircut—so that the percentage increase in required equity is equal to: [(haircut + $100k)/non-broker-dealer margin] − 1, or [(haircut + $100k)/ $0.02P] − 1. The AI standard under the market maker exception requires instead that book equity exceed the greater of $100,000 and a percentage of the position size P that depends on the exposures involved. We now turn to our findings.

Eleven of the 17 strategies for which we provide estimates have no haircuts under the Net Capital Rule, because the securities and/or futures positions offset each other—the 11 strategies are strategy 1, 2, 3, 4, 5, 6, 9, 11, 13, 14, and 15—and six strategies do have haircuts— these strategies are 7, 8, 12, 16, 17, and 18. To illustrate the calculations involved, Box 1 describes the calculation details for a strategy with no haircut, and Box 2 describes the calculation details for a strategy with a haircut.

BOX 1—CALCULATION DETAILS FOR STRATEGY 1: "TWO YEAR FUTURES VS ON THE RUN CASH"

*Description:* short $P futures position with 2yr Treasury deliverable, long $P Treasury note that will be deliverable against the futures contract.
*Transactions assumed:* borrow $P, buy $P 2yr notes, enter $P short futures position with 2yr Treasury deliverable, deposit $x in margin.

| Balance Sheet | | | |
|---|---|---|---|
| *Assets* ................................. | $P 2yr note ............................................ | *Liabilities* ............................ | $P loan. |
| | $x receivable (margin) ............................ | *Equity* ................................... | $x. |
| | | *Off balance sheet* .............. | short $P notional 2yr futures. |
| Calculations | Notes | | |
| Haircut * ................................. | 0 ............................................................ | futures and note positions offset. | |
| *Capital Requirement (minimum required x)* | | | |
| Non-dealer .......................... | 0.02P ...................................................... | margin requirement. | |
| Dealer ................................. | max(0.02P, 100k) .................................. | max(margin requirement, dealer capital). | |
| % Change .......................... | (100k/0.02P) − 1 .................................... | if P < 100k/0.02 = $5 million, | |
| | *or* | | |
| | 0 ............................................................ | if P ≥ $5 million (margin is binding constraint). | |

BOX 2—CALCULATION DETAILS FOR STRATEGY 7: "OFF-THE-RUN BOND BUTTERFLY"

*Description:* long $P 5yr Treasury note, short $0.5P 2yr Treasury note and short $0.5P 10yr Treasury note.

---

[583] Paragraph (c)(1) of the Net Capital Rule defines AI as ''the total money liabilities of a broker or dealer arising in connection with any transaction whatsoever,'' subject to several exclusions. Paragraphs (c)(1)(i) and (ii) describe two exclusions that apply to the trading strategies provided by FIA–PTG for ''indebtedness adequately collateralized by securities which are carried long by the broker or dealer and which have not been sold,'' and for ''amounts payable against securities

loaned, which securities are carried long by the broker or dealer and which have not been sold.''

[584] *See* FIA PTG Comment Letter I.

[585] *See* paragraph (a)(6) of the Net Capital Rule. The market maker exception is available to a dealer ''who does not effect transactions with other than brokers or dealers, who does not carry customer accounts, who does not effect transactions in options not listed on a registered national securities exchange or facility of a registered national

securities association, and whose market maker or specialist transactions are effected through and carried in a market maker or specialist account cleared by another broker or dealer.''

[586] *See* Rule 15c3–1(c)(6)(iii). For these strategies, the thresholds are generally 5% of the value of long positions in U.S. Treasury securities plus 25% of the value of long positions in U.S. Treasury futures plus 30% of the value of short positions.

BOX 2—CALCULATION DETAILS FOR STRATEGY 7: "OFF-THE-RUN BOND BUTTERFLY"—Continued

*Transactions:* borrow $P, buy $P 5yr notes, use 5yr notes as collateral to borrow $0.5P of 10yr notes and $0.5P of 2yr notes, sell them and use proceeds to repay loan, deposit $x in margin.

| Balance Sheet | | | |
|---|---|---|---|
| *Assets* ................................ | $x receivable (margin) ............................. | *Liabilities* ............................ | $0. |
| | | *Equity* ................................. | $x. |
| | | *Off Balance sheet* .............. | $0.5P stock borrowed (10yr note). |
| | | | $0.5P stock borrowed (2yr note). |
| | | | $P 5yr note posted as collateral. |

| Calculations | Note |
|---|---|
| Haircut * ................................ | P*7.25% ................................................. | (P*4% for 5yr note) + (0.5P*2% for 2yr note) + (0.5P*4.5% for 10yr note). |

| *Capital Requirement (minimum required x)* | |
|---|---|
| Non-dealer ......................... | 0.02P ...................................................... | margin requirement. |
| Dealer ................................ | max(0.02P,100k+0.0725P) ..................... | under regular AI standard. |
| | *or* | |
| | max(100k, 0.35P) ** ................................ | if acting as market maker (0.35P = 5% of long + 30% of short positions). |
| % Change ........................... | (100k/0.02P) − 1 ...................................... | if P < 100k/(0.35−0.0725) = 360k. |
| | *or* | |
| | (100k+0.0725P)/0.02P − 1 ...................... | if P > $360k. |

\* *See* 17 CFR 240.15c3–1, paragraph (c)(2)(vi)(A) ("Rule 240.15c3–1(c)(2)(vi)(A)").
\*\* *See* 17 CFR 240.15c3–1, paragraph (c)(6)(iii) ("Rule 240.l3–1(c)(6)(iii)").

For strategies with no haircuts, such as in Box 1, the percentage change in capital is equal to ($100,000/0.02P) − 1, which converges to zero as the position size P grows, since as P gets large the 2% margin requirement already requires more capital than would the Net Capital Rule.[587]

For strategies with haircuts, such as in Box 2, the AI standard with the market maker exemption is the easiest to meet when the position size P is small enough because the market maker exemption allows the entity to avoid taking a haircut. As P grows, the market maker exemption becomes more binding, and the regular AI standard is the easiest to meet. As P grows arbitrarily large, the increase in equity converges to (haircut/0.02) − 1.[588] If the haircut is greater than the margin requirement, the Net Capital Rule will always require an increase in minimum capital. If the haircut is less than the margin requirement, then a large enough P will make the margin requirement the binding constraint.

Table 10 reports our findings. The first column shows the estimated increase in required capital that the commenter provided for each strategy included in the comment letter. Columns 2 shows our estimated increases in required minimum capital for a position size of $50 million (*i.e.,* at P = $50mm), because the final rules will exclude persons that have or control less than $50 million in total assets. Column 3 shows our estimated increases in required minimum capital for very large position sizes (*i.e.,* as P → infinity). We estimate that in 10 out of the 17 strategies provided by the commenter the Net Capital Rule would not increase affected parties' minimum capital requirements, and in another four strategies the capital requirements would increase by less than 100%. Our estimates are generally lower than the commenter's estimates. As described above, our calculations may differ because (i) we do not agree that futures margin requirement would necessarily increase by 50% and (ii) we use a flat 2% margin rather than calculating a risk-based margin using VaR.

The values shown in Table 10 may also overstate or understate the actual costs of the Net Capital Rule for the following reasons. For affected parties that pursue more than one trading strategy, we expect that the actual increase in minimum net capital would be lower than the values shown in column 2, and perhaps even lower than the values shown in column 3, because net capital applies to the entire portfolio and not just to a single strategy. The increases shown in Table 10 are therefore not additive—*e.g.,* trading P=$50 million of, Strategy 7 and $50 million of Strategy 8 will not cause minimum net capital to increase by 273% + 54%, but by a smaller amount. Holding many securities or futures positions from many different strategies may allow additional offsets when calculating standardized haircuts according to the Net Capital Rule, so the total increase in capital required for a $100 million multi-strategy portfolio could be even lower than the increase associated with $100 million in a single strategy.

[587] The increase for strategies with uncovered futures would be higher. For example, if the additional futures margin meant the entity's overall margin requirement increased from 2% of P to 3% of P, then the percentage change would be [max(0.03, $100k)/$0.02P] − 1. The smallest value of P we consider is $50 million (*see infra* Table 10 and related discussion). Under the assumption that higher futures margin raises overall margin costs

from 2% to 3%, the increase in required capital for strategies with no margin would be 50% at P=$50 million.

[588] The increase for strategies with uncovered futures would be higher. For example, if the additional futures margin meant the entity's overall margin requirement increased from 2% of P to 3% of P, then the percentage increase would be

[max(0.03, haircut)/$0.02P] − 1. All but one of the 17 strategies with haircuts have haircuts larger than 0.03 except for strategy 8, for which we calculate a haircut of 2.875%. Under the assumption that higher futures margin raises overall margin costs from 2% to 3%, then, our calculations are nearly the same whether the futures positions are covered or not.

TABLE 10—ESTIMATED INCREASE IN REQUIRED MINIMUM CAPITAL

| Strategy | Estimated capital increase reported by the commenter (%) | Commission-estimated increases in capital | |
|---|---|---|---|
| | | P = $50mm (%) | Large P (P → infinity) (%) |
| 1 | 828 | 0 | 0 |
| 2 | 595 | 0 | 0 |
| 3 | 718 | 0 | 0 |
| 4 | 1,117 | 0 | 0 |
| 5 | 34 | 0 | 0 |
| 6 | 645 | 0 | 0 |
| 7 | 580 | 273 | 263 |
| 8 | 718 | 54 | 44 |
| 9 | 171 | 0 | 0 |
| 10 | 913 | * unknown | unknown |
| 11 | 530 | 0 | 0 |
| 12 | 207 | 410 | 400 |
| 13 | 742 | 80 | 0 |
| 14 | 612 | 0 | 0 |
| 15 | 615 | 0 | 0 |
| 16 | 315 | 85 | 75 |
| 17 | 173 | 98 | 88 |
| 18 (a) ** | 522 | 210 | 200 |
| 18 (b) ** | 522 | 335 | 325 |
| 18 (c) ** | 522 | 73 | 63 |

\* For strategy 10, the Commission was unable to find, under its analysis, a position size that corresponded to the commenter's estimate of 913%.

\*\* The Commission estimated three potential versions of strategy 18, "Low Risk Tight 3 Year Micro RV."

The values shown in Table 10 may understate the actual costs of the Net Capital Rule because this analysis does not consider the "lock-up" requirement that capital be held for at least a period of one year. As one commenter described, this requirement may be more restrictive for some corporate structures than for others.[590] For example, consider a dealer trading in both Treasury securities and equities for whom, on day 1, its Treasury positions require net capital of $70 and its equity positions require net capital of $30, for total required net capital of $100. On day 2, the dealer's activities shift such that its Treasury positions now require net capital of $30 and its equity positions require $70. If a single entity engages in these activities, the shift in activities on day 2 will not require any change in net capital. However, the shift may require additional net capital if different activities are conducted by separate subsidiary entities. Since the Net Capital Rule requires capital to be held for at least one year, the entity trading Treasury securities would still have $70 of net capital on day 2, while the entity trading equities would need

to increase its net capital from $30 to $70, for a total required net capital of $140 across both entities. For a dealer organized in this way, shifts in the distribution of activities across subsidiaries may result in a higher net capital requirement than would otherwise apply to the aggregate activities. In this simple example, a dealer that engaged 100% in equities one day (through its equity-focused subsidiary) and 100% in Treasury securities on another day (through its Treasury-focused subsidiary) may have to hold twice as much net capital as it would if it were organized as a single consolidated entity. Affected parties may respond to this capital lock-up by limiting the amount of capital they deploy toward dealing activities, with the result that affected parties may become less likely to commit capital to dealing activities, even in times when the returns to dealing may be high. However, currently-registered dealers and their investors must already consider these consequences of the Net Capital Rule.

We acknowledge that in instances where the Net Capital Rule may increase affected parties' minimum capital requirements, these parties may need to raise capital or reduce leverage. Several commenters suggested that affected parties could respond to the final rules by changing or curtailing their trading to

avoid the revised dealer definition.[591] Or, as discussed above, affected parties could respond by reorganizing their activities—*e.g.,* to consolidate subsidiaries—in order to avoid the capital lock-up problem described in the previous paragraph. We cannot quantify the costs to these affected parties and their investors of scaling back trading activities or reorganizing since we do not know the scope of their current activities, how profitable those activities may be, or how market participants may allocate trading across different legal entities. An affected party's costs of increased net capital requirements under the application of the Net Capital Rule could be partially offset by reductions in its cost of capital as higher levels of net capital may reduce the affected party's probability of default.

*c. Potential Implications for Private Funds and Advisers*

Commenters mentioned other potential conflicts between private funds' business and the dealer rules and regulations beyond the challenge of reconciling fund investors' withdrawal rights with dealers' capital requirements.[592] As explained above, the Commission expects that only a limited number of private funds will be affected by the final rules.[593] For the

---

[589] The Net Capital Rule allows for exceptions from the one-year lockup for withdrawals that are approved in writing by the examining authority. Based on staff experience, FINRA—in its capacity as an examining authority—has on rare occasions provided such approvals to address extraordinary circumstances. *See supra* note 567.

[590] *See* Duffie Comment Letter.

[591] *See supra* note 62.

[592] *See supra* notes 230, 233, 242, and 254.

[593] *See* sections II.A.3.b, III.B.2.c.

limited number of affected funds under the final rules, we discuss below potential costs to those funds and their advisers and investors. Depending on the specific conflict between private funds' business and the dealer rules and regulations, a fund may respond by revising its organizational documents and agreements with third parties, such as prime brokers and executing brokers; modifying its investing strategies (which can require investor consent and also trigger investors' redemption rights) to avoid dealing; or accommodating investors that withdraw from the fund. Although these costs may be significant for individual funds, in aggregate we do not expect that their combined impact will be significant because of the limited number of funds likely to be affected by the final rules.

One potential conflict is that private funds that register as dealers may face restrictions against participating in the IPO market.[594] Hedge funds that buy IPO shares and also engage in dealing strategies may have to withdraw from one set of activities when the final rules go into effect. We expect that funds will choose the activity that adds more value to the fund and its investors; some may choose to register and stay out of the IPO market, while others may forgo dealing to be able to invest in IPOs. Because hedge funds are important players in the IPO market,[595] any large-scale exit of hedge funds from this market could impact the ability of issuers to raise new capital, as well as reduce efficient pricing in new issues. Similarly, any large-scale exit from dealing could impact liquidity. The magnitude of these costs depends on the extent to which there are hedge funds that engage in both activities simultaneously, as well as on hedge funds' total share of aggregate IPO and dealing activity.

Several commenters stated that registering as dealers would cause funds to lose the benefit of various customer

protection regulations that govern their relations with their broker-dealers.[596] Funds that register as dealers may incur costs to the extent that they need to revise their organizational documents and agreements with third parties because certain customer protection regulations would no longer apply. And insofar as the applicability of these customer protections affect investors' decisions to invest, funds may also incur costs from investors withdrawing or choosing not to invest.

One commenter suggested that the proposed rules' impact may be costly for private funds because funds and broker-dealers are treated differently for tax purposes.[597] This different treatment may result in costs for some of the affected funds. But given the limited number of affected funds, we do not believe that tax consequences for those funds will harm market liquidity and efficiency.

One commenter said that ''many investment funds (*e.g.,* pension plans) may not be permitted to register as a dealer under their organizational charters'' and also that ''many potential fund investors may not be permitted to invest in the equity of a broker-dealer.''[598] If any affected funds are prohibited from registering as dealers or have investors that are prohibited from investing in a dealer, then we agree that those affected funds may incur additional costs, including costs of revising organizational documents, splitting dealing and non-dealing activities into separate legal entities, or changing investment strategies and withdrawal of investors, whichever option is least costly.

A commenter suggested one scenario in the context of all-to-all trading in which a fund's best execution obligation as a dealer under FINRA Rule 5310 may conflict with the fund adviser's fiduciary duty to achieve best execution for its client, the fund.[599] The adviser's fiduciary duty to achieve best execution is informed by applicable legal requirements,[600] and, as stated above, we do not believe a conflict between these legal obligations will arise in the scenario raised by the commenter.[601] The fund may nevertheless incur costs because of best execution obligations as a newly registered dealer, including

costs for amending its organizational agreements to facilitate compliance with FINRA Rule 5310. To the extent they face these costs, some affected persons may consider ceasing any behavior that constitutes dealing.

Another commenter said that FINRA rules may restrict investment advisers who are also dealers from receiving carried interest from their private fund clients.[602] The comment letter cited to FINRA Rule 2150, which contains prohibitions against FINRA members sharing in the profits of customers' accounts. The commenter said that the proposed rules' aggregation provision, which would have combined advisers' trading on behalf of their clients together with advisers' proprietary trading, would also have meant that adviser-client relationships could be treated like dealer-customer relationships for the purposes of FINRA Rule 2150. We have removed the aggregation standard from the definition of ''own account,'' as discussed previously, and these changes mean the final rules are not likely to prevent advisers who are also dealers from receiving carried interest from their private fund clients.

### d. Effects on Market Liquidity

Studies on HFT are mixed on whether affected firms' activities may improve or worsen market liquidity.[603] Recent experience is also mixed on the role of PTFs during market events. PTFs' share of market intermediation fell considerably more than did dealers' share did during 2020,[604] but their share actually increased during the 2014 flash rally[605] and again during March 2023.[606] Many commenters said that the final rules would reduce market liquidity, especially in the market for

[594] A broker-dealer registered with FINRA is subject to Rule 5130, which prohibits member firms from selling new issues (*e.g.,* IPOs) to restricted persons. Generally, a broker-dealer, along with the owners that would be listed on Form BD (*e.g.,* 5% direct owners, 25% indirect owners) would be considered ''restricted persons'' and subject to the new issue restrictions. FINRA member firms are also prohibited from purchasing new issue securities. *See* AIMA Comment Letter II; AIMA Comment Letter III; Citadel Comment Letter; Committee on Capital Markets Comment Letter; Element Comment Letter; Lewis Study; MFA Comment Letter I.

[595] *See* Hong Qian and Zhaodong (Ken) Zhong, 2017, ''Do Hedge Funds Possess Private Information about IPO Stocks? Evidence from Post-IPO Holdings,'' *Review of Asset Pricing Studies 8(1),* p. 117–152. These authors observe that hedge funds hold about 80% of the average IPO firm's shares as of the first reporting date after the IPO.

[596] *See, e.g.,* Citadel Comment Letter; Lewis Study.

[597] *See* Two Sigma Comment Letter I.

[598] *See* Blackrock Comment Letter.

[599] *Id.*

[600] *See* Commission Interpretation Regarding Standard of Conduct for Investment Advisers, Investment Advisers Act Release No. 5248 (June 5, 2019), 84 FR 33669, 33674–75 (July 12, 2019).

[601] *See supra* note 235 and accompanying text.

[602] *See* McIntyre Comment Letter II.

[603] *See* section III.B.2.b for why we believe HFT is the most likely private fund activity to fit the final rules' factors. *See also* 2015 Joint Staff Report, stating that low latency trading—*i.e.,* HFT—is ''typically [a] key element of trading strategies'' for PTFs. For a survey of the literature on HFT, *see* Albert J., 2016, The Economics of High-Frequency Trading: Taking Stock, *Annual Review of Financial Economics (8),* 1–24. *See also* Brogaard, Jonathan, Allen Carrion, Thibaut Moyaert, Ryan Riordan, Andriy Shkilko, Konstantin Sokolov, 2018, High Frequency Trading and Extreme Price Movements, *Journal of Financial Economics 128(2),* 253–265; ''Fast and Furious,'' 11/20/2018, *J.P. Morgan North America Fixed Income Strategy;* ''Revisiting the Ides of March, Part I: A Thousand Year Flood,'' Council on Foreign Relations (July 20, 2020), *available at https://www.cfr.org/blog/revisiting-ides-march-part-i-thousand-year-flood;* Better Markets Comment Letter.

[604] *See supra* notes 21 and 443.

[605] *See* 2015 Joint Staff report.

[606] *See supra* note 447.

U.S. Government securities.[607] These commenters said that affected parties would curtail or cease the trading activities described in the final rule rather than submit to dealer registration.[608] Two commenters also said that the costs of dealer registration, especially the Net Capital Rule, would lead affected parties to curtail their trading even if they were to register as dealers and continue dealing.[609] Also, if affected parties experience rapid changes in their amounts of liquid assets or unsubordinated liabilities, the requirement to maintain minimum net capital could prevent them from providing liquidity even if it would be profitable to do so.[610] One commenter said that the costs of dealer registration are a barrier to participation in the U.S. Treasury market.[611] Another commenter said that the costs of the Net Capital Rule might make it more costly for firms to employ capital in trading U.S. Government securities.[612] For instance, when a "parent" firm has the option to contribute capital to any of its trading businesses ("subsidiaries"), one commenter added that the effects of applying the Net Capital Rule to these entities might directly harm liquidity in government securities by making it more costly for the parent entity to "opportunistically" deploy capital internally.[613]

We acknowledge that the final rules could have the effect of reducing liquidity. Affected parties may respond by curtailing their liquidity-providing activities. If the final rules reduce affected parties' profitability, then investors in those entities may reduce their market participation as well.[614] A decrease in the activities of liquidity-providing entities and their investors would harm market liquidity. Because some PTFs have become especially prominent intermediaries in the market for U.S. Government securities, any harm to market liquidity may be more pronounced in that market.[615]

We conclude that any potential harm to market liquidity is likely to be smaller than commenters suggested because the final rules will likely affect fewer entities than the proposed rule, due to the elimination of the proposed first qualitative factor[616] and the elimination of aggregation.[617] We also believe that any harm to liquidity is likely to be limited for the following reasons. First, if affected persons reduce their trading and bid-ask spreads meaningfully widen, then other registered dealers may compete with one another to trade on the wider spreads. The additional buying and selling by these other dealers would offset some of the liquidity lost as the affected persons withdrew from dealing. Second, if significant liquidity providers that are better capitalized are also less volatile during times of crisis, then the final rules may promote the stability and resiliency of market liquidity by consistently applying the Net Capital Rule. Third, section III.B.4 describes how the failure of a significant liquidity provider can harm market functioning. These final rules will reduce the risk that a significant liquidity provider fails, and so they should also limit the harm

such failure may have on market liquidity.

The following analysis of Form PF data sheds light on how the final rules' effect on private funds might, in turn, reduce market liquidity.[618] Registered investment advisers report the monthly turnover[619] across all their funds, in each of 10 different asset classes. As discussed in section III.B.2.b, private fund activities reported as HFT are the most likely to be affected by the final rules. Table 11 describes the turnover for the advisers associated with funds that use HFT for the most recently reported month between 2021–Q4 and 2022–Q3 (*see also* Table 3). The left column describes the advisers for the 40 funds listed in Table 3 as using less than 10% of NAV for HFT, and the right column describes the advisers for the 12 funds listed as using more than 10%. The second row lists the total number of funds with these advisers (including funds that do not have any reported HFT), and the third row lists the total NAV of all of these funds. As described above in the context of Table 3, we use Form PF data to translate each fund's HFT use (reported as a percentage of NAV) into dollar amounts. The fourth row of Table 11 divides the total HFT use across these advisers by the total NAV of all the advisers' funds, to express an adviser-level percentage use of HFT. The remaining rows report the total turnover for these advisers during the most recent month in their most recent filings between 2021–Q4 and 2022–Q3. No adviser appears in both columns.

TABLE 11—TURNOVER FOR ADVISERS OF FUNDS USING HFT STRATEGIES, FOR MOST RECENT MONTH BETWEEN 2021–Q4 AND 2022–Q3

|  | Funds with HFT ≤10% of NAV | Funds with HFT >10% of NAV |
|---|---|---|
| Advisers over funds using HFT | 21 | 10 |
| Total funds with these advisers | 178 | 23 |
| Total NAV ($ billions) | $210.6 | $63.2 |
| HFT (as % of adviser total NAV) | 0%–6.1% | 14.1%–64.0% |
| Turnover ($ billions): |  |  |
| Listed equity | $1,511.3 | $193.8 |
| Corp. bonds (other than convertible) | 66.3 | 7.6 |
| Convertible bonds | 4.3 | 1.3 |
| U.S. Treasury securities | 423.1 | 78.6 |
| Agency securities | 11.0 | 3.4 |

[607] *See* AIMA Comment Letter II; BlackRock Comment Letter; Duffie Comment Letter, FIA–PTG Comment Letter; Hagerty-Hill Comment Letter; IDTA Comment Letter; Lewis Study; MMI Comment Letter; Morgan Lewis Comment Letter; Virtu Comment Letter. *See also* section III.C.2.b for a discussion of the Duffie Comment Letter, including the Net Capital Rule's potential impact on market participants' trading activity.

[608] *See supra* note 62.

[609] *See* MFA Comment Letter II; Citadel Comment Letter.

[610] Dealers that violate the Net Capital Rule by having too few liquid assets relative to unsubordinated liabilities, at any moment, must immediately cease taking on new positions.

[611] *See* Overdahl Comment Letter.

[612] *See* Duffie Comment Letter.

[613] *See* Duffie Comment Letter.

[614] *See* Two Sigma Comment Letter I.

[615] This potential reduction in liquidity may occur despite the improvement to the liquidity of the U.S. Treasury securities market that may result

from increased central clearing. *See* section III.C.1.b.

[616] *See* section II.A.1.a.

[617] *See* section II.A.4.

[618] The Overdahl Comment Letter recommended that the Commission examine the liquidity contribution made by persons who would be affected by the proposed rule (esp. *see* paragraph 43).

[619] Question 27 of Form PF defines turnover as "the sum of the absolute values of transactions in the relevant asset class during the period."

TABLE 11—TURNOVER FOR ADVISERS OF FUNDS USING HFT STRATEGIES, FOR MOST RECENT MONTH BETWEEN 2021–Q4 AND 2022–Q3—Continued

| | Funds with HFT ≤10% of NAV | Funds with HFT >10% of NAV |
|---|---|---|
| GSE bonds | 15.7 | 9.6 |
| Sov. bonds (non-U.S. G10) | 119.6 | 41.6 |
| Other sovereign bonds | 50.6 | 2.4 |
| U.S. state & local bonds | 0.8 | 0.6 |
| Futures | 2,709.3 | 1,366.1 |

As described in section III.B.2.c, the advisers in the left column may be less likely than those in the right column to have funds that meet the final rules' definition of dealing. To put the turnover numbers in context, total equity trading volume across all U.S. exchanges averaged about $12 trillion per month in 2022,[620] and total U.S. Treasury market volume was approximately $17 trillion in October 2023.[621] Therefore, the advisers in the left column may account for approximately 12.6% of equity market volume and 1.6% of Treasury market volume, and the advisers in the right column may account for another 2.5% of equity volume and 0.5% of Treasury volume. For the following reasons, we expect any curtailing of affected

activities to reduce trading volumes by much less than these numbers. First, for the advisers in the left column that may be less likely to have any affected funds, only 0%–6% of the advisers' total NAV was used for HFT. Second, for the advisers in both columns, the final rules may not apply to all the activities that advisers report as HFT on Form PF. Third, affected private funds that do cease certain HFT activities may redeploy their capital to alternate trading strategies and thus keep the capital engaged in the markets. Fourth, if falling trading volumes were to cause bid-ask spreads to meaningfully widen, other registered dealers might increase their own buying and selling and so replace some of the lost activity.

We also analyze entities' trading volumes in TRACE data to estimate how much liquidity affected parties may provide in the market for U.S. Government securities. For each government security CUSIP in TRACE in 2022, we calculate trading volume in the interdealer market[622] and calculate the share of that volume attributable to identifiable[623] non-broker-dealers. Figure 3 shows, for each CUSIP, what the interdealer volume was in 2022 along with the share of that volume attributable to (i) all non-broker-dealers and (ii) the subset of non-broker-dealers identified in TRACE as PTFs. We do not show the shares for firms identified as hedge funds because the shares are generally quite low.



Figure 3. CUSIP-level volumes in 2022 and volume shares attributable to non-broker-dealers

The values for "% interdealer volume" in Figure 3 may be biased downwards by any non-broker-dealers

that trade on Treasury ATSs by submitting orders through broker-dealers, because TRACE would attribute

such trades to the broker-dealer and the ultimate buyer or seller would remain anonymous. However, this bias will be

[620] See Cboe, Historical Market Volume Data, available at https://www.cboe.com/us/equities/market_statistics/historical_market_volume/.

[621] See FINRA, Treasury Monthly Aggregate Statistics, available at https://www.finra.org/finra-data/browse-catalog/about-treasury/monthly-data.

[622] See supra note 430.

[623] See supra note 380.

smaller for CUSIPs that PTFs are most likely to trade on the most active Treasury ATSs—generally the higher-volume CUSIPs—because PTFs involved in such trades are not anonymous in our data. Identifiable non-broker-dealer PTFs account for more than 10% of interdealer volume in approximately 11% of CUSIPs and for more than 25% of volume in 1.6% of CUSIPs, but for no CUSIPs do they account for more than 40% of the volume in 2022.

The TRACE analysis is limited by the large volume of trading where the counterparty to the reporting broker-dealer is anonymous.[624] However, we understand that entities that regularly provide liquidity in U.S. Government securities markets are likely to appear in our data, because they are likely to trade on the ATSs that report to TRACE.

Commenters said that the proposed rules would harm liquidity in markets for crypto assets.[625] We acknowledge that the final rules may affect PTFs in crypto asset markets, but some significant liquidity providers in these markets may already be dealers under the Exchange Act.[626] If affected PTFs curtail their crypto asset trading activities, then trading volumes in crypto asset markets could fall, harming the liquidity and efficiency of these markets.

### 3. Effects on Efficiency, Competition, and Capital Formation

### a. Effects on Efficiency

The previous section explains why we believe the final rules could have a small negative effect on market liquidity. More liquid markets tend to be more efficient markets since they allow new information to influence securities prices more quickly. Therefore, we also expect that the final rules could have a small negative effect on market efficiency, especially in the market for U.S. Government securities.[627] However, as discussed in section III.C.1.b, adequately capitalized firms [628] may be less sensitive to market disruptions that could otherwise reduce their capacity to provide liquidity.

Therefore, to the extent that the final rules lead to better capitalization for significant liquidity providers, the final rules could also promote market efficiency.

### b. Effects on Competition

Section III.C.1.a describes how the final rules will promote competition among entities that regularly provide significant liquidity by applying consistent regulation to these entities, thus leveling the competitive playing field between liquidity provision conducted by entities that are currently registered as dealers and government securities dealers and by entities that are not. The section also discusses how the final rules' costs may be proportionally greater for smaller affected parties, which may reduce the overall benefits to competition. Commenters also raised concerns that the final rules could harm competition. We respond to these concerns in the paragraphs below, but, in general, any negative effect on the competitiveness of liquidity provision in U.S. securities markets would likely be small because, as discussed in section III.B.3 (including Table 4 for the U.S. Treasury market), liquidity provision in securities markets is not concentrated, even among currently registered broker-dealers. The final rules may also affect some PTFs who conduct smaller trading volumes but nevertheless fit the final rules' qualitative factor, and such PTFs may choose to cease their liquidity-providing activities. Because such PTFs would be less significant liquidity providers on account of their smaller volumes, and because currently registered broker-dealers are not concentrated, we expect that any exit of theirs from the market would have a negligible effect on the competitiveness of liquidity provision in U.S. securities markets.

One commenter said that the final rules could put U.S. liquidity providers at a disadvantage versus foreign firms.[629] However, other than central banks, foreign sovereign entities, and international financial institutions (as defined in the final rules), foreign firms that deal in U.S. markets are not excluded from the final rules. Therefore, we do not expect the final rules to create competitive disadvantages for U.S. liquidity providers. Finally, any competitive disadvantages that these final rules may create would already be borne by currently registered dealers.

One commenter said that the final rules would harm competition by requiring some private funds to register

but not others.[630] The final rules would apply a similar regulatory treatment to persons conducting similar activities in securities markets, regardless of the persons' legal organization or structure. The final rules may treat some private funds differently from others, but only in cases where those private funds engage in activities that have different characteristics than other funds' activities.

Another commenter said that the proposed rules would not have leveled the playing field because too many non-dealing entities would have been swept up by the proposed quantitative factor, by ambiguity in the proposed qualitative factors (*e.g.,* "the same or substantially similar securities") and by the aggregation language.[631] The Commission has responded to these concerns by removing the proposed quantitative factor and the proposed first qualitative factor and by removing the aggregation provisions. With these changes, the final rules are more appropriately targeted to persons who are effectively dealers.

Two commenters said that the proposed rules would harm competition in crypto asset markets.[632] The effect on competition in crypto asset markets would be similar to the effects on competition already discussed for other markets.[633]

In addition, as stated above, some commenters requested that the Commission consider interactions between the economic effects of the proposed rules and other recent Commission rules, as well as practical realities such as implementation timelines.[634] As discussed above, the Commission acknowledges that overlapping compliance periods may in some cases increase costs.[635] This may be particularly true for smaller entities with more limited compliance resources.[636] This effect can negatively impact some competitors because these entities may be less able to absorb or pass on these additional costs, making it more difficult for them to remain in business or compete. However, the final rules mitigate overall costs relative to

---

[624] *See id.*

[625] *See* Blockchain Association Comment Letter; American Blockchain PAC Comment Letter; Andreessen Horowitz Comment Letter; ADAM Comment Letter; U.S. Reps. Comment Letter.

[626] *See* section III.B.2.c.

[627] By "efficiency," here we mean price discovery, or the speed with which new information or developments impact the market price of a security.

[628] PTFs' risk-taking is currently less constrained than that of registered broker-dealers (*see* section III.B.2.a). For evidence that hedge funds may have less capital than the Net Capital Rule allows, *see supra* notes 438 and 468 and accompanying text.

[629] *See* Overdahl Comment Letter.

[630] *See* Citadel Comment Letter.

[631] *See* Virtu Comment Letter.

[632] *See* Andreessen Horowitz Comment Letter; Consensys Comment Letter.

[633] We believe that some primary liquidity providers in crypto asset markets may already be dealers under the Exchange Act. *See* section III.B.2.c and *supra* note 626 and accompanying text.

[634] *See supra* section III.C.2.a.v.

[635] *Id.*

[636] *But see infra* section V (stating that the final rules will not have a significant economic impact on a substantial number of small entities for purposes of the Regulatory Flexibility Act).

the proposal,[637] and we do not believe these increased compliance costs will be significant for most affected parties subject to the final rules.[638] We therefore do not expect the risk of negative competitive effects from increased compliance costs due to simultaneous compliance periods to be significant.

c. Effects on Capital Formation

We expect the final rules' effect on capital formation to be mixed. As described above in sections III.C.2.d and III.C.3.a, we agree with commenters[639] that the final rules could have small negative effects on market liquidity and efficiency. Lower liquidity and efficiency would tend to harm capital formation by reducing security prices and raising yields.

The final rules will also promote market stability, resiliency, and investor confidence by helping to ensure that dealing activity is adequately capitalized, subject to regulatory oversight, and accompanied by regulated internal controls and deterrents to deceptive behaviors. More stable markets and strengthened investor confidence in U.S. markets may promote capital formation by increasing demand for securities issued in U.S. markets, raising security prices, and lowering yields. One commenter agreed that the "overall effects [on market participation, market liquidity, price efficiency, competition among liquidity providers, and capital formation] are positive."[640]

*D. Reasonable Alternatives*

The Commission considered several alternatives to the final rules: (1) retain the quantitative factor; (2) add a quantitative threshold to the proposed first qualitative factor; (3) remove the exclusion for registered investment companies; (4) exclude registered investment advisers and private funds; (5) require registered investment advisers and private funds to report to TRACE (rather than comply with the full set of dealer rules and regulations); and (6) revise the final rules to carve out or narrow the application to crypto asset securities.

1. Retain the Quantitative Standard

Proposed Rule 3a44–2 would have required dealer registration of persons who purchased and/or sold a total of at least $25 billion in U.S. Government securities in each of 4 out of the last 6 months. The Commission proposed the particular threshold value because available data suggested that $25 billion would appear to strike a balance between low values, which may affect many small-volume traders who are not dealing, and high values, which may miss entities whose activities provide significant liquidity in the market.[641] Some commenters said the analysis behind the proposed quantitative factor was flawed due to the limitations of TRACE data and the assumptions the Commission used.[642] In section III.B.2.d, we discuss the limitations of TRACE data. Based on comments received, we acknowledge that identifiable TRACE data may not

represent trading patterns in the dealer-to-customer market. This conclusion heightens the already high uncertainty around where to set the value of such a threshold.

Market participants who would meet the quantitative standard by regularly conducting large volumes of securities trading activity would likely also meet the expressing trading interest and primary revenue factors. The overlap may exist either because large trading volumes accompany expressions of trading interest in line with the expressing trading interest factor or because significant liquidity-providers that earn revenue from capturing bid-ask spreads or from capturing any incentives offered by trading venues (primary revenue factor) also tend to have large trading volumes.

Table 12 approximates the overlap between the proposed quantitative factor and the primary revenue factor by sorting identifiable firms based on their average monthly Treasury-trading volume in 2022 and then showing how many firms in each volume bucket appear to meet or not meet the primary revenue factor (*i.e.,* firms that appear in the left-most bar in Figure 2). This table counts firms based on their average monthly volume—which does not precisely match the "4 out of the past 6 months" in the proposed quantitative factor—but average monthly volume is sufficient to indicate the extent to which firms whose activities meet the primary revenue factor also have large trading volumes.

TABLE 12—OVERLAP BETWEEN QUANTITATIVE STANDARD AND PRIMARY REVENUE FACTOR

| Average monthly trading volume in 2022 | # firms meeting primary revenue factor | # firms not meeting primary revenue factor |
|---|---|---|
| <$10 billion | 4 | 174 |
| $10–25 billion | 8 | 18 |
| $25–50 billion | 7 | 6 |
| $50–100 billion | 2 | 3 |
| $100 billion or higher | 10 | 0 |

The quantitative factor could support the final rules in applying dealer registration to entities that provide significant liquidity, by specifically including the most active market participants (unless excluded). The bright-line test in the quantitative factor also could reduce self-evaluation costs for persons who regularly surpass the threshold, but it would not reduce the

self-evaluation costs of persons who do not regularly surpass the threshold because such persons would still have to consider the expressing trading interest and primary revenue factors.

The quantitative factor would potentially increase the costs of the final rules because the quantitative standard may apply to a greater number of entities.[643] This factor would have the

potential to affect persons who are not dealing, because it would not consider any other facts and circumstances other than total transaction volume. For example, a hypothetical long-only investor that regularly purchased $25 billion Treasuries in a month and held them to maturity, would be defined as a dealer under this alternative. Many commenters said that the $25 billion

---

[637] *See supra* section II.A.3.

[638] *See supra* section III.C.2.a.v.

[639] *See supra* note 607.

[640] *See* Gretz Comment Letter.

[641] *See* Proposing Release at 23092–93.

[642] *See* Citadel Comment Letter; MFA Comment Letter I; NAPFM Comment Letter; Overdahl Comment Letter.

[643] *See supra* notes 203–204.

quantitative factor had a threshold that was too low or was otherwise not indicative of dealing.[644] We agree that the $25 billion threshold could capture persons who are not dealing. This alternative would potentially burden non-dealers with the costs of registration and compliance, could harm their investors by lowering returns, and could potentially harm market liquidity, efficiency, competition, and capital formation if affected persons were to reduce their trading below the $25 billion threshold to avoid becoming dealers.

Given that the quantitative factor is unlikely to capture dealing activity that is not also captured by the expressing trading interest and primary revenue factors, and given the additional costs of requiring entities who are not dealing to register as dealers, the Commission has removed the quantitative standard from the final rules.[645]

### 2. Retain the First Qualitative Standard (e.g., ''Routinely Making Roughly Comparable Purchases and Sales of the Same or Substantially Similar Securities [or Government Securities] in a Day'')

The Commission has long distinguished dealer activity from trader activity by focusing on, among other things, a dealer's frequent turnover of positions—stating, for example, that the dealer ''sells securities . . . he has purchased or intends to purchase elsewhere or buys securities . . . with a view to disposing of them elsewhere'' [646] The proposed first qualitative factor was intended to describe activities that include such frequent turnover, and also to separate persons engaging in isolated or sporadic securities transactions from persons whose regularity of transacting demonstrates that they are acting as dealers.

Commenters raised concerns about the proposed first qualitative factor, saying that the factor's language was vague and that the factor could potentially capture significant non-dealing activities.[647] Commenters suggested that the Commission modify the factor, limit it with exclusions, or eliminate it from the final rules.[648] The Commission considered changes to the rule, including revising the terms ''routinely,'' ''roughly comparable,'' or ''in a day, or changing the factor to require that dealing mean trading in the same security instead of in ''the same or substantially similar'' securities. Upon consideration, the Commission agrees with commenters' that the proposed first qualitative factor could capture more than dealing activity. The Commission also does not believe that modifications to this factor could appropriately limit its application to dealing activity, and dealing activity that would be captured by the factor would also likely be captured by at least one of the final rules' qualitative factors—the trading interest factor and the primary revenue factor.

Retaining the proposed first qualitative factor may improve regulators' ability to analyze data on market activity,[649] if persons who would not otherwise be affected by the final rules (including persons who may not be dealing) were to submit to dealer registration. However, retaining this factor may also substantially increase the final rules' costs by capturing activities that are not dealing. To the extent that this factor would capture non-dealing, retaining it would require persons who are not dealing to either register as dealers and incur the costs described in section III.C.2, or else to cease certain non-dealing activities.

### 3. Remove the Exclusion for Registered Investment Companies

The final rules exclude registered investment companies from the application of the rules, even if their activities meet the final rules' definition of dealing. The Commission could adopt the final rules without this exclusion, extending the rationale that all market participants engaged in activities that meet the final rules' definition of dealing, including registered investment companies, ought to register as dealers.

Including investment companies in the application of the rule would provide additional benefits by applying dealer regulation to more significant liquidity providers. First, we believe that standardizing the regulatory treatment of all significant liquidity providers would be beneficial because,

as discussed previously, the uneven regulation potentially gives less-regulated entities an unfair advantage over registered dealers that engage in similar activities. Specifically, this alternative would further standardize regulatory treatment of significant liquidity providers in terms of capitalization, transaction reporting, books and records requirements, and anti-manipulation and anti-fraud provisions.[650] However, the benefits of registering investment companies that are engaged in dealing activity as dealers would be less than the benefits of registering PTFs that are engaged in dealing activity, because the existing regulation that applies to registered investment companies under the Investment Company Act overlaps with the regulation that applies to dealers on several points.[651] For example, registered investment companies are subject to rules that limit leverage risk;[652] they must maintain certain books and records;[653] and they must report to the Commission on many aspects of their operations and their portfolio holdings.[654] As discussed above and in the Proposing Release, the benefits of registering investment companies engaged in the rules' dealing activity as dealers would also be less than the benefits of registering private funds engaged in the rules' dealing activity, because private funds are not subject to the extensive regulatory

---

[644] See AIMA Comment Letter II; AIMA Comment Letter III; Citadel Comment Letter; Committee on Capital Markets Comment Letter; Element Comment Letter; FIA PTG Comment Letter I; Fried Frank Comment Letter; ICI Comment Letter; Lewis Study; MFA Comment Letter I; MFA Comment Letter II; NAPFM Comment Letter; Overdahl Comment Letter; SIFMA Comment Letter; T. Rowe Price Comment Letter; Two Sigma Comment Letter I. A few commenters calculated that $25 billion, as a fraction of average daily activity in the U.S. Treasury market, may be as small as approximately 0.2%.

[645] The MFA Comment Letter I said that the quantitative factor would be redundant with the qualitative factors.

[646] See U.S. Securities and Exchange Commission, Report on the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker XIV (1936).

[647] See section II.A.1.a.

[648] See supra notes 74–76.

[649] See section III.C.1.c.

[650] See section III.B.4 for a discussion of the market externalities that such rules seek to address; see also section III.C.1 for a discussion on the benefits of such rules.

[651] See ICI Comment Letter.

[652] See 15 U.S.C. 80a–18 (Section 18 prohibits closed-end funds from issuing or selling senior securities that represent indebtedness unless it has at least 300% asset coverage, and open-end funds from issuing or selling a senior security other than borrowing from a bank, which are also subject to 300% asset coverage, and defines ''senior security,'' in part, as ''any bond, debenture, note, or similar obligation or instrument constituting a security and evidencing indebtedness.''); 17 CFR 270.18f–4 (''Rule 18f–4'') (generally requiring investment companies that use derivatives to adopt a derivatives risk management program that includes a limitation on leverage risk based on VaR). See also Use of Derivatives by Registered Investment Companies and Business Development Companies, Investment Company Act Release No. 34084 (Nov. 2, 2021), 85 FR 83162 (Dec. 21, 2020).

[653] 15 U.S.C. 80a–30.

[654] Registered investment companies report certain census information annually to the Commission on Form N–CEN. Registered investment companies also are required to report monthly portfolio-wide and position-level holdings data to the Commission on Form N–PORT. This includes information regarding repurchase agreements, securities lending activities, and counterparty exposures, terms of derivatives contracts, and discrete portfolio-level and position-level risk measures to better understand fund exposure to changes in market conditions.

framework of the Investment Company Act.[655]

Removing the exclusion for registered investment companies would increase the costs of the final rules. Affected investment companies would bear the costs of registering with the Commission as dealers, joining FINRA or another SRO, reporting to TRACE and CAT, and becoming a member of SIPC.[656] They would also be required to comply with dealer rules on financial responsibility and risk management, operational integrity, and books and records.[657] Complying with these rules may be inefficient in cases where elements of the Investment Company Act overlap with dealer regulation—*i.e.,* where segments of the investment company rules and the dealer rules serve the same purpose but may entail different disclosure, recordkeeping, or other such actions.[658] The regulatory regime that has evolved around dealers might also be inadequate or inappropriate for affected investment companies. For example, investment companies may be unable to comply with the Net Capital Rule without substantially reducing their investors' withdrawal rights.[659]

Instead of registering as dealers, affected investment companies could respond by curtailing or ceasing certain trading activities.[660] Such a response would reduce the number of investment companies registering as dealers, and so would reduce or eliminate the benefits discussed above on net capital, transactions reporting, etc. The curtailing of profitable trading activities would also harm the affected investment companies and their investors. The changes in aggregate securities trading activity could also reduce market efficiency and liquidity, thus harming investors of all sizes throughout the markets. However, if the changes in market activity were to increase the profitability of certain activities (such as by increasing certain bid-ask spreads), then other registered dealers may increase their own trading activity and so offset at least some of the harm to market efficiency and liquidity.

Commenters generally agreed with the exclusion for registered investment

companies,[661] and did not suggest any changes to the final rules' treatment of investment companies.

### 4. Exclude Registered Investment Advisers and Private Funds

Registered investment advisers and private funds may engage in activities that meet the final rules' definition of dealing. If so, the final rules would require them to register as dealers and comply with dealer regulations. Some commenters said that the Commission should exclude registered investment advisers, along with any private funds they may advise, from the final rules because the advisers are already subject to an extensive regulatory framework under the Advisers Act and because elements of the dealer regime—*e.g.,* the Net Capital Rule, restrictions on participating in the IPO market—may be inappropriate or untenable for advisers and adviser-led funds.[662] However, as stated in the Proposing Release, market participants that are engaged in dealing activity should be subject to dealer regulations. The Commission is mindful of concerns raised by commenters regarding the application of the dealer regime to investment advisers and private funds, and it has made significant changes to the definition of "own account" to remove the aggregation standard in order to appropriately tailor the scope of advisers and funds captured by the final rules.[663]

Excluding registered investment advisers and their private fund clients could reduce many of the final rules' benefits by applying dealer regulation to fewer significant liquidity providers.[664] Advisers or private funds whose activities have the effect of providing liquidity would not have to report transactions to TRACE or comply with the Net Capital Rule or other dealer rules that govern internal controls and are designed to prevent fraud or manipulation. Advisers would continue to be subject to the adviser regulations described in the baseline, including conduct rules, books and records requirements, reporting requirements, and examinations. If advisers and private funds would have responded to the final rules by curtailing their trading instead of registering as dealers, then excluding them from the rules may not substantially reduce the benefits described in section III.C.1.

This alternative would also reduce the final rules' benefit to competition, by failing to level the playing field between significant liquidity providers who are registered as dealers and significant liquidity providers who may be investment advisers or private funds. However, if the final rules would have a net negative impact on competition by deterring private funds and advisers from providing liquidity,[665] then this alternative could reduce that negative impact by not deterring such liquidity provision.

Excluding registered investment advisers and private funds would reduce the final rules' costs. Advisers and private funds who would otherwise be affected would not be required to register with the Commission as dealers, join FINRA or another SRO, report to TRACE and CAT, and become a member of SIPC.[666] They would also not be required to comply with dealer rules on financial responsibility and risk management, operational integrity, and books and records.[667] Since they would not be registered as dealers, they would not face dealer-specific restrictions against participating in the IPO market. Since they would not be subject to the Net Capital Rule, they would also not need to consider restricting their investors' withdrawal rights in order to comply with that rule.[668] If the costs of dealer registration and compliance would have lowered returns for investors in private funds, then this alternative would also reduce the harm to investors.

Excluding private funds would also limit the final rules' effects on market liquidity, efficiency, competition, and capital formation, since it would affect fewer parties who could respond by curtailing their trading activities. Section III.C.2.d describes how such a response could harm market liquidity and efficiency as well as how reductions in funds' profitability could reduce investor participation in the market. If advisers and private funds were excluded, then they would not respond in this way, and so any potential negative impact of such curtailing on market functioning or investor participation could be less than under the final rules.

Excluding advisers and private funds may allow current or future significant liquidity providers to avoid the dealer regime by registering as advisers. Commenters argued that principal

---

[655] *See supra* notes 218–220 and accompanying text.

[656] *See* section III.C.2.a for a discussion of these costs.

[657] *See supra* notes 24, 26, and 27.

[658] *See supra* note 218.

[659] *See supra* notes 567 and 568 and accompanying text for a discussion of why the Net Capital Rule may necessarily restrict withdrawal rights of investors in a registered dealer.

[660] Commenters suggested that affected private funds would respond to the final rules' adoption in this way. *See supra* note 62.

[661] *See supra* note 222.

[662] *See supra* notes 223–229.

[663] *See* discussion of registered investment advisers and private funds in section II.A.3.b.

[664] In section III.B.2.c, we identify up to 12 hedge funds that may be dealing under the final rules.

[665] *See* section III.C.2.d.

[666] *See* section III.C.2 for a discussion of these costs.

[667] *See supra* note 27.

[668] *See supra* notes 567 and 570.

trading firms are unlikely to attempt to avoid the dealer regime in this way.[669] Though firms would incur significant costs to reorganize their business and register as advisers, an exclusion would nevertheless allow for the possibility. The possibility concerns us because, as discussed above and in the Proposing Release, registered investment advisers and private funds that are engaged in dealing activity should be subject to the dealer regulatory regime.[670]

### 5. Require Registered Investment Advisers and Private Funds To Report to TRACE

As described above, private funds and private fund advisers not registered as dealers are not subject to the requirement to report transactions to TRACE. Rather than requiring liquidity-providing investment advisers and private funds to register as dealers, the Commission could instead require them to report their transactions to TRACE as if they were members of FINRA, without submitting to the other requirements of the dealer regime.[671] This alternative would fall short of applying other important elements of the dealer regime that mitigate the problems discussed in sections III.B.3 and III.B.4. These important elements of the dealer regime include the Net Capital Rule,[672] Exchange Act section 15(c),[673] and SRO membership.[674] Therefore, this alternative would not adequately address the potential for negative externalities discussed in section III.B.3 in the baseline. However, the alternative would eliminate, for affected registered investment advisers and private funds, the final rules' registration and compliance costs other than the costs of self-evaluation and of reporting to TRACE.[675]

### 6. Carve Out or Narrow Application to Crypto Asset Securities

As described in section II.A.3 above, the Commission received comments regarding the application of the proposed rules to crypto asset securities. Commenters requested that if the Commission were to move forward with adopting the proposed rules, the Commission revise the final rules to carve out or narrow the application to crypto asset securities.[676] For example, one commenter asserted that without an exclusion for digital assets, the proposed rules would hinder innovation, competition, and capital formation in the U.S.[677] Another commenter stated that the Commission should limit the scope of the proposed rules to persons transacting in the U.S. Treasury and listed equity markets, for which the Commission has adequate data, and that to the extent the Commission intends to address digital assets, it should do so as part of a multi-agency approach and in consultation with Congress.[678] Consistent with the comments received, the Commission has considered an alternative that would treat crypto asset securities differently from other types of securities under the final rules.

As noted in section II.A.3, the definitions of ''dealer'' and ''government securities dealer'' under sections 3(a)(5) and 3(a)(44) of the Exchange Act, and the requirement that dealers and government securities dealers register with the Commission pursuant to sections 15 and 15C of the Exchange Act, apply to dealers in all securities or government securities, including crypto asset securities. Rules 3a5–4 and 3a44–2, as adopted, apply to any person transacting in securities or government securities, irrespective of where, or the technology through which, the security or government security trades.

The Commission is not changing this longstanding historical application of the Federal securities laws to securities, including crypto assets that are securities. After consideration of comments, the Commission continues to

believe that Rules 3a5–4 and 3a44–2 apply to persons transacting in crypto assets that meet the definition of ''securities'' or ''government securities'' under the Exchange Act. As discussed above, certain persons engaging in crypto asset securities transactions may be operating as dealers as defined under the Exchange Act.[679] The dealer framework is a functional analysis based on the securities trading activities undertaken by a person, not the type of security being traded.[680] Regardless of the technology used, if a person meets the expressing trading interest and primary revenue factors in the final rules, the application of the dealer regulatory regime to that person's activities[681] will be beneficial and critical to promoting the Commission's mission.

If the Commission were to revise the final rules to carve out or narrow the application to market participants who transact in crypto asset securities, that alternative would reduce costs for such market participants who are not dealers under current law and who, absent an exemption, would be required to register as dealers under the final rules. The alternative would also reduce the benefits of the final rules, discussed in section III.C.1, since it would not apply the dealer regime to market participants that provide liquidity in crypto asset securities markets.

The alternative could also have negative competitive effects, since certain market participants that deal in crypto asset securities would be exempted from registering as dealers, while market participants that deal in other types of securities would not enjoy such an exemption.

## IV. Paperwork Reduction Act

The new definitions adopted in this document do not, in and of themselves, contain ''collection of information'' requirements within the meaning of the Paperwork Reduction Act of 1995 (''PRA'').[682] However, they may increase the number of respondents for collection of information requirements in other Commission rules. Specifically, the rules may increase the number of respondents for fourteen Commission rules with existing collections of information. These are explained in more detail below. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless the agency displays a currently valid control number. The

---

[669] *See* IAA Comment Letter I; AIMA Comment Letter II; MFA Comment Letter I; T. Rowe Price Comment Letter.

[670] *See* sections II.A.3, III.B.3, and III.C.1; Proposing Release at 23078–79.

[671] *See* Overdahl Comment Letter (stating ''To the extent that the SEC does identify any material informational gaps, the SEC could explore whether additional recordkeeping requirements are appropriate.'').

[672] *See* section III.C.1.a.

[673] *See supra* note 396 and surrounding text.

[674] *See* sections III.C.1.a and III.C.1.d. *See also* FINRA Comment Letter.

[675] *See* cost discussions in section III.C.2 for a detailed discussion of TRACE, self-evaluation, and other costs. The Commission estimates the initial combined cost of self-evaluation and TRACE reporting is at most approximately $600,000. This estimate is the sum of the initial cost estimate for TRACE reporting, which is $2,000, and the initial cost estimate for self-evaluation, which is up to $600,000. The combined initial costs' sum is $602,000, which we round to $600,000 to reflect uncertainty in our estimate of these combined costs. The Commission estimates the ongoing costs for

TRACE reporting and self-evaluation are approximately $100,000. This ongoing cost estimate is the sum of the $100,000 annual expense estimate for TRACE reporting and a $0 annual expense for self-evaluation. The Commission expects few firms' trading operations to change sufficiently to merit ongoing self-evaluations because of the substantial investments in human-, technological-, and financial capital necessary to start a trading operation that satisfies the criteria necessary for registration as a dealer under the adopted rules.

[676] *See, e.g.,* Andreessen Horowitz Comment Letter; DeFi Foundation Comment Letter; ADAM Comment Letter; Gretz Comment Letter.

[677] *See* ADAM Comment Letter.

[678] *See* DeFi Fund Comment Letter.

---

[679] *See* section II.A.3.

[680] *Id.*

[681] *See* section III.C.1.

[682] 44 U.S.C. 3501 *et seq.*

Commission has submitted change requests to the Office of Management and Budget ("OMB") to update the number of respondents for these fourteen rules. The titles of these existing collections of information are:

| Rule | Rule title | OMB control No. |
|---|---|---|
| 17 CFR 240.15b1–1 ("Rule 15b1–1") and 17 CFR 249.501 ("Form BD"). | Application for registration of brokers or dealers ........................ | 3235–0012 |
| 17 CFR 240.15Ca1–1 ("Rule 15Ca1–1") and Form BD .............. | Notice of government securities broker-dealer activities. | |
| 17 CFR 240.15Ca2–1 ("Rule 15Ca2–1") and Form BD .............. | Application for registration of government securities brokers or government securities dealers. | |
| 17 CFR 240.15b3–1 ("Rule 15b3–1") and 17 CFR 400.5 ("Rule 400.5"). | Amendments to application. | |
| 17 CFR 240.15b6–1 ("Rule 15b6–1") and 17 CFR 249.501a ("Form BDW"). | Withdrawal from registration ............................................... | 3235–0018 |
| 17 CFR 240.15Cc1–1 ("Rule 15Cc1–1") and Form BDW .......... | Withdrawal from registration of government securities brokers or government securities dealers. | |
| 17 CFR 240.15c2–7 ("Rule 15c2–7") ......................................... | Identification of quotations ................................................. | 3235–0479 |
| 17 CFR 240.15c3–1 ("Rule 15c3–1") ......................................... | Net capital requirements for brokers and dealers ...................... | 3235–0200 |
| 17 CFR 240.15c3–5 ("Rule 15c3–5") ......................................... | Risk management controls for brokers or dealers with market access. | 3235–0673 |
| 17 CFR 240.17a–3 ("Rule 17a–3") ............................................. | Records to be made by certain exchange members, brokers, and dealers. | 3235–0033 |
| 17 CFR 240.17a–4 ("Rule 17a–4") ............................................. | Records to be preserved by certain members, brokers, and dealers. | 3235–0279 |
| 17 CFR 240.17a–5 ("Rule 17a–5") ............................................. | Reports to be made by certain exchange members, brokers and dealers. | 3235–0123 |
| 17 CFR 240.17a–11 ("Rule 17a–11") ......................................... | Notification provisions for brokers and dealers ........................ | 3235–0085 |
| 17 CFR 242.613 ("Rule 613") ................................................... | Consolidated audit trail ..................................................... | 3235–0671 |

*A. Purpose and Use of the Collections of Information*

As stated above, new definitions adopted in this document do not create any new collections of information, but we believe they will add respondents to the 14 existing collections of information noted above. The collections of information applicable to the additional respondents,[683] and the use of the information collected are summarized below.

1. Rules 15b1–1, 15Ca1–1, 15Ca2–1, 15b3–1, and 400.5 and Form BD

Section 15(a)(1) of the Exchange Act provides that it is unlawful for persons who meet the definition of the term "broker" or "dealer" to solicit or effect transactions in most securities unless they are registered as broker-dealers with the Commission pursuant to section 15(b) of the Exchange Act. Similarly, section 15C(a)(1) of the Exchange Act provides that it is unlawful for persons who meet the definition of the term government securities broker or government securities dealer, other than persons registered with the Commission as broker-dealers and certain financial institutions, to solicit or effect transactions in government securities unless they are registered with the Commission as government securities broker-dealers pursuant to section 15C(a)(2) of the Exchange Act. To

implement these provisions, the Commission adopted Rules 15b1–1, 15Ca1–1, and 15Ca2–1 and Form BD. In addition, Rules 15b3–1 and 400.5 require that registered broker-dealers and government securities broker-dealers submit an amended Form BD when information originally reported on Form BD changes or becomes inaccurate.

The Commission uses the information disclosed by applicants in Form BD: (1) to determine whether the applicant meets the standards for registration set forth in the provisions of the Exchange Act; (2) to develop a central information resource where members of the public may obtain relevant, up-to-date information about broker-dealers and government securities broker-dealers, and where the Commission, other regulators, and SROs may obtain information for investigatory purposes in connection with securities litigation; and (3) to develop statistical information about broker-dealers and government securities broker-dealers. In addition, all information collected on Forms BD is public. The public may use this information to assist in determining whether to engage in business with a particular broker-dealer.

2. Rules 15b6–1 and 15Cc1–1 and Form BDW

Section 15(b)(5) of the Exchange Act provides that any broker-dealer may, upon such terms and conditions as the Commission deems necessary or appropriate in the public interest or for

the protection of investors, withdraw from registration by filing a written notice of withdrawal with the Commission. Similarly, section 15C(c)(1)(B) of the Exchange Act provides that any registered government securities broker or government securities dealer may, upon such terms and conditions as the Commission may deem necessary in the public interest or for the protection of investors, withdraw from registration by filing a written notice of withdrawal with the Commission. To implement these statutory provisions of the Exchange Act, the Commission promulgated Rules 15b6–1 and 15Cc1–1 and Form BDW (the uniform request for broker-dealer withdrawal).

The Commission uses the information disclosed by applicants in Form BDW, as required by Rules 15b6–1, 15Bc3–1, and 15Cc1–1 to: (1) determine whether it is in the public interest to permit broker-dealers and notice-registered broker-dealers to withdraw from registration; (2) develop central information resources where the Commission and other government agencies and SROs may obtain information for investigatory purposes in connection with securities litigation; and (3) develop statistical information about broker-dealers, notice-registered broker-dealers, municipal securities dealers, and government securities broker-dealers.

[683] *See* section III.B above for a description of the categories of respondents.

### 3. Rule 15c2–7

The Commission adopted Rule 15c2–7 in 1964 to improve the reliability and transparency of the quotations broker-dealers submit to inter-dealer quotation systems. To ensure that an inter-dealer quotation system clearly reveals where two or more quotations in different names for a particular security represent a single quotation or where one broker-dealer appears as a correspondent of another, Rule 15c2–7 sets forth certain criteria that must be met for broker-dealers to furnish, or submit directly or indirectly, any quotation for a security (other than a municipal security) to an inter-dealer quotation system. More specifically, to furnish or submit any such quotation Rule 15c2–7 requires that:

• Broker-dealers that are correspondents for other broker-dealers for a particular security and enter quotations inform the inter-dealer quotation system of both the existence of the arrangement and the identity of the correspondent;

• Where two or more broker-dealers place quotations pursuant to any other arrangement between or among other broker-dealers, the identity of each broker-dealer participating in any such arrangement(s), and the fact that an arrangement exists, must be disclosed;

• The inter-dealer quotation systems to which the quotation is furnished or submitted must make it a general practice to disclose, with each published quotation, these arrangements, along with the identities of all other broker-dealers that were disclosed to the inter-dealer quotation system; and

• When a broker-dealer enters into any correspondent or other arrangement in which two or more broker-dealers furnish or submit quotations for a particular security, the broker-dealer must inform all broker-dealers furnishing or submitting such quotations of the existence of such correspondent or other arrangement and the identity of the parties thereto.

The information required by Rule 15c2–7 is designed to help the Commission prevent fraud, manipulation, and deceptive acts and practices. When Rule 15c2–7 was adopted in 1964, the information it required was critical to the Commission's role in monitoring broker-dealers and protecting the integrity of over-the-counter markets. The disclosures required by Rule 15c2–7 help assure that inter-dealer quotation systems reflect the demand for, and market activity related to, the securities quoted on their systems.

### 4. Rule 15c3–1

Rule 15c3–1 is designed to ensure that broker-dealers registered with the Commission at all times have sufficient liquid capital to protect the assets of customers and to meet their responsibilities to other broker-dealers.[684] Rule 15c3–1 is an integral part of the Commission's financial responsibility program for broker-dealers. In particular, Rule 15c3–1 facilitates the monitoring of the financial condition of broker-dealers by the Commission and the broker-dealer's designated examining authority (or "DEA").

Various provisions of Rule 15c3–1 require that broker-dealers provide written notification to the Commission and/or their DEA under certain circumstances. For example, no equity capital of a broker-dealer may be withdrawn if the amount withdrawn exceeds specified levels unless notice is provided to the broker-dealer's DEA and the Commission within prescribed timeframes.[685] In addition, a broker-dealer carrying the account of an options market maker must file a notice with the Commission and the DEA of both the carrying firm and the market maker prior to effecting transactions in the account.[686]

There are also certain recordkeeping requirements under Rule 15c3–1. For example, a broker-dealer must keep a record of who is acting as an agent in a securities loan transaction and records with respect to obtaining DEA approval prior to withdrawing capital within one year of a contribution.[687] The regulation at 17 CFR 240.15c3–1c ("appendix C to Rule 15c3–1") requires registered broker-dealers that consolidate their financial statements with a subsidiary or affiliate to submit, under certain circumstances, an opinion of counsel to their DEA.[688]

These recordkeeping and reporting requirements are designed to inform the Commission and a broker-dealer's DEA of certain financial situations involving broker-dealers' financial situations.

### 5. Rule 15c3–5

Rule 15c3–5 requires that broker-dealers with access to trading directly on an exchange or ATS, including those providing sponsored or direct market access to customers or other persons, implement risk management controls

and supervisory procedures reasonably designed to manage the financial, regulatory, and other risks of this business activity. More specifically, these broker-dealers must establish, document, and maintain certain risk management controls and supervisory procedures; regularly review those controls and procedures and document the review; and remediate issues discovered to assure overall effectiveness of such controls and procedures. These broker-dealers also must preserve a copy of their supervisory procedures and a written description of their risk management controls as part of their books and records. In addition, the Chief Executive Officer (or equivalent officer) is required to certify annually that the broker or dealer's risk management controls and supervisory procedures comply with Rule 15c3–5, and that the broker-dealer conducted the required review. These documents are required to be preserved by the broker-dealer as part of its books and records.

Rule 15c3–5 is generally designed to ensure that broker-dealers (which, under the current regulatory structure, are the only entities that may be members of exchanges or provide access to trading in securities on an ATS to non-broker-dealers) appropriately control the risks associated with market access, so as not to jeopardize their own financial condition, that of other market participants, the integrity of trading on the securities markets, and the stability of the financial system.

### 6. Rules 17a–3 and 17a–4

The Commission adopted Rules 17a–3 and 17a–4 ("Recordkeeping Rules") in 1939 to standardize recordkeeping practices by establishing minimum standards with respect to business records that broker-dealers registered with the Commission must create and maintain. Rule 17a–3 requires broker-dealers to make and keep current certain records relating to their financial condition, communications, customer information, and employees. Rule 17a–4 requires broker-dealers to preserve, for prescribed periods of time, the records required to be created under Rule 17a–3 and certain other Commission rules. In addition, Rule 17a–4 requires broker-dealers to preserve other records that may be created or received by the broker-dealer in the ordinary course of its business for prescribed periods of time. Rule 17a–4 also specifies the manner in which these records should be maintained. The Commission has periodically modified these rules to include additional records and to

---

[684] *See* Net Capital Rule, Exchange Act Release No. 39455 (Dec. 17, 1997), 62 FR 67996 (Dec. 30, 1997).

[685] *See* 17 CFR 240.15c3–1(e)(1).

[686] *See* 17 CFR 240.15c3–1(a)(6)(vi).

[687] *See* 17 CFR 240.15c3–1(c)(2)(iv)(B).

[688] *See* 17 CFR 240.15c3–1(c).

recognize new methods to maintain records.

The records and the information created and maintained in accordance with Rules 17a–3 and 17a–4 are used by examiners and other representatives of the Commission, State securities regulatory authorities, and the self-regulatory organizations (*e.g.,* FINRA, CBOE) (''SROs'') to determine whether broker-dealers are in compliance with the Commission's antifraud and anti-manipulation rules, financial responsibility program, and other Commission, SRO, and State laws, rules, and regulations.

### 7. Rule 17a–5

Rule 17a–5 requires that broker-dealers create, submit, and make available various reports. Paragraph (a)(1) of Rule 17a–5 requires broker-dealers to file quarterly or monthly (depending on a broker-dealer's business) reports on Form X–17A–5, the Financial and Operational Combined Uniform Single Report (''FOCUS Report'').[689] The FOCUS Report was designed to eliminate the overlapping regulatory reports required by various SROs and the Commission and to reduce reporting burdens. Paragraph (c) of Rule 17a–5 requires that certain broker-dealers furnish specified financial information to their customers.[690] Paragraph (d) of Rule 17a–5 requires broker-dealers, subject to limited exceptions, to file annual reports prepared by an accountant registered with the PCAOB.[691] The annual reports generally must be filed with the Commission, the SROs of which the broker-dealer is a member, and SIPC. Rule 17a–5 also requires additional notifications if an accountant identifies a material weakness in a broker-dealer's internal control over compliance during the most recent fiscal year.[692]

Reports required to be filed under Rule 17a–5 are used, among other things, to monitor the financial and operational condition of a broker-dealer by Commission staff and by the broker-dealer's DEA. The reports required under Rule 17a–5 are one of the primary means of ensuring compliance with the broker-dealer financial responsibility rules. In addition, FOCUS Report data are used in preparation for broker-dealer examinations. The completed forms also are used to determine which firms are engaged in various securities-related activities, the extent to which they are

engaged in those activities, and how economic events and government policies might affect various segments of the securities industry.

### 8. Rule 17a–11

Rule 17a–11 requires broker-dealers that are experiencing financial or operational difficulties to provide notice to the Commission, the broker-dealer's DEA, and the CFTC (if the broker-dealer is registered with the CFTC as a futures commission merchant). For example, if a registered broker-dealer determines that the net capital it has on hand has fallen below the amount it must maintain (as calculated under Rule 15c3–1), it must immediately notify the Commission and its DEA (and, if applicable, the CFTC).[693] Rule 17a–11 is an integral part of the Commission's financial responsibility program, which enables the Commission, a broker-dealer's DEA, and the CFTC to increase surveillance of a broker-dealer experiencing difficulties and to obtain any additional information necessary to gauge the broker-dealer's financial or operational condition. The real-time information contained in these notices alerts the Commission, the DEA, and the CFTC of the need to increase surveillance of the broker-dealer's financial and operational condition.

### 9. Rule 613

Rule 613 requires FINRA and the national securities exchanges (''Participants'') to submit an NMS plan to create, implement, and maintain the CAT to capture order event information for orders in NMS securities, across all markets, from the time of order inception through routing, cancellation, modification, or execution in a single, consolidated data source.[694] The term ''NMS Security'' is defined as ''any security or class of securities for which transaction reports are collected, processed, and made available pursuant to an effective transaction reporting plan, or an effective national market system plan for reporting transactions in listed options.''[695] In general, the term ''NMS Security'' refers to exchange-listed equity securities and standardized options, but does not include exchange-listed debt securities, securities futures, or open-end mutual funds, which are not currently reported pursuant to an effective transaction reporting plan. Rule 613 requires that each Participant and its member broker-dealers to record, and electronically report to the central repository, details for each order

documenting the life of an order through the process of original receipt or origination, routing, modification, cancellation, and execution (in whole or in part) for each NMS security.[696]

This audit trail information is designed to allow regulators to efficiently and accurately monitor and surveil the securities markets and detect and investigate activity in NMS securities throughout the U.S. markets, whether on one market or across markets. The data collected and reported to the central repository can also be used by regulators to evaluate tips and complaints and for complex enforcement inquiries or investigations, as well as inspections and examinations. Further, regulators can use the data collected and reported to conduct more timely and accurate analysis of market activity for reconstruction of broad-based market events in support of regulatory policy decisions.

### B. Respondents

As discussed above, new Rules 3a5–4 and 3a44–2 would further define activities that would cause a person engaged in a regular business of buying and selling securities for its own account within the meaning of the Exchange Act. A person who satisfies the factors described in the amended definitions would be considered a ''dealer'' or ''government securities dealer,'' and thus would be required to register as such with the Commission, absent an exception or exemption. As detailed in section III.B.2.c, the TRACE analysis identifies as potential significant liquidity providers a total of 31 firms that are not currently registered as dealers; including 22 entities classified as PTFs, 4 entities classified as hedge funds, and another 5 entities.[697] Further, the Form PF analysis identifies 12 hedge funds that are the most likely to meet the final rules' factors due to their reported HFT activities.[698] For purposes of this PRA, we will calculate the burdens based on an estimated 31 liquidity providers plus 12 hedge funds, or 43 respondents. This

---

[689] *See* 17 CFR 240.17a–5(a)(1).
[690] *See* 17 CFR 240.17a–5(c).
[691] *See* 17 CFR 240.17a–5(d).
[692] *See* 17 CFR 240.17a–5(h).

[693] *See* 17 CFR 240.17a–11(g).
[694] *See* 17 CFR 242.613(a)(1) and (c)(1) and (7).
[695] *See* 17 CFR 242.600(b)(54).

[696] *See* 17 CFR 242.613(a)(1) and (c)(1), (6), and (7).
[697] *See supra* note 418.
[698] Based on staff analysis (*see* section III.B.2.c), the 12 entities were identified through Form PF since we believe that any private funds employing trading strategies that would fit the final rules' qualitative standard, as adopted, would likely report them as HFT. However, since reported HFT may apply to a broader set of activities than the final rules' qualitative factors, the actual number of affected funds may be less than 12. However, for purposes of this PRA, we conservatively estimate that up to 12 entities could be required to register as dealers and submit order information to CAT. *See infra* note 766 and accompanying text.

estimate of 43 respondents differs from the estimate of 105 respondents used in the Proposing Release. As discussed more fully in the Economic Analysis, changes made to the proposed rule text to address commenters' concerns (described in section I.B above), have decreased the number of persons that will likely need to register under the final rules.[699] These respondents would be subject to some or all of the following collections of information described below.

### C. Paperwork Reduction Act Burdens

#### 1. Paperwork Burdens Associated With Rules 15b1–1, 15Ca1–1, 15Ca2–1, and 15b3–1 and Form BD

As discussed above, section 15C of the Exchange Act requires that government securities dealers register with the Commission.[700] A government securities dealer has the flexibility to either register as a dealer pursuant to Rule 15b1–1 and file notice as a government securities dealer under Rule 15Ca1–1, or register as a government securities dealer under Rule 15Ca2–1.[701] In either case, the respondent is required to complete a Form BD.[702] The Commission believes that new Rules 3a5–4 and 3a44–2 would impose the same burden on these respondents irrespective of whether the respondent registers as a dealer or a government securities dealer. Once registered, a broker-dealer must file an amended Form BD when information it originally reported on Form BD changes or becomes inaccurate.[703] The Commission

estimates an initial burden of 2.75 hours for completing a Form BD and an annual burden of .90 hours per respondent for amending Form BD,[704] resulting in a total initial burden of approximately 118 hours [705] and a total annual burden of approximately 39 hours [706] associated with the amendments to the definitions.

#### 2. Paperwork Burdens Associated With Rules 15b6–1 and 15Cc1–1 and Form BDW

The time necessary to complete and file Form BDW will vary depending on the nature and complexity of the applicant's securities business. On average, the Commission estimates that it would take a broker-dealer approximately one hour [707] per respondent to complete and file a Form BDW to withdraw from Commission registration. For purposes of estimating this paperwork burden, the Commission posits that at least one of the 43 respondents may withdraw as a dealer each year, resulting in a total annual burden of one hour.[708] It is not anticipated that respondents will have to incur any capital or start-up costs, nor any additional operational or maintenance costs, to comply with the collection of information.[709]

#### 3. Paperwork Burdens Associated With Rule 15c2–7

Any broker-dealer could be a potential respondent for Rule 15c2–7. Only quotations entered into through an inter-dealer quotation system, such as OTC Link and Global OTC, are covered by Rule 15c2–7. According to representatives of OTC Link and Global OTC, none of those entities has recently received, nor anticipates receiving, any

Rule 15c2–7 notices.[710] However, because a respondent may be required to submit such notices, to estimate this paperwork burden the Commission posits that one filing, in the aggregate, by one broker-dealer, is made annually pursuant to Rule 15c2–7.[711] Based on prior industry estimates, the time required to enter a notice pursuant to Rule 15c2–7 is 45 seconds, or .75 minutes.[712] The Commission believes that none of the respondents that are required to register as a result of the amended definitions will be required to file a Rule 15c2–7 notice. Accordingly, the Commission estimates that there will be no internal compliance cost associated with the burden hours for Rule 15c2–7.

#### 4. Paperwork Burdens Associated With Rule 15c3–1

The respondents that must register with the Commission as a result of the new final rules may incur a collection of information burden to comply with Rule 15c3–1. The Commission estimates the hour burdens of the requirements associated with Rule 15c3–1 as follows.

*Notices:* Based on the number of notices filed under Rule 15c3–1 between November 1, 2021, and October 31, 2022, the Commission estimated that broker-dealers annually file approximately 1,216 notices under Rule 15c3–1.[713] 3,528 broker-dealers submitted annual audit reports for the year ending December 31, 2021.[714] Thus, approximately 35% of broker-dealer respondents submitted a Rule 15c3–1 notice during this timeframe. Based on this percentage, the Commission estimates that at least approximately 15 of the 43 respondents would likely file one notice under Rule 15c3–1 annually.[715] In addition, the Commission estimated that a broker-dealer will spend approximately 30

---

[699] Section III.B above includes a discussion of commenters' concerns.

[700] *See* 15 U.S.C. 78o–5(a).

[701] *Compare* section 15(a) *with* section 15C. A government securities dealer that registers under section 15C(a)(l)(A) will be limited to conducting a government securities business only.

[702] *Compare* 17 CFR 240.15b1–1(a) ("Rule 15b1–1(a)") ("An application for registration of a broker or dealer that is filed pursuant to section 15(b) of the Act (15 U.S.C. 78o(b)) shall be filed on Form BD (249.501 of this chapter) in accordance with the instructions to the form") and 17 CFR 240.15Ca1–1(a) ("Rule 15Ca1–1(a)") ("Every government securities broker or government securities dealer that is a broker or dealer registered pursuant to section 15 or 15B of the Act (other than a financial institution as defined in section 3(a)(46) of the Act) shall file with the Commission written notice on Form BD (249.501 of this chapter) in accordance with the instructions contained therein that it is a government securities broker or government securities dealer.") *with* 17 CFR 240.15Ca2–1(a) ("Rule 15Ca2–1(a)") ("An application for registration pursuant to section 15C(a)(1)(A) of the Act, of a government securities broker or government securities dealer that is filed on or after January 25, 1993, shall be filed with the Central Registration Depository (operated by the Financial Industry Regulatory Authority, Inc.) on Form BD in accordance with the instructions contained therein.").

[703] *See* Rule 15b3–1.

[704] For the previously approved estimates, *see* ICR Reference No. 202306–3235–010 (conclusion date June 13, 2023), *available at https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202306-3235-010* ("Form BD PRA Supporting Statement"). The Commission's currently approved burden associated with filing an amendment to Form BD is .33 hours. From 2019 through 2021, the Commission received, on average, 2.72 amendments per broker-dealer (*see* Form BD PRA Supporting Statement at 5). Thus, we extrapolate that each new broker-dealer would submit approximately 2.72 amendments. 2.72 amendments × .33 hours = .90 hours per respondent.

[705] 43 respondents multiplied by 2.75 hours per respondent.

[706] 43 respondents multiplied by .90 hours per respondent.

[707] For the previously approved estimates, *see* ICR Reference No. 202306–3235–014 (conclusion date Aug. 11, 2023), *available at https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202306-3235-014* ("Form BDW PRA Supporting Statement").

[708] 1 respondent multiplied by 1 hour per respondent.

[709] Form BDW PRA Supporting Statement at 5.

[710] For the previously approved estimates, *see* ICR Reference No. 202008–3235–005 (conclusion date Feb. 1, 2021), *available at https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202008-3235-005* ("Rule 15c2–7 PRA Supporting Statement").

[711] Rule 15c2–7 PRA Supporting Statement at 3.

[712] *Id.*

[713] For the previously approved estimates, *see* ICR Reference No. 202301–3235–012 (conclusion date June 2, 2023), *available at https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=202301-3235-012* ("Rule 15c3–1 PRA Supporting Statement") at 4. This justification also describes other collections of information associated with Rule 15c3–1, however the Commission determined that the business model of the firms expected to register as broker-dealers as a result of these new definitions would likely not require that they comply with those provisions (*see supra* section III.B (discussing types of entities that could be captured by the final rules)).

[714] Based on FOCUS data.

[715] 43 respondents × 35% = 15.05.

minutes preparing and filing these notices.[716] Accordingly, the Commission estimates a total additional annual burden associated with submitting these Rule 15c3–1 notices of approximately 7.5 hours.[717]

*Capital Withdrawal Liability:* Paragraph (c)(2)(i)(G)(*2*) of Rule 15c3–1 requires that a broker-dealer treat as a liability any capital contribution that is intended to be withdrawn within one year of its contribution. The paragraph also includes the presumption that capital withdrawn within one year of contribution was intended to be withdrawn within one year, unless the broker-dealer receives permission in writing for the withdrawal from its DEA. For purposes of this PRA, the Commission estimates that approximately three respondents would likely seek permission in writing to withdraw capital[718] and that it will take each of those firms approximately one hour to prepare and submit the request to their DEAs.[719] Accordingly, the Commission estimates that the total annual reporting burden will be approximately three hours.[720]

### 5. Paperwork Burdens Associated With Rule 15c3–5

To comply with Rule 15c3–5, a respondent must maintain its risk management system by monitoring its effectiveness and updating its systems to address any issues detected.[721] In addition, a respondent is required to preserve a copy of its written description of its risk management controls as part of its books and records in a manner consistent with Rule 17a–4(e)(7).[722] The Commission estimates that the ongoing annualized burden for a respondent to maintain its risk management system will be approximately 115 burden hours.[723] The Commission believes the ongoing burden of complying with the rule's

collection of information will include, among other things, updating systems to address any issues detected, updating risk management controls to reflect any change in its business model, and documenting and preserving a broker-dealer's written description of its risk management controls.[724] In addition, the Commission estimates that a broker-dealer's legal and compliance burden of complying with Rule 15c3–5 will require approximately 45 hours per year.[725] Accordingly, the Commission estimates the annual aggregate information burden per respondent would be 160 hours,[726] for a total annual burden of 6,880 hours.[727]

### 6. Paperwork Burdens Associated With Rule 17a–3

As discussed above, the respondents that must register as dealers or government securities as a result of these new definitions will incur a burden associated with the collections of information necessary to comply with Rule 17a–3.

### (i) Rule 17a–3 Generally

While recordkeeping requirements will vary based on the size and complexity of the broker-dealer, the Commission estimates that one hour a day[728] is the average amount of time needed by a broker-dealer to comply with the overall requirements of Rule 17a–3, in addition to the separate burdens described below. The number of working days per year is 249, and as a result the total annual estimated burden for respondents with respect to Rule 17a–3 generally would be 10,707 hours.[729]

### (ii) Rule 17a–3(a)(12) and (19)

In addition to the hour burden estimate for Rule 17a–3 generally, the Commission also believes that paragraphs (a)(12) and (19) of Rule 17a–

3 will impose specific burdens on respondents. Paragraphs (a)(12) and (19) of Rule 17a–3 require that a broker-dealer create certain records regarding its associated persons.[730] The Commission estimates that each broker-dealer spends, on average, approximately 30 minutes each year[731] to ensure that it is in compliance with these requirements, resulting in a total annual compliance burden of approximately 21.5 hours for the respondents.[732]

### (iii) Rule 17a–3(a)(20) Through (22)

Paragraphs (a)(20) through (22) of Rule 17a–3 require broker-dealers to make, among other things, records documenting the broker-dealer's compliance, or that the broker-dealer has adopted policies and procedures reasonably designed to establish compliance, with applicable Federal regulations and SRO rules that require approval by a principal of the broker-dealer of any advertisements, sales literature, or other communications with the public.[733] Moreover, these rules require broker-dealers to create a record of the personnel responsible for establishing compliance policies and procedures and of the personnel capable of explaining the types of records the broker-dealer must maintain and the information contained in those records.[734] The Commission estimates that, on average, each broker-dealer will spend 10 minutes each year[735] to ensure compliance with these requirements, resulting in a total annual burden for the respondents of about approximately 7.2 hours.[736]

### 7. Paperwork Burdens Associated With Rule 17a–4

The respondents that registered as dealers or government securities would incur a collection of information burden to comply with Rule 17a–4. Rule 17a–4 establishes the records that must be

---

[716] Rule 15c3–1 PRA Supporting Statement at 4.

[717] 15 respondents multiplied by 0.5 hours per respondent.

[718] In its 2023 PRA, the Commission estimated that broker-dealers would submit approximately 238 notices annually. Rule 15c3–1 PRA Supporting Statement at 5. According to FOCUS data, 3,528 broker-dealers submitted annual audit reports for the year ending Dec. 31, 2021. Thus, approximately 7% of the active broker-dealers submitted a notice annually as of 2021. 43 respondents × 7% = 3.01.

[719] Rule 15c3–1 PRA Supporting Statement at 5.

[720] 3 respondents multiplied by 1 hour per respondent.

[721] *See* 17 CFR 240.15c3–5.

[722] *Id.*

[723] For the previously approved estimates, *see* ICR Reference No. 201907–3235–022 (conclusion date Dec. 10, 2019), *available at https:// www.reginfo.gov/public/do/ PRAViewDocument?ref_nbr=201907-3235-022* ("Rule 15c3–5 PRA Supporting Statement"). *See* Rule 15c3–5 PRA Supporting Statement at 4.

[724] *Id.*

[725] *Id.* at 5. Specifically, compliance attorneys who review, document, and update written compliance policies and procedures are expected to require an estimated 20 hours per year; a compliance manager who reviews, documents, and updates written compliance policies and procedures is expected to require 20 hours per year; and the Chief Executive Officer, who certifies the policies and procedures, is expected to require another 5 hours per year. *Id.*

[726] 115 hours for technology + 45 hours for legal and compliance.

[727] 43 respondents multiplied by 160 hours.

[728] For the previously approved estimates, *see* ICR Reference No. 202107–3235–019 (conclusion date Dec. 1, 2021), *available at https://www.reginfo.gov/ public/do/PRAViewDocument?ref_nbr=202107-3235-019* ("Rule 17a–3 PRA Supporting Statement"). Rule 17a–3 PRA Supporting Statement at 6.

[729] 43 respondents multiplied by 249 hours per respondent a year.

[730] These records that a broker-dealer is required to make regarding the broker-dealer's associated persons include: (1) all agreements pertaining to the associated person's relationship with the broker-dealer and a summary of each associated person's compensation arrangement (17 CFR 240.17a–3(a)(19)(i)), (2) a record delineating all identification numbers relating to each associated person (17 CFR 240.17a–3(a)(12)(ii)), (3) a record of the office at which each associated person regularly conducts business (17 CFR 240.17a–3(a)(12)(iii)), and (4) a record as to each associated person listing transactions for which that person will be compensated (17 CFR 240.17a3(a)(19)(i)).

[731] Rule 17a–3 PRA Supporting Statement at 6.

[732] 43 respondents multiplied by 0.5 hours per respondent.

[733] *See* 17 CFR 240.17a–3(a)(20).

[734] *See* 17 CFR 240.17a–3(a)(21) and (22).

[735] Rule 17a–3 PRA Supporting Statement at 6.

[736] (43 respondents multiplied by 10 minutes per respondent) divided by 60 minutes.

preserved by broker-dealers.[737] The Commission estimates that, on average, each broker-dealer spends 254 hours each year[738] to ensure that it preserves the records Rule 17a–4 requires all broker-dealers to preserve. Accordingly, the Commission estimates that there will be a total annual burden of 10,922 hours to comply with the Rule 17a–4 requirements applicable to the respondents.[739]

### 8. Paperwork Burdens Associated With Rule 17a–5

This section summarizes the burdens associated with Rule 17a–5.[740]

*FOCUS Report for Broker-Dealers that do not Clear Transactions or Carry Customer Accounts:* Paragraph (a)(2)(iii) of Rule 17a–5 requires that broker-dealers that do not clear transactions or carry customer accounts and do not use ANC models to calculate net capital are required to file FOCUS Report Part IIA on a quarterly basis.[741] The Commission believes that, based on their business models (as PTFs and hedge funds), the 43 respondents that would be required to register with the Commission would need to comply with this provision of Rule 17a–5. The Commission estimates that each FOCUS Report Part IIA takes approximately 12 hours to prepare and file.[742] As a result, each respondent is estimated to have an annual reporting burden of 48 hours,[743] resulting in an annual burden of 2,064 hours.[744]

*Annual Reports:* Paragraph (d)(1)(i)(A) of Rule 17a–5 requires broker-dealers, subject to limited exception, to file annual reports, including financial statements and supporting schedules that generally must be audited by a PCAOB-registered independent public accountant in accordance with PCAOB standards.[745] The Commission believes that each of the 43 respondents that would be required to register with the Commission would need to file an annual report. The Commission estimates that each respondent is estimated to have an annual reporting burden of 12 hours under this provision of Rule 17a–5,[746] resulting in an annual burden of 516 hours for the respondents.[747]

*Exemption Report:* Paragraph (d)(1)(i)(B) of Rule 17a–5 requires a broker-dealer that claims it was exempt from Rule 15c3–3 throughout the most recent fiscal year to file an exemption report with the Commission on an annual basis.[748] The Commission believes, based on their business models (as PTFs and hedge funds), that the respondents generally would claim exemptions from Rule 15c3–3 and be required to file an exemption report. The Commission estimates that it takes a broker-dealer claiming an exemption from Rule 15c3–3 approximately 7 hours to complete the exemption report,[749] resulting in an annual burden of 301 hours.[750]

*SIPC Annual Reports:* Paragraph (d)(6) of Rule 17a–5 requires that each SIPC member broker-dealer file a copy of its annual report with SIPC.[751] The Commission estimates that it takes a broker-dealer approximately 30 minutes to file the annual report with SIPC.[752] As a result, each firm is estimated to have an annual burden of .5 hour, resulting in an annual burden of 21.5 hours for the respondents.[753]

*SIPC Annual General Assessment Reconciliation Report or Exclusion from Membership Forms:* Paragraph (e)(4) of Rule 17a–5 requires broker-dealers to file with SIPC a report on the SIPC annual general assessment reconciliation or exclusion from membership forms.[754] The Commission estimates that it takes a broker-dealer approximately 5 hours to complete and submit its SIPC annual assessment reconciliation form or certification of exclusion from membership form,[755] resulting in an estimated annual burden of about 215 hours for the respondents.[756]

*Statement Regarding Independent Public Accountant:* Paragraph (f)(2) of Rule 17a–5 requires broker-dealers to prepare a statement providing information regarding the broker-dealer's independent public accountant and to file it each year with the Commission and its DEA (except that if the engagement is of a continuing nature, no further filing is required).[757] The Commission estimates that it takes a broker-dealer that neither carries customer accounts nor clears transactions approximately 2 hours to file the Statement Regarding Independent Public Accountant with the Commission.[758] As a result, each broker-dealer that neither carries nor clears transactions is estimated to have an annual burden of 2 hours, resulting in an annual burden of 86 hours for the respondents.[759]

### 9. Paperwork Burdens Associated With Rule 17a–11 [760]

In 2019, the Commission received 343 Rule 17a–11 notices from broker-dealers.[761] Approximately 3,679 broker-dealers filed annual audited financial statements for fiscal year 2019.[762] Thus, approximately 9% of registered broker-dealers submitted Rule 17a–11 notices. The Commission estimated that it will take approximately one hour to prepare and transmit each notice.[763] Based on this, the Commission believes that 9% of the respondents may need to submit 17a–11 notices, resulting in a burden of four hours.[764]

### 10. Paperwork Burdens Associated With Rule 613

Paragraph (c) of Rule 613 provides that certain requirements are placed upon broker-dealers to record and report CAT information to the central repository in accordance with specified

---

[737] *See* 17 CFR 240.17a–4.

[738] For the previously approved estimates, *see* ICR Reference No. 202107–3235–021 (conclusion date Oct. 1, 2021), *available at https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202107-3235-021* ("Rule 17a–4 PRA Supporting Statement"). Rule 17a–4 PRA Supporting Statement at 7.

[739] 43 respondents multiplied by 254 hours per respondent.

[740] Registered government securities dealers are required to comply with Rule 17a–5, subject to the modifications enumerated in 17 CFR 405.1 ("Rule 405.1") and 405.2 ("Rule 405.2"). *See* 17 CFR 405.1 and 405.2.

[741] *See* 17 CFR 240.17a–5(a)(2)(iii).

[742] For the previously approved estimates, *see* ICR Reference No. 202107–3235–022 (conclusion date Oct. 1, 2021), *available at https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202107-3235-022* ("Rule 17a–5 PRA Supporting Statement"). Rule 17a–5 PRA Supporting Statement at 6.

[743] These filings must be made quarterly. Rule 17a–5 PRA Supporting Statement at 6.

[744] 43 respondents multiplied by 48 hours per respondent.

[745] *See* 17 CFR 240.17a–5(d)(1)(i)(A).

[746] Rule 17a–5 PRA Supporting Statement at 7.

[747] 43 respondents multiplied by 12 hours per respondent.

[748] *See* 17 CFR 240.17a–5(d)(1)(i)(B).

[749] Rule 17a–5 PRA Supporting Statement at 8.

[750] 43 respondents multiplied by 7 hours per respondent.

[751] *See* 17 CFR 240.17a–5(d)(6).

[752] Rule 17a–5 PRA Supporting Statement at 8.

[753] 43 respondents multiplied by 0.5 hours per respondent.

[754] *See* 17 CFR 240.17a–5(e)(4).

[755] Rule 17a–5 PRA Supporting Statement at 9.

[756] 43 respondents multiplied by 5 hours per respondent.

[757] 17 CFR 240.17a–5(f)(2).

[758] Rule 17a–5 PRA Supporting Statement at 9.

[759] 43 respondents multiplied by 2 hours per respondent.

[760] Registered government securities dealers are required to comply with Rule 17a–11, subject to the modifications enumerated in 17 CFR 405.3. *See* 17 CFR 405.3.

[761] For the previously approved estimates, *see* ICR Reference No. 202107–3235–023 (conclusion date Oct. 1, 2021), *available at https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202107-3235-023* ("Rule 17a–11 PRA Supporting Statement").

[762] Rule 17a–11 PRA Supporting Statement at 7.

[763] Rule 17a–11 PRA Supporting Statement at 4.

[764] 43 respondents multiplied by 9% = approximately 4 respondents. 4 respondents multiplied by 1 hour per respondent.

timelines.[765] The CAT is designed to capture customer and order event information for orders in NMS securities, across all markets, from the time of order inception through routing, cancellation, modification, or execution in a single, consolidated data source. If an affected party does not trade NMS stocks, OTC equities, or listed options, then the affected party will not incur CAT-related reporting costs because the affected party does not trade securities that must be reported to CAT. Based on staff analysis (*see* section III.B.2.c), the 12 entities were identified through Form PF since we believe that any private funds employing trading strategies that would fit the final rules' qualitative standard, as adopted, would likely report them as HFT. However, since reported HFT may apply to a broader set of activities than the final rules' qualitative factors, the actual number of affected funds may be less than 12. However, for purposes of this PRA, we conservatively estimate that up to 12 entities could be required to submit order information to CAT.[766]

The Commission recognizes that broker-dealers may insource or outsource CAT data reporting obligations.[767] The Commission believes all 12 of the respondents that may be required to submit order information to CAT would likely strategically decide to insource their data reporting functions as a result of their high level of trading activity.[768] The Commission estimates that the average initial burden associated with implementing regulatory data reporting to capture the required information and transmit it to the central repository in compliance with Rule 613 for each respondent to be approximately 14,490 initial burden

hours,[769] totaling an initial burden of 173,880 hours for these respondents.[770]

After a respondent establishes the appropriate systems and processes required for collection and transmission of the required information, the Commission estimates that Rule 613 imposes ongoing annual burdens associated with, among other things, personnel time to monitor each respondent's reporting of the required data, maintenance of the systems to report the required data, and implementing changes to trading systems that might result in additional reports.[771] The Commission believes that it would take each respondent approximately 13,338 burden hours per year[772] to continue to comply with Rule 613, totaling an annual ongoing burden of 160,056 hours for the respondents.[773]

### C. Paperwork Reduction Act Costs

In addition to the hour burdens associated with these rules, there may also be external costs associated with the paperwork burdens imposed by these rules.

#### 1. Costs Associated With Rule 15c3–1 Paperwork Burden

Broker-dealers that file consolidated financial reports must obtain an opinion of counsel in accordance with appendix C to Rule 15c3–1.[774] The Commission indicated, when this rule was proposed, that it believed there will not be any respondents that are required to register as a result of the proposed rules that will obtain an opinion of counsel to file the consolidated financial reports as required under appendix C to Rule 15c3–1. We received no comment on this issue, and the Commission does not anticipate that respondents will incur any capital or start-up costs, nor any additional operational or maintenance costs, to comply with the collection of information under Rule 15c3–1.

#### 2. Costs Associated With Rule 15c3–5 Paperwork Burden

The Commission estimates that the average ongoing external hardware and software expenses relating to the paperwork burden associated with Rule 15c3–5 would be approximately $20,500 per respondent,[775] for a total annualized external cost for all respondents of $881,500.[776]

#### 3. Costs Associated With Rule 17a–4 Paperwork Burden

The Commission estimates that the average broker-dealer spends approximately $5,000 each year to store documents required to be retained under Rule 17a–4.[777] Accordingly, the Commission estimates that the annual reporting and recordkeeping cost burden for the respondents to be $215,000.[778]

#### 4. Costs Associated With Rule 17a–5 Paperwork Burden

The Commission estimates that Rule 17a–5 causes a broker-dealer to incur an annual dollar cost to meet its reporting obligations. Those requirements that are anticipated to impose an annual cost are discussed below.

*Annual Reports:* The Commission estimates that postage costs to comply with paragraph (d) of Rule 17a–5, impose on broker-dealers an annual dollar cost of $7.75 per firm,[779] resulting in a total annual cost for the respondents of approximately $333.[780]

*Exemption Report:* A broker-dealer that claims it was exempt from Rule 15c3–3 throughout the most recent fiscal year must file an exemption report with the Commission on an annual basis.[781] The cost associated with an independent public accountant's review of the exemption report is estimated to create an ongoing cost of $3,000 per non-carrying broker-dealer per year,[782] for a total annual reporting cost of approximately $129,000.[783]

*SIPC Annual Reports:* The Commission estimates that postage costs to comply with paragraph (d)(6) of Rule

---

[765] *See* 17 CFR 242.613(c).

[766] Additionally, we acknowledge that fewer entities may actually need to report to CAT because some entities identified in the data as engaging in equity strategies could be effecting transactions in futures rather than transactions in NMS securities.

[767] For the previously approved estimates, *see* ICR Reference No. 202306–3235–008 (Oct. 13, 2023), *available at https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202306-3235-008* ("2023 CAT PRA Supporting Statement").

[768] *See* 2023 CAT PRA Supporting Statement at 37.

[769] The 2023 CAT PRA Supporting Statement largely eliminated the initial burden estimate; stating that as the CAT reporting obligations have been in place for some time, the Commission assumes that the initial one-time hour burdens associated with implementation of the system have already been incurred. However, the 12 respondents may incur these initial burdens. The prior burden estimates (which include a description of the initial burdens) can be found at *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201911-3235-003* ("2020 CAT Supporting Statement").

[770] 12 respondents multiplied by 14,490 hours.

[771] *See* 2020 CAT PRA Supporting Statement at 39.

[772] *Id.* at 39–40.

[773] 12 respondents multiplied by 13,338 hours.

[774] Rule 15c3–1 PRA Supporting Statement at 11.

[775] Rule 15c3–5 PRA Supporting Statement at 6.

[776] 43 respondents multiplied by $20,500 per respondent.

[777] Rule 17a–4 PRA Supporting Statement at 13. Costs include the cost of physical space, computer hardware and software, etc., which vary widely depending on the size of the broker-dealer and the type of storage media employed. *Id.*

[778] 43 respondents multiplied by $5,000 per respondent.

[779] Rule 17a–5 PRA Supporting Statement at 15.

[780] 43 respondents multiplied by $7.75 per respondent.

[781] *See* 17 CFR 240.17a–5(d)(1)(i)(B).

[782] Rule 17a–5 PRA Supporting Statement at 16.

[783] 43 respondents multiplied by $3,000 per respondent.

Case 4:24-cv-00250-O   Document 1-1   Filed 03/18/24   Page 72 of 74   PageID 96

17a–5 impose an annual dollar cost of 50 cents per firm registered with SIPC as a SIPC member broker-dealer [784] totaling, an estimated cost burden for the respondents of $21.50.[785]

*SIPC Annual General Assessment Reconciliation Report or Exclusion from Membership Forms:* The Commission estimates that postage costs to comply with paragraph (e)(4) of Rule 17a–5 impose an annual dollar cost of 50 cents per firm.[786] The Commission estimates that the respondents will file with SIPC a report on the SIPC annual general assessment reconciliation or exclusion from membership form, such that the estimated annual cost burden totals $21.50.[787]

*Statement Regarding Independent Public Accountant:* The Commission estimates that postage costs to comply with paragraphs (f)(2) and (3) of Rule 17a–5, impose an annual dollar cost of 50 cents per firm.[788] Accordingly, the Commission estimates that a cumulative total cost of $21.50 per year.[789]

### 5. Costs Associated With Rule 613 Paperwork Burden

The Commission estimates that each of the 12 respondents that may engage in effecting transactions in NMS securities will, on average, incur approximately $450,000 in initial costs for hardware and software to implement the systems changes needed to capture the required information and transmit it to the central repository, an additional $9,500 in initial third party costs, and an additional $250,000 in costs to implement the modified allocation timestamp requirement,[790] totaling a cumulative initial cost of $8,514,000 for the respondents.[791]

After each respondent has established the appropriate systems and processes, the Commission believes that Rule 613 imposes ongoing annual burdens associated with, among other things, personnel time to monitor each respondent's reporting of the required data, maintenance of the systems to report the required data, and implementing changes to trading

systems that might result in additional reports to the central repository.[792] The Commission estimates costs for each respondent, on average, of approximately $80,000 per year to maintain systems connectivity to the central repository and purchase any necessary hardware, software, and other materials, an additional $1,300 per year in third party costs, and an additional $29,167 per year to maintain the modified allocation timestamp requirement,[793] totaling an estimated a cumulative annual ongoing cost of $1,325,604 for the respondents.[794]

### V. Regulatory Flexibility Act

The Regulatory Flexibility Act ("RFA") requires Federal agencies, in promulgating rules, to consider the impact of those rules on small entities. Section 603(a) of the Administrative Procedures Act ("APA"),[795] as amended by the RFA, generally requires the Commission to undertake a regulatory flexibility analysis of all proposed rules, or proposed rule amendments, to determine the impact of the rulemaking on "small entities." [796] Section 605(b) of the RFA [797] states that this requirement shall not apply to any proposed rule or proposed rule amendment which, if adopted, would not have a significant economic impact on a substantial number of small entities.[798]

The Commission received one comment on this certification.[799] The commenter stated that the Commission should consider as part of its regulatory flexibility analysis that requiring a new category of registrants (*i.e.,* funds) to register as dealers under the proposed rules would require FINRA to provide new registration categories.[800] For the reasons described below, the final rules will not have a significant economic impact on a substantial number of small entities; nor does the Commission

believe that there is a correlation between the regulatory flexibility analysis and the particular issue that the commenter raised.

As stated in the Proposing Release, the RFA defines "small entity" to mean "small business," "small organization," or "small governmental jurisdiction." [801] The Commission's rules define "small business" and "small organization" for purposes of the RFA for each of the types of entities regulated by the Commission.[802] A "small business" and "small organization," when used in reference to a person other than an investment company, generally means a person with total assets of $5 million or less on the last day of its most recent fiscal year.[803]

The final rules would not apply to persons that have or control total assets of less than $50 million.[804] Therefore, because small businesses and small organizations with total assets of $50 million or less would not meet the requirements of the final rules, the final rules would not have a significant economic impact on a substantial number of small entities.

For the foregoing reasons, the Commission certifies, pursuant to section 605(b), that the final rules will not have a significant economic impact on a substantial number of small entities for purposes of the RFA.

### VI. Other Matters

Pursuant to the Congressional Review Act,[805] the Office of Information and Regulatory Affairs has designated these rules as a "major rule," as defined by 5 U.S.C. 804(2).

If any of the provisions of these final rules, or the application thereof to any person or circumstance, is held to be invalid, such invalidity shall not affect other provisions or application of such provisions to other persons or circumstances that can be given effect without the invalid provision or application.

### Statutory Authority

The Commission is adopting Rules 3a5–4 and 3a44–2 pursuant to authority set forth in sections 3 and 23 of the Exchange Act (15 U.S.C. 78c and 78w).

[784] Rule 17a–5 PRA Supporting Statement at 16.

[785] 43 respondents multiplied by $0.50 per respondent.

[786] Rule 17a–5 PRA Supporting Statement at 16.

[787] 43 respondents multiplied by $0.50 per respondent.

[788] Rule 17a–5 PRA Supporting Statement at 17.

[789] 43 respondents multiplied by $0.50 per respondent.

[790] *See* 2020 CAT PRA Supporting Statement at 63–64.

[791] 12 respondents multiplied by (($450,000 in external hardware and software costs) + ($250,000 to implement the modified allocation timestamp requirement) + ($9,500 initial third party/ outsourcing costs) = $709,500).

[792] *See* 2020 CAT PRA Supporting Statement at 66.

[793] *Id.*

[794] 12 respondents multiplied by (($80,000 in external hardware and software costs) + ($29,167 to maintain the modified allocation timestamp requirement) + ($1,300 ongoing external third party/outsourcing costs) = $110,467).

[795] 5 U.S.C. 603(a).

[796] Although section 601(b) of the RFA defines the term "small entity," the statute permits agencies to formulate their own definitions. The Commission has adopted definitions for the term "small entity" for the purposes of Commission rulemaking in accordance with the RFA. Those definitions, as relevant to this rulemaking, are set forth in Rule 0– 10 under the Exchange Act. *See also* Exchange Act Release No. 18451 (Jan. 28, 1982), 47 FR 5215 (Feb. 4, 1982) (File No. AS–305).

[797] 5 U.S.C. 605(b).

[798] *Id.*

[799] *See* ABA Comment Letter.

[800] *See supra* section II.B.3.

[801] 5 U.S.C. 601(6).

[802] Exchange Act Rule 0–10 contains applicable definitions.

[803] *Id.*

[804] *See* Rules 3a5–4(a)(2)(i) and 3a44–2(a)(2)(i). *See also* section II.B.3.

[805] 5 U.S.C. 801 *et seq.*

**Text of Final Rules**

**List of Subjects in 17 CFR Part 240**

Securities dealers, Government securities dealers.

For the reasons set out in the preamble, the Commission is amending title 17, chapter II, of the Code of Federal Regulations as follows:

## PART 240—GENERAL RULES AND REGULATIONS, SECURITIES EXCHANGE ACT OF 1934

■ 1. The general authority citation for part 240 continues to read as follows:

**Authority:** 15 U.S.C. 77c, 77d, 77g, 77j, 77s, 77z–2, 77z–3, 77eee, 77ggg, 77nnn, 77sss, 77ttt, 78c, 78c–3, 78c–5, 78d, 78e, 78f, 78g, 78i, 78j, 78j–1, 78j–4, 78k, 78k–1, 78*l*, 78m, 78n, 78n–1, 78*o*, 78*o*–4, 78*o*–10, 78p, 78q, 78q–1, 78s, 78u–5, 78w, 78x, 78dd, 78*ll*, 78mm, 80a–20, 80a–23, 80a–29, 80a–37, 80b–3, 80b–4, 80b–11, 7201 *et seq.*, and 8302; 7 U.S.C. 2(c)(2)(E); 12 U.S.C. 5221(e)(3); 18 U.S.C. 1350; and Pub. L. 111–203, 939A, 124 Stat. 1376 (2010); and Pub. L. 112–106, sec. 503 and 602, 126 Stat. 326 (2012), unless otherwise noted.

\*   \*   \*   \*   \*

■ 2. Add § 240.3a5–4 to read as follows:

### § 240.3a5–4  Further definition of "as a part of a regular business" in connection with certain liquidity providers.

(a) A person that is engaged in buying and selling securities for its own account is engaged in such activity "as a part of a regular business" as the phrase is used in section 3(a)(5)(B) of the Act (15 U.S.C. 78c(a)(5)(B)) if that person:

(1) Engages in a regular pattern of buying and selling securities that has the effect of providing liquidity to other market participants by:

(i) Regularly expressing trading interest that is at or near the best available prices on both sides of the market for the same security and that is communicated and represented in a way that makes it accessible to other market participants; or

(ii) Earning revenue primarily from capturing bid-ask spreads, by buying at the bid and selling at the offer, or from capturing any incentives offered by trading venues to liquidity-supplying trading interest; and

(2) Is not:

(i) A person that has or controls total assets of less than $50 million;

(ii) An investment company registered under the Investment Company Act of 1940; or

(iii) A central bank, sovereign entity, or international financial institution.

(b) For purposes of this section:

(1) The term *person* has the same meaning as prescribed in section 3(a)(9) of the Act (15 U.S.C. 78c(a)(9)).

(2) A person's *own account* means any account:

(i) Held in the name of that person; or

(ii) Held for the benefit of that person.

(3) The term *central bank* means a reserve bank or monetary authority of a central government (including the Board of Governors of the Federal Reserve System or any of the Federal Reserve Banks) and the Bank for International Settlements.

(4) The term *international financial institution* means the African Development Bank; African Development Fund; Asian Development Bank; Banco Centroamericano de Integración Económica; Bank for Economic Cooperation and Development in the Middle East and North Africa; Caribbean Development Bank; Corporación Andina de Fomento; Council of Europe Development Bank; European Bank for Reconstruction and Development; European Investment Bank; European Investment Fund; European Stability Mechanism; Inter-American Development Bank; Inter-American Investment Corporation; International Bank for Reconstruction and Development; International Development Association; International Finance Corporation; International Monetary Fund; Islamic Development Bank; Multilateral Investment Guarantee Agency; Nordic Investment Bank; North American Development Bank; and any other entity that provides financing for national or regional development in which the U.S. Government is a shareholder or contributing member.

(5) The term *sovereign entity* means a central government (including the U.S. Government), or an agency, department, or ministry of a central government.

(c) No person shall evade the registration requirements of this section by:

(1) Engaging in activities indirectly that would satisfy paragraph (a) of this section; or

(2) Disaggregating accounts.

(d) No presumption shall arise that a person is not a dealer within the meaning of section 3(a)(5) of the Act solely because that person does not satisfy paragraph (a) of this section.

■ 3. Add § 240.3a44–2 to read as follows:

### § 240.3a44–2  Further definition of "as a part of a regular business" in connection with certain liquidity providers.

(a) A person that is engaged in buying and selling government securities for its own account is engaged in such activity "as a part of a regular business" as the phrase is used in section 3(a)(44)(A) of the Act (15 U.S.C. 78c(a)(44)(A)) if that person:

(1) Engages in a regular pattern of buying and selling government securities that has the effect of providing liquidity to other market participants by:

(i) Regularly expressing trading interest that is at or near the best available prices on both sides of the market for the same security and that is communicated and represented in a way that makes it accessible to other market participants; or

(ii) Earning revenue primarily from capturing bid-ask spreads, by buying at the bid and selling at the offer, or from capturing any incentives offered by trading venues to liquidity-supplying trading interest; and

(2) Is not:

(i) A person that has or controls total assets of less than $50 million; or

(ii) An investment company registered under the Investment Company Act of 1940; or

(iii) A central bank, sovereign entity, or international financial institution.

(b) For purposes of this section:

(1) The term *person* has the same meaning as prescribed in section 3(a)(9) of the Act (15 U.S.C. 78c(a)(9)).

(2) A person's *own account* means any account:

(i) Held in the name of that person; or

(ii) Held for the benefit of that person.

(3) The term *central bank* means a reserve bank or monetary authority of a central government (including the Board of Governors of the Federal Reserve System or any of the Federal Reserve Banks) and the Bank for International Settlements.

(4) The term *international financial institution* means the African Development Bank; African Development Fund; Asian Development Bank; Banco Centroamericano de Integración Económica; Bank for Economic Cooperation and Development in the Middle East and North Africa; Caribbean Development Bank; Corporación Andina de Fomento; Council of Europe Development Bank; European Bank for Reconstruction and Development; European Investment Bank; European Investment Fund; European Stability Mechanism; Inter-American Development Bank; Inter-American Investment Corporation; International Bank for Reconstruction and Development; International Development Association; International Finance Corporation; International Monetary Fund; Islamic Development Bank; Multilateral Investment Guarantee Agency; Nordic Investment Bank; North American Development Bank; and any other entity that provides financing for national or regional development in

which the U.S. Government is a shareholder or contributing member.

(5) The term *sovereign entity* means a central government (including the U.S. Government), or an agency, department, or ministry of a central government.

(c) No person shall evade the registration requirements of this section by:

(1) Engaging in activities indirectly that would satisfy paragraph (a) of this section; or

(2) Disaggregating accounts.

(d) No presumption shall arise that a person is not a government securities dealer within the meaning of section 3(a)(44) of the Act (15 U.S.C. 78c(a)(44))

solely because that person does not satisfy paragraph (a) of this section.

By the Commission.

Dated: February 6, 2024.

**J. Matthew DeLesDernier,**

*Deputy Secretary.*

[FR Doc. 2024–02837 Filed 2–28–24; 8:45 am]

**BILLING CODE 8011–01–P**