# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

NATIONAL ASSOCIATION OF PRIVATE FUND
MANAGERS; ALTERNATIVE INVESTMENT
MANAGEMENT ASSOCIATION, LIMITED; and
MANAGED FUNDS ASSOCIATION,

                *Plaintiffs*,

    v.

SECURITIES AND EXCHANGE COMMISSION,

                *Defendant*.

Case No. 4:24-cv-00250-O

# PLAINTIFFS' BRIEF IN SUPPORT OF
# MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 4

    I.     Congress Purposefully Exempts Private Funds From Federal Registration................ 4

    II.    The Commission Tries, and Fails, to Impose Registration and Other
           Requirements on Private Funds. ................................................................................. 5

    III.   The Commission Adopts Its Overbroad "Dealer" Rule to (Again) Try to Force
           Registration by Private Funds, Among Others. ........................................................... 7

LEGAL STANDARD............................................................................................................ 8

ARGUMENT ....................................................................................................................... 9

    I.     The Rule Conflicts with the Statutory Text and Improperly Expands the
           SEC's Authority. ....................................................................................................... 9

         A.    The Commission's Definition Improperly Omits A Requirement That A
               "Dealer" Act On Behalf of Customers. ........................................................... 10

         B.    The Commission's Overbroad Definition Cannot Be Reconciled With
               the Statutory Structure and History and the Existing Regulatory
               Requirements For Dealers. ............................................................................. 15

    II.    The Rule Is Arbitrary, Capricious, and Otherwise Unlawful. .................................... 18

         A.    There Is No Factual Basis for the Rule, and Its Purported Benefits are
               Illusory. ........................................................................................................ 18

         B.    The Rule Will Have Harmful Counterproductive Consequences..................... 27

             1.    The Rule Imposes Significant Costs on Private Funds............................ 27

             2.    The Rule Promotes the Very Outcome—Less Liquidity—That it
                  Purportedly Seeks to Avoid. ................................................................... 32

             3.    The Rule Is Overbroad, and the Commission Failed to Address Substantial
                  Comments Pointing that Out. .................................................................. 34

         C.    The Commission Failed to Adequately Consider the Rule's Impact on
               Efficiency, Competition, and Capital Formation............................................ 38

          D.    The Rule Departed Without Reason or Explanation from Prior
                Commission Positions. ................................................................................. 41

III.    The Rule Should Be Vacated......................................................................................... 41

CONCLUSION............................................................................................................................ 42

## Cases

*AEP Tex. N. Co. v. Surface Transp. Bd.*,
609 F.3d 432 (D.C. Cir. 2010) .................................................................................22

*All. for Hippocratic Med. v. FDA*,
78 F.4th 210 (5th Cir. 2023) ....................................................................................40

*Am. Bankers Ass'n v. SEC*,
804 F.2d 739 (D.C. Cir. 1986) ...................................................................................9

*Am. Equity Inv. Life Ins. Co. v. SEC*,
613 F.3d 166 (D.C. Cir. 2010) ...............................................20, 21, 24, 25, 38, 42

*Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of Fed. Reserve Sys.*,
745 F.2d 677 (D.C. Cir. 1984) .................................................................................38

*Bond v. United States*,
572 U.S. 844 (2014) .................................................................................................12

*Bullock v. BankChampaign, N.A.*,
569 U.S. 267 (2013) .................................................................................................15

*Bus. Roundtable v. SEC*,
647 F.3d 1144 (D.C. Cir. 2011) ...................9, 18, 19, 20, 21, 26, 27, 29, 38, 42

*Calumet Shreveport Refining, LLC v. EPA*,
86 F.4th 1121 (5th Cir. 2023) ............................................................................19, 24

*Cent. & S. W. Servs., Inc. v. EPA*,
220 F.3d 683 (5th Cir. 2000) ...................................................................................41

*Cent. United Life Ins. Co. v. Burwell*,
827 F.3d 70 (D.C. Cir. 2016) ...................................................................................25

*Chamber of Com. v. Dep't of Labor*,
885 F.3d 360 (5th Cir. 2018) ...............................................................................2, 16

*Chamber of Com. v. NLRB*,
--- F. Supp. 3d ---, 2024 WL 1203056 (E.D. Tex. Mar. 18, 2024) ........................38

*Chamber of Com. v. SEC*,
412 F.3d 133 (D.C. Cir. 2005) .....................................................................18, 20, 38

*Chamber of Com. v. SEC*,
443 F.3d 890 (D.C. Cir. 2006) .................................................................................20

*Chamber of Com. v. SEC*,
85 F.4th 760 (5th Cir. 2023) .....................9, 18, 19, 20, 21, 22, 26, 37, 39

*Chapel Invs., Inc. v. Cherubim Ints., Inc.*,
177 F. Supp. 3d 981 (N.D. Tex. 2016) ....................................................................10

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ........................................................................................41

*City of Pittsburgh v. Fed. Power Comm'n*,
   237 F.2d 741 (D.C. Cir. 1956) ........................................................................22

*Clarke v. CFTC*,
   74 F.4th 627 (5th Cir. 2023) ..........................................................................26

*Corrosion Proof Fittings v. EPA*,
   947 F.2d 1201 (5th Cir. 1991) ........................................................................19

*Data Mktg. P'ship, LP v. DOL*,
   45 F.4th 846 (5th Cir. 2022) ..........................................................................42

*Davidson v. Glickman*,
   169 F.3d 996 (5th Cir. 1999) ...........................................................................9

*Discover Growth Fund, LLC v. Beyond Commerce, Inc.*,
   561 F. Supp. 3d 1035 (D. Nev. 2021) .............................................................10

*Discover Growth Fund, LLC v. Camber Energy, Inc.*,
   602 F. Supp. 3d 982 (S.D. Tex. 2022) ...........................................................10

*El Paso Elec. Co. v. FERC*,
   76 F.4th 352 (5th Cir. 2023) ............................................................................9

*Farmers Union Cent. Exch., Inc. v. FERC*,
   734 F.2d 1486 (D.C. Cir. 1984) ......................................................................22

*In re FCC 11-161*,
   753 F.3d 1015 (10th Cir. 2014) .................................................................24, 27

*Franciscan All., Inc. v. Becerra*,
   47 F.4th 368 (5th Cir. 2022) ..........................................................................41

*Freeman v. Quicken Loans, Inc.*,
   566 U.S. 624 (2012) ........................................................................................15

*George v. McDonough*,
   596 U.S. 740 (2022) ........................................................................................12

*Goldstein v. SEC*,
   451 F.3d 873 (D.C. Cir. 2006) .......................................................4, 5, 6, 7, 25

*Grayscale Invs., LLC v. SEC*,
   82 F.4th 1239 (D.C. Cir. 2023) ......................................................................30

*In re Immune Pharm. Inc.*,
   635 B.R. 118 (Bankr. D.N.J. 2021) ................................................................10

*ISS Inc. v. SEC*,
   --- F. Supp. 3d ---, 2024 WL 756783 (D.D.C. Feb. 23, 2024) .......................42

*Johnson v. Winslow*,
    279 N.Y.S. 147 (N.Y. Sup. Ct. 1935) ........................................................................11, 14

*Jones v. Harris Assocs. L.P.*,
    559 U.S. 335 (2010) ........................................................................................................15

*Lone Mountain Processing, Inc. v. Sec'y of Labor*,
    709 F.3d 1161 (D.C. Cir. 2013) ......................................................................................41

*Louisiana v. DOE*,
    90 F.4th 461 (5th Cir. 2024) ........................................................19, 21, 23, 27, 28, 29

*Mex. Gulf Fishing Co. v. U.S. Dep't of Com.*,
    60 F.4th 956 (5th Cir. 2023) ..............................................................................18, 32, 36

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..............................................................................................18, 31, 39

*Nat. Min. Ass'n v. Babbitt*,
    172 F.3d 906 (D.C. Cir. 1999) ........................................................................................34

*Nat'l Ass'n of Mfrs. v. SEC*,
    631 F. Supp. 3d 423 (W.D. Tex. 2022) ........................................................................8, 42

*Nat'l Fuel Gas Supply Corp. v. FERC*,
    468 F.3d 831 (D.C. Cir. 2006) ..................................................................................19, 28

*Nat'l Lifeline Ass'n v. FCC*,
    921 F.3d 1102 (D.C. Cir. 2019) ......................................................................................23

*Neder v. United States*,
    527 U.S. 1 (1999) ............................................................................................................13

*New Prime Inc. v. Oliveira*,
    586 U.S. 105 (2019) ........................................................................................................10

*NYSE LLC v. SEC*,
    962 F.3d 541 (D.C. Cir. 2020) ..................................................................................20, 42

*Office of Commc'n of United Church of Christ v. FCC*,
    779 F.2d 702 (D.C. Cir. 1985) ........................................................................................32

*Radzinskaia v. NH Mountain, LP*,
    2023 WL 6376457 (S.D. Fla. Sept. 29, 2023) ................................................................10

*Roberts v. Sea-Land Servs., Inc.*,
    566 U.S. 93 (2012) ..........................................................................................................14

*Sackett v. EPA*,
    598 U.S. 651 (2023) ........................................................................................................16

*In re Scripsamerica, Inc.*,
    634 B.R. 863 (Bank. D. Del. 2021) ................................................................................10

*Skilling v. United States*,
    561 U.S. 358 (2010) .................................................................... 13

*Small Refiner Lead Phase-Down Task Force v. EPA*,
    705 F.2d 506 (D.C. Cir. 1983) ...................................................... 20

*Snohomish Cnty. v. Surface Transp. Bd.*,
    954 F.3d 290 (D.C. Cir. 2020) ...................................................... 33

*Stokeling v. United States*,
    139 S. Ct. 544 (2019) .................................................................... 10

*Sw. Elec. Power Co. v. EPA*,
    920 F.3d 999 (5th Cir. 2019) ........................................................ 32

*Texas v. Biden*,
    589 F. Supp. 3d 595 (N.D. Tex. 2022) ..................................... 22, 23

*Texas v. EPA*,
    389 F. Supp. 3d 497 (S.D. Tex. 2019) .......................................... 20

*Turtle Island Restoration Network v. U.S. Dep't of Com.*,
    878 F.3d 725 (9th Cir. 2017) ........................................................ 24

*UARG v. EPA*,
    573 U.S. 302 (2014) .................................................................. 9, 16

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
    985 F.3d 472 (5th Cir. 2021) ..................................................... 9, 23

*Universal Health Servs., Inc. v. United States*,
    579 U.S. 176 (2016) ...................................................................... 13

*Van Buren v. United States*,
    141 S. Ct. 1648 (2021) .................................................................. 14

*Wages & White Lion Invs., LLC v. FDA*,
    90 F.4th 357 (5th Cir. 2024) ......................................................... 41

*Weisbrod v. Lowitz*,
    282 Ill. App. 252 (1935) ............................................................... 14

*XY Planning Network, LLC v. SEC*,
    963 F.3d 244 (2d Cir. 2020) .......................................................... 10

## Statutes

5 U.S.C.
    § 500 ............................................................................................ 4
    § 706 ...................................................................................... 8, 41

15 U.S.C.
  § 78c ..................................................................7, 9, 10, 11, 13, 14, 18, 38
  § 78ff .............................................................................................................1
  § 78fff-4 ......................................................................................................15
  § 78o ........................................................................................................1, 15
  § 78w ......................................................................................................18, 40
  § 80a-1 ........................................................................................................16

Dodd-Frank Wall Street Reform and Consumer Protection Act,
  Pub. L. No. 111-203, 124 Stat. 1376 (2010) .................................................5

Securities Exchange Act of 1934,
  ch. 404, 48 Stat. 881 .................................................................................11, 14

## Regulations

12 C.F.R.
  § 220.1 ...........................................................................................................5
  § 221.1 ...........................................................................................................5
  § 224.1 ...........................................................................................................5

17 C.F.R.
  § 240.10b-5 ....................................................................................................6
  § 240.15c3-5 ..................................................................................................5
  § 242.105 .......................................................................................................5
  § 242.200 .......................................................................................................5
  § 249.501 .....................................................................................................14

## SEC Materials

2 H.R. Doc. No. 76-279 (1939) .........................................................................4, 13

*About the SEC*,
  https://www.sec.gov/about (last visited Apr. 30, 2024) ...................................28

*Certain Broker-Dealers Deemed Not To Be Investment Advisers*,
  70 Fed. Reg. 20,424 (Apr. 19, 2005) .............................................................13

*Duker & Duker*,
  1939 WL 36426 (SEC Dec. 19, 1939) ............................................................13

Form BD, Uniform Application for Broker-Dealer Registration,
  https://www.sec.gov/files/formbd.pdf ............................................................14

*Form PF*,
  89 Fed. Reg. 17,984 (Mar. 12, 2024) ............................................................39

*The Inspector General's Statement on the SEC's Management and Performance
  Challenges, October 2022* (Oct. 13, 2022) ....................................................7

*Large-Trader Reporting Requirements*,
  40 Fed. Reg. 29,795 (July 16, 1975) .............................................................23

*Money Market Fund Reforms*,
    88 Fed. Reg. 51,404 (Aug. 3, 2023)..................................................................30

*Order Granting a Temporary Conditional Exemption*,
    85 Fed. Reg. 37,133 (June 19, 2020) ...............................................................22

*Private Fund Advisers*,
    88 Fed. Reg. 63,206 (Sept. 14, 2023) .......................................................5, 6, 25

*Private Fund Statistics: First Calendar Quarter 2023*, SEC (Oct. 16, 2023),
    https://www.sec.gov/files/investment/private-funds-statistics-2023-q1.pdf .........34

*Registration Under the Advisers Act of Certain Hedge Fund Advisers*,
    69 Fed. Reg. 72,054 (Dec. 10, 2004) .................................................................6

Report of the President's Working Group on Financial Markets (1999)................................27, 41

Report on Feasibility & Advisability of Complete Segregation of the Functions of
    Dealer and Broker (1936) ...............................................................................11

*Request for Comments on the Oversight of the U.S. Gov't & Agency Sec. Markets*,
    Exchange Act Release No. 21959, 1985 WL 634789 (Apr. 19, 1985)................21

SEC Br., *Nat'l Ass'n of Private Fund Managers v. SEC*,
    No. 23-60471 (5th Cir. Dec. 15, 2023), 2023 WL 8875230..................................26

SEC Litigation Release No. 10329,
    1984 WL 472028 (Apr. 5, 1984) .......................................................................21

SEC Litigation Release No. 10458,
    1984 WL 471507 (July 12, 1984) ......................................................................21

SEC Litigation Release No. 10708,
    1985 WL 545686 (Mar. 26, 1985) ....................................................................21

SEC Statement,
    OMB No. 3235-0682 (2021),
    https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202009-
    3235-011 ...................................................................................................34

*Temporary Amendments to Regulation Crowdfunding*,
    85 Fed. Reg. 54,483 (Sept. 2, 2020) .................................................................22

**Other Authorities**

*America's Bonds are Getting Harder to Sell*,
    Wall St. J. (Apr. 14, 2024)...............................................................................33

W.O. Douglas & G.E. Bates, *Stock "Brokers" as Agents and Dealers*,
    43 Yale L.J. 46 (1933) ....................................................................................13

FINRA Rule 1210.01 .......................................................................................16, 17

FINRA Rule 5310(a)(1)....................................................................................16, 17

*General Securities Principal Exam*, FINRA,
   https://www.finra.org/registration-exams-ce/qualification-exams/series24 ............................16

C. Hodges *Wall Street* (1930) ......................................................................................................12

H.R. Rep. No. 76-2639 (1940)........................................................................................................4

C.H. Meyer, *The Law of Stockbrokers & Stock Exchanges* (1933)...................................11, 12, 13

Remarks of Chair Gensler (April 2, 2024), https://tinyurl.com/3vnrk9jk ....................................31

A. Scalia & B.A. Garner, *Reading Law* (2012) .............................................................................12

W. Strunk, *The Elements of Style* (1920)......................................................................................14

*The Hedge Funds That Changed the Game*,
   Wall St. J. (Feb. 23, 2024)........................................................................................................36

*This Is the Hedge-Fund Industry's Most Fashionable Strategy*,
   Wall St. J. (Sept. 12, 2023)........................................................................................................36

Twentieth Century Fund, *The Security Markets* (1935) ................................................................13

## INTRODUCTION

This case concerns the Securities and Exchange Commission's attempt to dramatically expand its authority by adopting a sweeping, unprecedented new interpretation of a 90-year-old statute. By a 3-2 vote, over two strong dissents, the SEC adopted a final rule (the "Dealer Rule" or "Rule") founded on the novel position that many of the world's largest, most prominent market participants have been operating unlawfully as unregistered securities "dealers" for 90 years without anyone—including the Commission—having previously noticed.

According to the Rule, a "dealer" includes—and, because the statutory text has not changed since 1934, has *always* included—any person whose trading activity "regular[ly]" has the effect of "providing liquidity" to the marketplace. App. 60/1. The Rule identifies two "ways in which a person" will be considered to be regularly providing liquidity, but these tests appear nowhere in the statutory text. They are also "non-exclusive." App. 60/1, 62/1. So even if a firm does not qualify as a "dealer" under the Rule, the firm can "*still* be a dealer." App. 61/2 (emphasis added).

By the SEC's own reckoning, this new interpretation could "arguably" capture "all" regular market participants because *anybody* who trades securities provides liquidity to the person on the other side of the trade. App. 9/1 ("all market participants who buy or sell securities … arguably contribute to a market's liquidity"). The Rule is so overbroad, so lacking any limiting principle, and so "clearly a misreading of the statute," that, by the SEC's own admission, it would mean that everyone from a mutual fund to the Federal Reserve Bank of New York has, under the SEC's supervision, been operating as an unregistered "dealer"—a felony, 15 U.S.C. §§ 78o(a)(1), 78ff— since the 1930s. App. 563 (Peirce, dissenting); *see* App. 75/1-2 (Federal Reserve), 115/1 (investment companies, *e.g.*, mutual funds).

The problems inherent in this definition are reflected in the exceptions and carve-outs the SEC created to try to mitigate the definition's unworkable results. The SEC recognized that the

definition is so broad, for example, that the "open market operations" of the Federal Reserve—a "key" component of the "monetary policy of the United States"—would be illegal unregistered "dealing." App. 75/1-2. So the SEC adopted a smattering of "exclusions" for specific types of entities that have never been considered dealers in the nine decades since the Act's adoption, carve-outs that also have no basis in the statutory text. App. 71/2-75/3. That the SEC was forced to arbitrarily exempt large swaths of the market from its new definition proves that the definition goes far beyond what Congress intended. *See Chamber of Com. v. Dep't of Labor*, 885 F.3d 360, 383 (5th Cir. 2018).

To make matters worse, the SEC's sweeping definition does not even represent the outer limit of who counts as a "dealer." The Rule is expressly non-exclusive, with no presumption of compliance if an entity falls outside the definition. *See* App. 80/2 ("a person may be a dealer … *even if it does not meet the conditions set forth in the ... rules*" (emphasis added)). That is not a "definition" at all.

Plaintiffs' members are managers of private funds that the SEC seeks to sweep under the Rule. App. 177 & n.1, 209 n.1, 276 & n.1; *see also* App. 551-61 (listing members). Private funds, such as hedge funds, are pooled investment vehicles—pools of investor assets collectively managed and invested by professional investment managers. Until this Rule, private funds, which are governed by an entirely different regulatory regime devoted specifically to such funds, have never been treated as "dealers." They do not have customers like broker-dealers do. Rather, private funds are *themselves* customers of broker-dealers, who execute trades with and on behalf of private funds and other investors. The SEC admits that the benefit of regulating private funds as "dealers" would "be very small," App. 35/1, but expressly acknowledges that the Rule will cover private funds anyway, *see, e.g.*, App. 87/3-88/3. The SEC estimates that only a dozen or so funds will be

swept up in its novel definition, but this estimate arbitrarily considers the effect of only a single prong of the Rule, in a single market segment, and is untethered to any meaningful data or other record evidence.  The reach of the *entire* Rule—completely ignored by the SEC—will go much further.

The costs of the Rule are enormous, and there are no corresponding benefits—indeed the Rule will only *undermine* the Commission's supposed goal of increasing liquidity in turbulent markets, even though fostering liquidity is a central mission of the agency that it is required to give heightened attention to in rulemaking.  Dealer regulations are not designed for private funds.  The regulations are (in the SEC's own words) "inappropriate or untenable," as applied to private funds.  App. 115/2.  As the SEC concedes, by classifying private funds as "dealers," existing regulations would (among other things): (1) prohibit the funds from participating in the market for initial public offerings—thereby degrading "the ability of issuers to raise new capital," App. 109/1, and undermining the SEC's mission of facilitating capital formation; (2) subject private funds to an insurance program that has no conceivable application to their business, App. 96/1; (3) strip private funds of existing regulatory protections, App. 563 & n.13 (Peirce, dissenting); (4) compel private funds to rewrite their governing documents to give their own investors *worse* terms, App. 104/1 n.570; and (5) subject private funds to a net-capital requirement that not only was designed for different purposes, App. 118/2, but will impose enormous costs on private funds and force them to curtail trading or withdraw from certain markets entirely.  Indeed, the SEC's own staff cannot defend the application of dealer regulations to private funds.  *See, e.g.*, App. 589 (Open Meeting Tr. 40:24) (Mr. Roy:  "… I'm not an expert on hedge funds ….").

The SEC must live within the bounds of the authority that Congress granted it.  The agency's ambition to exercise "more comprehensive regulatory oversight," App. 55/2, is not a

valid basis for the Rule.  The Rule exceeds the SEC's authority under the Exchange Act, is arbitrary and capricious, and was adopted without adequate consideration of its impacts on efficiency, competition, and capital formation.  Accordingly, the Rule cannot be sustained under the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* ("APA"), and the Court should set it aside in its entirety.

## BACKGROUND

### I.      Congress Purposefully Exempts Private Funds From Federal Registration.

This case concerns the Commission's effort to force private funds, among others, to register with the Commission.  This is not the first time this attempt has been made.

"Private funds," such as hedge funds, are a type of pooled investment vehicle—a pool of investor assets collectively managed and invested by professional investment managers.  App. 315, 319.  Unlike more familiar pooled investment vehicles, such as mutual funds, private funds are *private*; they generally are not accessible to non-professional investors (*i.e.*, retail customers).  *See Goldstein v. SEC*, 451 F.3d 873, 875 (D.C. Cir. 2006).  Instead, private funds generally serve the world's most sophisticated investors, including large institutions such as pension funds and endowments.  App. 209, 326.

Dating back to the enactment of the federal securities laws, Congress (and the Commission) recognized that pooled investment vehicles were not subject to direct regulation under the Exchange Act as "brokers," "dealers," or otherwise.  *See, e.g.*, H.R. Rep. No. 76-2639, at 10 (1940); 2 H.R. Doc. No. 76-279, at 1523 n.434 (1939).  Accordingly, in the Investment Company Act of 1940, Congress provided for the registration (as "investment companies") of some pooled investment vehicles.  But, critically, Congress *exempted* private funds, an exemption Congress has expanded over the years.  Because private-fund investors, generally due to their size and sophistication, are capable of protecting their own interests, Congress excluded private funds from the prescriptive   regulatory   regime—including   Commission   registration—applicable   under   the

4

Investment Company Act to mutual funds and other publicly offered investment vehicles. *See generally Goldstein*, 451 F.3d at 875.

Instead, Congress created a separate regulatory regime for private funds. That regime, which generally leaves private funds and their investors to structure their own business relationships, provides for the registration—as investment advisers, not dealers—of all but the smallest advisers to private funds and requires certain reports, among other things. *See, e.g.*, Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, §§ 401-19, 124 Stat. 1376, 1570-80 (2010) ("Private Fund Investment Advisers Registration Act of 2010").

## II.      The Commission Tries, and Fails, to Impose Registration and Other Requirements on Private Funds.

Congress's tailored regulatory approach with respect to private funds has proven remarkably successful. Over the years, private funds have returned trillions of dollars in gains to investors, far exceeding the returns available from other investment options. *See, e.g.*, App. 209 & n.1, 213 n.8, 326, 528 n.1. Today, investments in private funds are valued at some $26.6 trillion. *See* 88 Fed. Reg. 63,206, 63,207/3 (Sept. 14, 2023).

Nevertheless, the Commission has, from time to time, sought "a hook on which to hang more comprehensive regulation" of private funds. *Goldstein*, 451 F.3d at 882. As noted, private funds are not unregulated. Most private-fund managers must register as investment advisers and are accordingly subject to reporting requirements and examination by the Commission. App. 183-87, 214-17, 327. Private funds are also subject to numerous requirements regarding risk pursuant to Federal Reserve Regulations T, U, and X, 12 C.F.R. §§ 220.1 *et seq.*, 221.1 *et seq.*, 224.1 *et seq.*, and the Commission's Market Access Rule, 17 C.F.R. § 240.15c3-5 *et seq.*, short selling pursuant to Regulation SHO, *id.* § 242.200 *et seq.*, restrictions on participating in certain offerings under Rule 105 of Regulation M, *id.* § 242.105, as well as anti-fraud prohibitions under

Commission Rule 10b-5, *id.* § 240.10b-5, to name a few of the many regulations governing private funds and their activities.  *See also* App. 183-87, 214-17, 327.

But over time, the Commission has sought to expand its authority over private funds.  In 2004, for example, the Commission complained that although private funds had "become significant participants in the securities markets," and "provide[d] liquidity to the markets," they were not required to register with the Commission.  69 Fed. Reg. 72,054, 72,056/1, 72,060/2 (Dec. 10, 2004).  The Commission, by a 3-2 vote, tried a workaround.  It acknowledged that the investment advisers (the fund managers) to private funds were, under the plain text of the Investment Advisers Act, exempt from registration with the Commission (as "investment advisers") because they typically advised only one client (the fund itself).  *Id.* at 72,054-55.  So the Commission tried to redefine "client."  The Commission declared that fund managers really had thousands of clients (all of the individual investors in the funds they managed), rather than just one client (the fund itself).  *Id.* at 72,058/2.  So, the Commission said, the fund managers for private funds were required to register with the Commission after all.  *Id.*  The D.C. Circuit struck down the Commission's redefinition.  *See Goldstein*, 451 F.3d at 882.  The court recognized that the Commission could "not accomplish its objective"—"more comprehensive regulation" of private funds—"by a manipulation of meaning" of longstanding statutory words.  *Id.*

Last year, the Commission tried again, by another 3-2 vote.  Once again, the Commission complained that although "private fund assets under management have steadily increased," private funds were generally exempt from prescriptive Commission regulation.  88 Fed. Reg. at 63,207/3.  Turning to an ancillary provision in the Dodd-Frank Act enacted about a decade earlier, and which does not mention private funds, the Commission claimed to have found authority to comprehensively regulate the internal affairs of private funds.  *See id.* at 63,214.  Plaintiffs and others are

currently challenging that effort to unlawfully expand the SEC's reach over private funds.  *See*

*Nat'l Ass'n of Priv. Fund Managers v. SEC*, No. 23-60471 (5th Cir.).

## III.     The Commission Adopts Its Overbroad "Dealer" Rule to (Again) Try to Force Registration by Private Funds, Among Others.

In the Rule on review, the Commission has returned again to "manipulat[e] [the] meaning"

of language to force registration and other requirements on private funds.  *Goldstein*, 451 F.3d at

882.  As part of the "aggressive" Commission agenda that its own Inspector General has criticized

in an extraordinary report, App. 366 (*The Inspector General's Statement on the SEC's Manage-*

*ment and Performance Challenges, October 2022*, at 3 (Oct. 13, 2022)), the agency, by 3-2 vote,

adopted the Dealer Rule.

The Rule purports to re-interpret the statutory term "dealer," which was expressly defined

by Congress in Section 3(a)(5) of the Securities Exchange Act of 1934.  *See* 15 U.S.C. § 78c(a)(5)

(defining dealer as "any person engaged in the business of buying and selling securities … for such

person's own account through a broker or otherwise" except when "not as part of a regular busi-

ness"); *see also id.* § 78c(a)(44) (defining "government securities dealer").  According to the ma-

jority of the Commission, the word "dealer" actually includes any person whose trading activity

"regular[ly]" has the "effect of providing liquidity" to the marketplace, which seemingly describes

every private fund.  App. 61/2; *see* App. 570 (Uyeda, dissenting).  The Rule adopts two "qualita-

tive" tests for determining whether a person "regular[ly]" has the "effect of providing liquidity" to

the marketplace.  But those tests are non-exclusive:  "No presumption shall arise that a person is

not a dealer … solely because that person does not satisfy [the standards set forth in the Rule]."

App. 62/3.

Commissioners Uyeda (App. 570-78) and Peirce (App. 562-69) dissented.  Commissioner

Uyeda described the Commission's overbroad conception of what constitutes "dealing" as

"arbitrary and even tyrannical." App. 570 (Uyeda, dissenting). He explained that the Commission lacked authority to expand a statutory term, "dealer," that Congress *itself* defined in 1934. *Id.* As Commissioner Uyeda detailed, the Exchange Act's definitions of "dealer" and the related term "broker" "generally reference *how customer* securities transactions are effectuated." *Id.* at 573 (emphasis added). The definitions have no relation to private funds, who trade only for themselves, and do not effectuate "customer orders." *Id.* Commissioner Uyeda further explained that the existing "dealer" regulatory regime has no rational application to private funds, and that forcing private funds to register as "dealers" would cause private funds to *curtail* their trading, the exact opposite of what the Commission in the Rule purported to want. *Id.*

Commissioner Peirce agreed with Commissioner Uyeda that the Commission lacked statutory authority to redefine the word "dealer." App. 562 (Peirce, dissenting). She explained that the Rule was "absurd[ly]" overbroad and had nonsensical consequences. *Id.* at 563. "Not only" would the Rule "subject [private funds] to a dealer regulatory regime that does not make sense for them," it would cause private funds to "lose the [regulatory] protections now afforded to them" as customers of broker-dealers. *Id.* Worst of all, Commissioner Peirce explained, the Rule would drive private funds out of the markets, and thus "dampen liquidity provision"—not increase it—across the board. *Id.* at 564.

## LEGAL STANDARD

"[S]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency's action is supported by the administrative record and consistent with the APA standard of review." *Nat'l Ass'n of Mfrs. v. SEC*, 631 F. Supp. 3d 423, 427 (W.D. Tex. 2022). Under the APA, this Court "shall … hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations," or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C).

8

This Court's review is "searching and careful." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021). It reviews legal issues de novo, *Davidson v. Glickman*, 169 F.3d 996, 1000 (5th Cir. 1999), and is "skeptical" of an agency's claimed "discover[y] in a long-extant statute" of an "unheralded power to regulate," *UARG v. EPA*, 573 U.S. 302, 324 (2014). The Court ensures agency decisions are "reasonable and reasonably explained," *El Paso Elec. Co. v. FERC*, 76 F.4th 352, 364 (5th Cir. 2023), and that the SEC fulfills its statutory duty to account for rules' effects on "efficiency, competition, and capital formation," 15 U.S.C. § 78c(f); *see, e.g.*, *Chamber of Com. v. SEC* (*Chamber III*), 85 F.4th 760, 775-76 (5th Cir. 2023); *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011).

## ARGUMENT

The Dealer Rule improperly expands the Commission's authority and is arbitrary and capricious in violation of the APA. The Commission does not have authority to redefine a term that Congress itself defined in 1934, and the interpretation the Commission did adopt conflicts with the statutory language and is impossibly overbroad. The Commission's reasoning in adopting the Rule is also unsustainable. The broker-dealer regulatory regime is not designed for private funds and will make it impossible for them to operate, forcing them to withdraw from the markets and thus degrading liquidity and capital formation—the exact opposite of the Commission's stated intention and its mandate under the securities laws. The Court should set the Dealer Rule aside in its entirety.

## I.    The Rule Conflicts with the Statutory Text and Improperly Expands the SEC's Authority.

Congress defined "dealer" in 1934. *See* 15 U.S.C. § 78c(a)(5). The Commission does not have authority to supposedly "*further* define" it (App. 54/1, 55/1, 58/1, 61/3, 119/3 (emphasis added)), much less in a way that vastly expands the long-settled meaning of the term. *See Am.*

*Bankers Ass'n v. SEC*, 804 F.2d 739, 755-56 (D.C. Cir. 1986) (rejecting the SEC's previous "efforts to avoid the 'plain meaning' of the definition[ ] of … 'dealer'").  When Congress wants to give the Commission "[a]dditional authority" to further "define" statutory terms, it says so.  *Cf., e.g.*, 15 U.S.C. § 78c(a)(54)(C).

> **A.    The Commission's Definition Improperly Omits A Requirement That A "Dealer" Act On Behalf of Customers.**

The text, context, structure, and history of the Exchange Act make unmistakably clear that a "dealer" (like a "broker") is in the business of "effect[ing] securities transactions for customers." *XY Planning Network, LLC v. SEC*, 963 F.3d 244, 248 (2d Cir. 2020).  Thus, as this Court has previously held, a firm that trades *only* for "its own best interests," and "not [to] provide advice or services to other investors," "cannot be considered a dealer."  *Chapel Invs., Inc. v. Cherubim Ints., Inc.*, 177 F. Supp. 3d 981, 991 (N.D. Tex. 2016) (O'Connor, J.); *accord* App. 573 (Uyeda, dissenting), 225 & n.45 (citing *Chapel Investments*), 277, 284-87, 334, 529-30.

**1.**    This Court's holding in *Chapel Investments* follows the "original meaning of the statute," *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019), and has been explicitly adopted by courts throughout the country, *see Radzinskaia v. NH Mountain, LP*, 2023 WL 6376457, at *4 (S.D. Fla. Sept. 29, 2023) (following *Chapel Investments*' holding that "dealers" "transact securities on behalf of clients"); *Discover Growth Fund, LLC v. Camber Energy, Inc.*, 602 F. Supp. 3d 982, 989 (S.D. Tex. 2022) (similar); *Discover Growth Fund, LLC v. Beyond Commerce, Inc.*, 561 F. Supp. 3d 1035, 1040 (D. Nev. 2021) (similar); *In re Immune Pharm. Inc.*, 635 B.R. 118, 124 (Bankr. D.N.J. 2021) (similar); *In re Scripsamerica, Inc.*, 634 B.R. 863, 872 (Bank. D. Del. 2021) (similar).

When Congress enacted the relevant provisions of the Exchange Act in 1934, it borrowed and reused terms "obviously transplanted" from another source, *Stokeling v. United States*, 139

S. Ct. 544, 551 (2019):  the well-established understandings of "broker" and "dealer" in common

use at the time.  *See Johnson v. Winslow*, 279 N.Y.S. 147, 156 (N.Y. Sup. Ct. 1935) (the "rights

and duties" of "brokers" and "dealers" have "been before the courts for adjudication repeatedly"),

*aff'd*, 246 A.D. 800 (N.Y. App. Div. 1936).

At the time of the Act's passage, there were two—and only two—methods of effectuating

customer orders.  A firm could trade *for* the customer, as an agent (or "broker"), or *with* the cus-

tomer, on the opposite side of the transaction, as a principal (or "dealer").  Charles Meyer, *The

Law of Stockbrokers & Stock Exchanges* 32 (1933) ("Meyer") (App. 608).  In ordinary parlance,

the distinction between "broker" and "dealer" was expressed in terms of whose "account" facili-

tated the customer's order.  A broker, acting as the customer's agent, would be said to trade "solely

for the account of the customer."  Report on Feasibility & Advisability of Complete Segregation

of the Functions of Dealer and Broker, at XIV (1936) ("SEC Report") (App. 615).  Whereas a

"dealer," acting across from the customer, would be said to effectuate the customer's order by

taking the opposite side in "his own account."  *Id.*  Instead of trading for the *customer's* account

(like a broker), a dealer would effectuate the customer's order—say, a buy order—by selling "to

[the] customer" from the dealer's "*own* account."  *Id.* (emphasis added).

Congress, in the Exchange Act, adopted these precise terms of art.  A "broker" would trade

"for the account of others," whereas a "dealer," Congress continued, in the very next sentence,

would trade "for his own account."  § 3(a)(4)-(5), 48 Stat. 881, 883 (codified as amended at 15

U.S.C. § 78c(a)(4)-(5)).  These words were "obviously transplanted" from the way people distin-

guished the two methods of effectuating customer orders.  As contemporaneous trade confirma-

tions put it, a broker would act for the *customer's* account:  "We have this day bought" (or "sold")

"*for your account*."  Meyer 34 (emphasis added) (App. 610).  A dealer, in contrast, would facilitate

11

the customer's order with its *own* account:  "We are pleased to confirm purchase" (from the dealer's account) "from you," or "sale" (from the dealer's account) "to you." *Id.*  When Congress took this preexisting language and replanted it in the Exchange Act, it "br[ought] the old soil with it," including the "settled meaning" that dealers—like brokers—act on behalf of customers. *George v. McDonough*, 596 U.S. 740, 746, 750 (2022) (internal quotation marks omitted).

The evidence of this contemporaneous, widely-understood meaning is overwhelming. Prominent treatises of the time are replete with own-account/ others'-account references that could *only* be read as distinguishing the two ways of effectuating customer orders.  Charles Hodges' *Wall Street* (1930) treatise differentiated brokers and dealers as follows: "A dealer sells to and buys from a client whereas a broker buys and sells *for the account* of a client." *Id.* at 361 (emphasis added) (App. 605).  Meyer's *Law of Stockbrokers* (1933) treatise similarly explained that a "broker" is the "agent" of "his customer"; he trades for the "*account* and risk" of the customer.  Meyer 32, 34 (emphasis added) (App. 608, 610).  What "distinguishe[s]" the "*dealer* … from a *broker*," Meyer emphasized, is the dealer "sells to his customers … securities which he has purchased *for his own account* elsewhere," or "buys from his customer securities *for his own account* with a view of disposing of them elsewhere." *Id.* at 32-33 (emphases added) (App. 608-09).  "Account" unambiguously distinguished the way in which brokers or dealers effectuated customer orders.

2.     The broader statutory context and structure confirms the text's plain meaning.

"[T]he most significant … context" in construing statutory definitions is the ordinary meaning of the defined words themselves.  A. Scalia & B.A. Garner, *Reading Law* 232 (2012); *see Bond v. United States*, 572 U.S. 844, 861 (2014).  Here, there's no question the defined words, "broker" and "dealer," referred to the two alternative ways of effectuating customer orders.  As the Commission has explained, "[s]ince the early days of the brokerage industry," brokers and

dealers have served investors by "executing trades as part" of a "package of services provided to customers." 70 Fed. Reg. 20,424, 20,428 n.37 (Apr. 19, 2005). This "intimate relationship between customers and brokers and dealers" was acknowledged by everyone. *Duker & Duker*, 1939 WL 36426, at *3 n.6 (SEC Dec. 19, 1939); *e.g.*, SEC Report, at XIV (App. 615) ("his customer"); Meyer 32 (App. 608) ("his customers"); 2 H.R. Doc. No. 76-279, at 1525 ("their customers"); Hodges, *supra*, at 361 (App. 605) ("from a client"); Twentieth Century Fund, *The Security Markets* 266 (1935) (App. 603) ("for a customer").

The statutory phrase "the business of buying and selling securities" reinforces the customer-order-facilitation context. 15 U.S.C. § 78c(a)(5)(A). The definite article "the" ("*the* business") demonstrates Congress had a specific business in mind "when it enacted the statute." *Skilling v. United States*, 561 U.S. 358, 404-05 (2010). It was "*that*" business, *id.*—"buy[ing] and sell[ing]" to effect "an order … for a customer," Twentieth Century Fund, *supra*, at 266 (App. 603)—that Congress addressed, "not *all*" businesses of buying and selling, *Skilling*, 561 U.S. at 404-05.

The common-law backdrop confirms this reading. "[W]here Congress uses terms that have accumulated settled meaning" under the common law, courts infer "that Congress means to incorporate the established meaning of these terms." *Neder v. United States*, 527 U.S. 1, 21 (1999). Even where a statute "abrogates the common law in certain respects," courts "presume that Congress retained all other elements of [the common law] that are consistent with the statutory text." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 187 n.2 (2016). At common law, the concept of "broker" and "dealer" presupposed the facilitation of customer orders. The words "broker" and "dealer" were specifically used to distinguish the two alternative ways in which a firm could effectuate customer orders. W.O. Douglas & G.E. Bates, *Stock "Brokers" as Agents and*

*Dealers*, 43 Yale L.J. 46, 60-61 (1933) (detailing five-factor inquiry to distinguish brokers from dealers, entirely presupposing customer orders); *e.g.*, *Johnson*, 279 N.Y.S. at 156-59; *Weisbrod v. Lowitz*, 282 Ill. App. 252, 255 (1935).

The "interplay between" broker and dealer is an important structural clue confirming the customer-order-facilitation interpretation. *Van Buren v. United States*, 141 S. Ct. 1648, 1658 (2021). The Commission agrees that the definition of "broker"—effecting transactions for the "account of others," 15 U.S.C. § 78c(a)(4)(A)—refers *only* to trading on behalf of "customers," App. 60/3. Reading the dealer definition to refer also to methods of effectuating customer orders "makes sense of the statutory structure" by "treat[ing]" both definitions "consistently." *Van Buren*, 141 S. Ct. at 1658. By contrast, reading the customer nexus out of the dealer definition would improperly "create[] 'inconsistencies,'" *id.* at 1659 (cleaned up), and fail to fit both definitions "into an harmonious whole," *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100 (2012).

Underscoring the Commission's error is the *noscitur a sociis* canon—the commonsense principle that words are known by the company they keep. In multiple instances, the Exchange Act "links the words" broker and dealer. Scalia & Garner, *supra*, at 198. It places both definitions in back-to-back sentences. 48 Stat. at 883. It defines both words in parallel terms, implying a related meaning. W. Strunk, *The Elements of Style* 26 (1920) (App. 618). And on numerous occasions, it joins the terms as "broker or dealer" (or something similar). §§ 3(a)(3), 5, 7(c), (c)(2), (d), 8, 8(a), 9(a)(3)-(5), 11(d)-(e), 12(a), 14(b), 15, 17(a)-(b), 30(a), 48 Stat. at 883-904. The terms are so related the Commission doesn't distinguish them; firms can register *only* "as a broker-dealer," not one or the other. 17 C.F.R. § 249.501(a); *see* Form BD, Uniform Application for Broker-Dealer Registration, https://www.sec.gov/files/formbd.pdf (item 2.A).

The *noscitur* canon teaches that where words are linked in this fashion, they are read in light of their "common 'core of meaning.'" *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012). That overlapping meaning is clear: "both terms refer to different forms of generally similar conduct," *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 274 (2013)—that is, different methods of effectuating customer orders.

The customer-order-facilitation meaning also "reflects" brokers' and dealers' "place in the [overall] statutory scheme and, in particular, [their] relationship to the other protections that the Act affords." *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 348 (2010). The broker-dealer regulatory regime is premised on the protection of customer orders and accounts. The '34 Act, for example, requires brokers and dealers to send "notice[s] to [their] customers," 15 U.S.C. § 78o(e); meet "financial responsibility requirements" to keep "custody … of customers' securities," *id.* § 78o(c)(3)(A); and join a fund to insure "each of [their] customers[']" accounts, *id.* § 78fff-4(c). This makes sense *only* in the context of customer-order facilitation.

## B. The Commission's Overbroad Definition Cannot Be Reconciled With the Statutory Structure and History and the Existing Regulatory Requirements For Dealers.

Separate and apart from the Commission's failure to include a customer requirement in its "dealer" definition, the Rule fails for the additional reason that—whatever the precise meaning of "dealer"—the definition given here is massively overbroad and inconsistent with the statutory and regulatory framework. The premise of the Rule—that a "dealer" includes any person whose trading activity "regular[ly]" has the "effect of providing liquidity" to the marketplace, App. 60/1—is implausible. The Rule is "so broad that the Commission itself has determined that it needed to expressly exclude [registered] investment funds," and even the Federal Reserve Bank of New York, among numerous other entities, to attempt to deal with the tremendous overbreadth. App. (Peirce, dissenting); *see, e.g.*, App. 75/1-2. Those carve-outs have no asserted basis in the statutory

15

text; they were born of the agency's need to try to avoid the most absurd results of the new Rule. But that "a cure was needed" at all "'should have alerted [the Commission] that it had taken a wrong interpretive turn.'" *Chamber of Com. of U.S. v. Dep't of Labor*, 885 F.3d 360, 383 (5th Cir. 2018).  Investment companies, for example, have never been thought to be regulated by the Exchange Act, and Congress in fact created a specialized regulatory framework for them under a different statute—the Investment Company Act of 1940, 15 U.S.C. § 80a-1 *et seq*.  The Commission is "not free to 'adopt [so] unreasonable [an] interpretation[ ]'" of the Exchange Act that it sweeps in entities never before considered to be dealers and "then edit other statutory provisions to mitigate the unreasonableness." *UARG*, 573 U.S. at 328.

Even with these arbitrary carve-outs, the Rule is still vastly overbroad, further proof that the Commission has taken its redefinition of "dealer" far beyond what Congress intended.  Consider private funds; as applied to them, the Dealer Rule "produces a substantive effect that is [not] compatible with the rest of the law." *Sackett v. EPA*, 598 U.S. 651, 676 (2023).  For example:

- Dealers must become members of FINRA, App. 99/2, whose rules require certain "dealer" to be licensed in the "Supervision of … Institutional Customer-related Activities."  *Series 24 – General Securities Principal Exam*, FINRA, https://www.finra.org/registration-exams-ce/qualification-exams/series24; *see* FINRA Rule 1210.01.  Private funds do not trade with institutional customers; in fact, private funds are *themselves* the institutional customers of dealers, App. 326, 351, 459, 473 n.4, 530.

- "Dealers" must use "reasonable diligence" to "ascertain the best market" for their customers' securities orders.  FINRA Rule 5310(a)(1).  Private funds do not trade with customers; they are themselves the customers of dealers and rely on those

dealers to use *their* "reasonable diligence" to "ascertain the best market" for the private funds' orders, *id.*; *see* App. 217-18, 330, 448 ¶ 115, 459, 532 & n.23, 280, 296; *infra* p. 31.

- If private funds were to become "dealers," they would lose the regulatory protections of "customers," App. 330; *infra* pp. 31-32;

- "Dealers" must contribute a percentage of their operating revenue to an insurance fund to insure the assets held on behalf of customers.  App. 103/1.  Private funds have no customers and, as the Commission admits, would derive no benefit from contributing to the insurance fund, App. 591 (Open Meeting Tr. 47:1-4), and they, and their investors, would lose the benefits currently provided by such insurance, App. 217; *see infra* p. 32.

- "Dealers" allocate shares in initial public offerings (IPOs) to their customers and are prohibited from purchasing IPO shares for themselves.  App. 330.  Private funds purchase IPO shares for themselves, *from* dealers, App. 326; *see infra* pp. 28-29.

- "Dealers" must have employees.  *See, e.g.*, FINRA Rule 1210.01.  Private funds typically have no employees.  App. 450.

- "Dealers" custody customer assets and securities; accordingly, "dealers" are subject to net-capital rules to ensure that they have sufficient liquid resources on hand to satisfy the claims of customers.  App. 215 n.16.  Private funds, by contrast, do not custody customer securities.  *See, e.g.*, App. 473 n.4.  Instead, private funds custody *their* securities with custodians.

- Private funds have investors, but if private funds were subject to net-capital rules many investors would likely not invest in them, because the net-capital rules would

prevent the investors from withdrawing their funds.  *E.g.*, App. 205, 211; *infra* pp. 30-31.

None of this makes any sense, and the Commission does not explain how it could.  From stem to stern, the "dealer" regulatory regime is built for an entirely different purpose than regulating private funds.

## II.    The Rule Is Arbitrary, Capricious, and Otherwise Unlawful.

In addition to the absence of statutory authority for the Dealer Rule, the Rule must be set aside because the SEC failed to engage in reasoned decisionmaking, contrary to the general requirements of the APA and the specific demands Congress imposed on SEC rulemaking.  On top of its general obligation "to consider … important aspect[s] of the problem" before it, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), the SEC has a specific duty to consider whether its rules "will promote efficiency, competition, and capital formation," 15 U.S.C. § 78c(f).  These statutory mandates impose on the SEC a "unique obligation" "to 'apprise itself … of the economic consequences of a proposed regulation.'"  *Bus. Roundtable*, 647 F.3d at 1148.  And they require the SEC to determine, "as best it can," whether the benefits of a regulation justify its costs.  *Chamber of Com. v. SEC* (*Chamber I*), 412 F.3d 133, 143 (D.C. Cir. 2005); *accord Chamber III*, 85 F.4th at 777.  The SEC failed at each of these tasks.

### A.    There Is No Factual Basis for the Rule, and Its Purported Benefits are Illusory.

The Rule fails at the outset because the SEC "failed to justify" a need for it.  *Mex. Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023).  Under the APA, an agency issuing a new rule must overcome "a presumption … *against* changes in current policy that are not justified by the rulemaking record."  *State Farm*, 463 U.S. at 42.  And under the SEC's organic statutes, the agency must use rigorous economic analysis to overcome that presumption.  *See* 15 U.S.C. §§ 78c(f), 78w(a)(2).  Here, the SEC thrust on private funds and others an unprecedented

regulatory burden.  Yet it failed to "cogently explain *why*" additional regulation was warranted in the first place.  *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1214 (5th Cir. 1991) (emphasis added).

    **1.**    The Commission suggested that imposing "dealer" regulations on private funds and others would make them less likely to fail, and thus discontinue trading, in turbulent markets.  App. 94/3.  But that suggestion has "no basis beyond mere speculation."  *Bus. Roundtable*, 647 F.3d at 1150; *see also Calumet Shreveport Refining, LLC v. EPA*, 86 F.4th 1121, 1142 (5th Cir. 2023) (rejecting "[u]nsubstantiated agency speculation").

    **a.**    With respect to private funds, the SEC did not even attempt to "substantiate[ ] the threshold proposition" that curtailed trading was "a problem" that "warrant[ed] the rule."  *Chamber III*, 85 F.4th at 777.  The agency cited "no evidence" of private funds failing and limiting their trading in times of crises—an evidentiary failure that is a hallmark of irrational agency action.  *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 843-44 (D.C. Cir. 2006) (Kavanaugh, J.) ("Professing that an order ameliorates a real industry problem but then citing no evidence demonstrating that there is in fact an industry problem is not reasoned decisionmaking.").  And the agency disregarded unrebutted evidence that affirmatively "refute[d]" its position.  *Louisiana v. DOE*, 90 F.4th 461, 477 (5th Cir. 2024).  For example, the SEC ignored expert evidence that securities "most commonly traded" by private funds saw "*more* robust liquidity" during periods of market volatility than did other securities.  App. 258 ¶ 27 (emphasis added).  And the Commission had no answer to the fact that during volatile times, private funds "raised *new* funds to invest," thereby increasing their trading.  *Id.* ¶ 26 & n.64 (emphasis added).

    The SEC's failures to substantiate the problem it purported to address and to confront contrary evidence are all too familiar.  SEC regulations have repeatedly been invalidated on these

19

grounds.  *See, e.g.*, *Chamber III*, 85 F.4th at 777; *NYSE LLC v. SEC*, 962 F.3d 541, 556-57 (D.C. Cir. 2020); *Bus. Roundtable*, 647 F.3d at 1148; *Am. Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166, 177-79 (D.C. Cir. 2010); *Chamber I*, 412 F.3d at 140-44.

In claiming that curtailed trading during market turmoil was a genuine problem, the SEC latched onto two anecdotes—one regarding the March 2020 Covid lockdown, and one involving the 1982 failure of Drysdale Government Securities in which firms *other than* private funds purportedly limited their trading.  App. 92/1-3.  But those isolated, inapt examples do nothing to justify the Rule, especially with regard to private funds.  App. 571 (Uyeda, dissenting).  The SEC failed to expose the second anecdote to public comment and refutation, which disqualifies it as legitimate support for the Rule.  *See, e.g.*, *Chamber of Com. v. SEC* (*Chamber II*), 443 F.3d 890, 901 (D.C. Cir. 2006); *Texas v. EPA*, 389 F. Supp. 3d 497, 505 (S.D. Tex. 2019).  Moreover, the firms cited in the SEC's anecdotes were "not representative" of private funds, *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 544 (D.C. Cir. 1983); they were regulated, funded, and operated *differently*, *see* App. 212, and the SEC did "nothing to explain why" it thought "the rule would nonetheless yield the same benefits" for private funds that the SEC suggested it would yield for others, *Bus. Roundtable*, 647 F.3d at 1154.

Further, even if these two anecdotes had concerned private funds, the SEC had no response to the fact that two isolated instances over a 40-year period are meaningless in the scheme of things.  App. 139-40, 155-56; *cf.* App. 571 (Uyeda, dissenting) ("It is telling that the most specific example is from forty years ago.").  The SEC called the "frequency" of market disruptions irrelevant (App. 92/1), but as the Fifth Circuit explained in striking down another SEC rule just a few months ago, the "likelihood" of an asserted problem occurring—in other words, the frequency of occurrence—is a critical component of any "reasoned" analysis of a "rule's benefit."  *Chamber*

*III*, 85 F.4th at 778.  "Without this crucial datum," "the Commission has no way of knowing whether" an asserted problem will occur often enough to justify the rule's costs.  *Bus. Roundtable*, 647 F.3d at 1153; *cf. Chamber III*, 85 F.4th at 777 (if the cited activities are "not genuine problems, then there is no rational basis for" attempting to mitigate the harm "the SEC now claims warrants the rule").

The SEC erred, as well, in ignoring its "own [prior] statements," along with "evidence in the administrative record," that "utterly refute[d]" its suggestion that the cited curtailment of trading was attributable to a lack of dealer registration.  *Louisiana*, 90 F.4th at 477.  Drysdale Government Securities, for example, did not fail because its "securities portfolio … [was] far in excess of the leverage that the [broker-dealer] Net Capital Rule would have allowed."  App. 92/2.  Drysdale failed—the SEC said at the time—because it was "a massive securities fraud."  SEC Litigation Release No. 10708, 1985 WL 545686, at *1 (Mar. 26, 1985); *see also, e.g.*, SEC Litigation Release No. 10458, 1984 WL 471507, at *1 (July 12, 1984) (detailing the "fraudulent establishment of Drysdale Government Securities").  Indeed, Drysdale's parent company *was* subject to broker-dealer net-capital rules, but it, too, failed because it "covered-up and hid" its financial condition "from regulators."  SEC Litigation Release No. 10329, 1984 WL 472028, at *1 (Apr. 5, 1984).  In any event, the regulatory "shortcoming" that caused the "losses incurred in the Drysdale failure" was, according to the SEC itself, "corrected by standard industry practices" decades ago.  *Request for Comments on the Oversight of the U.S. Gov't & Agency Sec. Markets*, Exchange Act Release No. 21959, 1985 WL 634789, at *7 (Apr. 19, 1985).  The SEC did not "acknowledg[e]" any of this, *Louisiana*, 90 F.4th at 477, let alone explain why dealer regulation, under the "*existing* [regulatory] regime," would have altered Drysdale's case at all, *Am. Equity*, 613 F.3d at 179 (emphasis added).

The anecdote regarding the March 2020 Covid-lockdown is also no justification for the Rule. The SEC attributed the liquidity strains to certain high-frequency traders, who (as non-dealers) were not subject to broker-dealer net-capital rules. App. 92/2-3. But none of this has anything to do with private funds. And, in any event, expert evidence ignored by the Commission showed that foreign central banks—not the cited high-frequency traders—were primarily responsible for any disruption. App. 257 ¶ 25. As the SEC has acknowledged elsewhere, the Covid pandemic was an "unprecedented time" with unique, "extraordinary challenges," 85 Fed. Reg. 37,133, 37,134/1 (June 19, 2020); 85 Fed. Reg. 54,483, 54,490/1 n.47 (Sept. 2, 2020). In more typical periods of market stress, the record showed that the *same* high-frequency traders "*increased* their [trading] activity," even though they were not subject to broker-dealer net-capital rules then, either. App. 571 (Uyeda, dissenting); *see* App. 159 n.13. According to the U.S. Department of Treasury, this increased trading was "*more* consistent" with typical market behavior, App. 571 (Uyeda, dissenting) (emphasis added), than the "unique" anecdote, *AEP Tex. N. Co. v. Surface Transp. Bd.*, 609 F.3d 432, 440 (D.C. Cir. 2010), that the SEC cherry-picked from a time that is not indicative of how the world normally functions, *see* App. 155-56 (these "events cannot be extrapolated"); *cf. City of Pittsburgh v. Fed. Power Comm'n*, 237 F.2d 741, 754 (D.C. Cir. 1956) (vacating rule that arbitrarily ignored the "views of … other agencies"); *Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1511-14 (D.C. Cir. 1984) (similar).

**b.** The SEC failed to substantiate not only that curtailed trading by private funds during market turmoil was a "genuine problem," *Chamber III*, 85 F.4th at 778, but also that the SEC's new Rule would meaningfully address it, *see, e.g.*, *Texas v. Biden*, 589 F. Supp. 3d 595, 619 (N.D. Tex. 2022) (the government must "explain *how*" the rule would solve the problem (emphasis added)).

According to the SEC, broker-dealer net-capital rules would make private funds "better able to withstand adverse events" and thus less likely to discontinue trading in turbulent markets. App. 94/3.  But broker-dealer net-capital rules have nothing to do with "trading during market turmoil" and if anything would have the opposite effect.  App. 571 (Uyeda, dissenting).  As the Commission previously acknowledged, "the scope and purpose" of the net-capital rules is to address the "key" factor which "distinguish[es]" broker-dealers from others:  the "custodial responsibility for customers' funds."  App. 215 n.16 (quoting 40 Fed. Reg. 29,795, 29,798 (July 16, 1975)).  The net-capital rules (in the Commission's words) are "designed to ensure that broker-dealers … have sufficient liquid capital to protect the assets of customers and to meet their responsibilities to other broker-dealers."  App. 118/2; *accord* App. 215 n.16.  The Commission failed to "explain how [the Dealer Rule] is compatible" with the actual, stated "purpose" of the broker-dealer net-capital rules.  *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1111 (D.C. Cir. 2019); *see also Univ. of Tex. M.D. Anderson*, 985 F.3d at 479 ("Unexplained inconsistency is … a reason for holding [agency action] to be … arbitrary and capricious …." (alterations in original)).  And it further failed "to explain how" subjecting private funds to the net-capital rules, whatever the rules' purpose, would make private funds less likely to curtail trading during market stress anyway. *Texas*, 589 F. Supp. 3d at 619.

The Commission acted "without any acknowledgment—let alone explanation—of the evidence in the administrative record" that refuted the Commission's suggestion that curtailment of trading was attributable to a lack of dealer registration.  *Louisiana*, 90 F.4th at 477.  Unrebutted evidence showed that during periods of market turmoil, firms subject to broker-dealer regulation failed, *see, e.g.*, App. 443-44 ¶ 101 (Lehman Brothers); *supra* p. 21 (Drysdale's parent company), while other firms, not subject to broker-dealer regulation, thrived, *see, e.g.*, App. 159 n.13, 258

¶ 26 & n.64.  The Commission made no effort to "explain [this] discrepancy." *Turtle Island Res-toration Network v. U.S. Dep't of Com.*, 878 F.3d 725, 741 (9th Cir. 2017).  And it disregarded evidence that, "under the existing regime," *Am. Equity*, 613 F.3d at 179, relevant private-fund activities are already subject to "arguably *more* restrictive" "limitations on leverage" "than dealer limitations" anyway, App. 281 (emphasis added); *accord* App. 441 ¶ 98, 443 ¶ 101, 217, 344.; *see also* App. 442 ¶ 100 (academic research shows that private funds "generally do not have high exposures to market risks").

The record also showed that, as applied to private funds and others, broker-dealer net cap-ital rules would "undermine [the Commission's] own objective," *In re FCC 11-161*, 753 F.3d 1015, 1143 (10th Cir. 2014):  the net-capital rules would make firms *less* likely to trade during turbulent markets.  The Rule is premised on the notion that it will "bring[ ] firms … into [dealer] registration."  App. 587 (Open Meeting Tr. 32:16-17).  That is "the most direct metric of success," *id.* (Open Meeting Tr. 32:18-19), the Commission admitted, because as firms register as "dealers," they become subject to the net-capital rules, which (according to the Commission) "may" make them "less sensitive to market disruptions that could otherwise reduce their capacity" to trade, App. 112/1.  The underlying premise, however—that the Rule will "bring[ ] firms … into [dealer] registration," and thus the net-capital rules, App. 587 (Open Meeting Tr. 32:16-17)—is "contrary to the evidence" before the agency, and it is wrong, *Calumet*, 86 F.4th at 1140.

Advisers to private funds and others warned that for a variety of reasons (discussed in more detail below, *infra* pp. 30, 31-32), firms would "curtail their trading" or "exit the market" entirely, "[r]ather than face" dealer registration and the net-capital rules.  App. 211; *accord* 147, 192, 205, 304, 320, 402.  The Commission, in fact, admitted that this was the likely outcome.  *See* App. 112/1 (the Rule will "have a small negative effect on market liquidity"), 110/1-2 ("[a]ffected

parties may respond by curtailing their liquidity-providing activities").  But it plowed ahead any-way, just in case:  "*to the extent* that the [Rule] lead[s] to better capitalization," the Commission theorized, that "*could*" promote market liquidity.  App. 112/2 (emphases added).  That is wishful thinking, not reasoned decisionmaking.  The undisputed evidence showed that "the most likely outcome is exactly the opposite":  that trading "[s]trategies that are potentially implicated [by the Rule] will be abandoned," App. 147, not made more "resilien[t]," *cf.* App. 55/2.

> **2.** The SEC likewise failed to substantiate the Rule's claimed benefit of "more com-prehensive regulatory oversight."  App. 55/2.  The Commission stated that "registering" private funds "as dealers" was necessary "because private funds are not subject to the extensive regulatory framework of the Investment Company Act."  App. 114/3-115/1 (emphasis added).  But private funds "are not subject to the extensive regulatory framework of the Investment Company Act," *id.*, because "Congress explicitly excluded such funds … from regulation under the Investment Company Act," 88 Fed. Reg. at 63,215/1; *accord supra* p. 4.  Congress itself determined the ap-propriate level and manner of oversight of private funds.  *See supra* pp. 4-5.  "Disagreeing with Congress's expressly codified policy choice isn't a luxury [the Commission] enjoy[s]."  *Cent. United Life Ins. Co. v. Burwell*, 827 F.3d 70, 73 (D.C. Cir. 2016); *cf. Goldstein*, 451 F.3d at 882 (that "the Commission wanted a hook on which to hang more comprehensive regulation" of private funds did not justify a backdoor unraveling of Congress's explicit exemption of private funds). Congress's purposeful decision to subject private funds to their own, tailored regulations is pow-erful evidence against the Commission's regulatory usurpation, not justification for it.

In any event, the Commission's suggestion that "being an effective regulator" requires the full suite of "dealer" regulations is flawed.  App. 564 (Peirce, dissenting).  The SEC is required to assess its rules against "the existing regime," *Am. Equity*, 613 F.3d at 179, and assess costs and

benefits at the "margin[ ]" of that regime, *Chamber III*, 85 F.4th at 776; *Bus. Roundtable*, 647 F.3d at 1151.  The SEC failed to do this.  It cited, for example, anti-fraud authority it has over broker-dealers, App. 115/2, but private funds are already "subject to the anti-fraud, anti-manipulation rules," App. 598 (Open Meeting Tr. 77:3-10); *see also* App. 175, 272.  And private funds typically access the market through registered broker-dealers anyway, who oversee their activity.  App. 184; *see also, e.g.*, App. 326 (we "participate[ ] in the financial markets as a *customer*" of broker-dealers), 351, 459, 473 n.4, 530; *see also* 538.  Because private funds, moreover, are "not operating companies and have no employees," App. 450, they "rel[y] entirely" on their investment advisers, SEC Br. 27, *Nat'l Ass'n of Private Fund Managers v. SEC*, No. 23-60471 (5th Cir. Dec. 15, 2023), 2023 WL 8875230, who are "already regulated" by the Commission, App. 204; *accord* App. 326-27, 329, 30/1; *supra* p. 5.  The Commission, accordingly, was unable to "cite even a single" example of "market manipulation or fraud that was hidden because … the market participant was not registered as a dealer."  App. 430.

The Commission also cited benefits from transaction reporting, App. 74/1, 96/2-3, but it failed to seriously grapple with the fact that "transactions by private funds are already reported" because, again, private funds access the market through registered broker-dealers, App. 184.  At most, the Commission identified a subset of trades, in one market, with one product type, that may be reported "anonymously."  App. 74/1.  But that is not reason to require private funds to register as "dealers" en masse; if receiving reports on these trades would truly be beneficial, the Commission can undertake rulemaking to mandate that specific reporting.  *See* App. 409 ¶ 8; *cf. Clarke v. CFTC*, 74 F.4th 627, 641 (5th Cir. 2023) (agency action cannot be upheld when the agency fails to reasonably consider "significant and viable and obvious alternatives").

**3.**     Finally, the Commission asserted that the Rule is "expected to benefit currently registered dealers by ensuring that all of their competitors, including currently unregistered market participants," such as private funds, "are subject to common regulatory requirements."  App. 94/1-2.  That has matters backwards:  private funds are *customers* of broker-dealers, not their *competitors*.  *See* App. 326, 351, 459, 473 n.4, 530.  Broker-dealers compete *for* private funds' execution and other trading business.  *See, e.g.*, Report of the President's Working Group on Financial Markets 9 (1999) (describing broker-dealers' "[c]ompetition for hedge fund business"), *available at* https://tinyurl.com/4vmw7yxy.  The Commission misunderstood the relevant market.

## B.     The Rule Will Have Harmful Counterproductive Consequences.

Aside from failing to substantiate the Rule's benefits, the Commission failed "to adequately consider [its] negative consequences."  *Louisiana*, 90 F.4th at 470.  Among other defects unacknowledged by the Commission, the Rule "will undermine [the SEC's] own objective."  *In re FCC*, 753 F.3d at 1143.

### 1.     The Rule Imposes Significant Costs on Private Funds.

Commenters explained that by subjecting private funds to "a costly and ill-fitting regulatory regime," the Dealer Rule would create harmful, counterproductive consequences.  App. 563 (Peirce, dissenting); *see, e.g.*, App. 217-20, 279-80, 180-82, 189-90, 392-93, 264-70, 433-37, 445-48, 330-33.  In response, the SEC said "[b]asically nothing:  It acknowledged the concern and moved on."  *Louisiana*, 90 F.4th at 473.  The agency conceded that core "elements of the dealer regime—*e.g.*, the Net Capital Rule, restrictions on participating in the IPO market—may be inappropriate or untenable" for private funds.  App. 115/2.  But it "duck[ed] serious evaluation" of the issue.  *Bus. Roundtable*, 647 F.3d at 1152.  It merely declared that private funds must be covered because anyone "engaged in dealing activity should be subject to dealer regulations."  App. 115/2.  That is the exact type of unreasoned, "conclusory statement[ ]" that does "not constitute adequate

agency consideration of [the issue]." *Louisiana*, 90 F.4th at 473; *see also Nat'l Fuel*, 468 F.3d at 844 (the APA "does not tolerate that kind of truism as the basis for … administrative action").

The result of the SEC's cursory analysis was an assessment of the Rule's costs and benefits that grossly understated the Rule's adverse consequences for private funds in at least four respects.

a.   ***IPOs.***   The Commission failed to seriously grapple with the effect of the Rule on the market for initial public offerings (IPOs).  By turning private funds and others into "dealers," the Rule would bar these firms from participating in IPOs—and for no discernible reason.  Securities regulations prohibit broker-dealers from purchasing shares in IPOs to ensure that broker-dealers do not hold the shares for themselves, "at the expense of [their] public customers."  NASD Notice to Members 03-79, at 840 (Mar. 23, 2004).  That reasoning has no application to private funds and others, who do not trade with customers and are themselves customers of broker-dealers.  Yet the Commission's Rule would, by labeling private funds "dealers," sweep them within this prohibition anyway, even though it provides no regulatory benefit, and even though private funds are critical players in the IPO market.  Each year, thousands of companies raise billions of dollars though IPOs, *see, e.g.*, App. 398; private funds purchase almost 80% of these shares, App. 109/1 & n.595.  Driving them from the market would cripple companies' "ability … to raise new capital," App. 109/1, directly undermining a core part of the SEC's mission, *see About the SEC*, https://www.sec.gov/about (last visited Apr. 30, 2024) ("The SEC's mission is to … facilitate capital formation.").

Again, "[w]hat did [the SEC] say in response?  Basically nothing:  It acknowledged the concern and moved on." *Louisiana*, 90 F.4th at 473.  The Commission "expect[ed]" that "some" private funds would "choose to register and stay out of the IPO market," while others would "forego" their current trading activity "to be able to invest in IPOs."  App. 109/1.  Either way, the

Commission acknowledged, the result would be bad:  It would degrade the "ability of issuers to raise new capital."  *Id.*  Or it would reduce liquidity throughout the market.  *Id.*  But the Commission made no attempt to estimate—either quantitatively or qualitatively—the "magnitude" of these costs, *id.*, or why they would be justified, and it failed even to "hazard a guess as to which" market would suffer the most, *Bus. Roundtable*, 647 F.3d at 1150.  The Commission thereby failed to fulfill its basic fundamental rulemaking obligation to determine "as best it can" the impact its actions will have on liquidity and capital formation.  *Supra* p. 18.  Under the APA, as well, the Commission's "bare," "conclusory" assertion that it "considered" the issue, with no further discussion, no findings, and no attempt to justify the costs, is no substitute for actually "considering it" and does "not constitute adequate agency consideration of [this] important aspect of [the] problem."  *Louisiana*, 90 F.4th at 473.

b.    ***Net capital***.  The Rule will further impair liquidity—and undermine a core Commission objective—by subjecting private funds to net-capital rules that would force them to decrease their trading.  App. 219, 308.  Indeed, as applied to private funds, broker-dealer net capital rules would have the opposite effect of what the Commission purportedly intended:  those rules would hamper private funds' ability to continue trading during turbulent markets.  Again, the purpose of the net-capital rules is to ensure that broker-dealers have sufficient liquid resources on hand to satisfy the claims of customers.  So the rules effectively force broker-dealers to keep a significant portion of assets in cash-like instruments, *e.g.*, treasury securities.  App. 216.  Although broker-dealers are permitted to hold *other* assets, broker-dealers receive only limited "capital" credit for them; for example, if a broker-dealer holds $1 million of equity options, it may only receive credit for holding a fraction of that amount in assets.  *See* App. 216, 219.  The upshot is

that net-capital rules restrict broker-dealers' ability to hold certain assets, which *limits* their ability to trade (or hedge risk) during periods of market turmoil.  App. 219, 308; *see also* App. 548-50.

In fact, in the proposing release, the Commission acknowledged that it was "unclear" how certain types of pooled investment vehicles could even comply with "net capital requirements." App. 212; *see also* App. 320.  Commenters explained that this same concern applied to private funds, App. 212, which are also pooled investment vehicles, but as with other important aspects of the problem, the Commission ignored it entirely.  The Commission nowhere explained how private funds could realistically comply with the net-capital rules, and it made no attempt to reconcile its apparent concession that *other* pooled investment vehicles could not comply with net-capital rules with its decision to apply those rules to private funds.  App. 459.  *Cf. Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1251-52 (D.C. Cir. 2023) (vacating SEC action that "failed to adequately explain" disparate treatment of "similar" matters).

The Commission likewise failed to give serious consideration to the net-capital rules' other adverse effects.  Application of net-capital rules to private funds would force the funds to "lock[ ] up" their investors' capital for a year, the Commission conceded.  App. 104/1 n.570.  Yet private-fund investors *want* the ability to withdraw their capital.  And if they don't have that ability, commenters warned, investors will withdraw their money from affected private funds.  App. 320.  The Commission itself has recognized this danger in other contexts:  "investors have demonstrated particular sensitivity to the possibility of [withdrawal] gates and the corresponding lack of access to their investments, and these concerns appear to have incentivized [investor] redemptions."  88 Fed. Reg. 51,404, 51,409/3 (Aug. 3, 2023).  Here, however, the Commission failed to address the issue entirely, even though it could cause affected funds to liquidate, *e.g.*, App. 205, 219-20, 320, undermining the entire purported purpose of the Rule.  When asked at the open meeting to explain

30

how private funds could function while subject to net-capital requirements, the Commission's staff expert responded only that he was "not an expert on hedge funds, so [he] really [didn't] want to get into that too much." App. 589 (Open Meeting Tr. 40:24-25).

    **c.**     *Regulatory protections.* The SEC almost entirely ignored that turning private funds and others into "dealers" would immediately strip them of critical regulatory protections. *See* App. 563 (Peirce, dissenting). Private funds, like other investors, are *customers* of broker-dealers. *See* App. 326, 351, 459, 473 n.4, 530; *see also* App. 538. They rely on broker-dealers to hold their securities and execute their orders and are protected in these interactions by a range of important regulatory safeguards. App. 217-18, 330, 448 ¶ 115, 459, 532 & n.23, 280, 296. The SEC Chair has recognized that these safeguards—including broker-dealers' "duty to their customers" to obtain the "best execution" of the customers' orders—are "critical to both trust and competition in the markets." Remarks of Chair Gensler (April 2, 2024), https://tinyurl.com/3vnrk9jk.

    But these safeguards are available only to "customers" of broker-dealers. *E.g.*, App. 330. And if private funds become "dealers" themselves, they cannot be "customers." *E.g.*, *id.* This is an "important aspect of the problem," *State Farm*, 463 U.S. at 43, that the SEC almost entirely ignored. It stated, in conclusory fashion, that it did "not believe" the Dealer Rule would "significantly" diminish regulatory protections with regard to one issue—the safeguarding of customer assets (SEC Rule 15c3-3). App. 98/2-3. But even that's debatable. *See* App. 296 (explaining that private funds would lose "the full measure of Rule 15c3-3"). And the SEC did not address or even mention the many other regulatory safeguards that private funds (and others turned "dealers") would immediately lose; nor did it address the commercial consequences of this occurring. *See* App. 217-18, 330, 448 ¶ 115, 459, 532 & n.23, 296. Commenters explained that the loss of regulatory protections would be so severe that investors would refuse to invest in firms potentially

subject to the new Rule.  App. 532, 459.  The Commission "did not address the issue at all."  *Mex.*

*Gulf*, 60 F.4th at 973.

      **d.**     **SIPC.**  The Commission also failed to adequately consider the costs of forcing pri-

vate funds and others to join the Securities Investor Protection Corporation (SIPC).  SIPC is an

insurance program, similar to FDIC, that insures the assets held by broker-dealers on behalf of

their customers.  App. 336.  Every firm that registers as a broker-dealer automatically becomes a

member of SIPC and is required to contribute to SIPC a percentage of its gross operating revenue.

App. 103/1, 262.  But this regulatory scheme has no conceivable application to private funds, who

do not trade with customers.  App. 331.  The SEC could not identify any benefit from applying the

SIPC scheme to private funds whatsoever.  *See, e.g.*, App. 400 (Open Meeting Tr. 46:22-47:4) ("it

may well be that SIPC wouldn't even have to get involved because of course to start a SIPC liqui-

dation you have to have a customer").

      **2.**     **The Rule Promotes the Very Outcome—Less Liquidity—That it Pur-
portedly Seeks to Avoid.**

    By imposing massive, unwarranted costs on private funds, the Dealer Rule will also bring

about "the very outcome that it seeks to avoid."  App. 571 (Uyeda, dissenting).

    According to the SEC, the Rule is designed to preserve liquidity during times of crisis.

App. 94/3.  But it is undisputed that, overall, the Rule will have a "negative effect" on market

liquidity, as firms *exit* the market and otherwise curtail their trading to avoid being swept up in the

"dealer" registration requirement.  App. 112/1; *see also* App. 219-20; *supra* pp. 24-25, 30, 31-32.

The SEC failed to explain why reducing liquidity overall will increase liquidity in times of crisis.

App. 564 (Peirce, dissenting).  "Rational decisionmaking … dictates that the agency simply cannot

employ means that actually undercut its own purported goals."  *Office of Commc'n of United*

*Church of Christ v. FCC*, 779 F.2d 702, 707-08 (D.C. Cir. 1985); *see also Sw. Elec. Power Co. v.*

*EPA*, 920 F.3d 999, 1030 (5th Cir. 2019) (where "the agency's rationales contradict themselves," its action is "'illogical on its own terms' and therefore cannot stand"). Only certain misguided regulators in Washington would believe that imposing new burdens on an activity is a way to incentivize it.

Trading in U.S. government bonds issued by the Treasury Department will be especially adversely affected. Private funds are some of the largest purchasers of government bonds. App. 333. Applying the Rule to private funds, therefore, will "reduce liquidity in the Treasury markets" and "make them more volatile, reduce the number of liquidity providers, and increase debt costs to taxpayers," App. 570 (Uyeda, dissenting)—all at a time where the Treasury Department is finding it increasingly difficult to raise capital. *See America's Bonds are Getting Harder to Sell*, Wall St. J. (Apr. 14, 2024), https://www.wsj.com/finance/americas-bonds-are-getting-harder-to-sell-c3fde4de; *see also* App. 348 ("[T]he Proposal would reduce liquidity in the U.S. Treasury markets potentially increasing the severity and frequency of significant volatility in such markets with negative implications for financial stability.").

The Commission responded that if, as a result of the Rule, market conditions deteriorated to such a degree that it created trading opportunities for "other registered dealers," then those "other registered dealers" might step in and fill the slack from the funds that exited. App. 110/2. As Commissioner Uyeda put it, "[w]ishful thinking is not a strategy when it comes to the most important market in the world." App. 573. "Reasoned decisonmaking under the [APA] requires more than just wishing serious problems away." *Snohomish Cnty. v. Surface Transp. Bd.*, 954 F.3d 290, 306 (D.C. Cir. 2020) (Millett, J., concurring).

### 3.   The Rule Is Overbroad, and the Commission Failed to Address Substantial Comments Pointing that Out.

The Rule is "irrationally overbroad" in a number of ways unaddressed by the Commission. *Nat. Min. Ass'n v. Babbitt*, 172 F.3d 906, 913 (D.C. Cir. 1999).   Even with the makeshift exclusions the Commission adopted to try to avoid some of the most extreme outcomes, *see supra* pp. 15-16, the Dealer Rule will still sweep in many "firms the Commission has given no thought to including," App. 564 (Peirce, dissenting), and create significant "uncertainty about dealer status," *id.* at 563.  All this will only cause potentially thousands of firms—there are nearly 10,000 hedge funds[1] and nearly the same number of "large traders"[2]—to curtail their trading to avoid being swept into the SEC's overbroad conception of "dealing."  *See, e.g.*, App. 211, 304, 351, 534.  That is particularly true, commentators warned, when the Commission's Enforcement Division is taking the position that the penalty for failing to register as a "dealer" is disgorgement of *all* profits.  *See* App. 529-30 & n.6 (citing cases), 546 (same), 282-83 (same).

a.   The Rule's two "dealer" factors are independently overbroad and reach seemingly anyone "who make[s] money by buying low and selling high."  App. 570 (Uyeda, dissenting).

The first factor provides that a firm is a "dealer" if it "[r]egularly" expresses "trading interest" at or near the best available price on both sides of the market.  App. 125/1.  That definition "is practically limitless."  App. 570 (Uyeda, dissenting).  "Regularly," the SEC said, means "more than a few isolated times," App. 64/2 n.104, and expresses "trading interest," the SEC stated, means submitted "an 'order,'" App. 65/3.  As a result, a firm could be a "dealer," under the first

---

[1] *See Private Fund Statistics: First Calendar Quarter 2023*, SEC 4 (Oct. 16, 2023), https://www.sec.gov/files/investment/private-funds-statistics-2023-q1.pdf.

[2] *See* SEC Statement 6, OMB No. 3235-0682 (2021), https://www.reginfo.gov/public/do/PRA-ViewDocument?ref_nbr=202009-3235-011.

prong, if it submits an "order" to buy stock, and then, minutes or even hours later, submits an "order" to sell it—and repeats this "more than a few isolated times."

Commenters explained that this definition was "extraordinarily overbroad" (App. 234) and would sweep in any number of "ordinary investment strategies" (App. 413 ¶ 19). Consider, for example, an investor who thought that a scheduled news announcement would be good. App. 422 ¶ 48. Or, perhaps, thought that the announcement would be bad, but that the market would over-react. *Id.* Or predicted, based on any number of "technical model[s]," that regardless of the news the stock price would rise throughout the day. *Id.* In each of these examples, the investor would trade stock and then, "later in the day," unwind the position, *id.—i.e.*, express "trading interest" (submit "an order") on both sides of the market, App. 65/3.

The SEC did not dispute that none of this would be "dealer activity," App. 67/1, but failed to address whether the Rule would reach it. The SEC could not even estimate the number of entities that would be captured by its own Rule. App. 89. Commenters urged the SEC to, at the very least, limit the Rule's reach, and carve out the ordinary investment strategies discussed above, by requiring the buy and sell to be expressed "simultaneously." App. 234. But the SEC rejected this proposal, because it "might" exclude some unspecified quantum of "dealer" activity. App. 67/2. The SEC, however, made no attempt to compare the overbreadth—the *non*-dealer activity swept up by the Rule *without* the "simultaneous" exclusion—with the "dealer" activity that would supposedly escape further SEC regulation *with* the "simultaneous" exclusion.

The Rule's second factor is similarly overly broad, again, in ways the SEC failed to address. Under this second factor, a firm is a dealer if it "[e]arn[s] revenue primarily from capturing bid-ask spreads, by buying at the bid and selling at the offer." App. 125. This, again, is, under the Commission's theory, indistinguishable from "buying low and selling high." App. 574 n.7

(Uyeda, dissenting).  All securities have two prices—the "bid," the price someone will pay to buy the security, and the "offer," the price someone will accept to sell the security.  Suppose, for example, stock XYZ has a bid of $2.00 and an offer of $2.50.  If an investor bids $2.00, and that bid is executed, the investor will own shares of XYZ at $2.00 per share.  Suppose, then, the price goes up, so the new bid is $2.25, and the new offer is $2.75.  If the investor offers $2.75, and that offer is executed, the investor will sell his stock at $2.75 per share, and have made $0.75 per share.  Did this investor earn revenue "primarily" by "capturing the bid-ask spread"—the difference between the bid and offer—or from "intraday price movements"—the stock price rising?  The SEC admits that even *it* is unable to "distinguish between" the two.  App. 88/1.

**b.**      Compounding the overbreadth, the SEC failed to respond "at all" to comments regarding the Rule's potential effect on multi-strategy funds.  *Mex. Gulf Fishing*, 60 F.4th at 973. Multi-strategy funds are the "new center of gravity for the $4 trillion [hedge-fund] industry." *This Is the Hedge-Fund Industry's Most Fashionable Strategy*, Wall St. J. (Sept. 12, 2023), https://www.wsj.com/livecoverage/stock-market-today-dow-jones-09-12-2023/card/this-is-the-hedge-fund-industry-s-most-fashionable-strategy-bvnNUcDbMUSAuuSUlWsk.  "Unlike a traditional stock-picking hedge fund, where a single manager focused on a given domain makes investment decisions," multi-strategy funds "deploy hundreds of portfolio managers to trade independently across geographies and asset classes."  *Id.*; *see* App. 239-40 , 416 ¶ 27, 278, 340, 456-57, 473.  The aim, through diversification, is to produce "steadier returns," with less risk.  *The Hedge Funds That Changed the Game*, Wall St. J. (Feb. 23, 2024), https://www.wsj.com/finance/investing/the-hedge-funds-that-changed-the-game-857abc5b.

Commenters explained to the SEC that these independent trading strategies, by coincidence, may often result in the fund buying and selling the same security (*i.e.*, expressing trading

interest on both sides of the market).  *See* App. 239-40 , 416 ¶ 27, 278, 340.  For example, a portfolio manager executing a fund's long-short strategy could buy a particular stock because the manager thinks the stock price will rise; meantime, a different portfolio manager in charge of the same fund's convertible-bond arbitrage strategy could sell the same stock because this manager needs to hedge a convertible-bond position.  App. 416 ¶ 27.  In no world would any reasonable person consider that coincidence to be dealing.  *See* App. 239-40 , 416 ¶ 27, 278, 340.

The SEC, however, "failed to respond to [these] comments" entirely, in clear violation of the APA.  *Chamber III*, 85 F.4th at 780.  Instead, the Commission claimed to have addressed commenters' concerns by amending the Rule so that "dealer" status was not assessed across distinct legal entities.  App. 79/2.  But that missed the point:  different portfolio managers often operate independently within the same legal entity, and assessing "dealer" status across independent strategies irrationally threatens multi-strategy approaches.  *E.g.*, App. 239, 473.

**c.**  The SEC's sweeping definition does not even represent the outer limit of who counts as a "dealer."  Although the Commission claims to have narrowed the Rule from the proposal, the Commission adopted "a 'no presumption' clause to clarify that a person may be a dealer … even if it does not meet the conditions set forth in the … rules."  App. 80/2.  The Commission stated that "[n]o commenters suggested changes to the proposed no presumption clause," so the Commission adopted the "provision as proposed."  *Id.*  But commenters *did* object, repeatedly.  Plaintiff MFA, for example, explained that it would "be arbitrary and capricious for the Commission to finalize a Proposal intended to define a term, but then not define it," by leaving the purported definition entirely open-ended.  App. 545.  That is particularly true, MFA explained, when the Commission is simultaneously pursuing enforcement actions in federal court under an even broader theory that would make *every* professional trader in the United States a "dealer."  App.

546-47.  Other commenters pressed the same point.  *See, e.g.*, App. 529-30, 282-87.  The Commission simply ignored these problems with the "no presumption" clause, which arbitrarily renders the dealer definition no definition at all.  The Commission's Rule thus flunks the "whole point of rulemaking":  to replace the uncertainty of "case-by-case" "adjudication" with the "predictability" of a clear standard.  *Chamber of Com. v. NLRB*, --- F. Supp. 3d ---, 2024 WL 1203056, at *15 (E.D. Tex. Mar. 18, 2024) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of Fed. Reserve Sys.*, 745 F.2d 677, 689 (D.C. Cir. 1984) (Scalia, J.)).

### C.   The Commission Failed to Adequately Consider the Rule's Impact on Efficiency, Competition, and Capital Formation.

In adopting this unnecessary, costly, and counterproductive Rule, the SEC also violated its heightened statutory duty to consider its rules' impacts on "efficiency, competition, and capital formation."  15 U.S.C. § 78c(f).  Failures by the SEC to adequately "'apprise itself'" of the "'economic consequences'" of its rules have repeatedly resulted in invalidation of SEC rules.  *Bus. Roundtable*, 647 F.3d at 1148; *see also, e.g.*, *Am. Equity*, 613 F.3d at 179; *Chamber I*, 412 F.3d at 140-44.  Here, the SEC "failed once again" to fulfill this statutory duty.  *Bus. Roundtable*, 647 F.3d at 1148.  Its economic analysis is illogical, incomplete, and conspicuously lacks any finding that the Rule "will" promote efficiency, competition, or capital formation.  15 U.S.C. § 78c(f).

**1.**   The Commission concedes that the Rule will have "negative effects on market liquidity and efficiency," will disproportionately burden smaller firms, and, at best, will have "mixed" effects on capital formation.  App. 113/1, 112/2.  That is a reason to *abandon* the Rule, not to adopt it.  Liquidity and capital formation are at the heart of the SEC's mission, must be considered in every rulemaking, *see* 15 U.S.C. § 78c(f), and are the given rationale for the Rule, yet the Rule, by the SEC's own admission, will impair liquidity and capital formation in key ways. *Supra* pp. 32-33.

38

In downplaying these negative effects, the SEC argued that the final rule will "likely affect fewer" firms than the proposed rule would have.  App. 110/2.  But the costs and benefits of a rule must be "justified" against "current policy," *State Farm*, 463 U.S. at 52, not proposed policy.  The SEC cannot justify a wasteful rule merely by pointing out it was even more wasteful when first proposed.

Moreover, the SEC's assertion that the Rule is limited in scope has no basis in the record, and it is wrong.  As discussed above, the Commission failed to consider the Rule's overbreadth in multiple respects.  The Commission, for example, failed entirely to address the Rule's effect on multi-strategy funds.  *Supra* pp. 36-37.  Further, in claiming that the Rule would sweep in only a limited number of private funds, the Commission focused only on one market—the market for U.S. government bonds (App. 87/3)—and a single question on a regulatory form (App. 87-88 & n.420) that has nothing to do with the Rule, and which the Commission scrapped, two days after issuing the Dealer Rule, for not providing useful information, *see* 89 Fed. Reg. 17,984, 18,010/1 (Mar. 12, 2024).  Its analysis therefore did not even consider the market for regular stocks—a multi-billion dollar segment of the market.  And to make matters worse, the Commission's esti-mate considered only one of the two prongs of the Rule, App. 87/3, entirely ignoring the "no presumption" clause, *supra* pp. 37-38.  It likewise made no attempt to "estimate the number of entities that appear to meet the expressing trading interest factor," App. 87/3, even though that factor can obviously have an expansive sweep, *supra* pp. 34-35.  These are all "important aspect[s] of the problem" that significantly increase the Rule's costs, yet the SEC failed to deal with them.  *Chamber of Com.*, 85 F.4th at 777.

**2.**   The SEC's economic analysis is also inadequate because it failed to consider the aggregate impact of recent rulemakings.  The "cumulative effect" of related rulemakings is

"unquestionably an important aspect of the problem" that the Commission must consider. *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 246 (5th Cir.), *cert. granted*, 144 S. Ct. 537 (2023).  Here, however, the Commission expressly ignored all pending rulemakings.  App. 82/3 n.355; *cf.* App. 486-501 (detailing "aggregate costs" on advisers), 469 ("serious obstacles" to other proposals), 521-23 ("interconnections and dependencies" among proposals).  And although the Commission purported to consider recently adopted rules, App. 81/2-82/3, it did not meaningfully address them.  The Treasury Clearing Rule, for example, addresses many of the same purported risks targeted by the Dealer Rule.  *Id*.; *see also* App. 394, 484, 494-95, 531, 481, 502-03.  The Commission does not explain why the additional Dealer Rule is needed.  The Commission says that the two rules address the same risks "through different mechanisms," App. 93/2, but that does not mean both rules are warranted—rather, it suggests they are not.

3.     Finally, in failing to adequately account for the Rule's impact on efficiency, competition, and capital formation, the Commission independently violated Section 23(a)(2) of the Exchange Act, which prohibits the Commission from adopting a "rule or regulation which would impose a burden on competition not necessary or appropriate in furtherance of the purposes of" the Act.  15 U.S.C. § 78w(a)(2).  Here, the SEC admitted that the Rule will disproportionately burden small firms.  App. 112/1-2.  And although the SEC claimed that the Rule would have other benefits, mainly making it less likely that firms discontinued trading during turbulent markets, the SEC made no attempt to compare those benefits with the negative impact on competition.  In fact, as discussed, the SEC declared that the "frequency" of firms curtailing trading during market turmoil was irrelevant, App. 92/1, so the SEC could not possibly know how often (if ever) the Rule would produce the purported benefits.

**D.     The Rule Departed Without Reason or Explanation from Prior Commission Positions.**

Lastly, the Rule is arbitrary and capricious because it departs without explanation from prior Commission policy and practice.  The Commission has repeatedly stated that private funds are "*not*" broker-dealers.  *E.g.*, Report of the President's Working Group on Financial Markets, *supra*, at B-2 (emphasis added); *see also* App. 223 & n.39.  And it has never before taken the position it takes here, "that liquidity provision alone by a person trading for its own account constitutes dealing activity or that trading activity becomes dealing activity merely because it has the effect of providing liquidity."  App. 563 (Peirce, dissenting).  The Commission failed even to recognize "that it *is* changing position," let alone "provide a 'detailed justification' for its change." *Wages & White Lion Invs., LLC v. FDA*, 90 F.4th 357, 381 (5th Cir. 2024); *see also Lone Mountain Processing, Inc. v. Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) (an agency "'changing its course must supply a reasoned analysis'").

**III.     The Rule Should Be Vacated.**

In light of the Rule's manifold defects, the Court should set aside the Rule in its entirety. The APA directs that courts "*shall* … hold unlawful and set aside agency action" that is contrary to law.  5 U.S.C. § 706(2)(A), (C) (emphasis added). Accordingly, the APA's plain text requires that "[i]n all cases, unlawful agency action must be set aside."  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971); *see Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374-75 (5th Cir. 2022) ("Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation.").

Although courts have occasionally remanded without vacatur upon finding that an agency would "'be able to substantiate its decision'" and vacatur would be "'disruptive,'" *Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000), that is no basis to withhold vacatur here.

There is no prospect the SEC would be able to support its decision on remand, as there is no statutory authority for the Rule, *supra* pp. 9-18, and the SEC's blunderbuss approach to important aspects of the Rule cannot be rationalized, *supra* pp. 18-41.  Nor would vacating the Rule cause disruption:  vacatur would simply maintain the status quo that has existed for almost a century. *Supra* pp. 4, 41; *cf.* App. 563 (Peirce, dissenting) (the Rule "obliterates" the regulatory framework that "the Commission and market participants have [relied on] for decades").

The Court should apply the APA's "default" remedy and set aside the Dealer Rule in its entirety.  *Data Mktg. P'ship, LP v. DOL*, 45 F.4th 846, 859 (5th Cir. 2022); *see, e.g.*, *NYSE*, 962 F.3d at 559; *Bus. Roundtable*, 647 F.3d at 1156; *Am. Equity*, 613 F.3d at 179; *ISS Inc. v. SEC*, --- F. Supp. 3d ---, 2024 WL 756783, at *16 (D.D.C. Feb. 23, 2024); *Nat'l Ass'n of Mfrs.*, 631 F. Supp. 3d at 430-31.

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment and vacate the Dealer Rule in its entirety.

Dated:  April 30, 2024                    Respectfully submitted,


                                          */s/ Dee J. Kelly*
                                          _____
                                          DEE J. KELLY (TX Bar No. 11217250)
                                          KELLY HART & HALLMAN, LLP
                                          201 Main Street, Suite 2500
                                          Fort Worth, TX 76102
                                          (817) 332-2500
                                          dee.kelly@kellyhart.com

                                          EUGENE SCALIA*
                                          HELGI C. WALKER*
                                          MAX E. SCHULMAN*
                                          LAEL D. WEINBERGER*
                                          MICAH S. QUIGLEY*∞
                                          GIBSON, DUNN & CRUTCHER LLP
                                          1050 Connecticut Avenue, N.W.
                                          Washington, DC 20036-5306
                                          (202) 955-8500
                                          escalia@gibsondunn.com

                                          BRIAN A. RICHMAN (TX Bar No. 24139696)
                                          GIBSON, DUNN & CRUTCHER LLP
                                          2001 Ross Avenue, Suite 2100
                                          Dallas, TX 75201
                                          (214) 698-3100
                                          brichman@gibsondunn.com

                                          *Counsel for Plaintiffs*


_____
* Admitted *pro hac vice*.
∞ Admitted only in Texas; practicing under the supervision of principals of the firm.

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing using the CM/ECF system on April 30, 2024, which will send an electronic notification of such filing to all counsel of record.

Respectfully submitted,

*/s/ Dee J. Kelly*

DEE J. KELLY (TX Bar No. 11217250)
KELLY HART & HALLMAN, LLP
201 Main Street, Suite 2500
Fort Worth, TX 76102
(817) 332-2500
dee.kelly@kellyhart.com

*Counsel for Plaintiffs*

44