Case No. 4:24-cv-00250-O

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

NATIONAL ASSOCIATION OF PRIVATE FUND MANAGERS;
ALTERNATIVE INVESTMENT MANAGEMENT ASSOCIATION, LIMITED; and
MANAGED FUNDS ASSOCIATION,
*Plaintiffs*,
– v. –
SECURITIES AND EXCHANGE COMMISSION,
*Defendant.*

**BRIEF OF *AMICUS CURIAE* FUTURES INDUSTRY ASSOCIATION
IN SUPPORT OF PLAINTIFFS**

Brant C. Martin
State Bar No. 24002529
brant.martin@wickphillips.com
Stafford P. Brantley
State Bar No. 24104774
stafford.brantley@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
100 Throckmorton Street, Suite 1500
Fort Worth, Texas 76102
Telephone:    (817) 332-7788
Fax:          (817) 332-7789

James M. Brady
Illinois State Bar No. 6308633
james.brady@katten.com
Robert Bourret
Illinois State Bar No. 6345334
robert.bourret@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe Street
Chicago, Illinois  60661
Telephone:    (312) 902-5362
Daniel J. Davis
Virginia State Bar No. 65385
District of Columbia Bar No. 484717
daniel.davis@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
1919 Pennsylvania Ave NW, Suite 800
Washington, DC 20006
Telephone:    (202) 625-3644
Brandon N. McCarthy
State Bar No. 24027486
brandon.mccarthy@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
2121 North Pearl Street, Suite 1100
Dallas, Texas  75201
Telephone:    (214) 765-3680

*Counsel for* Amicus Curiae

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION AND INTEREST OF *AMICUS CURIAE* .......................................................1

ARGUMENT ........................................................................................................................2

    I.   DEALER RULE ABANDONS LONGSTANDING INTERPRETATION OF "DEALER" DEFINITION IN EXCHANGE ACT ................................................. 3

        A. Background on Statutory Definition of "Dealer" ........................................3

        B. The Dealer Rule Contradicts the Commission's Longstanding Interpretation of Statute .......................................................................................................6

            1.   The Commission Contradicted Itself by Insisting Incidental Liquidity Provision Makes a Person a "Dealer" Under the Exchange Act ............................... 7

            2.   The Commission Wrongfully Suggested "De Facto" Market Making is Indicative of Dealing, Despite Never Taking That Position in a Final Rulemaking ...................................................................................9

   II.  ADOPTING RELEASE FAILS TO CONSIDER OTHER KEY CONSIDERATIONS RAISED BY COMMENTERS ........................................................................10

        A. The Commission Failed to Consider the Implications of Re-Classifying Large Swaths of Market Participants as Dealers ..........................................10

        B. Failure to Consider Effects of Net Capital Requirements ...........................12

          1. The One-Year Capital Lockup Requirement .........................................12

          2. The Commission Failed to Adequately Respond to Duffie Comment Letter ...........14

CONCLUSION ...................................................................................................................16

## TABLE OF AUTHORITIES

**Cases**

*Bus. Roundtable v. SEC,*
  647 F.3d 1144 (D.C. Cir. 2011) ........................................................................15

*Chamber of Com. v. Dep't of Lab.,*
  885 F.3d 360 (5th Cir. 2018).............................................................................9

*Chapel Invs., Inc. v. Cherubim Ints., Inc.,*
  177 F. Supp. 3d 981 (N.D. Tex. 2016)..............................................................4, 6

*Discover Growth Fund, LLC v. Beyond Com., Inc.,*
  561 F. Supp. 3d 1035 (D. Nev. 2021) ...............................................................6

*Discover Growth Fund, LLC v. Camber Energy, Inc.,*
  602 F. Supp. 3d 982 (S.D. Tex. 2022) ...............................................................6

*In re Immune Pharm. Inc.,*
  635 B.R. 118 (Bankr. D.N.J. 2021)....................................................................6

*In re Scripsamerica, Inc.,*
  634 B.R. 863 (Bank. D. Del. 2021) ...................................................................6

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ........................................................................................12, 15

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
  545 U.S. 967 (2005) ......................................................................................10

*Oceana Capitol Grp. v. Red Giant Ent., Inc.,*
  150 F.Supp.3d 1219 (D. Nev. 2015) .................................................................6

*Radzinskaia v. NH Mountain, LP,*
  2023 WL 6376457 (S.D. Fla. Sept. 29, 2023) .................................................5

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS,*
  985 F.3d 472 (5th Cir. 2021)............................................................................10

*Wages & White Lion Invs., LLC v. FDA,*
  90 F.4th 357 (5th Cir. 2024) ...........................................................................10

**Statutes**

Administrative Procedure Act, 5 U.S.C. § 500 et seq..................................................................2

5 U.S.C. § 706(2)(A)...............................................................................................................10

5 U.S.C. § 706(2)(C)............................................................................................................9, 10

Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. ..........................................................1

15 U.S.C. § 78c(a)(5)(A).............................................................................................................4

15 U.S.C. § 78c(a)(5)(B).............................................................................................................4

15 U.S.C. § 78c(a)(44)................................................................................................................4

15 U.S.C. § 78c(f) ...............................................................................................................13, 15

**Rules**

Net Capital Rule, 17 C.F.R § 240.15c3-1 (2022) ......................................................................11

17 C.F.R § 240.15c3-1(c)(2)(i)(G)(2) (2022) ...........................................................................13

**Regulations**

63 Fed. Reg. 59,362 (Nov. 3, 1998) .....................................................................................5, 10

68 Fed. Reg. 8,686 (Feb. 24, 2003) ......................................................................................5, 10

75 Fed. Reg. 80,174 (Dec. 21, 2010) ..........................................................................................5

77 Fed. Reg. 30,596 (May 23, 2012) ..........................................................................................5

87 Fed. Reg. 23,054 (Apr. 18, 2022) ..........................................................................................7

89 Fed. Reg. 14,938 (Feb. 29, 2024) ..........................................................................................1

**Other Authorities**

Comment Letter, J. Darrell Duffie, Professor of Management and Professor of Finance,
Stanford Graduate School of Business, Stanford University, (Jan. 10, 2024),
in response to 87 Fed. Reg. 23,054 (Apr. 18, 2022) ..................................................................11

Comm'r Hester M. Peirce, *Dealer, No Dealer?: Statement on Further Definition of "As a Part of
a Regular Business" in the Definition of Dealer and Government Securities Dealer in
Connection with Certain Liquidity Providers*, U.S. SEC. & EXCH. COMM'N (Feb. 6, 2024),
https://www.sec.gov/news/statement/peirce-statement-dealer-trader-020624 ...........................2, 3

*Guide to Broker-Dealer Registration*, U.S. SEC. & EXCH. COMM'N DIV. OF TRADING & MKTS
(Apr. 2008), https://www.sec.gov/about/reports-publications/investor-publications/guide-broker-
dealer-registration. ......................................................................................................................4

*How SIPC Protects You*, SEC. INV. PROT. CORP. (2015),
https://www.sipc.org/media/brochures/HowSIPCProtectsYou-English-Web.pdf. ......................11

Pls.' App. Supp. Mot. Summ. J. (Apr. 30, 2024) ..........................1, 2, 3, 6, 7, 8, 11, 12, 13, 14, 15

Pls.' Br. Supp. Mot. Summ. J. (Apr. 30, 2024)...................................................................2, 4, 9

U.S. SEC. & EXCH. COMM'N, UNIFORM APPLICATION FOR BROKER-DEALER
REGISTRATION ("FORM BD") (2024), https://www.sec.gov/files/formbd.pdf .............................15

**INTRODUCTION AND INTEREST OF *AMICUS CURIAE***

*Amicus curiae* is the Futures Industry Association ("FIA"), which is the leading global trade organization for the futures, options and centrally cleared derivatives markets. The FIA Principal Traders Group ("FIA PTG"), an affiliate group of FIA members, is an association of firms that trade their own proprietary capital in a principal capacity on exchanges in equities, options and futures markets worldwide.

In this case, the Securities and Exchange Commission (the "SEC" or the "Commission") adopted two new rules that attempt to significantly expand its authority by adopting a sweeping new interpretation of the defined terms "dealer" and "government securities dealer" under the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78a et seq. (the "Exchange Act") (collectively, the "Dealer Rule"). *See* Pls.' App. Supp. Mot. Summ. J. 54 (Apr. 30, 2024) (citing 89 Fed. Reg. 14,938 (Feb. 29, 2024) (the "Adopting Release")). As a result of this significant expansion, the Commission attempts to unlawfully assert its authority over a broad swath of market participants that have never before met the definition of "dealer" since the Exchange Act's adoption in 1934.

FIA PTG is uniquely situated to comment on the Dealer Rule because many FIA PTG members trade securities solely for themselves and have never met the statutory definition of dealer under the Exchange Act. Each FIA PTG member has relied on the well-established boundaries regarding what constitutes the statutory definition of a "dealer" in structuring its business. Given FIA PTG members' deep understanding of and familiarity with the statutory definition of "dealer," *amicus curiae* believes that this brief is helpful in explaining why the Dealer Rule signifies a dramatic departure from the existing text, structure, and history of the Exchange Act.

1

As further background on *amicus curiae* and its members, FIA is a leading global organization with offices in Brussels, London, Singapore and Washington, D.C. FIA's membership includes clearing firms, exchanges, clearinghouses, trading firms and commodities specialists from more than forty-eight countries, as well as technology vendors, lawyers and other professionals serving the industry.

FIA PTG members are active in a wide variety of asset classes, including equities, fixed income, foreign exchange and commodities. FIA PTG member firms enable other market participants, including individual investors, to manage their risks and invest effectively. FIA PTG advocates for open access to markets, transparency and data-driven policy.

## ARGUMENT

As Plaintiffs have noted, the Dealer Rule exceeds the Commission's statutory authority and is arbitrary and capricious, and, under the Administrative Procedure Act, 5 U.S.C. § 500 et seq. (the "APA"), the Court should set it aside in its entirety. Pls.' Br. Supp. Mot. Summ. J. 3–4. This brief does not seek to retread the same ground covered by the Plaintiffs' Brief in Support of Motion for Summary Judgment. ("Plaintiffs' Brief"). Instead, this brief seeks to debunk a central myth in the Commission's latest rulemaking—that the Dealer Rule is consistent with the statutory definition of a dealer and "intended to reflect the longstanding" interpretation of the Commission on what constitutes "dealer" activity under the statute. Pls.' App. 61. Rather than remain consistent with that longstanding interpretation, the Commission departed dramatically from its existing statements by adopting an expansive Dealer Rule that requires market participants to register with the Commission as broker-dealers "merely because [they have] the effect of providing liquidity." Comm'r Hester M. Peirce, *Dealer, No Dealer?: Statement on Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer in Connection*

*with Certain Liquidity Providers*, U.S. SEC. & EXCH. COMM'N (Feb. 6, 2024), https://www.sec.gov/news/statement/peirce-statement-dealer-trader-020624. However, instead of acknowledging this dramatic departure, the Commission inexplicably insisted that it intended to allow market participants "whose liquidity provision is only *incidental* to their trading activities" to remain unregistered, while on the other hand prescribing a Dealer Rule that requires registration for these very same market participants. Pls.' App. 61 (emphasis added); *see* Section I.B, *infra.*

In addition, the Commission failed to adequately consider or respond to important comments by the public, including a comment letter that correctly explained how the Dealer Rule will have significant adverse consequences in the U.S. Treasury markets in particular given the capital consequences on the typical proprietary trading firms that trade U.S. Treasuries, as well as several other comment letters describing the significant costs associated with re-classifying large swaths of market participants as broker-dealers. *See* Section II, *infra.*

## I. Dealer Rule Abandons Longstanding Interpretation of "Dealer" Definition in Exchange Act

The "dealer" definition in the Exchange Act has remained largely unchanged since its adoption in 1934. Likewise, the Commission's analysis of the types of activities that meet the "dealer" definition under the Exchange Act had remained largely unchanged for many decades as well. *See* Section I.A, *infra*. Or rather, the Commission's analysis had remained unchanged until the Commission's puzzling adoption of the Dealer Rule. *See* Section I.B, *infra*.

### A. Background on Statutory Definition of "Dealer"

The Exchange Act defines the term "dealer" as "any person engaged *in the business* of buying and selling securities . . . for such person's own account through a broker or otherwise." 15 U.S.C. § 78c(a)(5)(A) (emphasis added). This definition explicitly confirms that a person that

trades securities but "not as a part of a regular business" is not a dealer. 15 U.S.C. § 78c(a)(5)(B). Similarly, the Exchange Act sets forth parallel language applicable to government securities dealers.[1] 15 U.S.C. § 78c(a)(44). As Plaintiffs explain, the legislative history of the Exchange Act and ordinary principles of statutory interpretation make clear that a "dealer" is "*in the business*" if it effects securities transactions *for its customers*. Pls.' Br. 10–15.

This brief does not reiterate Plaintiffs' arguments but rather highlights that simply trading for oneself is not "dealer" activity. As explained previously by this Court, a firm "cannot be considered a dealer" if the firm trades only for "its own best interests," and "does not provide advice or services to other investors." *Chapel Invs., Inc. v. Cherubim Ints., Inc.*, 177 F. Supp. 3d 981, 991 (N.D. Tex. 2016) (O'Connor, J.).

This plain interpretation of the statute is reflected on the Commission's website in a layperson's guide for market participants, entitled "Guide to Broker-Dealer Registration," in which Commission staff notes that "[i]ndividuals who buy and sell securities for themselves generally are considered traders and not dealers." *Guide to Broker-Dealer Registration*, U.S. SEC. & EXCH. COMM'N DIV. OF TRADING & MKTS (Apr. 2008), https://www.sec.gov/about/reports-publications/investor-publications/guide-broker-dealer-registration.

Over the decades, the Commission and the U.S. Federal courts have distinguished persons in the business of "dealing" securities from other types of market participants investing for themselves. In a 2012 joint release further defining the terms "swap dealer" and "security-based

---

[1]   The terms "dealer" and "government securities dealer" each contain substantively identical language in the Exchange Act for purposes of the Dealer Rule and the analysis set forth in this brief. As such, unless context otherwise requires, each reference in this brief to "dealer" should be interpreted to refer to each of "dealer" and "government securities dealer," as applicable.

swap dealer" (among others), the SEC and the Commodity Futures Trading Commission provided that the SEC's longstanding interpretation of the "dealer" definition:

> Recognizes that dealers normally have a *regular clientele*, *hold themselves out* as buying or selling securities at a regular place of business, have a regular turnover of inventory (or participate in the sale or distribution of new issues, such as by acting as an underwriter), *and* generally provide liquidity services in transactions with investors (or, in the case of dealers who are market makers, for other professionals). . . . [O]ther nonexclusive factors that are relevant for distinguishing between dealers and non-dealers can include receipt of customer property and the furnishing of incidental advice in connection with transactions. 77 Fed. Reg. 30,596, 30,599 fn.31 (May 23, 2012) (emphasis added) (citations omitted) (quoting 75 Fed. Reg. 80,174, 80,177 (Dec. 21, 2010); *see also* 68 Fed. Reg. 8,686, 8,688 (Feb. 24, 2003) (providing the same language).

Likewise, when adopting rules relevant to dealer banks in 2003, the Commission enumerated various activities that constitute "dealer" activity under the Exchange Act, including activities generally involving having regular clientele, "holding [oneself] out" as a dealer or market maker, acting as an underwriter or otherwise acting as a dealer on behalf of an affiliated broker-dealer. 68 Fed. Reg. 8,686, 8,689 fn.26 (Feb. 24, 2003) (citing 63 Fed. Reg. 59,362, 59,370 fn.61 (Nov. 3, 1998).

In addition, U.S. Federal courts have repeatedly and consistently distinguished persons "in the business of" dealing securities from other types of market participants. As noted by Plaintiffs, this Court's holding in *Chapel Investments* has been explicitly adopted by courts throughout the country, *see Radzinskaia v. NH Mountain, LP*, 2023 WL 6376457, at *4 (S.D. Fla. Sept. 29, 2023)

(following Chapel Investments' holding that "dealers" "transact securities on behalf of clients"); *Discover Growth Fund, LLC v. Camber Energy, Inc.*, 602 F. Supp. 3d 982, 989 (S.D. Tex. 2022) (similar); *Discover Growth Fund, LLC v. Beyond Com., Inc.*, 561 F. Supp. 3d 1035, 1040 (D. Nev. 2021) (similar); *In re Immune Pharm. Inc.*, 635 B.R. 118, 124 (Bankr. D.N.J. 2021) (similar); *In re Scripsamerica, Inc.*, 634 B.R. 863, 872 (Bank. D. Del. 2021) (similar). In addition, other U.S. Federal courts have determined that dealer activity includes "soliciting investor clients, handling investor clients' money and securities, [and] rendering investment advice to advisors." *In re Scripsamerica, Inc.*, 634 B.R. at 872. This also "distinguish[es] the activities of a dealer from those of a private investor or trader . . . an investor or trader may buy securities from issuers at substantial discounts and resell them into the public market for immediate profit, [whereas] a dealer buys and sells securities from its customer and to its customer." *Id.*; *see also Chapel Invs., Inc.*, 177 F. Supp. at 990 (citing *Oceana Capitol Grp. v. Red Giant Ent., Inc.*, 150 F.Supp.3d 1219, 1226 (D. Nev. 2015)) (providing that "[a] person who buys and sells securities for his own account in the capacity of a trader or individual investor is generally not considered to be engaged in the business of buying and selling securities and consequently, would not be deemed a dealer.").

### B.  The Dealer Rule Contradicts the Commission's Longstanding Interpretation of Statute

In the Adopting Release, the Commission contended that the Dealer Rule is "intended to reflect the longstanding distinction between so-called 'traders'—whose *liquidity provision is only incidental* to their trading activities—and persons who are 'in the business'" of dealing under the Exchange Act. Pls.' App. 61 (emphasis added). However, the Commission contradicted its self-proclaimed intention to honor the "longstanding distinction" by adopting a Dealer Rule that now characterizes "incidental" liquidity provision as being "dealer" activity. *See* Section I.B.1, *infra*.

6

To make matters worse, in the Adopting Release, the Commission ignored its own prior statements regarding the statutory definition of a "dealer" without explanation. *See* Section I.B.2, *infra*.

### 1. The Commission Contradicted Itself by Insisting Incidental Liquidity Provision Makes a Person a "Dealer" Under the Exchange Act.

As the Commission correctly points out in the preamble of the Adopting Release, a dealer does not include persons "whose liquidity provision is only incidental to their trading activities." Pls.' App. 61. However, the Commission then contradicted itself by redefining the term "dealer" so broadly that it could capture all of those market participants and does not consider the intentionality of the liquidity provision. *See* 87 Fed. Reg. 23,054, 23,062 (Apr. 18, 2022) (the "Proposing Release") (acknowledging that "all market participants who buy or sell securities in the marketplace arguably contribute to a market's liquidity"). Specifically, the Dealer Rule provides that a person meets the statutory definition of "dealer" if, *inter alia*, that person:

> Engages in a regular pattern of buying and selling securities that has the effect of providing liquidity to other market participants by . . . [r]egularly expressing trading interest that is at or near the best available prices on both sides of the market for the same security and that is communicated and represented in a way that makes it accessible to other market participants. Pls.' App. 125.

In the Proposing Release, the Commission repeatedly stated that "a person's intent is irrelevant" in determining whether that person meets the definition of "dealer." *See* Pls.' App. 13 fn.131; *see also id*. at 9 fn.91 (providing that the "[proposed Dealer Rule] focus[es] on effect regardless of a person's intention. The fact that the provision of liquidity is a fundamental aspect of the activities captured by the qualitative standards does not mean that such liquidity provision need be deliberate to come within the [proposed Dealer Rule]. Intent is not required by the statutory

7

language, nor is it relevant in every circumstance."). In the Adopting Release, the Commission did not refute or otherwise address its previous insistence that the Dealer Rule focuses on the effect of a person's trading activity regardless of a person's intention.

As a result, if a trading entity regularly trades on both sides of the market at the best available prices for the same security on an exchange, then that person would be considered a "dealer" under the Dealer Rule—irrespective of the intent of the trading entity or whether they are actually "in the business of" dealing as required by the statute. Indeed, under the Dealer Rule, it is sufficient that the trading entity's trading activity "has the effect of providing liquidity." As a common example, a person could risk being a dealer under the Commission's new interpretation even if the trading entity consisted of multiple independent trading desks that trade different strategies with no cooperation or coordination among the trading desks. If one trading desk regularly trades a common equity security (e.g., AAPL) on one side of the market, and another trading desk regularly trades the same common equity security on the other side of the market, then the trading entity appears to be deemed a "dealer" under the Dealer Rule. This would even be the result under the Dealer Rule if the trading desks do not trade the same common equity security on both sides of the market *at the same time* given that the Commission expressly rejected a simultaneity requirement. Pls.' App. 67 (noting that the Commission rejects any "requirement that the trading interest be expressed simultaneously on both sides of the market").

In other words, the Dealer Rule will require many persons incidentally providing liquidity to the markets to register with the Commission as "dealers," notwithstanding the Commission's own assertion in the preamble of the Adopting Release that the Dealer Rule is intended to reflect the Commission's longstanding position that incidental liquidity provision is not indicative of "dealer" activity under the statute. *Id*. Instead, the Commission has adopted a Dealer Rule that is

wildly overbroad and inconsistent with the statute and the Commission's longstanding interpretation in violation of Section 706(2)(C) of the APA. 5 U.S.C. § 706(2)(C). In fact, as pointed out by Plaintiffs, the Dealer Rule is so incredibly broad so as to require explicit exclusions for registered investment companies, the Federal Reserve Bank of New York and the International Monetary Fund, among other entities. Pls.' Br. 15–16 (noting that these carve-outs have no statutory basis and "should have alerted [the Commission] that it had taken a wrong interpretive turn.'" *Chamber of Com. of U.S. v. Dep't of Labor*, 885 F.3d 360, 383 (5th Cir. 2018)").

### 2. The Commission Wrongfully Suggested "De Facto" Market Making is Indicative of Dealing, Despite Never Taking That Position in a Final Rulemaking.

In the Adopting Release, the Commission repeatedly pointed to the phrase "*de facto* market maker" for its dramatic expansion of the definition of dealer. However, the Commission failed to explain that the phrase "*de facto* market maker" has never before been considered a litmus test for dealer registration in a final Commission rulemaking. The phrase previously only appeared *once* in the Federal Register—in a *proposing release* published in 2002—and was never incorporated into a final rulemaking. In the subsequent adopting release published in 2003, the Commission reverted to phrases much more aligned with its prior interpretation of the "dealer" definition, including "holding [oneself] out as a dealer or market-maker or as being otherwise willing to buy or sell one or more securities on a continuous basis," as well as other phrases that imply having regular clientele. 68 Fed. Reg. 8,686, 8,689 fn.26 (Feb. 24, 2003) (citing 63 Fed. Reg. 59,362, 59,370 fn.61 (Nov. 3, 1998)).[2]

---

[2]  In the Adopting Release, the Commission's repeated use of the phrase "*de facto* market maker" also ignored the context in which the phrase was provided in the 2002 proposal. More specifically, the proposal stated "acting as a *de facto* market maker whereby market professionals or the public look to the firm for liquidity," which implies that the person must "hold itself out" as a market maker. This is especially clear when the phrase is put in the context of the Commission's longstanding interpretation of the "dealer" definition, as described above.

There is a simple explanation why the Commission never formally adopted the phrase "*de facto* market maker" in a previous rulemaking: such a definition is wholly inconsistent with the statutory language in the Exchange Act in violation of Section 706(2)(C) of the APA. 5 U.S.C. § 706(2)(C).

In addition to the absence of statutory authority, the Commission's actions are arbitrary and capricious because the Final Rule departs dramatically from the Commission's prior policy and practice without explanation. An empty declaration that the Final Rule is intended to reflect the Commission's longstanding interpretation of the "dealer" definition is not an explanation— particularly given the contradictory language in the Final Rule itself. *See* Section I.B.1, *supra*. As such, the Commission failed to acknowledge "that it is changing position," let alone "provide a detailed justification for its change." *Wages & White Lion Invs., LLC v. FDA*, 90 F.4th 357, 381 (5th Cir. 2024) (citation omitted). The Commission's unexplained inconsistencies serve as evidence that the adoption of the Dealer Rule was arbitrary and capricious in violation of Section 706(2)(A) of the APA. 5 U.S.C. § 706(2)(A); *see also Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 479 (5th Cir. 2021) (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (clarifying that "[u]nexplained inconsistency is . . . a reason for holding [agency action] to be . . . arbitrary and capricious")).

## II.   ADOPTING RELEASE FAILS TO CONSIDER OTHER KEY CONSIDERATIONS RAISED BY COMMENTERS

### A. The Commission Failed to Consider the Implications of Re-Classifying Large Swaths of Market Participants as Dealers.

Many proprietary trading firms trade securities solely for themselves and have never met the statutory definition of dealer under the Exchange Act, but nevertheless, the Dealer Rule will require a significant portion of these same proprietary trading firms to register with the

10

Commission as broker-dealers. As pointed out by several comment letters on the Proposing Release, there are significant burdens associated with broker-dealer registration, and many of these burdens are ill-suited for proprietary trading firms trading solely for themselves. *See* Pls.' App. 162–63, 548–50. As an example, the Commission's net capital requirements applicable to all broker-dealers, 17 C.F.R § 240.15c3-1, including the One-Year Capital Lockup (as defined below) requirement, are designed to protect the money and other liabilities owed to a broker-dealer's customers and counterparties. Pls.' App. 162–63, 548–50. Similarly, the requirement to join the Securities Investor Protection Corporation ("SIPC") is designed to protect the assets that broker-dealers hold on behalf of their customers. *How SIPC Protects You*, SEC. INV. PROT. CORP. 3–5 (2015), https://www.sipc.org/media/brochures/HowSIPCProtectsYou-English-Web.pdf. In addition, broker-dealers generally are required to become members of the Financial Industry Regulatory Authority ("FINRA") and, in certain instances, other self-regulatory organizations, including becoming subject to related regulatory examinations and inspections. Pls.' App. 162–63. The combined costs of maintaining minimum net capital in accordance with Commission rules, maintaining SIPC membership and maintaining membership in FINRA and potentially other self-regulatory organizations would be significant and largely unnecessary for proprietary trading firms that do not have any customers.

As another example, comment letters specified significant costs associated with various trade reporting requirements applicable to broker-dealers, including Consolidated Audit Trail ("CAT") reporting for transactions in equities and listed options securities, as well as Trade Reporting and Compliance Engine ("TRACE") reporting for transactions in certain U.S.-dollar-denominated debt securities. Pls.' App. 163, 181–82, 227–28, 274, 280, 308–10, 331. As noted by several commenters, these transaction reporting costs are significant and likely will exceed

$1,000,000 or more per firm annually, depending on the size of the firm and the products traded. *Id.* However, the Commission failed to adequately consider the costs specific to CAT reporting, instead indicating without any justification that it "believes few, if any" of the market participants identified as being potentially subject to broker-dealer registration under the new Dealer Rule "will incur CAT-related reporting costs." Pls.' App. 101.

The combined effect of these costs will be to discourage certain proprietary trading firms from participating in U.S. securities markets rather than undergo the regulatory costs described above. Pls.' App. 158–59, 548–50. While the Commission attempts to address this issue in the Adopting Release, Pls.' App. 109–12, the Commission fails to incorporate in its analysis the negative effects that the absence will have on U.S. securities markets in times of increased volatility and stress. In other words, the Commission fails to consider the negative effects of the Dealer Rule in chasing away proprietary trading firms during periods in which U.S. securities markets desperately need more—rather than fewer—active market participants. This faulty analysis demonstrates a failure to "consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As such, the Commission has failed to comply with the general requirements of the APA and its duty under the Exchange Act to consider whether its rules "will promote efficiency, competition, and capital formation." 15 U.S.C. § 78c(f).

### B. Failure to Consider Effects of Net Capital Requirements

#### 1. The One-Year Capital Lockup Requirement

As an especially pertinent example, this brief highlights the Commission's failure to respond adequately to a comment letter submitted by J. Darrell Duffie, Professor of Management and Professor of Finance, Stanford Graduate School of Business, Stanford University, (Jan. 10,

2024), in response to the Proposing Release (the "Duffie Comment Letter"). In the Duffie Comment Letter, Professor Duffie correctly points out that existing Commission rules restricting a broker-dealer from withdrawing capital contributed for purposes of meeting its net capital requirements for a minimum of one-year "may have an adverse impact on Treasury market liquidity and potentially exacerbate episodes of market dysfunction, which could become more frequent and severe given the burgeoning size of the Treasury market relative to the intermediation capacity of the market." Pls.' App. 549. More specifically, Commission-registered broker-dealers (including government securities broker-dealers) are subject to Commission Rule 15c3-1(c)(2)(i)(G)(2), which generally provides that each broker-dealer must subtract from its net capital any contribution of capital that has been withdrawn (or intended to be withdrawn) within one year of contribution of the capital (the "One-Year Capital Lockup"). Net Capital Rule, 17 C.F.R § 240.15c3-1(c)(2)(i)(G)(2) (2022).

Many proprietary trading firms conduct trading activities in more than one trading entity with a well-capitalized parent company that can deploy capital to one or more of its trading subsidiaries on an as-needed basis. However, the One-Year Capital Lockup requirement hinders this allocation of capital for many of these proprietary trading firms. As described in the Duffie Comment Letter:

> The parent can make these capital contributions opportunistically, whenever market conditions suggest that expected returns are higher, relative to risk, in one trading subsidiary in comparison with another. If, however, a subsidiary that trades government securities becomes registered as a government securities dealer, then capital that is downstreamed to that subsidiary must remain in that subsidiary for at least one year, to the extent that the capital contribution is necessary to meet the

dealer's regulatory capital requirements at any point in time during that year. Thus, to make efficient use of the parent firm's capital, the parent will choose to trap less of its capital in its government securities dealer subsidiary than it would in a non-dealer subsidiary with similar risk-and-return opportunities. As a result, when US Treasury market liquidity deteriorates, as during the COVID shock of March of 2020, we would expect less capital to be committed to the US Treasury market by some firms that must newly register as government securities dealers under the proposed rulemaking than would be the case if those firms were not to register as government securities dealers. Pls.' App. 549.

The Duffie Comment Letter further notes that this One-Year Capital Lockup effect could significantly dampen the mobility of capital into U.S. government securities markets. Pls.' App. 550. Professor Duffie explains that during periods in which U.S. government securities markets are experiencing excessively low liquidity, "flows of capital into the market that could improve liquidity may be inefficiently held back, with a likely adverse impact on market liquidity. Moreover, capital formation at the parent level would probably be reduced, given the loss of efficiency with which capital could be deployed across multiple trading subsidiaries." *Id.*

As a potential solution to this issue, Professor Duffie suggests that the Commission may wish to consider an amendment to broker-dealer net capital requirements to allow for capital to be withdrawn within a much shorter period of time. *Id.*

### 2.  The Commission Failed to Adequately Respond to Duffie Comment Letter.

In the Adopting Release, the Commission vaguely referenced the issue raised in the Duffie Comment Letter but declined to meaningfully address it or consider the costs to the U.S. Treasury

market and market participants. Pls.' App. 108. In addition, the Adopting Release failed to address Professor Duffie's suggestion in the Duffie Comment Letter to amend net capital requirements for broker-dealers to allow for capital to be withdrawn within a much shorter period of time. Instead, the Commission noted that it "cannot quantify the costs to these affected parties and their investors of scaling back trading activities or reorganizing since [it does] not know the scope of their current activities, how profitable those activities may be, or how market participants may allocate trading across different legal entities." *Id.*

Notwithstanding the Commission's dismissive response, the Commission is aware of its Rule 15c3-1 under the Exchange Act, including the One-Year Capital Lockup requirement included in that rule. The Commission also is aware of the typical corporate structure of proprietary trading firms given that many of these firms already have registered at least one trading subsidiary with the Commission as a broker-dealer. (As background, each broker-dealer must disclose its ownership structure to the Commission on its Form BD. *See* U.S. SEC. & EXCH. COMM'N, UNIFORM APPLICATION FOR BROKER-DEALER REGISTRATION ("FORM BD") 11–12 (2024), available at https://www.sec.gov/files/formbd.pdf (requiring the disclosure of a broker-dealer's ownership structure on Schedules A and B)). In any event, the Commission failed its important obligation "to apprise itself . . . of the economic consequences of a proposed regulation." *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011). Likewise, the Commission "failed to consider [] important aspect[s] of the problem" raised by Professor Duffie, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), contrary to the general requirements of the APA and in violation of the Commission's duty under the Exchange Act to consider whether its rules "will promote efficiency, competition, and capital formation." 15 U.S.C. § 78c(f).

## <u>CONCLUSION</u>

For the foregoing reasons and the reasons set forth in the Plaintiffs' Brief, the Court should grant Plaintiffs' motion for summary judgment and vacate the Dealer Rule in its entirety.

Dated: May 7, 2024.

Respectfully submitted,

*/s/ Brant C. Martin*
Brant C. Martin
State Bar No. 24002529
*brant.martin@wickphillips.com*
Stafford P. Brantley
State Bar No. 24104774
*stafford.brantley@wickphillips.com*
**WICK PHILLIPS GOULD & MARTIN, LLP**
100 Throckmorton Street, Suite 1500
Fort Worth, Texas 76102
Telephone:     (817) 332-7788
Fax:               (817) 332-7789
-and-
James M. Brady *(pro hac vice forthcoming)*
Illinois State Bar No. 6308633
james.brady@katten.com
Robert Bourret *(pro hac vice forthcoming)*
Illinois State Bar No. 6345334
robert.bourret@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe Street
Chicago, Illinois  60661
Telephone:     (312) 902-5362
Daniel J. Davis *(pro hac vice forthcoming)*
Virginia State Bar No. 65385
District of Columbia Bar No. 484717
daniel.davis@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
1919 Pennsylvania Ave NW, Suite 800
Washington, DC 20006
Telephone: (202) 625-3644
Brandon N. McCarthy
State Bar No. 24027486
brandon.mccarthy@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
2121 North Pearl Street, Suite 1100
Dallas, Texas  75201
Telephone:     (214) 765-3680

**ATTORNEYS FOR FUTURES INDUSTRY
ASSOCIATION**

## CERTIFICATE OF SERVICE

This is to certify that on May 7, 2024, a true and correct copy of the foregoing document was filed and served in accordance with the Federal Rules of Civil Procedure via the CM/ECF filing system on all counsel of record.

*/s/ Brant C. Martin*
Brant C. Martin