# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

NATIONAL ASSOCIATION OF PRIVATE FUND
MANAGERS, ALTERNATIVE INVESTMENT
MANAGEMENT ASSOCIATION, LIMITED, and
MANAGED FUNDS ASSOCIATION,

    *Plaintiffs*,

        v.                                    No. 4:24-cv-00250-O

SECURITIES AND EXCHANGE COMMISSION,

    *Defendant*.

## DEFENDANT SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

KEEFE M. BERNSTEIN (TBN 24006839)
Securities and Exchange Commission
Fort Worth Regional Office
801 Cherry Street, Suite 1900
Fort Worth, TX 76102
(817) 900-2607
bernsteink@sec.gov

DOMINICK V. FREDA (*pro hac vice*)
Assistant General Counsel

EMILY TRUE PARISE (*pro hac vice*)
Senior Appellate Counsel

SAMUEL B. GOLDSTEIN (*pro hac vice*)
Counsel to the General Counsel

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
(202) 551-7692 (Goldstein)
goldsteinsa@sec.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................. 1

BACKGROUND ............................................................................... 3

    A.    Statutory and Regulatory Background ................................. 3

    B.    Proceedings Before the Commission................................... 6

        1.    The Commission proposed a rule to further define "as a part of a regular business" in the dealer definition in connection with certain liquidity providers. ................................................................. 6

        2.    The Commission adopted the rule with modifications based on input from commenters and analyzed the rule's economic effects............................. 8

LEGAL STANDARD......................................................................... 11

ARGUMENT .................................................................................. 12

I.    The rule is within the Commission's statutory authority................................. 13

    A.    The rule is a proper exercise of the Commission's statutory authority to define terms used in the Exchange Act................................. 13

    B.    Plaintiffs' contrary arguments lack merit. ................................. 15

        1.    The dealer definition is not limited to persons who effectuate customer orders................................................................. 15

        2.    The rule does not improperly redefine the dealer definition.................... 22

        3.    The rule's exemptions do not indicate that it exceeds the Commission's statutory authority. ................................. 22

        4.    Regulating certain hedge funds as dealers does not contravene the Exchange Act or any other statute. ................................. 24

II.    The rule is reasonable and reasonably explained.................................... 25

    A.    The Commission adequately substantiated the problems that the rule is designed to address................................................................. 25

    B.    The Commission adequately considered the rule's potential effects on a limited number of hedge funds................................. 31

C.   The Commission acted reasonably in adopting the two qualitative factors. ......... 36

D.   The Commission adequately considered the rule's effect on efficiency, competition, and capital formation. ...................................................... 41

E.   The rule is consistent with prior Commission positions....................................... 47

CONCLUSION............................................................................................................... 50

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.*,
78 F.4th 210 (5th Cir. 2023) ................................................................. 46

*Beecham v. United States*,
511 U.S. 368 (1994) ........................................................................... 17

*Biestek v. Berryhill*,
139 S. Ct. 1148 (2019) ....................................................................... 12

*Bittner v. United States*,
598 U.S. 85 (2023) ............................................................................. 16

*Bloomberg L.P. v. SEC*,
45 F.4th 462 (D.C. Cir. 2022) ...................................................... 42, 43

*Cent. Bank, N.A. v. First Interstate Bank, N.A.*,
511 U.S. 164 (1994) ............................................................................. 3

*Chamber of Commerce of U.S. v. U.S. SEC*,
85 F.4th 760 (5th Cir. 2023) ...................................................... 42, 43, 44

*Chapel Invs., Inc. v. Cherubim Interests, Inc.*,
177 F. Supp. 3d 981 (N.D. Tex. 2016) ............................................... 20

*Clean Water Action v. U.S. EPA*,
936 F.3d 308 (5th Cir. 2019) ............................................................. 12

*Discover Growth Fund, L.L.C. v. Beyond Commerce, Inc.*,
561 F. Supp. 3d 1035 (D. Nev. 2021) ................................................ 21

*Discover Growth Fund, L.L.C. v. Camber Energy, Inc.*,
602 F. Supp. 3d 982 (S.D. Tex. 2022) ............................................... 21

*Eastside Church of Christ v. Nat'l Plan, Inc.*,
391 F.2d 357 (5th Cir. 1968) ...................................................... 3, 4, 15

*FCC v. Fox TV Stations, Inc.*,
556 U.S. 502 (2009) ...................................................................... 27, 41

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .............................................................. 12, 25, 45

*GPA Midstream Ass'n v. U.S. Dep't of Transp.*,
67 F.4th 1188 (D.C. Cir. 2023) ......................................................... 50

*Huawei Techs. USA, Inc. v. FCC*,
2 F.4th 421 (5th Cir. 2021) .................................................. 11, 25, 29, 31

*In re Immune Pharms. Inc.*,
635 B.R. 118 (Bankr. D.N.J. 2021) ................................................. 21

*K Mart Corp. v. Cartier*,
486 U.S. 281 (1988) ......................................................................... 50

*Levine v. SEC*,
407 F.3d 178 (3d Cir. 2005) ............................................................ 17

*Loan Syndications & Trading Ass'n v. SEC*,
882 F.3d 220 (D.C. Cir. 2018) ........................................................ 50

*Nasdaq Stock Mkt. L.L.C. v. SEC*,
34 F.4th 1105 (D.C. Cir. 2022) ........................................ 30, 32, 35, 42

*Nasdaq Stock Mkt. L.L.C. v. SEC*,
38 F.4th 1126 (D.C. Cir. 2022) ....................................................... 27

*Nat. Res. Def. Council v. Wheeler*,
955 F.3d 68 (D.C. Cir. 2020) ......................................................... 50

*Pharm. Rsch. & Mfrs. of Am. v. FTC*,
790 F.3d 198 (D.C. Cir. 2015) ........................................................ 41

*Radzinskaia v. NH Mountain, LP*,
2023 WL 6376457 (S.D. Fla. Sept. 29, 2023) ............................... 21

*Roth v. SEC*,
22 F.3d 1108 (D.C. Cir. 1994) ...................................................... 3-4

*In re ScripsAmerica, Inc.*,
634 B.R. 863 (Bankr. D. Del. 2021) ............................................... 21

*SEC v. Almagarby*,
92 F.4th 1306 (11th Cir. 2024) ..................... 2, 5, 14, 15, 16, 24, 49

*SEC v. Keener*,
--- F.4th ---, 2024 WL 2745055 (11th Cir. May 29, 2024) ......... 14, 15, 16, 17, 18, 19, 24

*SEC v. Murphy*,
50 F.4th 832 (9th Cir. 2022) .......................................................... 17

*Sid Peterson Mem'l Hosp. v. Thompson*,
274 F.3d 301 (5th Cir. 2001) ......................................................... 27

*Sw. Elec. Power Co. v. U.S. EPA*,
920 F.3d 999 (5th Cir. 2019) ......................................................... 50

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
989 F.3d 368 (5th Cir. 2021) ......................................................... 49

*VanDerStok v. Garland*,
    2023 WL 4945360 (5th Cir. July 24, 2023) ................................................ 50

*Worldcall Interconnect, Inc. v. FCC*,
    907 F.3d 810 (5th Cir. 2018) ...................................................................... 12

*XY Planning Network, LLC v. SEC*,
    963 F.3d 244 (2d Cir. 2020) ....................................................................... 21

**Statutes**

Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*

    Section 2, 15 U.S.C. § 78b ......................................................................... 3

    Section 3, 15 U.S.C. § 78c .......................... 5, 6, 13, 16, 17, 19, 20, 22, 23, 41

    Section 3(a)(5), 15 U.S.C. § 78c(a)(5)........................................ 4, 5, 16, 18, 41

    Section 3(a)(5), 15 U.S.C. § 78c(a)(5)(A) ............................... 5, 13, 17, 19, 23

    Section 3(a)(5), 15 U.S.C. § 78c(a)(5)(B) ......................................... 5, 13, 16

    Section 3(a)(9), 15 U.S.C. § 78c(a)(9) ...................................................... 23

    Section 3(a)(22), 15 U.S.C. § 78c(a)(22)(A) .............................................. 19

    Section 3(a)(44), 15 U.S.C. § 78c(a)(44)(A) ............................................... 6

    Section 3(a)(61), 15 U.S.C. § 78c(a)(61)(A) .............................................. 19

    Section 3(a)(71), 15 U.S.C. § 78c(a)(71) ................................................... 19

    Section 3(b), 15 U.S.C. § 78c(b) .......................................................... 5, 13

    Section 3(f), 15 U.S.C. § 78c(f) ......................................................... 41, 44

    Section 6, 15 U.S.C. § 78f ........................................................................ 25

    Section 6, 15 U.S.C. § 78f(c)(1) ............................................................... 25

    Section 15, 15 U.S.C. § 78o(a)(1) .......................................................... 4, 6

    Section 15, 15 U.S.C. § 78o(b)(1) .............................................................. 4

    Section 15, 15 U.S.C. § 78o(c) ................................................................... 4

    Section 17, 15 U.S.C. § 78q(a)(1) .............................................................. 4

    Section 17, 15 U.S.C. § 78q(b)(1) .............................................................. 4

    Section 17, 15 U.S.C. § 78q(e)(1)(A) ......................................................... 4

    Section 23, 15 U.S.C. § 78w(a)(1) ............................................................ 13

    Section 23, 15 U.S.C. § 78w(a)(2) ............................................................ 41

    Section 25, 15 U.S.C. § 78y(a)(4) ............................................................ 12

Investment Company Act of 1940, 15 U.S.C. § 80a-1 *et seq.*

    Section 3, 15 U.S.C. § 80a-3(c)(1) ........................................................... 24

    Section 3, 15 U.S.C. § 80a-3(c)(7) ........................................................... 24

Investment Advisers Act of 1940. 15 U.S.C. § 80b-1 *et seq.*

    Section 201, 15 U.S.C. § 80b-1 ........................................................... 30

    Section 202, 15 U.S.C. § 80b-2(a)(29) ................................................. 24

Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.*

    15 U.S.C. § 78ccc ................................................................................ 36

5 U.S.C. § 706(2)(A) ................................................................................ 11

5 U.S.C. § 706(2)(C) ................................................................................ 11

**Commission Regulations**

Rules under the Securities Exchange Act of 1934, 17 C.F.R. § 240.01 *et seq.*

    17 C.F.R. § 240.15b9-1 ......................................................................... 19

    17 C.F.R. § 240.15c1-2 ........................................................................... 4

    17 C.F.R. § 240.15c3-1 ............................................................................4

    17 C.F.R. § 240.15c3-1(a)(2)(vi) ......................................................... 19

    17 C.F.R. § 240.15c3-1(a)(6)(ii) .......................................................... 19

    17 C.F.R. § 240.15c3-3 ...........................................................................36

    17 C.F.R. § 240.15c3-3(e) ........................................................................4

    17 C.F.R. § 240.15c3-3(k)(2)(i) ........................................................... 19

    17 C.F.R. § 240.17a-11(a) ....................................................................... 4

    17 C.F.R. § 240.17a-11(b) ....................................................................... 4

    17 C.F.R. § 240.17a-3(a) ......................................................................... 4

    17 C.F.R. § 240.17a-4 ..............................................................................4

    17 C.F.R. § 240.17a-5(a) ..........................................................................4

    17 C.F.R. § 240.17a-5(d)(1) .....................................................................4

    17 C.F.R. § 240.17a-5(d)(2) .....................................................................4

    17 C.F.R. § 240.17a-5(d)(3) .....................................................................4

17 C.F.R. § 279.9 ...................................................................................... 30

**Commission Releases**

*Definition of Terms in and Specific Exemptions for Banks, Savings Associations, and Savings Banks Under Sections 3(a)(4) and 3(a)(5) of the Securities Exchange Act of 1934,*
    67 Fed. Reg. 67,496 (Nov. 5, 2002) .......................................... 5, 6, 14, 48

*Concept Release on Equity Market Structure,*
    75 Fed. Reg. 3594 (Jan. 10, 2010) ...................................................... 47

*Further Definition of "Swap Dealer," "Security-Based Swap Dealer," "Major Swap Participant," "Major Security-Based Swap Participant" and "Eligible Contract Participant"*,
    77 Fed. Reg. 30,596 (May 23, 2012) ............................................................. 20, 49

*Regulation Best Interest*,
    83 Fed. Reg. 21,574 (May 9, 2018) ................................................................. 48, 49

*Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer in Connection With Certain Liquidity Providers*,
    89 Fed. Reg. 14,938 (Feb. 29, 2024) ..................................................................... 1

## Other Authorities

*Fairfield Trading Corp.*,
    1988 WL 233618 (SEC Jan. 10, 1988) ........................................................... 47, 48

5 Thomas Lee Hazen, Treatise on the Law of Securities Regulation (May 2024) ....................... 5

H.R. Rep. No. 99-258 (1985) ................................................................................ 22

Louis Loss, Securities Regulation (1st ed. 1951) ........................................... 5, 14, 17

*Louis Dreyfus Corp.*,
    1987 WL 108160 (SEC July 23, 1987) ................................................................ 48

*Murchinson Ltd.*,
    2021 WL 3639452 (SEC Aug. 17, 2021) ............................................................... 48

48 Stat. 881 (June 6, 1934) ................................................................................... 2

## INTRODUCTION

In the Securities Exchange Act of 1934, Congress required dealers—defined as those "in the business of buying and selling securities ... for [their] own account[s]"—to register with the Securities and Exchange Commission, become a member of a self-regulatory organization, report certain securities transactions, and comply with financial responsibility requirements. This system of dealer registration and regulation promotes market stability, protects investors, and helps regulators evaluate and address market risks.

But recent advancements in electronic trading created a gap in the regulatory regime for those engaged in dealer activity. Although entities engaging in strategies such as "high frequency trading"—algorithmic trading in which large volumes of shares are bought and sold automatically at high speeds—have been performing the same market functions as traditional dealers, some of those entities have done so without having been registered with the Commission and subject to the dealer regulatory framework.

The Commission promulgated a rule to address this inconsistency. *Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer in Connection With Certain Liquidity Providers*, 89 Fed. Reg. 14,938 (Feb. 29, 2024) (P.App.54-126).[1] The rule's adopting release explained that market participants that buy and sell securities for their own account and engage in two specific trading patterns that have the effect of providing liquidity—(1) regularly expressing trading interest at or near the best available prices on both sides of the market for the same security, or (2) earning revenue primarily from capturing bid-ask spreads—are engaged in the regular business of buying and selling securities

---

[1] "P.App." refers to Plaintiffs' Appendix in Support of Motion for Summary Judgment (Dkt. 30). "App." refers to the Commission's Appendix in Support of Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment, filed concurrently with this brief.

and thus qualify as dealers under the Exchange Act.  After notice and comment, the Commission modified the proposed rule in response to comments, analyzed the rule's likely economic effects, and found that the rule would promote competition in providing liquidity, increase transparency, and ensure market stability and resiliency.

Plaintiffs are interest groups whose members include private funds.  The Commission estimated that, due to their trading patterns, hedge funds would be the most likely type of private fund to have to register as dealers under the rule and that the rule would likely cover approximately a dozen or fewer hedge funds that provide significant liquidity by engaging in high-frequency trading strategies.  Plaintiffs challenge the rule presumably because they do not want those twelve hedge funds to be subjected to the same restrictions and oversight as their registered dealer counterparts.  But as the Commission reasonably concluded, nothing in law or logic supports plaintiffs' request to be immunized from the same restrictions and regulation as the significant liquidity providers who already register as dealers.

The rule fits comfortably within the Commission's authority to define terms used in the Exchange Act.  And the Commission's further definition of the term "as a part of a regular business" in the dealer definition is consistent with the statutory text and longstanding judicial and agency interpretations of it.  Plaintiffs' flawed argument that dealers must have customers was recently rejected by the Eleventh Circuit as having "no grounding in the statutory text." *SEC v. Almagarby*, 92 F.4th 1306, 1318 (11th Cir. 2024).

Plaintiffs' additional challenges misconstrue both the rule and the Commission's explanation.  Their hyperbolic claim that the rule renders "anybody who trades securities" a dealer, including "thousands" of private funds (Mot. 1, 34), is contrary to the rule's plain text, which specifies two tailored ways in which entities can be in the business of providing liquidity

2

to other market participants and thus meet the statutory dealer definition.  Based on an extensive

analysis of available data, the Commission estimated that a dozen or fewer hedge funds engage

in the sorts of trading patterns that could bring them within the rule's clarification of the dealer

definition.  Plaintiffs provide nothing more than unsupported speculation for their contention that

many more would be covered.

Plaintiffs' claims that the Commission failed to engage in reasoned decisionmaking fare

no better.  Contrary to plaintiffs' complaints that the Commission failed to justify—and ignored

comments about—the alleged costs and burdens of the rule, the Commission addressed

plaintiffs' concerns and reasonably determined that the rule would promote competition and

increase market stability and transparency—core objectives of the Exchange Act's dealer

framework.  That is all the Administrative Procedure Act and the Exchange Act require.

## BACKGROUND

### A.     Statutory and Regulatory Background

Congress enacted the Exchange Act "[i]n the wake of the 1929 stock market crash and in

response to reports of widespread abuses in the securities industry."  *Cent. Bank of Denver, N.A.*

*v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 170 (1994).  Broadly speaking, the

Exchange Act "regulates post-distribution trading" of securities.  *Id.*  Congress found that

"transactions in securities" are "effected with a national public interest which makes it necessary

to provide for regulation and control of such transactions and of practices and matters related

thereto."  15 U.S.C. § 78b.

The Exchange Act's system of registration of brokers and dealers is "of the utmost

importance in effecting the purposes of the Act."  *Eastside Church of Christ v. Nat'l Plan, Inc.*,

391 F.2d 357, 362 (5th Cir. 1968); *see also Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994)

("The broker-dealer registration requirement serves as the 'keystone of the entire system of

broker-dealer regulation.'" (citation omitted)).  "It is through the registration requirement that

some discipline may be exercised over those who may engage in the securities business and by

which necessary standards may be established with respect to training, experience, and records."

*Eastside Church*, 391 F.2d at 362.

The Exchange Act prohibits dealers from transacting in securities unless they are

registered with the Commission.  15 U.S.C. § 78o(a)(1).  In turn, the Act and the Commission's

implementing regulations impose various requirements on dealers that are designed to protect the

integrity of the securities markets.  For example, a registered dealer must become a member of a

"registered securities association" or a "national securities exchange" (often referred to as "self-

regulatory organizations" or "SROs") unless they obtain an exemption from the membership

requirement.  *Id.* § 78o(b)(1).  Registered dealers must keep and make available for periodic

Commission examination records of their financial activities.  *See* 15 U.S.C. § 78q(a)(1), (b)(1);

17 C.F.R. §§ 240.17a-3(a), 240.17a-4.  They are also required to file with the Commission

monthly, quarterly, and annual reports that include information about, among other things, net

capital, cash flow, and internal controls implemented to detect instances of regulatory non-

compliance.  *See* 15 U.S.C. § 78q(e)(1)(A); 17 C.F.R. §§ 240.15c3-1, 240.15c3-3(e),

240.17a-5(a), (d)(1), (2), (3).  Registered dealers are required to have adequate net capital to

ensure that they have sufficient liquid resources on hand at all times to satisfy claims promptly.

17 C.F.R. §§ 240.15c3-1, 240.17a-11(a), (b) (Net Capital Rule).  And registered dealers are

subject to specific antifraud provisions.  *See* 15 U.S.C. § 78o(c); 17 C.F.R. § 240.15c1-2; *see*

*also* P.App.57-58 (describing other requirements applicable to registered dealers).

The Exchange Act's "dealer" definition is central to this case.  Section 3(a)(5) of the

Exchange Act defines a "dealer" as "any person engaged in the business of buying and selling

securities … for such person's own account through a broker or otherwise."  15 U.S.C.

§ 78c(a)(5)(A).  The definition contains a carve-out, commonly known as the "trader exception,"

for persons who buy and sell securities for their own accounts "but not as a part of a regular

business."  *Id.* § 78c(a)(5)(B).  This exception "reflects a historical difference between the

functions of dealers and traders:  a dealer provided market liquidity, and a trader managed pools

of money and took investment positions based on views about asset valuation."  *Almagarby*, 92

F.4th at 1315.  Further, the Act grants the Commission "power by rules and regulations to define

technical, trade, accounting, and other terms used in this chapter, consistently with the provisions

and purposes of this chapter" as to "matters within [the Commission's] respective jurisdiction[]."

15 U.S.C. § 78c(b).

      The Exchange Act's "registration requirements, as well as the definitions of broker and

dealer, are drafted broadly to include a wide range of securities professionals."  5 Thomas Lee

Hazen, Treatise on the Law of Securities Regulation § 14:56 (May 2024 update).  Since the

Exchange Act's enactment, courts and the Commission have identified certain activities that are

indicative of a person being a dealer.  *See* Louis Loss, Securities Regulation 722 (1st ed. 1951)

(App.4) (listing "characteristic attributes" of a dealer but emphasizing that "a person does not

have to exhibit all or any given number of these dealer characteristics in order to be considered a

dealer").  For instance, a person may satisfy the dealer definition by "buying and selling directly

to securities customers together with conducting any of an assortment of professional market

activities such as providing investment advice, extending credit and lending securities in

connection with transactions in securities, and carrying a securities account."  *Definition of*

*Terms in and Specific Exemptions for Banks, Savings Associations, and Savings Banks Under*

*Sections 3(a)(4) and 3(a)(5) of the Securities Exchange Act of 1934*, 67 Fed. Reg. 67,496, 67,499

(Nov. 5, 2002) (2002 Release).  A person may also be acting as a dealer by "[u]nderwriting" (i.e., acquiring new securities from an issuer for the purpose of reselling them); "acting as a market maker or specialist on an organized exchange or trading system"; or, as particularly relevant here, "acting as a *de facto* market maker whereby market professionals or the public look to the firm for liquidity."  *Id.*[2]

### B.   Proceedings Before the Commission

#### 1.   The Commission proposed a rule to further define "as a part of a regular business" in the dealer definition in connection with certain liquidity providers.

In March 2022, the Commission proposed a rule to "further define what it means to be buying and selling securities 'as a part of a regular business'" within the dealer and government securities dealer definitions in connection with certain liquidity providers.  P.App.1.  The Commission observed that electronic trading platforms have supplanted "traditional" forms of liquidity provision, such as "manual trading floors" and "manual transactions made via the telephone."  P.App.2.  Those "[t]echnological advancements have prompted changes to trading practices," particularly regarding "the way in which orders are generated, routed, and executed," P.App.2-3, including the development of trading patterns such as "high-frequency trading," in which market participants "employ automated, algorithmic trading strategies" to "quickly execute trades, or cancel or modify quotes in response to perceived market events."  P.App.2.

As the Commission explained, market participants engaging in such trading strategies "play an increasingly significant role as major liquidity providers."  P.App.7.  For instance,

---

[2] The Exchange Act's definition of "government securities dealer" is materially similar to the definition of "dealer" as relevant here.  *See* 15 U.S.C. § 78c(a)(44)(A).  Persons registered only as government securities dealers are subject to different requirements than those registered as dealers under 15 U.S.C. § 78o(a)(1).  *See* P.App.83.  For instance, persons registered only as government securities dealers are subject to different net capital requirements and need not become members of the Securities Investor Protection Corporation (SIPC).  P.App.83.

"proprietary or principal trading firms" "trade as principals, buying and selling for their own accounts, and often employ automated, algorithmic trading strategies ... that rely on speed, which allows them to quickly execute trades, or cancel or modify quotes in response to perceived market events."  P.App.56 n.19.  Those firms "often" use such trading strategies, and they "account for about half of the daily volume in the interdealer market" for U.S. Treasury securities.  P.App.2; *see* P.App.1 n.2.  Yet despite "engaging in liquidity providing activities similar to those traditionally performed by either 'dealers' or 'government securities dealers,'" such market participants "may not be registered with the Commission as either dealers or government securities dealers."  P.App.1.  This regulatory gap threatened "market stability and investor protection" and made it "difficult for regulators and market observers to detect, investigate, understand, or address market events."  P.App.1, 3.

The Commission thus "propose[d] standards to identify those market participants that are providing an important liquidity provision function in today's securities markets."  P.App.3.  The Commission observed that "over the years the Commission and the courts have identified a number of qualitative factors, including acting as a market maker, de facto market maker, or liquidity provider, that might indicate a person may be engaged in a regular business of buying and selling securities for its own account."  P.App.8 (citing 2002 Release).  The proposed rule would "expand upon these statements to further define three qualitative standards designed to more specifically identify activities of certain market participants who assume dealer-like roles, specifically, persons whose trading activity in the market 'has the effect of providing liquidity' to other market participants."  P.App.8-9.  Those qualitative standards were (1) "routinely making roughly comparable purchases and sales of the same or substantially similar securities (or government securities) in a day"; (2) "routinely expressing trading interests that are at or near the

best available prices on both sides of the market and that are communicated and represented in a way that makes them accessible to other market participants"; or (3) "earning revenue primarily from capturing bid-ask spreads, by buying at the bid and selling at the offer, or from capturing any incentives offered by trading venues to liquidity-supplying trading interests."  P.App.12.

The Commission also proposed a "quantitative standard" that would "establish a bright-line test, under which a person engaging in certain specified levels of activity would be deemed to be buying and selling government securities 'as a part of a regular business,' regardless of whether it meets any of the qualitative standards."  P.App.9.  As proposed, the rule would have required any market participant that met one of the qualitative or quantitative standards to register with the Commission as a dealer or a government securities dealer.  P.App.8.

> **2.    The Commission adopted the rule with modifications based on input from commenters and analyzed the rule's economic effects.**

After making significant modifications to the proposed rule in response to comments, the Commission adopted the final rule in February 2024.  *See* P.App.55.  The Commission made several changes to the rule text to "more appropriately tailor the scope of" the final rule to ensure that "only entities engaging in *de facto* market making activity" are required to register as dealers under the rule.  P.App.59.  In particular, the Commission eliminated the first qualitative standard—routinely making roughly comparable purchases and sales of the same or substantially similar securities (or government securities) in a day—in response to comments that it would "capture activity that was not dealing, but rather investing in the ordinary course."  P.App.62.  It also eliminated the quantitative standard in response to comments that it would "capture persons engaging in non-dealing trading activity."  P.App.71.  And the Commission removed a provision that would have "aggregat[ed] accounts across entities that are controlled by" a single entity for

8

purposes of applying the rule's qualitative standards in response to comments that such an approach was "overbroad."  P.App.78-79.

In the adopting release, the Commission reiterated the need for the rule, noting that some entities such as proprietary trading firms "perform[] critical market functions, in particular liquidity provision, that historically have been performed by dealers" by "act[ing] as *de facto* market makers" but are not registered with the Commission as dealers.  P.App.56.  The Commission explained that "[s]uch a regulatory gap results in inconsistent oversight of market participants performing similar functions" and "increases the difficulty and complexity for regulators to investigate, understand, and address significant market events."  P.App.56.

The Commission concluded that the rule as adopted would address these problems.  It found that the "identification, registration, and regulation of these market participants as dealers will provide regulators with a more comprehensive view of the markets through regulatory oversight and will support market stability and resiliency and protect investors by promoting the financial responsibility and operational integrity of market participants that are acting as dealers."  P.App.54.  The Commission also found that the rule "will promote competition among entities that regularly provide significant liquidity by applying consistent regulation to these entities, thus leveling the competitive playing field between liquidity provision conducted by entities that are currently registered as dealers and government securities dealers and by entities that are not."  P.App.54.  "Overall," the Commission found that the rule "will achieve the Commission's important goals of protecting investors and supporting fair, orderly, and efficient markets."  P.App.59.

In promulgating the rule, the Commission examined the market baseline; the rule's benefits and costs; the rule's effects on efficiency, competition, and capital formation; and

reasonable alternatives to the rule.  P.App.81-116.  The Commission found that the rule would "promote competition among entities that regularly provide significant liquidity by applying consistent regulation to these entities."  P.App.81.  It also found that the rule would "promote the financial responsibility and operational integrity of significant liquidity providers that are acting as dealers in securities markets by subjecting them to the Net Capital Rule and to other Commission and SRO rules and oversight," which would in turn "support the resilience of securities markets."  P.App.81.  And the rule would "improve the Commission's ability to analyze market events and detect manipulation and fraud."  P.App.81.  Although the rule "may have small negative effects on market liquidity and efficiency, due to increases in costs for affected parties," the Commission found that the rule "may also promote liquidity and efficiency by limiting the probability that significant liquidity providers fail."  P.App.81.

The Commission excluded from the rule's scope certain categories of entities—such as persons with total assets of less than $50 million, investment companies registered under the Investment Company Act of 1940, and central banks and other sovereign entities—based on its determination that including such entities was not necessary to accomplish the rule's objectives. P.App.71-75.  For instance, as the Commission explained, persons with less than $50 million in assets are "unlikely to engage in the significant liquidity provision that is the focus of" the rule and are "less likely to pose the types of financial and operational risks to the market" that the dealer regime is designed to address.  P.App.71-72.  The Commission also adopted a "no presumption" provision to clarify that the rule's two qualitative standards are not the exclusive means of establishing that a person is a dealer.  P.App.80.  Persons engaging in other activities that have long been understood as satisfying the dealer definition, such as underwriting, qualify as dealers even if they do not meet either of the rule's specific prongs focused on liquidity

provision.  P.App.61.  Further, the less than $50 million exclusion applies "only for purposes of the final rule[]" and does not apply to other traditional dealer activities such as underwriting. P.App.72.

The Commission considered but declined to adopt a categorical exclusion of private funds from the rule's scope.  P.App.72-74, 115-116.  As the Commission explained, "private equity funds and liquidity funds are unlikely to engage in activities that meet" the rule's "definition of dealing, because they are generally long-only investors that are not likely to regularly communicate trading interests on both sides of the market or earn revenue primarily from capturing bid-ask spreads."  P.App.86-87.  But based on two analyses using data from a database of U.S. Treasury securities transactions and information from forms that registered private funds advisers file with the Commission, the Commission estimated that a small number of hedge funds (a type of private fund)—specifically, between four and twelve hedge funds— "could meet the final [rule's] definition of dealing" because they engage in strategies "such as those that involve automated or high-frequency trading."  P.App.86; *see* P.App.87-90.  The Commission explained that "market actors that are engaged in dealing activity should be subject to the dealer regulatory regime" and that existing requirements for private funds and private fund advisers were inapposite because the "regulatory requirements specific to dealer activity and oversight ... broadly focus on the dealer market functionality—that is, the impact of dealing activity on the market as a whole."  P.App.73.

**LEGAL STANDARD**

Under the Administrative Procedure Act, a rule should be upheld unless the agency exceeded its statutory authority or the rule is arbitrary and capricious.  5 U.S.C. § 706(2)(A), (C). The APA's arbitrary-and-capricious standard is "narrow and highly deferential."  *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 449 (5th Cir. 2021) (citation omitted).  A court applying it

11

"simply ensures that the agency ... has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "If the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld." *Clean Water Action v. EPA*, 936 F.3d 308, 312 (5th Cir. 2019) (citation omitted). A reviewing court "may not 'substitute its judgment for that of the agency.'" *Id.* (citation omitted).

"The findings of the Commission as to the facts, if supported by substantial evidence, are conclusive." 15 U.S.C. § 78y(a)(4). This evidentiary threshold "is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Worldcall Interconnect, Inc. v. FCC*, 907 F.3d 810, 818 (5th Cir. 2018) (citation omitted).

## ARGUMENT

The rule under review fits squarely within Congress's broad grant of authority to the Commission to define terms used in the Exchange Act and is consistent with the longstanding recognition that dealer activity includes acting as a *de facto* market maker whereby market participants look to the firm for liquidity. Moreover, the rule is reasonable and reasonably explained: the Commission substantiated the problems the rule was designed to address, thoroughly analyzed the rule's likely economic effects, and found that the rule would promote competition as well as market stability and transparency. Plaintiffs may disagree with how the Commission weighed certain of the rule's costs and benefits, but Congress vested the Commission with the authority to balance competing policy objectives in order to promote market stability, protect investors, and further competition among market participants. There is no basis to set aside the Commission's reasonable exercise of that authority here.

I.      **The rule is within the Commission's statutory authority.**

      A.      **The rule is a proper exercise of the Commission's statutory authority to define terms used in the Exchange Act.**

The Exchange Act authorizes the Commission's adoption of the rule.  Section 3(a)(5)(A) of the Act defines "dealer" broadly as "any person engaged in the business of buying and selling securities ... for such person's own account through a broker or otherwise."  15 U.S.C. § 78c(a)(5)(A).  Section 3(a)(5)(B) further provides that "[t]he term 'dealer' does not include a person that buys or sells securities ... for such person's own account, either individually or in a fiduciary capacity, but not as a part of a regular business."  *Id.* § 78c(a)(5)(B).  Read together, these provisions specify that a "dealer" is "any person engaged in the business of buying and selling securities ... for such's person's own account ... as part of a regular business."  *See id.* § 78c(a)(5)(A)-(B).  In turn, Section 3(b) of the Act expressly authorizes the Commission to promulgate "rules and regulations" that "define technical, trade, accounting and other terms used in" the Act.  *Id.* § 78c(b); *see also id.* § 78w(a)(1) (authorizing the Commission to "make such rules and regulations as may be necessary or appropriate to implement the provisions of" the Exchange Act); P.App.124 (invoking these statutory authorities).

Plaintiffs do not dispute (Mot. 9-18) that the phrase "as a part of a regular business" is a "technical, trade, [or] other term[]" used in the Act's definition of "dealer."  *See* 15 U.S.C. § 78c(a)(5)(B).  And the rule "further define[s] what it means to be engaged in the business of buying and selling securities 'as a part of a regular business'" within the dealer and government securities dealer definitions.  P.App.55.  That is reflected in the rule's text, which sets out two specific circumstances in connection with liquidity provision in which a person is "engaged in buying and selling securities for its own account ... 'as a part of a regular business' as that phrase is used in section 3(a)(5)(B) of the Act": (1) regularly expressing trading interest at or near the

13

best available prices on both sides of the market for the same security, or (2) earning revenue primarily from capturing bid-ask spreads.  P.App.125.

The rule's further definition of "as a part of a regular business" is consistent with the dealer definition's text and judicial and agency interpretations of that provision.  "The 'centerpiece' of the Exchange Act's dealer definition is the word 'business.'"  *Almagarby*, 92 F.4th at 1317 (citation omitted).  As Professor Loss explained in a leading securities law treatise, "[t]he phrase 'engaged in the business' ... connotes a certain regularity of participation in purchasing and selling activities rather than a few isolated transactions."  Loss, *supra*, at 720 (App.2).  Accordingly, the "volume and regularity" of an entity's "transactions" are critical factors in determining whether it is "'in the business' of buying and selling securities" and thus acting as a dealer.  *Almagarby*, 92 F.4th at 1317; *see also SEC v. Keener*, --- F.4th ---, No. 22-14237, 2024 WL 2745055, at *4 (11th Cir. May 29, 2024) ("The nature, volume, regularity, and frequency of [defendant's] transactions render him a dealer.").  The Commission has long recognized that when the nature and frequency of a firm's trading activity are such that the firm is "acting as a *de facto* market maker whereby market professionals or the public look to the firm for liquidity," the firm satisfies the statutory dealer definition.  2002 Release, 67 Fed. Reg. at 67,499; *cf.* Loss, *supra*, at 722 (App.4) (noting that a trader, unlike a dealer, "does not 'make a market'").  Courts have likewise recognized that the "historical" understanding of the dealer definition is that "a dealer provided market liquidity."  *Almagarby*, 92 F.4th at 1315; *see Keener*, 2024 WL 2745055, at *4.  The rule merely specifies two tailored circumstances in which the "frequency and nature of a person's securities trading is such that the person assumes a role— whether described as market-making, *de facto* market-making, or liquidity-providing—similar to the role that historically has been performed by a registered dealer."  P.App.61.  In classifying

14

those persons as dealers, the rule falls squarely within the Commission's statutory authority to define terms used in the Exchange Act and comports with settled understandings of dealer activity.

      **B.**    **Plaintiffs' contrary arguments lack merit.**

          **1.**    **The dealer definition is not limited to persons who effectuate customer orders.**

Plaintiffs' and amici's main statutory argument (Mot. 10-15; Futures Indus. Ass'n Amicus Br. 3-6; Comm. on Capital Markets Regul. Amicus Br. 4-7) is that the rule conflicts with the statutory dealer definition because "dealer" supposedly "require[s] that a 'dealer' act on behalf of customers." But plaintiffs' efforts to read a customer requirement into the statute do not withstand scrutiny. The Commission correctly rejected that contention, explaining that the statutory text contains "no requirement … that dealers have customers," and "since its enactment, the dealer definition was understood to cover" those with "'no customers.'" P.App.60 (quoting Charles H. Meyer, Securities Exchange Act of 1934 Analyzed and Explained 33-34 (1934)). Indeed, the Eleventh Circuit has squarely rejected plaintiffs' position, reasoning that "a customer requirement has no grounding in the statutory text." *Almagarby*, 92 F.4th at 1318; *Keener*, 2024 WL 2745055, at *4. And the Fifth Circuit has similarly held that persons fall within the dealer definition, *see Eastside Church*, 391 F.2d at 361-62 (defendant that "purchased many church bonds ... for its own account as a part of its regular business and sold some of them" was a dealer "within the meaning of the [Exchange] Act"), even where the record showed they had no customers, *see* Brief for SEC as Amicus Curiae at 25, *Eastside Church*, 391 F.2d 357 (5th Cir. 1968) (App.34) ("Since [the churches] dealt with [the defendant] through a broker-dealer, ... they were *not customers* of [the defendant] ... ." (emphasis added)). The Eleventh Circuit has emphasized that whether a particular entity qualifies as a dealer turns on the

entity's "specific conduct," *Almagarby*, 92 F.4th at 1318—in other words, its "function," *Keener*, 2024 WL 2745055, at *4.

a.    The Eleventh Circuit's rejection of a customer requirement follows from the text and structure of the statutory dealer definition, which turns on "whether an entity is transacting as a part of a 'regular business.'"  *Almagarby*, 92 F.4th at 1318; *see* 15 U.S.C. § 78c(a)(5).  A "customer requirement" is "nowhere mentioned in the relevant portions of the Exchange Act." *Almagarby*, 92 F.4th at 1318; *see Keener*, 2024 WL 2745055, at *4 ("Although many dealers execute trades on behalf of customers, the Exchange Act makes no mention of a customer-facing role in its statutory definition.").  Had Congress intended to limit a dealer to persons that effectuate customer orders, it could have done so, such as by defining "dealer" as a person engaged in the business of "effecting transactions in securities for others for such person's own account."  But it did not.  By contrast, in the neighboring statutory definition of the term "broker," Congress imposed just such a requirement, defining a broker as "any person engaged in the business of effecting transactions in securities *for the account of others*."  15 U.S.C. § 78c(a)(4)(A) (emphasis added).  "When Congress includes particular language in one section of a statute but omits it from a neighbor," courts "normally understand that difference in language to convey a difference in meaning."  *Bittner v. United States*, 598 U.S. 85, 94 (2023).

Plaintiffs' position also cannot be squared with the trader exception adjoining the statutory dealer definition.  Under that carve-out, the dealer definition "does not include a person that buys or sells securities ... for such person's own account ... but not as a part of a regular business."  15 U.S.C. § 78c(a)(5)(B).  If, as plaintiffs appear to suggest, buying or selling securities "for such person's own account" necessarily denotes buying or selling on behalf of a customer, that person, by definition, cannot be the ordinary, non-business investor that the trader

exception was intended to exclude from regulation as a dealer. After all, such ordinary, non-business investors generally do not have customers. *See* Loss, *supra*, at 722 (App.4).

Contrary to plaintiffs' argument, the words "own account" as used in the Exchange Act have a different purpose than indicating persons who "effectuate customer orders." "When someone acts 'on one's own account,' he or she acts 'at one's own risk.'" *SEC v. Murphy*, 50 F.4th 832, 843 (9th Cir. 2022) (citations omitted); *see also Levine v. SEC*, 407 F.3d 178, 183-84 (3d Cir. 2005) (holding that a floor broker on a national securities exchange trades "for its own account" by sharing in the economic risk of the trade). Acting at one's own risk need not entail effectuating transactions for others. Thus, the statutory reference to buying and selling securities for one's "own account" is not "a term of art presupposing that trades executed through a dealer's account are for customers." *Keener*, 2024 WL 2745055, at *4. Rather, "a dealer is a market participant whose 'business model depends on his volume of buying and selling because he profits from executing trades' and who 'provide[s] market liquidity.'" *Id.* (emphasis omitted) (quoting *Almagarby*, 92 F.4th at 1315).

Similarly unavailing is plaintiffs' invocation (at 14-15) of the *noscitur a sociis* canon in arguing that the terms "broker" and "dealer" have "a related meaning" that includes effectuating customer trades. That interpretive canon has no application here because "broker" and "dealer" are defined in separate subsections (15 U.S.C. § 78c(a)(4)-(5)) as two of the eighty terms defined in Section 3(a) of the Exchange Act. They are thus not "items in a list" that all "share an attribute." *Beecham v. United States*, 511 U.S. 368, 371 (1994). Regardless, as the plain text of the broker and dealer definitions indicate, the common attribute that brokers and dealers share is that both are "engaged in the business" of transacting in securities—not that both do so on behalf of customers. *See* 15 U.S.C. § 78c(a)(4)(A), (5)(A).

17

b.      The historical sources plaintiffs cite (at 11-12) likewise do not support their argument that the term "dealer" means one who effectuates customer orders.  Plaintiffs contend (at 10-11) that the phrase "own account" was "obviously transplanted" from treatises that used the phrase "own account" to refer to effectuation of customer orders.  They rely heavily on a 1933 treatise authored by Charles H. Meyer (Mot. 11) that describes a dealer as a "person … engaging in the business of buying and selling securities for his own account as principal." P.App.608.  But as discussed above, *supra* p. 17, this simply confirms no more than that a dealer acts at his or her own risk.  Indeed, in discussing the then-newly enacted Exchange Act, Meyer asked "whether a trader who has no customers but merely trades for his own account through a broker is a 'dealer' under the Act."  Meyer, *supra*, at 34 (App.40).  Meyer concluded that such a person would be a dealer if he were in the regular business of trading for his own account:  "A fair interpretation of the Act would seem to indicate that if the operations of a trader are sufficiently extensive to be regarded as a regular business[,] he would be considered a 'dealer.'" *Id.*; *see Keener*, 2024 WL 2745055, at *4 (relying on this passage from Meyer in rejecting argument that "market participants and Congress historically 'presumed' that dealers handled orders for customers").

Similarly, the 1936 Commission report plaintiffs rely on (at 11) refers to a dealer as someone who "buys securities from his customer with a view to disposing of them elsewhere." App. 43.  But the report also explains that a dealer "is at complete liberty to deal for his own account with persons other than his customers" and describes a dealer's activities as "similar to those of a dealer or jobber in merchandise," who "relies for his compensation upon a favorable difference or spread between the price at which he buys and the amount for which he sells." App. 43-44.  By invoking the common understanding of a dealer as a "jobber in merchandise,"

the report confirms that, as the dealer definition provides, a dealer is simply one who is in the business of buying to sell.  And as shown, the dealer does so for its "own account"—i.e., at its own risk.  The dealer may or may not have customers—a fact all the more apparent given the text's allowance that a dealer may engage in securities transactions "through a broker or otherwise."  15 U.S.C. § 78c(a)(5)(A).

       c.      Plaintiffs' other attempts to insert a customer requirement into the dealer definition likewise fail.  Plaintiffs argue (at 13) that dealers must effectuate customer orders because "Congress had a specific business in mind when it" referred to "*the* business of buying and selling securities" in the dealer definition.  15 U.S.C. § 78c(a)(5)(A) (emphasis added).  But the business that Congress had "in mind" is "the business of buying and selling securities ... for [one's] own account," *id.*, which does not require a customer for the reasons discussed above. Congress abided by the same convention in neighboring subsections.  *See id.* § 78c(a)(22)(A) ("The term 'securities information processor' means any person engaged in the business of (i) collecting, processing, or preparing for distribution or publication ... information ... ."); *id.* § 78c(a)(61)(A) ("The term 'credit rating agency' means any person ... engaged in the business of issuing credit ratings ... .").

      Plaintiffs also incorrectly assert (at 15) that "the broker-dealer regulatory regime is premised on the protection of customer orders and accounts" and contend that "[t]his makes sense *only* in the context of customer-order facilitation."  To the contrary, "several Exchange Act provisions apply to a dealer 'who does *not* carry customer accounts' 'or hold funds or securities for customers.'"  *Keener*, 2024 WL 2745055, at *4 (quoting *Almagarby*, 92 F.4th at 1318); *see* 17 C.F.R. § 240.15c3-1(a)(2)(vi), (6)(ii); *id.* § 240.15b9-1(a); *id.* § 240.15c3-3(k)(2)(i).  Further, in defining who is a security-based swap dealer, *see* 15 U.S.C. § 78c(a)(71), the Commission

19

specifically rejected the argument plaintiffs advance: "Although commenters have expressed the view that a person that engages in security-based swap activities on an organized market should not be deemed to be a dealer unless it engages in those activities with customers, we do not agree." *Further Definition of Swap Dealer*, 77 Fed. Reg. 30,596, 30,619 (May 23, 2012) (footnote omitted); *see id.* at 30,704 n.282 ("[A]ny interpretation of the 'security-based swap dealer' definition that is predicated on the existence of a customer relationship may lead to an overly narrow construction of the definition."). The Commission's rejection of a customer requirement in the rule here is thus consistent with its prior statements on that subject.

d.      Nor do the cases plaintiffs cite (at 10) support their position. In *Chapel Investments, Inc. v. Cherubim Interests, Inc.*, 177 F. Supp. 3d 981 (N.D. Tex. 2016), this Court granted a joint motion for approval of a settlement to which the Commission was not a party. *See id.* at 983-84. The parties had "agreed to settle Plaintiff's claims against Defendant in exchange for the issuance of unregistered shares of Defendant's stock to Plaintiff." *Id.* at 984. This Court observed that "[t]o be considered a dealer, a person must be engaged in the securities business, such as soliciting investor clients, handling investor clients' money and securities, rendering investment advice to investors, and sending investors subscription agreements for their review and execution." *Id.* at 990. Because the plaintiff there did "not provide advice or services to other investors," but was "instead acting in its own best interests as an investor and a party in litigation," it could not "be considered a dealer." *Id.* at 991. The Court was not addressing, and had no occasion to address, whether a person who regularly buys and sells securities as part of a regular business for its own account, but lacks customers, could be a dealer within the meaning of the Exchange Act.

The other decisions plaintiffs cite are similarly inapposite.  In *XY Planning Network, LLC v. SEC*, the Second Circuit stated in summarizing the "regulatory background" that "*[b]roker-dealers* effect securities transactions for customers."  963 F.3d 244, 248 (2d Cir. 2020) (emphasis added).  The Second Circuit was not addressing dealers individually, nor was it deciding whether dealers must have customers under the statutory definition.  Other cases, as with this Court's decision in *Chapel Investments*, involved issuance of securities in connection with settlements.  *See Discover Growth Fund, LLC v. Beyond Com., Inc.*, 561 F. Supp. 3d 1035, 1041 (D. Nev. 2021) (holding that settling plaintiff "should not be required to register as a dealer due to its participation in the negotiation of the settlement of its claims, the exchange of the claims for shares of stock pursuant to court approval, or resale of the shares on the open market"); *In re Immune Pharms. Inc.*, 635 B.R. 118, 124 (Bankr. D.N.J. 2021) (similar); *In re Scripsamerica, Inc.*, 634 B.R. 863, 872 (Bankr. D. Del. 2021) (similar).  Others assessed the totality of facts and circumstances bearing on whether a firm acted as a dealer and concluded that other factors—not just the absence of customers—weighed against classification as a dealer.  *See Radzinskaia v. NH Mountain, LP*, 2023 WL 6376457, at *4-5 (S.D. Fla. Sept. 29, 2023) (holding that entities were not dealers because the complaint "allege[d] that [the entities] are in the business of developing real estate" and "run[ning] a ski resort" rather than "buying and selling securities"); *Discover Growth Fund, LLC v. Camber Energy, Inc.*, 602 F. Supp. 3d 982, 988 (S.D. Tex. 2022) (holding that plaintiffs were not dealers because they "did not buy and sell the same security simultaneously, did not buy and sell a particular security on a continuous basis, and did not hold themselves out as being willing to buy and sell a particular security on a continuous basis").  In short, none of the cases plaintiffs cite held that the statutory dealer definition applies only to those effectuating orders on behalf of customers.

### 2.     The rule does not improperly redefine the dealer definition.

Plaintiffs erroneously argue (at 9) that the rule is unlawful because the Commission "does not have authority to supposedly 'further define'" the "dealer" term that Congress defined in the Exchange Act.  By its terms, the rule does not purport to define the word "dealer."  Instead, it expressly "further define[s] what it means to be engaged in the business of buying and selling securities 'as a part of a regular business' within the definitions of 'dealer' and 'government securities dealer.'"  P.App.55.  As explained above, Congress expressly authorized the Commission to define terms used within the Exchange Act.  *See supra* p. 13.  And in particular, Congress has indicated that the Commission has authority to "interpret[]" the "concept of 'engaged in the business'" in the "dealer" definition.  *See* H.R. Rep. No. 99-258, at 24 (1985). That is what the rule does, and the Commission's actions here thus fit comfortably within its statutory authority.

### 3.     The rule's exemptions do not indicate that it exceeds the Commission's statutory authority.

Plaintiffs incorrectly contend (at 15-16) that the rule's exclusions for certain entities show that the rule's definition of "as a part of a regular business" is overbroad.  The rule excludes investment companies registered under the Investment Company Act.  P.App.125.  The Commission explained that registered investment companies are already subject to "extensive oversight and broad insight into [their] operations and activities" under the Investment Company Act's "comprehensive regulatory framework."  P.App.72 & n.218.  In particular, the Commission reasoned that existing requirements applicable to registered investment companies "overlap[] with the regulation that applies to dealers on several points":  for example, registered investment companies "are subject to rules that limit leverage risk" and "must report to the Commission on many aspects of their operations and their portfolio holdings."  P.App.114; *see*

*also, e.g.*, P.App.168-169 (Investment Company Institute comment letter supporting exclusion of registered investment companies for this reason).  The rule also excludes central banks (such as the Federal Reserve Banks) and other sovereign entities.  P.App.125.  As the Commission explained, "the Federal Reserve Banks already consider market integrity and resiliency issues," and "[r]egulators already have insight into the activities of the Federal Reserve System."  P.App.75 n.258.  Thus, entities that are part of the Federal Reserve System do not implicate "the primary concerns animating" the rule.  P.App.75.

Contrary to plaintiffs' suggestion (at 15-16), the premise of these exclusions—that registered investment companies and the Federal Reserve Banks could otherwise qualify as dealers—does not contravene the Exchange Act.  Rather, Congress chose to draft a broad definition of the term "dealer."  Again, the Exchange Act defines "dealer" as "*any person* engaged in the business of buying and selling securities ... for such person's own account" "as a part of a regular business."  15 U.S.C. § 78c(a)(5)(A)-(B) (emphasis added); *see also id.* § 78c(a)(9) (defining "person" to include a "company, government, or political subdivision, agency, or instrumentality of a government").  But to the extent any registered investment companies or any Federal Reserve Banks engage in the sort of automated, algorithmic liquidity provision that meets the rule's two tailored standards—which plaintiffs offer no evidence to support (Mot. 1, 15-16)—the Commission reasonably excluded any such entities from the requirement to register as dealers because existing oversight of these entities accomplishes similar purposes as would regulation as dealers.  *See supra* pp. 10, 22-23.  By contrast, because "private funds are not subject to the extensive regulatory framework of the Investment Company Act," and given the "material differences between the private fund and dealer regulatory frameworks," the Commission declined to adopt a categorical exemption from the rule for

23

private funds.  P.App.72, 74; *see infra* pp. 30-31.  In excluding registered investment companies and central banks—but not private funds—from the rule's scope, the Commission acted reasonably and consistently with the Exchange Act.

### 4.   Regulating certain hedge funds as dealers does not contravene the Exchange Act or any other statute.

Plaintiffs also incorrectly contend (at 15) that applying the rule to hedge funds is "inconsistent with the statutory framework."  There is no basis in the text, structure, or history of the Exchange Act for a categorical exemption of hedge funds from the statutory dealer definition.  Tellingly, the Exchange Act's original definition of "dealer" expressly excluded "banks," 48 Stat. 881, 883 (June 6, 1934), but no other categories of entities.  And Congress knows how to exclude private funds from statutory definitions:  in the Investment Company Act of 1940, Congress exempted private funds from the definition of an "investment company."  15 U.S.C. § 80a-3(c)(1), (7); *see id.* § 80b-2(a)(29).  But Congress has never amended the Exchange Act's dealer definition to exclude hedge funds or other private funds.  And whether an entity is a dealer turns on the entity's "specific conduct," *Almagarby*, 92 F.4th at 1318—its "function" rather than its identity, *Keener*, 2024 WL 2745055, at *4.

Plaintiffs also posit (at 16-18) a laundry list of reasons why applying the dealer framework to hedge funds is supposedly not "compatible with the rest of the law."  These claims merely repackage plaintiffs' erroneous arguments that the Commission violated the APA's reasoned decisionmaking requirement in declining to exempt hedge funds from the rule's scope and thus fail for the same reasons as explained below.  *See infra* pp. 31-36.  Even so, none of plaintiffs' assertions shows that the Commission lacked the statutory authority to regulate hedge funds as dealers when they perform the same "historical" dealer function of "provid[ing] market liquidity."  *Almagarby*, 92 F.4th at 1315; *see Keener*, 2024 WL 2745055, at *4.

II.      **The rule is reasonable and reasonably explained.**

The rule's adopting release thoroughly analyzes:  the rule's likely economic effects, identifying and substantiating the problems it was trying to address (*see, e.g.*, P.App.56-58, 91-93), and considering affected parties (P.App.83-90); the economic baseline (P.App.82-83, 90-93); benefits (P.App.93-97); costs (P.App.97-112); effects on efficiency, competition, and capital formation (P.App.112-113); and reasonable alternatives (P.App.113-116).  In so doing, the Commission "reasonably considered the relevant issues and reasonably explained [its] decision." *Prometheus*, 592 U.S. at 423.  That is "all the APA requires." *Huawei*, 2 F.4th at 452.

A.      **The Commission adequately substantiated the problems that the rule is designed to address.**

The Commission clearly identified the problems the rule was designed to address, explaining that "[a]dvancements in electronic trading across securities markets" had "led to the emergence of certain market participants that play an increasingly significant liquidity-providing role in overall trading and market activity." P.App.54.  Yet many of these market participants are not registered with the Commission as dealers or government securities dealers "despite engaging in liquidity-providing activities similar to those traditionally performed by" dealers and government securities dealers "and despite their significant share of market volume." P.App.54.

The Commission observed that this inconsistency was particularly evident in the government securities markets.  In equity markets, unlike government securities markets, "there is [an] incentive for many [proprietary trading firms] to register as broker-dealers":  such firms typically engage in certain trading strategies that require them to be members of national securities exchanges, and they must register with the Commission as broker-dealers to be able to do so.  P.App.56 n.20; *see* 15 U.S.C. § 78f(c)(1).  Because government securities are not traded

on registered national securities exchanges, however, proprietary trading firms that transact in government securities markets "lack this incentive to register."  P.App.56 n.20.  The Commission cited data bearing out this concern.  For instance, although proprietary trading firms accounted for "about half of the daily volume in the interdealer market" in the U.S. Treasury market—where, unlike the dealer-to-customer market, trading on electronic platforms is similar to trading on other highly liquid markets, P.App.56; *see* P.App.2 n.8, many of these firms "are not registered as dealers—despite performing critical market functions, in particular liquidity provision, that historically have been performed by dealers."  P.App.56.

The Commission found that this "regulatory gap result[ed] in inconsistent oversight of market participants" and that this "limited regulatory oversight of significant liquidity providers increase[d] the difficulty and complexity for regulators to investigate, understand, and address significant market events."  P.App.56.  It reasoned that this limited regulatory oversight of significant yet unregistered liquidity providers increased the risk that such providers could "fail financially," which would "not only harm their counterparties but also cause wider harm throughout securities markets."  P.App.91-92.  And the Commission further explained that this "unevenness of regulation potentially gives less-regulated entities an unfair advantage over registered dealers that engage in similar activities."  P.App.82.

Plaintiffs largely do not dispute the Commission's findings about the need for the rule in general.  Instead, they assert (at 19) that the Commission provided no evidence of "private funds" in particular "failing and limiting their trading in times of crises."  But the Commission explained in detail how other types of firms that more frequently engage in such trading practices can harm other market participants and markets in general if they fail.  *See* P.App.91-92.  And it explained how applying the dealer regulatory regime to such significant liquidity providers

would "promote the stability and transparency" of securities markets by decreasing the likelihood that such firms would fail and reducing the negative effects if such a failure occurred. *See* P.App.93-94.  The Commission reasonably concluded that the same problems of inadequate regulatory supervision—and the same benefits from inclusion in the dealer framework—would apply to the few hedge funds that function as significant liquidity providers and thus would be covered by the rule.  *See* P.App.73-74.  That the Commission did not provide more specific evidence of private funds failing is unsurprising given that very few private funds likely engage in the sort of trading patterns that would make them significant liquidity providers that could cause broader market harm if they failed.  *See* P.App.86-90.

In any event, plaintiffs are mistaken that the Commission had to point to specific examples of hedge funds failing to justify including them in the prophylactic dealer regime. Even if the Commission's "worry has not yet manifested itself," that "is of little consequence" under the APA, "as an agency has the latitude to 'adopt prophylactic rules to prevent potential problems before they arise'—that is, '[a]n agency need not suffer the flood before building the levee." *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1143 (D.C. Cir. 2022) (citation omitted); *cf. Sid Peterson Mem'l Hosp. v. Thompson*, 274 F.3d 301, 313 (5th Cir. 2001) ("It is well within the power of an agency to promulgate prophylactic regulations which are broad in scope in order to effectuate the purposes of the enabling legislation.").  While plaintiffs may not think the risks the Commission recognized will materialize with respect to hedge funds, it is not the Court's role—nor that of plaintiffs—to "substitute [its] judgment for that of the agency." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 530 (2009) (rejecting attempts to "quibble with the [agency's] policy choices and not with the explanation it has given").

Plaintiffs also criticize (at 20-22) the adopting release's reliance on the 1982 failure of Drysdale Government Securities and the March 2020 Treasury market liquidity disruption. P.App.92.  But these were just examples of the principle—which plaintiffs do not seriously dispute—that "[m]arket participants engaged in dealing activities but without being registered as dealers create the potential for serious externalities if they fail."  P.App.92.

Even so, plaintiffs' criticisms of these examples miss the mark.  For instance, plaintiffs assert (at 21) that Drysdale Government Securities failed due to "massive securities fraud" rather than undercapitalization and note that "Drysdale's parent company *was* subject to broker-dealer net-capital requirements."  But the Commission readily acknowledged that "even registered dealers can fail."  P.App.95.  The dealer registration requirement and associated regulations are designed not only to limit the probability that entities will fail, but also to "mitigate the magnitude" of any resulting harm to other market participants and to allow regulators to "investigate" any such "significant market events" that do occur.  P.App.56, 91.  Similarly, plaintiffs characterize (at 22) the March 2020 Treasury market volatility as related to the "COVID-lockdown" and thus "unique."  But plaintiffs offer no reason why the Commission's analysis of the need for the rule must be limited to "normal[]" market conditions rather than more "extraordinary" market disruptions.  *Contra* Mot. 22.

Further, plaintiffs erroneously suggest (at 23-24) that the rule is unnecessary because "during periods of market turmoil, firms subject to broker-dealer regulation failed," while "other firms, not subject to broker-dealer regulation, thrived."  *See also* Mot. 22 (asserting that "high-frequency traders "increased their [trading] activity" during "market stress" even though "they were not subject to broker-dealer net-capital rules").  The Commission discussed the evidence that plaintiffs point to (Mot. 23) when it characterized "[r]ecent experience" as "mixed on the

28

role of" proprietary trading firms, such as those that engage in high-frequency trading, "during market events." P.App.109. For example, the Commission pointed out that "[proprietary trading firms'] share of market intermediation fell considerably more than dealers' share did during 2020, but their share actually increased during the 2014 flash rally and again during March 2023." P.App.109 (footnotes omitted). The Commission found that ensuring such firms are subject to dealer registration was warranted because "[t]he identification, registration, and regulation of these market participants as dealers will provide regulators with a more comprehensive view of the markets through regulatory oversight and will support market stability and resiliency and protect investors by promoting the financial responsibility and operational integrity of market participants that are acting as dealers." P.App.54. The Commission thus "weighed the evidence differently than [plaintiffs] and reached contrary but reasonable policy conclusions." *Huawei*, 2 F.4th at 451.

Plaintiffs next incorrectly assert (at 24) that the Commission failed to consider that "firms would 'curtail their trading' or 'exit the market' entirely, '[r]ather than face' dealer registration and the net-capital rules." But the Commission yet again acknowledged and discussed this possibility. The Commission repeatedly noted statements from "[s]everal commenters" that "affected parties could respond" to the rule by "changing or curtailing their trading to avoid the revised dealer definition." P.App.108; *see also, e.g.*, P.App.61, 109-110, 115. But after considering these and other comments, the Commission reasonably concluded that benefits from "closing the regulatory gap" and "ensuring consistent regulatory oversight of persons engaging in regular liquidity provision in securities markets" nonetheless justified the rule. *See* P.App.93. The APA does not "'require[] anything more' of an agency than to weigh costs and benefits and

to make 'reasonable trade-offs,' and the Commission did so here." *Nasdaq Stock Mkt. LLC v. SEC*, 34 F.4th 1105, 1113 (D.C. Cir. 2022) (citations omitted).

      Finally, plaintiffs contend (at 25-26) that the reporting requirements for dealers are unnecessary for hedge funds because certain "transactions by private funds are already reported." But the Commission explained that the information private funds currently report is insufficient for those few that engage in *de facto* market making by being significant liquidity providers. As the Commission observed, many private fund advisers are registered with the Commission as investment advisers under the Investment Advisers Act of 1940. P.App.87; *see* 15 U.S.C. § 80b-1 *et seq.* Under the Advisers Act and the Commission's implementing regulations, certain registered private fund advisers with at least $150 million in private fund assets under management must periodically file Form PF with the Commission. P.App.72-73; *see* 17 C.F.R. § 279.9. On that form, private fund advisers report information such as their private fund assets under management and their investment strategies. Form PF, https://www.sec.gov/files/ formpf.pdf. But private funds and private fund advisers "do not report their securities transactions," and while their counterparties may be subject to reporting obligations, such reports lack "complete data" about those transactions. P.App.30; *see* P.App.87.

      The Commission thus acknowledged—and discussed why it disagreed with—comments that "dealer registration would not provide an information benefit because transactions are already reported," because "investment advisers are already subject to Commission oversight," and because "investment advisers are potentially subject to reporting on" Form PF and other forms. P.App.96. The Commission explained that the information it collects from private fund advisers "is not a sufficient substitute for the comprehensive dealer requirements because the dealer requirements are specific to dealer activity" and focus on "the impact of dealing activity

on the market as a whole."  P.App.73-74.  For example, Form PF "only requires reporting related to a subset of the private fund industry and does not include individual trade reporting details, which would give regulators greater insight into securities trading patterns, including the ability to more efficiently match trades to market participants."  P.App.74.  While plaintiffs may disagree that this additional information is needed, the Commission's decision was reasonable and reasonably explained.  *See Huawei*, 2 F.4th at 451.

**B.      The Commission adequately considered the rule's potential effects on a limited number of hedge funds.**

The Commission thoroughly analyzed and responded to comments about the rule's potential costs, including its possible effects on hedge funds, P.App.86-89, 108-109, expressly acknowledging and addressing each of the concerns plaintiffs identify (at 28).  Notwithstanding those potential impacts, the Commission reasonably concluded that categorically exempting private funds from the rule was unwarranted.[3]

1.      Contrary to plaintiffs' argument (at 28), the Commission recognized that "private funds that register as dealers may face restrictions against participating in the IPO market." P.App.109.  Dealers registered with FINRA (a self-regulatory organization) are subject to a rule that prohibits them from purchasing new issue securities such as IPOs.  *See* P.App.109 n.594. Due to the rule, the Commission noted, some funds "may choose to register and stay out of the IPO market, while others may forgo dealing to be able to invest in IPOs."  P.App.109.  The Commission recognized that "any large-scale exit of hedge funds from" the IPO market "could impact the ability of issuers to raise new capital" and "reduce efficient pricing in new issues."

---

[3] Indeed, as of October 2023, there were 3,490 active broker-dealers registered with the Commission (P.App.90 n.431)—indicating that those entities confronted the same concerns plaintiffs raise and nonetheless chose to register with the Commission and structure their business to comply with the broker-dealer regulatory regime.

P.App.109.  Similarly, it acknowledged that "any large-scale exit from dealing could impact liquidity."  P.App.109.  But the Commission determined that "in aggregate," it did "not expect that the[] combined impact" of these changes "will be significant because of the limited number of funds likely to be affected by" the final rule.  P.App.109.

In adopting the rule, the Commission balanced those potential costs to the IPO market against the rule's expected benefits, including promoting market resiliency and protecting regulators' ability to investigate and address significant market events.  *See* P.App.54, 56-57.  And the Commission found that excluding private funds from the rule's scope would create an unfair advantage for hedge funds over other significant liquidity providers that are required to register as dealers with the Commission.  P.App.115.  Such a "reasonable trade-off[]" is all the APA requires.  *Nasdaq*, 34 F.4th at 1113 (citation omitted).

2.      Plaintiffs misapprehend the rule's purpose as well as dealers' net capital requirements when they argue (at 29) that the rule will "further impair liquidity" by "subjecting private funds to net-capital rules that would force them to decrease their trading."  The Commission promulgated the rule to protect the "stability and resiliency" of liquidity provision, not merely to maximize the amount of liquidity provided.  P.App.55.

The Commission acknowledged comments suggesting that "imposing dealer requirements—and in particular net capital requirements—on private funds would be inappropriate and untenable, and could in turn significantly and negatively affect liquidity if private funds were to modify or cease their trading activity."  P.App.72 (footnotes omitted).  But considering this and other comments, the Commission concluded that the rule would avoid "wider harm throughout securities markets" that would occur if market participants were "unable to meet short-term obligations."  *See* P.App.91-92, 94.  The Commission thus found that the rule

would "promote the financial responsibility and operational integrity of significant liquidity providers that are acting as dealers in securities markets." P.App.81. Moreover, the Commission observed that "[a]n affected party's costs of increased net capital requirements under the application of the Net Capital Rule could be partially offset by reductions in its cost of capital as higher levels of net capital may reduce the affected party's probability of default." P.App.108. The Commission concluded that, on balance, although the rule "may have small negative effects on market liquidity and efficiency, due to increases in costs for affected parties," the rule "may also promote liquidity and efficiency by limiting the probability that significant liquidity providers fail." P.App.81.

The Commission pointed to commenters' assertions that "the proposed rules could have a negative impact on liquidity or may cause many market participants to cease, modify, or curtail their trading activity to avoid being required to register as a dealer." P.App.61; *see* P.App.110 ("We acknowledge that" the final rule "could have the effect of reducing liquidity."). But the Commission concluded that the rule as modified in response to comments "appropriately balance[s] the concerns of the various commenters in a way that will best achieve the Commission's important goals to protect investors and support fair, orderly, and resilient markets through the complete and consistent application of dealer regulations." P.App.61. And it concluded that "any potential harm to market liquidity is likely to be smaller than commenters suggested" because the final rule "will likely affect fewer entities than the proposed rule." P.App.110.

The Commission also explained how, even if some firms exited the market, other firms could compensate for any negative effect on liquidity in the markets as a whole. The Commission found that "any harm to liquidity is likely to be limited" because "if affected

33

persons reduce their trading and bid-ask spreads meaningfully widen, then other registered dealers may compete with one another to trade on the wider spreads."  P.App.110.  The "additional buying and selling by these other dealers would offset some of the liquidity lost as the affected persons withdrew from dealing."  P.App.110.  The Commission further explained that "if significant liquidity providers that are better capitalized are also less volatile during times of crisis," then the rule "may promote the stability and resiliency of market liquidity by consistently applying the Net Capital Rule."  P.App.110.  It thus concluded that the rule would "reduce the risk that a significant liquidity provider fails" and "limit the harm such failure may have on market liquidity."  P.App.110.

Plaintiffs similarly fail to show any infirmity in other aspects of the Commission's discussion of net capital requirements.  They erroneously assert (at 30) that the Commission "nowhere explained how private funds could realistically comply with the net-capital rules."  But the Commission recognized that affected entities may "need to decrease the charges to their net capital or raise additional capital," and in particular, that the "small percentage" of hedge funds that the rule would cover "may need to renegotiate contracts with investors" to comply with applicable net-capital requirements.  P.App.104 & n.570.  Nor did the Commission "conce[de]" (*contra* Mot. 30) that "other pooled investment vehicles"—in particular, registered investment companies—"could not comply with net-capital rules."  In the proposing release, the Commission stated that it was "unclear how registered investment companies would comply with net capital requirements" (P.App.41) and solicited comments on whether and how a "registered investment company" could "comply with the requirements applicable to dealers" (P.App.11). Regardless, the Commission emphasized that "[r]egistered investment companies have different business models and serve different market purposes than … hedge funds."  P.App.41; *see supra*

pp. 22-23.  The Commission thus adequately justified any differential treatment of registered investment companies and hedge funds.  *Contra* Mot. 30.

Relatedly, plaintiffs are wrong in arguing (at 30) that the Commission "failed to address" the concern that "[a]pplication of net-capital rules to private funds would force the funds to 'lock[] up' their investors' capital for a year."  The Commission "acknowledge[d]" that the few hedge funds subject to the rule "may have to limit investor withdrawals if they want to continue dealing securities."  P.App.104 & n.570.  But the Commission explained that these firms could mitigate this consequence by "separat[ing] [their] dealing activities into a separate entity," leaving another entity that "continues to operate the non-dealing strategies and offers the same liquidity rights as the original fund."  P.App.104 & n.571.  And contrary to plaintiffs' assertion (at 30), the Commission acknowledged that "investors in [affected] entities may reduce their market participation," citing a comment letter raising this concern.  P.App.110 (citing P.App.144-153).

The Commission thus weighed the upsides and downsides of subjecting those covered by the rule—including the few hedge funds engaged in *de facto* market making activity—to the applicable net capital requirements and other requirements for registered dealers.  And it made a "reasonable trade-off[]" as to these competing considerations.  *Nasdaq*, 34 F.4th at 1113.  Again, the APA does not "require[] anything more," and neither plaintiffs nor this Court may "re-weigh the technically complex trade-offs the Commission carefully considered."  *Id.* at 1113-14.

3.      Contrary to plaintiffs' argument (at 31), the Commission acknowledged that "[s]everal commenters stated that registering as dealers would cause funds to lose the benefit of various customer protection regulations that govern their relations with their broker-dealers."  P.App.109; *see also* P.App.98 ("Several commenters suggested that dealers registered under the

[rule] would lose protections under Rule 15c3-3 [the customer protection rule].").  But the Commission determined that the rule would not "significantly impact registered dealers with respect to the customer protection rule."  P.App.98.  In particular, as the Commission explained, the relevant customer protection regulation "requires a carrying broker-dealer to take steps to protect both customer accounts and also proprietary accounts of other brokers or dealers."  P.App.98.  Thus, the Commission explained, the few affected hedge funds would still "benefit from the[se] protections" so long as they hold accounts with other broker-dealers.  P.App.98.  The Commission thus reasonably rejected the premise of plaintiffs' claim, and plaintiffs point to no other part of the customer protection regulations that the Commission failed to consider.

4.     Similarly, contrary to plaintiffs' assertion (at 32), the Commission acknowledged that "[s]ome commenters questioned whether dealers registered under" the rule "that do not have customers would benefit from [Securities Investor Protection Corporation] membership."  P.App.96.  But the Commission observed that "Congress mandated that a broad range of dealers, including those without customers, are required to become members of SIPC."  P.App.96 (citing 15 U.S.C. § 78ccc(a)(2)).  As the Commission explained, Congress intended "to place the financial support of the SIPC program on all firms that make their livelihood in the securities business, regardless of whether they had public customers or not."  P.App.96.  Indeed, "there are many firms that are current broker-dealers and have no customers that are members of SIPC."  P.App.96.  The Commission thus reasonably concluded that "expanding SIPC membership will enhance the ability of SIPC to carry out its investor protection mission ... which will have positive effects on the securities markets overall."  P.App.96.

**C.     The Commission acted reasonably in adopting the two qualitative factors.**

Plaintiffs' contention (at 34) that the rule's two factors are "overbroad" and that the Commission "failed to address substantial comments pointing that out" misapprehends the

meaning and scope of those factors.  As the Commission reasonably explained, the factors are narrowly tailored to capture only persons that engage in traditional dealer activities.

1.      A person qualifies as a dealer under the "expressing trading interest factor" if that person "[e]ngages in a regular pattern of buying and selling securities that has the effect of providing liquidity to other market participants" by "[r]egularly expressing trading interest that is at or near the best available prices on both sides of the market for the same security and that is communicated and represented in a way that makes it accessible to other market participants." P.App.62-63; *see* P.App.125.  As the Commission explained, this factor "would update the longstanding understanding that regular or continuous quotation is a hallmark of market making or *de facto* market making (and, hence, dealer) activity, to reflect technological changes to the ways in which buyers and sellers of securities are brought together."  P.App.63.

Plaintiffs' claim (at 35) that this factor is "overbroad" is based on the misperception that it would capture "ordinary investment strategies" such as buying stock and then selling it "minutes or even hours later" "more than a few isolated times."  Contrary to plaintiffs' suggestion (at 35), the Commission made clear that, under this factor, such ordinary investment strategies involving a small number of transactions would not be considered dealer activity. Rather, the factor captures only "market participants that have established themselves as ... critical sources of liquidity," such as by using "automated, algorithmic trading strategies that rely on high frequency trading strategies to generate a large volume of orders and transactions." P.App.64.  This is because, as the Commission explained, the word "regularly" in the rule "capture[s] significant liquidity providers who express trading interests at a high enough frequency to play a significant role in price discovery and the provision of market liquidity," and thus "distinguishes persons engaging in isolated or sporadic expressions of trading interest from

37

persons whose regularity of expression of trading interest demonstrates that they are acting as dealers." P.App.63-64. In particular, the Commission pointed out, "'regular' in the most liquid markets," such as the U.S. Treasury market, would mean "expressing trading interest on both sides of the market" not merely "on a one-off basis," but over "more frequent periods … both intraday and across days." P.App.64.

Further, the Commission reasonably rejected commenters' suggestion that trading interest must be expressed on both sides of the market "simultaneously," as opposed to just "regularly." *Contra* Mot. 35. The Commission explained that, "[w]hile simultaneously expressing trading interest on both sides of the market in the same security is indicative of dealer activity, market participants also can be acting as dealers by regularly providing liquidity even where the expressions of trading interest on both sides of the market for the same security are not simultaneous." P.App.67. And "adding a simultaneity condition could lead to behavior where a dealer might, for example, express trading interest to buy and sell in alternate moments in time to evade the requirement to register." P.App.67.

2.     A person qualifies as a dealer under the "primary revenue factor" if that person "[e]arn[s] revenue primarily from capturing bid-ask spreads, by buying at the bid and selling at the offer, or from capturing any incentives offered by trading venues to liquidity-supplying trading interest." P.App.68; *see* P.App.125. As the Commission explained, "one fundamental characteristic typical of market makers and liquidity providers—and one that has historically been viewed as dealer activity—is trading in a manner designed to profit from bid-ask spreads or liquidity incentives rather than with a view toward appreciation in value." P.App.68.

Plaintiffs' assertion (at 35-36) that this factor would capture all forms of "buying low and selling high" is based on a misreading of the rule. As the Commission explained, "when a

liquidity provider routinely buys and sells securities in a manner designed to capture a spread with such frequency and consistency that its revenue is made up primarily of this form of compensation, it would be considered to be engaged in a routine pattern of providing liquidity as a service and would fall within the scope of" the rule.  P.App.68.  Similarly, the Commission noted that certain trading venues offer incentives such as rebates to persons that execute liquidity-providing orders, and it explained that when a liquidity provider captures such incentives "with such frequency and consistency that its revenue is made up primarily of this form of compensation, it would be considered to be engaged in a routine pattern of providing liquidity as a service" and thus would be covered by the rule.  P.App.68.  The Commission acknowledged comments suggesting that "the term 'primarily' is potentially vague because a person might earn more revenue from appreciation in the value of its inventory of securities than from capturing bid-ask spreads or trading incentives."  P.App.69.  The Commission explained, however, that "while the analysis of this specific scenario would depend on the totality of circumstances, as a general matter, it is unlikely that a person who regularly earns more revenue from an appreciation in the value of its inventory of securities than from capturing bid-ask spreads or incentive payment for liquidity provision, would be considered to earn revenue 'primarily' from capturing bid-ask spreads or trading incentives."  P.App.70.  This factor thus comports with the settled understanding that the dealer inquiry is not a bright-line rule, but rather "depends upon all of the relevant facts and circumstances."  P.App.56; *see also, e.g.*, 2002 Release at 67,498-500.

    3.    Plaintiffs also wrongly suggest (at 36-37) that the Commission "failed to respond" to "comments regarding the Rule's potential effect on multi-strategy funds," which plaintiffs describe as funds that engage in different trading strategies within the same legal entity.

Plaintiffs refer to comments that addressed the proposed rule's "routinely making roughly comparable purchases and sales" factor and the proposed "aggregation" provision that would have aggregated accounts across entities controlled by a single firm for purposes of applying the proposed rule's standards.  *E.g.*, P.App.239-240, 278, 340; *see* P.App.77 (describing proposal's aggregation provision).  In response to comments that the proposed aggregation provision would "force market participants to constantly monitor their trading activities and their volume ... across all subsidiaries and clients to determine whether either the qualitative or quantitative standards are triggered," the Commission eliminated that qualitative factor and the aggregation provision from the final rule, explaining that "persons whose securities activities may have been captured may no longer be within the scope of the rules as adopted."  P.App.71 n.207, 78-79.  The Commission also acknowledged comments suggesting that the rule should "[t]reat separately trading activity conducted by separate decision-makers without coordination of trading or cooperation among or between them."  P.App.79; *see* P.App.78 n.305 (quoting comment letter discussing "independent portfolio managers").  But the Commission explained that "[r]emoval of the aggregation provision adequately addresses" this suggestion.  P.App.79.

Plaintiffs' suggestion (at 37) that a firm would be covered merely because one portfolio manager "buy[s] a particular stock" and a different portfolio manager "sell[s] the same stock" is likewise incorrect.  Rather, as the rule's text makes clear, a person must meet one of the rule's specific qualitative standards to be covered; for example, a person must "regularly" express trading interest on both sides of the market for the same security, and those activities must "ha[ve] the effect of providing liquidity to other market participants."  P.App.125; *supra* p. 37.

4.    Plaintiffs further complain (at 37-38) that the rule "does not even represent the outer limit of who counts as a 'dealer,'" but the Commission acted reasonably in specifying a

particular set of trading strategies that qualify as dealing activity.  The Commission explained

that the rule "address[es] one way in which a person can be engaged in the regular business of

buying and selling securities for its own account."  P.App.61.  But "[a] person engaging in other

activities that satisfy the definition of dealer under otherwise applicable interpretations and

precedent, such as underwriting, will still be a dealer even though those activities are not

addressed by the [rule's] two qualitative factors."  P.App.61; *see also* P.App.125 ("No

presumption shall arise that a person is not a dealer within the meaning of section 3(a)(5) of the

Act solely because that person does not satisfy" the rule's qualitative factors).

Plaintiffs cite no authority requiring the Commission to comprehensively list every

activity that could bring a firm within the statutory dealer definition.  To the contrary, "[n]othing

prohibits federal agencies from moving in an incremental manner."  *Fox*, 556 U.S. at 522; *cf.*

*Pharm. Rsch. & Mfrs. of Am. v. FTC*, 790 F.3d 198, 210 (D.C. Cir. 2015) (holding that agency

did not act arbitrarily and capriciously in "promulgat[ing] a rule focused on the pharmaceutical

industry").  Based on developments in algorithmic, high-frequency trading, the Commission took

action to address the resulting regulatory gap by clarifying that specific trading patterns that have

the effect of providing liquidity to other market participants are dealer activity.  *See* P.App.56-

57.  The Commission did not act unreasonably merely because it did not at the same time attempt

to delineate all other activities that could meet the dealer definition.

**D.    The Commission adequately considered the rule's effect on efficiency, competition, and capital formation.**

The Commission satisfied its obligations under the Exchange Act to "consider, in

addition to the protection of investors, whether the action will promote efficiency, competition,

and capital formation," 15 U.S.C. § 78c(f), and to "consider ... the impact any such rule or

regulation would have on competition," *id.* § 78w(a)(2).  Those provisions require the

Commission to "determine as best it can the economic implications of the rule it has proposed,"
but they do not require the Commission to "base its every action upon empirical data" or a
"quantitative analysis." *Chamber of Com.*, 85 F.4th at 772 (citations omitted).  Nor do they
obligate the Commission to conduct a "precise cost-benefit analysis." *Nasdaq*, 34 F.4th at 1111.
To the contrary, the Commission "may reasonably conduct 'a general analysis based on informed
conjecture.'" *Id.* (citation omitted).  Moreover, the Commission need only consider a rule's
effects on "the market as a whole," not "narrow sections of the market." *Bloomberg L.P. v. SEC*,
45 F.4th 462, 474 (D.C. Cir. 2022); *see also Nasdaq*, 34 F.4th at 1113 (rejecting rule challenge
that improperly "equate[d] competition with [challengers'] own competitive position").

The Commission's economic analysis comports with these principles.  The Commission
found that the rule would "promote competition among entities that regularly provide significant
liquidity by applying consistent regulation to these entities, thus leveling the competitive playing
field" between entities currently registered as dealers and those that are not.  P.App.112.  The
Commission acknowledged that the rule "could have a small negative effect on market
efficiency" and liquidity if entities covered by the rule "respond by curtailing their liquidity-
providing activities."  P.App.110, 112.  But it found that the rule "could also promote market
efficiency" by "lead[ing] to better capitalization for significant liquidity providers," making them
"less sensitive to market disruptions that could otherwise reduce their capacity to provide
liquidity."  P.App.112.  The Commission likewise acknowledged that the rule could "harm
capital formation" if affected entities respond by reducing their market participation, but it found
that the rule could also "promote capital formation" by "promot[ing] market stability, resiliency,
and investor confidence," thus "increas[ing] demand for securities issued in U.S. markets."
P.App.113.

Plaintiffs' criticisms of the Commission's analysis of these factors ignore much of the Commission's discussion and misapprehend the governing requirements.

1.       Plaintiffs assert (at 38) that the Commission "concede[d]" that the rule will have "negative effects on market liquidity and efficiency" and would have "mixed" effects on capital formation.  Plaintiffs' selective quotations misconstrue the Commission's analysis.  As to efficiency, as noted above, the Commission also found that because "adequately capitalized firms may be less sensitive to market disruptions that could otherwise reduce their capacity to provide liquidity," the rule's application of net capital requirements to "significant liquidity providers" could also "promote market efficiency."  P.App.112.  And as to capital formation, the Commission found that the rule "will also promote market stability, resiliency and investor confidence," and explained that "[m]ore stable markets and strengthened investor confidence in U.S. markets may promote capital formation by increasing demand for securities issued in U.S. markets."  P.App.113.  Further, the Commission found that "any potential harm to market liquidity is likely to be smaller than commenters suggested" because the final rule "will likely affect fewer entities than the proposed rule, due to the elimination of the proposed first qualitative factor and the elimination of aggregation."  P.App.110 (footnotes omitted).  For instance, the Commission "estimate[d]" that the final rule "will only affect a small percentage of private funds."  P.App.104; *see Bloomberg*, 45 F.4th at 474 ("The Exchange Act obligates the Commission to consider the effects of proposed rules and regulations on the market as a whole, not just narrow sections of the market.").

Regardless, the Exchange Act does not obligate the Commission to find conclusively that the rule will promote each of efficiency, competition, and capital formation.  Rather, "the agency is only told to 'consider' ... the economic implications of a proposed rule."  *Chamber*, 85 F.4th

at 773 (quoting 15 U.S.C. § 78c(f)).  Recognizing that the rule could have some small negative effects is a hallmark of the mandated analysis, not evidence of its absence.

2.     Plaintiffs also suggest (at 39), with no support, that the Commission underestimated the number of private funds that would be affected by the rule, but the Commission's analysis of the number of private funds that the rule may cover complied with the Exchange Act's requirements.  To estimate that number, the Commission used data from a database of U.S. Treasury securities transactions and determined how many firms were likely to meet the rule's primary-revenue factors because they traded "at least 4 of the 10 highest-volume U.S. government securities on at least 15 different trading days in a given month" and averaged a positive intraday trading spread on each of those securities.  P.App.88.  The Commission separately derived an estimate using information from a form filed by private fund advisers registered with the Commission.  P.App.87 ("[T]o the extent private funds employ trading strategies that would qualify under" the final rule's "qualitative standards, they would most likely report those as [high-frequency trading] strategies.").  After conducting extensive analyses (P.App.87-90), the Commission determined that "up to 4 entities classified as hedge funds" appeared to meet the primary-revenue factor for U.S. Government securities in 2022 based on data on U.S. Treasury securities transactions (P.App.88), and that up to 12 hedge funds may meet that factor based on data reported by private fund advisers (P.App.89).

Plaintiffs complain (at 39) that the Commission's analysis focused on "the market for U.S. government bonds" rather than "the market for regular stocks."  But the Commission's analysis of data reported by private fund advisers on Form PF captured private funds' trading activities in all securities, not just U.S. government securities.  *See* P.App.88-89.  As for its other analysis, the Commission explained that its estimate "does not cover markets for equities,

options, or other fixed-income markets" because the data to which the Commission had access was "limited to U.S. Government securities." P.App.89. And the Commission observed that in "other markets such as those for equities and options," "significant liquidity providers are more likely to be registered broker-dealers … than they are in the market for U.S. Treasury securities." P.App.87-88; *see supra* pp. 25-26. Plaintiffs point to no data or information that the Commission overlooked or that would call its analysis into question. The APA "imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies." *Prometheus*, 592 U.S. at 427. "In the absence of additional data from commenters," an agency need only "ma[k]e a reasonable predictive judgment based on the evidence it had." *Id.* That is precisely what the Commission did here.

Similarly, plaintiffs fault the Commission (at 39) for not "estimat[ing] the number of entities that appear to meet the expressing trading interest factor" (P.App.87). But as the Commission explained, it did "not have sufficient data on quoting activities" to make such an estimate. P.App.87. And it noted that it was "unable to determine whether the [high-frequency trading] activities that these funds report would satisfy the expressing trading interest factor or the primary revenue factor" because the Commission "do[es] not observe individual transactions in Form PF." P.App.89; *see* P.App.89 ("[T]he analysis also does not estimate the number of entities described by" the final rule's "expressing trading interest factor because of data limitations."). Again, plaintiffs identify no data or other evidence that the Commission could have used to make such an estimate or that would call the Commission's estimate into question.

3.      Nor did the Commission improperly fail to consider the potential economic impacts of "pending rulemakings." *Contra* Mot. 39-40. There is no requirement that the Commission do so. Here, the Commission reasonably considered "existing regulatory

requirements, including recently adopted rules, as part of its economic baseline." P.App.81. But in considering the baseline—how "the world would look in the absence" of the rule—the Commission "typically does not include recently proposed actions, because doing so would improperly assume" their adoption. P.App.81 n.344. Plaintiffs do not explain how the Commission could, as a practical matter, assess the likely economic consequences of multiple pending proposals that it might never adopt or might adopt with alterations after the notice-and-comment process—let alone why the APA would require such an analysis. The only authority plaintiffs cite (at 40), *Alliance for Hippocratic Medicine v. FDA*, 78 F.4th 210 (5th Cir. 2023), is inapposite, because there the Fifth Circuit faulted the FDA for failing to consider concurrent changes to regulations, not proposed changes. *Id.* at 246.

The Commission also adequately addressed the effect of "recently adopted rules." *Contra* Mot. 40. The Commission's economic analysis considered "potential effects arising from any overlap between the compliance period[s] for" the rule and "each of the[] recently adopted rules" that commenters identified. P.App.81-82; *see* P.App.103-104. Plaintiffs contend (at 40) that the Commission's recently adopted Treasury Clearing Rule makes the rule here unnecessary because it "addresses many of the same purported risks." But the Commission addressed this concern, explaining that because the Treasury Clearing Rule "address[es] these externalities through different mechanisms," the rule here would "further reduce the probability that a significant liquidity provider fails," and thus would further "promote[] the stability and resiliency of the government securities market." P.App.93. The Commission also reasoned that the rule here would have several benefits beyond those of the Treasury Clearing Rule, such as "consistent application of dealer regulations across significant liquidity providers" and "operational and financial requirements designed to mitigate risk." P.App.93. The

Commission's conclusion that the Treasury Clearing Rule did not render the rule here unnecessary was thus reasonable and reasonably explained.

> ### E.     The rule is consistent with prior Commission positions.

Contrary to plaintiffs' assertion (at 41), there is no inconsistency between the rule and prior Commission positions.  Plaintiffs cite (at 41) a 1999 Report of the President's Working Group on Financial Markets[4] that merely recognized that the term "hedge fund"—which is "not defined or used in the federal securities laws"—"has come to be used to refer to a variety of pooled investment vehicles that are not registered under the federal securities laws as investment companies, broker-dealers, or public corporations."  Hedge Funds, Leverage, and the Lessons of Long-Term Capital Management at B-1 (Apr. 1999), https://tinyurl.com/4vmw7yxy.  The report does not state that hedge funds can never qualify as dealers, even if they engage in traditional dealer activities like acting as a *de facto* market maker.  And in any event, the report predates the rise of algorithmic, high-frequency trading activities that the Commission adopted the rule to address. *See Concept Release on Equity Market Structure*, 75 Fed. Reg. 3594, 3594-95 (Jan. 10, 2010) (noting that New York Stock Exchange began offering fully automated access to its displayed quotations in October 2006).

Plaintiffs also cross-reference (at 41) Commission no-action letters that supposedly do not "require hedge funds and other active investors to register as dealers or government securities dealers."  P.App.223 & n.39.  As the no-action letters themselves recognize, they are "staff position[s] regarding enforcement action only"—not the position of the Commission—and do "not purport to express any legal conclusions regarding the applicability of statutory provisions of the federal securities laws." *Fairfield Trading Corp.*, 1988 WL 233618, at *2 (SEC Jan. 10,

---

[4] The Report was signed by the Commission's Chairman at the time but was not a position of the Commission itself.

1988).  Further, the letters' analyses are limited to the facts and circumstances of the entities requesting them, and such facts distinguish the firms at issue in those letters from the market participants, including the limited number of hedge funds, that may be covered by the rule here. *See, e.g.*, *id.* at *1 (noting that company "does not make a market" and does not "stand ready to purchase and sell securities in general"); *Louis Dreyfus Corp.*, 1987 WL 108160, at *2 (SEC July 23, 1987) ("The Company does not make a market through Broker.").  Nor do the no-action letters purport to take the position that private funds can never meet the statutory definition of a dealer, regardless of their activities.  To the contrary, the Commission has brought an enforcement action against a hedge fund's principals for causing the fund to act as a dealer without registering with the Commission.  *See Murchinson Ltd.*, 2021 WL 3639452, at *2 (Aug. 17, 2021) (settled matter).

Similarly, plaintiffs assert (at 41) that the Commission "has never before taken the position it takes here, 'that liquidity provision alone by a person trading for its own account constitutes dealing activity or that trading activity becomes dealing activity merely because it has the effect of providing liquidity.'"  That is not what the rule says.  It sets forth two specific circumstances in which a person is engaged in buying and selling securities for its own account because it "[e]ngages in a *regular pattern* of buying and selling securities that has the effect of providing liquidity to other market participants."  P.App.125 (emphasis added).

The rule's connection between providing liquidity and dealer activity is consistent with previous Commission pronouncements, which have repeatedly recognized that "[a] person generally may ... be acting as a dealer in the securities markets by," among other activities, "acting as a *de facto* market maker whereby market professionals or the public look to the firm for liquidity."  2002 Release, 67 Fed. Reg. at 67,499; *see also, e.g.*, *Regulation Best Interest*, 83

Fed. Reg. 21,574, 21,653 (May 9, 2018) ("Dealer activity may include, but is not limited to, ... acting as a *de facto* market maker or liquidity provider ... ."); *Further Definition of Swap Dealer*, 77 Fed. Reg. at 30,617 (factors for identifying security-based swap dealers include "[p]roviding liquidity to market professionals or other persons in connection with security-based swaps"). Indeed, the "historical" understanding of dealer activity is that "a dealer provided market liquidity." *Almagarby*, 92 F.4th at 1315. As explained, the rule here reiterates this principle and sets out specific circumstances in which a person is engaged in the business of buying or selling securities that has the effect of providing liquidity to other market participants. *See supra* p. 14.

*          *          *

For the above reasons, plaintiffs' challenges to the rule fail. But if this Court concludes that the Commission did not adequately consider an issue or explain its decision, remand without vacatur would be warranted. *See Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021) ("Remand, not vacatur, is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so.").

In addition, if this Court agrees with plaintiffs that the rule's application to private funds exceeds the Commission's statutory authority (Mot. 16-17) or that the Commission failed to engage in reasoned decisionmaking as to private funds (Mot. 18-41), the proper remedy under settled severability principles would be to vacate the rule only as applied to private funds. The Commission stated that "[i]f any of the provisions of" the final rule, "or the application thereof to any person or circumstance, is held to be invalid, such invalidity shall not affect other provisions or application of such provisions to other persons or circumstances that can be given effect without the invalid provision or application." P.App.124. And the remainder of the rule will

49

function sensibly without applying to private funds. *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988) (severance preferred when doing so "will not impair the function of the [rule] as a whole, and there is no indication that the regulation would not have been passed but for its inclusion"); *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019); *VanDerStok v. Garland*, 2023 WL 4945360 (5th Cir. July 24, 2023) (unpublished).

That result accords with the principle that "when a court encounters statutory or regulatory text that is 'invalid as applied to one state of facts and yet valid as applied to another,' it should 'try to limit the solution to the problem' by, for instance, enjoining the problematic applications 'while leaving other applications in force.'" *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 81-82 (D.C. Cir. 2020) (citation omitted); *see also, e.g.*, *Loan Syndications & Trading Ass'n v. SEC*, 882 F.3d 220, 229 (D.C. Cir. 2018) (concluding that application of rule to managers of certain types of securities was invalid under relevant statute and remanding with instructions for district court to "vacate the rule insofar as it applies to" those certain managers). Nor does it matter that "the text of the final rule is not divisible in this way"; courts may "invalidate only some applications even of indivisible text.'" *GPA Midstream Ass'n v. U.S. Dep't of Transp.*, 67 F.4th 1188, 1202 (D.C. Cir. 2023) (citation omitted). Plaintiffs make little attempt to demonstrate that the rule is unwarranted or arbitrary as applied to entities such as proprietary trading firms that are not structured as private funds. Vacating the rule in its entirety would thus needlessly undermine market stability and harm the investing public that Congress enacted the dealer regime to protect.

## CONCLUSION

The Court should deny plaintiffs' motion for summary judgment, grant the Commission's cross-motion for summary judgment, and enter judgment for the Commission.

Dated:  June 11, 2024

Respectfully submitted,

/s/ Samuel B. Goldstein

KEEFE M. BERNSTEIN (TBN 24006839)
Securities and Exchange Commission
Fort Worth Regional Office
801 Cherry Street, Suite 1900
Fort Worth, TX 76102
(817) 900-2607
bernsteink@sec.gov

DOMINICK V. FREDA (*pro hac vice*)
Assistant General Counsel

EMILY TRUE PARISE (*pro hac vice*)
Senior Appellate Counsel

SAMUEL B. GOLDSTEIN (*pro hac vice*)
Counsel to the General Counsel

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
(202) 551-7692 (Goldstein)
goldsteinsa@sec.gov

**CERTIFICATE OF SERVICE**

I certify that on June 11, 2024, I electronically submitted the foregoing document with

the clerk of court for the U.S. District Court, Northern District of Texas, Fort Worth Division,

using the electronic case filing system of the court.

/s/ Samuel B. Goldstein