## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

Nаtiоnаl Аssосiаtiоn оf Privаtе Fund
Mаnаgеrs; Аltеrnаtivе Invеstmеnt
Mаnаgеmеnt Аssосiаtiоn, Limitеd; аnd
Mаnаgеd Funds Аssосiаtiоn,

        *Plaintiffs*,

   v.

Sесuritiеs аnd Еxсhаngе Соmmissiоn,

        *Defendant*.

Case No. 4:24-cv-00250-O

## PLAINTIFFS' COMBINED REPLY BRIEF
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
## AND OPPOSITION TO
## DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

ARGUMENT ........................................................................................................................ 3

    I.    The Commission Misreads The Exchange Act And Other Statutory Law.................. 3

        A.    The Commission's Novel And Overbroad Reading Of The Statute
            Cannot Possibly Be Right. ............................................................................ 3

        B.    In Resisting A Requirement That "Dealers" Buy And Sell To
            Customers, The Commission Ignores Context, Structure, And History.............. 6

            1.    Congress Did Not Intend "Dealer" To Take On A "No Customers"
                Meaning At War With Its Ordinary And Traditional Sense...................... 7

            2.    The Commission's Other Attempts To Support Its Implausible
                Conception of "Dealing" Are Unavailing................................................. 15

        C.    Whether Or Not The Definition Of Dealers Includes A Customer
            Requirement, The Commission Fails To Reconcile The Rule With The
            Statutory And Regulatory Framework Of The Securities Laws....................... 23

    II.    The Commission Fails To Show That The Rule Is The Product Of Reasoned
         Decisionmaking Or Otherwise Lawful....................................................................... 28

        A.    The Commission Cannot Explain Why It Undertook This Rulemaking........... 29

        B.    The Commission's Defense Of The Rule's Harmful, Counterproductive
            Consequences Does Not Withstand Scrutiny. .................................................. 34

            1.    The Commission Minimizes The Rule's Adverse Consequences On
                Private Funds. ......................................................................................... 34

            2.    The Rule Undermines The Commission's Stated Goals, Promoting the
                Very Outcome—Less Liquidity—That It Purportedly Seeks To Avoid.. 39

            3.    The Commission Cannot Justify The Rule's Overbreadth...................... 40

        C.    The Commission Cannot Save Its Flawed Economic Analysis....................... 45

        D.    The Commission Cannot Square The Rule With Prior Commission
            Positions............................................................................................................ 48

    III.    Vacatur Is Appropriate. ............................................................................................. 49

CONCLUSION................................................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Equity Inv. Life Ins. Co. v. SEC*,
  613 F.3d 166 (D.C. Cir. 2010) ............................................................30

*Am. Fed'n of Gov't Emps. v. FLRA*,
  24 F.4th 666 (D.C. Cir. 2022) ............................................................49

*Andrus v. Charlestone Stone Prods. Co.*,
  436 U.S. 604 (1978) ............................................................................8

*Aqua Slide 'N' Dive Corp. v. CPSC*,
  569 F.2d 831 (5th Cir. 1978) ........................................................36, 40

*Bond v. United States*,
  572 U.S. 844 (2014) ............................................................................5

*Bullock v. BankChampaign, N.A.*,
  569 U.S. 267 (2013) ..........................................................................14

*Bus. Roundtable v. SEC*,
  647 F.3d 1144 (D.C. Cir. 2011) ....................................32, 34, 42, 43, 46, 47

*CAB v. Delta Air Lines, Inc.*,
  367 U.S. 316 (1961) ..........................................................................39

*Calumet Shreveport Refining, LLC v. EPA*,
  86 F.4th 1121 (2023) ..........................................................................29

*Chamber of Com. of U.S. v. DOL*,
  885 F.3d 360 (5th Cir. 2018) ........................................................7, 9, 23, 24

*Chamber of Com. of U.S. v. SEC*,
  412 F.3d 133 (D.C. Cir. 2005) ........................................................34, 46

*Chamber of Com. of U.S. v. SEC*,
  85 F.4th 760 (5th Cir. 2023) ....................................29, 32, 33, 35, 39, 42

*Chamber of Com. of U.S. v. SEC*,
  88 F.4th 1115 (5th Cir. 2023) ............................................................50

*Chapel Invs., Inc. v. Cherubim Interests, Inc.*,
  177 F. Supp. 3d 981 (N.D. Tex. 2016) ....................................4, 6, 8, 12, 14, 15, 18

*Clarke v. CFTC*,
  74 F.4th 627 (5th Cir. 2023) ........................................................43, 47

*Coolidge v. Old Colony Tr. Co.*,
  156 N.E. 701 (Mass. 1927) ..................................................................7

*Corrosion Proof Fittings v. EPA*,
  947 F.2d 1201 (5th Cir. 1991) ................................................................30

*Demond v. Infiniti HR, LLC*,
  2018 WL 4145053 (N.D. Tex. Aug. 30, 2018)..........................................20

*Discover Growth Fund, LLC v. Beyond Com., Inc.*,
  561 F. Supp. 3d 1035 (D. Nev. 2021) ......................................................19

*Discover Growth Fund, LLC v. Camber Energy, Inc.*,
  602 F. Supp. 3d 982 (S.D. Tex. 2022) ..............................6, 8, 18, 19, 43

*Donander Co. v. Comm'r*,
  29 B.T.A. 312 (1933) ............................................................................7, 8

*East Bay Sanctuary Covenant v. Garland*,
  994 F.3d 962 (9th Cir. 2020) ............................................................32, 33

*Eastside Church of Christ v. National Plan*,
  391 F.2d 357 (5th Cir. 1968) ............................................................19, 20

*FAIC Sec., Inc. v. United States*,
  768 F.2d 352 (D.C. Cir. 1985) .................................................................18

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009).................................................................................45

*Food Mktg Inst. v. Argus Leader Media*,
  588 U.S. 427 (2019).................................................................................11

*Fox Television Stations, Inc. v. FCC*,
  280 F.3d 1027 (D.C. Cir. 2002) ...............................................................29

*Friends of Boundary Waters Wilderness v. Bosworth*,
  437 F.3d 815 (8th Cir. 2006) ...................................................................42

*Goldstein v. SEC*,
  451 F.3d 873 (D.C. Cir. 2006) ...................................................................7

*Harriman Nat'l Bank v. Comm'r*,
  43 F.2d 950 (2d Cir. 1930).........................................................................7

*Illinois v. Lidster*,
  540 U.S. 419 (2004).................................................................................22

*In re Immune Pharms., Inc.*,
  635 B.R. 118 (Bankr. D.N.J. 2021) ..............................................8, 18, 19

*Jarkesy v. SEC*,
  34 F.4th 446 (5th Cir. 2022) ......................................................................8

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024).................................................................1, 15, 28

*Louisiana v. Dep't of Energy*,
  90 F.4th 461 (5th Cir. 2024) ...........................................................................32, 35

*Mass. Fin. Servs., Inc. v. SIPC*,
  411 F. Supp. 411 (D. Mass 1976) ...........................................................................39

*MCR Oil Tools, LLC v. DMG Mori USA, Inc.*,
  2020 WL 13133311 (N.D. Tex. Sept. 15, 2020)...............................................30, 42, 48

*Mex. Gulf Fishing Co. v. U.S. Dep't of Com.*,
  60 F.4th 956 (5th Cir. 2023) ...............................................................31, 33, 38, 44

*Nat'l Archives & Records Admin. v. Favish*,
  541 U.S. 157 (2004) ...............................................................................................8

*Nat'l Ass'n of Mfrs. v. SEC*,
  --- F.4th ---, ---, 2024 WL 3175755 (5th Cir. 2024) ...........................31, 34, 37, 40, 44

*Nat'l Ass'n of Private Fund Managers v. SEC*,
  103 F.4th 1097 (5th Cir. 2024) ...........................................6, 8, 9, 25, 29, 49, 50

*Nat'l Fuel Gas Supply Corp. v. FERC*,
  468 F.3d 831 (D.C. Cir. 2006) ...........................................................................24, 30

*Nat'l Min. Ass'n v. Babbitt*,
  172 F.3d 906 (D.C. Cir. 1999) ...............................................................................41

*NetChoice, LLC v. Paxton*,
  49 F.4th 439 (5th Cir. 2022) ...................................................................................23

*Niz-Chavez v. Garland*,
  593 U.S. 155 (2021) ...............................................................................................5

*Ohio v. EPA*,
  144 S. Ct. 2040 (2024)...........................................................................34, 36, 37, 43

*Polymer80, Inc. v. Garland*,
  2023 WL 3605430 (N.D. Tex. Mar. 19, 2023) ...........................................................23

*PSEG Energy Res. & Trade LLC v. FERC*,
  665 F.3d 203 (D.C. Cir. 2011)...............................................................................37

*Radzinskaia v. NH Mountain, LP*,
  2023 WL 6376457 (S.D. Fla. Sept. 29, 2023) ...................................................8, 18, 19

*Roth v. SEC*,
  22 F.3d 1108 (D.C. Cir. 1994) ...........................................................................13, 20, 21

*Sackett v. EPA*,
  598 U.S. 651 (2023)...........................................................................................26, 27

*Schafer v. Helvering*,
  299 U.S. 171 (1936) ...................................................................................1, 7, 15

*In re Scripsamerica Inc*,
    634 B.R. 863 (Bankr. D. Del. 2021) ...................................................................19

*SEC v. Almagarby*,
    92 F.4th 1306 (11th Cir. 2024) .............................................................21, 22, 23

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) ...............................................................................................40

*SEC v. Federated All. Grp., Inc.*,
    1996 WL 484036 (W.D.N.Y. Aug. 21, 1996) .......................................................6

*SEC v. Hallam*,
    42 F.4th 316 (5th Cir. 2022) .................................................................................8

*SEC v. Keener*,
    102 F.4th 1328 (11th Cir. 2024) .........................................................21, 22, 23

*SEC v. Ridenour*,
    913 F.2d 515 (8th Cir. 1990) ..............................................................................21

*Shivangi v. Dean Witter Reynolds, Inc.*,
    825 F.2d 885 (5th Cir. 1987) ..............................................................................10

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) .............................................................................................28

*Skilling v. United States*,
    561 U.S. 358 (2010) .............................................................................................13

*Sw. Elec. Power Co. v. EPA*,
    920 F.3d 999 (5th Cir. 2019) ..............................................................................24

*Texas v. Becerra*,
    667 F. Supp. 3d 252 (N.D. Tex. 2023) ..............................................................50

*Texas v. Biden*,
    589 F. Supp. 3d 595 (N.D. Tex. 2022) ..............................................................32

*Texas v. Cardona*,
    2024 WL 2947022 (N.D. Tex. June 11, 2024) ..................................................17

*United States v. Burke*,
    504 U.S. 229 (1992) .......................................................................................13, 14

*United States v. Golding*,
    332 F.3d 838 (5th Cir. 2003) ..............................................................................13

*United States v. Jasso*,
    587 F.3d 706 (5th Cir. 2009) ..............................................................................13

*United States v. Pugh*,
    99 U.S. 265 (1878) ...............................................................................................12

*Van Buren v. United States*,
   593 U.S. 374 (2021)...................................................................................4

*Wages & White Lion Invs., LLC v. FDA*,
   90 F.4th 357 (5th Cir. 2024) ...................................................................43

*Weisbrod v. Lowitz*,
   282 Ill. App. 252 (1935) .........................................................................10

*West Virginia v. EPA*,
   597 U.S. 697 (2022).........................................................................27, 40

**Statutes**

15 U.S.C.
   § 78c ..................................................................................8, 12, 13, 17, 18
   § 78cc ...............................................................................................13
   § 78dd ...............................................................................................13
   § 78ddd .............................................................................................39
   § 78f ...........................................................................................13, 16
   § 78ff ...............................................................................................26
   § 78g ................................................................................................13
   § 78h ................................................................................................13
   § 78j-1 ..............................................................................................13
   § 78k ................................................................................................13
   § 78*l* ...............................................................................................13
   § 78m ...............................................................................................13
   § 78n ................................................................................................14
   § 78o ................................................................................................13
   § 78o-3 .........................................................................................13, 15
   § 78o-4 ..............................................................................................13
   § 78o-5 ..............................................................................................13
   § 78o-6 ..............................................................................................13
   § 78o-7 ..............................................................................................13
   § 78o-10 ............................................................................................13
   § 78q-1 ..............................................................................................13
   § 78q-2 ..............................................................................................13
   § 78u .................................................................................................13
   § 78u-1 ..............................................................................................13
   § 78w ...............................................................................................47
   § 80a-3 ..........................................................................................6, 12

Securities Acts Amendments of 1975,
   Pub. L. No. 94-29, 89 Stat. 97 ...............................................................16

**Regulations**

17 C.F.R.
   § 240.13h-1 .......................................................................................12
   § 240.15b9-1(a) .................................................................................16
   § 240.15c3-1 .....................................................................................16
   § 240.15c3-3 .....................................................................................16

## SEC Materials

2 H.R. Doc. No. 76-279 (1939) ........................................................................12

40 Fed. Reg. 29,795
   (SEC July 16, 1975)...............................................................................16

49 Fed. Reg. 20,512
   (SEC May 15, 1984)...............................................................................13

56 Fed. Reg. 42,550
   (SEC Aug. 28, 1991).........................................................................12, 27

61 Fed. Reg. 56,990
   (SEC Nov. 5, 1996)................................................................................15

69 Fed. Reg. 72,054
   (SEC Dec. 10 2004)..........................................................................27, 48

70 Fed. Reg. 20,424
   (SEC Apr. 19, 2005) .........................................................................11, 37

74 Fed. Reg. 18,042
   (SEC Apr. 20, 2009) ..............................................................................35

76 Fed. Reg. 46,960
   (SEC Aug. 3, 2011)..................................................................................6

77 Fed. Reg. 45,722
   (SEC Aug. 1, 2012)................................................................................33

88 Fed. Reg. 5440
   (SEC Jan. 27, 2023) ..............................................................................38

*Burton Sec.*, SEC No-Action Letter,
   1977 WL 10680 (Dec. 5, 1977) ........................................................4, 18

*Duker & Duker*,
   1939 WL 36426 (SEC Dec. 19, 1939)....................................................7

*Equitec Proprietary Mkts.*,
   2009 WL 536632 (SEC Mar. 4, 2009).................................................16

Exchange Act Release
   No. 253, 1935 WL 29145 (SEC May 31, 1935) ..................................14

Exchange Act Release No. 60,428,
   74 Fed. Reg. 40,273 (Aug. 11, 2009).................................................16

*G.L. Ohrstrom & Co.*,
   1938 WL 33306 (SEC Dec. 16, 1938) ..................................................10

*Gordon Sodorff, Jr.*,
   1992 WL 224082 (SEC Sept. 2, 1992) ...........................................15, 20

*Inv. Co. Series and Class Info.*, SEC,
 https://tinyurl.com/2k634hfk (last updated June 5, 2024) ...................................... 6

Paul S. Atkins, SEC, Comm'r, Remarks Before the ABA Section on Business
 Law (Mar. 2, 2004), 2004 WL 724425 ...................................................................... 48

Report of the President's Working Group on Financial Markets (1999) ...................... 48

*Rules for the Regulation of Over-the-Counter Markets*,
 1936 WL 31460 (SEC Jan. 20, 1936) ........................................................................ 10

SEC, *Report on the Feasibility and Advisability of the Complete Segregation of
 the Functions of Dealer and Broker* (1936) ................................................ 11, 12, 14

William H. Donaldson, Chairman, SEC, Testimony Concerning the Long and
 Short of Hedge Funds (May 22, 2003),  2003 WL 21250365 .................................. 48

## Other Authorities

Benjamin Haggott Beckhart, *Fluctuations in Brokers' Loans and Interest Rates*,
 13 Proceedings of Academy of Political Science 459 (1930) .................................... 24

*Hearing Before the H. Comm. on Banking, Finance & Urban Affairs*,
 103d Cong. (1994) ................................................................................................ 4, 48

William O. Douglas & George E. Bates, *Stock "Brokers" as Agents and Dealers*,
 43 Yale L.J. 46 (1933) ............................................................................................... 7

Charles F. Hodges, *Wall Street* (1930) ........................................................................ 7

2 Jerry W. Markham, *A Financial History of the United States* (2002) ...................... 24

James W. Maxwell, *The Dealer House*,
 Magazine of Wall Street, Dec. 5, 1925 at 228 ............................................................ 7

Charles H. Meyer, *The Law of Stockbrokers and Stock Exchanges*
 (1933 cum. supp.) ................................................................................................ 7, 10

Charles H. Meyer, *Securities Exchange Act of 1934* (1934) ................................. 11, 12

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012) ........................................... 13

Twentieth Century Fund, *The Security Markets* (1935) ............................................... 11

*Webster's New International Dictionary* (2d ed. 1934) ................................................ 18

## INTRODUCTION

The Dealer Rule is the product of a bygone era. The *Chevron* era. With *Loper Bright* pending, the Commission dared not mention *Chevron* in its brief. But *Chevron* is the Rule's guiding spirit nonetheless, as the Commission's brief tacitly confirms. The Rule institutes a novel, self-aggrandizing agency interpretation of the term "dealer" that has no footing in the statutory text, history, or purpose, and is literally boundless. The interpretation would denominate as "dealers" entities that for 90 years the Commission considered *not* to be dealers. Even then, the Rule forbids any "presumption" that its terms mark the outer limits of entities that can be labeled dealers. The Commission cannot even estimate how many entities its new interpretation will sweep in.

In fact, when the Exchange Act was adopted, "dealer" was a well-established term of art that—in the Supreme Court's words—unambiguously referred to trading securities with "customers." *Schafer v. Helvering*, 299 U.S. 171, 174 (1936). The Commission asks this Court to conclude that Congress gave the Act's definition a different and much broader meaning, encompassing investors whose trading activity regularly has the effect of providing liquidity. *E.g.*, SEC Br. 37. That cannot be squared with the traditional understanding of the term, nor with the customer-protection purposes for which Congress set about regulating dealers and brokers. It cannot be reconciled with the understanding the Commission and the industry have held from 1934 until today, nor with "the whole point of having written statutes": that "'every statute's meaning is fixed at the time of enactment.'" *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024).

Whatever the outer limits of the term "dealer"—and regardless whether it applies to those without "customers"—it simply cannot be so expansive as the Commission posits. On the Commission's view "dealer" evidently captures not just private funds and anyone else regularly providing liquidity but—save for the Rule's tacked-on carve-outs—mutual funds, the Federal Reserve, and more. This overbreadth is confirmed by the gaping regulatory mismatch between the

obligations the Commission's regulations place on dealers and the very different nature of private funds.  Simply, private funds are customers of broker-dealers, not broker-dealers themselves.

Ultimately, the Commission's interpretation fails not only because it takes the Commission's powers to places Congress never intended, but also because it extends Commission regulation to a place Congress affirmatively *barred*:  Congress shielded private funds from intrusive Commission regulation, and by trying to sweep them into its dealer registration regime, the Commission commits the same errors of statutory construction that recently led the Fifth Circuit to invalidate the Commission's attempt to regulate private-fund advisers.  The Commission thus errs seriously in supposing that "because" Congress did not subject private funds to an intrusive regulatory framework, that is a reason for the Commission itself to do so.  SEC Br. 24.

Sometimes when agencies exceed their statutory authority, at least they do so for understandable reasons.  Not so here—the Rule is arbitrary and capricious and violates the Administrative Procedure Act (APA) many times over.  It also fails the Commission's independent statutory duty to determine "as best it can" the economic consequences of its action.  The Commission still cannot articulate a rational explanation for this Rule.  And despite the Commission's focus on liquidity provision as a supposed justification, all evidence is that the Rule will *decrease* liquidity.  This is only natural:  When the government makes an activity a trigger for intrusive regulation, it will get less of that activity.  The Commission admits as much, acknowledging that firms likely will curtail their trading to avoid registration under the Rule, but claiming that this is just a "cost" that will be "balanced" by the Rule's benefits.  This balance collapses, however, because those supposed benefits depend on firms actually registering, and there is no evidence that any private fund would—or even can—register as a "dealer."  All the Commission can say is not to worry, because the Rule will capture only a dozen or so funds.  That number is made up and meaningless.

2

The Commission's analysis ignores half of the Rule and entire, multi-trillion-dollar markets.  In truth, the Rule is so broad even the Commission cannot estimate its full sweep.

The Commission's inability to intelligibly explain, justify, and defend this Rule confirms that the entire project is beyond the bounds of the statute and the Commission's lawful authority.  It must be vacated in full.

## ARGUMENT

## I.    The Commission Misreads The Exchange Act And Other Statutory Law.

The Commission's "'revised dealer definition'" (SEC Br. 29) fails for three independent reasons.  First, the Commission's statutory interpretation as set forth in its brief is untenable because it would subject a virtually boundless range of market participants to dealer registration.  Second, by failing to recognize a requirement that dealers trade with customers, the interpretation flouts the term's well-established meaning when the securities laws were enacted, and the understanding that has animated the Commission's regulation of dealers throughout its history.  Third, whether or not the definition includes a customer requirement, the Rule cannot stand because it is irreconcilable with the statutory structure established by Congress for regulating private funds.

### A.    The Commission's Novel And Overbroad Reading Of The Statute Cannot Possibly Be Right.

The Commission argues that Congress defined "dealer" to include any person "in the regular business of trading for his own account," whether he is "'a trader who has no customers'" or not.  SEC Br. 18.  That cannot possibly be what "dealer" means.  Under that interpretation, *everyone* who participates in the securities market is a dealer, so long as his trading is "'sufficiently extensive to be regarded as a regular business.'"  *Id.*

Defining "dealer" in such a novel, open-ended way drains the word of meaning, deprives it of any constraining effect, and contradicts precedent from the Commission and this Court.  *See,*

*e.g.*, *Chapel Invs., Inc. v. Cherubim Interests, Inc.*, 177 F. Supp. 3d 981, 984, 990–91 (N.D. Tex. 2016) (O'Connor, J.) (holding that a "highly experienced" "institutional investor" "in the business of buying and selling securities" was not a "dealer"); *Hearing Before the H. Comm. on Banking, Finance & Urban Affairs*, 103d Cong. 111, 125 n.6 (1994) (Statement of Arthur Levitt, Chairman, SEC) (Pls.' Reply App. 76, 90) (explaining that even though "hedge funds have become major participants in markets," they are not "dealers" because they trade "solely" for themselves); *Burton Sec.*, SEC No-Action Letter, 1977 WL 10680, at *2 (Dec. 5, 1977) (similar).

The Commission claims it is "focus[ed]" on automated, high-frequency trading (SEC Br. 10), and suggests that its interpretation may be constrained by certain "'qualitative factors'" (*id.* at 7) and other supposed "'characteristic attributes'" of "dealers" (*id.* at 5). But it "does not identify any textual basis" in the statute "for these guardrails," and it "stops far short of endorsing" any actual "limitations" on in its power. *Van Buren v. United States*, 593 U.S. 374, 384, 394 (2021). In fact, the Commission insists that a person "does not have to exhibit all or any given number of these dealer characteristics in order to be considered a dealer." SEC Br. 5; *accord* Pls.' Reply App. 146 (SEC stating that "a 'no' answer to . . . even all of the factors does not foreclose the possibility that someone is a 'dealer.'"); Pls.' Reply App. 148 (SEC asserting that "[n]othing . . . requires that to be a dealer, one must . . . provid[e] such dealer services"). In its brief, the Commission warns that agency guidance citing these factors is "*not* the position of the Commission." SEC Br. 47 (emphasis added); *see also* Pls.' App. 56/1 n.14 (acknowledging that existing guidance "should be withdrawn" as "inconsistent with the final rules"). And it insists—as it has in numerous other recent "instances," *Van Buren*, 593 U.S. at 395—that "*any person*" who buys and sells securities is a "dealer" (SEC Br. 23), so long as he is engaged in a "'regularity of participation in purchasing and selling activities rather than a few isolated transactions,'" (*id.* at 14). *See also* Pls.'

Reply App. 149 (SEC asserting that "[t]he only definitional requirement . . . is that a dealer engages in the business of buying and selling securities"); SEC Br. 14 ("'volume and regularity'").

That the Commission's reading would embrace as a "dealer" virtually all "of modern American finance" (Pls.' App. 283) "is the inescapable conclusion of [its] position," *Bond v. United States*, 572 U.S. 844, 862 (2014), as evidenced by the agency's position in recent enforcement cases. As the Commission "let slip" in proposed jury instructions recently, *Niz-Chavez v. Garland*, 593 U.S. 155, 168 n.5 (2021), "any person" is guilty of running an unregistered "dealer" when, in "more than a few isolated transactions," he "purchas[es] and sell[s]" "stock" as part of a "'business'" ("a commercial enterprise carried on for profit"). Pls.' Reply App. 152; *accord* Pls.' Reply App. 155 ("It really is that simple."); Pls.' Reply App. 133 ("Defendants acted as securities dealers because they regularly purchased and sold securities as part of a regular business."); Pls.' Reply App. 144 ("Defendants . . . regularly bought and sold securities for their own account, and therefore meet the Exchange Act's broad definition"); Pls.' Reply App. 141 ("To establish that a defendant is a 'dealer,'" a "complaint must plead that the defendant '(1) bought and sold securities, (2) as principal rather than as agent for another, (3) as part of a profit-seeking enterprise, and (4) on more than a few isolated occasions.'"); Pls.' Reply App. 213 (same). In fact, at oral argument recently, the Commission's lawyers refused to forswear prosecution even of a person that traded stock just *once per year*. *See* Pls.' Reply App. 184–85 (Tr. 25:19–27:9). And in its briefs, the Commission insists only "*non-business* investor[s]" can escape dealer registration. SEC Br. 16 (emphasis added); *accord* SEC Br. 18, *Crypto Freedom All. v. SEC*, No. 4:24-cv-361-O (N.D. Tex. June 26, 2024), ECF No. 39; *see also* Pls.' App. 576 n.28 (Uyeda, dissenting).

It is hard to imagine *any* investment professional escaping the Commission's interpretation. *Cf.* SEC Br. 14 (distinguishing only those who trade in "'a few isolated transactions'"); *id.* at 37

("'isolated or sporadic'"); *id.* at 38 ("'one-off basis'").  *All* 2,046 investment companies are deal-

ers (under the Commission's reading) because they, by definition, are in a regular "business of . . .

trading."  15 U.S.C. § 80a-3(a)(1)(A); *see Inv. Co. Series and Class Info.*, SEC, https://ti-

nyurl.com/2k634hfk (last updated June 5, 2024).  So are all 9,750 "large trading business[es]," 76

Fed. Reg. 46,960, 46,964/2 (SEC Aug. 3, 2011); *see* Pls.' Reply App. 206, 9,846 hedge funds, *see*

Pls.' Reply App. 212, and countless others who have never been considered dealers.  The Teacher

Retirement System of Texas trades 8.9 billion shares per year (Pls.' Reply App. 7), yet neither it,

nor any pension fund (*see* Pls.' App. 537), has ever been registered as a dealer.

It is an absurd reading of the Exchange Act to suggest that, 90 years ago, Congress required

to register as a "dealer" every person who, in the words of the SEC's brief, displays as part of a

"business" a "'regularity of participation in purchasing and selling.'"  SEC Br. 14.  Congress did

not adopt—and the market (and SEC itself) did not for almost a century fail to notice—such an

"excessively broad definition," which "would embrace as a dealer every securities trader who

makes money through buying and selling of securities."  *SEC v. Federated All. Grp., Inc.*, 1996

WL 484036, at *5 (W.D.N.Y. Aug. 21, 1996) (rejecting the SEC's theory); *see also Discover*

*Growth Fund, LLC v. Camber Energy, Inc.*, 602 F. Supp. 3d 982, 988 (S.D. Tex. 2022) (same).

**B.     In Resisting A Requirement That "Dealers" Buy And Sell To Customers, The Commission Ignores Context, Structure, And History.**

The Commission denies (SEC Br. 15) the word "dealer" is limited to "'the business of

dealing,'" *i.e.*, buying and selling to customers.  *Camber Energy*, 602 F. Supp. 3d at 989 (citing,

*inter alia*, *Chapel Invs.*, 177 F. Supp. 3d at 990).  That position is a masterclass in two ways agen-

cies seek to seize power Congress never gave them:  ignore statutory context, structure, and his-

tory, and read narrow terms as granting boundless authority.  *See, e.g.*, *Nat'l Ass'n of Private Fund*

*Managers v. SEC*, 103 F.4th 1097, 1110–14 (5th Cir. 2024); *Chamber of Com. of U.S. v. DOL*, 885 F.3d 360, 369 (5th Cir. 2018); *Goldstein v. SEC*, 451 F.3d 873, 875 (D.C. Cir. 2006).

### 1.    Congress Did Not Intend "Dealer" To Take On A "No Customers" Meaning At War With Its Ordinary And Traditional Sense.

**a.**    By the time Congress enacted the Exchange Act in 1934, the word "dealer" had accumulated a settled meaning "limited"—in the words of the Supreme Court—"to one who . . . buys and sells securities *to customers*." *Schafer v. Helvering*, 299 U.S. 171, 174 (1936) (quotation marks omitted; emphasis added).  By 1934, securities treatises uniformly provided "dealers" buy and sell securities to customers.  Pls.' Br. 13; *see, e.g.*, Charles F. Hodges, *Wall Street* 361 (1930) (Pls.' App. 605) ("A dealer sells to and buys from a client[.]"); Charles H. Meyer, *The Law of Stockbrokers and Stock Exchanges* 32–33 (1933 cum. supp.) (Meyer) (Pls.' App. 608–09) ("a security *dealer* . . . sells to his customers . . . or buys from his customers"); William O. Douglas & George E. Bates, *Stock "Brokers" as Agents and Dealers*, 43 Yale L.J. 46, 56 (1933) (when acting as a dealer, "[h]is dominant motive is profit to himself realized by buying . . . and selling to his customer"); James W. Maxwell, *The Dealer House*, Magazine of Wall Street, Dec. 5, 1925 at 228, 228 (Pls.' Reply App. 97) ("the Dealer must be close . . . to his customers").  State law presumed the same.  Pls.' Br. 13–14; *see, e.g.*, *Coolidge v. Old Colony Tr. Co.*, 156 N.E. 701, 703 (Mass. 1927) (describing the "relation between Burroughs and his customers"); *see also Duker & Duker*, 1939 WL 36426, at *3 n.6 (SEC Dec. 19, 1939) (acknowledging state laws' "recognition of the intimate relationship between customers and brokers and dealers").  So did federal law.  *See, e.g.*, *Harriman Nat'l Bank v. Comm'r*, 43 F.2d 950, 952 (2d Cir. 1930) (dealer "purchased securities to fill specific [customer] orders"); *Donander Co. v. Comm'r*, 29 B.T.A. 312, 315 (1933) ("dealer" is "a merchant who holds himself out to sell to customers").

Modern day courts have correctly understood this history. *See, e.g.*, *Radzinskaia v. NH Mountain, LP*, 2023 WL 6376457, at *4 (S.D. Fla. Sept. 29, 2023); *Camber Energy*, 602 F. Supp. 3d at 988; *In re Immune Pharms., Inc.*, 635 B.R. 118, 124 (Bankr. D.N.J. 2021).

"[A]gainst this background of law, scholarship, and history," *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 169 (2004), it would take extraordinary evidence to believe Congress intended "dealer" to take on a "no customers" meaning at war with its ordinary and traditional sense. *See, e.g.*, *Jarkesy v. SEC*, 34 F.4th 446, 455 (5th Cir. 2022) (when "'Congress uses terms that have accumulated settled meaning,'" a "'court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of those terms'"), *aff'd*, 144 S.Ct. 2117 (2024); *SEC v. Hallam*, 42 F.4th 316, 339 (5th Cir. 2022) ("When a statutory term is 'obviously transplanted from another legal source,' 'it brings the old soil with it.'"). The Commission has no evidence that would justify departing from "dealer's" received meaning here, *i.e.*, "the business of dealing." *Chapel Invs.*, 177 F. Supp. 3d at 990.

      **b.**     The Commission points, in isolation, to the following words in the "dealer" definition—"the business of buying and selling securities . . . for such[ ] person's own account . . . as part of a regular business"—and insists these sweep in active traders, with or without customers. SEC Br. 13 (quoting 15 U.S.C. § 78c(a)(5)(A)–(B)). But Congress did not "effect so major an alteration in established legal relationships based on nothing more than an overly literal reading of" those few words, "without any regard for [their] context or history." *Andrus v. Charlestone Stone Prods. Co.*, 436 U.S. 604, 616 (1978); *cf. Donander*, 29 B.T.A. at 315 ("[i]f Congress had intended the word 'dealer'" to extend beyond "a merchant who holds himself out to sell to customers," "we think that it would have used language which would more aptly convey that thought"). As in *National Association of Private Fund Managers*, although "at first blush" those

8

words could "seemingly" be read to grant the Commission sweeping power over "*all* investors," they "must be read in their context and with a view to their place in the overall statutory scheme." 103 F.4th at 1110–11 (internal quotation marks and brackets omitted).

      ***Context.***  The Commission does not, and cannot, identify any "inconsisten[cy]" between the text of the dealer definition and the term's ordinary and traditional meaning. *Chamber of Com.*, 885 F.3d at 372; *see* Pls.' Br. 12–13.  There is thus no reason to depart from dealer's traditional sense.  To the contrary, the agency has no real answer to the fact that Congress defined "dealer"—and the related term "broker"—in *the exact words* people at the time used (and continue to use) to distinguish the two methods by which broker-dealers effect customer securities orders.  Acting as "broker" (or agent), the broker-dealer is said to trade "for the account of" the customer, whereas acting as "dealer" (or principal), the broker-dealer is said to effectuate the customer's order by taking the opposite side in the dealer's "own account."  The point is not that a few words—"for such person's own account"—"necessarily," and in a vacuum, "denotes buying and selling" to "customer[s]."  SEC Br. 16.  The point, rather, is that "'in [the] context'" of differentiating brokers and dealers, and in addressing the business of dealing, *Nat'l Ass'n of Private Fund Managers*, 103

F.4th at 1111, this is the terminology differentiating the two methods of effectuating customer

orders used by the courts,[1] commentators,[2] broker-dealer companies,[3] and the Commission itself.[4]

The Commission has but one response to this evidence:  selective quotation.  It plucks a

few words from its own 1936 report on "brokers" and "dealers"—*e.g.*, a dealer obtains "'a favor-

able . . . spread'"— and declares that a "dealer" "is simply one who is in the business of buying to

sell," and "may or may not have customers."  SEC Br. 18–19.  But the Commission's 1936 report,

in truth, says exactly the opposite.  Dealers buy and sell *to customers*:

> The characteristic activities of a dealer in securities are similar to those of a dealer
> or jobber in merchandise.  The dealer sells securities to his customer which he has
> purchased elsewhere or buys securities from his customer with a view to disposing
> of them elsewhere.  In any such transaction he acts for his own account and not as
> agent for the customer.  He receives no brokerage commission but relies for his

---

[1]    *See, e.g.*, *Shivangi v. Dean Witter Reynolds, Inc.*, 825 F.2d 885, 886–87 (5th Cir. 1987) ("Un-
less a . . . customer requests Dean Witter to handle . . . as an agent [or broker], Dean Witter handles
as a principal [or dealer]," "that is, Dean Witter sells the stock to its customer from its own account
instead of acting as the customer's agent"); *Weisbrod v. Lowitz*, 282 Ill. App. 252, 255 (1935)
(differentiating "a stock dealer who deals in stocks on his own account" in "transactions to cus-
tomers" and a "stock broker who acts as his customer's agent" "for [the customer's] account").

[2]    *See, e.g.*, Meyer 32, 34 (Pls.' App. 608, 610) (the dealer "sells to his customers . . . securities
which he had purchased for his own account elsewhere," or "buys from his customer securities for
his own account with a view to disposing them elsewhere," while "*brokers*, on the other hand,"
buy and sell "for [the customer's] account."); Hodges, *supra*, at 361 (Pls.' App. 605) ("a dealer
sells to and buys from a client whereas a broker buys and sells for the account of the client.").

[3]    *See, e.g.*, TD Wealth LLC 9–10 (Pls.' Reply App. 173–74) ("When we act as your 'broker,'
we act as your agent and . . . buy or sell a security for your account.  When we act as a 'dealer,'
we act as a principal for our own account . . . .  We may purchase a security . . . for our own
account and then sell it to you . . . [or] purchase the security from you . . . and then sell on the
open market."); Fidelity 2 (Pls.' Reply App. 22) ("[W]e buy from you or sell to you for or from
our own accounts," or "buy and sell investments for your account").

[4]    *See, e.g.*, *Rules for the Regulation of Over-the-Counter Markets*, 1936 WL 31460, at *6 (SEC
Jan. 20, 1936) (requiring brokers and dealers to "disclose to [their] customer[s] . . . whether [they]
[were] acting as a dealer for [their] own account," or "a broker" for customer's account); *G.L.
Ohrstrom & Co.*, 1938 WL 33306, at *7 (SEC Dec. 16, 1938) (differentiating acting "as agent for
such customers" by trading "for [customers'] accounts" and acting "as principal for its own ac-
count in transactions with . . . customers"); *How to Read Confirmation Statements* 2, SEC (2012)
(Pls.' Reply App. 93) ("capacity" is "whether your broker-dealer acts as your agent, on your be-
half . . . or whether your broker-dealer acts as a principal, for its own account, in the transaction")

compensation upon a favorable difference or spread between the price at which he buys and the amount for which he sells. . . .  On the other hand, a broker employed to execute an order for the purchase or sale of securities is the agent of his customer. He does not undertake to sell to or buy from his customer but rather to negotiate a contract . . . between the customer and a third party.  The transaction is solely for the account of the customer . . . .

SEC, *Report on the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker*, at XIV (1936) (SEC Report) (Pls.' App. 615).

Similarly, the Commission retreats to a post-enactment treatise, which (the Commission says) adopted the position that "a trader" "is a 'dealer,'" so long as its "operations . . . are sufficiently extensive to be regarded as a regular business."  SEC Br. 18.  As a preliminary matter, the Commission's "cherry-pick[ed]" quotation (Pls.' App. 573 (Uyeda, dissenting)) is of limited relevance.  Unlike the earlier, pre-enactment treatises cited by plaintiffs, *see* Pls.' Br. 11–13; *supra* p. 7, the Commission's post-enactment treatise does not explain how words are used in ordinary language; instead, the treatise speculates how a court *might* ("would seem" to) "interpre[t]" the Act.  Charles H. Meyer, *Securities Exchange Act of 1934*, at 34 (1934) (SEC App. 40).  This post-enactment speculation is from "'bygone era of statutory construction,'" *Food Mktg Inst. v. Argus Leader Media*, 588 U.S. 427, 437 (2019), and is an outlier.  After the Exchange Act's adoption, the Commission itself defined a "dealer" as one who buys and sells "to his customer."  SEC Report at XIV (Pls.' App. 615).  And the "leading study of the time" (as christened by SEC, 70 Fed. Reg. at 20,428/2 n.41) agreed "Dealer[s]" handle "order[s] . . . for a customer."  Twentieth Century Fund, *The Security Markets* 266 (1935) (Pls.' App. 603).

More important, the Commission's treatise does not provide that a "trader" "who has no customers" "would be a dealer."  *Contra* SEC Br. 18.  Quite the opposite:  The treatise posited a test of how broadly "dealer" *could* be read:  "[I]f" it "is correct" to read dealer as broadly as the Commission now proposes, the treatise predicted, then all "professional traders" "will be classed

as a 'dealer.'"  Meyer, *Securities*, *supra*, at 34 (SEC App. 40).  It is undisputed that the Commission's current, "no customers" interpretation flunks that test—all professional traders have never been classified as dealers.  *See, e.g.*, *Chapel Invs.*, 177 F. Supp. 3d at 991 ("distinguish[ing] the activities of a dealer from those of a . . . trader" (quoting *Sodorff*, 1992 WL 224082, at *5 n.27)).  Investment companies, for example, are (by definition) professional traders.  *See* 15 U.S.C. § 80a-3(a)(1)(A) ("engage[d] primarily" in "the business of . . . trading").  Yet the "contemporaneous" understanding of those "called upon to carry" the Exchange Act "into effect," *United States v. Pugh*, 99 U.S. 265, 269 (1878), including the Commission, was that investment companies were *not* dealers.  *See, e.g.*, 2 H.R. Doc. No. 76-279, at 1523 n.434 (Pls.' Reply App. 3) (acknowledging investment companies were not subject to rules applicable to "'brokers and dealers' only").  No investment company is registered as a dealer.  *See* Pls.' App. 166–76.  And for decades, the Commission has run a reporting program for other "professional traders"—"large traders" trading $20 million per day (17 C.F.R. § 240.13h-1(a)(7)(i))—because they, too, are not dealers.  56 Fed. Reg. 42,550, 42,550 (SEC Aug. 28, 1991).  The Commission's theory fails its favorite treatise's test.

*Overall statutory scheme.*  The Commission does not, and cannot seriously, deny that "broker" and "dealer" are related concepts in the securities law.  Pls.' Br. 14; *cf.* Pls.' Reply App. 139 (SEC "not arguing that brokers and dealers are unrelated").

At the time Congress enacted the Exchange Act—and ever since—"brokers" and "dealers" have "combine[d] the functions of dealer and broker" in single entities: "broker-dealers."  SEC Report at XIV (Pls.' App. 615).  Congress in the Exchange Act linked "broker" and "dealer" throughout the Act.  *See, e.g.*, § 7(c) ("broker or dealer").  And it defined both terms in parallel, back-to-back sentences, implying a related meaning.  Pls.' Br. 14.  In both definitions, moreover, Congress employed the definite article—"*the* business" of effecting securities transactions, 15

U.S.C. § 78c(a)(4), (5) (emphasis added)—narrowing language intended to capture a specific business activity that preceded the statute. *Cf. Skilling v. United States*, 561 U.S. 358, 404 (2010) ("[t]he definite article 'the' suggests" that "*the* intangible right of honest services" "had a specific meaning to Congress" that predated the law, "not *all* intangible rights of honest services"). The business of "brokers" and "dealers"—the Commission itself has said repeatedly—is "effect[ing] transactions for customers." Pls.' Reply App. 124.

Accordingly, the "interlocking requirements" of the broker-dealer regulatory regime are, and have always been, premised on protecting investor customers, that is, "ensur[ing] that 'securities are [only] sold by a salesman who understands and appreciates . . . his responsibilities to the investor to whom he sells,'" *i.e.*, to his customer. *Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994) (quoting 49 Fed. Reg. 20,512, 20,515 (SEC May 15, 1984)) (cited at SEC Br. 3–4); *see also* 49 Fed. Reg. at 20,512 & n.4 ("Registered broker-dealers are subject to a comprehensive regulatory scheme designed to ensure that customers are treated fairly[.]"); Pls.' Br. 15.

The Commission nevertheless urges the Court to ignore any "'related meaning'" between "broker" and "dealer," and to disregard the associated-words canon, because the terms broker and dealer are "not 'items in a list.'" SEC Br. 17. A "listing," however, "is not prerequisite" for applying the associated-words canon, or for otherwise recognizing dealer's place in the overall statutory scheme. Antonin Scalia & Bryan A. Garner, *Reading Law* 197 (2012); *see, e.g.*, *United States v. Burke*, 504 U.S. 229, 243–44 (1992) (Scalia, J., concurring); *United States v. Jasso*, 587 F.3d 706, 711 (5th Cir. 2009); *United States v. Golding*, 332 F.3d 838, 844 (5th Cir. 2003). Broker and dealer "keep quite close company." *Jasso*, 587 F.3d at 711. Congress in the Exchange Act paired them as "broker or dealer" 262 times. *See* 15 U.S.C. §§ 78o-6, 78q-2, 78k, 78q, 78o, 78o-3, 78h, 78f, 78dd, 78g, 78c, 78*l*, 78o-5, 78j-1, 78o-10, 78m, 78u-1, 78q-1, 78cc, 78o-7, 78o-4, 78u,

78n.  And under the SEC's own regulations, it is *impossible* to register as a "deale[r] individually," *contra* SEC Br. 21; *every* broker-dealer registers as a "broker-dealer," Pls.' Br. 14; *cf.* SEC Br. 31 n.3, because the "terms refer to different forms" of the same thing, *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 274 (2013)—effectuating customer orders.

The Commission admits half of this:  "broker" refers to *one* method of "effectuat[ing] customer orders," SEC Br. 16:  acting as "agent" for "the account of the customer," SEC Report at XIV (Pls.' App. 615).  "Dealer" should similarly be read to refer to the *other* method—trading opposite the customer's order, "sell[ing] securities to [the] customer" or "buy[ing] securities from [the] customer," with the broker-dealers' "own account."  *Id.* (Pls.' App. 615); *see also* Exchange Act Release No. 253, 1935 WL 29145, at *1 (SEC May 31, 1935) (entitling a "customer" to "adequate notice of the capacity in which [the] broker-dealer is acting," "whether [it] [is] acting as [a] dealer[ ] for [its] own account[ ]" or "as [a] broker[ ] for the customer['s]" account).  In short, reading the second part of the phrase "broker-dealer" to refer to something *other* than customer-order facilitation is comparable to reading the second part of "fork and knife" to refer to something *other* than a kitchen utensil.  *Cf. Burke*, 504 U.S. at 243–44 (Scalia, J., concurring).

The Commission responds that the "common attribute that brokers and dealers share is that both are 'engaged in the business' of transacting in securities—not that both" trade with "customers."  SEC Br. 17.  That is nonsense.  "Broker-dealers effect transactions for customers."  Pls.' Reply App. 124 (quoting SEC).  "Again, [a broker-dealer] may serve a customer as broker in one transaction and as dealer in another, subject always to the requirement that the capacity," "broker" or "dealer," "in which he is acting be clearly delineated" to the customer.  SEC Report at XV (SEC App. 44).  As this Court and the Commission have recognized, serving "investor clients" is "'*equally* indicative'" of "broker" and "dealer" activities.  *Chapel Invs.*, 177 F. Supp. 3d at 990–

91 (emphasis added) (quoting *Gordon Sodorff, Jr.*, 1992 WL 224082, at *5 n.27 (SEC Sept. 2, 1992)).  That is why the "various requirements on dealers" the Commission cites in its brief (SEC Br. 4) are requirements on "*broker[s]* or dealer[s]," *e.g.*, 15 U.S.C. § 78q(a) (emphasis added), and why they concern the relationship between "brokers or dealers" and "customers," without differentiating between "brokers" and "dealers," *see, e.g., id.* § 78q(e)(1)(B) (requiring "[e]very registered broker and dealer" to send financial reports "to its customers"); *id.* § 78o-3(b)(6) (requiring associations "of brokers and dealers" to adopt rules to prevent "discrimination between customers").  Dealers, like brokers, have "customers."  *Schafer*, 299 U.S. at 174; *supra* pp. 7–12.

### 2. The Commission's Other Attempts To Support Its Implausible Conception of "Dealing" Are Unavailing.

With no evidence that Congress intended to depart from "dealer's" ordinary and traditional sense, the Commission offers a number of additional arguments to support its overbroad, ultimately implausible conception of "dealing."  None withstands scrutiny.

**a.**    The Commission claims the definition of "dealer" must cover more than the traditional "business of dealing" (*i.e.*, buying and selling to customers), *Chapel Invs.*, 177 F. Supp. 3d at 990, because "several Exchange Act provisions apply to a dealer 'who does not *carry* customer accounts' 'or *hold* funds or securities for customers.'"  SEC Br. 19 (emphases altered).  This is a double sleight of hand.  None of those provisions are "Exchange Act provisions," *contra id.*; they are SEC regulations, merely "'what the agency says,'" *Loper Bright*, 144 S. Ct. at 2261.  Moreover, the regulations say the opposite of what the Commission implies.  *Holding* or *carrying* customer funds and securities is different than *effectuating* customer orders.  *See* 61 Fed. Reg. 56,990, 56,990 (SEC Nov. 5, 1996) (explaining difference between "prime" and "executing" brokers).  Investors typically hold or custody their funds and securities at one broker-dealer, but rely on multiple broker-dealers to execute their orders.  Pls.' Reply App. 108 n.21 (SEC report).  So while

15

some dealer regulations apply to dealers that do not "*carr[y]*" customer accounts or "*hold*" customer securities, 17 C.F.R. §§ 240.15c3-1(a)(2)(vi), 240.15c3-3(k)(2)(i) (emphases added), all those regulations apply to dealers that "*execut[e]* [their] customer's order[s]" (*id.* § 240.15c3-1(a)(2)(vi)(A) (emphasis added)), or "*effectuat[e]* . . . transactions" with "[their] customers" (§ 240.15c3-3(k)(2)(i) (emphasis added)).

The Commission also cites (SEC Br. 19) two regulations concerning stock-exchange members—specialists and market makers, 17 C.F.R. §§ 240.15c3-1(a)(6)(ii), 240.15b9-1(a)—but those regulations do not help the Commission.  Stock-exchange members are "unique," 40 Fed. Reg. 29,795, 29,796 (SEC July 16, 1975):  they must register as broker-dealers *regardless* of the statutory definitions.  Securities Acts Amendments of 1975, Pub. L. No. 94-29, sec. 4, § 6(c)(1), 89 Stat. 97, 105 (codified at 15 U.S.C. § 78f(c)(1)); *cf.* SEC Br. 25.  And in any event, specialists and market makers do effectuate customer orders:  they have a legal obligation to other exchange members to execute transactions to maintain "continuous" markets, Exchange Act Release No. 60,428, 74 Fed. Reg. 40,273, 40,274 (Aug. 11, 2009), including by effectuating other members' customer orders, *Equitec Proprietary Mkts.*, 2009 WL 536632, at *2 ¶ 6 (SEC Mar. 4, 2009).

**b.**     Retreating to a *different* statutory term ("security-based swap dealer"), the Commission cites (at 20) a prior Commission statement that supposedly indicated that the Commission's "security-based swap dealer" regulations are not "predicated" on "customer relationship[s]." But as that Commission statement acknowledged, Congress defined "security-based swap dealers" in broader "terminology" than "dealers."  77 Fed. Reg. 30,596, 30,619 (SEC May 23, 2012).  While a "dealer" would be limited to entities that engaged "with customers" as commenters at the time assumed, *id.* at 30,619 & n.281, a "security-based swap dealer" would—per the statute—include

not only "dealer[s]," 15 U.S.C. § 78c(a)(71)(A)(i), but also those who "regularly" executed swaps with *any* "counterpart[y]," *id.* § 78c(a)(71)(A)(iii).

It is telling that the Commission turns to *broader* statutory language—applicable to an entirely different set of market participants—to support its theory.  And in fact, the Commission's "expanded interpretation" of dealer "render[s]" the definition of security-based swap dealer "meaningless," and thus "violates '[t]he canon against surplusage.'"  *Texas v. Cardona*, 2024 WL 2947022, at *33 (N.D. Tex. June 11, 2024) (O'Connor, J.).  Congress defined a "security-based swap dealer" as anyone who "hold[s] themself out as a dealer," 15 U.S.C. § 78c(a)(71)(A)(i), or "regularly enters into security-based swaps with counterparties as an ordinary course of business," *id.* § 78c(a)(71)(A)(iii).  But if "dealer" already includes any "trader" whose "operations . . . are sufficiently extensive to be regarded as a regular business," as the SEC says in defending the Rule, SEC Br. 18, then traders that meet the second prong ("regularly enter[ing] into security-based swaps with counterparties as an ordinary course of business," 15 U.S.C. § 78c(a)(71)(A)(iii)) would *already be* "security-based swap dealers" under the first prong ("hold[ing] [one]self out as a dealer," *id.* § 78c(a)(71)(A)(i)).  But that cannot possibly be right, because that "would render" the  regularly-entering-into-security-based-swaps-as-an-ordinary-course-of-business  prong "utterly meaningless."  *Cardona*, 2024 WL 2947022, at *33.

**c.**     The Commission also seeks to rely on what it calls the "trader exception," which (the Commission says) is available only to "non-business investor[s]."  SEC Br. 16; *see supra* p. 5.  The exception—the statute's exclusion, from its definition of dealer, for people who buy and sell securities "but not as a part of a regular business," 15 U.S.C. § 78c(a)(5)(B)—does not say that those who *are* covered by the definition *don't* have customers.  At best, it leaves open the question whether those covered by the definition (and by the exception) have customers; to answer

that, one still has to interpret "dealer."  "Dealer," moreover, is a term that Congress itself defined in the statute (drawing on a pre-existing term of art)—the Commission has no power to "revis[e] [this] dealer definition" (SEC Br. 29) by "further defin[ing]" (*id.* at 13) the definition's *exception*. *Cf. FAIC Sec., Inc. v. United States*, 768 F.2d 352, 362 (D.C. Cir. 1985) (Scalia, J.) (a "general authority to define terms . . . does not confer power to *redefine* those terms that the statute itself defines").  And whether something is "'a part of a regular business'" is not (as the Commission claims at 13) a "'technical'" or "'trade'" term within its interpretative authority in any event.  15 U.S.C. § 78c(b).  The language simply makes doubly clear that dealers "regular[ly]" act for customers; buying and selling is only "part," *id.* § 78c(a)(5)(B)—*i.e.*, "[o]ne of the portions," *Webster's New International Dictionary* 1781 (2d ed. 1934) (defining "part")—of their business; serving customers is the other.  *Camber Energy*, 602 F. Supp. 3d at 989; *Radzinskaia*, 2023 WL 6376457, at *4; *In re Immune Pharms.*, 635 B.R. at 125; *cf. Burton Secs.*, 1977 WL 10680, at *1–2 ("if Burton were to purchase and sell," "it would not, in the absence of any other securities activities," such as "handl[ing] other people's money or securities," "be deemed a 'dealer'").

   **d.**    Turning to precedent, the Commission denies that in *Chapel Investments*, this Court had "occasion to addres[s] whether a person who regularly buys and sells securities . . . but lacks customer[s] could be a dealer."  SEC Br. 20.  But that is exactly what this Court addressed.  The plaintiff there was—in the words of the Court—a "sophisticated . . . institutional investor, highly experienced in the business of buying and selling securities."  177 F. Supp. 3d at 984.  Yet it "cannot be considered a dealer," this Court held, because it did "not provide advice or services to other investors," *i.e.*, to customers.  *Id.* at 991.  Investors, like private funds, are not dealers.

   The Commission protests that the numerous decisions applying *Chapel Investments* are based on the "totality of facts," "not just the absence of customers."  SEC Br. 21.  This is wishful

thinking.  For example, in *Camber Energy*, another court within this Circuit held—following *Chapel Investments*—that investment funds are "not dealers because they do not provide dealer services, and do not have any customers."  602 F. Supp. 3d at 989.  Every case cited on page 21 of the Commission's brief says exactly this.  *See Radzinskaia*, 2023 WL 6376457, at *5 (because "the Amended Complaint does not allege an investor client-professional relationship that entails buying and selling securities and cannot do so," "Defendants cannot be 'dealers'"); *Discover Growth Fund, LLC v. Beyond Com., Inc.*, 561 F. Supp. 3d 1035, 1041 (D. Nev. 2021) ("Whereas a dealer buys and sells securities from its customer," Discover trades in "the public market"; "[a]ccordingly, Discover should not be required to register as a dealer."); *In re Immune Pharms.*, 635 B.R. at 125 ("Because it did not provide 'dealer' services to customers, [the fund] did not act as a dealer."); *In re Scripsamerica Inc*, 634 B.R. 863, 872 (Bankr. D. Del. 2021) ("Institutional investors like Ironridge have no individual customers, and therefore cannot be dealers.").  The Commission's claim that "none of the cases . . . held that the statutory dealer definition applies only to those" trading with "customers" (SEC Br. 21) is untrue.

The Commission turns to *Eastside Church of Christ v. National Plan*, 391 F.2d 357 (5th Cir. 1968), which (the Commission says) "held that persons fall within the dealer definition . . . even where the record showed they had no customers."  SEC Br. 15.  This, again, is sleight of hand.  The Commission says that the churches from whom National Plan (the putative "dealer") bought bonds were "not customers" of National Plan, SEC Br. 15, but no one claims they were. Once National Plan received bonds from the churches, it "directed the bond sales program" in which it sold bonds over-the-counter *to customers*.  391 F.2d at 361.  The "record show[s]" (SEC Br. 15) that these retail purchasers—not "the churches" (*id.*) misleadingly cited by the Commission—were National Plan's "customers."  *See* Appellants' Supp. Br. 12, *Eastside Church*, No.

24500 (5th Cir. Dec. 1, 1967) (Pls.' Reply App. 12) (the "purchasers of the bonds [were] 'customers' of [National Plan]"). Selling to *them* was National Plan's "principal business": "Mr. Knox testified that the principal business of National [Plan] was to 'put on bond issues,'" that is, to "direct[ ] the bond sales program." 391 F.2d at 361; *see also* SEC Amicus Br. 15, *Eastside Church* (SEC App. 24) ("In view of this close relationship between [National Plan's] securities transactions and its bond programming business, [National Plan's] transactions must be deemed a part of *that* business . . . ." (emphasis added)). The Commission's own example undermines its case.

Moreover, stripped of "a customer requirement" (SEC Br. 15), the Commission's reading of *Eastside Church* "lead[s] to absurd results," *Demond v. Infiniti HR, LLC*, 2018 WL 4145053, at *6 (N.D. Tex. Aug. 30, 2018): if "'purchas[ing] many church bonds . . . for [one's] own account as part of a regular business and [selling] some of them'" make someone a "dealer," SEC Br. 15, *every* financial professional is a "dealer." Again, that cannot possibly be right. *Supra* pp. 3–6; *cf., e.g.*, Pls.' Reply App. 8 (in 2023 alone, the Teacher Retirement System of Texas "[t]raded" over 200,000 "Government Bonds").

Every other appellate case, or adjudicated Commission decision, concerning the meaning of "dealer" between 1934 and 2023 undermines the Commission's case, too; *all* recognize that dealers facilitate customer orders. For example, Sodorff was a dealer, the SEC held, because he "solicited investors and handled their money and securities" and the like. *Gordon Sodorff, Jr.*, 1992 WL 224082, at *5 (SEC Sept. 2, 1992). "These factors," the SEC concluded (all concerning customer-order facilitation) made Sodorff "a dealer." *Id.* at *5 n.27. So, too, with Roth and Ridenour. Per the SEC, they "assisted [their] clients to buy and sell securities," SEC Br. 7, *Roth*, 22 F.3d 1108 (No. 92-1557), 1993 WL 13650741; they "clearly satisfied" the "criteria" that "define a dealer" because they "regularly engaged in transactions directly with the customers," SEC Br. 33

n.37, *SEC v. Ridenour*, 913 F.2d 515 (8th Cir. 1990) (No. 89-2534) (Pls.' Reply App. 122). They

used their own accounts to trade opposite "clients," *Roth*, 22 F.3d at 1110—to help "customers"

find "the best available market price," *SEC v. Ridenour*, 913 F.2d 515, 517 (8th Cir. 1990); *see*

*also* SEC Br. 33 n.37, *Ridenour*, 913 F.2d 515 (Pls.' Reply App. 122) ("A dealer's activity must

be 'part of a *regular business*,' a test which 'serves to distinguish the securities dealer from the

ordinary trader—the active investor who buys and sells with frequency but does not attempt to

attract a clientele."). Again, investors like private funds do none of this and are not dealers.

In the end, the Commission relies almost entirely on two decisions from the Eleventh Cir-

cuit, both issued this year, ninety years after the Exchange Act's adoption, and focused entirely on

"toxic lending." *See SEC v. Almagarby*, 92 F.4th 1306 (11th Cir. 2024); *SEC v. Keener*, 102 F.4th

1328 (11th Cir. 2024). But neither carries the weight the Commission places on them. *Almagarby*

expressly acknowledged that private funds are "*not* traditionally understood as dealers." 92 F.4th

at 1318 (emphasis added). And to avoid adopting too "expansive [a] definition [that] might sweep

in all manner of market participants," *Almagarby* explicitly limited its "holding" to Almagarby's

"specific conduct," *id.*, which the court characterized as "underwriting," *id.* at 1316 ("[this] is

called 'underwriting'"). The court went out of its way to recognize that "significant differences

exist[ed]" between Almagarby's underwriting conduct and that of private funds. *Id.* at 1318. Turn-

ing to the "crucial" "distinction between dealers and traders," *id.* at 1315, the court observed that

"trader[s]," like private funds, but "[u]nlike" Almagarby, *trade*: they make "research"-based in-

vestment decisions, grounded in their "views on the value of [their] holdings," and take "price

risk," *id.* at 1316. Dealers, by contrast, charge customers fees *for* trading. *Cf.* SEC Br. 37, *Alma-*

*garby* (SEC alleging "Almagarby *had* customers—the 38 issuers whose securities he brought to

market in exchange for acquiring their . . . debt"). *Keener* simply applied *Almagarby*. *See* 102

F.4th at 1334 ("Keener's business model was materially similar to Almagarby's").  And, again, panel members recognized that anything they said that might apply to private funds would be "dicta."  Oral Arg. Tr. 17:1–3, *Keener* (No. 22-14237) (Pls.' Reply App. 182).

The Commission, nevertheless, hangs virtually its entire case on three sentences:  that a "customer requirement has no grounding in the statutory text"; that the "'dealer' definition has been understood to cover a trader 'who has no customers but merely trades for his own account'"; and that "several Exchange provisions apply to a dealer 'who does *not* carry customer accounts' 'or hold funds or securities for customers.'"  *Keener*, 102 F.4th at 1334–35 (quoting *Almagarby*, 92 F.4th at 1318).  But this is doubly dicta.  As noted, and as the Commission told the Eleventh Circuit, "the activity that Almagarby" (and hence Keener, *see* 102 F.4th at 1334) "engaged in" "ha[d] nothing to do with" private funds.  Oral Arg. at 22:13–23:04, *Almagarby*, https://ti-nyurl.com/3bvbc8a6.  Those opinions "must [be] read" as "referring in context to circumstances *similar* to the circumstances then before the [c]ourt and not referring to [the] quite different cir-cumstances" here.  *Illinois v. Lidster*, 540 U.S. 419, 424 (2004) (emphasis added); *cf. Almagarby*, 92 F.4th at 1318 ("acknowledg[ing]" "significant differences" between Almagarby and "institu-tional asset managers"); Oral Arg. at 23:00–23:03, *Almagarby* (THE COURT:  "But you're saying [that the activity covered by the Dealer Rule is] not what Almagarby was doing?"  THE SEC:  "No, not at all.").  Moreover, as the Commission conceded in *Keener* and *Almagarby*, whether the "dealer definition extend[ed] only to those who 'effectuate customer orders'" was "beyond the scope" of the appeals.  SEC Br. 35, *Almagarby*, 92 F.4th 1306 (No. 21-13755); *see also* SEC Br. 33, *Keener* (No. 22-14237) ("Keener forfeited the argument" that "dealers" "effecuat[e] customer orders" "because it was not raised below").

This Court should not be persuaded by the Eleventh Circuit's "fairly cursory," three-sentence analysis. *Polymer80, Inc. v. Garland*, 2023 WL 3605430, at *7 (N.D. Tex. Mar. 19, 2023) (O'Connor, J.); *cf. NetChoice, LLC v. Paxton*, 49 F.4th 439, 493 (5th Cir. 2022) (finding "unpersuasive" an Eleventh Circuit analysis that "quickly dismissed [a relevant] doctrine without addressing its history"), *vacated on other grounds*, 144 S. Ct. 2383 (2024).  As discussed, a "'customer requirement'" has clear "'grounding in the statutory text,'" *contra Keener*, 102 F.4th at 1334; among other things, that is what "dealer" and "the business of" dealing meant, *see supra* p. 7.  Moreover, *no one* at the time "understood [dealer] to cover a trader who has no customers," *contra Keener*, 102 F.4th at 1335 (quotation marks and emphasis omitted); the source quoted in *Keener* (and by the Commission here) says that "*if*" that were the interpretation, all "professional traders" would be "dealers."  *Supra* pp. 5–6.  But, again, no one has ever understood that to be the case.  *Supra* pp. 8–15; *cf. Almagarby*, 92 F.4th at 1318 ("To be clear, we do not mean to suggest that *every* professional investor who buys and sells securities in high volumes is a 'dealer.'").  And while, of course, dealer regulations apply to dealers who do not "carry" or "hold" customer funds, *Keener*, 102 F.4th at 1334; *all* those regulations apply to dealers that "execute [a] customer's order," *supra* pp. 15–16.  At every step, the Commission is demonstrably wrong.

### C.   Whether Or Not The Definition Of Dealers Includes A Customer Requirement, The Commission Fails To Reconcile The Rule With The Statutory And Regulatory Framework Of The Securities Laws.

Whatever the precise meaning of "dealer"—and even if it *did not* include a customer requirement—the Rule still must be set aside because it is incompatible with the Exchange Act and its sister statutes on numerous levels, as four binding, directly-on-point decisions establish.

### 1.   *Chamber of Commerce v. DOL*, 885 F.3d 360 (5th Cir. 2018).

That the Commission was forced to adopt numerous, arbitrary exclusions to its definition in order to try to avoid some of the most extreme outcomes is proof that the agency's definition is irrationally overbroad.

*Id.* at 383; *see* Pls.' Br. 16.  "That a cure was needed 'should have alerted [the agency] that it had taken a wrong interpretive turn.'"  885 F.3d at 383.

The Commission's attempt to explain away its exclusions for investment companies and Federal Reserve Banks confirms the Rule cannot stand.  The Commission claims that there is "no evidence" that "investment companies" or "Federal Reserve Banks engage in the sort of automated, algorithmic liquidity provision that meets the rule's" test, SEC Br. 23, but the Rule is not limited to such "automated, algorithmic liquidity provision"—a distinction that never existed 90 years ago when the statute was enacted in any event.  The Rule by its terms covers anyone who "regularly" "expresses a trading interest" (*i.e.*, submits an order) in the same security—a definition that on its face sweeps in investment companies and the Federal Reserve.  More important, the Commission in the adopting release itself *"admitted*," *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1032 (5th Cir. 2019), that investment companies "*would*" be covered by the Rule absent an exemption, Pls.' App. 114/2 (emphasis added).  And it is well-known, both today and in 1934, that the Federal Reserve's open-market operations "regular[ly]" "provide liquidity."  Pls.' App. 62/1; *see, e.g.*, 2 Jerry W. Markham, *A Financial History of the United States* 229 (2002) (Pls.' Reply App. 5) (the Federal Reserve "provided liquidity" by "agree[ing] to buy bonds" and "resell them"); Benjamin Haggott Beckhart, *Fluctuations in Brokers' Loans and Interest Rates*, 13 Proceedings of Academy of Political Science 459, 459 (1930) (Pls.' Reply App. 12) (recognizing that the market for "commercial paper . . . would come to possess great fluidity and liquidity through the . . . open-market operations" of the Federal Reserve).  That the Commission contradicts its own adopting release—and common knowledge—"merely underscores the need to vacate" the Rule.  *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 844 (D.C. Cir. 2006) (Kavanaugh, J.).

2.      *Nat'l Ass'n of Private Fund Managers v. SEC*, 103 F.4th 1097 (5th Cir. 2024).

That the Commission decided to apply the Rule to "private funds" "because"—in the Commission's words—"'private funds are not subject to the extensive regulatory framework of the Investment Company Act'" (SEC Br. 23) is proof that the Rule is inconsistent with the "'overall statutory scheme,'" 103 F.4th at 1111.  As the Fifth Circuit concluded in striking down the Commission's last attempt to expand its authority over private funds, *see* Pls.' Br. 67, the Investment Company Act "'places significant restrictions on the types of transactions registered investment companies may undertake,'" 103 F.4th at 1111.  "Yet Congress clearly chose *not* to impose the same prescriptive framework on private funds."  *Id.*  Accordingly, the Fifth Circuit held, the "Commission cannot promulgate rules under the guise" of other securities laws to impose on private funds the type of Investment-Company-Act restrictions from which "private funds are exempt."  *Id.* at 1114.  Here, the Commission is doing exactly that—and openly so.  *See, e.g.*, Pls.' App. 114/3–115/1 (SEC exempting investment companies because "regulation . . . under the Investment Company Act overlaps with the regulation that applies to dealers," but not exempting private funds "because private funds are not subject to . . . the Investment Company Act").  "[N]o part" of this power grab "can stand."  *Nat'l Ass'n of Private Fund Managers*, 103 F.4th at 1114.

Just as the Rule is inconsistent with the structure of the securities laws, so too it is inconsistent with the regulatory "framework" established to implement those laws.  *Nat'l Ass'n of Private Fund Managers*, 103 F.4th at 1113.  The Commission argues that the "laundry list of reasons" why hedge funds fit poorly within the dealer regulatory framework is not evidence that "the Commission lacked the statutory authority to regulate hedge funds as dealers."  SEC Br. 24.  But the Commission cannot explain why Congress would have created so nonsensical a system.  Why, for example, would Congress require hedge funds to hire employees—which they generally do not

25

have—to take licensing exams on processing orders *from* hedge funds, the precise license that the broker-dealers who serve hedge funds must have?  Pls.' Br. 16.  Or why would Congress expect FINRA to impose on hedge funds an obligation to ascertain the "best market" for their customers' orders, when there *are no* customer orders?  *Id.*  The Commission does not explain how any of this could fit within the statutory scheme.  The gaping mismatch between the regulatory obligations of registered "dealers" and private funds shows that these funds do not fit in the dealer category.

   **3.**   ***Sackett v. EPA*, 598 U.S. 651 (2023).**   That the Commission's answers about the scope of the Rule, at every turn, are "'hopelessly indeterminate'" is yet further proof that the Rule is irrationally overbroad.  *Id.* at 681.  The penalty for operating as an unregistered dealer is the financial equivalent of the death penalty—according to the SEC, disgorgement of *all* profits.  *See* Pls.' Br. 34.  And maybe prison.  *See* 15 U.S.C. § 78ff(a).  But the Commission, even in its brief, cannot tell anyone who is—or isn't—a "dealer" under the Rule.  When confronted with the Rule's obvious overbreadth, the Commission simply responds that there is no "'bright-line rule'"; it "rather 'depends upon all of the relevant facts and circumstances.'"  SEC Br. 39.  And even then, the Rule is "not the exclusive means of establishing that a person is a dealer," SEC Br. 10, so a "variety of open-ended factors" could sweep anyone in anyway, *Sackett*, 598 U.S. 681—and even the Commission cannot say which factors will matter, or how, *see* Pls.' App. 6/1 n.51 ("factors are 'neither exclusive, nor function as a checklist'"); Pls.' App. 56/1 n.14 (the staff "is reviewing" its guidance to determine which documents "should be withdrawn" as "inconsistent with the final rules").  "This freewheeling inquiry provides little notice" to market participants, and "gives rise to serious vagueness concerns."  *Sackett*, 598 U.S. 680–81.  "Facing severe" sanctions, market participants "are 'left to feel their way on a case-by-case basis.'"  *Id.* at 681.  Courts should be "wary about"

reading statutes in this way, and, in these circumstances, the SEC cannot show that "clear congressional authorization exists" for a Rule of this sort.  *Id.*

    **4.** ***West Virginia v. EPA*, 597 U.S. 697 (2022).**  Finally, the real-world proof that the Commission's newfound interpretation of "dealer" is wrong is that between 1934 and today, no one—not any investment company, not any private fund, and not the Commission itself—thought the definition swept so broadly as the Commission claims today.  *See id.* at 725 ("'want of assertion of [regulatory] power by those who presumably would be alert to exercise it'" is "'significant in determining whether such power was actually conferred'").  In 2004, for example, the Commission premised an entire rulemaking on "hedge funds[']" "important role[ ] of providing . . . liquidity to our markets."  69 Fed. Reg. 72,054, 72,080/2 (SEC Dec. 10 2004).  But the Commission never once suggested the hedge funds might be dealers; in fact, the Commission considered regulating the broker-dealers that execute trades "*for* hedge funds," *id.* at 72,091/2 n.17 (emphasis added), thereby acknowledging that hedge funds are *customers* of broker-dealers, not broker-dealers themselves.  Likewise, in 1991, the Commission again addressed concerns that "hedge funds" had "grown extraordinarily in size" and "trade[d] large amounts of securities . . . with stunning swiftness."  56 Fed. Reg. at 42,550/3.  Yet, again, the Commission never once suggested that hedge funds might be dealers; instead, the Commission constructed a reporting regime entirely premised on hedge funds providing information "*to* . . . [their] broker[s] or dealer[s]."  *Id.* at 42,560/1.

* * *

    We are in a post-*Chevron* era, and there can be no mistaking what the Commission is impermissibly trying to do here.  It cannot claim to be using interpretative discretion to adopt an admittedly different but (supposedly) reasonable construction of a statute to adapt it to changing times.  *See* SEC Br. 6.  *Loper Bright* forecloses that.  Instead, the Commission is purporting to

27

proclaim now, in 2024, what the term "dealer" has *always meant* under the securities laws. And that claim is absurd, because until the Commission put forward this interpretation, *no one* thought that is what "dealer" meant. Indeed, that is why the Commission adopted the Rule. And it is why this Court should vacate the rule as a flagrant violation of the Commission's statutory authority.[5]

## II.    The Commission Fails To Show That The Rule Is The Product Of Reasoned Decisionmaking Or Otherwise Lawful.

The Commission's attempt to rationalize the Rule is flawed from root to branch. The Commission insists, in response to virtually every objection, that the Rule will cover only "a dozen or fewer hedge funds" (SEC Br. 2), but there is no evidence in the record to support that estimate, and it is clearly wrong. The Commission's analysis *still* does not engage with one of the two prongs of the Rule, and entirely fails to consider every market except that for U.S. Treasury securities. And the Rule is in no way limited to "high-frequency trading," as the Commission misleadingly implies. *Id.* The Commission does not even attempt to explain why any of the ordinary trading strategies highlighted in plaintiffs' brief and in the comments would not be covered—because the Commission has no explanation.

The agency's purported "balanc[ing]" of "policy objectives" is nonsensical, in any event. SEC Br. 12. The Commission repeatedly insists that it acknowledged that firms potentially covered by the Rule would "'curtail their trading'" to avoid being swept up. *Id.* at 29. But then it purports to "'trade-of[f]'" those costs on the ground that benefits will flow from "dealer"

---

[5]    *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), does not save the Commission's interpretation. Under *Skidmore*, courts may consider another branch's interpretation of the law, but the weight due that interpretation must always "depend upon [its] thoroughness . . . , the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Id.* at 140. The Commission's interpretation fails this test at every level. As the Court recently reiterated, agency interpretations are most "useful" when they have been "issued contemporaneously with the statute at issue" and when they "have remained consistent over time." *Loper Bright*, 144 S. Ct. at 2262. The Commission's position here has neither virtue.

registration, *id.* at 30, the exact outcome the Commission acknowledges the Rule will *deter*.  The

Commission's balance thus collapses, even on its own terms.

### A.    The Commission Cannot Explain Why It Undertook This Rulemaking.

**1.**    The Commission's brief doubles down on the claim that "applying the dealer reg-

ulatory regime" to private funds and others would "decreas[e] the likelihood that such firms would

fail and reduc[e] the negative effects if such a failure occurred."  SEC Br. 26–27.  Even supposing

the Commission had a textual basis for using liquidity provision as a basis for defining "dealer" (it

does not), the agency's assertions about liquidity are "unsubstantiated speculation."  *Calumet*

*Shreveport Refining, LLC v. EPA*, 86 F.4th 1121, 1141 (2023).

**a.**    The Commission still has not "'substantiated the threshold proposition'" that pri-

vate fund or other trader failures are a "genuine proble[m]."  *Chamber of Com. of U.S. v. SEC*

(*Chamber III*), 85 F.4th 760, 777 (5th Cir. 2023).  The Commission admits it has "no evidence of

'private funds' . . . 'failing and limiting their trading.'"  SEC Br. 26.  It claims "latitude to 'adopt

prophylactic rules to prevent potential problems before they arise,'" *id.* at 27, but it still must show

that prophylaxis is necessary by articulating a "substantial" basis to conclude the asserted problem

will occur, *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1051 (D.C. Cir.), *opinion modified*

*on reh'g*, 296 F.3d 537 (D.C. Cir. 2002).  Just last month, the Fifth Circuit rejected as "pretextual,"

*Nat'l Ass'n of Private Fund Managers*, 103 F.4th at 1113, a nearly identical assertion of "prophy-

lactic rulemaking," SEC Br. 28, *Nat'l Ass'n of Private Fund Managers* (No. 23-60471), 2023 WL

8875230 (Dec. 15, 2023), because the Commission failed to establish the asserted problem affected

private funds, 103 F.4th at 1113.  Here, again, the Commission has no response to evidence refut-

ing its position.  Pls.' Br. 19.  It still refuses to respond to expert evidence that securities "'most

commonly traded'" by private funds saw "'*more* robust liquidity'" during periods of market vol-

atility than did other securities.  *Id.*  It still has no answer to the fact that during volatile times,

private funds "'raised *new* funds to invest,'" thereby increasing their trading. *Id.* And it still

ignores evidence that, "under the existing regime," *Am. Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d

166, 179 (D.C. Cir. 2010), relevant private-fund activities are already subject to "'arguably *more*

restrictive'" (Pls.' Br. 24) limitations on "'leverage risk'" (SEC Br. 22) than dealers anyway.

The Commission defends two anecdotes cited in the adopting release, one regarding the

March 2020 Covid lockdown, and one involving the 1982 failure of Drysdale Government Secu-

rities. SEC Br. 28. But the Commission concedes that neither has anything to do with private

funds. *See id.* It offers no reasoned response to evidence that private funds are "regulated, funded,

and operated *differently*." Pls.' Br. 20. And it "fails to address," and thus "presumably concedes,"

*MCR Oil Tools, LLC v. DMG Mori USA, Inc.*, 2020 WL 13133311, at *9 (N.D. Tex. Sept. 15,

2020) (O'Connor, J.), that the second anecdote, concerning Drysdale Government Securities, was

never exposed to public comment and refutation, and is thus disqualified as legitimate support for

the Rule, *see* Pls.' Br. 20; *cf. Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1212 (5th Cir. 1991)

(an agency violates the APA when it relies on evidence that "is alleged to be unreliable and [the

agency] has not exposed it to . . . full public scrutiny") (quotation marks and emphasis omitted).

Regardless, the Commission does not, and cannot, explain how the Dealer Rule would have

altered the outcome for Drysdale at all. The Commission does not dispute that Drysdale failed

"due to 'massive securities fraud' rather than undercapitalization" and that "'Drysdale's parent

company *was* subject to broker-dealer net-capital requirements.'" SEC Br. 28; *see* Pls.' Br. 21.

The Commission protests that in its rulemaking, it acknowledged that dealer regulation is not a

cure-all—"'even registered dealers can fail.'" SEC Br. 28. But when an agency puts forward two

specific examples to substantiate a Rule's supposedly protective purposes, it must give reason to

believe that—in those examples—the protections would have *worked*. *Cf. Nat'l Fuel Gas Supply*

30

*Corp. v. FERC*, 468 F.3d 831, 841–42 (D.C. Cir. 2006) (Kavanaugh, J.). In the Drysdale case, they did not. Pls.' Br. 21. Moreover, the Commission has claimed elsewhere that it *already* took steps sufficient to guard against a repeat of the "'losses incurred in the Drysdale failure.'" Pls.' Br. 21. "The Commission did not engage in any analysis of [this] prior finding regarding the level of risk" from a failure of a firm such as Drysdale, and it failed to "explain *why* it changed its mind," *Nat'l Ass'n of Mfrs. v. SEC*, --- F.4th ---, ---, 2024 WL 3175755, at *6 (5th Cir. 2024), such that it once believed it had corrected the Drysdale shortcoming, but now treats Drysdale as a central illustration of why a new rule is warranted.

Similarly, the Commission cannot defend the anecdote regarding the March 2020 Covid-lockdown as justification for the Rule. The Commission continues to ignore expert evidence that firms *exempt* from the current Rule were primarily responsible for any disruption. Pls.' Br. 22. And it admits that the Covid pandemic was an "'extraordinary'" time with unprecedented disruption. SEC Br. 28. The Commission argues that its rules need not "be limited to 'norma[l]' market conditions." *Id.* But the issue is not that Covid was unrepresentative of "norma[l]" market conditions; it was unrepresentative of "market disruptions" *themselves. Id.* The unrebutted evidence shows that during other periods of market stress, firms not registered as "dealers" "'*increased* their [trading] activity,'" Pls.' Br. 22, undermining any conceivable basis for the Rule.

Worse, the Commission in its brief continues to fail to address the "*frequency*" of market disruptions. Commenters explained that even if the Commission's anecdotes could support the Rule, such disruptions are so infrequent that the Rule could not produce benefits with enough frequency to justify its costs. Pls.' Br. 20–21. As in the adopting release, however, the Commission's brief fails to consider the issue "at all." *Mex. Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023). The SEC's failure to consider the frequency with which an issue

might arise has repeatedly led to invalidation of Commission rules, and should do so again here. *See, e.g.*, *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1153 (D.C. Cir. 2011) ("Without this crucial datum, the Commission has no way of knowing whether the rule will facilitate enough election contests to be of net benefit."); *Chamber III*, 85 F.4th at 778 (SEC cannot show there is "a genuine problem" without assessing the "likelihood" of an issue occurring).

      **b.**     Even if the Commission had substantiated that curtailed trading by private funds during market turmoil was a "genuine problem," *Chamber III*, 85 F.4th at 778—it did not—it fails to "explain how" the Rule would solve that problem, *Texas v. Biden*, 589 F. Supp. 3d 595, 619 (N.D. Tex. 2022).  The Commission in its brief claims it acknowledged "mixed" evidence that "'during periods of market turmoil, firms subject to broker-dealer regulation failed,'" while "'other firms, not subject to broker-dealer regulation, thrived.'"  SEC Br. 28.  "But bare acknowl-edgment is no substitute for reasoned consideration."  *Louisiana v. Dep't of Energy*, 90 F.4th 461, 473 (5th Cir. 2024).  The Commission must explain *how*, from this mixed evidence, it concluded that "dealer" registration would "'support market stability and resiliency.'"  SEC Br. 29.  The Commission did not, and could not.  And its "'conclusory statemen[t]'" to the contrary "do[es] not" suffice under the APA.  *Louisiana*, 90 F.4th at 473.

      The Commission "fail[ed] to consider" an "alternative (and very likely) explanation" for this evidence, *East Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 983 (9th Cir. 2020):  that net-capital rules have nothing to do with whether a broker-dealer *will* fail, Pls.' Br. 23, as the Commission claims.  Rather, the rules are "designed to protect customers of a broker-dealer from losses *upon* the broker-dealer's failure."  SEC Press Release No. 11-100, 2011 WL 1575386 (Apr. 27, 2011) (emphasis added).  In other words, these rules ensure that broker-dealers "maintain suf-ficient liquid assets to meet" customer claims "*if* they fail," Pls.' App. 91/3 (emphasis added); they

do not, as the SEC assumes, "decreas[e] the likelihood that . . . firms *would* fail," *contra* SEC Br. 27 (emphasis added). The Commission's contrary "assumption 'runs counter to the evidence before [it].'" *E. Bay Sanctuary*, 994 F.3d at 983 (quoting *State Farm*, 463 U.S. at 43).

    **2.**    The Commission also asserts that the Rule would provide more comprehensive regulatory oversight, because "the information private funds currently report is insufficient." SEC Br. 30. But that, too, is "unsubstantiated." *Chamber III*, 85 F.4th at 778. The Commission does not dispute that private funds typically access the market through registered broker-dealers, so their transactions "'are already reported.'" Pls.' Br. 26. The Commission argues those reports lack "'complete data,'" SEC Br. 30, but it never says what data is missing. In truth, any new data would "only tel[l] the [Commission] what it already knows," *Mex. Gulf*, 60 F.4th at 973, or could easily obtain, *see* Pls.' App. 30/2 (admitting all data is available through examinations of fund advisers anyway). Transactions in fixed income securities are already reported by private funds' broker-dealers. Pls.' App. 430–32, 272, 294–95. And all "material information" about equity and options trades already appear in the consolidated audit trail, 77 Fed. Reg. 45,722, 45,726/3 (SEC Aug. 1, 2012), *see* Pls.' App. 430–31, 272, 295, 320, which itself "build[s] upon . . . the large trader reporting system," 77 Fed. Reg. at 45,733/3; *see* Pls.' App. 131–32, 295, 320, 586.

    The Commission concluded more than a decade ago that large-trader reporting "provide[s] the Commission with a valuable source of useful data to support its investigative and enforcement activities, as well as facilitate the Commission's ability to assess the impact of large trader activity on the securities markets, to reconstruct trading activity following periods of unusual market volatility, and to analyze significant market events for regulatory purposes." Pls.' App. 132. The Commission here "offers no evidence that [this] preexisting reporting" is insufficient. *Mex. Gulf*, 60 F.4th at 973. It, again, fails to "engage in any analysis of its prior finding" that large-trader

reporting *is* sufficient.  *Nat'l Ass'n of Mfrs.*, --- F.4th ---, ---, 2024 WL 3175755, at *6.  And it continues to fail to explain why, if some additional trade reporting would be beneficial, the Commission could not simply undertake rulemaking to mandate that specific reporting; there is no reason to require private funds to register as "dealers" en masse.  Pls.' Br. 26.

### B.     The Commission's Defense Of The Rule's Harmful, Counterproductive Consequences Does Not Withstand Scrutiny.

When Congress required the Commission to "apprise itself . . . of the economic consequences of a proposed regulation," *Chamber of Com. of U.S. v. SEC* (*Chamber I*), 412 F.3d 133, 144 (D.C. Cir. 2005), it meant something more than the agency must merely cite commenters' concerns and then opine that whatever the costs, they are worth it.  An agency's "awareness" and even its "appreciate[ion]" of a concern flagged by commenters isn't sufficient.  *Ohio v. EPA*, 144 S. Ct. 2040, 2054–55 (2024).  "[A]wareness is not itself an explanation."  *Id.* at 2055.

#### 1.     The Commission Minimizes The Rule's Adverse Consequences On Private Funds.

Cramming private funds into a regulatory framework that does not fit will have costs—costs for the funds and their investors, and costs for the markets the Commission purports to be helping.  The Commission repeatedly and erroneously minimized those costs in adopting its Rule.

**a.     *IPOs.***  The Commission admits that by turning private funds and many others into dealers, the Rule would bar these firms from participating in the market for initial public offerings (IPOs).  *See* SEC Br. 31; Pls.' Br. 28.  The Commission offers no justification for this bar, *see* Pls.' Br. 28, but instead tries to downplay the impact "'because of the limited number of funds likely to be affected'" by the Rule.  SEC Br. 32.  The agency, however, gives no rational basis to expect this number to be "limited" (more on that later, *see infra* pp. 40–45).

In any event, the Commission "inconsistent[ly]" frames the Rule's purported costs and benefits, depending on what suits its present purposes.  *Bus. Roundtable*, 647 F.3d at 1153.  A chief

predicate of the Rule is that having private funds register as dealers is critical, because even if "very few private funds" will be covered by the Rule, they are "significant liquidity providers that could cause broader market harm if they" ceased trading during a market downturn.  SEC Br. 27. But now, forced to address the Rule's potential adverse effects, the Commission admits that affected firms "may forgo" their current trading strategies to avoid triggering the Rule and that this "exit" would degrade market liquidity, but—in a reversal—says this is "'[in]significant'" because the "'number of funds likely to be affected'" is "'limited.'"  *Id.* at 32.  "The SEC cannot have it both ways," *Chamber III*, 85 F.4th at 778, *discounting* the Rule's costs on the ground that the affected funds will have an "'[in]significant'" effect on market liquidity (SEC Br. 32), and claiming as a *benefit* that the Rule will capture these "significant liquidity providers" (*id.* at 27).

      **b.**    ***Net capital.***  The Commission does not dispute that application of net-capital rules would require private funds to decrease their trading, and would thus degrade overall market liquidity.  *See* SEC Br. 32; Pls.' Br. 29.

      The Commission says the Rule is nevertheless worth it because, although market liquidity will decrease, liquidity may become more "stab[le]," since in times of crisis the Rule may "limi[t] the probability that significant liquidity providers fail."  SEC Br. 32, 33.  This "unexplained balancing" makes no sense.  *Louisiana*, 90 F.4th at 473.  The Commission still fails to "explain," *id.*, how a Rule that "*reduc[es]* liquidity provision ex ante" will "solve the problem of inadequate liquidity provision in times of crises," App. 564 (Peirce, dissenting) (emphasis added).  When the crisis hits, there will be *fewer* liquidity providers who are each trading *less* often, compared to before the Rule's adoption.  Moreover, liquidity "stability" is not an end in itself.  *Cf.* 74 Fed. Reg. 18,042, 18,104/1 (SEC Apr. 20, 2009) (SEC rules "are designed to help promote . . . liquidity").  It does little good for a falling tide to be less volatile, if the result is that it grounds all boats.

The Commission purports to acknowledge concerns that the net-capital rules that would apply to private funds are "'inappropriate'" and "'untenable'" for the funds, "'and could in turn significantly and negatively affect liquidity if private funds were to modify or cease their trading activity.'" SEC Br. 32. But, "on balance," the Commission says, the Rule may "'promote liquidity and efficiency by limiting the probability that significant liquidity providers fail.'" *Id.* at 33. This, too, makes no sense—it assumes the benefit of the very thing the Rule will deter. The Rule's claimed benefit depends on firms registering as dealers and becoming subject to the "dealer" regulatory regime. Pls.' Br. 24. "But what happens if . . . many" firms avoid registration by restricting trading and thus "are not covered" by the Rule? *Cf. Ohio*, 144 S. Ct. at 2050. If firms avoid registration by restricting trading—and the undisputed records shows that firms potentially subject to the Rule will, Pls.' Br. 24–25—the benefits of the Rule are zero under the Commission's own theory, because few if any firms will newly register as a dealer. The result would be a net loss of liquidity with no corresponding benefit, a very real dynamic the Commission failed to address. "Because the Commission failed to produce substantial evidence to show" that the Rule "would work" in getting firms to register, "its balance collapses and all of [the Rule] must be set aside." *Aqua Slide 'N' Dive Corp. v. CPSC*, 569 F.2d 831, 844 (5th Cir. 1978).

The Commission argues that private funds "could" attempt to "mitigate" some of the negative "consequence[s]" of the net-capital rules by entirely restructuring their operations:  by "'separat[ing]'" their liquidity-providing trading "'into a separate entity'" and leaving "another entity" to "'continue to operate'" the other "'strategies.'" SEC Br. 35. That makes no sense, either. If investors will decline to invest in private funds subject to the net-capital rules—because their investment capital will be "'lock[ed] up,'" Pls.' Br. 30—*who* is going to contribute funds to the "'separate entity'" subject to the net-capital rules, SEC Br. 35? The Commission "simply ignore[s]

'[this] important aspect of the problem.'" *Ohio*, 144 S. Ct. at 2053.  And although its brief hints at an improper "*post hoc* rationalizatio[n]," *Nat'l Ass'n of Mfrs.*, --- F.4th ---, ---, 2024 WL 3175755, at *8, that rationalization collapses under scrutiny.  The Commission notes there are "3,490 active broker-dealers registered with the Commission" and asserts that "*those* entities" figured out how to "structure their business" as broker-dealers, implying private funds could, too. SEC Br. 31 n.3 (emphasis added).  Of course, *none* of those 3,490 entities are structured as pooled investment vehicles.  *See* Pls.' Br. 30.  And all of them have a *different* business model.  *Cf.* 70 Fed. Reg. 20,424, 20,428/2 n.38 (SEC Apr. 19, 2005) (broker-dealers offer a "package of services provided to customers"); Pls.' App. 74/2 (SEC "acknowledg[ing]" the Rule may require private funds to "revise their business models").  The Commission never explains *how* a pooled investment vehicle, such as a private fund, could operate as a broker-dealer subject to net-capital rules.  Pls.' Br. 30; *cf.* Pls.' App. 41/2 (acknowledging that is "unclear how" a type of pooled investment vehicle could "comply with net capital requirements").

     c.    ***Regulatory protections.***  The Commission "acknowledge[s] that '[s]everal commenters stated that registering as dealers would cause funds to lose the benefit of various customer protection regulations that govern their relations with their broker-dealers.'"  SEC Br. 35.  But, again, "[t]o characterize objections . . . is not to answer them."  *PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 210 (D.C. Cir. 2011).  And in fact the Commission directly addressed only one lost customer protection—and did so poorly—while ignoring the many other protections that commenters warned would be lost.

     The Commission points to Rule 15c3-3, which concerns the custody of customer assets, and asserts that private-funds-turned-dealers would "still 'benefit from'" it because private-fund assets would be held in "'proprietary accounts,'" SEC Br. 36, so-called "PAB Accounts," Pls.'

App. 98/3.  But the Commission "failed to respond to public comments" explaining that PAB accounts do not offer sufficient protection.  *Mex. Gulf*, 60 F.4th at 973; *see* Pls.' App. 296 ("PAB account[s]" do not provide "the full measure of Rule 15c3-3").

Meantime, the Commission continues to ignore the many *other* customer protections that private-funds-turned-dealers would lose under the Dealer Rule.  *See* Pls.' Br. 31.  Its brief erroneously asserts that there are "*no* other part[s] of the customer protection regulations that the Commission failed to consider."  SEC Br. 36 (emphasis added).  But in fact, comments cited in plaintiffs' brief (at 31) identify a half-dozen such regulations, including SEC Rule 10b-10 and FINRA Rules 2111, 2121, 5310, 5320, 2232, and 2231, *see* App. 217, 330, 448 ¶ 115, 459, 532.  Commenters had explained that the loss of "best execution" rights (FINRA Rule 5310) was particularly problematic.  Pls.' Br. 31; *see* Pls.' App. 217, 330, 448 ¶ 115, 459, 532.  The Commission ordinarily treats these rights as highly important—"'critical to both trust and competition in the markets,'" in the words of Chair Gensler.  Pls.' Br. 31; *see also* Pls.' Reply App. 160 (SEC explaining that "institutional customers place substantial trust and confidence in the broker-dealer's skill and in the broker-dealer's honesty and integrity to effect trades to the customer's best advantage").  Indeed, in the last year the Commission has proposed a number of separate rules to supposedly bolster best execution.  *See, e.g.*, 88 Fed. Reg. 5440 (SEC Jan. 27, 2023).  But in jamming through this rule, the Commission did an about face and "did not address the[se] issue[s] at all."  *Mex. Gulf*, 60 F.4th at 973.  That is a clear violation of the APA.

      **d.**    ***SIPC***.  The Commission concedes that forcing private funds and others to join the Securities Investor Protection Corporation (SIPC) would not benefit them in any way.  *See* SEC Br. 36; Pls.' Br. 32.  But it asserts that mandatory SIPC membership for "'all firms that make their

livelihood in the securities business'" would nevertheless benefit the market because it would "'enhance the ability of SIPC to carry outs its investor protection mission.'"  SEC Br. 36.

The Commission's answer is doubly flawed.  First, it assumes a breadth of SIPC membership ("'all firms that make their livelihood in the securities business,'" SEC Br. 36) courts have squarely rejected.  *See Mass. Fin. Servs., Inc. v. SIPC*, 411 F. Supp. 411, 415 (D. Mass 1976) (SIPC membership limited to "'broker[s]'" and "'dealer[s],'" which "are words of art, with a specific meaning"; "neither definition is all-encompassing" and each "excludes . . . a variety" of parts of "'securities business'").  Second, it counts as a benefit a proposition—"'enhanc[ing] the ability of SIPC to carry outs its investor protection mission,'" SEC Br. 36—that is wholly "unsubstantiated." *Chamber III*, 85 F.4th at 778.  SIPC does not address problems of "the entire securities industry"; it "provide[s] protection to customers of broker-dealers"—and is funded by those same broker-dealers. *Mass. Fin.*, 411 F. Supp. at 415–16.  The Commission cites no evidence that this self-funding needs "'enhance[ment]'" (SEC Br. 36), and even if it did, Congress tasked *the SEC* with issuing notes to shore up the fund, *Mass. Fin.*, 411 F. Supp. at 416; *see* 15 U.S.C. § 78ddd(g). Expanding the range of "contributors" is not a tool Congress authorized and so not a legitimate basis for the Rule. *Mass. Fin.*, 411 F. Supp. at 416; *cf. CAB v. Delta Air Lines, Inc.*, 367 U.S. 316, 328 (1961) (questioning an agency's "power to do indirectly what it cannot do directly").

### 2.    The Rule Undermines The Commission's Stated Goals, Promoting the Very Outcome—Less Liquidity—That It Purportedly Seeks To Avoid.

The Commission concedes that, overall, the Rule will "'have small negative effects on market liquidity and efficiency.'"  SEC Br. at 33.  It claims these costs will be "balanc[ed]" by the Rule's benefits, *id.,* but in truth the Rule will produce no "'benefit[s]'" to "'trade-of[f],'" SEC Br. 35.

As plaintiffs explained, the assumption underlying every purported benefit of the Rule is that firms will register as dealers. Pls.' Br. 24; *see* Pls.' App. 587 (this is "the most direct metric

of success"). That will not happen, however. The undisputed evidence shows "the most likely outcome is exactly the opposite": that whatever trading "[s]trategies . . . are potentially implicated [by the Rule] will be abandoned" so firms can avoid the ill-fitting requirements of dealer coverage. App. 147; *see* Pls.' Br. 25. The Commission tacitly concedes this will be its Rule's effect—it *never* finds that firms will maintain the trading strategies that would cause them to qualify as dealers. *Cf.* SEC Br. 29 ("acknowledg[ing]" that "'affected parties'" may "'chang[e] or curtai[l] their trading to avoid the revised dealer definition'"). That being the case, the Commission can claim no benefits from its Rule. Its "balance collapses." *Aqua Slide*, 569 F.2d at 844.

### 3.    The Commission Cannot Justify The Rule's Overbreadth.

The Commission argues that the Rule is "narrowly tailored to capture only persons that engage in traditional dealer activities." SEC Br. 37. This is false, of course—if the activities at issue here were "traditional[ly]" regarded as dealer activities, the Commission would have treated them as such since 1934, rather than stretching to classify them as "dealer" activities 90 years after the law's passage. *Cf. West Virginia*, 597 U.S. at 725. And in fact the Rule's two factors are "practically limitless." App. 570 (Uyeda, dissenting); *see* Pls.' Br. 34–36.

a.    Stripped of the Commission's bureaucratic, vaguely Orwellian jargon, the first factor applies to any person that "regularly" submits "an 'order'" (*i.e.*, "expresses trading interest") in the same security. Pls.' Br. 34–35. The Commission protests that this somehow will not sweep in "ordinary investment strategies," SEC Br. 37, but that is merely the SEC's litigators talking—it is not what the Commission said in adopting the Rule. As with other "important aspect[s] of the problem," *State Farm*, 463 U.S. at 43, the Commission ignored it, nowhere addressing the ordinary trading strategies described in plaintiffs' comments and in their brief (at 35). Speculation by the Commission's lawyers cannot cure that deficiency now. *See SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943); *Nat'l Ass'n of Mfrs.*, --- F.4th at ---, 2024 WL 3175755, at *8.

Regardless, the Commission's current denial fails on its own terms.  The Commission talks about "'automated, algorithmic trading,'" "'high frequency trading strategies,'" and the like, SEC Br. 37, but the text of the Rule does not mention any of that.  And while the Rule *is* limited to "regula[r]" placement of orders (expressions of interest), that is no limitation at all.  Pls.' Br. 34–35.  The Commission acknowledges that this just means "more than a few isolated" transactions, App. 64/2 n.104, *i.e.*, trading that is more than "'isolated or sporadic,'" SEC Br. 37.  The Commission does not and cannot deny that ordinary trading strategies of hedge funds and many others involve trading the same security more frequently than such a "'one-off'" basis, SEC Br. 36–37, and that all of this arguably provides liquidity, *see* Pls.' App. 9/1 (conceding that "all market participants who buy or sell securities . . . arguably contribute to a market's liquidity").  As interpreted in the Commission's own brief, the Rule's first prong is "irrationally overbroad."  *Nat'l Min. Ass'n v. Babbitt*, 172 F.3d 906, 913 (D.C. Cir. 1999).

So is the second.  *See* Pls.' Br. 35–36.  In its brief, the Commission claims that the second factor captures any person who "'routinely buys and sells securities in a manner *designed* to capture'" the bid-ask "'spread.'"  SEC Br. 39 (emphasis added).  But the factor is much broader than that; it captures anyone whose trading strategy has the "effect" of capturing bid-ask spreads, "regardless of a person's intention."  Pls.' App. 9 n.91; *see also* Futures Industry Ass'n Amicus Br. 7 (Dkt. 34).  As the Commission has admitted, it is often impossible, looking at transaction data, to ascertain whether a person earned revenue by capturing the bid-ask spread or from simply buying low and selling high.  Pls.' Br. 36.  If even *the Commission* cannot "empirically distinguish between those two activities," it is difficult to see how the Commission can reasonably maintain that *the Rule* treats them as "different."  App. 574 n.7 (Uyeda, dissenting).  In fact, the Commission nowhere responds to plaintiffs' specific examples of non-dealer activity swept up by the second

factor—because there is no response.  *See* Pls.' Br. 35–36; *cf. MCR Oil*, 2020 WL 13133311, at

*9 ("'the failure to respond to arguments constitutes abandonment or waiver of the issue'").

  The Commission nevertheless asserts that only "a dozen or fewer hedge funds" would be

swept up by the Rule.  SEC Br. 3.  But that estimate is baseless.  *See* Pls.' Br. 39.  The Commission

used market data regarding only one prong of the Rule (the primary-revenue factor), and conducted

that analysis on only one market (U.S. Treasury securities).  *See* SEC Br. 44.  And although it

"separately" looked to one question on a regulatory form—concerning the number of hedge funds

that self-identify as using "high-frequency trading strategies," *id.*—it scrapped that question two

days after issuing the Dealer Rule for failing to provide useful information, Pls.' Br. 39.  The Rule

is also much broader than anything the Commission purported to analyze.  Again, the Rule is not

limited to high-frequency trading, and the Commission *never* explains why the ordinary trading

strategies, across numerous markets, and especially from multi-strategy funds, would not be cov-

ered.  *Supra* pp. 4–5; *infra* pp. 43–44.  And even *if* the Commission had "no data" concerning any

market other than that for U.S. Treasury securities, SEC Br. 45—which is untrue, *see* Pls.' App.

431 (the consolidated audit trail has comprehensive data from other asset classes)—the Commis-

sion failed even to "'hazard a guess'" as to how many firms might be swept up in any of the *other*

multi-billion dollars markets covered by the Rule, *Bus. Roundtable*, 647 F.3d at 1150; *see* Pls.' Br.

39; *cf. Friends of Boundary Waters Wilderness v. Bosworth*, 437 F.3d 815, 826 (8th Cir. 2006)

(agency acted arbitrarily in failing to "adjus[t]" its estimates based on flaws in the data); *Chamber*

*III*, 85 F.4th at 776 (same where agency "ignore[d]" other "existing data").  Estimating that a

school has only 20 students because that is all you see in one classroom is not reasoned deci-

sionmaking when you *know* that other classrooms are full.  That is what the Commission did here.

The Commission could at least have limited the Rule's overbreadth by requiring buys and sells to be expressed "simultaneously," Pls.' Br. 35, but the Commission still offers no reasoned explanation for rejecting that proposal.  Its own brief admits that caselaw imposes a simultaneity requirement.  *See* SEC Br. 21 (citing *Camber Energy*, 602 F. Supp. 3d at 988).  It doubles down on its assertion that market participants "can" or "could" engage in what it calls "dealer" activity through expressions of trading interest that "are not simultaneous," SEC Br. 38.  But the Commission continues to fail to consider the "margin[al]" effect of expanding dealer coverage to non-simultaneous activity, *Bus. Roundtable*, 647 F.3d at 1151.  Even if there *were* a benefit to capturing some amount of dealer activity, how does that benefit compare to the cost of capturing a large swath of non-dealer activity, Pls.' Br. 35?  Reasoned decisionmaking requires "consideration of both sides of the cost-benefit ledger," *Clarke v. CFTC*, 74 F.4th 627, 642 (5th Cir. 2023).  Here, the Commission failed to consider the cost of the overbreadth of its approach at all.

**b.**      As plaintiffs explained in their rulemaking comments and in their brief, the Rule's overbreadth is also reflected in the fact that its coverage can be triggered by "multi-strategy funds," that is, single funds, housed in a single entity, that have different portfolio managers who may take different strategies toward the same security—one manager buying, while the other sells.  *See* App. 239–40 , 416 ¶ 27, 278, 340, 456–57, 473.  The Commission "offered no reasoned response" to this objection by commenters in the rulemaking, *Ohio*, 144 S. Ct. at 2054, and is "not free" to supply a new rationale to this Court, *Wages & White Lion Invs., LLC v. FDA*, 90 F.4th 357, 371 (5th Cir. 2024).  The Commission's post-hoc rationalizations fail on their own terms in any event.

Stitching together quotations from the adopting release that did not even mention multi-strategy funds, the Commission asserts that it "'adequately addresse[d]'" the issue of "[t]reat[ing] separate trading activity conducted by separate decision-makers" by "'[r]emov[ing]'" the proposed

43

rule's "'aggregation provision.'"  SEC Br. 40.  The aggregation provision, however, required consideration of trading strategies "*across entities*."  SEC Br. 40 (emphasis added); *see* Pls.' Br. 37. But as commenters explained, it is "it is quite common that *a single entity* . . . engage[s] in trading through substantially (for all relevant purposes) independent portfolio managers."  Pls.' App. 239 (emphasis added).  The Commission in the adopting release did not address *this* issue—multiple strategies operating independently within a single entity—"at all."  *Mex. Gulf*, 60 F.4th at 973.

In another *post hoc* rationalization, the Commission asserts in its brief that a person would not be covered by the Rule "merely because one portfolio manager 'buy[s] a particular stock' and a different portfolio manager 'sell[s] the same stock.'"  SEC Br. 40.  But if that happens "'regularly,'" the Commission acknowledges, they would be covered.  *Id.*  And in a multi-strategy fund, with "'hundreds of portfolio managers . . . trad[ing] independently,'" Pls.' Br. 36, that type of trading coincidence is frequent, and occurs on certainly "more than a few isolated" occasions, Pls.' App. 64/2 n.104.  The Rule irrationally threatens multi-strategy approaches.

**c.**      In saying there should be no concerns about overbreadth because the Rule sets forth "two tailored ways" that entities can meet the "statutory dealer definition," SEC Br. 1–2, the Commission also ignores its explicit statement that the Rule is non-exclusive: "a person may be a dealer . . . even if it does not meet the conditions set forth in the . . . rules."  Pls.' App. 80/2.  This "no presumption" clause further overextends the Rule's reach, and the Commission fails to justify it. *See* Pls.' Br. 37–38.  Again unlawfully abandoning the adopting release's reasoning, *see Nat'l Ass'n of Mfrs.*, --- F.4th at ---, 2024 WL 3175755, at *8, the Commission no longer disputes that commenters repeatedly objected to this proviso, which (particularly in conjunction with the Commission's ongoing aggressive enforcement) makes the Rule's open-ended standards no real definition of "dealer" at all.  Pls.' Br. 37–38 (collecting citations).  Instead, the Commission now

defends the no-presumption clause by citing its authority to proceed "'incremental[ly],'" SEC Br. 41, but that post-hoc rationalization fundamentally misunderstands the problem with this clause.

The issue here is not whether an agency might, under appropriate circumstances, proceed an "incremental" step beyond prior rulemakings. *Cf., e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 522 (2009) (cited at SEC Br. 41). The issue is whether the Commission can draw a "'rational connection'" between "'the choice made'" and the record evidence. *State Farm*, 463 U.S. at 43. It cannot. Commenters explained that an open-ended, limitless definition was unwarranted. They pointed to recent Commission enforcement actions in which the agency pressed a definition of "dealer" so broad it would sweep in almost "every financial firm in the world," Pls.' App. 546, and thus "cal[l] into question the legality of most of modern American finance," Pls.' App. 283; *see also* Pls.' App. 546 ("Under this interpretation . . . every investment company . . . would be a dealer."); Pls.' App. 530 (so would every "hedge fund, mutual fund, pension fund, insurance company, family office, [and] endowment"). And they warned that unless the Commission applied some guardrails in this rulemaking—adopted an exclusive definition that defined what a "dealer" actually *was*—market participants would curtail their trading activity to avoid the risk of prosecution for failure to register as a "dealer." Pls.' App. 545–46, 529–30, 282–87. But neither the adopting release nor the Commission's brief even mention this conflict between the Rule and the agency's ongoing enforcement actions. Only time will tell what other market participants—maybe "even an 'investment club,'" as the Commission warned elsewhere (Pls.' Reply App. 156)—must register with the SEC. In adopting the "no presumption" clause, the Commission failed to address these "important aspect[s] of the problem." *State Farm*, 463 U.S. at 43.

**C.   The Commission Cannot Save Its Flawed Economic Analysis.**

**1.**   In addition to repeatedly retreating to its only-12-funds-are-covered defense, the Commission protests that, in any event, it "[r]ecogniz[ed]" the Rule's costs. SEC Br. 44. This

dodges the point.  The Commission's failure is not (in every respect) a lack of recognition, but its repeated, purposeful refusal to settle on a projection of the Rule's ultimate effects on efficiency, competition, and capital formation.

For example, the Commission argues it "acknowledged that the rule 'could have a small **negative effect** on market efficiency' and liquidity if entities covered by the rule 'respond by curtailing their liquidity-providing activities.'"  SEC Br. 42 (emphases added).  "But," the Commission says in its (supposed) defense, "it found that the rule 'could also **promote market efficiency**' by 'lead[ing] to better capitalization for significant liquidity providers,' making them 'less sensitive to market disruptions that could otherwise reduce their capacity to provide liquidity.'"  *Id.* (emphases added).  *So which is it?*  These mealy-mouthed, indeterminate statements are a bug, not a feature—they reflect an agency purposely dodging a key issue and failing to come to ground on what the impact of its action will be.  So, too, with the Commission's misplaced boast that it both "acknowledged that the rule **could 'harm capital formation'** if affected entities respond by reducing their market participation," but also "found that the rule **could also 'promote capital formation'** by 'promot[ing] market stability, resiliency, and investor confidence,' thus 'increas[ing] demand for securities issued in U.S. markets.'"  *Id.*  (emphases added).  Talking around an issue ad nauseum is no substitute for predicting a rule's consequences "as best" as the agency "can." *Chamber I*, 412 F.3d at 143.  Although "uncertainty may limit what the Commission can do," *id.* at 144, that does not excuse the Commission from "'mak[ing] tough choices about which of the competing estimates is most plausible,'" *Bus. Roundtable*, 647 F.3d at 1150.

2.     The Commission doubles down on its erroneous refusal to consider the "cumulative effect" of related rulemakings.  Pls.' Br. 39.  It complains "Plaintiffs do not explain how the Commission could, as a practical matter, assess the likely economic consequences of multiple pending

46

proposals." SEC Br. 46. But the Commission could do so the same way it addresses all potential alternatives. When pending rules address similar issues, *see, e.g.*, Pls.' App. 521–23, they are obvious potential alternatives that must be considered in relation to each other. *See Clarke*, 74 F.4th at 641 (agency must consider "'viable and obvious alternatives'").

Regardless, the Commission cannot show it adequately considered *adopted* rules. Pls.' Br. 40. The Commission, for instance, acknowledges the Treasury Clearing Rule "'addresses many of the same purported risks'" as the Dealer Rule. SEC Br. 46. But it maintains both rules are warranted because they "'addres[s] these [issues] through different mechanisms.'" *Id.* That still doesn't explain why both rules are needed. Tylenol and Advil address headaches through different mechanisms—acetaminophen versus ibuprofen—but that doesn't mean everyone suffering a headache needs to take two sets of pills. The Commission's failure to assess the purported benefit of the two rules "at the margi[n] is illogical and, in an economic analysis, unacceptable." *Bus. Roundtable*, 647 F.3d at 1151.

**3.** Finally, the Commission effectively concedes that the Rule violates Section 23(a)(2) of the Exchange Act. It asserts that it need "only . . . 'consider . . . the implications of a proposed rule'"; it does not need to "find conclusively that the rule will promote each of efficiency, competition, and capital formation." SEC Br. 43. That is incorrect. Section 23(a)(2) expressly bars the Commission from adopting "any . . . rule or regulation which would impose a burden on competition not necessary or appropriate in furtherance of the purposes of" the Act. 15 U.S.C. § 78w(a)(2). And it requires the Commission to explain "the reasons" for its "determination that any burden on competition imposed by such rule or regulation is necessary or appropriate in furtherance of the purposes of" the Act. *Id.* Here, the Commission does not dispute that the Rule will disproportionately burden small firms. Pls.' Br. 40. And although it claims other benefits

47

(which will never materialize, in any event, because firms will curtail their trading instead of registering, *supra* pp. 45–46), it makes no attempt to compare those (illusory) benefits with the admitted drag on competition from hampering smaller firms and new entrants. Pls.' Br. 40.

The Commission also says that it is "'leveling the . . . playing field'" between registered dealers and private funds, SEC Br. 42, but it continues to "fai[l] to address," and thus "presumably concedes," *MCR Oil*, 2020 WL 13133311, at *9, that "private funds are *customers* of broker-dealers, not their *competitors*," Pls.' Br. 27.

### D.    The Commission Cannot Square The Rule With Prior Commission Positions.

The Commission declares "there is no inconsistency between the rule and prior Commission positions." SEC Br. 47. That argument does not withstand serious scrutiny.

The Commission has repeatedly stated that hedge funds are not required to register as "dealers." *See, e.g.*, *Hearing Before the H. Comm. on Banking, Finance & Urban Affairs*, 103d Cong. 125 n.6 (1994) (Statement of Arthur Levitt, Chairman, SEC) (Pls.' Reply App. 90). And it has repeatedly recognized, in simultaneous pronouncements, both that private funds "[p]rovid[e] liquidity to markets," and that they "are not registered under the federal securities laws as . . . broker-dealers." Report of the President's Working Group on Financial Markets, at A-5, B-1 (1999); *see also, e.g.*, *Hearing Before the H. Comm. on Banking, Finance & Urban Affairs*, *supra* at 111–12 (Statement of Arthur Levitt, Chairman, SEC) (Pls.' Reply App. 76–77) (acknowledging that "trading activity by hedge funds adds depth to markets and thereby increases market liquidity," and also that hedge funds "are not registered under the federal securities laws"); 69 Fed. Reg. at 72,060/2 (noting hedge funds are not registered, and also that they "provide liquidity to the markets"); Paul S. Atkins, SEC, Comm'r, Remarks Before the ABA Section on Business Law (Mar. 2, 2004), 2004 WL 724425, at *4 (stating that hedge funds "do not register with the SEC" and that they "play an important role in providing market liquidity"); William H. Donaldson, Chairman,

SEC, Testimony Concerning the Long and Short of Hedge Funds (May 22, 2003), 2003 WL 21250365, at *2 (hedge funds are "unregistered" and are "providers of liquidity" and "active and informed traders"). Both those things being true is impossible to square with the present Rule.

## III.   Vacatur Is Appropriate.

As the Fifth Circuit recently reaffirmed in a closely related context, "[u]nder section 706 of the APA, when a court holds that an agency rule violates the APA, it shall—not may—hold unlawful and set aside the agency action." *Nat'l Ass'n of Private Fund Managers*, 103 F.4th at 1114 (quotation marks and brackets omitted). The Fifth Circuit accordingly vacated in full the Commission's previous misguided rule attempting to regulate private funds without congressional authorization, *id.*, and this Court should follow the same course here.

The Commission offers no ground to depart from that straightforward conclusion. It asks this Court to "seve[r]" portions of the Rule that the Court concludes "excee[d] the Commission's statutory authority," SEC Br. 49, but ignores that a holding that "[t]he Commission has exceeded its statutory authority in adopting the Final Rule" would necessarily mean that "no part of [the Rule] can stand," just as the Fifth Circuit recently held in vacating "all portions of" the Private Fund Advisers Rule, *Nat'l Ass'n of Private Fund Managers*, 103 F.4th at 1110 n.10, 1114—expressly rejecting the same "severability" arguments that the Commission repeats here, *see* Br. for Respondent SEC, No. 23-60471, 2023 WL 8875230, at *55–56 (5th Cir. filed Dec. 15, 2023). Here too, severance makes no sense because the Commission fails to identify any "portions" of its Rule that can "'operate entirely independently'" of the "defective portions," *Am. Fed'n of Gov't Emps. v. FLRA*, 24 F.4th 666, 674 (D.C. Cir. 2022). The Commission's lack of statutory authority renders the Rule unlawful from stem to stern, including as applied to parties other than private funds. *See generally* FIA Br. (explaining the unlawful effects on proprietary trading firms).

The Commission argues for remand without vacatur "if this Court concludes that the Commission did not adequately consider or explain its decision," SEC Br. 49, but that exceptional course "is justifiable only in 'rare cases'" under "conditions" that the Commission fails to satisfy here, *Chamber of Com. v. SEC*, 88 F.4th 1115, 1118 (5th Cir. 2023). *First*, there is no "'serious possibility' that the agency will be able to correct the rule's defects on remand" given the fundamental and far-reaching problems undermining the Commission's reasoning at every step. *Id.* (explaining that remand without vacatur is "inappropriate for agency action suffering from one or more serious procedural or substantive deficiencies"). The Commission fails even to attempt to "explain how [it] would substantiate the Rule if given the opportunity to do so." *Texas v. Becerra*, 667 F. Supp. 3d 252, 291 (N.D. Tex. 2023) (vacating rule), *vacated in part on other grounds*, 2024 WL 2747751 (5th Cir. Feb. 2, 2024). *Second*, vacatur would not produce "'disruptive consequences,'" *id.*, because it would merely maintain the status quo that has existed for decades under the securities laws, without ever allowing the Commission's unprecedented new Rule to go into effect, *see* Order 2, Dkt. 20 (acknowledging that Plaintiffs "request [a decision] by December 2, 2024" to avoid incurring costs to meet future compliance date).

Just as the Fifth Circuit held in vacating the Commission's most recent unlawful rule aimed at private funds, this Court "'shall'—not may—'hold unlawful and set aside'" the Rule in its entirety. *Nat'l Ass'n of Private Fund Managers*, 103 F.4th at 1114.

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment, deny Defendant's cross-motion, and vacate the Dealer Rule.

Dated:  July 18, 2024                              Respectfully submitted,


                                                   */s/ Dee J. Kelly*
                                                   _____
                                                   DEE J. KELLY (TX Bar No. 11217250)
                                                   KELLY HART & HALLMAN, LLP
                                                   201 Main Street, Suite 2500
                                                   Fort Worth, TX 76102
                                                   (817) 332-2500
                                                   dee.kelly@kellyhart.com

                                                   EUGENE SCALIA*
                                                   HELGI C. WALKER*
                                                   MAX E. SCHULMAN*
                                                   LAEL D. WEINBERGER*
                                                   MICAH S. QUIGLEY*∞
                                                   GIBSON, DUNN & CRUTCHER LLP
                                                   1050 Connecticut Avenue, N.W.
                                                   Washington, DC 20036-5306
                                                   (202) 955-8500
                                                   escalia@gibsondunn.com

                                                   BRIAN A. RICHMAN (TX Bar No. 24139696)
                                                   GIBSON, DUNN & CRUTCHER LLP
                                                   2001 Ross Avenue, Suite 2100
                                                   Dallas, TX 75201
                                                   (214) 698-3100
                                                   brichman@gibsondunn.com

                                                   *Counsel for Plaintiffs*

_____
* Admitted *pro hac vice*.
∞ Admitted only in Texas; practicing under the supervision of principals of the firm.

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing using the CM/ECF system on July 18, 2024, which will send an electronic notification of such filing to all counsel of record.

Respectfully submitted,

*/s/ Dee J. Kelly*

DEE J. KELLY (TX Bar No. 11217250)
KELLY HART & HALLMAN, LLP
201 Main Street, Suite 2500
Fort Worth, TX 76102
(817) 332-2500
dee.kelly@kellyhart.com

*Counsel for Plaintiffs*

52