# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF PRIVATE FUND MANAGERS, ALTERNATIVE INVESTMENT MANAGEMENT ASSOCIATION, LIMITED, and MANAGED FUNDS ASSOCIATION,<br><br>*Plaintiffs*,<br><br>v.<br><br>SECURITIES AND EXCHANGE COMMISSION,<br><br>*Defendant*. | No. 4:24-cv-00250-O |

## DEFENDANT SECURITIES AND EXCHANGE COMMISSION'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

KEEFE M. BERNSTEIN (TBN 24006839)
SECURITIES AND EXCHANGE COMMISSION
Fort Worth Regional Office
801 Cherry Street, Suite 1900
Fort Worth, TX 76102
(817) 900-2607
bernsteink@sec.gov

DOMINICK V. FREDA (*pro hac vice*)
Assistant General Counsel
EMILY TRUE PARISE (*pro hac vice*)
Senior Appellate Counsel
SAMUEL B. GOLDSTEIN (*pro hac vice*)
Counsel to the General Counsel
SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, DC 20549
(202) 551-7692 (Goldstein)
goldsteinsa@sec.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

I.       The Commission has statutory authority to adopt the rule. ................................. 2

         A.       The dealer definition is not limited to those who effectuate customer orders......... 4

         B.       Hedge funds are not categorically exempt from the dealer definition. ................... 8

         C.       The rule is focused on trading patterns that have traditionally distinguished
                  dealers from traders............................................................................................... 10

II.      The rule is reasonable and reasonably explained.............................................. 12

         A.       The Commission substantiated the problems that the rule is designed to
                  address..................................................................................................................... 12

         B.       The Commission adequately considered the rule's potential effects on a limited
                  number of hedge funds.......................................................................................... 15

         C.       The Commission acted reasonably in adopting the two qualitative factors. ......... 18

         D.       The Commission adequately considered the rule's effect on efficiency,
                  competition, and capital formation. ...................................................................... 21

         E.       The rule is consistent with prior Commission positions...................................... 23

III.     Plaintiffs' requested relief is overbroad. .......................................................... 24

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**                                **Page(s)**

*Bittner v. United States*,
  598 U.S. 85 (2023) ................................................................... 7

*Bus. Roundtable v. SEC*,
  647 F.3d 1144 (D.C. Cir. 2011) .............................................. 22

*Chamber of Commerce of U.S. v. SEC*,
  412 F.3d 133 (D.C. Cir. 2005) ................................................ 22

*Chamber of Commerce of U.S. v. SEC*,
  85 F.4th 760 (5th Cir. 2023) ................................................... 22

*Competitive Enter. Inst. v. U.S. Dep't of Transp.*,
  863 F.3d 911 (D.C. Cir. 2017) ................................................ 14

*Discover Growth Fund, LLC v. Camber Energy, Inc.*,
  602 F. Supp. 3d 982 (S.D. Tex. 2022) ............................. 7, 8, 19

*FCC v. Fox TV Stations, Inc.*,
  556 U.S. 502 (2009) ............................................................... 20

*Lindeen v. SEC*,
  825 F.3d 646 (D.C. Cir. 2016) ................................................ 22

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024) .......................................................... 2, 5

*Nasdaq Stock Mkt. LLC v. SEC*,
  38 F.4th 1126 (D.C. Cir. 2022) ............................................... 15

*Nat'l Ass'n of Priv. Fund Managers v. SEC*,
  103 F.4th 1097 (5th Cir. 2024) ............................................ 9, 25

*Resident Council of Allen Parkway Vill. v. U.S. Dep't of Hous. & Urban Dev.*,
  980 F.2d 1043 (5th Cir. 1993) ................................................ 25

*Roth v. SEC*,
  22 F.3d 1108 (D.C. Cir. 1994) .................................................. 7

*Sackett v. EPA*,
  598 U.S. 651 (2023) ............................................................... 12

*SEC v. Almagarby*,
  92 F.4th 1306 (11th Cir. 2024) ....................... 2, 3, 4, 5, 7, 8, 10, 11

*SEC v. Auctus Fund Mgmt.*,
  No. 23-cv-11233, 2024 WL 3498593 (D. Mass. July 22, 2024) .............. 2, 4, 5, 6, 7, 9

*SEC v. Keener*,
  102 F.4th 1328 (11th Cir. 2024) ........................................................... 2, 4, 5, 6

*SEC v. Long*,
  No. 23-cv-14260, 2024 WL 3161669 (N.D. Ill. June 25, 2024) ......................................... 2, 4

*SEC v. Ridenour*,
  913 F.2d 515 (8th Cir. 1990) ........................................................... 8

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ........................................................... 9, 10

**Statutes**

Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*

  Section 3(a)(4), 15 U.S.C. § 78c(a)(4)(A) ........................................................... 7

  Section 3(a)(5), 15 U.S.C. § 78c(a)(5) ........................................................... 3

  Section 3(a)(5), 15 U.S.C. § 78c(a)(5)(A) ........................................................... 4, 7, 11

  Section 3(a)(5), 15 U.S.C. § 78c(a)(5)(B) ........................................................... 11

  Section 3(a)(9), 15 U.S.C. § 78c(a)(9) ........................................................... 11

  Section 3(a)(44), 15 U.S.C. § 78c(a)(44) ........................................................... 3

  Section 3(b), 15 U.S.C. § 78c(b) ........................................................... 2

  Section 3(f), 15 U.S.C. § 78c(f) ........................................................... 22

  Section 23(a)(2), 15 U.S.C. § 78w(a)(2) ........................................................... 23

Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.*

  15 U.S.C. § 78ccc(a)(2) ........................................................... 18

**Commission Releases**

*Persons Deemed Not to Be Brokers*,
  49 Fed. Reg. 20,512 (May 15, 1984) ........................................................... 7

*Large Trader Reporting System*,
  56 Fed. Reg. 42,550 (Aug. 28, 1991) ........................................................... 10

*Definition of Terms in and Specific Exemptions for Banks, Savings Associations, and Savings
Banks Under Sections 3(a)(4) and 3(a)(5) of the Securities Exchange Act of 1934*,
  67 Fed. Reg. 67,496 (Nov. 5, 2002) ........................................................... 3, 12

*Registration Under the Advisers Act of Certain Hedge Fund Advisers*,
  69 Fed. Reg. 72,054 (Dec. 10, 2004) ........................................................... 10

*Concept Release on Equity Market Structure*,
   75 Fed. Reg. 3594 (Jan. 10, 2010) ............................................................... 10, 24

**Other Authorities**

Broker-Dealer Regulation (July 2024 supplement) ......................................................... 19

*Gordon Wesley Sodorff, Jr.*,
   1992 WL 224082 (SEC Sept. 2, 1992) ................................................................ 8

Louis Loss, Securities Regulation (1st ed. 1951) .................................................. 8, 12

Charles H. Meyer, The Securities Exchange Act of 1934 Analyzed and Explained (1934) ..........5

*Remarks Before the ABA Section on Business Law,*
   2004 WL 724425 (Mar. 2, 2004) ............................................................................ 24

48 Stat. 881 (June 6, 1934) ........................................................................................ 9

**INTRODUCTION**

The Commission adopted the rule under review to address recent advancements in electronic trading that had resulted in a gap in the regulation of those engaged in traditional dealer activity.  Entities engaging in automated, algorithmic high-frequency-trading strategies have been performing the same *de facto* market-making function as traditional dealers, but some of those entities have done so without registering with the Commission and being subject to the dealer regulatory framework.  As the Commission explained in adopting the rule, market participants that buy and sell securities for their own account and engage in at least one of two specific trading patterns that have the effect of providing significant liquidity—(1) regularly expressing trading interest at or near the best available prices on both sides of the market for the same security, or (2) earning revenue primarily from capturing bid-ask spreads or trading incentives—are engaged in the regular business of buying and selling securities and thus are dealers under the Exchange Act.

Plaintiffs' challenge to the rule misconstrues its scope, misreads the Exchange Act's dealer definition, and misapprehends the Commission's rationale for adoption.  Contrary to plaintiffs' hyperbole, the rule does not cover everyone that buys and sells securities.  Instead, consistent with the longstanding distinction between dealers and traders, the rule applies to trading designed to profit from trade execution itself, as dealers historically have done, and does not capture trading with a view toward appreciation in the value of securities.  As such, the rule will likely cover only a dozen or fewer hedge funds that engage in *de facto* market making by engaging in high-frequency trading strategies that fall within the rule's specific criteria. Plaintiffs offer no reason to immunize this handful of hedge funds from the same regulatory scheme to which other significant liquidity providers already adhere.

Plaintiffs' challenge to the Commission's authority fails because the rule's further

1

definition of the term "as a part of a regular business" in the dealer and government securities dealer definitions is within the definitional authority expressly delegated to the Commission in the Exchange Act and is consistent with the statutory text and longstanding judicial and agency interpretations.  Plaintiffs repeat their flawed argument that dealers must have customers, but a "customer requirement" has "no grounding in the statutory text," the "Exchange Act's structure," or the relevant "legal backdrop."  *SEC v. Keener*, 102 F.4th 1328, 1334 (11th Cir. 2024); *accord SEC v. Almagarby*, 92 F.4th 1306, 1318 (11th Cir. 2024).  Indeed, two additional courts have recently rejected plaintiffs' argument.  *SEC v. Auctus Fund Mgmt.*, No. 23-cv-11233, 2024 WL 3498593, at *3-4 (D. Mass. July 22, 2024); *SEC v. Long*, No. 23-cv-14260, 2024 WL 3161669, at *1-3 (N.D. Ill. June 25, 2024).  And plaintiffs identify no basis in the Exchange Act or any other statute for categorically exempting hedge funds from dealer registration and regulation.

Plaintiffs also fail to show a lack of reasoned decisionmaking.  The Commission substantiated the problems the rule was designed to address, analyzed the rule's likely economic effects, and found that the rule would promote competition as well as market stability and transparency.  Plaintiffs disagree with the Commission's policy choices and weighing of costs and benefits, but Congress authorized the Commission to balance competing policy objectives to promote market stability, protect investors, and further competition among market participants.  There is no basis to set aside the Commission's reasonable exercise of that authority.

**ARGUMENT**

**I.       The Commission has statutory authority to adopt the rule.**

Congress authorized the Commission to "define technical, trade, … and other terms used" in the Exchange Act.  15 U.S.C. § 78c(b).  The "best reading" of the statute is that Congress "'expressly delegate[d]' to [the] agency the authority to give meaning to a particular statutory term" (*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024)), and the rule is

2

a proper exercise of that authority.  Consistent with the text of the Exchange Act's definitions of "dealer" and "government securities dealer" and judicial and agency interpretations of those definitions, the rule further defines what it means to be engaged in the business of buying and selling securities "as a part of a regular business."  P.App.55; *see* 15 U.S.C. § 78c(a)(5), (44).[1]

The "historical" understanding is that "a dealer provided market liquidity."  *Almagarby*, 92 F.4th at 1315.  Thus, as the Commission has long recognized, a market participant "acting as a *de facto* market maker whereby market professionals or the public look to the firm for liquidity" is engaged in a regular business of buying and selling securities.  *Definition of Terms in and Specific Exemptions for Banks, Savings Associations, and Savings Banks Under Sections 3(a)(4) and 3(a)(5) of the Securities Exchange Act of 1934*, 67 Fed. Reg. 67,496, 67,499 (Nov. 5, 2002) (2002 Release).  The rule builds on that understanding by identifying two trading patterns tailored to how a market participant provides liquidity by acting as a *de facto* market maker in today's securities markets:  (1) regularly communicating trading interest on both sides of the market for the same security, or (2) earning revenue primarily from capturing bid-ask spreads or trading incentives.  P.App.125; *see* P.App.62.

Plaintiffs do not seriously dispute that the Commission has statutory authority to further define "as a part of a regular business" or that the rule properly interprets that phrase.  Instead, they repeat their flawed arguments (Reply 3) that a dealer must have customers; that Congress

---

[1] "P.App." refers to plaintiffs' appendix in support of their summary judgment motion (Dkt. 30).  "C.App." refers to the Commission's appendix in support of its opposition and cross-motion for summary judgment (Dkt. 39).  "P.Reply.App." refers to plaintiffs' appendix in support of their combined reply and opposition (Dkt. 42).  "Mot." refers to plaintiffs' brief in support of their summary judgment motion (Dkt. 29).  "Opp." refers to the Commission's brief in opposition to plaintiffs' motion and in support of the Commission's cross-motion for summary judgment (Dkt. 39).  "Reply" refers to plaintiffs' reply in support of their motion and opposition to the Commission's cross-motion (Dkt. 41).

silently exempted hedge funds and other private funds from the dealer definition; and that the rule renders the dealer definition "boundless."  Those arguments lack merit.

### A.      The dealer definition is not limited to those who effectuate customer orders.

1.  Plaintiffs double down (Reply 3, 6-23) on their invented "requirement" that "dealers trade with customers."  But as the Commission's motion explained (Opp. 15-21) and the Eleventh Circuit has held, such a requirement has "no grounding in the statutory text," "structure," or "legal backdrop."  *Keener*, 102 F.4th at 1334; *see Almagarby*, 92 F.4th at 1318. "[T]he Exchange Act makes no mention of a customer-facing role in its statutory definition" of a dealer; instead, "the Act defines dealers by their function, as being '*in the business of* buying and selling securities.'"  *Keener*, 102 F.4th at 1334 (quoting 15 U.S.C. § 78c(a)(5)(A)); *Almagarby*, 92 F.4th at 1338 (same).  Two other courts recently reached the same conclusion, rejecting the purported customer requirement that plaintiffs advance here.  *Long*, 2024 WL 3161669, at *1-3 (dealer definition "does not require the buying and selling of securities be pursuant to a customer request because the focus is on the regularity of the conduct and the goal of securing a profit"); *Auctus*, 2024 WL 3498593, at *3-7 (rejecting argument that dealers must "effectuate customer orders" and explaining that dealer definition turns on "a business-based analysis").

Plaintiffs' attempts to avoid *Almagarby* and *Keener* do not withstand scrutiny.  The Eleventh Circuit's rejection of a customer requirement was not "explicitly limited" to the facts of those cases involving "toxic lending" and "underwriting."  *Contra* Reply 21.  While the court's conclusions that the defendants qualified as dealers turned on their "specific conduct" (*Almagarby*, 92 F.4th at 1318) or "activit[ies]" (*Keener*, 102 F.4th at 1334), its analysis of the Exchange Act's text, structure, and history in rejecting a customer requirement is not limited to any particular set of facts.  And *Almagarby*'s recognition that "investment advisors, mutual funds, pension funds, and other asset managers" are "not traditionally understood as dealers" (92

4

F.4th at 1318) is entirely consistent with the challenged rule. As the Commission explained, most hedge funds and other private funds do not "engage in activities that meet the [rule's] definition of dealing" because they are "generally long-only investors" (P.App.87)—that is, they trade with "a view toward appreciation in value" rather than profiting from trade execution itself (P.App.68). But the limited number of hedge funds that engage in the type of algorithmic, high-frequency trading strategies scoped in by the rule perform the same traditional *de facto* market-making function that dealers have historically performed. The rule thus embodies the same principle underlying the Eleventh Circuit's decisions: whether a particular entity is a dealer depends on the "nature, volume, regularity, and frequency" of its "transactions" (*Keener*, 102 F.4th at 1334; *see Almagarby*, 92 F.4th at 1318) rather than its identity.

2. Plaintiffs are therefore mistaken when they claim (Reply 7-8) that "histor[ical]" understandings of dealer activity grafted a customer requirement onto the statutory text. As the Eleventh Circuit explained, relying on a leading securities-law treatise published in 1934, "[s]ince the enactment of" the Exchange Act's dealer provisions, "the 'dealer' definition has been understood to cover a trader 'who *has no customers* but merely trades for his own account through a broker,' so long his operations 'are sufficiently extensive to be regarded as a regular business.'" *Keener*, 102 F.4th at 1335 (quoting Charles H. Meyer, The Securities Exchange Act of 1934 Analyzed and Explained 34 (1934) (C.App.40)); *see Auctus*, 2024 WL 3498593, at *5 (1934 Meyer treatise's "language clearly shows that, in 1934, there was no established understanding that dealers only worked for customers"). Plaintiffs quixotically criticize Meyer's 1934 treatise as "post-enactment" (Reply 11), but courts routinely rely on "contemporaneous[]" views of "respected commentators" in interpreting statutory text. *Loper Bright*, 144 S. Ct. at 2247 (citing commentary from 1947, 1950, and 1965 in interpreting the APA, adopted in 1946).

Plaintiffs cite snippets of historical sources that reference "customers" or "clients" in relation to dealers (Reply 7-8, 11-12), but they do not support the notion that dealers *must* effectuate customer orders.  For instance, a 1930 book (Reply 7) defined a "dealer" as "[o]ne who deals in securities as a principal rather than as a broker."  P.App.605.  In illustrating that distinction, the author contrasted a "dealer" who "sells to and buys from a client" with a "broker" that "buys and sells for the account of a client."  P.App.605.  That passage demonstrates that the key characteristic of a dealer (as opposed to a broker) is that a dealer buys and sells securities for its own account rather than the account of others—not that dealers must have customers. Similarly, plaintiffs err in relying on a 1925 article asserting that a "better-class Dealer" must be "very close to his customers" to "bring to his customers' attention securities of which they have never heard."  P.Reply.App.97.  The article does not claim that those who buy and sell securities for their own accounts cannot qualify as dealers merely because they lack customers.

It is unsurprising that some sources from the time of the Exchange Act's enactment refer to dealers with customers.  After all, "many dealers execute trades on behalf of customers." *Keener*, 102 F.4th at 1334.  But that does not change the fact that "the Exchange Act makes no mention of a customer-facing role in its statutory definition."  *Id.*; *see Auctus*, 2024 WL 3498593, at *5, *7 (concluding that "contemporaneous reports from the 1930s" did not demonstrate any settled understanding that dealers must effectuate customer orders and explaining that "while it may be more common for a dealer to be customer-facing, the courts have employed a business-based analysis when assessing whether a party is a 'dealer' subject to the Exchange Act's registration requirement").

3.  The "link[]" between "broker" and "dealer" in the Exchange Act also does not establish that dealers must effectuate customer orders.  *Contra* Reply 12-14.  As the Commission

explained in its motion (Opp. 17), the plain text of the broker and dealer definitions demonstrate that the common attribute brokers and dealers share is that both are "engaged in the business" of buying and selling securities (15 U.S.C. § 78c(a)(4)(A), (5)(A))—not that both must have customers.  Indeed, by defining a broker as someone "engaged in the business of effecting transactions in securities for the account of others" (15 U.S.C. § 78c(a)(4)(A)), but omitting the terms "effecting" and "others" from the dealer definition, Congress intended that "difference in language to convey a difference in meaning" (*Bittner v. United States*, 598 U.S. 85, 94 (2023)). The *Auctus* court thus rejected the argument that the "parallel language of the Exchange Act" regarding "broker" and "dealer" reflects an underlying "assumption" that "both buy and sell securities to effectuate customer orders."  2024 WL 3498593, at *3.

Plaintiffs' sources referring to "broker-dealers" having "customers" (Reply 13 (citing, *e.g.*, *Persons Deemed Not to Be Brokers*, 49 Fed. Reg. 20512, 20512 (May 15, 1984))) do not demonstrate that an entity acting only as a dealer must have customers.  Nor does resort to the "premise[]" of the "broker-dealer regulatory regime" help plaintiffs.  *Contra* Reply 13.  As the D.C. Circuit has explained, the "broker-dealer registration requirement" and the "supervision" that registration entails serve to "protect prospective purchasers of securities" (*Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994))—that is, a dealer's counterparty in a securities transaction, not necessarily the dealer's customer.

4.  Plaintiffs fail to identify any "precedent" contrary to *Almagarby*, *Keener*, *Long*, and *Auctus* that holds that dealers must effectuate customer orders.  Reply 18-21; *see* Opp. 20-21. Plaintiffs quote (Reply 19) a statement in *Discover Growth Fund, LLC v. Camber Energy, Inc.* that certain parties were "not dealers because they do not provide dealer services, and do not have any customers or any 'authority over the accounts of others.'"  602 F. Supp. 3d 982, 989

(S.D. Tex. 2022).  But plaintiffs ignore that the court also examined other activities that could have rendered the parties "dealers."  *Id.* at 987.  For example, the parties "did not buy and sell the same security simultaneously, did not buy and sell a particular security on a continuous basis, and did not hold themselves out as being willing to buy and sell a particular security on a continuous basis."  *Id.* at 988.  *Camber Energy* is thus consistent with the settled understanding that having a "clientele" is only one "characteristic attribute" of a dealer, but "a person does not have to exhibit all or any given number of these dealer characteristics in order to be considered a dealer."  Louis Loss, Securities Regulation 722 (1st ed. 1951) (C.App.4).

Plaintiffs likewise erroneously rely (Reply 20-21) on *Gordon Sodorff, Jr.*, 1992 WL 224082 (SEC Sept. 2, 1992), and *SEC v. Ridenour*, 913 F.2d 515 (8th Cir. 1990), among other decisions.  In *Sodorff*, the Commission determined that the respondent had acted as a dealer because he "solicited investors and handled their money and securities, rendered investment advice, and sent subscription agreements to investors for their review and signature, all of which are characteristics of dealer activity."  1992 WL 224082, at *5.  But the Commission also explained that his "profits did not result from appreciation in the value of the securities, but rather from his markup over the price he paid."  *Id.*  Similarly, in *Ridenour*, the Eighth Circuit relied not only on the defendant "attempt[ing] to obtain and keep a regular clientele for … bond deals," but also on his "level of activity" in trading bonds, in concluding that he had acted as a "broker-dealer."  913 F.2d at 517.  These decisions thus found customer-order effectuation to be a factor supporting the conclusion that a person was a dealer, not that this activity is *necessary* to be a dealer.  That is why *Almagarby* favorably cited to *Sodorff* and *Ridenour* while holding that a "customer requirement" has "no grounding" in the Exchange Act.  92 F.4th at 1317-18.

### B.    Hedge funds are not categorically exempt from the dealer definition.

There is no basis in the Exchange Act's text, structure, or history for categorically

exempting hedge funds from the statutory dealer definition.  The Exchange Act's original "dealer" definition excluded "banks," 48 Stat. 881, 883 (June 6, 1934), but no other entities, and Congress has never amended that definition to exclude hedge funds or other private funds.

Sidestepping the statutory text, plaintiffs instead rely (Reply 25-26) on *Nat'l Ass'n of Private Fund Managers v. SEC*, 103 F.4th 1097 (5th Cir. 2024) (*NAPFM*), but that decision is inapposite.  In *NAPFM*, the Fifth Circuit examined the two provisions in the Investment Advisers Act that the Commission had invoked in adopting a rule governing private funds.  According to the court, one provision authorizing the Commission to "facilitate the provision of simple and clear disclosures to investors" applied only to "'retail customers,' not private fund investors." *Id.* at 1110-12.  The other provision authorized the Commission to "define[] and prescribe" means reasonably designed to prevent "fraudulent" acts by investment advisers, but the court held that the Commission had "fail[ed] to explain how" the challenged rule "would prevent fraud." *Id.* at 1112-14.  The Fifth Circuit did not hold, as plaintiffs suggest (Reply 25), that Congress's choice "not to impose [a] prescriptive framework on private funds" in the Investment Company Act of 1940 (*NAPFM*, 103 F.4th at 1111) also categorically exempted private funds from *other* provisions of the securities laws that may encompass certain private funds by their plain text.  As the *Auctus* court explained, *NAPFM*'s analysis of "the history of the [Advisers] Act and the numerous ways that Congress explicitly exempted private funds from its regulations" is "clearly distinguishable from the Exchange Act, which does not ever differentiate between customer-facing roles and non-customer-facing roles." *Auctus*, 2024 WL 3498593, at *3 n.1.

Plaintiffs further err in asserting that hedge funds can never meet the Exchange Act's dealer definition because the Commission has previously promulgated rules affecting hedge funds without expressly "suggest[ing] that hedge funds might be dealers." Reply 27 (citing *West*

9

*Virginia v. EPA*, 597 U.S. 697, 725 (2022)).  The 1991 proposed rule and the 2004 final rule that

plaintiffs cite (Reply 27) predate the rise of liquidity providers utilizing algorithmic, high-

frequency trading strategies that the Commission adopted the rule to address.  *See Concept*

*Release on Equity Market Structure*, 75 Fed. Reg. 3594, 3594-95 (Jan. 10, 2010) (noting that

New York Stock Exchange began offering fully automated access to its displayed quotations in

October 2006); *cf. Almagarby*, 92 F.4th at 1315-16 (discussing the rise of "high-frequency and

algorithmic traders" in the context of "the distinction between dealers and traders").  And

although the 2004 final rule referred to "hedge funds … provid[ing] price information and

liquidity" (*Registration Under the Advisers Act of Certain Hedge Fund Advisers*, 69 Fed. Reg.

72,054, 72,080 (Dec. 10, 2004)), neither of the statements plaintiffs cite suggests that hedge

funds that provide liquidity as a part of a regular business by engaging in the rule's specified

trading patterns categorically cannot be considered dealers under the Exchange Act.  *See id.*;

*Large Trader Reporting System*, 56 Fed. Reg. 42,550, 42,550 (Aug. 28, 1991).

> **C.**     **The rule is focused on trading patterns that have traditionally distinguished dealers from traders.**

Contrary to plaintiffs' hyperbolic claims (Reply 3-6), the rule does not turn "virtually all

'of modern American finance'" into dealing activity.  The rule specifies two trading patterns—

(1) regularly expressing trading interest on both sides of the market for the same security, or

(2) earning revenue primarily from capturing bid-ask spreads or trading incentives—that indicate

that an entity "provide[s] liquidity to other market participants" as "a part of a regular business,"

and thus meets the statutory definition of a dealer.  P.App.125.  Merely trading a high volume of

securities, like the "8.9 billion shares per year" traded by the "Teacher Retirement System of

Texas" (Reply 6), does not suffice, since "not … *every* professional investor who buys and

sell[s] securities in high volumes is a 'dealer.'"  *Almagarby*, 92 F.4th at 1318.  The rule thus

10

preserves the "historical difference between the functions of dealers and traders":  an "'investor'
who profits from the 'appreciation in the value' of his investment portfolio instead of from trade
execution" is not a dealer, whereas a "dealer provide[s] market liquidity."  *Id.* at 1315.

Statements from pleadings, proposed jury instructions, and other filings in unrelated
Commission enforcement actions (Reply 5) have no bearing on the rule's scope and whether the
rule is consistent with the Exchange Act's dealer definition.  Regardless, the quotes that plaintiffs
characterize as "let[ting] slip" a "boundless" interpretation of the dealer definition (Reply 3, 5)
simply mirror Congress's statutory text.  *Compare* 15 U.S.C. § 78c(a)(5)(A)-(B) (defining
"dealer" as "any person engaged in the business of buying and selling securities … for such
person's own account … as a part of a regular business"), *with, e.g.*, P.Reply.App.133
(Commission complaint alleging that "[d]efendants acted as securities dealers because they
regularly purchased and sold securities as part of a regular business").

Contrary to plaintiffs' argument (Reply 23-24), the rule's exclusions for certain entities,
including registered investment companies and central banks, do not show that the rule's
definition of "as a part of a regular business" is overbroad.  Congress broadly defined "dealer" as
"any person"—including a "company" or "instrumentality of a government"—"engaged in the
business of buying and selling securities ... for such person's own account" as "a part of a regular
business."  15 U.S.C. § 78c(a)(5)(A)-(B), (9).  The rule refines a portion of that definition to
clarify its application to significant liquidity provision.  In any event, the Commission did not
"admit[]" that any registered investment companies "'would' be covered by the [r]ule absent an
exemption."  Reply 24.  Plaintiffs provide no evidence of investment companies that engage in
the specific trading patterns subject to the rule.  And even if "the Federal Reserve's open-market
operations 'regular[ly]' 'provide liquidity'" (Reply 24), merely "providing liquidity" does not

11

trigger registration under the rule if the entity does not engage in one of the specified trading patterns.  P.App.125.

Nor is the rule "hopelessly indeterminate."  Reply 26 (quoting *Sackett v. EPA*, 598 U.S. 651, 681 (2023)).  The Commission reasonably explained how each of the rule's two qualitative standards would operate in practice, responding to commenters' concerns and in some instances modifying the proposal in response.  P.App.62-70; *see* Opp. 36-39.  And while plaintiffs complain that applying the rule's qualitative standards involves consideration of a market participant's "facts and circumstances" (P.App.88) rather than a "bright-line rule" (Reply 26), the "analysis of whether a person meets the [statutory] definition of a dealer" has always "depend[ed] upon all of the relevant facts and circumstances" (2002 Release, 67 Fed. Reg. at 67,499).  *See also, e.g.*, Loss, *supra*, at 722 (C.App.4) ("when … a person's trading activities make him a 'dealer'" involves "no ready distinction").

## II.    The rule is reasonable and reasonably explained.

The Commission thoroughly explained the need for the rule, the rule's costs and benefits, and the rule's likely economic effects.  Plaintiffs' contrary arguments misconstrue the rule, the Commission's explanation, and the governing legal standards.

### A.    The Commission substantiated the problems that the rule is designed to address.

The Commission explained that, due to advancements in electronic trading, certain market participants—particularly proprietary trading firms in the government securities markets—have a "significant share of market volume" and "perform[] critical market functions, in particular liquidity provision, that historically have been performed by dealers."  P.App.56. But some of those entities that perform traditional dealer functions "are not registered as dealers" or government securities dealers.  P.App.56.  The Commission detailed the "negative

externalities" created by this lack of dealer registration.  P.App.82.  For instance, the absence of leverage constraints on these entities' trading activities increases the risk that these significant liquidity providers could "fail financially," which would "not only harm their counterparties but also cause wider harm throughout securities markets."  P.App.91-92.  The "limited regulatory oversight" of these entities also "increases the difficulty and complexity for regulators to investigate, understand, and address significant market events."  P.App.56.  And the "unevenness of regulation potentially gives less-regulated entities an unfair advantage over registered dealers that engage in similar activities."  P.App.82.

Plaintiffs dispute the need for the rule with respect to hedge funds, contending that "during volatile times, private funds raised new funds to invest, thereby increasing their trading." Reply 29-30.  The Commission discussed the evidence that plaintiffs invoke and found "[r]ecent experience" to be "mixed on the role of" proprietary trading firms, such as those that engage in high-frequency trading, "during market events."  P.App.109.  Those firms' "share of market intermediation fell considerably more than … dealers' share did during 2020, but their share actually increased during the 2014 flash rally and again during March 2023."  P.App.109 (footnotes omitted).  Nor are hedge funds "subject to arguably more restrictive limitations on leverage risk than dealers."  Reply 29 (citing P.App.281).  As the Commission explained, while the regulations plaintiffs cite impose some "constraints on risk-taking," entities that are not registered as dealers "face fewer constraints than registered dealers."  P.App.85.

Further, plaintiffs erroneously criticize (Reply 30) the adopting release's reliance on the 1982 failure of Drysdale Government Securities (P.App.82), insisting that dealer registration would not have "altered the outcome for Drysdale."  As the Commission pointed out (P.App.56, 91), subjecting Drysdale to dealer regulation might have "mitigate[d] the magnitude" of the

13

resulting harm to other market participants or better enabled regulators to "investigate" the market disruption after the fact. Plaintiffs do not address those benefits. Nor are plaintiffs correct in characterizing the Drysdale "anecdote" as "disqualified" from supporting the rule because it was not discussed in the proposal. Reply 30. An agency can rely on "'supplementary' information" that "further support[s]" the agency's "reasoning" in the final rule. *Competitive Enter. Inst. v. U.S. Dep't of Transp.*, 863 F.3d 911, 920 (D.C. Cir. 2017). The Drysdale example supplemented the proposal's discussion of several other examples supporting the premise that "the activity of significant market participants that are not registered may pose certain risks to the market." P.App.7; *see* P.App.7 n.72; P.App.33 & n.243.

Plaintiffs' criticisms of the Commission's analysis of the March 2020 Treasury market volatility similarly fail. The Commission did not "ignore" supposed evidence that "firms exempt from the [rule] were primarily responsible for any disruption." Reply 31; *see* P.App.257 (asserting that March 2020 Treasury market instability was "primarily the result of activity by foreign central banks and registered mutual funds"). The Commission acknowledged that proprietary trading firms such as those covered by the rule "may not have been the primary cause of the volatility," citing the very comment letter plaintiffs invoke. P.App.92 & n.444. Other evidence showed, however, that proprietary trading firms—"many of whom were not registered as dealers"—"appeared to pull back from providing liquidity … relative to dealers" during this market disruption. P.App.92. The Commission thus reasonably concluded that the March 2020 Treasury market volatility "illustrates that [proprietary trading firms'] market withdrawal can contribute to stress in the overall U.S. Treasury market." P.App.92. And while plaintiffs insist (Reply 31) that this "unprecedented" volatility was caused by the Covid pandemic, market disruptions are often caused by unforeseen events, and an "agency need not suffer the flood

before building the levee." *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1143 (D.C. Cir.

2022). Thus, far from ignoring comments regarding the "'frequency' of market disruptions"

(Reply 31), the Commission explained that "[m]arket participants engaged in dealing activities

but without being registered as dealers create the potential for serious externalities if they fail,

regardless of the historical frequency of such failure." P.App.92. That is simply good

governance, as courts routinely sustain agency decisions to "adopt prophylactic rules to prevent

potential problems before they arise." *Nasdaq*, 38 F.4th at 1143.

Plaintiffs fare no better in asserting that the Commission failed to substantiate the need

for "more comprehensive regulatory oversight" of market activity. Reply 33. The Commission

explained "what data is missing" from existing reports (Reply 33): for instance, when a market

participant not registered as a government securities dealer trades through a broker-dealer, "the

broker-dealer … reports the transaction," but the market participant "remains anonymous."

P.App.86. Similarly, market participants "that are not registered as dealers are always

anonymous" for "corporate bond transactions." P.App.86. As to private fund adviser reporting,

even if "[t]ransactions in fixed income securities are already reported by private funds' broker

dealers" (Reply 33), "private funds appear anonymously" in those reports (P.App.74). And

while plaintiffs assert that "information about equity and options trades already appear in the

consolidated audit trail" (Reply 33), "identification of customers" using this data "takes more

time" than if the trades were reported pursuant to dealer requirements (P.App.85-86).

### B.    The Commission adequately considered the rule's potential effects on a limited number of hedge funds.

The Commission thoroughly analyzed available data and responded to comments about

the rule's potential costs, including on hedge funds, and reasonably concluded that categorically

exempting private funds from the rule was unwarranted. P.App.86-89, 108-109. Plaintiffs'

response—that the Commission "erroneously minimized th[e]se costs" (Reply 34-39)—misunderstands the Commission's analysis and relies on nonexistent inconsistencies.

1. *IPOs*.  The Commission recognized that hedge funds that register as dealers "may face restrictions against participating in the IPO market," with some funds "choos[ing] to register and stay out of the IPO market, while others may forgo dealing to be able to invest in IPOs." P.App.109.  While acknowledging that "any large-scale exit from dealing could impact liquidity," the Commission determined that "in aggregate," it did "not expect that the[] combined impact" of these changes "will be significant because of the limited number of funds likely to be affected by" the final rule and the likelihood that other firms could compensate for and thus mitigate any negative effects on liquidity from exiting firms.  P.App.109-10.  There is no inconsistency (*contra* Reply 34-35) between that conclusion and the Commission's recognition that the market will benefit, in times of crisis, from the stabilization of liquidity provision that comes from applying the dealer framework to those few hedge funds that are in the business of providing significant liquidity in the manner the rule outlines.

2. *Net capital*.  The Commission addressed comments suggesting that "imposing dealer requirements—and in particular net capital requirements—on private funds would be inappropriate and untenable, and could in turn significantly and negatively affect liquidity if private funds were to modify or cease their trading activity" (P.App.72 (footnotes omitted)), but it concluded that, among other things, the rule would avoid "wider harm throughout securities markets" that would occur if market participants were "unable to meet short-term obligations" (P.App.91-92, 94), and that "any potential harm to market liquidity is likely to be smaller than commenters suggested" because the final rule "will likely affect fewer entities than the proposed rule" (P.App.110).  Plaintiffs fault the Commission for "fail[ing] to 'explain'" how a rule that

they contend would "reduc[e] liquidity provision ex ante" will "solve the problem of inadequate liquidity provision in times of cris[i]s" (Reply 35 (citations omitted)), but this relies on the same faulty premise discussed above with respect to IPOs.

The inconsistency plaintiffs claim to identify depends on the unsupported assumption that any decrease in liquidity from funds altering their trading in response to net capital requirements would outweigh both the offsetting increases in liquidity from the other sources the Commission discussed and the benefits from liquidity stabilization during extreme market volatility. As discussed above, the Commission concluded that "many" firms would not be affected at all and that the "small percentage" of hedge funds covered by the rule could comply with applicable net-capital requirements by, if needed, "renegotiat[ing] contracts with investors." P.App.104 & n.570. Plaintiffs point to nothing in the record that calls into question these conclusions.

3. *Regulatory protections*. The Commission acknowledged that "[s]everal commenters stated that registering as dealers would cause funds to lose the benefit of various customer protection regulations that govern their relations with their broker-dealers." P.App.109. Plaintiffs fault the Commission's motion for focusing on the main customer protection regulation raised by commenters, Rule 15c3-3 (the customer protection rule), but the Commission did not "ignore" the other customer protections commenters raised. Reply 37-38. For example, the Commission addressed comments about FINRA Rule 5310 and best execution obligations. P.App.109; *see* P.App.73 & n.235. But as to these (and other customer protection) costs, the Commission "d[id] not expect that their combined impact will be significant because of the limited number of funds likely to be affected by the final rules." P.App.109.

4. *SIPC*. The Commission acknowledged that "[s]ome commenters questioned whether dealers registered under" the rule "that do not have customers would benefit from [Securities

Investor Protection Corporation] membership." P.App.96. But the Commission observed that "Congress mandated that a broad range of dealers, including those without customers, are required to become members of SIPC," and "there are many firms that are current broker-dealers and have no customers that are members of SIPC." P.App.96 (citing 15 U.S.C. § 78ccc(a)(2)). The Commission thus reasonably concluded that "expanding SIPC membership will enhance the ability of SIPC to carry out its investor protection mission ... which will have positive effects on the securities markets overall." P.App.96. Plaintiffs call these positive effects "unsubstantiated" (Reply 39), but the Commission rationally explained why it is plaintiffs' position, which would carve out hedge funds from those dealers required to become members of SIPC, that would be contrary to the statutory scheme. P.App.96. The SIPC scheme is an important part of the regulatory framework for registered dealers, and "even small differences across significant liquidity providers in regulatory costs could be enough to give important advantages to the firms bearing the smallest regulatory burdens." P.App.94.

**C.      The Commission acted reasonably in adopting the two qualitative factors.**

Plaintiffs' complaints about the supposed "overbreadth" of the two qualitative factors in the rule as adopted (Reply 40) misapprehend those factors. *See* Opp. 36-39.

1. Starting with the rule's "expressing trading interest" factor, plaintiffs are wrong that the Commission "nowhere address[ed] the ordinary trading strategies described in" certain comment letters. Reply 40. The Commission explained that "long-only investors" that do not "regularly communicate trading interests on both sides of the market or earn revenue primarily from capturing bid-ask spreads" do not "meet the [rule's] definition of dealing." P.App.87. Plaintiffs also assert (Reply 41) that "ordinary trading strategies of hedge funds and many others involve trading the same security more frequently than such a 'one-off' basis" and thus "arguably provide[] liquidity." But again, the plain text of the "expressing trading interest"

18

factor makes clear that merely "provid[ing] liquidity" does not suffice.  An entity must do so by "[r]egularly expressing trading interest that is at or near the best available prices on both sides of the market for the same security," among other requirements.  P.App.125.

Further, the Commission reasonably rejected a "simultaneity requirement" (Reply 43) for this factor.  As the Commission explained, market participants "can be acting as dealers by regularly providing liquidity even where the expressions of trading interest on both sides of the market for the same security are not simultaneous, particularly because the markets for different securities have varying structures, trading volume, and liquidity."  P.App.67.  Nor does "caselaw impos[e] a simultaneity requirement."  Reply 43 (citing *Camber Energy*, 602 F. Supp. 3d at 988).  The treatise *Camber Energy* quoted indicates that "not buying and selling the same security simultaneously" is a "factor[]" that "ha[s] been relevant to determining that a person is acting as a trader rather than a dealer," but it stressed that the trader-dealer distinction "depends substantially upon all of the relevant facts and circumstances of a given situation."  Broker-Dealer Regulation § 2:3.2 (July 2024 supplement).

2.  Plaintiffs likewise err in asserting (Reply 41) that the "primary revenue" factor fails to distinguish between "earn[ing] revenue by capturing the bid-ask spread or from simply buying low and selling high."  The Commission noted commenters' concerns that "the term 'primarily' is potentially vague because a person might earn more revenue from appreciation in the value of its inventory of securities than from capturing bid-ask spreads or trading incentives."  P.App.69.  But the Commission found that "it is unlikely that a person who regularly earns more revenue from an appreciation in the value of its inventory of securities than from capturing bid-ask spreads or incentive payment for liquidity provision, would be considered to earn revenue 'primarily' from capturing bid-ask spreads or trading incentives."  P.App.70.  The Commission's

19

observation that the agency's "calculation of intraday spreads" based on a database of government securities transactions "does not distinguish between trades that capture the bid-ask spread and trades that profit from intraday movements" (P.App.88) does not mean (Reply 41-42) that individual market participants cannot determine, based on their own data, whether they earn more revenue from capturing bid-ask spreads or from value appreciation (P.App.69-70).

3.  The Commission also adequately responded to comments about "multi-strategy funds," which plaintiffs describe (Reply 43-44) as funds that engage in different trading strategies within the same legal entity.  Plaintiffs cite a comment letter observing that "if one manager were pursuing a long-only strategy and another were pursuing a short-only strategy, the combined trading activity of the two managers might coincidentally but inadvertently trigger *Qualitative Test 1* for roughly comparable purchases and sales of the same or substantially similar securities."  P.App.239-240 (emphasis added).  But in response to comments like this, the Commission eliminated from the final rule both that qualitative test and an aggregation provision.  P.App.62, 78-79.

4.  The Commission acted reasonably in identifying a particular set of trading strategies that qualify as dealing activity rather than attempting to delineate all activities that could qualify a person as a dealer.  Reply 44-45.  The agency properly acted "incremental[ly]" (*Fox*, 556 U.S. at 522) by addressing "one way in which a person can be engaged in the regular business of buying and selling securities for its own account" (P.App.61) while making clear that "[a] person engaging in other activities that satisfy the definition of dealer under otherwise applicable interpretations and precedent, such as underwriting, will still be a dealer even though those activities are not addressed by the [rule's] two qualitative factors."  P.App.61; *see* P.App.125 ("no-presumption" provision).

Contrary to plaintiffs' assertion (Reply 44) that "commenters repeatedly objected" to the "'no presumption' clause" as proposed, the comment letters plaintiffs cite (Reply 44; Mot. 37-38) made no mention of the rule's no-presumption clause.  And none advocated for the Commission to change the rule to "adopt[] an exclusive definition that defined what a 'dealer' actually *was*," as plaintiffs wrongly suggest (Reply 45).  Nor was the Commission obligated to address a supposed "conflict between the [r]ule and the agency's ongoing enforcement actions" (Reply 45), because no such conflict exists.  In both the rule and its enforcement actions, the Commission has correctly interpreted the Exchange Act's dealer definition as extending to those engaged in buying and selling securities for their own account as a part of a regular business.

### D.   The Commission adequately considered the rule's effect on efficiency, competition, and capital formation.

Plaintiffs' challenges to the Commission's consideration of the rule's effects on efficiency, competition, and capital formation lack merit.  The Commission found that the rule would "promote competition among entities that regularly provide significant liquidity by applying consistent regulation to these entities, thus leveling the competitive playing field" between entities currently registered as dealers and those that are not.  P.App.112.  The Commission acknowledged that the rule "could have a small negative effect on market efficiency," but it found that the rule "could also promote market efficiency" by making significant liquidity providers "less sensitive to market disruptions that could otherwise reduce their capacity to provide liquidity."  P.App.112.  The Commission likewise acknowledged that the rule could "harm capital formation" if affected entities respond by reducing their market participation, but it found that the rule could also "promote capital formation" by "promot[ing] market stability, resiliency, and investor confidence."  P.App.113.

1.  Pivoting from their flawed argument that the rule will "impair liquidity and capital

21

formation" (Mot. 38), plaintiffs now contend (Reply 46) that the Commission improperly failed to "settle on" a "projection" of the rule's effects on efficiency and capital formation. "Per the text, the agency is only told to 'consider'" a rule's effects on efficiency, competition, and capital formation. *Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 773 (5th Cir. 2023) (quoting 15 U.S.C. § 78c(f)). Nothing in the statutory text requires the Commission to conclusively determine a rule's effects on those enumerated factors, and the relevant statutes do not "require the Commission 'to measure the immeasurable'" or to conduct a "quantitative" economic analysis absent "explicit[]" language not present here. *Lindeen v. SEC*, 825 F.3d 646, 658 (D.C. Cir. 2016).

Consistent with these principles, the Commission reasonably explained that it could not definitively predict how any particular entity would respond to the rule. After all, each entity's decision would involve consideration of "the scope of their current activities" and "how profitable those activities may be"—information that the Commission could "not know" with respect to individual market participants. P.App.108. This case is thus unlike *Business Roundtable v. SEC*, 647 F.3d 1144, 1150 (D.C. Cir. 2011), where the agency "did nothing to estimate and quantify the costs it expected companies to incur" despite "empirical evidence" about such costs being "readily available." It is also unlike *Chamber of Commerce of U.S. v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005), where the agency "readily could have estimated the cost to an individual fund" but failed to do so. Plaintiffs' recycled attacks (Reply 42) on the Commission's estimated number of hedge funds affected lack evidentiary or record support.

Nor did the Commission "effectively concede[] that the [r]ule violates Section 23(a)(2) of the Exchange Act" (Reply 47), which precludes the Commission from adopting a rule that would "impose a burden on competition not necessary or appropriate in furtherance of the purposes of"

the Act (15 U.S.C. § 78w(a)(2)).  The Commission found that the rule would "*promote*

*competition among entities that regularly provide significant liquidity by applying consistent*

*regulation to these entities, thus leveling the competitive playing field*" between entities currently

registered as dealers and those that are not.  P.App.112.  The Commission's recognition that the

rule's "costs may be proportionally greater for smaller affected parties" (P.App. 112) does not

mean (Reply 47) that the rule will "impose a burden on competition not necessary or appropriate

in furtherance of" the Exchange Act's purposes (15 U.S.C. § 78w(a)(2)).  Plaintiffs ignore the

rule's exclusion for market participants with less than $50 million in total assets.  P.App.71-72.

Regardless, because smaller firms are "less significant liquidity providers on account of their

smaller volumes," the Commission reasonably explained, any reduction in trading by those firms

"would have a negligible effect on the competitiveness of liquidity provision in U.S. securities

markets."  P.App.112.  Nothing in the APA or the Exchange Act required the Commission to

quantitatively "compare" these various potential outcomes.  Reply 48.

       2.  The Commission's consideration of pending and recently adopted rules satisfied

applicable requirements.  Plaintiffs provide no support for their bare assertion that the

Commission must treat proposed rules as analogous to "potential alternatives" (Reply 47).  The

Commission's conclusion that the recently adopted Treasury Clearing Rule did not render the

rule here unnecessary was also reasonable and reasonably explained.  Unlike the Treasury

Clearing Rule, the rule would promote "consistent application of dealer regulations across

significant liquidity providers" and "operational and financial requirements designed to mitigate

risk."  P.App.93.

       **E.     The rule is consistent with prior Commission positions.**

       Plaintiffs still fail to identify any "inconsistency" (Reply 48-49) between the rule and

prior Commission positions.  Plaintiffs erroneously rely on a 1994 statement from the

Commission's then-Chairman noting that "[h]edge funds … claim an exclusion from registration as securities dealers … based on the 'trader' exception to the definition of 'dealer.'" P.Reply.App.90 n.6.  That statement described a trader "[i]n general" as "an entity that trades solely for its own investment account"—in contrast with a "dealer," which "buys and sells securities as part of a regular business," among other things.  P.Reply.App.90 n.6.  Nothing in that description is inconsistent with the premise of the rule's treatment of hedge funds:  that a hedge fund can qualify as a dealer if it provides liquidity by buying and selling securities as part of a regular business, such as by engaging in the rule's specific trading patterns, rather than trading securities for investment purposes (as do most hedge funds).  *See* P.App.86-87.

Nor is there any inconsistency between the rule and disparate references to unregistered hedge funds "providing liquidity," such as in a statement from another former Commissioner. *Contra* Reply 48-49 (citing, *e.g.*, *Remarks Before the ABA Section on Business Law*, 2004 WL 724425, at *4 (Mar. 2, 2004)).  As explained, the rule does not cover every entity that "contribute[s] to a market's liquidity" in some sense.  P.App.9.  By its plain terms, the rule extends only to entities that are "[e]ngage[d] in a regular pattern of buying and selling securities" with the effect of providing significant liquidity by engaging in one of two specific trading patterns.  P.App.125.  And in any event, those statements predate the rise of proprietary trading firms in the business of providing significant liquidity through algorithmic, high-frequency trading strategies.  *See Concept Release on Equity Market Structure*, 75 Fed. Reg. at 3594-95.

## III.   Plaintiffs' requested relief is overbroad.

For the reasons above and in the Commission's motion, plaintiffs' challenges to the rule fail.  But should the Court conclude otherwise, it should not "vacate" the rule "in its entirety." *Contra* Reply 49-50.  Even assuming that vacatur is an available remedy, if this Court concludes that the Commission did not adequately consider an issue or explain its decision, remand without

vacatur would be warranted.  *See* Opp. 49-50.

Further, if this Court agrees with plaintiffs that the rule's application to private funds exceeds the Commission's statutory authority (Mot. 16-17; Reply 23-26) or that the Commission failed to engage in reasoned decisionmaking as to private funds (Mot. 18-41; Reply 28-49), the proper remedy would be to set aside the rule only as applied to private funds and to sever the rule's remaining applications.  Plaintiffs make little attempt to demonstrate that the rule is unwarranted or arbitrary as applied to entities such as proprietary trading firms that are not structured as private funds, merely citing an amicus brief that they characterize as "explaining the [rule's] unlawful effects on proprietary trading firms."  Reply 49 (citing Amicus Brief of Futures Industry Association).  But the Futures Industry Association's assertions fail for the same reasons as plaintiffs' similar arguments, and, in any event, "an amicus curiae generally cannot expand the scope of an appeal to implicate issues that have not been presented by the parties to the appeal."  *Resident Council of Allen Parkway Vill. v. U.S. Dep't of Hous. & Urb. Dev.*, 980 F.2d 1043, 1049 (5th Cir. 1993).

The Fifth Circuit's decision in *NAPFM* (Reply 49-50) does not foreclose severance.  The rules challenged in *NAPFM* applied *only* to private fund advisers, and the court concluded that no provision of the rules was authorized by the cited statutory authorities.  *NAPFM*, 103 F.4th at 1110 & n.10.  Here, by contrast, the rule has many applications beyond hedge funds, and plaintiffs fail to show that those applications exceed the Commission's statutory authority or violate the APA.  *Supra* pp. 2-8, 10-15, 18-23.

## CONCLUSION

The Court should deny plaintiffs' motion for summary judgment, grant the Commission's cross-motion for summary judgment, and enter judgment for the Commission.

25

Dated:  August 22, 2024

Respectfully submitted,

/s/ Samuel B. Goldstein

KEEFE M. BERNSTEIN (TBN 24006839)
SECURITIES AND EXCHANGE COMMISSION
Fort Worth Regional Office
801 Cherry Street, Suite 1900
Fort Worth, TX 76102
(817) 900-2607
bernsteink@sec.gov

DOMINICK V. FREDA (*pro hac vice*)
Assistant General Counsel
EMILY TRUE PARISE (*pro hac vice*)
Senior Appellate Counsel
SAMUEL B. GOLDSTEIN (*pro hac vice*)
Counsel to the General Counsel
SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, DC 20549
(202) 551-7692 (Goldstein)
goldsteinsa@sec.gov

**CERTIFICATE OF SERVICE**

I certify that on August 22, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, Fort Worth Division, using the electronic case filing system of the court.

/s/ Samuel B. Goldstein