UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| NATIONAL ASSOCIATION OF PRIVATE FUND MANAGERS; ALTERNATIVE INVESTMENT MANAGEMENT ASSOCIATION, LIMITED; and MANAGED FUNDS ASSOCIATION, | § § § § § § § | |
| *Plaintiffs*, | § § | Case No. 4:24-cv-00250-O |
| v. | § § | |
| SECURITIES AND EXCHANGE COMMISSION, | § § § § | |
| *Defendant*. | § § | |

**MEMORANDUM OPINION & ORDER**

"A regulator's temptation may be to put every corner of the market under a regulatory spotlight."[1] When engaging in that temptation causes an agency to act beyond its authority, the judiciary is obligated to thwart that action.

Pending before the Court are Plaintiffs' Motion for Summary Judgment (ECF No. 28), Brief in Support (ECF No. 29), and Appendix in Support (ECF No. 30), filed on April 30, 2024; Defendant's Cross-Motion for Summary Judgment (ECF No. 38), Brief in Support (ECF No. 39), and Appendix in Support (ECF No. 40), filed on June 11, 2024; Plaintiffs' Reply (ECF No. 41) and Appendix in Support (ECF No. 42), filed on July 18, 2024; and Defendant's Reply (ECF No. 43), filed on August 22, 2024. Additionally, the Court was presented amicus briefs by Futures Industry Association (ECF No. 34) and Capital Markets Regulation (ECF No. 36).

---

[1] Pls.' App. in Supp. Mot. Summ. J. 564 (Peirce, dissenting statement), ECF No. 30.

The Court heard oral argument on the above-referenced motions on November 14, 2024.[2] Having considered the above-referenced filings and applicable law, the Court concludes that Defendant engaged in unlawful agency action taken in excess of its authority. The Court, therefore, **GRANTS** Plaintiffs' Motion for Summary Judgment (ECF No. 28) and **DENIES** Defendant's Cross-Motion for Summary Judgment (ECF No. 38).

## I.    BACKGROUND[3]

The United States Congress passed the Securities Exchange Act of 1934 (the "Exchange Act" or "Act"). Since its inception, the Act required "dealers" to register with the Securities and Exchange Commission (the "SEC" or "Commission"), become a member of a self-regulatory organization, report certain securities transactions, and comply with financial-responsibility requirements. The Exchange Act defined dealers as those "in the business of buying and selling securities . . . for [their] own account[s]." 15 U.S.C. § 78c(a)(5)(A). This system of dealer registration and regulation promotes market stability, protects investors, and helps regulators evaluate and address market risks. This case concerns the SEC's attempt to dramatically expand the definition of dealer, with a novel interpretation of a 90-year-old statute that sweeps in securities-market participants.

### A.    The Dealer Rule

By a 3-2 vote, over two strong dissents, the SEC adopted a final rule (the "Dealer Rule" or "Rule"). *See Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer in Connection With Certain Liquidity Providers*, 89 Fed. Reg. 14938 (Feb. 29, 2024) (to be codified at 17 C.F.R. pt. 240). As now defined, many of the world's

---

[2] Min. Entry, Nov. 14, 2024, ECF No. 45.
[3] Unless otherwise indicated, all facts are taken from the parties' summary judgment briefing. There is no indication in the summary judgment record—or at any stage in this litigation—that the parties disagree as to the relevant facts.

largest, most prominent market participants, including the Federal Reserve, may have been operating unlawfully as unregistered securities "dealers" for 90 years without anyone—including the Commission—having previously noticed. Operating as an unregistered dealer under the Exchange Act is a felony. 15 U.S.C. §§ 78o(a)(1), 78ff.

According to the Rule, a "dealer" includes—and, has always included—any person whose trading activity "regular[ly]" has the effect of "providing liquidity" to the marketplace.[4] The Rule adopts two "qualitative" tests for determining if a person meets the new definition.[5] A person is a dealer under the first test if he "[r]egularly express[es] trading interest that is at or near the best available prices on both sides of the market for the same security, and that is communicated and represented in a way that makes it accessible to other market participants."[6] The second test examines whether someone is "[e]arning revenue primarily from capturing bid-ask spreads, by buying at the bid and selling at the offer, or from capturing any incentives offered by trading venues to liquidity-supplying trading interest."[7]

Notably, these tests appear nowhere in the statutory text. Moreover, and most concerningly, the tests are "non-exclusive," meaning that even if a firm does not qualify as a "dealer" under the qualitative tests, the firm can "still be a dealer" because "[a] person engaging in other activities that satisfy the definition of dealer under otherwise applicable interpretations and precedent, such as underwriting, will still be a dealer even though those activities are not addressed by the two qualitative factors."[8] As justification for the Rule, the SEC asserts that "advancements in electronic

---

[4] *Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer in Connection With Certain Liquidity Providers*, 89 Fed. Reg. 14938, 14945 (February 28, 2024) (to be codified at 17 C.F.R. pt. 240) [hereinafter "Final Rule"]; Pls.' App. in Supp. Mot. Summ. J. 61, ECF No. 30.
[5] Final Rule at 14946; Pls.' App. in Supp. Mot. Summ. J. 62, ECF No. 30.
[6] Final Rule at 14944; Pls.' App. in Supp. Mot. Summ. J. 60, ECF No. 30.
[7] Final Rule at 14944; Pls.' App. in Supp. Mot. Summ. J. 60, ECF No. 30.
[8] Final Rule at 14945; Pls.' App. in Supp. Mot. Summ. J. 61, ECF No. 30.

trading created a gap in the regulatory regime" because algorithmic traders "have been performing the same market functions as traditional dealers" without registering with the SEC.[9] The Commission promulgated this Rule to address this apparent gap.[10]

### B.    Parties

Plaintiffs are non-profit-membership organizations whose members include hedge-fund managers adversely affected by the Rule. Plaintiff National Association of Private Fund Managers ("NAPFM") is a Texas non-profit corporation headquartered in Fort Worth, Texas, which provides education to its members and represents their legal and economic interests before the government and judiciary.[11] As part of this mission, NAPFM has submitted comments on behalf of its members in rulemakings—including in the administrative proceedings below. NAPFM's members managed over $600 billion in assets as of July 2023.[12]

Plaintiff Managed Fund Association ("MFA") represents the global alternative asset management industry, and its mission is to advance the ability of its members to raise capital, invest, and generate returns for their beneficiaries. MFA's members manage over $3.2 trillion in assets across a diverse range of investment strategies.[13]

Plaintiffs sue the SEC, an agency of the Government of the United States subject to the Administrative Procedures Act. *See* 5 U.S.C. § 551(1). Plaintiffs raise numerous claims in their Complaint, including that the SEC's promulgation of the Rule was without statutory authority under 5 U.S.C. § 706(2)(C),[14] that the Rule is arbitrary and capricious under 5 U.S.C.

---

[9] Def.'s Mem. in Supp. Cross Mot. Summ J. & Resp. in Opp'n to Pls.' Mot. for Summ. J. 1, ECF No. 39.
[10] Final Rule at 14938; Pls.' App. in Supp. Mot. Summ. J. 54, ECF No. 30.
[11] Pls.' Compl. 5, ECF No. 1.
[12] *Id.*
[13] *Id.*
[14] *Id.* at ¶¶ 62–64.

§ 706(2)(A),[15] and contrary to law under 5 U.S.C. § 706(2)(A).[16] Now before the Court are the parties' cross-motions for summary judgment, which are ripe for review.

## II.   LEGAL STANDARDS

### A.   Summary Judgment

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[A] material fact is genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotation marks omitted). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id*.

A party seeking summary judgment must inform the court of the basis for its motion and identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing summary judgment must then set forth specific facts showing that there is a genuine issue for trial. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968). Here, the questions before the Court are of a purely legal nature and contain no fact disputes.

### B.   The APA

The Administrative Procedure Act ("APA") "authorizes suit by '[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the

---

[15] *Id.* at ¶¶ 65–67.
[16] *Id.* at ¶¶ 68–70.

5

meaning of a relevant statute.'" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61 (2004) (alteration in original) (quoting 5 U.S.C. § 702). Upon review of agency action, the APA requires the district court to "hold unlawful and set aside agency action" that the court finds is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [and] (D) without observance of procedure required by law." 5 U.S.C. § 706(2)(A)–(D).

Disputes arising under the APA are commonly resolved on summary judgment, where district courts sit as an appellate tribunal to decide legal questions on the basis of the administrative record. *Amin v. Mayorkas*, 24 F.4th 383, 391 (5th Cir. 2022). In APA cases challenging agency action, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the action is supported by the administrative record and otherwise consistent with the APA standard of review." *Gadhave v. Thompson*, 2023 WL 6931334, at *1 (N.D. Tex. Oct. 19, 2023) (citations omitted). The agency "resolve[s] factual issues to arrive at a decision . . . supported by the administrative record," and the district court applies the APA standards of review to determine whether, as a matter of law, "the evidence in the administrative record permitted the agency to make the decision it did." *Yogi Metals Grp. Inc. v. Garland*, 567 F. Supp. 3d 793, 797–98 (S.D. Tex. 2021), *aff'd*, 38 F.4th 455 (5th Cir. 2022) (quotation marks and citation omitted).

## III.    ANALYSIS

Plaintiffs contend that the SEC's novel Rule is an unlawful expansion of the agency's authority and is arbitrary, capricious, and contrary to law.[17] Because there is no genuine dispute regarding any material facts and statutory interpretation is a question of law, the Court concludes

---

[17] Pls.' Br. in Supp. Mot. Summ. J. 4, ECF No. 29.

6

that the SEC exceeded its statutory authority by expanding definition of dealer, untethered from the text, history, and structure of the Act. As a result, the Court does not address Plaintiffs' claims that the SEC's rulemaking was arbitrary and capricious.

### A.     Excess of Statutory Authority

The Exchange Act grants the Commission "power by rules and regulations to define technical, trade, accounting, and other terms . . . consistently with the provisions and purposes of this chapter" as to "matters within [the Commission's] respective jurisdiction[]." 15 U.S.C. § 78c(b). Plaintiffs do not dispute[18] that the phrase "as a part of a regular business" is a "technical, trade, . . . [or] other term[]" used in the Act's definition of "dealer." *Id.* § 78c(a)(5)(B). The SEC's new definition in the Dealer Rule, however, is not "consistent[] with the provisions and purposes of" the Exchange Act. *Id.* § 78c(b).

#### 1.     The Text of the Exchange Act

The Exchange Act's "dealer" definition is central to this case. Section 3(a)(5) of the Exchange Act defines a "dealer" as "any person engaged in the business of buying and selling securities . . . *for such person's own account* through a broker or otherwise." 15 U.S.C. § 78c(a)(5)(A) (emphasis added). The definition contains a carve-out, commonly known as the "trader exception," for persons who buy and sell securities for their own accounts "but not as a part of a regular business." *Id.* § 78c(a)(5)(B). Importantly, the Exchange Act also defines "broker," a related statutory term, as "any person engaged in the business of effecting transactions in securities *for the account of others*." *Id.* § 78c(a)(4)(A) (emphasis added).

Statutory interpretation starts with the text. "[S]tatutory terms are generally interpreted in accordance with their ordinary meaning." *Sebelius v. Cloer*, 569 U.S. 369, 376, (2013) (citation

---

[18] Pls.' Reply Br. in Supp. Mot. Summ. J. 18, ECF No. 41.

omitted). The traditional approach for courts is to "interpret the words consistent with their ordinary meaning . . . at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (alteration in original) (internal quotation marks and citation omitted). This approach is only altered if "the context in which the word[s] appear[]" suggests some other meaning. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 569 (2012). Moreover, the statutory language "cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (citation omitted).

Here, the two terms—broker and dealer—must be read together to understand the Exchange Act as a whole. To this effect, the Commission does not distinguish between brokers and dealers for registration; firms can only register as "a broker-dealer," not as a broker or dealer *independently*. *See* 17 C.F.R. § 249.501(a). Thus, under the statutory scheme enacted in 1934 to regulate the finance industry, Congress differentiated brokers and dealers based on *how* one engaged in the transactions of securities, be that for the account of others—a broker—or for one's own account—a dealer. And by the above-mentioned registration as a "broker-dealer," the Commission recognizes this parallel.

Defendant, however, does not read these two terms as connected. Instead, Defendant argues "'[w]hen Congress includes particular language in one section of a statute but omits it from a neighbor,' courts 'normally understand that difference in language to convey a difference in meaning.'"[19] This argument does not persuade the Court, namely because the Commission's reading of the text does not explain why the Commission treats "broker-dealers" as two sides of the same coin. If brokers act on behalf of customers but dealers only "act[] at his or her own risk,"

---

[19] Def.'s Mem. in Supp. Cross Mot. Summ J. & Resp. in Opp'n to Pls.' Mot. for Summ. J 24, ECF No. 39 (quoting *Bittner v. United States*, 598 U.S. 85, 94 (2023)).

why has the Commission treated the two similarly for 90 years?[20] Additionally, the "interlocking requirements" of a broker-dealer "ensure that 'securities are [only] sold by a salesman who understands and appreciates both the nature of the securities he sells and his responsibilities to the investor to whom he sells.'" *Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994) (alteration in original) (quoting *Persons Deemed Not to Be Brokers,* Exchange Act Release No. 20,943 (May 9, 1984), 49 Fed. Reg. 20,512, 20,515 (SEC May 15, 1984)). Moreover, Defendant's reading creates structural problems with the Act, as discussed below.

Additionally, Defendant's argument regarding the trader exception does not support its reading of the statute. "Once [a] liquidity provision—not in the form of a service provided to market participants but as an effect of one's trading activity—turns a person into a dealer, the dealer-trader distinction becomes unintelligible."[21] Congress defined the term "dealer" against a pre-existing historical backdrop. As discussed below, this history is indicative of an understanding that dealers have customers. The Act's text only bolsters this interpretation.

The Exchange Act's text does not regulate trading entities without customers as dealers. Historically, this is what was understood by Congress's omission from dealer regulation parties who buy and sell securities for their own accounts "but not as a part of a regular business." 15 U.S.C. § 78c(a)(5)(B). The statutory phrase "the business of buying and selling securities" reinforces the customer-order-facilitation context of the Act. *Id.* § 78c(a)(5)(A). The definite article "the" ("the business") demonstrates Congress had a specific business in mind "when it enacted the statute." *Skilling v. United States*, 561 U.S. 358, 404 (2010) (citation omitted). "*The business* of buying and selling securities" when Congress passed the statute was to effect "an order . . . for a

---

[20] *Id.* at 18.
[21] Pls.' App. in Supp. Mot. Summ. J. 563 (Peirce, dissenting statement), ECF No. 30.

9

customer."[22] 15 U.S.C. § 78c(a)(5)(A) (emphasis added). Congress did not address all businesses of buying and selling securities.[23]

As Commissioner Peirce put it, "[t]his rule turns traders, many of whom are customers, into dealers. Doing so runs counter to the statute, as the Commission and market participants have read it for decades."[24] The Court agrees with Commissioner Peirce.

### 2. The History of the Term Dealer

Along with the text of the Exchange Act, the historical backdrop that Congress relied upon when crafting the statutory scheme is also critical to this case. Plaintiffs argue the "history of the Exchange Act make[s] unmistakably clear that a 'dealer' (like a 'broker') is in the business of 'effect[ing] securities transactions for customers.'"[25] Defendant argues that Plaintiffs' historical argument does not "withstand scrutiny" and has been rejected by other courts.[26] The Court agrees with Plaintiffs.

Dealers, like other terms used in statutory text, did not exist in the abstract. Instead, the term was an "obvious[] transplant[]" from the preexisting financial-legal landscape and the common law. *Stokeling v. United States*, 586 U.S. 73, 80 (2019); *see Johnson v. Winslow*, 279 N.Y.S. 147, 156 (N.Y. Cnty. Sup. Ct. 1935) (The "rights and duties" of "brokers" and "dealers" have "been before the courts for adjudication repeatedly."), *aff'd,* 246 A.D. 800 (N.Y. App. Div. 1936). This rich common law history is also exemplified in pre-Exchange Act treatises. *See, e.g.*,

---

[22] TWENTIETH CENTURY FUND, THE SECURITY MARKETS 266 (1935); Pls.' App. in Supp. Mot Summ. J. 603, ECF No. 30.
[23] *See* Order 5–10, Nov. 21, 2024, ECF No. 49, Crypto Freedom All. of Tex. et al. v. SEC, No. 4:24-cv-00361 (N.D. Tex).
[24] Pls.' App. in Supp. Mot. Summ. J. 562 (Peirce, dissenting statement), ECF No. 30.
[25] Pls.' Br. in Supp. Mot. Summ. J. 10, ECF No. 29 (quoting *XY Planning Network, LLC v. SEC*, 963 F.3d 244, 248 (2d Cir. 2020)).
[26] Def.'s Mem. in Supp. Cross Mot. Summ J. & Resp. in Opp'n to Pls.' Mot. for Summ. J. 15, ECF No. 39.

CHARLES F. HODGES, WALL STREET 361 (1930)[27] ("A dealer sells to and buys from a client."); CHARLES H. MEYER, THE LAW OF STOCKBROKERS AND STOCK EXCHANGES 32–33 (1933 cum. supp.)[28] ("[A] security dealer . . . sells to his customers . . . or buys from his customers.").

This term predating the Exchange Act "brings the old soil with it." *George v. McDonough*, 596 U.S. 740, 746 (2022) (citation omitted). Thus, when Congress enacted the Exchange Act in 1934, the word "dealer" had accumulated a settled meaning—in the words of the Supreme Court—"limited to one who . . . buys and sells securities to customers." *Schafer v. Helvering*, 299 U.S. 171, 174 (1936) (citation omitted.)

Defendant pushes back on this well-settled definition by arguing that the dealer definition was always understood to cover people without customers.[29] Defendant argues that the Exchange Act's reference to "for one's own account" denotes "no more than that a dealer acts at his or her own risk."[30] 15 U.S.C. § 78c(a)(5)(A). The Court disagrees. The SEC did not point to one pre-enactment historical source of the Exchange Act articulating that dealers have customers. One treatise from shortly after the passage of the Act *speculated* that the Commission could interpret dealer to include entities without customers.[31] The Commission rejected this interpretation. Instead, until recently, the SEC took the position that what distinguished a trader and a dealer was not volume or frequency but client-facing action like "attempt[s] to attract a clientele,"[32]

---

[27] Pls.' App. in Supp. Mot. Summ. J. 605, ECF No. 30.
[28] *Id.* at 608–09.
[29] Def.'s Mem. in Supp. Cross Mot. Summ. J. & Resp. in Opp'n to Pls.' Mot. for Summ. J. 18, ECF No. 39.
[30] *Id.*
[31] CHARLES H. MEYER, SECURITIES EXCHANGE ACT OF 1934 ANALYZED AND EXPLAINED 33–34 (1934) ("*A question arises* whether a trader who has no customers but merely trades for his own account through a broker is a 'dealer' under the Act. *A fair interpretation* of the Act *would seem to indicate* that if the operations of a trader are sufficiently extensive to be regarded as a regular business[,] he would be considered a 'dealer.'" (emphasis added)); Def.'s App. in Supp. Mot. Summ. J. & Resp. in Opp'n to Pls.' Mot. for Summ. J. 39–40, ECF No. 40.
[32] Brief of the SEC, Appellee, 33 n.37, *SEC v. Ridenour*, 913 F.2d 515 (8th Cir. 1990) (No. 89-2534).

"solicit[ing] investors and handl[ing] [client] money and securities,"[33] and "assist[ing] . . . clients to buy and sell securities,"[34] to name a few activities from the Commission's previous cases.

In the Dealer Rule, the Commission deemed it necessary to provide an exception to the Federal Reserve because of the expansiveness of the new definition.[35] The Rule's expansive view of SEC authority is concerning given the time it took the agency to recognize that the Federal Reserve may be operating as an unregistered dealer, which constitutes a felony. The late recognition of a latent authority is good evidence to question the Commission's statutory interpretation. *See Chamber of Com. of U.S. v. U.S. Dep't of Lab.*, 885 F.3d 360, 380 (5th Cir. 2018), *judgment entered sub nom. Chamber of Com. of Am. v. United States Dep't of Lab.*, No. 17-10238, 2018 WL 3301737 (5th Cir. June 21, 2018) ("[T]hat it took [Department of Labor] forty years to 'discover' its novel interpretation further highlights the Rule's unreasonableness."); *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism."). Here, not only was this authority discovered nearly a century after the Exchange Act was passed, but if the Commission had not provided an exception, at its discretion, this Rule would apply to the Federal Reserve. Congress does not "hide elephants in mouseholes," especially when it takes nearly a century to discover. *Whitman v. Am. Trucking Ass'n, Inc.*, 531 U.S. 457, 468 (2001).

Thus, Congress did not upset the common law understanding that a dealer traditionally interacts with customers. The overwhelming historical evidence shows that the term dealer has

---

[33] *In re Sodorff*, 50 S.E.C. 1249, 1992 WL 224082, at *5 (Sept. 2, 1992).
[34] Answering Brief of SEC, Respondent, 7, *Roth v. SEC*, 22 F.3d 1108 (D.C. Cir. 1994) (No. 92-1557), 1993 WL 13650741.
[35] *See* Final Rule at 14959; Pls.' App. in Supp. Mot. Summ. J. 75, ECF No. 30 ("The exclusion is appropriate for the Federal Reserve System.").

always carried with it this connotation. Even previous interpretations of the Commission's rules and legal arguments support this understanding. The Commission's newfound attempt to change the definition, when the statutory language has not changed, is in excess of its statutory authority.

### 3. The Structure of the Exchange Act

Beyond the text and well-settled historical meaning of dealer, the SEC's new definition does not comport with the structure of the Exchange Act. As explained above, dealer and broker are sister-terms which must be read consistently. The Dealer Rule fundamentally upsets the balance between these terms.

The "interplay between" broker and dealer is an important structural clue confirming the customer-order-facilitation interpretation. *Van Buren v. United States*, 593 U.S. 374, 389 (2021). Both parties agree that the definition of "broker"—effecting transactions for the "account of others," 15 U.S.C. § 78c(a)(4)(A)—refers only to trading on behalf of "customers."[36] Reading the dealer definition to also refer to methods of effectuating customer orders, therefore, "makes sense of the statutory structure" by "treat[ing]" both definitions "consistently." *Van Buren*, 593 U.S. at 390. By contrast, reading the customer nexus out of the dealer definition would improperly "create[] 'inconsistencies.'" *Id.* (citation omitted). In doing so, the SEC fails to fit both definitions "into an harmonious whole." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100 (2012) (citation omitted).

This Court has previously held that a firm that trades for "its own best interests," and "not [to] provide advice or services to other investors," "cannot be considered a dealer." *Chapel Invs., Inc. v. Cherubim Ints., Inc.*, 177 F. Supp. 3d 981, 991 (N.D. Tex. 2016) (O'Connor, J.). Other courts have recognized/held the same. *See, e.g.*, *Radzinskaia v. NH Mountain, LP*, 2023 WL

---

[36] Final Rule at 14944; Pls.' App. in Supp. Mot. Summ. J. 60, ECF No. 30.

6376457, at *4 (S.D. Fla. Sept. 29, 2023) (following *Chapel Investments*'s holding that dealers "transact securities on behalf of clients"); *Discover Growth Fund, LLC v. Camber Energy, Inc.*, 602 F. Supp. 3d 982, 989 (S.D. Tex. 2022) (similar); *Discover Growth Fund, LLC v. Beyond Commerce, Inc.*, 561 F. Supp. 3d 1035, 1040 (D. Nev. 2021) (similar); *In re Immune Pharm. Inc.*, 635 B.R. 118, 124 (Bankr. D.N.J. 2021) (similar); *In re Scripsamerica, Inc.*, 634 B.R. 863, 872 (Bankr. D. Del. 2021) (similar). The structural argument reinforces the opinions of these courts.

Additionally, the broker-dealer regulatory scheme is premised on the protection of customer orders and accounts. The Exchange Act, for example, requires brokers and dealers to send "notice[s] to [their] customers," 15 U.S.C. § 78o(e); meet "financial responsibility requirements" to keep "custody . . . of customers' securities," *id.* § 78o(c)(3)(A); and join a fund to insure "each of [their] customers[']" accounts, *id.* § 78fff-4(c). The structure, therefore, of the Act only makes sense if dealers are in the business of customer-order facilitation.

### 4. Inconsistent with Provisions and Purposes of the Exchange Act as Applied to Private Funds

Finally, Plaintiff's argue the Rule was enacted beyond the Commission's statutory authority because of the inconsistent results of regulating private funds as dealers. Plaintiffs' claim that, as applied to private funds, the Dealer Rule "produces a substantive effect that is [not] compatible with the rest of the law." *Sackett v. EPA*, 598 U.S. 651, 676 (2023).

The Commission argues that two cases from the Eleventh Circuit justify ruling that dealers do not need customers.[37] *See SEC v. Almagarby*, 92 F.4th 1306 (11th Cir. 2024); *SEC v. Keener*, 102 F.4th 1328 (11th Cir. 2024). These two cases, however, do not settle the question. First, *Almagarby* explicitly limited its "holding" to the defendants' "specific conduct," which the court

---

[37] Def.'s Mem. in Supp. Cross Mot. Summ. J. & Resp. in Opp'n to Pls.' Mot. for Summ. J. 14–18, ECF No. 39.

characterized as "underwriting." 92 F.4th at 1316, 1318. Additionally, *Keener* applied *Almagarby* because of the similarities in the business models in the two cases. *Keener*, 102 F.4th at 1334 ("Keener's business model was materially similar to Almagarby's"). *Almagarby* expressly acknowledged that private funds are "not traditionally understood as dealers." 92 F.4th at 1318. Critically, the Eleventh Circuit in neither *Almagarby* nor *Keener* held that merely regularly buying and selling securities renders someone a dealer.

Plaintiffs argue that by subjecting private funds to the dealer requirements, the Rule creates absurd results that are inconsistent with the provision and purposes of the Act.[38] For instance, Plaintiffs provide a list of absurdities that result from this novel construction of the Exchange Act.[39] Defendant responds saying these arguments are "merely repackaging [P]laintiffs' . . . arguments that the Commission violated the APA's reasoned decisionmaking requirement" and do not show how the Commission "lacked the statutory authority to regulate hedge funds as dealers when they perform the same 'historical' dealer function of 'provid[ing] market liquidity.'"[40] The Court does not need to analyze Plaintiffs' concerns regarding private funds because, as explained above, *Almagarby* and *Keener* are not dispositive of this issue and the Commission has acted in excess of authority.

The Court holds that the Rule is in excess of the Commission's authority based on the text, history, and structure of the Exchange Act. Given the significant overlap with Plaintiffs' arbitrary and capricious argument and because the Court does not address said arguments, the Court does not rule on the Dealer Rule as applied to private funds in particular.

---

[38] Pls.' Br. in Supp. Mot. Summ. J. 16–18, ECF No. 29.
[39] *See id.* at 16–18.
[40] Def.'s Mem. in Supp. Cross Mot. Summ. J. 24, ECF No. 39 (alteration in original) (quoting *Almagarby*, 92 F.4th at 1315; *Keener*, 102 F.4th at 1334).

### B. Arbitrary and Capricious and Contrary to Law

The Commission has exceeded its statutory authority in adopting the Final Rule. Under Section 706 of the APA, when a court holds that an agency rule violates the APA, it "'shall'—not may—'hold unlawful and set aside' [the] agency action." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1022 (5th Cir. 2019) (citation omitted). Because the promulgation of the Final Rule was unauthorized, no part of it can stand, as detailed below. Accordingly, because the Court has ruled that the Commission acted outside of its statutory authority, the Court does not consider Plaintiffs' remaining arguments.

### IV.  REMEDIES

Having found in favor of Plaintiffs on the merits, the Court now considers the proper remedy. To alleviate the harms and injuries that Plaintiffs suffered as a result of Defendant's actions, Plaintiffs request that this Court "[v]acate and set aside the Rule in its entirety."[41] Defendant requests, in the event the Court rules in Plaintiffs' favor, the Court either "vacate the rule only as applied to private funds" or "remand without vacatur."[42]

Vacatur of the rule in its entirety is appropriate. "Under [S]ection 706 of the APA, when a court holds that an agency rule violates the APA, it shall—not may—hold unlawful and set aside [the] agency action." *Nat'l Ass'n of Priv. Fund Managers v. SEC*, 103 F.4th 1097, 1114 (5th Cir. 2024) (internal quotation marks and citation omitted). This includes when an agency "has exceeded its statutory authority in adopting the Final Rule." *Id.* Therefore, here, "[b]ecause the promulgation of the Final Rule was unauthorized, no part of it can stand." *Id.*

---

[41] Pls.' Compl. 23, ECF No. 1.
[42] Def.'s Mem. in Supp. Cross Mot. Summ. J. 49, ECF No. 39.

### A. Vacatur

Plaintiffs are entitled to a vacatur of Defendant's further definition of dealer. While in some cases, a court may remand a rule or decision to the agency to cure procedural defects, the Fifth Circuit considers vacatur the "default rule" for agency action otherwise found to be unlawful. *Data Mktg. P'ship*, 45 F.4th at 859–60 (describing vacatur as the default remedy under 5 U.S.C. § 706(2)); *accord Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–75, 375 & n.29 (5th Cir. 2022) ("Vacatur is the *only* statutorily prescribed remedy for a successful APA challenge to a regulation." (emphasis added)). The D.C. Circuit agrees. *See United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action. . . . In rare cases, however, we do not vacate the action but instead remand for the agency to correct its errors."). So does Justice Kavanaugh. *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2460–61 (Kavanaugh, J., concurring) (criticizing the "far-reaching argument that the APA does not allow vacatur . . . but instead permits a court only to enjoin . . . a rule against the plaintiff" alone because that position "would revolutionize long-settled administrative law" and "shut[] the door on entire classes of everyday administrative law cases").

In any event, the propriety of vacatur-without-remand "turns on two factors: (1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *United Steel*, 925 F.3d at 1287 (cleaned up). Applying these factors here, the Court cannot envision how the SEC could satisfactorily salvage its Dealer Rule such that it would no longer violate the APA.

#### 1. Seriousness of Deficiencies and Ability to Provide Justification on Remand

As for the first vacatur-versus-remand factor, if the case were remanded, Defendant would not be able to justify its decision to expand the definition of dealer beyond the scope of what Congress enacted. Broadly speaking, remand to the agency "is generally appropriate when there

17

is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021) (citing *Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000)). Under this factor, remand without vacatur is proper "only where the agency failed 'adequately to explain why it chose one approach rather than another for one aspect of an otherwise permissible rule.'" *Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, No. 6:23-cv-59-JDK, 2023 WL 4977746, at *13 (E.D. Tex. Aug. 3, 2023) (quoting *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009)).

Because the Court decides that the SEC promulgated the Rule in excess of its authority—rather than merely failing to justify its decision for "an otherwise permissible rule"—remand would not be appropriate. The SEC would not be able to substantiate its novel definition on remand because there is no possibility that it could correct the fundamental lack of authority. *See Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022) (concluding that vacatur was appropriate when there was "no possibility that [the agency] could obviate the[] conflicts on remand").

### 2. Disruptive Consequences

As to the second factor—disruptive consequences—vacatur will not cause a disruption. Instead, vacatur of the Rule will maintain the status quo because while the Rule's effective date was April 29, 2024, the Commission set a compliance deadline one year from the effective date.[43] Additionally, as characterized by one of the dissenting Commissioners, the Rule "obliterates" the regulatory scheme as "the Commission and market participants have read it for decades."[44]

Moreover, vacating this unlawful assertion of Defendant's authority would be minimally disruptive because vacatur simply "re-establish[es] the status quo" that existed prior to the agency

---

[43] *See* Final Rule at 14964; Pls.' App. in Supp. Mot. Summ. J. 80, ECF No. 30.
[44] Pls.' App. in Supp. Mot. Summ. J. 562, 563 (Peirce, dissenting statement), ECF No. 30.

action. *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022) ("[A] vacatur does nothing but re-establish the status quo absent the unlawful agency action.").

If the alternative remedy—remand to the agency—were the default, it would "create[] a risk that an agency may drag its feet and keep in place an unlawful agency rule." *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 132 (D.C. Cir. 2015) (Kavanaugh, J.). Remand would also "invite[] agency indifference." *In re Core Commc'ns, Inc.*, 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J., concurring) (urging courts "to consider the alternatives to the open-ended remand without vacatur"); *see also Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1264 (D.C. Cir. 2007) (Randolph, J., concurring) ("A remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such."). And "[b]ecause vacatur is the default remedy . . . defendants bear the burden to prove that vacatur is unnecessary." *Tex. Med. Ass'n*, 2023 WL 4977746, at *13 (alterations in original) (citation omitted). Defendant has not met its burden here. Thus, applying the default remedy, the Court **VACATES** the SEC's Dealer Rule.

### 3. Scope of Vacatur

Defendant argues that "the proper remedy under settled severability principles would be to vacate the [R]ule only as applied to private funds."[45] However, this position is contrary to the idea that "[v]acatur is inherently universal."[46] There may be circumstances that justify a court fashioning a more limited vacatur. *Cf. VanDerStok v. Garland*, 86 F. 4th 179, 196–97 (5th Cir. 2023) (remanding in part for consideration of narrowing the vacatur to only cover certain provisions of the final rule rather than the entire rule), *cert. granted*, 144 S. Ct. 1390 (2024). But

---

[45] Def.'s Mem. in Supp. Cross Mot. Summ. J. 49, ECF No. 39.
[46] John Harrison, *Vacatur of Rules Under the Administrative Procedure Act*, 40 YALE J. ON REGUL. 119, 120 (2023).

by its very nature, the statutory remedy of vacatur is designed to correspond with the universal agency rulemaking with "judicial review of matching scope."[47] Here, vacatur cannot be limited to only private funds when the agency action no longer exists. *See Data Mktg. P'ship*, 45 F.4th at 859 (explaining that vacatur "retroactively undoes or expunges a past [agency] action" (alteration in original) (citation omitted)); *see also Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (2024) (Jones, J.) (concluding "that the scope of preliminary relief or ultimate relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action").

Therefore, in keeping with standard practice, the Rule is **VACATED** in its entirety. Complete vacatur is warranted because the Rule not only exceeds the Commission's authority as applied to private funds; rather, the very promulgation of the Rule was in excess of statutory authority.[48]

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion for Summary Judgment (ECF No. 28) and **DENIES** Defendant's Cross-Motion for Summary Judgment (ECF No. 38). Specifically, the Court **VACATES** Defendant's unlawful Dealer Rule. A separate final judgment shall issue as to the appropriate parties and claims.

**SO ORDERED** this **21st day** of **November, 2024**.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

---

[47] *See* T. Elliot Gaiser, Marthura Sirdaran, & Nicholar Cordova, *The Truth of Erasure: Universal Remedies for Universal Agency Actions*, U. CHI. L. REV. ONLINE 1, 2, https://lawreview.uchicago.edu/online-archive/truth-erasure-universal-remedies-universal-agency-actions (2024).

[48] *See generally* Order, Nov. 21, 2024, ECF No. 49, Crypto Freedom All. of Tex. et al. v. SEC, No. 4:24-cv-00361 (N.D. Tex).